THE DURST FIRM
LEE H. DURST, Esq., SBN 69704
23 Corporate Plaza, Suite 150
Newport Beach, CA 92660
949-478-8388 – e-Fax 714-242-2096
Email:  lee.durst@gmail.com, manulegal@hotmail.com

LARRY ROTHMAN & ASSOCIATES, A P.L.C.
LARRY ROTHMAN, Esq. SBN 72451
City Plaza 1 City Blvd W #850
Orange, CA 92868
714-363-0220 – Fax 714-363-0229
**tocollect@aol.com**

Attorneys for PAUL PEJMAN EDALAT, an individual, OLIVA KARPINSKI, an individual, FARAH BARGHI, an individual, SENTAR PHARMACEUTICALS, INC., a Nevada Corporation, BLUE TORCH VENTURES, INC., a Wyoming Corporation, LIWA, N. A., a Wyoming Corporation

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT STATE OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| BRUCE CAHILL, an individual, Greg Cullen, an individual, Shane Scott, an individual and Pharma Pak, Inc. a California Corporation. | Case No.:    8:16-cv-00686-AG-DFM |
| | ANSWER TO FIRST AMENDED |
| Plaintiffs, | COMPLAINT BY PAUL EDALAT |
| vs. | |
| PAUL PEJMAN EDALAT, an individual, OLIVA KARPINSKI, an | |

1  individual, FARAH BARGHI, an

2  individual, SENTAR

3

4  PHARMACEUTICALS, INC., a

5  Nevada Corporation, BLUE TORCH

6
   VENTURES, INC., a Wyoming
7

8  Corporation, LIWA, N. A., a Wyoming

9  Corporation, SENTUS LAND

10
   MANAGEMENT, LLC, a Wyoming
11

12  Limited Liability Company,

13             Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANSWER**

Defendant **PAUL EDALAT** files this Answer with Affirmative Defenses to the First Amended Complaint filed by Plaintiffs **BRUCE EDWARD CAHILL, GREGORY DAVID CULLEN, SHANE RYAN SCOTT, and RONALD VENTURA FRANCO V.**

**PHARMA PAK, INC. is a company that Defendant EDALAT founded and put his assets into.  He presently owns a majority of the company's stock and he has not authorized, nor has the Board of Directors of Pharma Pak authorized this action.  Edalat will be filing a cross-complaint with this answer and will be seeking the return of the corporation to the actual shareholders and prosecuting an action against Cahill, Cullen, Scott, and Franco for theft of the corporate assets and breach of fiduciary duties by these Plaintiffs. Plaintiffs have filed this action in an attempt to intimidate Edalat and fellow defendants. Further, they are attempting to force Edalat to allow Plaintiffs' to get away with theft, embezzlement, and other fraudulent activities in order to cover their own actions.** Each paragraph in this Answer corresponds to the same numbered paragraph in the Plaintiffs' Complaint.

1. ADMIT

2. Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 2, and the fact that this paragraph is a

morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

3.  DENIED

4.  DENIED

5.  DENIED

6.  DENIED

7.  DENIED

8.  DENIED

9.  DENIED

10. DENIED

11. DENIED

12. DENIED

13. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 13, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

14. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 14, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

15. Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 15, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

16. Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 16, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

17. DENIED

18. ADMIT

19. DENIED ALL ALLEGATIONS EXCEPT THAT KARPINSKI IS A CITIZEN OF CALIFORNIA.

20. DENIED.

21. Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 21, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

22. Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 22, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

23. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 23, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

24. DENIED

25. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 25, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

26. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 26, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

27. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 27, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

28.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 28, thus this Answering Defendant therefore DENIES the allegations.

29.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 29, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

30.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 30, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

31.  DENIED

32.  DENIED

33.  DENIED

34.  DENIED

35.  DENIED

36.  DENIED

37.  DENIED. Plaintiffs' were well aware of Edalat's bankruptcy, as further described in Paragraph 6 of Defendant Edalat's Affirmative Defenses below. Not only was Plaintiff Cahill aware of Defendant Edalat's

personal bankruptcy, but Plaintiff Cahill further made an introduction to Counsel for Edalat. It Plaintiffs' that have committed RICO as will be shown in the Affirmative Defenses and the Cross-Complaint.

38.  DENIED

**39.  DENIED.**

40.  Admit that Cullen paid to Edalat $100,000 for a certain sum of Edalat's personally held shares on a $10,000,000 valuation of Pharma Pak, Inc., as approved by the Board of Directors and Plaintiff Cahill personally, and to Plaintiff Cahill a further $150,000 for a certain sum of Company held shares, for a total of 2.5% ownership in Pharma Pak, Inc.

41.  Admit that Scott and Scott's business partner Chris Campbell, paid to Edalat $500,000 for a certain sum of Edalat's personally held shares on a $10,000,000 valuation of Pharma Pak, Inc. as approved by the Board of Directors and Plaintiff Cahill personally, for a total of 5% ownership in Pharma Pak, Inc.

42.  Defendant Edalat has not - despite numerous formal and informal requests by both Edalat and Edalat's counsel - been given complete access to final copies of Pharma Pak, Inc. Books and Records, and thus has insufficient knowledge as to Plaintiff Franco's supposed investment in Pharma Pak, Inc., and if said investment was indeed completed. Edalat

is informed based upon belief that Franco received a certain percentage of Pharma Pak, Inc. stock directly from Plaintiff Cahill on a $10,000,000 valuation of Pharma Pak, Inc. Due to insufficient knowledge as to the details of Plaintiff Franco's investment, Answering Defendant therefore DENIES the allegations.

43. DENIED

44. DENIED. The "Pharma Pak, Inc. Chief Scientist", employed as the Chief Technical Officer, Dr. Ludwig Jan Weimann, has a documented history of manufacturing Tetrahydrocannabinol ("THC") containing products, including unapproved medical devices, and has access to multiple sources for procurement of said Schedule 1 drug. Further, Plaintiff Cahill, on February 22, 2016, attempted to induce fellow Defendant Karpinksi into unwittingly participating in an illegal cash transaction of product knowingly and illicitly produced by Cahill, Weimann and Aydinol before Karpinski's retaliatory termination on March 3, 2016.

45. DENIED.  At the time of initial filing of this complaint in April of 2016, and the filing of the First Amended Complaint in May of 2016, the Company was not insolvent. As of March 2016, Cahill and Plaintiffs fraudulently transferred the remaining Pharma Pak funds and assets to

other entities, and continued to use the Corporate bank account to

conduct transactions on behalf of their new entity, Life Tech Global LLC

(possibly doing business as Pharma Patch).

The only reason the Company is now insolvent is that Cahill and

Plaintiffs fraudulently transferred, embezzled, and otherwise mismanaged

Company funds. Further, Cahill, Cullen, Scott and Franco conspired to

transfer Company assets, accounts, and patents to their new entity Life

Tech Global, LLC, a Delaware Corporation.

46. Defendant responds to this paragraph with the same responses as in the

prior 1 thru 45 paragraphs.

47. DENIED

48. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 48, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

49. Defendant is without sufficient information to form a belief as to the

truth of the allegations in paragraph 49, and the fact that this paragraph is

a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

50.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 50, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

51.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 51, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

52.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 52, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

53.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 53, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

54.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 54, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

55.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 55, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

56.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 56, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

57.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 57, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

58.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 58, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

59.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 59, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

60.  DENIED

61. DENIED

62.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 62, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

63.  Defendant is without sufficient information to form a belief as to the truth of the allegations in paragraph 63, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

64.  DENIED

65.  DENIED

66.  Defendant responds to this paragraph with the same responses as in paragraphs 1 thru 65.

67.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

68.  DENIED

69.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

70.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

71.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

72.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

73.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

74.  DENIED

75.  Defendant responds to this paragraph with the same responses as in paragraphs 1 thru 74.

76.  DENIED

77.  DENIED

78.  DENIED

79.  DENIED

80.  Defendant responds to this paragraph with the same responses as in paragraphs 1 thru 79.

81.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

82.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

83.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph

is a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

84.  Defendant is without sufficient information to form a belief as to the

truth of the allegations in this paragraph, and the fact that this paragraph

is a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

85.  DENIED

86.  Defendant responds to this paragraph with the same responses as in

paragraphs 1 thru 85.

87.  Defendant is without sufficient information to form a belief as to the

truth of the allegations in this paragraph, and the fact that this paragraph

is a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

88.  DENIED

89.  Defendant is without sufficient information to form a belief as to the

truth of the allegations in this paragraph, and the fact that this paragraph

is a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

90.  Defendant responds to this paragraph with the same responses as in

paragraphs 1 thru 89.

91. DENIED. The "Chief Scientist", employed as the Chief Technical Officer of Pharma Pak, Inc., Dr. Ludwig Jan Weimann, was not terminated nor has he severed his employment as of June 1, 2016. On or about March 3, 2016 after termination of some Pharma Pak, Inc. employees by Plaintiff Cahill, Cahill's lackey Leslie Harold Wood, and a hereto unnamed "private investigator" employed by Cahill, Weimann was still present in the Pharma Pak, Inc. offices located at 17809 Gillette Avenue in Irvine, California, and was not terminated. Furthermore, Weimann was observed to be present in the building on subsequent days. On or about May 2, 2016 Weimann was observed outside the former Pharma Pak, Inc. offices at 17809 Gillette Avenue in Irvine, California, looking for a package delivered to Pharma Pak, Inc. at that address Attached as **Exhibit A** is a true and correct copy of the shipping label from Cattie Adhesive Solutions to Pharma Pak, Inc., attention Dr. Ludwig Weimann. On that date, there was evidence that mail had been stolen from the Gillette Avenue offices, and locks had been tampered with in an attempt to gain access to the building. There is currently an open investigation with the Irvine police department, case number 16-0500636. Attached as **Exhibit B** is a true and correct copy of the

responding police officer's business card, along with the incident number assigned to this investigation.

92.  DENIED.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

93.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

94.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.  Edalat does claim damages against these Plaintiffs which will be covered in the attached Cross-Complaint.

95.  Defendant is without sufficient information to form a belief as to the truth of the allegations in this paragraph, and the fact that this paragraph is a morass of unintelligible gibberish, thus this Answering Defendant therefore DENIES the allegations.

96.  Admit

97.  Defendant is without sufficient information to form a belief as to the

truth of the allegations in this paragraph, and the fact that this paragraph

is a morass of unintelligible gibberish, thus this Answering Defendant

therefore DENIES the allegations.

AFFIRMATIVE DEFENSES

FACTUAL BASIS FOR MOST OF THE AFFIRMATIVE DEFENSES SET

FORTH HEREIN:

1.  Plaintiffs' have named Defendant Edalat as Paul "Pejman" Edalat: a deliberate

attempt to confuse the record. Defendant Edalat's legal name is, and always has

been, Paul Edalat, as Plaintiffs' are well aware.

2.  Plaintiffs are attempting to conduct a campaign of slander against Edalat via the

Federal Courts, personal friends of Edalat's, and business associates of Edalat's.

3.  Plaintiffs' have named entities wholly unrelated to the Pharma Pak, Inc. venture

in an attempt to disadvantage and otherwise economically harm those entities,

and in an attempt to spin the facts of their own gross negligence, embezzlement,

and unlawful and fraudulent activities. Plaintiffs' naming of these entities is a

deliberate attempt to confuse the record;

a.  Sentar Pharmaceuticals has no relationship to Pharma Pak, Inc.,

Plaintiffs' are well aware of this fact.

      b.  LIWA N.A. has no relationship to Pharma Pak, Inc. Plaintiffs' are well aware of this fact.

      c.  Blue Torch Ventures has no relationship to Pharma Pak, Inc. Plaintiffs' are well aware of this fact.

4.  Plaintiffs' further construct fictitious entity names in order to deliberately confuse the record. There exists no such entities as "Edalat Family Trust" nor "APS Sciences".

5.  Plaintiffs also seem to be unable to keep their own facts straight, on one hand claiming that Edalat and Karpinski used the *Sentar Pharmaceuticals pending patents* to induce their investments into Pharma Pak, Inc., and on the other stating Edalat and Karpinski used the *Pharma Pak, Inc., patents* to induce their investment into Pharma Pak, Inc.

6.  That Plaintiffs' filed their initial Complaint on April 12, 2016, waited until May 16, 2016 to file a First Amended Complaint, and further did not properly serve Edalat until May 20, 2016, **despite** having frequent contact with Edalat's personal counsel on matters concerning Pharma Pak, is indicative of the malicious nature and intent of this Complaint.

      a.  Proof that Plaintiffs' counsel, John J. Markham was in contact with Edalat's counsel Lisa Salisbury of Salisbury Law Group well before the filing of this Complaint on April 12, 2016 is attached as **Exhibit C.**

i.   Markham and his client Plaintiff Scott attempted to induce Edalat into attendance at a meeting to discuss ongoing Pharma Pak, Inc. concerns on April 12, 2016. However, mere hours before the meeting was to take place, Plaintiffs' chose instead to file this Complaint under false pretenses.

7.   **That Cahill and Plaintiff's claim Edalat did not disclose his 2014 Bankruptcy is deliberately misleading based on the following facts:**

a.   Plaintiffs' claim to be savvy investors, and thus a perfunctory Internet search would disclose Edalat's bankruptcy, even if, as they claim, he had not.

b.   **Plaintiff Cahill was well aware of Edalat's bankruptcy**, **going so far as to offer to fund any bankruptcy related litigation, and introducing Edalat to the partners of prestigious Southern California law firm Hueston Hennigan LLP**, whom Edalat would go on to retain. Evidence of Cahill's knowledge is attached hereto as **Exhibit D, Exhibit E,** and **Exhibit F.**

c.   Edalat disclosed his bankruptcy to Plaintiff Scott, as they discussed other joint business ventures outside of Pharma Pak, Inc., and Scott had himself been through the bankruptcy process twice before in Utah (docket numbers 2:11-bk-20079 and 2:11-bk-23640).

d. Plaintiff Cullen and Plaintiff Franco were brought in to Pharma Pak by Cahill, and not Edalat, well after Cahill's knowledge of Edalat's bankruptcy. Edalat disclosed his pending bankruptcy litigation to both Plaintiffs in conversations leading up to their investments.

8. That Plaintiffs **disingenuously list Edalat's deceased brother's Ferrari as an asset of Edalat's**, disingenuously state that Edalat lied in Bankruptcy proceedings, and **maliciously list a bevvy of assets that are not owned by Edalat**, shows the lengths they are willing to go to perpetuate a falsehood upon the Court.

9. Plaintiffs' repeated characterization of Edalat as a 'fraud' may be construed as not only a deliberate and malicious attempt to interfere in Edalat's business and personal life, but is also indicative of attempting to use the judicial system as a way to protect themselves from charges of slander and libel.

**Cahill had been previously warned on two separate occasions by counsel from Manatt, Phelps, and Phillips to cease and desist from his libelous statements to third parties,** and chose instead to continue his baseless personal attacks on Edalat by contacting personal friends and business acquaintances of Edalat in an attempt to cause Edalat to react.

When Plaintiffs' realized Edalat and non-plaintiff shareholders would not back away quietly, they instead chose to file suit. True and correct copies of

communications from counsel Thomas Poletti of Manatt, Phelps, and Phillips are attached as **Exhibit G**

10. At the time of the Company's formation in January of 2015, Plaintiff Cahill, and non-plaintiff shareholder John Crowther, were both well aware of Edalat's personal financial situation.

  a.  As of approximately October of 2014, Edalat was in negotiations with interested third parties for further development of the 17809 Gillette manufacturing facility in Irvine, California. The facility held a valid Pharmaceutical Manufacturing license, a copy of which is attached as **Exhibit N**, and was ripe for a myriad of business activities. In fact, Cahill attended many meetings in Texas regarding such potential joint venture partners, including some of the largest pharmaceutical compounding operations in the United States. It was on Cahill's advice that Edalat did not partner with these third parties.

  Cahill, among other lulling statements made to Edalat, stated that since he (Cahill) was retired, he was looking for a secondary project to keep him (Cahill) occupied.

  Cahill, seeing the potential value of pharmaceutical compounding operations, induced Edalat to partner with Cahill himself in order to enter the pharmaceutical compounding space.

b. At this point in the Cahill and Edalat relationship, they had known each other socially for many years, through a trusted mutual friend. Cahill used his clout as a Board of Trustee member for various entities, his philanthropic endeavors, and references to his $38,900,000 "house on the hill" in Laguna Beach, the Cahill titled 'Villa de Sogni' mansion, as proof of his success and established business prowess. Edalat had no reason at this point to doubt Cahill's sincerity. It was only later that Edalat would come to realize the extent of Cahill's duplicity.

11. In February of 2015, Cahill and Crowther urged Edalat to sell Edalat's personal shares in the newly formed Pharma Pak, Inc. venture in order to raise needed personal funds for ongoing bankruptcy litigation. Cahill brought to the table multiple potential investors for Pharma Pak, Inc., including Plaintiffs Cullen and Franco.

12. In September of 2015, Cahill was actively soliciting further investors for the Pharma Pak, Inc. venture. In a text message dated September 24, 2015, Cahill stated to Edalat, "*Paul At lunch with investors about to make you rich*". Cahill goes on to say, "*There are a couple of doctors here in San Diego that are wealthy and just cashed out $100 meg* [sic] *on an IPO. Have taken a couple of companies through IPO. Bring money and expertise.* Furthermore, that **Plaintiffs' accuse Edalat and co-defendant Karpinski of working on both**

**Pharma Pak, Inc. and Sentar related matters is laughable.** Cahill's own text message from September 24, 2015 further states, "*Simple first. PharmaPak. Then discuss Sentar. Trying my best to solve our problems.*". A copy of this text message is attached herein as **Exhibit H.**

13. Cahill repeatedly stated to Edalat that Cahill himself did not have the liquidity needed to fund the venture, and that outside investors would need to be sought. However, as will be illustrated further, this was a **falsehood designed to fraudulently induce Edalat into diluting himself out of Pharma Pak, Inc., and to reduce Edalat's shareholder status in the Company.**

   a. Attached as **Exhibit I** is a true and correct copy of an email from Plaintiff Cahill to Plaintiff Cullen, also mistakenly sent to Edalat, on January 29, 2016, wherein Cahill clearly lays out how he planned to dilute Edalat from the Company in order to give himself a majority Shareholder position.

14. Cahill introduced plaintiff Gregory David Cullen to Defendant Edalat for investment into Pharma Pak, Inc.

   a. Plaintiff Cullen received due diligence documents on Pharma Pak, Inc., including projections, from Pharma Pak, Inc. "Chief Financial Officer" Leslie Harold Wood on or about August 24, 2015. Attached as **Exhibit J**,

is a true and correct copy of the communication between Wood and Cullen regarding Pharma Pak, Inc.

b. In a September 14, 2015 text message from Cahill to Edalat, Cahill states, in part, "*Glad you and Greg could work it out. He will be a great partner.*" Furthermore, in a follow up September 17, 2015 text message from Cahill to Edalat, Cahill states, "*Call Greg He's in but just wants to make sure all the documents are in order. Greg will be like John Crowther, provide funding without second guessing all of our decisions.*" In essence, Cahill was actively seeking to fill the investor roster with those he knew would not interfere with daily operations or Cahill's mis-management of Pharma Pak, Inc. A copy of these text messages is attached herein as **Exhibit K** and **Exhibit L**, respectively.

c. In an October 10, 2016 text message from Plaintiff Cahill to Edalat, Cahill stated, in part, "*just finished with Greg He is still back east. Returning tomorrow I think he can come up with $250k next week,*" and "*Hope you can Close* [sic] *the deal Paul*". This message is attached herein as **Exhibit M.**

d. Plaintiff Cullen purchased a quantity of Edalat's personal shares, and a quantity of Company held shares for a total of 2.5% of Pharma Pak, Inc. shares on or around October 2015. Plaintiff Cullen paid to Edalat

$100,000 for Edalat's shares, and paid to Plaintiff Cahill a further $150,000 for the remaining shares. Plaintiffs' allegation that Cullen gave to Edalat personally $250,000 is a blatant falsehood.

15. Cahill introduced plaintiff Ronald Ventura Franco to Edalat and Pharma Pak, Inc. Franco purchased his shares directly from the corporation on or around October 2015. Edalat is informed based on belief that Plaintiff Franco paid to Plaintiff Cahill directly monies for his certain percentage in Pharma Pak, Inc.

16. Plaintiff Scott, Scott's business partner Chris Campbell, and Scott's trust EL-1 Trust purchased a quantity of Edalat's personal shares on or around November 2015. True and correct copies of the communication regarding this purchase is attached as **Exhibit N.**

    a.  Furthermore, as part of his investment discussions with Edalat, Scott made statements to Edalat regarding the success of his ongoing multi level marketing and distribution businesses in the dietary supplement sector. Knowing of Edalat's nearly three decades of experience in the dietary supplement industry, Scott found Edalat's contacts and knowledge to be a valuable asset for his operations, and attempted to leverage this in order to acquire Edalat's rolodex of contacts.

    b.  Scott, along with Scott's attorney Matthew Starley, conceived an idea to create a company with Edalat that would acquire various brands in the

dietary supplement sector.

Scott attempted to induce Edalat to introduce Edalat's wealthy friends and contacts to Scott for investment in this new venture named Maybach. In early January 2016, Scott's assistant was soliciting information from Edalat in order to put together an Executive Summary for the newly formed Maybach corporation. **Edalat was promised 50% of this new venture**. To date Edalat has received no information regarding Maybach, no corporate documents, and none of the marketing materials Scott implied he was creating.

c.  Scott further intended to induce Edalat into investment in Scott's so called 'church', a money laundering scheme utilized by Scott and his partners in order to avoid paying taxes. Scott had, in passing, made reference to this so called Church as located in the State of Georgia.

17. At the time of Shareholders' collective initial investments, Cahill was said to have secured certain patent rights from Weimann, the Chief Technical Officer of the Company. As part of his employment, Weimann was to develop certain patents for Pharma Pak, Inc.

i.  Weimann and Cahill further conspired to place patent applications for illicit substances under Edalat's name in order to hide the true originator of the patents.

  ii. Weimann and Cahill are currently conspiring, as of June 2016, to reassign patents otherwise belonging to Pharma Pak, Inc.

  iii. It was the promise of these certain Pharma Pak, Inc. patents that caused Edalat and other investors to continue funding Pharma Pak, Inc. operations.

18. Plaintiff Cahill had induced Edalat to allow him to become CEO and President of Pharma Pak, Inc., by promising to leverage his various contacts acquired over the decades.

 a. One such person Cahill courted for Pharma Pak, Inc. was Dr. Elizabeth M. Hagerman, a former fellow Trustee of Rose-Hulman Institute of Technology with Cahill. Cahill stated that Hagerman, a former Baxter Healthcare executive, would be interested in joining the Board for Pharma Pak, Inc.

  i. Cahill brought Hagerman to the Pharma Pak administrative offices at 17802 Sky Park Circle, brought Hagerman to the 17809 Gillette Ave manufacturing facility, and also flew to Indianapolis to visit Hagerman.

 b. Another individual Cahill sought to bring in for Pharma Pak, Inc. was Associate Professor of Pharmaceutical Sciences at the University of

California at Irvine Mahtab Jafari. Attached as **Exhibit O** is a copy of Cahill's October 11, 2015 text message.

   c.  Cahill stated in various meetings for Pharma Pak, Inc., that his contacts spanned the Pharmaceutical and Technology industries, and that he would fill the Board of Directors with notable names. However, to date Cahill had failed to bring any of these individuals on for Pharma Pak, Inc.'s benefit.

19. Plaintiffs fraudulently and maliciously claim that Sentar Pharmaceuticals is a successor corporation to Scilabs Nutraceuticals, which is not only a blatant falsehood, but intended to interrupt and otherwise materially disadvantage future business of Sentar Pharmaceuticals.

   a.  Plaintiff Cahill is well aware that Scilabs Nutraceuticals, Inc. had no relationship to Sentar Pharmaceuticals nor any other Edalat entity. Furthermore, Cahill was entirely aware of the developing FDA concerns, and of its resolution. As an example of proof of such knowledge find attached as **Exhibit P**, a true and correct copy of an email from Edalat to Cahill regarding the matter, and Edalat's full disclosure of the situation.

   **b.**  Plaintiff Cahill had been involved with multiple conversations concerning the Scilabs Nutraceuticals, Inc. and Scilabs Pharmaceuticals (a DBA of EFT Global Holdings) distinction, including conversations

with Food and Drug Administration counsel Stephen Cook at Brown Rudnick, LLP. Attached as **Exhibit Q** is just one such example.

In fact, Cahill urged Edalat *on multiple occasions* to change the original name of Scilabs Pharmaceuticals **to avoid the very confusion Plaintiffs attempt to capitalize on.**

c.  Plaintiff Cahill was fully aware that EFT Global Holdings dba Sentar Pharmaceuticals sought to **formalize** the Sentar Pharmaceuticals name in preparation for potential future business endeavors including investment, potential IPO, and finalization of the Sentar patents.

   i.  As Plaintiffs' have made apparent, their lack of due diligence, and desire to confuse the record, is profound. While Sentar Pharmaceuticals, Inc. is registered in Nevada, no operations have moved to Nevada, no business takes place in Nevada, and furthermore the registration was nothing more than reservation of the Sentar Pharmaceuticals name.

d.  Plaintiff Cahill, used his long standing corporate experience, and leveraged his existing Board of Trustees positions with the University of California at Irvine, Rose-Hulman Institute of Technology, the Oceania Institute, and other institutions, to induce Edalat into allowing Cahill to

become an 'advisor' to Edalat in regards to Sentar's development, among other things.

e.  At the time Cahill stepped in to advise Edalat on Sentar related matters, Sentar was in the preliminary stages of potential Initial Public Offering conversations. Cahill attended many of these meetings in the guise of advisor to Edalat.

f.  Plaintiff Cahill gave instrumental input to Defendant Barghi in regards to EFT Global Holdings dba Sentar Pharmaceuticals related marketing materials from on or around February 2015 through approximately November 2015. These marketing materials included the Sentar Pharmaceuticals Website Plaintiffs' quote in their First Amended Complaint.

20. Plaintiffs fraudulently and maliciously claim that the Sentar Pharmaceuticals patents are illegitimate, and that work on patent related matters for Sentar Pharmaceuticals had ceased. **They know this to be untrue.** In fact, the patent has moved to advanced stages of inspection by those countries IP protection has been applied for. Furthermore, Cahill was updated on the patent process, and in communication with Sentar patent attorney Peter Gluck, formerly of Brown Rudnick LLP, at least through December 2015. Attached as **Exhibit R** is one such example of Cahill's communication with Sentar attorney Gluck. Plaintiffs

have made this claim in an attempt to disadvantage and otherwise thwart Sentar's current business, and have in fact materially economically damaged Sentar Pharmaceuticals with the filing of this malicious complaint.

21. **Plaintiffs are well aware that a valid pharmaceutical processing license existed for the 17809 Gillette facility, a copy of which is attached herein as Exhibit S.** A copy of this license was, until at least January 2016, physically present on the wall at the 17809 Gillette facility. The license did not expire until February 13, 2016, and was, even with the FDA consent decree, able to be utilized until such time that Pharma Pak obtained its own licensure.

22. **Plaintiffs are well aware that it was Cahill's complete and utter refusal to obtain necessary licensure on the 17809 Gillette Avenue facility that lead to the lack of finalized purchase orders. Cahill's repeated statements that "I've got this buddy" and "it's being handled" were lulling, and induced Edalat to otherwise believe that Cahill was handling the necessary applications,**

   a. Pharma Pak employees were, as early as February of 2015, actively seeking information on, and gathering documentation for, appropriate licensing for the 17809 Gillette facility. At the time of Karpinski's hire in June of 2015, repeated requests for Cahill's input and signature had already been made. A multitude of supporting documents in this regard

have been submitted for the Court's review under Defendant Karpinski's Answer to the First Amended Complaint, Docket Number 29 in this case. In the interests of conserving the Court's time, Defendant Edalat does not reincorporate those Exhibits in Edalat's Answer.

23. Plaintiffs are well aware that it was Cahill's own personal counsel, Timothy Balog of Balog & Rasch LLP, that incorporated the Pharma Pak name on or around February 10, 2015, and further that Balog's office controls the Books and Records of the entity.

   a. Attached as **Exhibit T** is a true and correct copy of the Articles of Incorporation of General Stock Corporation filing with the California Secretary of State. Furthermore, attached as **Exhibit U** are true and correct copies of the founding Articles of Incorporation of Pharma Pak, Inc. listing Edalat as Secretary of the Corporation.

   b. Without Shareholder approval, and unbeknownst to Edalat and the other Shareholders, Cahill and Leslie Harold Wood filed a Statement of Information with the California Secretary of State on April 1, 2015, removing Edalat as Secretary, and placing Wood as both Secretary of Pharma Pak, Inc., and Chief Financial Officer. A true and correct copy of this document is attached as **Exhibit V**.

c. Unbeknownst to Edalat, Cahill utilized this document to remove Edalat's name from the corporate bank account. Given Cahill's long standing relationship with First Foundation Bank in Newport Beach, California, as both a retail banking customer, and a Trustee at the University of California, Irvine, Cahill was able to use this relationship to improperly remove Edalat's name from the Pharma Pak, Inc. corporate bank accounts without notice to, or approval of, the Pharma Pak Board of Directors or Edalat himself.

Cahill had, on many previous occasions, boasted about his relationship with the First Foundation Bank CEO. It is also believed that Cahill utilized the services of Assistant Vice President Kyle Auslander and Universal Banker Claudia "Isela" Esquivel for his fraudulent transactions.

d. Attorney Balog failed to conduct appropriate and timely Shareholder meetings, failed to keep updated and complete copies of records, failed to circulate copies of relevant documents altered by Cahill, and neglected to keep shareholders informed of their rights pertaining to inspection of such records, at the direction of Plaintiff Cahill.

In fact, Plaintiff Cullen noted the sloppy recordkeeping practices of Cahill and Counsel in an email dated September 18, 2015 to both Cahill

and Edalat regarding his investment and involvement in Pharma Pak, Inc.

Attached is a true and correct copy of this email as **Exhibit W.**

24. Plaintiffs repeatedly accuse Edalat of illicit visits to Las Vegas, when in fact they were well aware of Edalat's presence at meetings in Las Vegas to further Pharma Pak, Inc. business. Attached as an example of Plaintiffs' knowledge as **Exhibit X** is a copy of Cahill's October 19, 2015 text message to Edalat stating, in part, "*Paul Stay in Vegas and keep everything moving there.*"

25. Plaintiffs repeatedly accuse Edalat and Karpinski of misusing Company funds for personal enrichment, despite being aware of the following facts:

    a. Neither Edalat nor Karpinski had access to the Corporate bank accounts, all reimbursements to both parties were approved by Cahill and further signed for by Pharma Pak, Inc., "Chief Financial Officer" Leslie Harold Wood, a long time lackey and employee of Cahill's.

    b. The venue of Las Vegas, Nevada was a convenient middle point between Scott's location in St. George, Utah, and the Pharma Pak, Inc. offices in Irvine, California. Due to frequent travel to the city, and with the intention of overseeing operations at the new Sentus facility at 1850 Whitney Mesa in Henderson, Nevada Edalat personally rented an apartment on the Las Vegas Strip. Plaintiffs' were all frequent guests, and used the apartment at any time they wished.

c.  Cahill, and his son Brent (employed by Pharma Pak, Inc. as a financial analyst) used the cover of Company funded meetings in Las Vegas as unauthorized, *Company funded*, vacations.

On or about June 1, 2016, at a Pharma Pak, Inc., meeting in Las Vegas, Cahill brought with him a Dr. Stefanie Bernritter Kleine or, "Dr. K", whom Cahill stated held three PhD's from the University of California, Los Angeles, the University of Chicago, and Pepperdine University. Attached as **Exhibit Y** is a screen shot of Bernritter-Kleine's public Facebook.com profile. **Exhibit Z** is a true and correct copy of Cahill's email to Edalat dated February 18, 2016 wherein Cahill states that "Dr. K" was a neurological expert, and actively working with the National Football League conducting concussion research, and further that "Dr. K" was a well respected researcher for children's brain issues. (It would later be discovered that Kleine holds no such credentials.) Attached as **Exhibit AA** is a a copy of Kleine's LinkedIn.com account, and as **Exhibit BB** a copy of Kleine's Curriculum Vitae as posted to her website workingmindscoaching.com

Despite Cahill's statements, and insinuations that Kleine would be acting in an advisory capacity to Pharma Pak, Inc., at no time was "Dr." Kleine involved in furthering Pharma Pak, Inc. business opportunities despite

her presence at these meetings.

In fact, Cahill referred to Kleine as his "assistant" in the presence of potential Company partners, allowed her to attend confidential meetings, discussed with her confidential Company information, and further had Kleine accompany him on a trip to the Crazy Horse III, a famous Las Vegas adult entertainment establishment. Cahill, in an unauthorized use of Company funds, paid for her travel and meals, and allowed Kleine to charge spa services to Company funded suite at the Wynn Encore Hotel in Las Vegas, Nevada. Attached as **Exhibit CC** is a screen shot of Kleine's own social media page, placing her at the Encore the same weekend as Cahill, with a picture of the suite Edalat provided for Cahill's use.

    i.  Cahill's pattern of extramarital affairs, and sexual harassment of women, only became apparent to Edalat towards the end of 2015, when he began to have more personal conversations with Cahill associates, including Cahill's wife, Karen Jane Cahill (nee Grobba). Grobba-Cahill conspired with her husband to lull Edalat into further investments of monies and resources into Pharma Pak, Inc. for her own benefit.

ii.  Despite his close professional relationship with Defendant

Karpinski, Edalat was unaware that Cahill had been harassing

Karpsinki since her hire.

d.  Defendant Scott was also present at many Pharma Pak, Inc. related

meetings in Las Vegas. Scott, usually accompanied by females he passed

off as his assistants, would drink heavily, and was known to take these

assistants back to his Company provided hotel rooms, or on excursions to

local adult entertainment establishments.

One such assistant, by the name of Ramon Sekhon, accompanied Scott

on at least two visits to Las Vegas. Sekhon's own social media put her in

the same hotel as Scott the same weekends as Company related meetings.

Attached as **Exhibit DD** are Sekhon's own photographs with locations

placing Sekhon at the Wynn Encore Hotel in Las Vegas Nevada the same

weekend as a Company meeting with Plaintiff Scott.

e.  Both Plaintiff Cahill and Plaintiff Scott were known to drink excessively,

with Scott frequently becoming inebriated and running up large tabs

during Company dinners.

f.  **In fact,** thousands of dollars of reimbursements remain outstanding to

Edalat, who not only paid for many of these business related dinners, but

used his own personal 'comps' in Las Vegas to obtain suites for Plaintiff Cahill, Plaintiff Scott, and their various guests.

26. Plaintiffs fraudulently state that Edalat, and co-defendant Barghi, created and maintain Sentus Land Management, the operating company holding title to the property at 1850 Whitney Mesa Drive in Henderson Nevada. Cahill himself was heavily involved in the negotiations for purchase of the 1850 Whitney Mesa property, but also the development of potential business opportunities in the building.

Proof that Plaintiffs are fully aware of the true owners and incorporators of Sentus is attached as **Exhibit EE**. Furthermore, Plaintiffs have had ample access and opportunity to inspect the 1850 Whitney Mesa Drive property, and are fully aware that it is, and always has been, unoccupied. In fact, Defendant Edalat and Defendant Barghi have performed thousands of dollars of uncompensated renovation work within the building.

27. Plaintiffs' are aware that Defendant Cahill had, for personal gain, otherwise abused his position as CEO at Pharma Pak, Inc., to pay for personal expenses, including a fraudulent forged lease, fraudulent salary to himself, conspiracy with Wood to defraud the lessor of the manufacturing facility and utility companies, and embezzlement from the Corporate bank account. These items were discovered in or about January 2016 by non-plaintiff shareholder Amir

Asvadi. It was also around this time that Edalat discovered Plaintiffs Cahill,

Cullen, Scott, and Franco, were actively conspiring to remove Edalat from

Pharma Pak, Inc.

a.  Plaintiff Cahill forged Defendant Edalat's signature on a lease between a

"Scilabs Pharma, Inc." and Kira Investments LLC – a Cahill family

entity-  for office space at Kira Investments owned property 17802 Sky

Park Circle in Irvine, California. A true and correct copy of this forged

lease is attached as **Exhibit FF**. Kira Investments is a defunct entity in

the State of California: attached as **Exhibit GG,** is a copy of the

California Secretary of State's website illustrating this fact.

i.  Edalat only became aware of the existence of this lease in or

around January of 2016 during a Shareholder meeting. Plaintiff

Cullen sent a copy of this lease to non-plaintiff shareholder Amir

Asvadi on February 20, 2016. A copy of Cullen's email is attached

as **Exhibit HH.**

ii.  According to public tax records, Cahill and the Cahill Family Trust

along with Cahill Bruce E. Family Trust used this lease document

in or about March 2015 as part of a loan application with First

Foundation Bank for $5,000,000 against the property located at

1330 Moorea Way in Laguna Beach, California, APN 641-491-03 and 641-491-02.

iii. Cahill has a longstanding relationship with First Foundation Bank as both a retail banking customer and as Trustee of the University of California at Irvine. Cahill may have leveraged his position as Trustee in order to gain favors from First Foundation Bank.

iv. On February 17, 2016 Plaintiff Cullen emailed a copy of a Microsoft Excel spreadsheet to all Pharma Pak, Inc., shareholders. A copy of this email is attached as **Exhibit II**.

   1. The subject forged lease is dated January 1, 2015.

   2. Kira Investments did not begin taking payments from Pharma Pak, Inc. until approximately August of 2015.

   3. Kira Investments took payments until February of 2016.

   4. In total Kira Investments took over $31,000 in 7 rent payments from Pharma Pak, Inc. in addition to over $35,000 in security deposits and payments that are unaccounted for. A screenshot detail of the document provided on February 17, 2016 by Plaintiff Cullen is attached as **Exhibit JJ**, and illustrates the payments made by Pharma Pak, Inc. to Kira Investments, LLC for the supposed lease. No accounting

exists for those monies removed by Cahill directly from the Pharma Pak, Inc. bank account.

v. Defendant Edalat, knowing that he did not sign said lease with Kira Investments, immediately sent a copy of this lease to a hand writing analysis expert, Phil Sprague.

Sprague's credentials included over 5,000 criminal and civil trials as an expert witness for a multitude of law enforcement agencies, including the FBI. Sprague's analysis concluded that Edalat's signature on the Kira Investments lease was a forgery, and this assessment is attached as **Exhibit KK.**

vi. Edalat is informed based on belief that Kira Investments is the vehicle through which Plaintiff Cahill funnels monies to his daughter, Kira Cahill. Plaintiff Cahill had previously made statements in late 2015 to Edalat and others that his daughter had "blown through" over $100,000 in less than three months due to her "Hollywood lifestyle". Furthermore, Plaintiff Cahill had alluded to Cahill's ongoing narcotics habit. Cahill frequently called Plaintiff Cahill asking for money, and Kira Investments was a convenient way to surreptitiously provide funding for Cahill's lifestyle.

   b.  Cahill paid to himself, without Shareholder approval, or notice to other

       shareholders, a salary of $20,000 per month.

   c.  Cahill paid personal expenses through the Pharma Pak, Inc. bank

       account, including but no limited to personal credit card payments, and

       reimbursements.

   d.  Cahill, without notice to shareholders, conducted two transactions below

       the $10,000 threshold at First Foundation Bank in an attempt to evade

       required reporting for cash transactions over $10,000.

   **e.  Cahill deliberately conspired with Wood to defraud Olen**

       **Corporation, the lessor of the 17809 Gillette Avenue manufacturing**

       **facility by failing to pay rent for the months of February and March,**

       **without notifying Olen of lease termination, or notifying the other**

       **shareholders, including Edalat. Given his long standing relationship**

       **with Olen Corporation, Edalat was personal guarantor on this**

       **property lease.**

   **f.  Cahill deliberately conspired with Wood and failed to pay invoices**

       **due to vendors, utilities, and contractors in an attempt to saddle**

       **Edalat with the impending debt on the 17809 Gillette property.**

**28.** Plaintiff Scott, made lulling statements to Edalat that he "sided" with Edalat in

the ongoing dispute with Cahill, going so far as to call Cahill "bipolar", a

"narcissist", "seriously manipulative", and questioning if Cahill was using the illicit Tetrahydrocannabinol "THC" patches made by Dr. Ludwig Weimann, during a phone call with Edalat and others. Scott repeatedly stated that he would assist Edalat and non-plaintiff Shareholders in regaining control of Pharma Pak, Inc., and that his existing companies were the perfect model of distribution for Pharma Pak, Inc. products.

a. A series of text messages between Scott and Edalat in early February 2016 illustrate Scott's attempts to earn Edalat's trust, and thus retrieve sensitive and confidential data from Edalat.

   i. Scott's February 1, 2016 text message read, in parts "*I am really grateful for the opportunity to work with you,*" "*your* [sic] *loaded with gifts bro,*" "*You have made a lot of money because its* [sic] *a direct result of who you are. I could throw you in a pile of shit and you would come out smelling like a rose. I may not be good at the tables in vegas* [sic] *but I am good with people. My money is on your* [sic] *bro.*". A copy of this message is attached herein as **Exhibit LL.**

   ii. In a February 4, 2016 text message to Edalat, Plaintiff Scott states to Edalat that Matthew Starley, Scott's counsel, advised that Edalat should revoke his signatures on documents recently signed by

Edalat for Pharma Pak, Inc. Attached herein as **Exhibit MM** is a copy of this text message.

iii. A further message from Scott in the same chain goes on to say that "*People like Bruce think everything is real so they take everything personal and constantly feel threatened,*" and "*...by allowing Bruce to feel like he is winning the game when in fact he is playing the game exactly the way the conscious person is dictating.*" Scott further went on to state that "*Paul from day one I could tell that you knew that life is a game. That's what make* [sic] *you powerful.*" A copy of this message is herein attached as **Exhibit NN.**

b. **Scott manipulated Edalat into allowing Scott access to Edalat's counsel, Lisa Salisbury, and all legal strategy, and further shared this information with his fellow Plaintiffs.** Scott never intended to engage Edalat's counsel, and only made false statements to Edalat in an attempt to glean information in a long planned conspiracy with co-plaintiffs. As of June 2016, Scott is actively participating in the Life Tech Global LLC venture with Cahill and Plaintiffs.

29. Plaintiff Cullen repeatedly stated to Edalat and other shareholders that Cullen would step in as interim "Chief Financial Officer" in order to sort out not only

the financial affairs of Pharma Pak, but assist in placing a proper valuation on the Company. Cullen took the lead in collecting missing corporate documents in a February 2, 2016 email to Pharma Pak, Inc. counsel Timothy Balog. Furthermore, Cullen agreed with non-plaintiff shareholder Amir Asvadi that the Company and fellow shareholders would not be held liable for, nor be liable for defense against, any misdeeds by Cahill. A true and correct copy of Asvadi's email dated February 11, 2016 is attached herein as **Exhibit OO.** A true and correct copy of Cullen's email stating "*No shareholder should have to defend a CEO for wrong doing.  I agree*" dated February 11, 2016 is attached as **Exhibit PP.**

30. In or about February 2016, Karpinski and other employees discovered Cahill, Cullen, Scott, and Franco had conspired with Dr. Weimann and Ertan Aydinol, to produce, among other things, illegal Tetrahydrocannabinol "THC", a Schedule 1 drug, at the Gillette Avenue facility, despite the lack of appropriate licensing. After learning of this, Karpinski notified Edalat, who upon consultation with the FDA, FDA counsel, and FDA consultants among others, informed the Irvine Police Department. Upon their investigation at the 17809 Gillette Avenue facility, the responding IPD officers noted that the stash of Tetrahydrocannabinol ("THC") containing products found within the building was the largest they had seen to date. There is currently an open investigation

with the Irvine Police Department, Case number 16-3257, assigned to Detective Grange. Attached as **Exhibit QQ** is a true and correct copy of the Irvine Police Department business card with the pending investigation case number.

31. That same week, Dr. Weimann informed Plaintiffs, that the Irvine Police Department had removed the THC from the 17809 Gillette facility building, upon discovering this fact, Cahill fired *some*, but not all, of the employees in retaliation against Edalat. These employees have filed a wrongful termination claim against Cahill and Plaintiffs'.

32. On March 3, 2016, Cahill, Wood, and the unnamed "private investigator" told Defendant Karpinski that a "majority shareholder's vote" had dissolved the corporation.  **No such vote had taken place.** In fact, Edalat's counsel, Thomas Poletti of Manatt Phelps Phillips, warned Cahill in a letter dated March 4, 2016 not to proceed with this course of action. Attorney Poletti's letter further requested access to applicable Books and Records for the Company, which were never provided. Attached as **Exhibit RR** is a copy of the letter addressed to Cahill from Manatt, Phelps, Phillips.

33. Cahill, Wood, and Cahill's unnamed "private investigator" told the manufacturing employees that "[Edalat's] actions" had caused them to be fired, and that Pharma Pak was being shut down. Employees harassed and threatened with legal action include: Olivia Karpinski, Luis Navarro, Jesse Suarez, Luz

Navarro, Alonso Navarro, Alex Rosales, and Martin Garcia. These employees were specifically targeted due to their relationship with Edalat. In addition to this, these employees were wrongfully terminated in direct retaliation for reporting the illegal activities of Cahill, Weimann, and the other Plaintiffs:

34. Cahill damaged the Company materially by hiring employees, and contractors, with questionable backgrounds, without performing necessary due diligence or full disclosure to Shareholders:

 a. Dr. Ludwig Jan Weimann, Chief Technology Officer hired on or about June 2015: An expert in transdermal patch delivery systems, Weimann had formerly worked at an unlicensed transdermal patch research and manufacturing facility in San Diego, California, illegally producing Tetrahydrocannabinol "THC", Cannabidol "CBD", and other medical marijuana related patches and unregistered, unapproved, medical devices. Weimann possessed a California medical marijuana card, and obtained samples of THC among other illicit substances through his pre-existing relationships in the marijuana industry; attached as **Exhibit SS** are examples of Weimann's use of cannabinoid, "CBD", and history of contacts within the marijuana industry.

 i. Weimann was paid a salary of approximately $93,000 per year, including benefits such as lease payments on a BMW 328i.

 ii. Weimann was to produce for Pharma Pak, Inc. a series of patents for among other things, transdermal patches. Weimann, in a move calculated to secure his employment contract and full benefits, stated that he owned these patents, however, this was a fraudulent statement.

 iii. Weimann and Cahill further conspired to place patent applications for illicit substances under Edalat's name in order to hide the true originator of the patents.

 iv. Weimann and Cahill are currently conspiring, as of June 2016, to reassign patents otherwise belonging to Pharma Pak, Inc.

 v. It was the promise of these certain Pharma Pak, Inc. patents that caused Edalat and other investors to continue funding Pharma Pak, Inc. operations.

b. Mark John Erfurt, Information Technology Consultant engaged at the formation of the Company in February 2015: Erfurt has a criminal history for hacking, and unauthorized access into computer systems of a Cahill competitor in 2003. Furthermore, Erfurt had been convicted of obstructing an FBI investigation in order to protect Cahill and his

company, Centaur Corporation, and sentenced to five months'

imprisonment as well as five months' house arrest and three years'

probation. A true and correct copy of the Department of Justice press

release dated August 31, 2004, and an article concerning the incident

dated December 1, 2004 are attached as **Exhibit TT.** This had not

been disclosed to Edalat or the other shareholders and employees of

the Company. Erfurt was given full access to employee computers,

employee passwords, confidential Company information, given false

reimbursements, and exaggerated compensation. As of February 2016,

Erfurt was paid in excess of $26,000 through his company Tec-in-a-

Sec, which holds no business license in Irvine, California, for

management of a pre-existing computer network encompassing fewer

than 7 full time users.

***Furthermore, Erfurt has destroyed vital company records, including***

***electronic mail belonging to Defendants', and stolen non-Pharma***

***Pak, Inc. servers and computer systems from the 17809 Gillette***

***Facility. Erfurt has also removed and potentially destroyed the pre-***

***existing video surveillance system present in the 17809 Gillette***

***Avenue facility.***

c.  Ertan Aydinol, Vice President of Manufacturing hired on or about December 2015: Aydinol formerly worked with Weimann at the unlicensed patch facility in San Diego, and at the time of his hire was spending a majority of his time travelling between the United States and Turkey, where his father purportedly owns a manufacturing facility. Unbeknownst to Edalat, Karpinski and the other shareholders and employees, but known to Cahill, Aydinol had previously been investigated by the FBI for suspected bomb making activities. Although the FBI could not conclusively prove Aydinol's participation in illegal activities, he was banned from "owning certain items". Aydinol, despite not having performed any work for the Company, was awarded a base salary of $165,600 annually, plus full benefits and full commission. A true and correct copy of Aydinol's unsigned employment agreement is attached as **Exhibit UU.** Aydinol had stated to Cahill that he had been making "over $10,000 a month" at his former employer; however, Cahill never did his due diligence, and it came to light that Aydinol's actual previous salary was a fraction thereof, and Aydinol's statements were purposefully fraudulent and misleading.

Most recently, Aydinol has been arrested for DUI and possession

related charges for amphetamines in Boulder, Colorado, where it is believed he currently resides. A true and correct copy of Aydinol's arrest record and accompanying toxicology report is attached as **Exhibit VV**

As of February 2016, Aydinol was paid bonuses and advances for manufacturing in excess of $38,000, not including cash removed from the Pharma Pak, Inc. bank account under the guise of manufacturing payment.

d.  Leslie Harold Wood, controller, hire date unknown: Wood is a long time employee of Cahill's, and by his own admission controls the accounting for many of Cahill's entities, including Kira Investments (aka Kira Invest), the Cahill Family Trust, Centaur Corporation, Centaur Sales, the Bruce E. Cahill Family Trust, and other as to yet unknown entities thought to total approximately 9 entities, as according to Wood himself. Wood was given an initial $1,800 per month salary by Pharma Pak, that was then, without approval or proof of an employment contract, raised to an annual salary of $90,000. Wood controls and maintains the books and records, including accounting, for Cahill's various operations and shell corporations,

signs all checks, orders supplies for these operations, and oversees the movement of money between Cahill's various bank accounts.

**i. Wood deliberately conspired with Cahill for failure to pay the lease payments at 17809 Gillette Ave for February and March of 2016, and failure to pay thousands of dollars in invoices to utilities and service providers.**

1. Wood failed to notify shareholders, or the lessor of 17809 Gillette Avenue that he did not intend to further pay payments on the property, *knowing that Edalat was personal guarantor on the Pharma Pak, Inc. lease on the property*.

   **a. At the time of the firing of Employees there existed enough funds in the First Foundation Bank account to pay the due lease payments and utility bills. Wood deliberately paid Erfurt, among others, the remaining monies in an attempt to drain the bank account.**

e. All four of these employees are currently employed by Life Tech Global LLC (possibly doing business as Pharma Patch), the successor corporation for Pharma Pak.

35. Cahill repeatedly and deliberately sabotaged Pharma Pak, Inc. and conspired with fellow plaintiffs Cullen, Scott, and Franco to defraud Edalat and other investors in the Company, for their own gain, and to remove assets of Pharma Pak Inc., including investor monies. Examples of these acts include but are not limited to:

    a. Deliberate circumvention of Federal law in order to circumvent legal reporting requirements for cash withdrawals over the $10,000 reporting limit; in other words, structuring.

    b. Failure to obtain necessary licensure on the 17809 Gillette Avenue manufacturing facility in Irvine, California.

    c. Deliberate delay in engagement of necessary consultants and contractors to obtain the aforementioned licensure.

    d. Deliberate circumvention of State and Federal law to produce illicit medical marijuana patches, including those containing Tetrahydrocannabinol "THC" and Cannabidol "CBD".

        1. Cahill had been warned by many industry experts and advisors not to produce these items in an unlicensed facility, yet proceeded to do so.

    e. Deliberate circumvention of State and Federal law to produce unlicensed medical devices in the form of transdermal patches, and other items.

f.  Further, while Edalat was overseas, in a self-styled "clandestine" operation at Weimann and Aydinol's former employer in San Diego, Cahill ordered the production of illicit THC and CBD containing patches. In order to preserve the Court's time, the entirety of these conversations have not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit U*.

i.  Cahill paid to Aydinol a sum in excess of $19,000 for this illicit production, in cash withdrawn from the Pharma Pak bank account on or around December 7, 2015. A photograph of which Aydinol messaged to Karpinski on December 11, 2016 at 4:52 PM under the heading *"This is how I do business with Bruce…:) LOL"*.

Location data of the photograph puts Cahill and Aydinol in La Jolla, California, near the site of the unlicensed manufacturing facility. This photograph depicts the interior of Cahill's late model Jaguar, with Cahill holding stacks of $100 dollar bills in his hands, and stacks of $100 dollar bills placed on the center console. It is believed that Aydinol and Cahill kept the cash. A true and correct copy of this photograph, along with the

accompanying text message, are attached hereto as **Exhibit WW**

    ii.  On around February 22, 2016, Cahill attempted to induce Karpinski into selling these patches by accepting cash in exchange for delivery of illegal materials. Believing this to be a set up, and a criminal act, Karpinski refused to participate in the transaction and notified Cahill, Edalat, and the other shareholders of her concern. In order to preserve the Court's time, the entirety of these conversations have not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit Z* and *Exhibit AA*.

  g.  Cahill and Plaintiffs conspired to grossly mismanage, and embezzle, from the corporate bank accounts and to defraud fellow non-plaintiff investors: These acts include, but are not limited to:

    i.  Grossly exaggerated compensation to Ertan Aydinol, Mark Erfurt, and Leslie Wood.

    ii.  Cash payments to Aydinol for illicit patch manufacturing at the San Diego facility of his former employer.

iii. Overseas wire transfers to Aydinol for production of alleged machinery in excess of $20,000. Delivery of these machines were then accepted by the Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

iv. Wire transfers to KNB Mfg. & Automation LLC in excess of $80,000 for machinery that was then removed by Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

v. Other payments with as yet to be calculated sums for equipment and supplies removed by Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

vi. Payment of illicit salaries to Plaintiff Cahill, to the tune of $20,000 per month, for an unknown amount of time, without an employment contract or Board approval.

vii. Payment of Cahill's own credit card, and personal expenses, through the Company accounts.

viii.   Payment to Kira Investments (Kira Invest), a Cahill family owned and controlled Company, based on a fraudulent, forged, lease in excess of $30,000.

ix.   Payment of Company funded travel to Las Vegas and Colorado for non-company related activities, including a visit by Dr. Weimann to Las Vegas, on or around September 29, 2015, for a visit to the 1850 Whitney Mesa property, under the guise of attendance at an industry conference. Cahill had, in a text message on September 22, 2015, inquired of Edalat "*Do you have connections for rooms for Ludwig and me for Monday night in Vegas for the PharmaPak show?*".  A copy of this text message was earlier incorporated as **Exhibit K**.

In order to preserve the Court's time, a photograph of Weimann and Cahill inside the building has not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit CC*.

x.   Conspiring with Leslie Wood for payment of other non Pharma Pak, Inc., payments through the Company bank account without approval.

36. Cahill and Plaintiffs, including Wood and Brent Cahill, also conspired to defraud Edalat, and fraudulently induce Edalat's further investment into the Company with the presentation of falsified accounting, along with falsified business projections.

    a. In or about May of 2015, Plaintiff Cahill hired his then 17-year-old son Brent Cahill, as a "financial analyst", despite Cahill's lack of experience or expertise in the area. Plaintiff Cahill conspired with Cahill to produce falsified projections based on potential business for the Company, that led to Edalat's further investment in Pharma Pak, Inc. Attached as **Exhibit XX** is a screen shot of Brent Cahill's Facebook.com social media profile stating that he was employed by Pharma Pak, Inc. in this capacity.

    b. Cahill's projections were also used as a basis for the valuation of Pharma Pak, Inc. by Plaintiff Cullen, who stated in a meeting in or about January 2016 that he felt Pharma Pak, Inc. was slated to be worth at least $300,000,000 in the next two years. Attached as **Exhibit YY** is an email from non-plaintiff Pharma Pak, Inc. shareholder John Crowther to Edalat on January 20, 2016, reiterating Cullen's statement. This email followed the Pharma Pak, Inc., shareholder's meeting wherein Cahill's duplicity was discovered by non-plaintiff Shareholder Amir Asvadi.

c. Wood presented to Edalat and shareholders falsified accounting records. When asked for the complete records, it took Wood over 2 weeks from the date of request on or about February 1, 2016 to provide a Microsoft Excel spread sheet work book of expenses, despite the fact that on June 3, 2015 the Company paid over $2,000 for QuickBooks Enterprise edition. Plaintiff Cullen finally provided the requested accounting records on or about February 17, 2016.

**37. Pharma Pak, Inc.'s successor company is Life Tech Global, LLC. Plaintiffs' are holding Defendant Edalat's shares in Constructive Trust.**

*a.* Plaintiffs' have moved Pharma Pak's patents, cash, and other assets to this new entity by fraudulent means and without shareholder approval.

***b. Plaintiffs conspired to form this entity even before the firing of Pharma Pak, Inc. Employees on March 3, 2016.***

c. Plaintiffs have, and are currently, conspiring to defraud non-plaintiff Shareholders by reassigning certain patents and trademarks as belonging to Pharma Pak, Inc.

d. Plaintiffs further conducted business as Pharma Pak, Inc., in order to move business to Life Tech Global, LLC (possibly also doing business as Pharma Patch).

e.  Plaintiffs' formed Life Tech Global, LLC on March 9, 2016 in the State of Delaware, despite the fact that Plaintiffs' nor anyone else involved has any ties with that State, only because that State does not require entities organized under its laws to be identified publically. A true and correct copy of Life Tech Global, LLC's Entity Details from the State of Delaware's Division of Corporation's website is attached hereto as **Exhibit ZZ.** Edalat is informed based on belief that Plaintiffs' utilized a third party registered agent Incorp Services, Inc., to perform this transaction and to evade detection.

f.  Plaintiffs registered the domain name of LifeTechGlobal.net on March 10, 2016. Attached as **Exhibit AAA** is a copy of the WHOIS report from ICANN.org.

g.  Attached as **Exhibit BBB** are screenshots of Life Tech Global's website at www.lifetechglobal.net/about.html. Plaintiffs' have committed RICO with their statements.

i.  On the Life Tech Global website, Plaintiffs' state *"Life Tech Global a 24,000 square foot manufacturing facility in Irvine, CA, delivering products that positively influence the standard of care for our providers and their patients, while enhancing outcomes for*

*our partners and stakeholders. **Pharma Pak [sic]** can ship most products to all 50 states."*

ii. Further, Plaintiffs' utilize a stock photograph of a textile manufacturing facility as if this photograph is of the Life Tech Global facilities in Irvine. Incorporated within **Exhibit CCC** is proof that Plaintiffs' utilized this stock photography in an attempt to defraud potential clients and investors.

h. Attached as **Exhibit DDD** is a screenshot of Life Tech Global's website at www.lifetechglobal.net/index.html, stating that *"Medical devices and pharmaceutical*[sic] *are produced in a cGMP and CFR compliant, FDA licensed manufacturing facility."* This statement is fraudulent. No licensing exists under the Life Tech Global name, not even a business license as illustrated by **Exhibit EEE.**

I

FIRST AFFIRMATIVE DEFENSE

Plaintiffs' complaint in each alleged cause of action thereof fails to state a cause of action against these answering defendants.

II

SECOND AFFIRMATIVE DEFENSE

That any and all events and happenings in connection with the allegations contained in Plaintiffs complaint and resulting injuries and damages, if any, referred to therein, were proximately caused and/or contributed to by the negligence of the plaintiff and by or were proximately caused and/or contributed to or were proximately caused and/or contributed to by the negligence of the plaintiff and by others for whom these answering defendants are not responsible, and as such said complaint is barred herein to the extent of the application of the doctrine of comparative negligence.

III

THIRD AFFIRMATIVE DEFENSE

If in fact plaintiff was damaged in any manner whatsoever, these defendants are entitled to a right to indemnification by apportionment against all other parties and persons whose negligence contributed proximately to the happening of the incidents or alleged injuries.

IV

FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' complaint is barred by the doctrine of laches.

V

FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' complaint is barred by the doctrine of unclean hands.

VI

SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' complaint is barred by all appropriate statutes of limitation.

VII

SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' complaint is barred by the doctrine of assumption of the risk.

VIII

EIGHTH AFFIRMATIVE DEFENSE

These answering defendants incorporate by reference each and every other affirmative defense plead by each and every defendants and cross-defendants.

IX

NINTH AFFIRMATIVE DEFENSE

Plaintiffs' complaint is barred by the doctrine of waiver.


WHEREFORE, Defendants prays for judgment as follows:

1.      That Plaintiff takes nothing by their complaint.

2.      That in the event that Plaintiff does recover damages from Defendants, that Defendants have a determination by the Court as to an apportionment of fault and declaration of the right of indemnity from all other defendants and cross-defendants.

3.     That Defendants be awarded costs of suit.

4.     For such other relief as the Court deems proper.

1
2

DEMAND FOR TRIAL BY JURY
DEFENDANTS HEREBY DEMAND A JURY TRIAL

3

4

5    DATED: June ___, 2016

6

7                                              THE DURST FIRM

8                                                  /S/    LEE H. DURST

9

10                                      BY:_____

11                                              LEE H. DURST

12

13   DATED: June ___, 2016

14

15                                      LAW OFFICES OF LARRY ROTHMAN

16                                          /S/    LARRY ROTHMAN

17

18                                      BY:_____

19                                              LARRY ROTHMAN

20

21

22

23

24

25

26

27

28