THE DURST FIRM
Lee H. Durst, Esq. [SBN 69704]
23 Corporate Plaza, Suite 150
Newport Beach, California 92660
TELEPHONE: 949-478-8388
e-FAX: 714-242-2096
lee.durst@gmail.com, Skype lee.durst1

LARRY ROTHMAN & ASSOCIATES, A P.L.C.

LARRY ROTHMAN, Esq. SBN 72451

City Plaza 1 City Blvd W #850

Orange, CA 92868

714-363-0220 – Fax 714-363-0229

tocollect@aol.com


Attorneys for Cross-Complainants, OLIVIA KARPINSKI

## U.S. DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| BRUCE CAHILL, an individual, Greg Cullen, an individual, Shane Scott, an individual, Ron Franco, an individual and Pharma Pak, Inc. a California Corporation | Case No.: 16-cv-00686 AG |
| Plaintiffs, | COUNTER – CLAIM AND CROSS-<br><br>FIRST AMENDED COMPLAINT FOR:<br>RICO<br>SEXUAL HARASSMENT,<br>WRONGFUL TERMINATION,<br>ASSAULT,<br>BATTERY<br>AND DAMAGES |
| vs. | |
| | DEMAND FOR JURY TRIAL |

PAUL PEJMAN EDALAT, an

individual, OLIVA KARPINSKI, an

individual, FARAH BARGHI, an

individual, SENTAR

PHARMACEUTICALS, INC., a

Nevada Corporation, BLUE TORCH

VENTURES, INC., a Wyoming

Corporation, LIWA, N. A., a Wyoming

Corporation, SENTUS LAND

MANAGEMENT, LLC, a Wyoming

Limited Liability Company,

Defendants

---

OLIVIA  KARPINSKI

Cross-Complainant

Vs.

BRUCE EDWARD CAHILL, an

individual, Gregory David Cullen, an

individual, Shane Ryan Scott, an

individual, Ronald Ventura Franco,

an individual, Pharma Pak, Inc., a

California Corporation, Life Tech

Global LLC and Does 1 to 100

Cross-Defendants

CROSS-COMPLAINANT alleges as follows:

GENERAL ALLEGATIONS

ALL ALLEGATIONS CONTAINED HEREIN ARE DIRECTLY RELATED TO THE VIOLATION OF 28 USC 1961, 1963 AND 1964. THE ADDITIONALLY CLAIMS FOR RELIEF ARE BASED UPON THE FACTS THAT CROSS-DEFENDANTS WERE ACTING WITHIN THEIR SCOPE OF A CONSPIRACY AND DOING ALL THINGS NECESSARY TO COMMIT A CRIMINAL ACT. THEREFORE, ALL CLAIMS WHICH ARE NOT DIRECTLY FEDERAL CLAIMS ARE BASED UPON FCP RULES, 13, 14, 19 AND 20 BECAUSE OF THE FACT THAT ALL CLAIMS ARE RELATED TO THE RICO CLAIMS. ADDITIONALLY, ALL REFERENCES TO ANY EXHIBITS IN THIS CROSS-COMPLAINT REFER TO EXHIBITS WHICH WERE ATTACHED TO THE ORIGINAL CROSS-COMPLAINT AND WILL INCORPORATED HEREIN BY THIS REFERENCE IN LIEU OF ATTACHING THE COPIES THERETO AGAIN.

1. CROSS-COMPLAINANTS are and, at all times relevant herein, Citizens of the State of California.

2. CROSS-COMPLAINANTS were wrongfully terminated when they reported to the majority shareholder that the present management of the Company was participating in the manufacturing of illegal, Class I drugs without proper licensing. The Majority shareholder called the police, who found the illegal drugs, and removed them. Attached as Exhibit A is a true and correct copy of the responding police officer's business card, along with the incident number assigned to this investigation. Management found out that the police had been called, they shut down operations and fired all employees because the police

had been notified.  This was an act of absolute retaliation by Cahill, Scott, Cullen, and Franco.

3. CROSS-COMPLAINANT Karpinski is also suing Cahill for sexual harassment, assault and battery.

4. Olivia Karpinski, joined Pharma Pak, Inc., June 1, 2015 some 4 months after the company was formed. Attached as Exhibit B is a copy of Pharma Pak, Inc.'s Articles of Incorporation as filed with the State of California by Pharma Pak attorney Timothy Balog of Balog and Rasch, LLP on February 10, 2015. At the time of her hire, as Director of Sales, she accepted a cut to her base salary and commission percentage, and accepted a base of $72,000 per year, plus reduced benefits. Attached as Exhibit C is a true and correct copy of Karpinski's employment agreement signed by Plaintiff Cahill. On November 6, 2015, Karpinski was promoted by plaintiff Cahill to Executive Vice President of Sales and Marketing, with a salary increase to $120,000 per year, plus benefits. Attached as Exhibit D is a true and correct copy of Karpinski's employment agreement signed by Plaintiff Cahill. Contrary to the allegations of the Plaintiffs, Karpinski brought many different sales accounts to Pharma Pak, Inc., many of which Plaintiffs' would go on to poach for Pharma Pak, Inc.'s successor corporation Life Tech Global LLC (possibly doing business as Pharma Patch, Inc).

5. At the time of her employment Karpinski was advised by Cahill that the Company was well capitalized, and that he would make "[Karpinski] a millionaire". Cahill was well aware this was not fact, and

fraudulently induced Karpinski to accept employment with the Company.

6. Cahill and Wood repeatedly promised, and failed, to pay both Karpinski's health insurance and vehicle payment: parts of her benefit package with the Company. Attached as Exhibit E is a true and correct copy of an email from Karpinski, to both Wood and Cahill regarding failure to pay for medical insurance in a timely manner dated March 10, 2016.

7. It was not until meeting Cahill's wife, Karen Jane Cahill (née Grobba), that Karpinski became aware of potential financial troubles of both Cahill personally, and Pharma Pak. During a business meeting at the Cahill family home in Laguna Beach, California with Cahill, Edalat, shareholder John Crowther, and other associates, Karen Cahill stated, "I hope you can all get something going with Pharma Pak so that we can keep the house"

8. At the time she was promoted by Cahill on November 6, 2015, he attempted to kiss her.  Cahill grabbed Karpinski's arm, and pulled her bodily towards himself in a thwarted attempt to kiss Karpinski. She deflected the kiss by turning her face away, and pulling her body away from Cahill.  Plaintiff Cahill has a history of unwelcome sexual

advances, verbal conduct of a sexual nature, and creation of a hostile, intimidating, and offensive work environment, as set forth herein:

9. Upon Karpinski's employment with the Company, there was no sexual harassment training, statement, or manual. Given that Karpinski was one of two female employees of Pharma Pak, Inc., such training and documents are necessary. Furthermore, the Company had no formal Human Resources department, only a de facto person in charge of HR related matters, Cahill's long time lackey Leslie Harold Wood. Given Wood's long time employment and relationship with Cahill, Karpinski was uncomfortable reporting Cahill's behavior.

10.     Cahill, against Karpinski's wishes and complaints, would find ways to place his hands upon Karpinski's person. Shoulder rubs, pats on the leg, and unwelcome hugs, among other actions, generally construed as normal between friends, were not ignored by Karpinski, who made multiple requests for Cahill to stop, stating that she – Karpinski – did not like being touched. Pharma Pak, Inc. had no dedicated Human Resources department, no mandated entity to whom to make complaints, nor any manuals on sexual harassment

reporting. As Karpinski had made many large personal investments of time and resources (attending out of town Company meetings without reimbursement, attending after hours meetings on short notice, and moving her residence to Orange County in order to focus on Pharma Pak, Inc.) into the Company, she feared losing her job should she lodge any formal complaints against Plaintiff Cahill or speak to other Pharma Pak, Inc. Shareholders regarding his unwelcome advances and verbal conduct.

11.     Following the close of the first large Pharma Pak, Inc. contract on June 12, 2015 with Ithica Enterprises, Cahill invited Karpinski to a celebratory lunch at Il Fornaio in Irvine, California, a restaurant that Cahill is known to frequent. Attached as EXHIBIT F, is a true and correct copy of a photograph of the contract signature page, showing both Cahill and Karpinski's execution of the document. During this presumed business lunch, Cahill proceeded to order a large bottle of wine and become visibly intoxicated. He made many advances on Karpinski, who rebutted these advances. Karpinski, again concerned for her employment, was unable to leave without fear of repercussions.

After this lunch, the dynamic between Cahill and Karpinski radically

changed. He would make frequent comments regarding Karpinksi's "cute young friends" (a reference to Karpinski's former modeling career), and invited Karpinski to bring her friends, the age of Cahill's own daughter, Kira, to his home in Laguna Beach, California. As illustrated further, Cahill made other such sexually derogatory comments towards women and, Karpinski herself, in Karpinski's presence.

12.     On or about November 6, 2015, Karpinski signed a new employment agreement with the Company (countersigned and approved by Cahill). At the conclusion of the meeting, Karpinski shook Edalat's hand, and as Edalat left the conference room, moved to shake Cahill's hand as well. At this time, Cahill pulled Karpinski in for a hug, and kissed Karpinski against her will. This inappropriate maneuver is indicative of Cahill's presumptive manner regarding women, a pattern that is long standing, (he has done a woman a favor, and now she 'owes' him in some way). The Company had no dedicated Human Resources department, no mandated entity to whom to make complaints, nor any manuals on sexual harassment reporting.

13.    By creation of a hostile and offensive work environment, Cahill intentionally threatened Karpinski and thwarted her ability to conduct her job in an efficient manner.

Cahill deliberately created undue tension between Dr. Ludwig Jan Weimann, Pharma Pak, Inc.'s Chief Technical Officer, and Karpinski. On or about July 28, 2015 in an attempt to defame Karpinski, and stop her from working with lab personnel, (a specified job duty in her employment contract), Cahill stated to Weimann that, "Olivia thinks you are stealing patch material", a reference to the substrates and materials used in the research and development of transdermal patches in the 17809 Gillette Ave facility.

A maliciously false statement, Cahill instigated Weimann to terminate his employment with Pharma Pak, Inc. that same day, as well as demand Karpinski's termination.

Upon Dr. Weimann's return to Pharma Pak, Inc., his relationship with Karpinski was noticeably less cordial, and bordered on the hostile at times. Attached as Exhibit G are true and correct copies of hostile emails from Weimann to Karpinski questioning Karpinski's knowledge, job performance, and loyalties to Pharma Pak, Inc.

14.     Cahill perpetuated, and encouraged, a pattern of fear and hostility within the Company, as a way to maintain control over the Employees. Cahill would frequently make his displeasure known by slamming office doors and exaggeratedly making noise with his belongings around his office.  On around January 30, 2016, Karpinski was told by Cahill that Weimann stated, "[Weimann] does not take orders from women", specifically referring to Karpinski and her request for technical documentation on the CBD patches Weimann was developing for Pharma Pak, Inc. Karpinksi needed this data in order to apply for the appropriate Food and Drug Administration approval for the medical device Weimann was developing. Affronted, Weimann refused to perform any further work that may assist Karpinski.

Cahill, as CEO and de facto leader, found humor in the situation and did nothing to remedy this hostile work environment. Cahill then further inflamed the open hostility of Weimann by following this in person statement with an email to Karpinski on February 1, 2016 that "[Weimann] will no longer take orders from [Karpinski]"; attached as Exhibit H is a true and correct copy of this email, along with an accompanying email from Weimann, stating, "[his] boss is Bruce

Cahill".

On or about February 15, 2016, Weimann sent another email to Karpinski, stating that she did not "understand the cannabis business", and that the quality or purity of cannabinoid, "CBD", used in production was irrelevant. Attached as Exhibit I is a true and correct copy of this email.

15.     In about December 2015, Cahill made further sexually derogatory, inappropriate, and unwelcome comments to Karpinski, in an attempt to humiliate her in front of her colleagues, by addressing her with such diminutive terms as "honey" and "babe", as well as saying "thanks honey", and "nice skirt" during a meeting with Dr. Ludwig Weimann, Pharma Pak, Inc. Vice President of Manufacturing Ertan Aydinol, and a potential supplier.

Cahill made comments about Karpinski's appearance, clothing, and youth, on multiple occasions, and would further use comments related to Karpinski's appearance as a way to 'close' potential sales accounts. Karpinski had no one to report these incidents to. The Company had no dedicated Human Resources department, no mandated entity to whom to make complaints, nor any manuals on sexual harassment reporting.

16.     On or about November 25, 2015, in a meeting with potential web developer Gaby Moussa of GMI Design, Pharma Pak, Inc. I.T. contractor Mark Erfurt, and Karpinski, Cahill made the comment "if it fucks, flies, or floats: rent it", a reference to women as commodities to be bought and sold.

17.     Cahill regularly offered to drive Karpinski to meetings or events. On one such occasion on November 19, 2015, a meeting in San Diego with potential supplier Stephen McCamman, Cahill left copies of 'Playboy Magazine' plainly visible in the vehicle, knowing that Karpinski would be a passenger, and that she would be with him for many hours.

18.     In a meeting with Aydinol, Edalat, Karpinski, and Andy Bharath, Cahill's friend, Cahill stated that, "[Cahill's] wife is married, I am not". A reference to his long-standing extramarital affairs.

19.     Cahill's pattern of sexual harassment, sexually motivated derogatory comments, and sexualized unprofessional behavior was not limited to Company employees.

During Company lunches at local diner Arnie's Manhattan Deli in Newport Beach, California, Cahill would go out of his way to lavish attention on the young waitresses employed there. Inviting them on

outings, such as rides on his motorcycle, making comments about their physical appearance in front of Pharma Pak, Inc. employees, including his son Brent, and referring to them with such diminutive terms as "honey" and "babe".

Cahill regularly purchased gifts for his "special" waitress, SueAnn Challita.  On one such occasion, during a Company lunch with Brent Cahill, Karpinski, and Edalat, Cahill made a detour to a local pharmacy to purchase a birthday card and balloons for SueAnn, an incident demonstrative of his focus on other women.

Cahill would, in front of Karpinski and others, make comments about his own daughter, Kira Cahill, and the "hot little friends" his daughter would bring to the family home in Laguna Beach, California.

Cahill stated on many occasions that he enjoyed it when his daughter brought her young friends to his home.

Cahill also repeatedly made similarly perverse comments about the women he saw while on college tours with his teenage son Brent Cahill. He made such comments as "you should have seen all the cute girls," and that if he [Cahill] were Brent, "he would have gone to USC for the girls". Cahill was disappointed when his son chose to attend the prestigious California Institute of Technology, as he felt the

young women there were "socially awkward" and unattractive, stating that "ugly girls don't put out". Seeing how Cahill spoke about, and treated, young women, made Karpinski very uncomfortable, but without a formal HR department at the company, and concerned for her employment, Karpinski had no one to make a complaint to.

20.      In a malicious attempt to slander and defame both Karpinski and Edalat, Cahill began subversively perpetuating a rumor to common business associates and mutual friends that Karpinski and Edalat were engaged in an illicit affair. Regardless of the fact that Karpinski was in a committed relationship at the time. Said rumor is a manipulative attempt to discredit both Karpinski and Edalat, a tactic Cahill is familiar with and has perpetuated on many occasions.

21.      Cahill, and his son Brent (employed by Pharma Pak, Inc. as a financial analyst) used the cover of Company funded meetings in Las Vegas to as unauthorized, Company funded, vacations. At one such meeting during the very early days of Karpinski's tenure, Cahill brought with him a Dr. Stefanie Bernritter Kleine or "Dr. K", whom Cahill stated held three PhD's from the University of California, Los Angeles, the University of Chicago, and Pepperdine University. Attached as Exhibit J is a screen shot of Bernritter-Kleine's public

Facebook.com profile. Exhibit K is a true and correct copy of Cahill's email to Edalat dated February 18, 2106 wherein Cahill states that "Dr. K" was a neurological expert, and actively working with the National Football League conducting concussion research, and further that "Dr. K" was a well respected researcher for children's brain issues. (It would later be discovered that Kleine holds no such credentials.) Attached as Exhibit L is a print out of Kleine's own web page, WorkingMindsCoaching.com, and Kleine's curriculum vitae as posted on this web page.

Despite Cahill's statements, and insinuations that Kleine would be acting in an advisory capacity to Pharma Pak, Inc., at no time was "Dr." Kleine involved in furthering Pharma Pak, Inc. business opportunities despite her presence at these meetings. In fact, Cahill referred to Kleine as his "assistant" in the presence of potential Company partners, allowed her to attend confidential meetings, discussed with her confidential Company information, and further had Kleine accompany him on a trip to a local strip club. Cahill, in an unauthorized use of Company funds, paid for her travel and meals, and allowed Kleine to charge spa services to his Company funded suite at the Wynn Encore Hotel in Las Vegas, Nevada. Attached as

Exhibit M is a screen shot of Kleine's own social media page, placing her at the Encore the same weekend as Cahill, with a picture of the suite.

Plaintiff Cahill's behavior placed Karpinski in an uncomfortable situation, as she was, from time to time, forced to interact with Cahill's wife Karen Jane Cahill (nee Grobba), a frequent visitor to Pharma Pak, Inc.'s primary administrative offices at 17802 Sky Park Circle in Irvine, California.

22.     Plaintiffs collectively accuse Karpinski of not attending to her duties, taking frequent vacations or trips, and otherwise being unavailable. This is a patently false statement.

23.     Karpinski's business related trips to Las Vegas were to attend related Company meetings, or industry related conventions. Karpinski frequently took her personal time, including evenings, holidays and weekends, to attend these events, paying for her own non-flight expenses without reimbursement.

24.     Throughout Karpinski's tenure, she took less than 3 vacation or sick days, instead focusing on developing the Company. Karpinski spent much of her personal time, including late nights, holidays, and weekends, on Company business. Plaintiffs' also neglect to

acknowledge that Karpinski moved her home from Los Angeles, California to Orange County, California, in order to devote more time and attention to the Company.

25.     Throughout Karpinski's tenure, Cahill would frequently take international vacations, attend to personal business during Company hours, be unavailable for Company meetings, fail to follow through on operations related concerns or potential business ventures, and took frequent "business" trips to Colorado to "visit" potential suppliers, sales accounts, or Aydinol, who is believed to reside in Boulder, Colorado.  However, it is believed Cahill's trips to Denver and Aspen coincide with visits to Dr. Kleine, who currently resides in the Denver area.

26.     Karpinski met with Plaintiff Scott telephonically and in Las Vegas to discuss marketing of Pharma Pak, Inc.'s pending CBD patches.

27.     Karpinski had little contact with Plaintiff Cullen. Through Cullen's verbal representations, she is aware of his supposed Harvard education, his work with a so called Harvard Investment Group, his various real estate dealings, and his former ventures with Cahill – including a food manufacturing operation shut down by

regulatory authorities.

During a meeting in or around the latter part of January 2016, Cullen stated to Karpinski that he was a 'King' and she is a 'peon'. He further advised during this same meeting that Company Shareholders were looking at alternative options to replace Cahill, in light of the recent events.

28.     Karpinski had little contact with Plaintiff Franco, and only knows of his frequent travel to Thailand through statements made by Cahill.

29.     In or about January of 2016, Karpinski began to notice a shift in the corporate atmosphere at Pharma Pak, Inc. Unbeknownst to her at that time, it had been discovered that Plaintiffs' and non-plaintiff shareholders were in dispute regarding Cahill's corporate misconduct, including fraud and embezzlement.

30.     It was around this time that Cahill, in a closed door meeting, interrogated Karpinski regarding meetings she attended on behalf of Pharma Pak, Inc., meetings she initiated on behalf of Pharma Pak, Inc., her general work for Pharma Pak, Inc., and her relationship with fellow defendant Edalat. Attached as Exhibit N is a true and correct copy of Karpinski's follow up email to Cahill on January 31, 2016.

31.     In or about February of 2016, Karpinski and the other Pharma Pak, Inc. employees- excluding Weimann, Aydinol, and Wood- discovered that Cahill, Cullen, Scott, and Franco had conspired with Weimann and Aydinol to produce, among other things, unapproved medical devices containing illegal Tetrahydrocannabinol "THC", a Schedule 1 drug, at the Gillette Avenue facility, despite the lack of appropriate licensing. Karpinski learned of this from potential Pharma Pak, Inc. distributor, Erron Present.  Present stated to Karpinski, "[Cahill] is one to look in to my background to see if I qualify for a [patch] machine when he manufactured THC pills out of [Gillette] and I can prove it. [Weimann] gave me 5 and 10mg THC pills and they didn't work."  After learning of this, Karpinski notified Edalat. Edalat, upon consultation with the Food and Drug Administration and others, informed the Irvine Police Department. Upon their investigation in the building, the responding officers noted that the stash of Tetrahydrocannabinol "THC", found within the building is the largest they had seen to date. There is currently an open investigation with the Irvine Police Department, Case Number 16-3257, assigned to Detective Grange. Attached as Exhibit O is a true and correct copy of

the Irvine Police Department business card with the pending investigation case number.

32.     A few days after this police investigation, Dr. Weimann informed Cahill and plaintiffs, that the police had removed the THC from the building, and Cahill fired some of the employees in retaliation against Edalat.

On March 3, 2016, Cahill, Wood, and the unnamed "private investigator" told Karpinski that a "majority shareholder's vote" had dissolved the corporation.  No such vote had taken place. Cahill, Wood, and the "private investigator" told the other employees that "[Edalat's] actions" had caused them to be fired. The following employees were harassed, threatened, and wrongfully terminated in retaliation for reporting the illegal activities of Cahill, Weimann, and the other Plaintiffs:

33.     Olivia Karpinski

34.     Luis Navarro

35.     Jesse Suarez

36.     Luz Navarro

37.     Alonso Navarro

38.     Alex Rosales

39.     Martin Garcia

40.     On or about February 2016, it was discovered that Cahill had

forged Edalat's signature on a lease document for Cahill's 17802 Sky

Park Circle commercial building in Irvine, California. Attached as

Exhibit P is a true and correct copy of this forged lease. This building

is owned by Cahill's entity Kira Investments, LLC, a corporation that

is currently defunct and suspended by the State of California. A copy

of the California Secretary of State Business Entity Detail is attached

as Exhibit Q.

41.     Cahill damaged the Company materially by hiring employees,

and contractors, with questionable backgrounds, without performing

necessary due diligence or providing full disclosure to all Pharma

Pak, Inc. Shareholders:

42.     Dr. Ludwig Jan Weimann, Chief Technology Officer hired on or

about June 2015: An expert in transdermal patch delivery systems,

Weimann had formerly worked at an unlicensed transdermal patch

research and manufacturing facility in San Diego, California, illegally

producing Tetrahydrocannabinol "THC", Cannabidol "CBD", and other

medical marijuana related patches and unregistered, unapproved,

medical devices. Weimann possessed a California medical marijuana

card, and obtained samples of THC among other illicit substances through his pre-existing relationships in the marijuana industry; attached as Exhibit R are examples of Weimann's use of cannabinoid, "CBD", and history of contacts within the marijuana industry.

43.     Mark John Erfurt, Information Technology Consultant engaged at the formation of the Company in February 2015: Erfurt has a criminal history for hacking, and unauthorized access into computer systems of a Cahill competitor in 2003. Furthermore, Erfurt had been convicted of obstructing an FBI investigation in order to protect Cahill and his company, Centuar Corporation, and sentenced to five months imprisonment as well as five months house arrest and three years probation. A true and correct copy of the Department of Justice press release dated August 31, 2004, and an article concerning the incident dated December 1, 2004 are attached as Exhibit S. This had not been disclosed to Edalat or the other shareholders and employees of the Company. Erfurt was given full access to employee computers, employee passwords, confidential Company information, given false reimbursements, and exaggerated compensation. As of February 2016, Erfurt was paid in excess of $26,000 through his company Tec-

in-a-Sec, which holds no business license in Irvine, California, for management of a pre-existing computer network encompassing fewer than 7 full time users.

Furthermore, Erfurt has destroyed vital company records, including electronic mail belonging to Defendants', and stolen non-PharmaPak, Inc. servers and computer systems from the 17809 Gillette Facility.

44.     Ertan Aydinol, Vice President of Manufacturing hired on or about December 2015: Aydinol formerly worked with Weimann at the unlicensed patch facility in San Diego, and at the time of his hire was spending a majority of his time travelling between the United States and Turkey, where his father purportedly owns a manufacturing facility. Unbeknownst to Edalat, Karpinski and the other shareholders and employees, but known to Cahill, Aydinol had previously been investigated by the FBI for suspected bomb making activities, although the FBI could not conclusively prove Aydinol's participation in illegal activities, he was banned from "owning certain items". Aydinol, despite not having performed any work for the Company, was awarded a base salary of $165,600 annually, plus full benefits and full commission. A true and correct copy of Aydinol's unsigned employment agreement is attached as Exhibit T. Aydinol had stated

to Cahill that he had been making "over $10,000 a month" at his former employer; however, Cahill never did his due diligence, and it came to light that Aydinol's actual previous salary was a fraction thereof, and Aydinol's statements were purposefully fraudulent and misleading. Most recently, Aydinol has been arrested for DUI and possession related charges in Boulder, Colorado, where it is believed he currently resides.

As of February 2016, Aydinol was paid bonuses and advances for manufacturing in excess of $38,000, not including cash removed from the Pharma Pak, Inc. bank account under the guise of manufacturing payment.

45.     Leslie Harold Wood, controller, hire date unknown:  Wood is a long time employee of Cahill's, and by his own admission controls the accounting for many of Cahill's entities, including Kira Investments (aka Kira Invest), the Cahill Family Trust, Centaur Corporation, Centaur Sales, the Bruce E. Cahill Family Trust, and other as to yet unknown entities thought to total approximately 9 entities, as according to Wood himself. Wood was given an initial $1,800 per month salary, that was then, without approval or proof of an employment contract, raised to $9,000 per month. Wood controls and

maintains the books and records, including accounting, for Cahill's operations, signs all checks, orders supplies for these operations, and oversees the movement of money between Cahill's various bank accounts.

46.     All four of these employees are currently employed by Life Tech Global LLC (possibly doing business as Pharma Patch), the successor corporation for Pharma Pak, Inc..

47.     Cahill repeatedly sabotaged Pharma Pak, Inc. and conspired with fellow plaintiffs Cullen, Scott, and Franco to defraud Edalat and other investors in the Company, for their own gain.  Examples of these acts include but are not limited to:

48.     Deliberate circumvention of State and Federal law to produce illicit medical marijuana patches, including those containing Tetrahydrocannabinol "THC", a Class 1 drug, in a self-styled "clandestine" operation at Weimann and Aydinol's former employer in San Diego, while Edalat was overseas.

49.     In a December 5, 2015 email, Cahill stated "It also looks like will can [sic] clandestinely use the MediPatch facility next week when Dr. Williams is traveling". A true and correct copy of this email is attached as Exhibit U.

50.      In a follow up email on December 18, 2015, Cahill confirmed that the supply of material used was below both Federal and the supplier's own standards. A true and correct copy of this email is attached as Exhibit V.

51.      Cahill paid to Aydinol approximately $19,000 for this illicit production. Aydinol sent via text message a photograph of this transaction to Karpinski on December 11, 2016 at 4:52 PM under the heading "This is how I do business with Bruce…:) LOL". True and correct copies of Aydinol's text message and accompany photograph are attached as Exhibit W.

Location data of the photograph puts Cahill and Aydinol in La Jolla, California, and depicts the interior of Cahill's late model Jaguar, with Cahill holding stacks of $100 dollar bills in his hands, and stacks of $100 dollar bills placed on the center console. It is believed that Aydinol and Cahill kept the cash.

52.      On or about February 11, 2016, Karpinski was contacted by some of her ongoing sales accounts. A true and correct copy of an example of such contact is attached as Exhibit X. Cahill had, in an attempt to damage Karpinski's reputation and thwart her earning potential, told Karpsinski's sales accounts, distributors, and suppliers

that "[Karpinski] was out of the picture". Following her discovery of this knowledge, Karpinski sent a follow-up email to the Shareholders expressing her distress.

53.     On around February 22, 2016, Cahill and Weimann attempted to induce Karpinski into selling the illicitly made patches by accepting cash in exchange for delivery of illegal materials. A true and correct copy of Weimann's text message to Karpinski is attached as Exhibit Z. Attached as Exhibit AA are photographs of Weimann and Erron Present, conducting the transaction at a Starbucks near the 17802 Sky Park Circle administrative offices in Irvine, California. These photographs also depict Weimann delivering cash to Cahill at the 17802 Sky Park Circle offices.

Believing this to be a set up in order to terminate her employment, a criminal act as a violation of laws set place at the local, State, and Federal level by the Federal Trade Commission, the Drug Enforcement Agency for distribution of a Class 1 Drug, and the Food and Drug Administration, as an unregistered medical device, Karpinski refused to participate in the transaction and sent a follow up email stating the same to Cahill and Cullen. Attached as Exhibit BB is a true and correct copy of an email from Karpinski to Cahill and

Cullen dated February 22, 2016 11:35am regarding the transaction, along with an email dated February 22, 2016 7:48pm.

54.     Cahill grossly mismanaged, misappropriated, and embezzled, from the corporate bank accounts, leading to the supposed insolvency of Pharma Pak, Inc. Including but not limited to:

55.     Grossly exaggerated compensation to Ertan Aydinol, Mark Erfurt, Leslie Wood, and himself personally.

56.     Cash payments to Aydinol for illicit patch manufacturing at the San Diego facility of his former employer.

57.     Overseas wire transfers to Aydinol for alleged machinery. Delivery of these machines were then accepted by Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

58.     Payment of illicit salaries to himself, to the tune of $20,000 per month, without an employment contract or Board approval.

59.     Payment of Cahill's own credit card through the Company accounts.

60.     Payment to Kira Investments (Kira Invest) based on a fraudulent, forged, lease in excess of $30,000.

61.     Payment of Company funded travel to Las Vegas and Colorado for non-company related activities, including a visit by Dr. Weimann to Las Vegas, on or around September 29, 2015, for a visit to the 1850 Whitney Mesa property, under the guise of attendance at an industry conference. Exhibit CC is a photograph of Weimann and Cahill inside the property.

62.     Conspiring with Leslie Wood for payment of other non-Pharma Pak, Inc. expenses through the Company bank account without approval. Thus depleting the bank account and not allowing for purchase of necessary equipment or hiring of necessary personnel to obtain licensing and being licensed production.

63.     Despite her official Company title of Executive Vice President of Sales and Marketing, Karpinski had taken on many operations related roles otherwise left neglected by Cahill, in essence becoming a de facto project manager. This required Karpinski to gather information from different departments in order to assist in completing the appropriate application and licensing forms, furthermore Karpinski was left with the task of interviewing and sourcing appropriate consultants, with the final hiring decision left to Cahill. Cahill repeatedly failed to sign and approve applications for pharmaceutical

wholesale licensing in the State of California, repeatedly failed to engage consultants to obtain specialty licensing for the various manufacturing and operation models for QSR-820 (medical device) and ISO 13485 210/211 (pharmaceutical preparations) that could have been installed at the Gillette Avenue facility, repeatedly failed to engage industry experts and consultants, and repeatedly refused to engage appropriate legal counsel for the various manufacturing and operation models, repeatedly failed to register the transdermal patches with the FDA as a medical device or otherwise acquire the necessary licensing to produce such medical devices, repeatedly failed to obtain necessary equipment needed for production and quality control, repeatedly failed to hire necessary personnel for quality control and production compliance oversight, and flagrantly disregarded Federal and State law by producing Schedule 1 drugs without appropriate licensing in the Gillette Avenue manufacturing facility, all despite repeated requests and advisement from Karpinski, Edalat, Weimann and third-party industry experts. Attached as Exhibit DD is just one example of Cahill's presence at meetings discussing these items, and furthermore his on-going knowledge of Pharma Pak's needs and concerns.

64.     Karpinski had attended meetings and negotiated contracts and purchase orders with large pharmaceutical compound operations, potential distributors for Pharma Pak, Inc. produced transdermal patches, potential franchisees for Pharma Pak, Inc. owned machines, and other potential business partners for additional products and business models. Attached as Exhibit EE is a true and correct copy of Weimann's February 21, 2016 email regarding what Weimann calls Bruce's vision for Pharma Pak. Further, Weimann's email illustrates that as of February 21, 2016, Cahill had still not obtained appropriate manufacturing licensing.

However, all of these contracts were thwarted by Cahill and his repeated refusal to implement operational needs, and Cahill's repeated refusal to obtain the necessary licensure needed to close these deals despite repeated operational requests for him to do so dating back to at least March 2015, prior to Karpinski's hire.

65.     Cahill conducted clandestine business overseas, including foreign wire transfers from company accounts without approval.

66.     In the weeks before Karpinski's termination, in a meeting at the 17802 Sky Park Circle administrative offices in Irvine, California, Cahill discussed that a confidential deal had been struck with Aydinol

and his associates in Turkey to manufacture nutraceutical patches for Kazakhstan. Cahill, advised he did not want investor oversight in to the Company and its operations and advised Karpinski to keep this confidential from Edalat, stating "I'm sure whatever you talk about with Paul is confidential, and whatever you talk about with me stays here so we can focus on business."

67.    Cahill and the plaintiffs, diverted funds from the Pharma Pak, Inc. bank account in the final weeks, without permission from or notice to non-plaintiff shareholders, moved company equipment and assets to 2929 Oceanside Blvd, Oceanside, CA, and stole non-company equipment from the Gillette Avenue office.

68.    On March 3, 2016, Karpinksi's employment with Pharma Pak, Inc. was terminated by Cahill. While at the Gillette Avenue offices, Cahill, Wood, Erfurt, and a hereto unnamed private investigator questioned employees, and stated to them that "[Edalat's] actions" (in reference to Plaintiffs' illegal activity reported to the police), had caused the termination of the manufacturing facility employees. Cahill and his investigator advised that a forensics team would be "entering the lab" to "conduct an investigation", and that locks would be changed.

At this time, Erfurt removed computers, laptops, and servers not belonging to Pharma Pak, Inc. Furthermore, they removed personal property not belonging to Pharma Pak, Inc.

69.     Despite his comments on March 3, 2016 to the other employees that "[Edalat's] actions" had caused their terminations, Cahill and Wood told Karpinski that there had been a majority shareholder vote by Pharma Pak, Inc. shareholders, and that as a result the Company was being dissolved.

70.     To the best of Karpinski's knowledge, the following facts are true:

71.     As of March 4, 2016 after the locks to the Gillette Avenue facility were changed, Dr. Ludwig Weimann was observed working out of the facility, and conducting business, on behalf of Pharma Pak, Inc.

72.     As of March 4, 2016 Cahill and plaintiffs conspired to transfer Karpinski's account Erron Present to their new corporation, Life Tech Global LLC (possibly doing business as Pharma Patch).

73.     As of March 7, 2016 Ertan Aydinol is still producing machines on behalf of Life Tech Global LLC (possibly doing business as Pharma Patch).

74.     As of March 8, 2016, Pharma Pak, Inc. operations, assets, equipment, monies, and Karpinski's accounts had been moved to two new locations.

75.     17802 Sky Park Circle Unit 100 and Unit 200 in Irvine, California. No licensing, business or otherwise, exists for the corporations performing business at this location.

76.     2929 Oceanside Boulevard in Oceanside, California. No licensing, business or otherwise, exists for the corporations performing business at this location.

77.     As of April 9, 2016 another Karpinski account, RX Green, contacted Karpinski, and confirmed that Plaintiffs have relocated their operations 2929 Oceanside Boulevard in Oceanside, California, He further stated that Plaintiffs are currently producing "nutraceutical patches for Kazakhstan" among other goods, in a facility that is unlicensed with regulatory bodies. Furthermore, RX Green was unhappy that Cahill and Plaintiffs had circumvented RX Green, and taken the space RX Green had already leased.

78.     As of April 10, 2016 a second Karpinski account, Present Naturals, contacted Karpinski and confirmed that Pharma Pak, Inc.'s successor corporation is conducting business from this Oceanside

facility.  Erron Present of Present Naturals texted Karpinski, "I am having a problem with Bruce and company .I'm ready to rock and roll and they want to change contract [sic] and make me wait months I need someone do u [sic] know if Paul is doing anything". Attached as Exhibit FF is a true and correct copy of Present's text message to Karpinski on April 10, 2016 at 3:49pm.

79.     As of May 1, 2016 Cahill and Plaintiffs are still conducting business that would otherwise have belonged to Pharma Pak, Inc. Inc, under the new name of Life Tech Global LLC (possible doing business as Pharma Patch.)


## FIRST CLAIM FOR RICO BY ALL CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS

80.     CROSS-COMPLAINANT re-alleges each and every allegation contained in ¶¶ 1 – 79.

81.  Cross-Complainant is informed and based upon believed allege that these Cross-Defendants have committed the following illegal and criminal actions:

  a.  Embezzlement of $900,000 cash and $100,000 worth of equipment from the company
  b.  Theft of trade secrets from the company
  c.  Production of illegal schedule 1 drugs on the Controlled Substance Act ("THC").

d. Transportation and distribution of said illegal drugs (THC) across state lines and international boarders,

e. Patent Infringement

f. Breaking and entering and the theft of $600,000 worth of products from Medipatch

g. Assault and Battery on a female employee

h. Sexually harassed a female employee

i. Forgery of documents for the purpose of obtaining a loan on real property while using false and fraudulent forged documents to give to the bank for a $5,00,000 loan without adequate income to secure the loan.  Cahill forged Edalat's signature on a purported lease of one of Cahill's property so that he could show the income. Thereby committing bank fraud.

j. Cross-Defendants are producing pills and patches at their Oceanside location which has not been approved by FDA and California Department of Public Health (CDPH).  These agencies are tasked with oversight of all facilities which produce such products and it is illegal to manufacture such products without the building, its location and other requirements for testing the products and securing samples in special rooms for inspection by these two departments.

82.   <u>EMBEZZLEMENT UNDER CALIFORNIA PENAL CODE 503 & 504</u>

*"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."*

Cite as Ca. Pen. Code § 503

*"Every officer of this state, or of any county, city, city and*

*county, or other municipal corporation or subdivision thereof,*

*and every deputy, clerk, or servant of that officer, and every*

*officer, director, trustee, clerk, servant, or agent of any*

*association, society, or corporation (public or private), who*

*fraudulently appropriates to any use or purpose not in the due*

*and lawful execution of that person's trust, any property in his or*

*her possession or under his or her control by virtue of that trust,*

*or secretes it with a fraudulent intent to appropriate it to that use*

*or purpose, is guilty of embezzlement.*

Cite as Ca. Pen. Code § 504

83.   *VIOLATION OF 18 USC 1961*

*"As used in this chapter - "racketeering activity" means (A) any*
*act or threat involving murder, kidnapping, gambling, arson,*
*robbery, bribery, extortion, dealing in obscene matter, or*
*dealing in a controlled substance or listed chemical (as defined*
*in section 102 of the Controlled Substances Act), which is*
*chargeable under State law and punishable by imprisonment*
*for more than one year; (B) any act which is indictable under*
*any of the following provisions of title 18, United States Code:*
*Section 201 (relating to bribery), section 224 (relating to sports*
*bribery), sections 471, 472, and 473 (relating to counterfeiting),*
*section 659 (relating to theft from interstate shipment) if the act*

*indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation*

*of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phono records, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor*

*organizations) or section 501 (c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b (g)(5)(B);*

*1962. Prohibited activities*

*Cite as 18 U.S.C. 1962*

*(a)      It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged*

*in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.*

*(b)      It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.*

*(c)      It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

*(d)      It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.*

*1964. Civil remedies*

*The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.*

*The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.*

<u>*Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee,*</u>

*…*

84.      *California Corporations Code Section §2253:*

*"Any director of a stock corporation, domestic or foreign, who concurs in any vote or act of the directors of the corporation or any of them, knowingly and with dishonest or fraudulent purpose, to make any dividend or distribution of assets except in the cases and in the manner allowed by law, either with the design of defrauding creditors or shareholders or of giving a false appearance to the value of the stock and thereby defrauding subscribers or purchasers, is guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars ($1,000) or imprisonment for not more than one year or both."
California Corporations Code §2254.*

*Every director, officer or agent of any corporation, domestic or foreign, is guilty of a felony (a) who knowingly concurs in making, publishing or posting either generally or privately to the shareholders or other persons (1) any written report, exhibit, statement of its affairs or pecuniary condition or notice containing any material statement which is false, or (2) any untrue or willfully or fraudulently exaggerated report, prospectus, account, statement of operations, values, business, profits, expenditures or prospects, or (3) any other paper or document intend to produce or give, or having a tendency to produce or give, the shares of stock in such corporation a greater*

*value or a less apparent or market value than they really possess, or*

*(b) who refuses to make any book entry or post any notice required*

*by the law in manner required by law.*

85.   Cross-Complainant did not know at the time she took this job that Cross-Defendants were in a complicacy to violate US laws dealing with the illegal manufacturing of drugs and selling them across both state and international boarders.

86.   CROSS-DEFENDANTS have conspired to steal the business started by Edalat.  The purpose of this was so that they could steal intellectual property, assets, and cash in order to manufacture illegal Schedule 1 drugs on the Controlled Substance Act.

87.   The Majority Shareholder, Paul Edalat, notified law enforcement of the illegal activities and law enforcement found a significant amount of THC liquid hidden in the building by Cahill and the other Cross-Defendants

88.   Immediately upon finding out that the police had been called and taken their hidden illegal product the Cross-Defendants fired these CROSS-COMPLAINANTS.   Cross-Defendants then moved their operations to two additional locations: 2929 Oceanside Blvd in Oceanside California, and 17802 Sky Park Circle in Irvine, California. At these locations they are producing, with Pharma Pak, Inc. owned equipment and intellectual property, illegal Schedule 1 drugs, and unregistered medical devices.

89.   Additionally, these CROSS-DEFENDANTS have used the wire services, US Mail services, committed bank, wire, and postal fraud in their criminal actions and activities.  They have also embezzled more than

$1,000,000 in cash and assets from Pharma Pak, Inc and its rightful shareholders.

90.   Cross-Complainant took this job and had to move to be near the location of the business.  She had relocation expenses, she had other travel expenses which were not reimbursed.  She was humiliated by Cahill and co-conspirators because they "knew that they were above the law." All laws, including laws created by the U.S. Government for the manufacturing of illegal THC and its sales outside the state of California and the boarders of the United States of America.  She has also been damaged because she did not receive her last pay check, her severance package or the rights to obtain stock under her stock option agreement with the company

91.   As a direct result of this conspiracy and illegal acts, the CROSS-DEFENDANTS have damaged Cross-Complainant in an undetermined amount, but at least over $100,000. Pursuant to the RICO statutes Edalat would be entitled to damages of three times that amount plus the actual amount of the damages, bringing these damages to a total of $400,000 or more according to proof at time of trial against these CROSS-DEFENDANTS.

THE FOLLOWING CLAIMS FOR RELIEF ARE BASED UPON THE FACTS THAT CAHILL AND HIS OTHER CO-CONSPIRATORS WERE ACTING IN CONCERT AND ALL ACTS CLAIMS HEREUNDER ARE ACTS RELATED TO THE FEDERAL ISSUE PRESENTED HEREIN UNDER FEDERAL RULES OF CIVIL PROCEDURES 13, 14, 18, 19 & 20.

## SECOND CLAIM FOR WRONGFUL TERMINATION BY ALL CROSS-COMPLAINANTS AGAINST ALL CROSS-DEFENDANTS

92.     CROSS-COMPLAINANTS re-alleges each and every allegation contained in ¶¶ 1 – 91.

93.     CROSS-COMPLAINANT and her co-workers were terminated because they notified their majority shareholder of illegal activities happening at the business and that these Cross-Defendants were responsible for the illegal activities.

94.     The Majority Shareholder, Paul Edalat, notified the police of the illegal activities and the police investigated and found a massive amount of THC liquid hidden in the building by Cahill and the other Cross-Defendants

95.     Immediately upon finding out that the police had been called and taken their hidden illegal product the Cross-Defendants fired the CROSS-COMPLAINANT.

96.     This is textbook wrongful termination because it was a retaliation against all of these employees for doing their legal duty in calling the police to the fact that a crime was happening in the building by these Cross-Defendants.

97.     The CROSS-COMPLAINANT has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.

## THIRD CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS AGAINST ALL CROSS-DEFENDANTS

98.     CROSS-COMPLAINANT re-alleges each and every allegation contained in ¶¶ 1 – 97.

99.     In every contract in California there is a covenant of Good Faith and Fair Dealings.

100.    Cahill, Scott, Cullen, and Franco Breach Covenant of Good Faith and Fair Dealings to the CROSS-COMPLAINANT by the following acts:

    a. They fired the Cross-Complainant because she refused to violate the law and allow them to commit criminal activities on the premises where they worked.

    b. Cahill sexually harassed Karpinski and created a hostile work environment.

    c. All other actions alleged in paragraphs 1 through 90 inclusive.

101.    All of the Cahill actions were part of his continued conspiracy to get Ms. Karpinski to either become a co-conspirator or to eliminator her from the company so that he could continue his illegal actions.

102.    The CROSS-COMPLAINANT has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.


FORTH CLAIM FOR WRONGFUL TERMINATION BY CROSS-COMPLAINANT OLIVIA KARPINSKI AGAINST CROSS-DEFENDANT BRUCE CAHILL

103.    CROSS-COMPLAINANT KARPINSKI re-alleges each and every allegation contained in ¶¶ 1 – 102.

104.    CROSS-COMPLAINANT was terminated because she refused the sexual advances of Cahill.  Cahill was her immediate supervisor and there was no one she could go to in the company.

105.    Immediately upon finding out that the police had been called and taken their hidden illegal product the Cross-Defendant CAHILL fired

KARPINSKI in the hopes of silencing here and to hide the fact of his sexual assault on her.

106.     This is textbook wrongful termination because it was a retaliation against this employee for doing her legal duty in calling the police to the fact that a crime was happening in the building by these Cross-Defendants.  Additionally, since she refused to play his games and to give him sex he fired her.

107.     OLIVIA KARPINSKI has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.

### FIFTH CLAIM FOR ASSAULT BY CROSS-COMPLAINANT OLIVIA KARPINSKI AGAINST CROSS-DEFENDANT BRUCE CAHILL

108.     CROSS-COMPLAINANT KARPINSKI re-alleges each and every allegation contained in ¶¶ 1 – 107.

109.     CROSS-COMPLAINANT was touched and continuously feared that the improper touching would continue.

110.     The touching was not authorized by Karpinski.

111.     Karpinski did not consent to the touching; and

112.     Karpinski was apprehensive at all times when in Cahill's presence and afraid that he would harmed her and/or otherwise offended by his conduct;

113.     That a reasonable person in Karpinski's situation would have been offended by the touching and/or the strong likelihood that Cahill would continue his improper touching of Karpinski.]

114.     OLIVIA KARPINSKI has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.

### SIXTH CLAIM FOR BATTERY BY CROSS-COMPLAINANT OLIVIA KARPINSKI AGAINST CROSS-DEFENDANT BRUCE CAHILL

115.    CROSS-COMPLAINANT KARPINSKI re-alleges each and every allegation contained in ¶¶ 1 – 114.

116.    CROSS-COMPLAINANT was touched improper on numerous occasions.

117.    The touching was not authorized by Karpinski.

118.    Karpinski did not consent to the touching; and

119.    That a reasonable person in Karpinski's situation would have been offended by the touching and/or the strong likelihood that Cahill would continue his improper touching of Karpinski.]

120.    OLIVIA KARPINSKI has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.

### DEMAND FOR JURY TRIAL

Demand is hereby made by the Plaintiff for a trial by Jury.

WHEREFORE, Plaintiffs prays for judgment as follows:

1.    General Damages according to proof.

2.    Special Damages according to proof.

3.    Punitive Damages according to proof.

4.    Such other relief as the court deems proper.

DATED:    August 9, 2016        THE JUSTICE LAW CENTER



BY _____

Lee H. Durst
Attorney for Plaintiffs

PROOF OF SERVICE
State of California, County of Orange

I am employed in the county and state aforesaid. I am over the age of 18 and not a party to the within action. My business address is 23 Corporate Plaza, Suite 150, Newport Beach, CA 92660.

On August 9, 2016, I served the foregoing document described as:

CROSS-COMPLAINT / COUNTER - CLAIM

on the parties listed below in this action by placing a true copy thereof or the originals via electronic mail through the ECF system of the United States District Court to the following

JMarkham@markhamread.com, BZerner@markhamread.com, & ERead@markhamread.com

Attorneys for Plaintiffs & Cross-Defendants

TOCOLLECT@aol.com

Attorney for Defendants and Cross-Complainants
DHamman@stuartkane.com
ATTORNEY FOR THE BANK

[X]         BY ELECTRONIC MAIL. I caused the above document to be electronically mailed through the ECF system of the United States District Court. Executed on August 9, 2016, at Newport Beach, California.


[X]         FEDERAL. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury under the laws of United States and the State of California that the above is true and correct.

/S/ Lee H. Durst

_____

Lee H. Durst