THE DURST FIRM
Lee H. Durst, Esq. [SBN 69704]
23 Corporate Plaza, Suite 150
Newport Beach, California 92660
TELEPHONE: 949-478-8388
e-FAX: 714-242-2096
lee.durst@gmail.com, Skype lee.durst1

LARRY ROTHMAN & ASSOCIATES, A P.L.C.
LARRY ROTHMAN, Esq. SBN 72451
160 Old Springs Road, Suite 170
Anaheim Hills, California 92808
714-363-0220 – Fax 714-363-0229
tocollect@aol.com


Attorneys for Cross-Complainants, PAUL EDALAT, MEDIPATCH, INC., A

CALIFORNIA CORPORATION, AND AMIR ASVADI

# U.S. DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| BRUCE CAHILL, an individual, GREGORY CULLEN, an individual, SHANE SCOTT, an individual and Pharma Pak, Inc. a California Corporation | Case No.: 16-cv-00686 AG |
| --- | --- |
| Plaintiffs, | FIRST AMENDED COUNTER – CLAIM AND CROSS-COMPLAINT FOR DAMAGES BY PAUL Edalat, MEDIPATCH, Inc., a California Corporation, and AMIR ASVADI FOR: |
| vs. | 1. VIOLATION OF FEDERAL RICO LAW, 28 USC 1961, 1963 & 1964, FRAUD AND DECEIT, FORGERY, BREAKING AND ENTERING, TRANSPORTATION & SALES OF ILLEGAL SCHEDULE 1 DRUGS |

PAUL PEJMAN EDALAT, an

individual, OLIVA KARPINSKI, an

individual, FARAH BARGHI, an

individual, SENTAR

PHARMACEUTICALS, INC., a

Nevada Corporation, BLUE TORCH

VENTURES, INC., a Wyoming

Corporation, LIWA, N. A., a Wyoming

Corporation, SENTUS LAND

MANAGEMENT, LLC, a Wyoming

Limited Liability Company,

    Defendants

PAUL EDALAT, MEDIPATCH, INC.,
A CALIFORNIA CORPORATION,
AND AMIR ASVADI
    Cross-Complainant

Vs.

BRUCE EDWARD CAHILL, an
individual, Gregory David Cullen, an
individual, Shane Ryan Scott, an

2.  BREACH OF CONTRACT
3.  BREACH OF THE
    COVENANT OF GOOD
    FAITH AND FAIR
    DEALINGS
4.  FRAUD
5.  BREACH OF FIDUCIARY
    DUTIES
6.  EMBEZZLEMENT,
7.  TRESPASS TO REAL
    PROPERTY & THEFT


DEMAND FOR JURY TRIAL

individual, Ronald Ventura Franco, an individual, Pharma Pak, Inc., a California Corporation, Brent Cahill, Leslie Harold Wood, Ludwig Jan Weimann, Mark John Erfurt, Erton Aydinol, Kira Lindsay Cahill, Karen Jane Grobba-Cahill, Life Tech Global LLC, a Delaware Corporation, Kira Investments LLC, a California Corporation, Cahill Family Trust, a California Trust, Cahill Bruce E. Trust, a California Trust, First Foundation Bank, a California corporation and Does 1 to 100

Cross-Defendants

ALL ALLEGATIONS CONTAINED HEREIN ARE DIRECTLY RELATED TO THE VIOLATION OF 28 USC 1961, 1963 AND 1964.  THE ADDITIONALLY CLAIMS FOR RELIEF ARE BASED UPON THE FACTS THAT CROSS-DEFENDANTS WERE ACTING WITHIN THEIR SCOPE OF A CONSPIRACY AND DOING ALL THINGS NECESSARY TO COMMIT A CRIMINAL ACT.  THEREFORE, ALL CLAIMS WHICH ARE NOT DIRECTLY FEDERAL CLAIMS ARE BASED UPON FCP RULES, 13, 14, 19 AND 20 BECAUSE OF THE FACT THAT ALL CLAIMS ARE RELATED TO THE RICO CLAIMS, ADDITIONALLY, ALL EXHIBITS MENTIONED HEREIN WERE ATTACHED TO THE ORIGINAL COMPLAINT AND WILL NOT BE ATTACHED HERETO, BUT ARE INCORPORATED HEREIN BY THIS REFERENCE.

CROSS-COMPLAINANTS, alleges as follows:

GENERAL ALLEGATIONS

1. CROSS-COMPLAINANTS are and, at all times relevant herein, Citizens of State of California.

2. MEDIPATCH, Inc., is a California Corporation with its principal offices in San Diego.

3. Amir Asvadi is and, at all times relevant herein, a Citizen of the State of California.

4. Edalat and Asvadi are both shareholders in Pharma Pak, Inc.

5. Edalat and Medipatch both hold patents for the creation of patches with difference substances allowed to be on them.  One of those substances is Cannabinoids, "CBD".  Additionally, Edalat has patents for sublingual

delivery technology.   Based upon information and belief, Edalat and Medipatch both are informed that Cross-Defendants Cahill, Cullen, Scott, and Franco, and their co-conspirators are making pills and patches in direct violation of Edalat's and Medipatch's Patents.

6. In addition to illegally using the Medipatch patch technology, Cahill and Cross-Defendants sent former Medipatch employee, Ertan Aydinol, to illicitly utilize the Medipatch facility to produce more than 15,000 patches with a retail value in excess of $300,000.  Cahill further had former Medipatch employees Ludwig Jan Weimann and Ertan Aydinol sabotage the Medipatch facility. These are just two examples of Cahill and Cross-Defendants criminal actions.

7. Brent Cahill, is and, at all times relevant herein, a Citizen of the State of California. Cahill created projections relied upon by investors, created and maintained the website for Pharma Pak, Inc. (PharmaPakCA.com), earned illegitimate wages, and was directly involved in the conspiracy to defraud Pharma Pak, Inc. and investors.

8. Leslie Harold Wood, is and, at all times relevant herein, a Citizen of the State of California. Wood created projections relied upon by investors, created and maintained the accounting records for Pharma Pak, Inc., signed all checks, approved all reimbursements, and was, according to

the Statement of Information filed with the State of California, Pharma Pak, Inc.'s Chief Financial Officer. Furthermore, Wood earned illegitimate wages, and was directly involved in the conspiracy to defraud Pharma Pak, Inc. and investors.

9.  Ludwig Jan Weimann, is and, at all times relevant herein, a Citizen of the State of California. Weimann brought onto Company property illegal Schedule 1 drugs, authorized and actively participated in the production of illegal medical devices, earned illegitimate wages, and was directly involved in the conspiracy to defraud Pharma Pak, Inc. and investors and sabotage Medipatch facilities.

10.   Mark John Erfurt is and, at all times relevant herein, a Citizen of the State of California. Erfurt illegally accessed non Pharma Pak, Inc. servers and computers in order to obtain trade secrets, stole non Pharma Pak, Inc. computers and servers, destroyed evidence including digital files of the Pharma Pak, Inc. website, electronic mail, and other such electronic documents. Erfurt defrauded Pharma Pak, Inc. through illicit reimbursements and other such payments.

11.   Ertan Aydinol is, based upon belief, a Citizen of the State of Colorado. Aydinol conspired to defraud Pharma Pak, Inc. and its investors, and further embezzled cash from the Company. Aydinol

earned illegitimate wages, and further conspired to defraud Pharma Pak, Inc. and its investors, and sabotage Medipatch facilities.

12.   Karen Jane Grobba-Cahill is and, at all times relevant herein, a Citizen of the State of California. Grobba-Cahill is a beneficiary of the Cahill Family Trust and Cahill Bruce E. Trust, and conspired with Cahill to produce a fraudulent loan application.

13.   Kira Lindsay Cahill is and, at all times relevant herein, a Citizen of the State of California. Cahill is a beneficiary of the Cahill Family Trust and Cahill Bruce E. Trust. Cahill is the controlling shareholder of Kira Investments, LLC, and forged Edalat's signature on an illegitimate lease document. Cahill is a beneficiary of monies received by Kira Investments, LLC from Pharma Pak, Inc. as a result of this forgery.

14.   Cahill Family Trust is and, at all times relevant herein, a Trust formed in the State of California. It is directly involved in the forgery and fraudulent loan application submitted to First Foundation bank.

15.   Cahill Bruce E. Trust is and, at all times relevant herein, a Trust formed in the State of California. It is directly involved in the forgery and fraudulent loan application submitted to First Foundation Bank.

16.   Kira Investments is and, at all times relevant herein a corporation formed in the Stated of California. It is directly involved in the forgery

and recipients of illicit gains via fraudulent rent payments

17.    First Foundation Bank, operating in the State of California, is directly involved in Cahill's acts of fraud. First Foundation Bank allowed Cahill to illicitly remove Edalat's name from corporate bank accounts, allowed Cahill to file a fraudulent loan application, and allowed Cahill to commit acts against banking law.

18.    Life Tech Global, LLC is and, at all times relevant herein, formed in the State of Delaware, and operating in the State of California. Life Tech Global, LLC is the successor corporation to Pharma Pak, Inc. It has stolen Pharma Pak, Inc. assets, cash, and intellectual property, and is the vehicle through which cross-defendants are hiding their illicit activities.

19.    Plaintiffs' have named Defendant Edalat as Paul "Pejman" Edalat: a deliberate attempt to confuse the record. Defendant Edalat's legal name is, and always has been, Paul Edalat, as Plaintiffs' are well aware.

20.    Plaintiffs are attempting to conduct a campaign of slander against Edalat via the Federal Courts, personal friends of Edalat's, and business associates of Edalat's.

21.    Plaintiffs' have named entities wholly unrelated to the Pharma Pak, Inc. venture in an attempt to disadvantage and otherwise economically harm those entities, and in an attempt to spin the facts of their own

gross negligence, embezzlement, and unlawful and fraudulent activities. Plaintiffs' naming of these entities is a deliberate attempt to confuse the record;

    a. Sentar Pharmaceuticals has no relationship to Pharma Pak, Inc., Plaintiffs' are well aware of this fact.

    b. LIWA N.A. has no relationship to Pharma Pak, Inc. Plaintiffs' are well aware of this fact.

    c. Blue Torch Ventures has no relationship to Pharma Pak, Inc. Plaintiffs' are well aware of this fact.

22.    Plaintiffs' further construct fictitious entity names in order to deliberately confuse the record. There exist no such entities as "Edalat Family Trust" nor "APS Sciences".

23.    Plaintiffs also seem to be unable to keep their own facts straight, on one hand claiming that Edalat and Karpinski used the *Sentar Pharmaceuticals pending patents* to induce their investments into Pharma Pak, Inc., and on the other stating Edalat and Karpinski used the *Pharma Pak, Inc., patents* to induce their investment into Pharma Pak, Inc.

24.    That Plaintiffs' filed their initial Complaint on April 12, 2016, waited until May 16, 2016 to file a First Amended Complaint, and further did not

properly serve Edalat until May 20, 2016, despite having frequent contact with Edalat's personal counsel on matters concerning Pharma Pak, is indicative of the malicious nature and intent of this Complaint.

    a. Proof that Plaintiffs' counsel, John J. Markham was in contact with Edalat's counsel Lisa Salisbury of Salisbury Law Group well before the filing of this Complaint on April 12, 2016 is attached as Exhibit C.

        i. Markham and his client Plaintiff Scott attempted to induce Edalat into attendance at a meeting to discuss ongoing Pharma Pak, Inc. concerns on April 12, 2016. However, mere hours before the meeting was to take place, Plaintiffs' chose instead to file this Complaint under false pretenses.

25.    That Cahill and Plaintiff's claim Edalat did not disclose his 2014 Bankruptcy is deliberately misleading based on the following facts:

    a. Plaintiffs' claim to be savvy investors, and thus a perfunctory Internet search would disclose Edalat's bankruptcy, even if, as they claim, he had not.

    b. Plaintiff Cahill was well aware of Edalat's bankruptcy, going so far as to offer to fund any bankruptcy related litigation, and introducing Edalat to the partners of prestigious Southern California law firm

Hueston Hennigan LLP, whom Edalat would go on to retain.

Evidence of Cahill's knowledge is attached hereto as Exhibit D,

Exhibit E, and Exhibit F.

c. Edalat disclosed his bankruptcy to Plaintiff Scott, as they

discussed other joint business ventures outside of Pharma Pak,

Inc., and Scott had himself been through the bankruptcy process

twice before in Utah (docket numbers 2:11-bk-20079 and 2:11-bk-

23640).

d. Plaintiff Cullen and Plaintiff Franco were brought in to Pharma Pak

by Cahill, and not Edalat, well after Cahill's knowledge of Edalat's

bankruptcy. Edalat disclosed his pending bankruptcy litigation to

both Plaintiffs in conversations leading up to their investments.

26.    That Plaintiffs disingenuously list Edalat's deceased brother's Ferrari

as an asset of Edalat's, disingenuously state that Edalat lied in

Bankruptcy proceedings, and maliciously list a bevy of assets that are

not owned by Edalat, shows the lengths they are willing to go to

perpetrate a falsehood upon the Court.

27.    Plaintiffs' repeated characterization of Edalat as a 'fraud' may be

construed as not only a deliberate and malicious attempt to interfere in

Edalat's business and personal life, but is also indicative of attempting to

use the judicial system as a way to protect themselves from charges of slander and libel.

Cahill had been previously warned on two separate occasions by counsel from Manatt, Phelps, and Phillips to cease and desist from his libelous statements to third parties, and chose instead to continue his baseless personal attacks on Edalat by contacting personal friends and business acquaintances of Edalat in an attempt to cause Edalat to react. When Plaintiffs' realized Edalat and non-plaintiff shareholders would not back away quietly, they instead chose to file suit. True and correct copies of communications from counsel Thomas Poletti of Manatt, Phelps, and Phillips are attached as Exhibit G

28.   At the time of the Company's formation in January of 2015, Plaintiff Cahill, and non-plaintiff shareholder John Crowther, were both well aware of Edalat's personal financial situation.

   a.   As of approximately October of 2014, Edalat was in negotiations with interested third parties for further development of the 17809 Gillette manufacturing facility in Irvine, California. The facility held a valid Pharmaceutical Manufacturing license, a copy of which is attached as Exhibit N, and was ripe for a myriad of business activities. In fact, Cahill attended many meetings in Texas

regarding such potential joint venture partners, including some of the largest pharmaceutical compounding operations in the United States. It was on Cahill's advice that Edalat did not partner with these third parties.

Cahill, among other lulling statements made to Edalat, stated that since he (Cahill) was retired, he was looking for a secondary project to keep him (Cahill) occupied.

Cahill, seeing the potential value of pharmaceutical compounding operations, induced Edalat to partner with Cahill himself in order to enter the pharmaceutical compounding space.

b. At this point in the Cahill and Edalat relationship, they had known each other socially for many years, through a trusted mutual friend. Cahill used his clout as a Board of Trustee member for various entities, his philanthropic endeavors, and references to his $38,900,000 "house on the hill" in Laguna Beach, the Cahill titled 'Villa de Sogni' mansion, as proof of his success and established business prowess. Edalat had no reason at this point to doubt Cahill's sincerity. It was only later that Edalat would come to realize the extent of Cahill's duplicity.

29.     In February of 2015, Cahill and Crowther urged Edalat to sell Edalat's personal shares in the newly formed Pharma Pak, Inc. venture in order to raise needed personal funds for ongoing bankruptcy litigation. Cahill brought to the table multiple potential investors for Pharma Pak, Inc., including Plaintiffs Cullen and Franco.

30.     In September of 2015, Cahill was actively soliciting further investors for the Pharma Pak, Inc. venture. In a text message dated September 24, 2015, Cahill stated to Edalat, "*Paul At lunch with investors about to make you rich*". Cahill goes on to say, "*There are a couple of doctors here in San Diego that are wealthy and just cashed out $100 meg* [sic] *on an IPO. Have taken a couple of companies through IPO. Bring money and expertise.* Furthermore, that Plaintiffs' accuse Edalat and co-defendant Karpinski of working on both Pharma Pak, Inc. and Sentar related matters is laughable. Cahill's own text message from September 24, 2015 further states, "*Simple first. Pharma Pak. Then discuss Sentar. Trying my best to solve our problems.*" A copy of this text message is attached herein as Exhibit H.

31.     Cahill repeatedly stated to Edalat that Cahill himself did not have the liquidity needed to fund the venture, and that outside investors would need to be sought. However, as will be illustrated further, this was a

falsehood designed to fraudulently induce Edalat into diluting himself out of Pharma Pak, Inc., and to reduce Edalat's shareholder status in the Company.

  a. Attached as Exhibit I is a true and correct copy of an email from Plaintiff Cahill to Plaintiff Cullen, also mistakenly sent to Edalat, on January 29, 2016, wherein Cahill clearly lays out how he planned to dilute Edalat from the Company in order to give himself a majority Shareholder position.

32. Cahill introduced plaintiff Gregory David Cullen to Defendant Edalat for investment into Pharma Pak, Inc.

  a. Plaintiff Cullen received due diligence documents on Pharma Pak, Inc., including projections, from Pharma Pak, Inc. "Chief Financial Officer" Leslie Harold Wood on or about August 24, 2015. Attached as Exhibit J, is a true and correct copy of the communication between Wood and Cullen regarding Pharma Pak, Inc.

  b. In a September 14, 2015 text message from Cahill to Edalat, Cahill states, in part, "*Glad you and Greg could work it out. He will be a great partner.*" Furthermore, in a follow up September 17, 2015 text message from Cahill to Edalat, Cahill states, "*Call Greg He's*

*in but just wants to make sure all the documents are in order. Greg*

*will be like John Crowther, provide funding without second*

*guessing all of our decisions."* In essence, Cahill was actively

seeking to fill the investor roster with those he knew would not

interfere with daily operations or Cahill's mismanagement of

Pharma Pak, Inc. A copy of these text messages is attached

herein as Exhibit K and Exhibit L, respectively.

c.  In an October 10, 2016 text message from Plaintiff Cahill to Edalat,

Cahill stated, in part, "*just finished with Greg He is still back east.*

*Returning tomorrow I think he can come up with $250k next week,*"

and "*Hope you can Close* [sic] *the deal Paul".* This message is

attached herein as Exhibit M.

d.  Plaintiff Cullen purchased a quantity of Edalat's personal shares,

and a quantity of Company held shares for a total of 2.5% of

Pharma Pak, Inc. shares on or around October 2015. Plaintiff

Cullen paid to Edalat $100,000 for Edalat's shares, and paid to

Plaintiff Cahill a further $150,000 for the remaining shares.

Plaintiffs' allegation that Cullen gave to Edalat personally

$250,000 is a blatant falsehood.

33.   Cahill introduced plaintiff Ronald Ventura Franco to Edalat and Pharma Pak, Inc. Franco purchased his shares directly from the corporation on or around October 2015. Edalat is informed based on belief that Plaintiff Franco paid to Plaintiff Cahill directly monies for his certain percentage in Pharma Pak, Inc.

34.   Plaintiff Scott, Scott's business partner Chris Campbell, and Scott's trust EL-1 Trust purchased a quantity of Edalat's personal shares on or around November 2015. True and correct copies of the communication regarding this purchase is attached as Exhibit N.

a.   Furthermore, as part of his investment discussions with Edalat, Scott made statements to Edalat regarding the success of his ongoing multi-level marketing and distribution businesses in the dietary supplement sector. Knowing of Edalat's nearly three decades of experience in the dietary supplement industry, Scott found Edalat's contacts and knowledge to be a valuable asset for his operations, and attempted to leverage this in order to acquire Edalat's rolodex of contacts.

b.   Scott, along with Scott's attorney Matthew Starley, conceived an idea to create a company with Edalat that would acquire various brands in the dietary supplement sector.

Scott attempted to induce Edalat to introduce Edalat's wealthy friends and contacts to Scott for investment in this new venture named Maybach. In early January 2016, Scott's assistant was soliciting information from Edalat in order to put together an Executive Summary for the newly formed Maybach corporation. Edalat was promised 50% of this new venture. To date Edalat has received no information regarding Maybach, no corporate documents, and none of the marketing materials Scott implied he was creating.

c.  Scott further intended to induce Edalat into investment in Scott's so called 'church', a money laundering scheme utilized by Scott and his partners in order to avoid paying taxes. Scott had, in passing, made reference to this so called Church as located in the State of Georgia.

35.  At the time of Shareholders' collective initial investments, Cahill was said to have secured certain patent rights from Weimann, the Chief Technical Officer of the Company. As part of his employment, Weimann was to develop certain patents for Pharma Pak, Inc.

  i. Weimann and Cahill further conspired to place patent applications for illicit substances under Edalat's name in order to hide the true originator of the patents.

  ii. Weimann and Cahill are currently conspiring, as of June 2016, to reassign patents otherwise belonging to Pharma Pak, Inc.

  iii. It was the promise of these certain Pharma Pak, Inc. patents that caused Edalat and other investors to continue funding Pharma Pak, Inc. operations.

36. Plaintiff Cahill had induced Edalat to allow him to become CEO and President of Pharma Pak, Inc., by promising to leverage his various contacts acquired over the decades.

 a. One such person Cahill courted for Pharma Pak, Inc. was Dr. Elizabeth M. Hagerman, a former fellow Trustee of Rose-Hulman Institute of Technology with Cahill. Cahill stated that Hagerman, a former Baxter Healthcare executive, would be interested in joining the Board for Pharma Pak, Inc.

  i. Cahill brought Hagerman to the Pharma Pak administrative offices at 17802 Sky Park Circle, brought Hagerman to the

17809 Gillette Ave manufacturing facility, and also flew to Indianapolis to visit Hagerman.

b. Another individual Cahill sought to bring in for Pharma Pak, Inc. was Associate Professor of Pharmaceutical Sciences at the University of California at Irvine Mahtab Jafari. Attached as Exhibit O is a copy of Cahill's October 11, 2015 text message.

c. Cahill stated in various meetings for Pharma Pak, Inc., that his contacts spanned the Pharmaceutical and Technology industries, and that he would fill the Board of Directors with notable names. However, to date Cahill had failed to bring any of these individuals on for Pharma Pak, Inc.'s benefit.

37.   Plaintiffs fraudulently and maliciously claim that Sentar Pharmaceuticals is a successor corporation to Scilabs Nutraceuticals, which is not only a blatant falsehood, but intended to interrupt and otherwise materially disadvantage future business of Sentar Pharmaceuticals.

a. Plaintiff Cahill is well aware that Scilabs Nutraceuticals, Inc. had no relationship to Sentar Pharmaceuticals nor any other Edalat entity. Furthermore, Cahill was entirely aware of the developing FDA concerns, and of its resolution. As an example of proof of

such knowledge find attached as Exhibit P, a true and correct copy

of an email from Edalat to Cahill regarding the matter, and Edalat's

full disclosure of the situation.

b. Plaintiff Cahill had been involved with multiple conversations

concerning the Scilabs Nutraceuticals, Inc. and Scilabs

Pharmaceuticals (a DBA of EFT Global Holdings) distinction,

including conversations with Food and Drug Administration

counsel Stephen Cook at Brown Rudnick, LLP. Attached as

Exhibit Q is just one such example.

In fact, Cahill urged Edalat *on multiple occasions* to change the

original name of Scilabs Pharmaceuticals to avoid the very

confusion Plaintiffs attempt to capitalize on.

c. Plaintiff Cahill was fully aware that EFT Global Holdings dba

Sentar Pharmaceuticals sought to formalize the Sentar

Pharmaceuticals name in preparation for potential future business

endeavors including investment, potential IPO, and finalization of

the Sentar patents.

  i. As Plaintiffs' have made apparent, their lack of due

diligence, and desire to confuse the record, is profound.

While Sentar Pharmaceuticals, Inc. is registered in Nevada,

no operations have moved to Nevada, no business takes place in Nevada, and furthermore the registration was nothing more than reservation of the Sentar Pharmaceuticals name.

d. Plaintiff Cahill, used his long standing corporate experience, and leveraged his existing Board of Trustees positions with the University of California at Irvine, Rose-Hulman Institute of Technology, the Oceania Institute, and other institutions, to induce Edalat into allowing Cahill to become an 'advisor' to Edalat in regards to Sentar's development, among other things.

e. At the time Cahill stepped in to advise Edalat on Sentar related matters, Sentar was in the preliminary stages of potential Initial Public Offering conversations. Cahill attended many of these meetings in the guise of advisor to Edalat.

f. Plaintiff Cahill gave instrumental input to Defendant Barghi in regards to EFT Global Holdings dba Sentar Pharmaceuticals related marketing materials from on or around February 2015 through approximately November 2015. These marketing materials included the Sentar Pharmaceuticals Website Plaintiffs' quote in their First Amended Complaint.

38.     Plaintiffs fraudulently and maliciously claim that the Sentar

Pharmaceuticals patents are illegitimate, and that work on patent related

matters for Sentar Pharmaceuticals had ceased. They know this to be

untrue. In fact, the patent has moved to advanced stages of inspection

by those countries IP protection has been applied for. Furthermore,

Cahill was updated on the patent process, and in communication with

Sentar patent attorney Peter Gluck, formerly of Brown Rudnick LLP, at

least through December 2015. Attached as Exhibit R is one such

example of Cahill's communication with Sentar attorney Gluck. Plaintiffs

have made this claim in an attempt to disadvantage and otherwise

thwart Sentar's current business, and have in fact materially

economically damaged Sentar Pharmaceuticals with the filing of this

malicious complaint.

39.     Plaintiffs are well aware that a valid pharmaceutical processing

license existed for the 17809 Gillette facility, a copy of which is attached

herein as Exhibit S. A copy of this license was, until at least January

2016, physically present on the wall at the 17809 Gillette facility. The

license did not expire until February 13, 2016, and was, even with the

FDA consent decree, able to be utilized until such time that Pharma Pak

obtained its own licensure.

40.    Plaintiffs are well aware that it was Cahill's complete and utter refusal to obtain necessary licensure on the 17809 Gillette Avenue facility that lead to the lack of finalized purchase orders. Cahill's repeated statements that "I've got this buddy" and "it's being handled" were lulling, and induced Edalat to otherwise believe that Cahill was handling the necessary applications,

   a.  Pharma Pak employees were, as early as February of 2015, actively seeking information on, and gathering documentation for, appropriate licensing for the 17809 Gillette facility. At the time of Karpinski's hire in June of 2015, repeated requests for Cahill's input and signature had already been made. A multitude of supporting documents in this regard have been submitted for the Court's review under Defendant Karpinski's Answer to the First Amended Complaint, Docket Number 29 in this case. In the interests of conserving the Court's time, Defendant Edalat does not reincorporate those Exhibits in Edalat's Answer.

41.    Plaintiffs are well aware that it was Cahill's own personal counsel, Timothy Balog of Balog & Rasch LLP, that incorporated the Pharma Pak name on or around February 10, 2015, and further that Balog's office controls the Books and Records of the entity.

a. Attached as Exhibit T is a true and correct copy of the Articles of Incorporation of General Stock Corporation filing with the California Secretary of State. Furthermore, attached as Exhibit U are true and correct copies of the founding Articles of Incorporation of Pharma Pak, Inc. listing Edalat as Secretary of the Corporation.

b. Without Shareholder approval, and unbeknownst to Edalat and the other Shareholders, Cahill and Leslie Harold Wood filed a Statement of Information with the California Secretary of State on April 1, 2015, removing Edalat as Secretary, and placing Wood as both Secretary of Pharma Pak, Inc., and Chief Financial Officer. A true and correct copy of this document is attached as Exhibit V.

c. Unbeknownst to Edalat, Cahill utilized this document to remove Edalat's name from the corporate bank account. Given Cahill's long standing relationship with First Foundation Bank in Newport Beach, California, as both a retail banking customer, and a Trustee at the University of California, Irvine, Cahill was able to use this relationship to improperly remove Edalat's name from the Pharma Pak, Inc. corporate bank accounts without notice to, or approval of, the Pharma Pak Board of Directors or Edalat himself.

Cahill had, on many previous occasions, boasted about his relationship with the First Foundation Bank CEO. It is also believed that Cahill utilized the services of Assistant Vice President Kyle Auslander and Universal Banker Claudia "Isela" Esquivel for his fraudulent transactions.

d. Attorney Balog failed to conduct appropriate and timely Shareholder meetings, failed to keep updated and complete copies of records, failed to circulate copies of relevant documents altered by Cahill, and neglected to keep shareholders informed of their rights pertaining to inspection of such records, at the direction of Plaintiff Cahill.

In fact, Plaintiff Cullen noted the sloppy recordkeeping practices of Cahill and Counsel in an email dated September 18, 2015 to both Cahill and Edalat regarding his investment and involvement in Pharma Pak, Inc. Attached is a true and correct copy of this email as Exhibit W.

42.   Plaintiffs repeatedly accuse Edalat of illicit visits to Las Vegas, when in fact they were well aware of Edalat's presence at meetings in Las Vegas to further Pharma Pak, Inc. business. Attached as an example of Plaintiffs' knowledge as Exhibit X is a copy of Cahill's October 19, 2015

text message to Edalat stating, in part, "*Paul Stay in Vegas and keep everything moving there.*"

43.   Plaintiffs repeatedly accuse Edalat and Karpinski of misusing Company funds for personal enrichment, despite being aware of the following facts:

a. Neither Edalat nor Karpinski had access to the Corporate bank accounts, all reimbursements to both parties were approved by Cahill and further signed for by Pharma Pak, Inc., "Chief Financial Officer" Leslie Harold Wood, a long time lackey and employee of Cahill's.

b. The venue of Las Vegas, Nevada was a convenient middle point between Scott's location in St. George, Utah, and the Pharma Pak, Inc. offices in Irvine, California. Due to frequent travel to the city, and with the intention of overseeing operations at the new Sentus facility at 1850 Whitney Mesa in Henderson, Nevada Edalat personally rented an apartment on the Las Vegas Strip. Plaintiffs' were all frequent guests, and used the apartment at any time they wished.

c. Cahill, and his son Brent (employed by Pharma Pak, Inc. as a financial analyst) used the cover of Company funded meetings in

Las Vegas as unauthorized, *Company funded*, vacations.

On or about June 1, 2016, at a Pharma Pak, Inc., meeting in Las Vegas, Cahill brought with him a Dr. Stefanie Bernritter Kleine or, "Dr. K", whom Cahill stated held three PhD's from the University of California, Los Angeles, the University of Chicago, and Pepperdine University. Attached as Exhibit Y is a screen shot of Bernritter-Kleine's public Facebook.com profile. Exhibit Z is a true and correct copy of Cahill's email to Edalat dated February 18, 2016 wherein Cahill states that "Dr. K" was a neurological expert, and actively working with the National Football League conducting concussion research, and further that "Dr. K" was a well respected researcher for children's brain issues. (It would later be discovered that Kleine holds no such credentials.) Attached as Exhibit AA is a a copy of Kleine's LinkedIn.com account, and as Exhibit BB a copy of Kleine's Curriculum Vitae as posted to her website workingmindscoaching.com

Despite Cahill's statements, and insinuations that Kleine would be acting in an advisory capacity to Pharma Pak, Inc., at no time was "Dr." Kleine involved in furthering Pharma Pak, Inc. business opportunities despite her presence at these meetings.

In fact, Cahill referred to Kleine as his "assistant" in the presence of potential Company partners, allowed her to attend confidential meetings, discussed with her confidential Company information, and further had Kleine accompany him on a trip to the Crazy Horse III, a famous Las Vegas adult entertainment establishment. Cahill, in an unauthorized use of Company funds, paid for her travel and meals, and allowed Kleine to charge spa services to Company funded suite at the Wynn Encore Hotel in Las Vegas, Nevada. Attached as Exhibit CC is a screen shot of Kleine's own social media page, placing her at the Encore the same weekend as Cahill, with a picture of the suite Edalat provided for Cahill's use.

i. Cahill's pattern of extramarital affairs, and sexual harassment of women, only became apparent to Edalat towards the end of 2015, when he began to have more personal conversations with Cahill associates, including Cahill's wife, Karen Jane Cahill (nee Grobba). Grobba-Cahill conspired with her husband to lull Edalat into further investments of monies and resources into Pharma Pak, Inc. for her own benefit.

  ii. Despite his close professional relationship with Defendant Karpinski, Edalat was unaware that Cahill had been harassing Karpsinki since her hire.

 d. Defendant Scott was also present at many Pharma Pak, Inc. related meetings in Las Vegas. Scott, usually accompanied by females he passed off as his assistants, would drink heavily, and was known to take these assistants back to his Company provided hotel rooms, or on excursions to local adult entertainment establishments.

One such assistant, by the name of Raman Sekhon, accompanied Scott on at least two visits to Las Vegas. Sekhon's own social media put her in the same hotel as Scott the same weekends as Company related meetings. Attached as Exhibit DD are Sekhon's own photographs with locations placing Sekhon at the Wynn Encore Hotel in Las Vegas Nevada the same weekend as a Company meeting with Plaintiff Scott.

 e. Both Plaintiff Cahill and Plaintiff Scott were known to drink excessively, with Scott frequently becoming inebriated and running up large tabs during Company dinners.

f.  In fact, thousands of dollars of reimbursements remain outstanding

to Edalat, who not only paid for many of these business related

dinners, but used his own personal 'comps' in Las Vegas to obtain

suites for Plaintiff Cahill, Plaintiff Scott, and their various guests.

44.  Plaintiffs fraudulently state that Edalat, and co-defendant Barghi,

created and maintain Sentus Land Management, the operating company

holding title to the property at 1850 Whitney Mesa Drive in Henderson

Nevada. Cahill himself was heavily involved in the negotiations for

purchase of the 1850 Whitney Mesa property, but also the development

of potential business opportunities in the building.

Proof that Plaintiffs are fully aware of the true owners and incorporators

of Sentus is attached as Exhibit EE. Furthermore, Plaintiffs have had

ample access and opportunity to inspect the 1850 Whitney Mesa Drive

property, and are fully aware that it is, and always has been,

unoccupied. In fact, Defendant Edalat and Defendant Barghi have

performed thousands of dollars of uncompensated renovation work

within the building.

45.  Plaintiffs' are aware that Defendant Cahill had, for personal gain,

otherwise abused his position as CEO at Pharma Pak, Inc., to pay for

personal expenses, including a fraudulent forged lease, fraudulent

salary to himself, conspiracy with Wood to defraud the lessor of the manufacturing facility and utility companies, and embezzlement from the Corporate bank account. These items were discovered in or about January 2016 by non-plaintiff shareholder Amir Asvadi. It was also around this time that Edalat discovered Plaintiffs Cahill, Cullen, Scott, and Franco, were actively conspiring to remove Edalat from Pharma Pak, Inc.

a. Plaintiff Cahill forged Defendant Edalat's signature on a lease between a "Scilabs Pharma, Inc." and Kira Investments LLC – a Cahill family entity- for office space at Kira Investments owned property 17802 Sky Park Circle in Irvine, California. A true and correct copy of this forged lease is attached as Exhibit FF. Kira Investments is a defunct entity in the State of California: attached as Exhibit GG, is a copy of the California Secretary of State's website illustrating this fact.

i. Edalat only became aware of the existence of this lease in or around January of 2016 during a Shareholder meeting. Plaintiff Cullen sent a copy of this lease to non-plaintiff shareholder Amir Asvadi on February 20, 2016. A copy of Cullen's email is attached as Exhibit HH.

ii. According to public tax records, Cahill and the Cahill Family Trust along with Cahill Bruce E. Family Trust used this lease document in or about March 2015 as part of a loan application with First Foundation Bank for $5,000,000 against the property located at 1330 Moorea Way in Laguna Beach, California, APN 641-491-03 and 641-491-02.

iii. Cahill has a longstanding relationship with First Foundation Bank as both a retail banking customer and as Trustee of the University of California at Irvine. Cahill may have leveraged his position as Trustee in order to gain favors from First Foundation Bank.

iv. On February 17, 2016 Plaintiff Cullen emailed a copy of a Microsoft Excel spreadsheet to all Pharma Pak, Inc., shareholders. A copy of this email is attached as Exhibit II.

    1. The subject forged lease is dated January 1, 2015.

    2. Kira Investments did not begin taking payments from Pharma Pak, Inc. until approximately August of 2015.

    3. Kira Investments took payments until February of 2016.

4. In total Kira Investments took over $31,000 in 7 rent payments from Pharma Pak, Inc. in addition to over $35,000 in security deposits and payments that are unaccounted for. A screenshot detail of the document provided on February 17, 2016 by Plaintiff Cullen is attached as Exhibit JJ, and illustrates the payments made by Pharma Pak, Inc. to Kira Investments, LLC for the supposed lease. No accounting exists for those monies removed by Cahill directly from the Pharma Pak, Inc. bank account.

v. Defendant Edalat, knowing that he did not sign said lease with Kira Investments, immediately sent a copy of this lease to a hand writing analysis expert, Phil Sprague. Sprague's credentials included over 5,000 criminal and civil trials as an expert witness for a multitude of law enforcement agencies, including the FBI. Sprague's analysis concluded that Edalat's signature on the Kira Investments lease was a forgery, and this assessment is attached as Exhibit KK.

vi. Edalat is informed based on belief that Kira Investments is the vehicle through which Plaintiff Cahill funnels monies to

his daughter, Kira Cahill. Plaintiff Cahill had previously made statements in late 2015 to Edalat and others that his daughter had "blown through" over $100,000 in less than three months due to her "Hollywood lifestyle". Furthermore, Plaintiff Cahill had alluded to Cahill's ongoing narcotics habit. Cahill frequently called Plaintiff Cahill asking for money, and Kira Investments was a convenient way to surreptitiously provide funding for Cahill's lifestyle.

b.   Cahill paid to himself, without Shareholder approval, or notice to other shareholders, a salary of $20,000 per month.

c.   Cahill paid personal expenses through the Pharma Pak, Inc. bank account, including but no limited to personal credit card payments, and reimbursements.

d.   Cahill, without notice to shareholders, conducted two transactions below the $10,000 threshold at First Foundation Bank in an attempt to evade required reporting for cash transactions over $10,000.

e.   Cahill deliberately conspired with Wood to defraud Olen Corporation, the lessor of the 17809 Gillette Avenue manufacturing facility by failing to pay rent for the months of

February and March, without notifying Olen of lease termination, or notifying the other shareholders, including Edalat. Given his long standing relationship with Olen Corporation, Edalat was personal guarantor on this property lease.

    f.  Cahill deliberately conspired with Wood and failed to pay invoices due to vendors, utilities, and contractors in an attempt to saddle Edalat with the impending debt on the 17809 Gillette property.

46.    Plaintiff Scott, made lulling statements to Edalat that he "sided" with Edalat in the ongoing dispute with Cahill, going so far as to call Cahill "bipolar", a "narcissist", "seriously manipulative", and questioning if Cahill was using the illicit Tetrahydrocannabinol "THC" patches made by Dr. Ludwig Weimann, during a phone call with Edalat and others. Scott repeatedly stated that he would assist Edalat and non-plaintiff Shareholders in regaining control of Pharma Pak, Inc., and that his existing companies were the perfect model of distribution for Pharma Pak, Inc. products.

    a.  A series of text messages between Scott and Edalat in early February 2016 illustrate Scott's attempts to earn Edalat's trust, and thus retrieve sensitive and confidential data from Edalat.

i. Scott's February 1, 2016 text message read, in parts "*I am really grateful for the opportunity to work with you," "your* [sic] *loaded with gifts bro," "You have made a lot of money because its* [sic] *a direct result of who you are. I could throw you in a pile of shit and you would come out smelling like a rose. I may not be good at the tables in vegas* [sic] *but I am good with people. My money is on your* [sic] *bro.".* A copy of this message is attached herein as Exhibit LL.

ii. In a February 4, 2016 text message to Edalat, Plaintiff Scott states to Edalat that Matthew Starley, Scott's counsel, advised that Edalat should revoke his signatures on documents recently signed by Edalat for Pharma Pak, Inc. Attached herein as Exhibit MM is a copy of this text message.

iii. A further message from Scott in the same chain goes on to say that "*People like Bruce think everything is real so they take everything personal and constantly feel threatened,"* and "*…by allowing Bruce to feel like he is winning the game when in fact he is playing the game exactly the way the conscious person is dictating."* Scott further went on to state

that *"Paul from day one I could tell that you knew that life is a game. That's what make* [sic] *you powerful."* A copy of this message is herein attached as Exhibit NN.

b. Scott manipulated Edalat into allowing Scott access to Edalat's counsel, Lisa Salisbury, and all legal strategy, and further shared this information with his fellow Plaintiffs. Scott never intended to engage Edalat's counsel, and only made false statements to Edalat in an attempt to glean information in a long planned conspiracy with co-plaintiffs. As of June 2016, Scott is actively participating in the Life Tech Global LLC venture with Cahill and Plaintiffs.

47.    Plaintiff Cullen repeatedly stated to Edalat and other shareholders that Cullen would step in as interim "Chief Financial Officer" in order to sort out not only the financial affairs of Pharma Pak, but assist in placing a proper valuation on the Company. Cullen took the lead in collecting missing corporate documents in a February 2, 2016 email to Pharma Pak, Inc. counsel Timothy Balog. Furthermore, Cullen agreed with non-plaintiff shareholder Amir Asvadi that the Company and fellow shareholders would not be held liable for, nor be liable for defense against, any misdeeds by Cahill. A true and correct copy of Asvadi's

email dated February 11, 2016 is attached herein as Exhibit OO. A true

and correct copy of Cullen's email stating "*No shareholder should have*

*to defend a CEO for wrong doing.  I agree*" dated February 11, 2016 is

attached as Exhibit PP.

48.     In or about February 2016, Karpinski and other employees

discovered Cahill, Cullen, Scott, and Franco had conspired with Dr.

Weimann and Ertan Aydinol, to produce, among other things, illegal

Tetrahydrocannabinol "THC", a Schedule 1 drug, at the Gillette Avenue

facility, despite the lack of appropriate licensing. After learning of this,

Karpinski notified Edalat, who upon consultation with the FDA, FDA

counsel, and FDA consultants among others, informed the Irvine Police

Department. Upon their investigation at the 17809 Gillette Avenue

facility, the responding IPD officers noted that the stash of

Tetrahydrocannabinol ("THC") containing products found within the

building was the largest they had seen to date. There is currently an

open investigation with the Irvine Police Department, Case number 16-

3257, assigned to Detective Grange. Attached as Exhibit QQ is a true

and correct copy of the Irvine Police Department business card with the

pending investigation case number.

49.   That same week, Dr. Weimann informed Plaintiffs, that the Irvine Police Department had removed the THC from the 17809 Gillette facility building, upon discovering this fact, Cahill fired *some*, but not all, of the employees in retaliation against Edalat. These employees have filed a wrongful termination claim against Cahill and Plaintiffs'.

50.   On March 3, 2016, Cahill, Wood, and the unnamed "private investigator" told Defendant Karpinski that a "majority shareholder's vote" had dissolved the corporation.  No such vote had taken place. In fact, Edalat's counsel, Thomas Poletti of Manatt Phelps Phillips, warned Cahill in a letter dated March 4, 2016 not to proceed with this course of action. Attorney Poletti's letter further requested access to applicable Books and Records for the Company, which were never provided. Attached as Exhibit RR is a copy of the letter addressed to Cahill from Manatt, Phelps, Phillips.

51.   Cahill, Wood, and Cahill's unnamed "private investigator" told the manufacturing employees that "[Edalat's] actions" had caused them to be fired, and that Pharma Pak was being shut down. Employees harassed and threatened with legal action include: Olivia Karpinski, Luis Navarro, Jesse Suarez, Luz Navarro, Alonso Navarro, Alex Rosales, and Martin Garcia. These employees were specifically targeted due to

their relationship with Edalat. In addition to this, these employees were wrongfully terminated in direct retaliation for reporting the illegal activities of Cahill, Weimann, and the other Plaintiffs:

52.    Cahill damaged the Company materially by hiring employees, and contractors, with questionable backgrounds, without performing necessary due diligence or full disclosure to Shareholders:

   a. Dr. Ludwig Jan Weimann, Chief Technology Officer hired on or about June 2015: An expert in transdermal patch delivery systems, Weimann had formerly worked at an unlicensed transdermal patch research and manufacturing facility in San Diego, California, illegally producing Tetrahydrocannabinol "THC", Cannabidol "CBD", and other medical marijuana related patches and unregistered, unapproved, medical devices. Weimann possessed a California medical marijuana card, and obtained samples of THC among other illicit substances through his pre-existing relationships in the marijuana industry; attached as Exhibit SS are examples of Weimann's use of cannabinoid, "CBD", and history of contacts within the marijuana industry.

   i.  Weimann was paid a salary of approximately $93,000 per

       year, including benefits such as lease payments on a BMW

       328i.

  ii.  Weimann was to produce for Pharma Pak, Inc. a series of

       patents for among other things, transdermal patches.

       Weimann, in a move calculated to secure his employment

       contract and full benefits, stated that he owned these

       patents, however, this was a fraudulent statement.

 iii.  Weimann and Cahill further conspired to place patent

       applications for illicit substances under Edalat's name in

       order to hide the true originator of the patents.

  iv.  Weimann and Cahill are currently conspiring, as of June

       2016, to reassign patents otherwise belonging to Pharma

       Pak, Inc.

   v.  It was the promise of these certain Pharma Pak, Inc. patents

       that caused Edalat and other investors to continue funding

       Pharma Pak, Inc. operations.

b. Mark John Erfurt, Information Technology Consultant engaged

   at the formation of the Company in February 2015: Erfurt has a

   criminal history for hacking, and unauthorized access into

computer systems of a Cahill competitor in 2003. Furthermore, Erfurt had been convicted of obstructing an FBI investigation in order to protect Cahill and his company, Centaur Corporation, and sentenced to five months' imprisonment as well as five months' house arrest and three years' probation. A true and correct copy of the Department of Justice press release dated August 31, 2004, and an article concerning the incident dated December 1, 2004 are attached as Exhibit TT. This had not been disclosed to Edalat or the other shareholders and employees of the Company. Erfurt was given full access to employee computers, employee passwords, confidential Company information, given false reimbursements, and exaggerated compensation. As of February 2016, Erfurt was paid in excess of $26,000 through his company Tec-in-a-Sec, which holds no business license in Irvine, California, for management of a pre-existing computer network encompassing fewer than 7 full time users.

*Furthermore, Erfurt has destroyed vital company records, including electronic mail belonging to Defendants', and stolen non-Pharma Pak, Inc. servers and computer systems from the*

*17809 Gillette Facility. Erfurt has also removed and potentially destroyed the pre-existing video surveillance system present in the 17809 Gillette Avenue facility.*

c. Ertan Aydinol, Vice President of Manufacturing hired on or about December 2015: Aydinol formerly worked with Weimann at the unlicensed patch facility in San Diego, and at the time of his hire was spending a majority of his time travelling between the United States and Turkey, where his father purportedly owns a manufacturing facility. Unbeknownst to Edalat, Karpinski and the other shareholders and employees, but known to Cahill, Aydinol had previously been investigated by the FBI for suspected bomb making activities. Although the FBI could not conclusively prove Aydinol's participation in illegal activities, he was banned from "owning certain items". Aydinol, despite not having performed any work for the Company, was awarded a base salary of $165,600 annually, plus full benefits and full commission. A true and correct copy of Aydinol's unsigned employment agreement is attached as Exhibit UU. Aydinol had stated to Cahill that he had been making "over $10,000 a month" at his former employer; however, Cahill never

did his due diligence, and it came to light that Aydinol's actual previous salary was a fraction thereof, and Aydinol's statements were purposefully fraudulent and misleading.

Most recently, Aydinol has been arrested for DUI and possession related charges for amphetamines in Boulder, Colorado, where it is believed he currently resides. A true and correct copy of Aydinol's arrest record and accompanying toxicology report is attached as Exhibit VV

As of February 2016, Aydinol was paid bonuses and advances for manufacturing in excess of $38,000, not including cash removed from the Pharma Pak, Inc. bank account under the guise of manufacturing payment.

d. Leslie Harold Wood, controller, hire date unknown: Wood is a long time employee of Cahill's, and by his own admission controls the accounting for many of Cahill's entities, including Kira Investments (aka Kira Invest), the Cahill Family Trust, Centaur Corporation, Centaur Sales, the Bruce E. Cahill Family Trust, and other as to yet unknown entities thought to total approximately 9 entities, as according to Wood himself. Wood was given an initial $1,800 per month salary by Pharma Pak,

that was then, without approval or proof of an employment contract, raised to an annual salary of $90,000. Wood controls and maintains the books and records, including accounting, for Cahill's various operations and shell corporations, signs all checks, orders supplies for these operations, and oversees the movement of money between Cahill's various bank accounts.

i.   Wood deliberately conspired with Cahill for failure to pay the lease payments at 17809 Gillette Ave for February and March of 2016, and failure to pay thousands of dollars in invoices to utilities and service providers.

1.   Wood failed to notify shareholders, or the lessor of 17809 Gillette Avenue that he did not intend to further pay payments on the property, *knowing that Edalat was personal guarantor on the Pharma Pak, Inc. lease on the property*.

a.   At the time of the firing of Employees there existed enough funds in the First Foundation Bank account to pay the due lease payments and utility bills. Wood deliberately paid Erfurt,

among others, the remaining monies in an

attempt to drain the bank account.

e. All four of these employees are currently employed by Life Tech

Global LLC (possibly doing business as Pharma Patch), the

successor corporation for Pharma Pak.

53. Cahill repeatedly and deliberately sabotaged Pharma Pak, Inc. and

conspired with fellow plaintiffs Cullen, Scott, and Franco to defraud

Edalat and other investors in the Company, for their own gain, and to

remove assets of Pharma Pak Inc., including investor monies.

Examples of these acts include but are not limited to:

a. Deliberate circumvention of Federal law in order to circumvent

legal reporting requirements for cash withdrawals over the

$10,000 reporting limit; in other words, structuring.

b. Failure to obtain necessary licensure on the 17809 Gillette Avenue

manufacturing facility in Irvine, California.

c. Deliberate delay in engagement of necessary consultants and

contractors to obtain the aforementioned licensure.

d. Deliberate circumvention of State and Federal law to produce illicit

medical marijuana patches, including those containing

Tetrahydrocannabinol "THC" and Cannabidiol "CBD".

1. Cahill had been warned by many industry experts and advisors not to produce these items in an unlicensed facility, yet proceeded to do so.

e. Deliberate circumvention of State and Federal law to produce unlicensed medical devices in the form of transdermal patches, and other items.

f. Further, while Edalat was overseas, in a self-styled "clandestine" operation at Weimann and Aydinol's former employer in San Diego, Cahill ordered the production of illicit THC and CBD containing patches. In order to preserve the Court's time, the entirety of these conversations have not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit U*.

i. Cahill paid to Aydinol a sum in excess of $19,000 for this illicit production, in cash withdrawn from the Pharma Pak bank account on or around December 7, 2015. A photograph of which Aydinol messaged to Karpinski on December 11, 2016 at 4:52 PM under the heading *"This is how I do business with Bruce….:) LOL"*.

Location data of the photograph puts Cahill and Aydinol in

La Jolla, California, near the site of the unlicensed manufacturing facility. This photograph depicts the interior of Cahill's late model Jaguar, with Cahill holding stacks of $100 dollar bills in his hands, and stacks of $100 dollar bills placed on the center console. It is believed that Aydinol and Cahill kept the cash. A true and correct copy of this photograph, along with the accompanying text message, are attached hereto as Exhibit WW

ii.  On around February 22, 2016, Cahill attempted to induce Karpinski into selling these patches by accepting cash in exchange for delivery of illegal materials. Believing this to be a set up, and a criminal act, Karpinski refused to participate in the transaction and notified Cahill, Edalat, and the other shareholders of her concern. In order to preserve the Court's time, the entirety of these conversations have not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit Z* and *Exhibit AA.*

g. Cahill and Plaintiffs conspired to grossly mismanage, and embezzle, from the corporate bank accounts and to defraud fellow non-plaintiff investors: These acts include, but are not limited to:

   i. Grossly exaggerated compensation to Ertan Aydinol, Mark Erfurt, and Leslie Wood.

   ii. Cash payments to Aydinol for illicit patch manufacturing at the San Diego facility of his former employer.

   iii. Overseas wire transfers to Aydinol for production of alleged machinery in excess of $20,000. Delivery of these machines were then accepted by the Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

   iv. Wire transfers to KNB Mfg. & Automation LLC in excess of $80,000 for machinery that was then removed by Pharma Pak, Inc. successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

   v. Other payments with as yet to be calculated sums for equipment and supplies removed by Pharma Pak, Inc.

successor company LifeTech Global LLC (possibly doing business as Pharma Patch).

vi. Payment of illicit salaries to Plaintiff Cahill, to the tune of $20,000 per month, for an unknown amount of time, without an employment contract or Board approval.

vii. Payment of Cahill's own credit card, and personal expenses, through the Company accounts.

viii. Payment to Kira Investments (Kira Invest), a Cahill family owned and controlled Company, based on a fraudulent, forged, lease in excess of $30,000.

ix. Payment of Company funded travel to Las Vegas and Colorado for non-company related activities, including a visit by Dr. Weimann to Las Vegas, on or around September 29, 2015, for a visit to the 1850 Whitney Mesa property, under the guise of attendance at an industry conference. Cahill had, in a text message on September 22, 2015, inquired of Edalat "*Do you have connections for rooms for Ludwig and me for Monday night in Vegas for the PharmaPak show?*". A copy of this text message was earlier incorporated as Exhibit K.

In order to preserve the Court's time, a photograph of Weimann and Cahill inside the building has not been reproduced, but may be found in Defendant Karpinski's Answer to the First Amended Complaint, Docket 29 of this case, as *Exhibit CC*.

x.   Conspiring with Leslie Wood for payment of other non Pharma Pak, Inc., payments through the Company bank account without approval.

54.   Cahill and Plaintiffs, including Wood and Brent Cahill, also conspired to defraud Edalat, and fraudulently induce Edalat's further investment into the Company with the presentation of falsified accounting, along with falsified business projections.

a.   In or about May of 2015, Plaintiff Cahill hired his then 17-year-old son Brent Cahill, as a "financial analyst", despite Cahill's lack of experience or expertise in the area. Plaintiff Cahill conspired with Cahill to produce falsified projections based on potential business for the Company, that led to Edalat's further investment in Pharma Pak, Inc. Attached as Exhibit XX is a screen shot of Brent Cahill's Facebook.com social media profile stating that he was employed by Pharma Pak, Inc. in this capacity.

b. Cahill's projections were also used as a basis for the valuation of Pharma Pak, Inc. by Plaintiff Cullen, who stated in a meeting in or about January 2016 that he felt Pharma Pak, Inc. was slated to be worth at least $300,000,000 in the next two years. Attached as Exhibit YY is an email from non-plaintiff Pharma Pak, Inc. shareholder John Crowther to Edalat on January 20, 2016, reiterating Cullen's statement. This email followed the Pharma Pak, Inc., shareholder's meeting wherein Cahill's duplicity was discovered by non-plaintiff Shareholder Amir Asvadi.

c. Wood presented to Edalat and shareholders falsified accounting records. When asked for the complete records, it took Wood over 2 weeks from the date of request on or about February 1, 2016 to provide a Microsoft Excel spread sheet work book of expenses, despite the fact that on June 3, 2015 the Company paid over $2,000 for QuickBooks Enterprise edition. Plaintiff Cullen finally provided the requested accounting records on or about February 17, 2016.

55.    Pharma Pak, Inc.'s successor company is Life Tech Global, LLC. Plaintiffs' are holding Defendant Edalat's shares in Constructive Trust.

a. Plaintiffs' have moved Pharma Pak's patents, cash, and other assets to this new entity by fraudulent means and without shareholder approval.

b. *Plaintiffs conspired to form this entity even before the firing of Pharma Pak, Inc. Employees on March 3, 2016.*

c. Plaintiffs have, and are currently, conspiring to defraud non-plaintiff Shareholders by reassigning certain patents and trademarks as belonging to Pharma Pak, Inc.

d. Plaintiffs further conducted business as Pharma Pak, Inc., in order to move business to Life Tech Global, LLC (possibly also doing business as Pharma Patch).

e. Plaintiffs' formed Life Tech Global, LLC on March 9, 2016 in the State of Delaware, despite the fact that Plaintiffs' nor anyone else involved has any ties with that State, only because that State does not require entities organized under its laws to be identified publically. A true and correct copy of Life Tech Global, LLC's Entity Details from the State of Delaware's Division of Corporation's website is attached hereto as Exhibit ZZ. Edalat is informed based on belief that Plaintiffs' utilized a third party registered agent Incorp Services, Inc., to perform this transaction and to evade detection.

f.  Plaintiffs registered the domain name of LifeTechGlobal.net on March 10, 2016. Attached as Exhibit AAA is a copy of the WHOIS report from ICANN.org.

g.  Attached as Exhibit BBB are screenshots of Life Tech Global's website at www.lifetechglobal.net/about.html. Plaintiffs' have committed RICO with their statements.

  i.  On the Life Tech Global website, Plaintiffs' state *"Life Tech Global a 24,000 square foot manufacturing facility in Irvine, CA, delivering products that positively influence the standard of care for our providers and their patients, while enhancing outcomes for our partners and stakeholders. Pharma Pak [sic] can ship most products to all 50 states."*

  ii.  Further, Plaintiffs' utilize a stock photograph of a textile manufacturing facility as if this photograph is of the Life Tech Global facilities in Irvine. Incorporated within Exhibit CCC is proof that Plaintiffs' utilized this stock photography in an attempt to defraud potential clients and investors.

h.  Attached as Exhibit DDD is a screenshot of Life Tech Global's website at www.lifetechglobal.net/index.html, stating that *"Medical devices and pharmaceutical [sic] are produced in a cGMP and CFR*

*compliant, FDA licensed manufacturing facility."* This statement is

fraudulent. No licensing exists under the Life Tech Global name,

not even a business license as illustrated by Exhibit EEE.

56.   <u>FORGERY UNDER CALIFORNIA PENAL CODE SECTION 470 (b)
& (d) PENAL CODE §472:</u>

*"(b)  Every person who, with the intent to defraud, counterfeits*

*or forges the seal or handwriting of another is guilty of forgery."*


*"(d) Every person who, with the intent to defraud, falsely*

*makes, alters, forges, or counterfeits, utters, publishes,*

*passes or attempts or offers to pass, as true and genuine, any*

*of the following items, knowing the same to be false, altered,*

*forged, or counterfeited, is guilty of forgery: any check, bond,*

*bank bill, or note, cashier's check, traveler's check, money*

*order, post note, draft, any controller's warrant for the*

*payment of money at the treasury, county order or warrant, or*

*request for the payment of money, receipt for money or*

*goods, bill of exchange, promissory note, order, or any*

*assignment of any bond, writing obligatory, or other contract for money or other property, contract, due bill for payment of money or property, receipt for money or property, passage ticket, lottery ticket or share purporting to be issued under the California State Lottery Act of 1984, trading stamp, power of attorney, certificate of ownership or other document evidencing ownership of a vehicle or undocumented vessel, or <u>any certificate of any share, right, or interest in the stock of any corporation</u> or association, or the delivery of goods or chattels of any kind, or for the delivery of any instrument of writing, or acquittance, release or discharge of any debt, account, suit, action, demand, or any other thing, real or personal, or any transfer or assurance of money, certificate of <u>shares of stock</u>, goods, chattels, or other property whatever, or any letter of attorney, or other power to receive money, or to receive or transfer certificates of shares of stock or annuities, or to let, lease, dispose of, alien, or convey any goods, chattels, lands, or tenements, or other estate, real or personal, or falsifies the acknowledgment of any notary*

*public, or any notary public who issues an acknowledgment*

*knowing it to be false; or any matter described in subdivision*

*(b)."*

57. Penal Code § 472

*"Every person who, with intent to defraud another, forges, or*

*counterfeits the <u>seal of this State, the seal of any public officer</u>*

*<u>authorized by law</u>, the seal of any Court of record, or the seal of*

*any corporation, or any other public seal authorized or*

*recognized by the laws of this State, or of any other State,*

*Government, or country, or who falsely makes, forges, or*

*counterfeits any impression purporting to be an impression of*

*any such seal, or who has in his possession any such*

*counterfeited seal or impression thereof, knowing it to be*

*counterfeited, and willfully conceals the same, is guilty of*

*forgery."*

58. <u>EMBEZZLEMENT UNDER CALIFORNIA PENAL CODE 503 & 504</u>

*"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."*

Cite as Ca. Pen. Code § 503

*"Every officer of this state, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of that officer, and <u>every officer</u>, director, trustee, clerk, servant, or agent of any association, society, or <u>corporation (public or private)</u>, who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement.*

Cite as Ca. Pen. Code § 504

59.   <u>VIOLATION OF 18 USC 1961</u>

*"As used in this chapter - "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, <u>robbery</u>, bribery, extortion, dealing in obscene matter, or <u>dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year</u>; (B) any act which is indictable under*

*any of the following provisions of title 18, United States Code:*
*Section 201 (relating to bribery), section 224 (relating to sports*
*bribery), sections 471, 472, and 473 (relating to counterfeiting),*
*section 659 (relating to theft from interstate shipment) if the act*
*indictable under section 659 is felonious, section 664 (relating*
*to embezzlement from pension and welfare funds), sections*
*891-894 (relating to extortionate credit transactions), section*
*1028 (relating to fraud and related activity in connection with*
*identification documents), section 1029 (relating to fraud and*
*related activity in connection with access devices), section 1084*
*(relating to the transmission of gambling information), section*
*1341 (relating to mail fraud), section 1343 (relating to wire*
*fraud), section 1344 (relating to financial institution fraud),*
*section 1425 (relating to the procurement of citizenship or*
*nationalization unlawfully), section 1426 (relating to the*
*reproduction of naturalization or citizenship papers), section*
*1427 (relating to the sale of naturalization or citizenship*
*papers), sections 1461-1465 (relating to obscene matter),*
*section 1503 (relating to obstruction of justice), section 1510*
*(relating to obstruction of criminal investigations), section 1511*
*(relating to the obstruction of State or local law enforcement),*
*section 1512 (relating to tampering with a witness, victim, or an*
*informant), section 1513 (relating to retaliating against a*
*witness, victim, or an informant), section 1542 (relating to false*
*statement in application and use of passport), section 1543*
*(relating to forgery or false use of passport), section 1544*
*(relating to misuse of passport), section 1546 (relating to fraud*
*and misuse of visas, permits, and other documents), sections*

*1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phono records, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological*

*weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501 (c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b (g)(5)(B);*

**1962. Prohibited activities**

*(a)      It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in*

*which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.*

*(b)      It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or*

control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)      It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d)      It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. Cite as 18 U.S.C. 1962

1964. Civil remedies

(a)      The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from

*engaging in the same type of endeavor as the enterprise*

*engaged in, the activities of which affect interstate or foreign*

*commerce; or ordering dissolution or reorganization of any*

*enterprise, making due provision for the rights of innocent*

*persons.*

*(b)    The Attorney General may institute proceedings under*

*this section. Pending final determination thereof, the court may*

*at any time enter such restraining orders or prohibitions, or take*

*such other actions, including the acceptance of satisfactory*

*performance bonds, as it shall deem proper.*

*(c)    Any person injured in his business or property by reason*

*of a violation of section 1962 of this chapter may sue therefor in*

*any appropriate United States district court and shall recover*

*threefold the damages he sustains and the cost of the suit,*

*including a reasonable attorney's fee, …*

*60.    California Corporations Code Section §2253:*

*"Any director of a stock corporation, domestic or foreign, who concurs*

*in any vote or act of the directors of the corporation or any of them,*

*knowingly and with dishonest or fraudulent purpose, to make any*

*dividend or distribution of assets except in the cases and in the manner allowed by law, either with the design of defrauding creditors or shareholders or of giving a false appearance to the value of the stock and thereby defrauding subscribers or purchasers, is guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars ($1,000) or imprisonment for not more than one year or both."*
*California Corporations Code §2254.*

*Every director, officer or agent of any corporation, domestic or foreign, is guilty of a felony (a) who knowingly concurs in making, publishing or posting either generally or privately to the shareholders or other persons (1) any written report, exhibit, statement of its affairs or pecuniary condition or notice containing any material statement which is false, or (2) any untrue or willfully or fraudulently exaggerated report, prospectus, account, statement of operations, values, business, profits, expenditures or prospects, or (3) any other paper or document intend to produce or give, or having a tendency to produce or give, the shares of stock in such corporation a greater value or a less apparent or market value than they really possess, or (b) who refuses to make any book entry or post any notice required by the law in manner required by law.*

# FIRST CLAIM FOR RICO

## BY ALL CROSS-COMPLAINANTS AGAINST

## ALL CROSS-DEFENDANTS

61.    CROSS-COMPLAINANTS re-alleges each and every allegation contained in ¶¶ 1 – 60.

62.    Cross-Complainants are informed and based upon believed allege that these Cross-Defendants have committed the following illegal and criminal actions:

a. Embezzlement of $900,000 cash and $100,000 worth of equipment from the company

b. Theft of trade secrets from the company

c. Production of illegal schedule 1 drugs on the Controlled Substance Act ("THC").

d. Transportation and distribution of said illegal drugs (THC) across state lines and international boarders,

e. Patent Infringement

f. Breaking and entering and the theft of $300,000 worth of products from Medipatch

g. Assault and Battery on a female employee

h. Sexually harassed a female employee

i. Forgery of documents for the purpose of obtaining a loan on real property while using false and fraudulent forged documents to give to the bank for a $5,00,000 loan without adequate income to secure the loan.  Cahill forged Edalat's signature on a purported lease of one of Cahill's property so that he could show the income. Thereby committing bank fraud.

j.   Cross-Defendants are producing pills and patches at their Oceanside location, which has not been approved by FDA and California Department of Public Health (CDPH).  These agencies are tasked with oversight of all facilities which produce such products and it is illegal to manufacture such products without the building, its location and other requirements for testing the products and securing samples in special rooms for inspection by these two departments.

63.   EMBEZZLEMENT UNDER CALIFORNIA PENAL CODE 503 & 504

*"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."*

Cite as Ca. Pen. Code § 503

*"Every officer of this state, or of any county, city, city and county, or other municipal corporation or subdivision thereof, and every deputy, clerk, or servant of that officer, and every officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement.*

Cite as Ca. Pen. Code § 504

64.   _VIOLATION OF 18 USC 1961_

"_As used in this chapter - "racketeering activity" means (A) any_
_act or threat involving murder, kidnapping, gambling, arson,_
_robbery, bribery, extortion, dealing in obscene matter, or_
**_dealing in a controlled substance or listed chemical (as_**
**_defined in section 102 of the Controlled Substances Act),_**
_which is chargeable under State law and punishable by_
_imprisonment for more than one year; (B) any act which is_
_indictable under any of the following provisions of title 18,_
_United States Code: Section 201 (relating to bribery), section_
_224 (relating to sports bribery), sections 471, 472, and 473_
_(relating to counterfeiting), section 659 (relating to theft from_
_interstate shipment) if the act indictable under section 659 is_
_felonious, section 664 (relating to embezzlement from pension_
_and welfare funds), sections 891-894 (relating to extortionate_
_credit transactions), section 1028 (relating to fraud and related_
_activity in connection with identification documents), section_
_1029 (relating to fraud and related activity in connection with_
_access devices), section 1084 (relating to the transmission of_
_gambling information), section 1341 (relating to mail fraud),_
_section 1343 (relating to wire fraud), section 1344 (relating to_
_financial institution fraud), section 1425 (relating to the_
_procurement of citizenship or nationalization unlawfully), section_
_1426 (relating to the reproduction of naturalization or citizenship_
_papers), section 1427 (relating to the sale of naturalization or_
_citizenship papers), sections 1461-1465 (relating to obscene_

*matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to <u>tampering with a witness, victim, or an informant</u>), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phono records,*

*computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501 (c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to*

*importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b (g)(5)(B);*

***1962. Prohibited activities***

> *It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.*

*It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.*

*It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

*It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.*

**Cite as 18 U.S.C. 1962**


**1964. Civil remedies**

*The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce;*

*or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.*

*The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.*

***Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, …***

65.     *California Corporations Code Section §2253:*

"*Any director of a stock corporation, domestic or foreign, who concurs in any vote or act of the directors of the corporation or any of them, knowingly and with dishonest or fraudulent purpose, to make any dividend or distribution of assets except in the cases and in the manner allowed by law, either with the design of defrauding creditors or shareholders or of giving a false appearance to the value of the stock and thereby defrauding subscribers or purchasers, is guilty of a*

*misdemeanor, punishable by a fine of not more than one thousand*

*dollars ($1,000) or imprisonment for not more than one year or both."*

*California Corporations Code § 2254.*

*Every director, officer or agent of any corporation, domestic or*

*foreign, is guilty of a felony (a) who knowingly concurs in making,*

*publishing or posting either generally or privately to the shareholders*

*or other persons (1) any written report, exhibit, statement of its affairs*

*or pecuniary condition or notice containing any material statement*

*which is false, or (2) any untrue or willfully or fraudulently*

*exaggerated report, prospectus, account, statement of operations,*

*values, business, profits, expenditures or prospects, or (3) any other*

*paper or document intend to produce or give, or having a tendency to*

*produce or give, the shares of stock in such corporation a greater*

*value or a less apparent or market value than they really possess, or*

*(b) who refuses to make any book entry or post any notice required*

*by the law in manner required by law.*

66.     CROSS-DEFENDANTS have conspired to steal the business started
by Edalat.  The purpose of this was so that they could steal intellectual
property, assets, and cash in order to manufacture illegal Schedule 1
drugs on the Controlled Substance Act.

67.    The Majority Shareholder, Paul Edalat, notified law enforcement of the illegal activities and law enforcement found a significant amount of THC liquid hidden in the building by Cahill and the other Cross-Defendants

68.    Immediately upon finding out that the police had been called and taken their hidden illegal product the Cross-Defendants fired these CROSS-COMPLAINANTS.    Cross-Defendants then moved their operations to two additional locations: 2929 Oceanside Blvd in Oceanside California, and 17802 Sky Park Circle in Irvine, California. At these locations they are producing, with Pharma Pak, Inc. owned equipment and intellectual property, illegal Schedule 1 drugs, and unregistered medical devices.

69.    Additionally, these CROSS-DEFENDANTS have used the wire services, US Mail services, committed bank, wire, and postal fraud in their criminal actions and activities.    They have also embezzled more than $1,000,000 in cash and assets from Pharma Pak, Inc. and its rightful shareholders.    This is a violation of *Corporations Code Section §2253.*

70.    As a direct result of this conspiracy and illegal acts, the CROSS-DEFENDANTS have stolen Edalat's business which had been valued at over $100,000,000.    Pursuant to the RICO statutes Edalat would be entitled to damages of three times that amount plus the actual amount of the damages, bringing these damages to a total of $400,000,000 against these CROSS-DEFENDANTS.

THE FOLLOWING CLAIMS FOR RELIEF ARE BASED UPON THE
FACTS THAT CAHILL AND HIS OTHER CO-CONSPIRATORS WERE
ACTING IN CONCERT AND ALL ACTS CLAIMS HEREUNDER ARE
ACTS RELATED TO THE FEDERAL ISSUE PRESENTED HEREIN
UNDER FEDERAL RULES OF CIVIL PROCEDURES 13, 14, 18, 19 & 20.

SECOND CLAIM FOR EMBEZZLEMENT
AGAINST ALL CROSS-DEFENDANTS
EXCLUDING CROSS-COMPLAINANT MEDIPATCH, INC.

71.   CROSS-COMPLAINANTS re-alleges each and every allegation contained in ¶¶ 1 – 70.

72.   CROSS-DEFENDANTS all conspired to steal money and assets from PHARMA PAK, INC. which had been given to the company by EDALAT as part of the agreement for the formation of this new corporation.  Cahill and fellow cross-Defendants stole more than $1,000,000 in cash and assets from Pharma Pak, Inc. and illegally transferred these to their new entity, Life Tech Global, LLC.

73.   Additionally, Bruce Cahill forged a lease with EDALAT's signature on it for a building owned by Cahill and his family under the entity Kira Investments, LLC, so that he could pass the lease off to First Foundation Bank as sufficient income to qualify for a $5,000,000 loan on his residence at 1330 Moorea in Laguna Beach, California.  Money was then taken monthly from PHARMA PAK, INC. to make the monthly payments on this fraudulently induced loan for Cahills' personal benefits.

74.   First Foundation Bank approved this fraudulent loan document given their long relationship with Cahill as Trustee of the University of California at Irvine.

75.   Each of these CROSS-COMPLAINANTS has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.


THIRD CLAIM FOR BREACH OF CONTRACT BY CROSS-COMPLAINANT EDALAT AGAINST CROSS-DEFENDANTS

76.   CROSS-COMPLAINANT re-alleges each and every allegation contained in ¶¶ 1 – 75.

77.   CROSS-DEFENDANTS stole all of the assets of PHARMA PAK, INC including patents, trademarks, cash, and equipment. These CROSS-DEFENDANTS stole and embezzled these assets and moved their operations to two additional locations: 2929 Oceanside Blvd in Oceanside California, and 17802 Sky Park Circle in Irvine, California. At these locations they are producing, with Pharma Pak, Inc. owned equipment and intellectual property, illegal Schedule 1 drugs, and unregistered medical devices.

78.   Immediately upon finding out that law enforcement had been called and law enforcement had taken their hidden illegal product the Cross-Defendant Cahill and the other CROSS-DEFENDANTS, in an act of retaliation, fired Karpinski and all of the other employees so as to make PHARMA PAK INC. totally insolvent, and to complete their conspiracy to steal all of the company and its assets, thereby breaching their contract with EDALAT.

79.   This is textbook breach of contract.  The contract was entered into by Cahill and EDALAT to form the new corporation.  The corporation is formed and Cahill gains control of it.  Cahill brings his fellow conspirators into the Company, and all monies that were placed into the company bank

accounts is stolen by them along with Pharma Pak, Inc.'s patents, trademarks, equipment, and other assets.

80.   PAUL EDALAT has been damaged by the actions of these Cross-Defendants, in an amount to be proven at time of trial.


FORTH CLAIM FOR BREACH OF FIDUCIARY DUTIES BY CROSS-COMPLAINANTS EDALAT & ASVADI AGAINST CROSS-DEFENDANTS

81.   CROSS-COMPLAINANT re-alleges each and every allegation contained in ¶¶ 1 – 80.

82.   CROSS-COMPLAINANT was owed a Fiduciary Duty by all Board Members, including these CROSS-DEFENDANTS.

83.   These CROSS-DEFENDANTS breached their duties by stealing company assets, attempting to steal EDALAT's patents, moving all of the company assets out of the Gillette Avenue office in Irvine California, and moving operations to two new locations.   Also, these CROSS-DEFENDANTS breached their duties when Cahill improperly sexually harrassed Karpinski on numerous occasions, and fired all of the employees in retaliation for their reporting of Cross-Defendant's illegal behavior.

84.   PAUL EDALAT AND AMIR ASVADI have been damaged by the actions of these CROSS-DEFENDANTS, in an amount to be proven at time of trial.


FIFTH CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS BY CROSS-COMPLAINANTS PAUL EDALAT AND AMIR ASVADI AGAINST CROSS-DEFENDANTS

85.   CROSS-COMPLAINANTs re-alleges each and every allegation contained in ¶¶ 1 – 84.

86.   In California there is a covenant of Good Faith and Fair Dealings in every contract.

87.   By doing the acts complained of hereinabove, these CROSS-DEFENDANTS have breached their contract and this covenant of good faith and fair dealings.

88.   CROSS-COMPLAINANTS PAUL EDALAT AND AMIR ASVADI have been damaged as a direct result of the actions of these CROSS-DEFENDANTS' actions in an amount of damage to be proven at time of trial, but no less than $100,000,000.


### SIXTH CLAIM FOR BREACH OF FIDUCIARY DUTIES BY CROSS-COMPLAINANTS PAUL EDALAT AND AMIR ASVADI AGAINST CROSS-DEFENDANTS

89.   CROSS-COMPLAINANT re-alleges each and every allegation contained in ¶¶ 1 – 88.

90.   Cahill and the other board members owed a fiduciary duty to PAUL EDALAT AND AMIR ASVADI.

91.   Cahill and the other board members breach that duty by embezzlement of company assets and contracts and making illegal drugs on the premises without a license.

92.   CROSS-COMPLAINANTS have been damaged as a direct result of the actions of these CROSS-DEFENDANTS' actions in an amount of damage to be proven at time of trial, but no less than $100,000,000.

### SEVENTH CLAIM FOR FRAUD BY CROSS-COMPLAINANT AGAINST CROSS-DEFENDANTS

93.   CROSS-COMPLAINANT PAUL EDALAT re-alleges each and every allegation contained in ¶¶ 1 – 92.

94.   CROSS-COMPLAINANT entered into a group of contracts with these Cross-Defendants which the Cross-Defendants broke because they never intended to comply with the terms and conditions of the contract.

95.   Cross-Defendants also fraudulently induced CROSS-COMPLAINANT into these contracts so that they could gain control of his company, his patents and his contacts so that they could steal the company.

96.   CROSS-COMPLAINANT has been damaged as a direct result of the actions of these CROSS-DEFENDANTS' actions in an amount of damage to be proven at time of trial, but no less than $100,000,000.

97.   Cross-Complainant will also seek to impose a Constructive Trust on all properties where the stolen moneys and assets have been taken and hidden by these Cross-Defendants; including their homes, office buildings and bank accounts.

EIGHTH CLAIM FOR TRESPASS TO REAL PROPERTY AND THE THEFT OF 15,000 PATCHES BY CROSS-COMPLAINANT MEDIPATCH AGAINST CROSS-DEFENDANTS

98.   CROSS-COMPLAINANT MEDIPATCH re-alleges each and every allegation contained in ¶¶ 1 – 97.

99.   CROSS-DEFENDANTS in furtherance of their conspiracy and criminal activities, broke into the Medipatch building while the owner of the company was out of town.  One of the conspirators had been a consultant with Medipatch and had a key to the property.  That consultant and Cahill both knew that the owner of the company had told them that he would not agree to their using his equipment and materials without him being there.  Knowing that he was out of town, the conspirators entered into the property without permission or justification.  And then they produced and manufactured more than 15,000 patches with a retail value of $300,000.

100.  CROSS-COMPLAINANT has been damaged as a direct result of the actions of these CROSS-DEFENDANTS' actions in an amount of damage to be proven at time of trial, but no less than $300,000.00.

101.  Cross-Complainant will also seek to impose a Constructive Trust on all properties where the stolen moneys and assets have been taken and hidden by these Cross-Defendants; including their homes, office buildings and bank accounts.

## DEMAND FOR JURY TRIAL

Demand is hereby made by the CROSS-COMPLAINANTS for a trial by Jury.

WHEREFORE, Plaintiffs prays for judgment as follows:

1.      General Damages according to proof.

2.      Special Damages according to Proof.

3.      Punitive Damages according to Proof.

4.      RICO Damages according to Proof.

5.      Such other relief as the court deems proper.

//

DATED: August 8, 2016

THE DURST FIRM

/S/    LEE H. DURST

BY:_____
LEE H. DURST

DATED: August 8, 2016

LAW OFFICES OF LARRY ROTHMAN

/S/    LARRY ROTHMAN

BY:_____
LARRY ROTHMAN

## PROOF OF SERVICE
### State of California, County of Orange

I am employed in the county and state aforesaid. I am over the age of 18 and not a party to the within action. My business address is 23 Corporate Plaza, Suite 150, Newport Beach, CA 92660.

On August 9, 2016, I served the foregoing document described as:

<u>ANSWER & CROSS-COMPLAINT / COUNTER - CLAIM</u>

on the parties listed below in this action by placing a true copy thereof or the originals via electronic mail through the ECF system of the United States District Court to the following

JMarkham@markhamread.com, BZerner@markhamread.com, & ERead@markhamread.com

Attorneys for Plaintiffs & Cross-Defendants
TOCOLLECT@aol.com
Attorney for Defendants and Cross-Complainants
DONALD HAMMAN
DHamman@stuartkane.com
ATTORNEY FOR THE BANK

[X]        BY ELECTRONIC MAIL. I caused the above document to be electronically mailed through the ECF system of the United States District Court. Executed on August 9, 2016, at Newport Beach, California.


[X]        FEDERAL. I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury under the laws of United States and the State of California that the above is true and correct.

/S/ Lee H. Durst

_____

Lee H. Durst