1              U.S. DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3

4

  BRUCE CAHILL, an individual, )
5 et al.,                       )
                                )
6           Plaintiffs,         )
                                )
7    vs.                        ) CASE NO.:
                                ) 8:16-cv-00686-AG-DFM
8 PAUL EDALAT, an individual,   )
  et al.,                       )
9                               )
            Defendants.         )
10 _____ )
  AND ALL CROSS-ACTIONS.        )
11 _____)

12

13                VOLUME I

14        VIDEOTAPED DEPOSITION OF

15        PAUL BENJAMIN EDALAT

16        COSTA MESA, CALIFORNIA

17          DECEMBER 21, 2016

18

19

20

21

22

23

  Reported by:
24 CARINA VALLES, CLR
   CSR 12605
25 No. 16-47965

PLAINTIFFS' EXHIBIT B - 1

```
 1              U.S. DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3

 4

   BRUCE CAHILL, an individual, )
 5 et al.,                       )
                                 )
 6            Plaintiffs,        )
                                 )
 7    vs.                        ) CASE NO.:
                                 ) 8:16-cv-00686-AG-DFM
 8 PAUL EDALAT, an individual,   )
   et al.,                       )
 9                               )
              Defendants.        )
10 _____  )
   AND ALL CROSS-ACTIONS.        )
11 _____  )

12

13

14

15               VOLUME I

16      VIDEOTAPED DEPOSITION OF PAUL BENJAMIN

17      EDALAT, a plaintiffs herein, taken on

18      behalf of the defendants, at 695 Town

19      Center Drive, Suite 700, Costa Mesa,

20      California, at 9:27 a.m., on Wednesday,

21      December 21, 2016, before Carina Valles,

22      CLR, CSR 12605.

23

24

25
```

PLAINTIFFS' EXHIBIT B - 2

```
 1    APPEARANCES OF COUNSEL:

 2    For Plaintiffs and Counterclaim-Defendants:

 3              MARKHAM & READ
                BY JOHN J. E. MARKHAM, II
 4              One Commercial Wharf West
                Boston, Massachusetts 02110
 5              617.523.6329
                Jmarkham@markhamread.com
 6


 7    For Defendants and Cross-Complainants:

 8              FORD & DIULIO, PC
 9              BY KRISTOPHER P. DIULIO
                695 Town Center Drive, Suite 700
10              Costa Mesa, California 92626
                714.384.5540
11              Kdiulio@forddiulio.com

12


13    THE VIDEOGRAPHER:  SHERRI MULFORD

14


15    ALSO PRESENT:  BRUCE CAHILL

16

17

18

19

20

21

22

23

24

25
```

**PLAINTIFFS' EXHIBIT B - 3**

```
 1                          I N D E X

 2   WITNESS:  PAUL BENJAMIN EDALAT

 3   EXAMINATION BY:                              PAGE

 4             Mr. Markham                          7

 5

 6

 7

 8                        E X H I B I T S

 9

10   DEPOSITION  DESCRIPTION                      PAGE

11   68         Business Entity Information        87

12   69         Default Judgment                   83

13   70         Email chain, Subject:  Tim. Balog  132
                (attorney) contact info
14
     71         In re Paul Edalat, Case No.        181
15              14-14529-TA, April 3, 2015

16   72         Summary of Schedules               205

17   73         Voluntary Petition                 208

18   74         Exhibit P, California Association   210
                of Realtors Commercial Lease
19              Agreement Between Kira Investments,
                LLC and Scilabs Pharma, Inc.,
20              dated January 1, 2015

21   75         Checks to Paul Edalat from         213
                Dare 2 Dream
22
     76         Exhibit KK, Expert Handwriting     215
23              Analysis in Re Edalat's Forged
                Signature on the Kira Investments
24              Lease Dated February 25, 2015

25
```

THE SULLIVAN GROUP OF COURT REPORTERS                    4

**PLAINTIFFS' EXHIBIT B - 4**

```
 1                    E X H I B I T S (Continued)

 2    DEPOSITION   DESCRIPTION                              PAGE

 3    77           Exhibit 3, Articles of                   220
                   Incorporation and Bylaws
 4
      78           Yellow sheet of paper, not utilized
 5
      79           Emails                                   234
 6
      80           Email, Subject:  Forecasts               261
 7
      81           Payment record, check to Paul            281
 8                 Edalat

 9    82           Check to Paul Edalat from                308
                   Pharma Pak, Inc. in the amount
10                 of $16,192.98 with receipts

11    83           Check to Paul Edalat from                316
                   Pharma Pak, Inc. in the amount
12                 of $1,139.98 with receipts

13    84           Encore Wynn Las Vegas receipt            317

14    85           Check to Paul Edalat from Pharma         318
                   Pak, Inc. in the amount of
15                 $5,618.19 with receipts

16    86           Check to Paul Edalat from Pharma         318
                   Pak, Inc. in the amount of
17                 $2,152.33 with receipts

18    87           Bizapedia profile for Health             323
                   Goddess, LLC
19
      88           Patent Cooperation Treaty,               331
20                 International Preliminary Report
                   on Patentability
21
                       QUESTIONS NOT ANSWERED
22
                          PAGE        LINE
23
                           54          15
24                         61          22
                          190           2
25                        271          13
```

THE SULLIVAN GROUP OF COURT REPORTERS                           5

**PLAINTIFFS' EXHIBIT B - 5**

```
 1              DECEMBER 21, 2016; COSTA MESA, CALIFORNIA

 2                          9:27 A.M.

 3

 4              THE VIDEOGRAPHER:  Good morning.  Here begins
09:27
 5    Media Number 1 in the deposition of Paul Edalat,

 6    Volume I in the matter of United States of America

 7    versus Sci-Labs Nutraceuticals, Inc.

 8              MR. DIULIO:  No.  No.

 9              MR. MARKHAM:  No, wrong caption.  Here you
09:27
10    go.  That was a consent decree.  Start over with that

11    part.

12              THE VIDEOGRAPHER:  Sorry about that.

13              Bruce Cahill, et al., versus Paul Benjamin

14    Edalat, et al.  This case is in the United States
09:28
15    District Court, Central District of California,

16    Southern Division.  Today's date is December 21st,

17    2016.  The time is 9:28 a.m.  This deposition is

18    taking place at 695 Town Center Drive, Suite 700 in

19    Costa Mesa, California.  The videographer is Sherri
09:28
20    Mulford, appearing on behalf The Sullivan Group of

21    Court Reporters.

22              Would counsel please identify yourselves and

23    state whom you represent.

24              MR. MARKHAM:  I'm John Markham and I
09:28
25    represent all of the plaintiffs and all of the
```

PLAINTIFFS' EXHIBIT B - 6

1    counter-claim defendants in this action.

2            MR. DIULIO:  Good morning.  My name is

3    Kristopher Diulio.  I represent Paul Edalat, both in

4    his capacity as a party and as a witness at this

09:28    5    deposition here today.

6            MR. MARKHAM:  Also appearing here is Bruce

7    Cahill, who is one of the plaintiffs in the action.

8            THE VIDEOGRAPHER:  Thank you.

9            The court reporter today is Carina Valles

09:29   10    with the Sullivan Group of Court Reporters.

11            Will the court reporter please administer the

12    oath.

13

14                    PAUL BENJAMIN EDALAT,

15    a defendant herein, having been sworn, testifies as

16    follows:

17

18                    -EXAMINATION-

19    BY MR. MARKHAM:

09:29   20        Q.    Good morning, Mr. Edalat.

21        A.    Morning.

22        Q.    Have you ever had your deposition taken

23    before?

24        A.    Yes.

09:29   25            MR. MARKHAM:  Before I get into that, I'd

PLAINTIFFS' EXHIBIT B - 7

1    like to propose, Kris, that we have the usual

2    stipulations.  And by that, I mean, that except as to

3    the form of the question in relation to which you

4    would object now or forever hold your peace, all other

09:29    5    objections are reserved for the time of trial.

6            MR. DIULIO:  Yes, consistent with the Federal

7    Rules of Civil Procedure, I agree that applies.

8    BY MR. MARKHAM:

9        Q.   How many times have you had your deposition

09:29    10    taken?

11       A.   A few.

12       Q.   Can you give me a number?

13       A.   Not exact, no.

14       Q.   What's your best approximation?

09:29    15       A.   More than half a dozen.

16       Q.   Good enough.

17            What is your understanding of the purpose of

18    a deposition?

19            MR. DIULIO:  Objection.  Vague.

09:30    20            THE WITNESS:  I don't know what you're

21    asking.

22    BY MR. MARKHAM:

23       Q.   What do you understand the purpose of this

24    deposition to be; what's the purpose of taking this?

09:30    25            MR. DIULIO:  Objection.  Vague.  Lacks

**PLAINTIFFS' EXHIBIT B - 8**

```
 1   foundation.
 2   BY MR. MARKHAM:
 3        Q.   You don't know?
 4        A.   This particular deposition?
 5        Q.   Yeah.
 6        A.   Wasting my time.
 7        Q.   And why is it wasting your time?
 8        A.   Do you want me to get into details?
 9        Q.   Yeah.  I asked you why.  Just answer my
10   question.  That's --
11        A.   My company --
12             MR. DIULIO:  Hold on.  Just so we don't speak
13   over each other, Mr. Markham will ask his questions
14   and then hopefully a little break and then,
15   Mr. Edalat, you can speak.  And that way we don't
16   drive the poor court reporter nuts.
17   BY MR. MARKHAM:
18        Q.   The question is, why do you think this
19   particular deposition is a waste of your time?
20             MR. DIULIO:  Objection.  Vague.
21             THE WITNESS:  I think that you, Mr. Markham,
22   and Mr. Cahill and the other partners -- my
23   ex-partners all conspired to create a distraction to
24   steal my company, which I founded as a larger
25   shareholder, while I was out in Dubai on a trip.  You
```

09:30 (line 5)
09:30 (line 10)
09:30 (line 15)
09:30 (line 20)
09:31 (line 25)

**PLAINTIFFS' EXHIBIT B - 9**

```
 1    stole the company, you moved it to Oceanside, then you

 2    filed the lawsuit against myself, my sister and one of

 3    the -- probably best employees whoever worked for the

 4    company.

 5    BY MR. MARKHAM:

 6        Q.   So why does that make it a waste of time to

 7    come here and talk about that?

 8        A.   Because I think Mr. Cahill couldn't find an

 9    attorney in town to take this case and he found you.

10    And I don't know if you have anything else better to do

11    but to be here and waste everybody's time for filing a

12    frivolous lawsuit, which I think as time goes on, your

13    case is looking worse and worse in the court.

14        Q.   Why do you say that?

15             MR. DIULIO:   Objection.   That necessarily

16    will involve attorney-client communications.   You're

17    asking about his view and his counsel's view of the

18    merits of the lawsuit.   So I'm going to caution the

19    witness not to respond to the extent that that

20    response would reveal any attorney-client

21    communications.

22    BY MR. MARKHAM:

23        Q.   Yeah.   I'm not asking what your lawyers told

24    you, I'm asking you --

25        A.   Do you want my personal opinion?
```

09:31
09:31
09:31
09:31
09:32
09:32

**PLAINTIFFS' EXHIBIT B - 10**

```
 1        Q.    Yes.
 2        A.    I have 28 years of expertise in what I did and
 3   built a company, handed it over to Mr. Cahill, did not
 4   make one single penny as salary.  As a matter of fact, I
 5   invested money in the company on capital calls.  And
 6   when Mr. Cahill found the cat, myself away, he, as the
 7   mice, started playing with the other guys.
 8             You understand that?
 9        Q.    So when you say you didn't make any money off
10   of the company, does that include the sale of shares
11   of stock?
12             MR. DIULIO:  Objection.  Vague.
13             THE WITNESS:  What stock?
14   BY MR. MARKHAM:
15        Q.    Your stock.
16        A.    My personal stock?
17        Q.    Yes.
18        A.    No.  Because you said in the lawsuit it was the
19   company stock that was sold and I took.
20        Q.    Did you make any money off the sale of any
21   Pharma Pak stock whether it was yours or the
22   company's?
23        A.    Did I make money?  No.  As a matter of fact, I
24   lost money.
25        Q.    Were you paid any money?
```

09:32 — 5
09:32 — 10
09:32 — 15
09:32 — 20
09:33 — 25

**PLAINTIFFS' EXHIBIT B - 11**

| | | |
|---|---|---|
| | 1 | A.   I sold my shares to partners that came in |
| | 2 | approved by Mr. Cahill, the CEO and chairman of |
| | 3 | Pharma Pak. |
| | 4 | It that what you are asking? |
| 09:33 | 5 | Q.   And you made money off those sales? |
| | 6 | A.   Does that mean I made money? |
| | 7 | MR. DIULIO:  Hold on.  Objection.  Vague. |
| | 8 | Sorry, just give me a split second so I can |
| | 9 | jump in. |
| 09:33 | 10 | BY MR. MARKHAM: |
| | 11 | Q.   Was money transferred to you in relationship |
| | 12 | to those sales of stock? |
| | 13 | A.   There was money transferred, yes. |
| | 14 | Q.   How much? |
| 09:33 | 15 | A.   Minus the capital calls, about 700,000. |
| | 16 | Q.   What you say "minus the capital calls," what |
| | 17 | do you mean by that? |
| | 18 | A.   The money that the company still owes me, over |
| | 19 | $300,000 that was loaned to the company. |
| 09:33 | 20 | Q.   You're talking about Pharma Pak; correct? |
| | 21 | A.   Sir, what are you talking about?  What are we |
| | 22 | here for?  Why don't you explain to me why we're here. |
| | 23 | Q.   Do you mean Pharma Pak; is that the company |
| | 24 | you're talking about?  You say "company," I just -- |
| 09:34 | 25 | A.   What company are we here for? |

**PLAINTIFFS' EXHIBIT B - 12**

1     Q.    There's several, but --

2     A.    There's relevance in between those companies

3  that I don't understand why you pulled those other

4  companies in.  I mean, it's good tactics used, sir, but

09:34    5  what are we here for; which company are we here for?

6     Q.    I'm just asking you some questions today,

7  Mr. Edalat.

8     A.    And I'm trying to answer them.  I'm here all

9  day to answer any questions because you definitely filed

09:34   10  a frivolous lawsuit, which I will come after you

11  personally and Cahill for malicious prosecution.

12     Q.    So what company are you talking about when

13  you say you made capital calls to the company, just to

14  clarify for the record?  Are you talking about

09:34   15  Pharma Pak?

16     A.    Are you not aware of it?

17     Q.    I'm just asking --

18     A.    You know this case better than I do.

19     Q.    You have to -- is that your answer?

09:34   20     A.    Ask me a specific question and I'll --

21          THE REPORTER:  Talk one at a time because I'm

22  not getting everybody's statements, please.

23  BY MR. MARKHAM:

24     Q.    When you say that you made capital calls to

09:35   25  the company, can you state for the record what company

**PLAINTIFFS' EXHIBIT B - 13**

1    you're talking about?

2        A.    The company I founded, Pharma Pak, Inc.

3        Q.    And how many capital calls -- what was the

4    dollar value?

09:35    5        A.    Over 300-.

6        Q.    I'm not finished with my question.  You have

7    to let me finish and then I'll let you finish the

8    answer.  Otherwise, this poor woman over here is going

9    to have a hard time taking it down.

09:35   10        A.    No problem.  It's your show.  I'm just here.

11        Q.    Okay.  So what was the specific amount of the

12    capital calls you say you made to Pharma Pak?

13        A.    Over the period of 14 months, it was

14    approximately $320,000.

09:35   15        Q.    And do you have records of those payments?

16        A.    It was the records that you provided it as

17    financial statements provided by Mr. Cahill and

18    Mr. Lindsey -- Leslie Woods [sic], our interim CFO.

19        Q.    So you're relying on those records for the

09:35   20    purposes of the accuracy of your capital calls you

21    made?

22        A.    Sir, should I not rely on those records?  Those

23    are things you supplied me.

24        Q.    I'm just asking a question, sir.

09:35   25        A.    Of course.  Let the document speak for itself.

**PLAINTIFFS' EXHIBIT B - 14**

```
 1   How is that?
 2       Q.   Do you have any reason to doubt the
 3   reliability of those documents in that regard?
 4            MR. DIULIO:  Objection.  Calls for
 5   speculation.
 6            THE WITNESS:  I'm not a financial expert, but
 7   we do have an outside CPA firm that will be reviewing
 8   those documents shortly.
 9   BY MR. MARKHAM:
10       Q.   So can you answer my question or you can't
11   answer my question about whether you have doubts?
12            MR. DIULIO:  Objection.  Lacks foundation.
13   Calls for speculation at this time.
14            THE WITNESS:  According to those documents
15   that was presented to me, that you prepared and
16   Mr. Cahill prepared, yes, I have debt.
17   BY MR. MARKHAM:
18       Q.   You have what?
19       A.   Debt owed to me.
20       Q.   And that again is over $300,000 you said?
21       A.   That's what the documents say.
22       Q.   I'm asking you for your under oath testimony.
23       A.   It's approximately right.
24       Q.   After all, it's money that you paid; correct?
25       A.   Yes.
```

09:36 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 15**

| | |
|---|---|
| 1 | Q.   So I'm asking you if you have any memory of |
| 2 | what you paid? |
| 3 | MR. DIULIO:  Objection.  Asked and answered. |
| 4 | MR. MARKHAM:  No.  He said, this is what the |
| 09:36   5 | documents show.  I want to know what his memory is. |
| 6 | BY MR. MARKHAM: |
| 7 | Q.   Is your memory at all at odds with those |
| 8 | documents? |
| 9 | MR. DIULIO:  Objection.  Asked and answered. |
| 09:37   10 | THE WITNESS:  Are you testing my memory? |
| 11 | BY MR. MARKHAM: |
| 12 | Q.   Yes, absolutely, I'm testing your memory. |
| 13 | That's what a deposition is for, among other things. |
| 14 | A.   Really?  Then put the document in front of me |
| 09:37   15 | so I can clarify that for you. |
| 16 | Q.   So is the answer -- do you have an |
| 17 | independent memory of the amount of money that you |
| 18 | gave as capital calls to Pharma Pak over the 14-month |
| 19 | period? |
| 09:37   20 | A.   Sir -- |
| 21 | Q.   Do you have that memory? |
| 22 | A.   Are you testing my memory? |
| 23 | Q.   Is that your answer? |
| 24 | A.   Do I have Alzheimer's?  Are you a medical |
| 09:37   25 | expert? |

**PLAINTIFFS' EXHIBIT B - 16**

1          Q.    I'm asking if you have a memory, sir.

2          A.    You prepared documents that you gave me -- that

3    you supplied to my counsel that said approximately

4    $320,000, and that's what I answered.

09:37    5          Why are you dancing around?

6          Q.    I'm just asking what your memory is of what

7    you paid?

8          A.    How many times --

9          MR. DIULIO:  Object.  I'll object again as

09:37   10    asked and answered.  I think the record is clear that

11    he relied on the documents, but there may be some

12    questions about their veracity.  I know you can ask

13    this like eight different ways, but I don't -- I think

14    we can spend all morning doing this.

09:37   15    BY MR. MARKHAM:

16          Q.    I just want to ask you one more time.  Apart

17    from those documents, do you have any independent

18    memory of how much you have paid as capital calls?

19          A.    Approximately $320,000.

09:38   20          Q.    Where were you born?

21          A.    Tehran, Iran.

22          Q.    When?

23          A.    1969.

24          Q.    That makes you how old now; 47?

09:38   25          A.    Your math is good.

THE SULLIVAN GROUP OF COURT REPORTERS                    17

**PLAINTIFFS' EXHIBIT B - 17**

1      Q.    Okay.  So that's a yes, you're 47?

2      A.    Yes.

3      Q.    How long did you stay in Tehran after you

4    were born?

09:38    5      A.    Seven years.

6      Q.    And where did you move after you left Tehran?

7      A.    Orange County.

8      Q.    Why did you move to Orange County?

9      A.    Sir, when I was seven years old, you don't have

09:38   10    much of a choice when your parents want to move.

11      Q.    You say you moved because your parents moved?

12      A.    What I did just say?

13      Q.    I'm just asking if you can confirm that

14    that's why you moved.

09:38   15      A.    Yes.

16      Q.    Do you know why your parents moved?

17           MR. DIULIO:  Objection.  Lacks foundation.

18    Calls for speculation.

19           MR. MARKHAM:  I asked him if he knew.

09:38   20           MR. DIULIO:  Same objections.

21           THE WITNESS:  Probably why about over two and

22    a half million Iranians moved here to Los Angeles,

23    Beverly Hills and made Southern California what it is.

24    BY MR. MARKHAM:

09:39   25      Q.    And when you got here, did you -- I assume

**PLAINTIFFS' EXHIBIT B - 18**

```
 1    you went to school?
 2         A.    I did.
 3         Q.    Where did you -- where did you go to high
 4    school?
 5         A.    I went to three different high schools.
 6         Q.    And which ones?
 7         A.    El Toro High School, Clovis West in Fresno and
 8    then West High School in Bakersfield.
 9         Q.    What were you doing up in Fresno?
10         A.    Going to school.
11         Q.    And were you with your parents at the time?
12         A.    Yes.
13         Q.    Do you know what they were doing in Fresno?
14         A.    What's the relevance?
15         Q.    I'm just asking what you knew.
16         A.    I don't know.
17         Q.    And when they moved to Bakersfield, do you
18    know what they were doing there?
19         A.    No.
20         Q.    And from which of these -- did you graduate
21    from high school?
22         A.    Yes.
23         Q.    Which school did you graduate from?
24         A.    West High School.
25         Q.    And where is that?
```

09:39 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 19**

```
         1        A.    Bakersfield.

         2        Q.    Do you recall when that was?

         3        A.    1987.

         4        Q.    After you left high school, did you have any

09:40    5   further formal education?

         6        A.    Yes.

         7        Q.    Where was that?

         8        A.    Bakersfield Junior College.

         9        Q.    When did you go there?

09:40   10        A.    From '88 to '90.

        11        Q.    Did you get a degree?

        12        A.    Yes.

        13        Q.    What was the degree you received?

        14        A.    Associate's in Arts.

09:40   15        Q.    And after that, did you have any more formal

        16   education?

        17        A.    I went to about half a year of law school down

        18   here and decided not to continue my education in law.

        19        Q.    Do you recall where you went to law school?

09:40   20        A.    Yeah, it was Irvine Western State, School of

        21   Law, which is no longer around.

        22        Q.    Apart from that period in law school, have

        23   you had any other formal education?

        24        A.    School of hard knocks.

09:41   25        Q.    All right.
```

**PLAINTIFFS' EXHIBIT B - 20**

1          A.    Is that educational?

2          Q.    Probably very good education, depending on

3     what you learned from it.

4          A.    Yeah.

09:41    5          Q.    But, again, apart from that law school,

6     nothing else formal, no other institutions attended,

7     no enrolling in courses anywhere?

8          A.    No.

9          Q.    What did you do after you stopped that law

09:41   10    school experience?  What did you do for work?

11         A.    I moved back down here to Orange County and got

12    involved in the nutrition industry.

13         Q.    When was that?

14         A.    I think it was 1994.

09:41   15         Q.    And have you been -- well, what was your

16    first job in the nutrition industry?

17         A.    I worked under Joe Wheater, Muscle & Fitness.

18    He was my -- one of my mentors.  Dr. Scott Connelly from

19    Metrics and I developed my own brand of supplements by

09:42   20    1996.

21         Q.    And what brand was that; what was the name?

22         A.    Formulated Sciences.

23         Q.    Did you have a company?

24         A.    Yes.

09:42   25         Q.    What was the name of the company?

PLAINTIFFS' EXHIBIT B - 21

```
 1        A.    Formulated Sciences.

 2        Q.    And how long did you work in relation with

 3   Formulated Sciences?

 4        A.    Approximately, about 13 years.

 5        Q.    All right.  So that gets us to 2003?

 6        A.    I think so, yes.

 7        Q.    And did you leave Formulated Sciences?

 8        A.    No.

 9        Q.    What did you do after -- what did you do

10   after that?

11        A.    Continued the brand, then acquired the

12   manufacturing facility that used to produce our

13   products.

14        Q.    What facility was that?

15        A.    That facility was Pharma Pak.

16        Q.    Was Pharma Pak at that time an entity?

17        A.    Yes.

18        Q.    What was the formal name of the entity?

19        A.    Pharma Pak, Inc.

20        Q.    And was that a company that you formed or

21   that you just bought from somebody else?

22        A.    I formed.

23        Q.    And when did you form Pharma Pak, Inc.?

24        A.    I think approximately 2001.

25        Q.    And then by about 2003 -- you said you
```

Time stamps: 09:42 (5), 09:42 (10), 09:43 (15), 09:43 (20), 09:43 (25)

**PLAINTIFFS' EXHIBIT B - 22**

1    started working with that company in 2003.  What

2    happened between 2001 and 2003?

3        A.   Oh, it was the manufacturing facility that

4    produced the Formulated Sciences brand.  And we also

09:43  5    contract manufactured for other companies.

6        Q.   All right.  Was the manufacturing facility

7    something that was up and running before you formed

8    Pharma Pak to buy it?  Was it in existence or did you

9    create it?

09:43  10        A.   Created it.

11        Q.   Where was it?

12        A.   In Santa Ana.

13        Q.   And is that Pharma Pak still a going concern?

14        A.   No.

09:44  15        Q.   How long -- when did that not any longer

16    become a going concern?

17        A.   2008.

18        Q.   Why?

19        A.   There was an issue in one of the buildings with

09:44  20    contamination, so we had to basically shut the building

21    down and move it to another facility.

22        Q.   Okay.  And did you?

23        A.   Yes.

24        Q.   And what was that new facility?

09:44  25        A.   Sci-Labs Nutraceuticals, Inc.

PLAINTIFFS' EXHIBIT B - 23

```
 1        Q.   When was that formed?

 2        A.   2008.

 3        Q.   And who formed that?

 4        A.   I did, along with a couple partners.

 5        Q.   And who were they?

 6        A.   My sister, and at the time, before my brother

 7   passed away, he was a part of it, so it became family.

 8        Q.   By sister, Farah Barghi?

 9        A.   Yes.

10        Q.   Do you have any other sisters?

11        A.   Not that I know of.

12        Q.   So how long did Sci-Labs Nutraceuticals stay

13   in business?

14        A.   It stayed in business until, approximately,

15   200- -- I think 2012.

16        Q.   And then what happened?

17        A.   A lot of things happened.

18        Q.   What happened to cause Sci-Labs

19   Nutraceuticals, Inc. to go out of business in 2012?

20        A.   Well, one of the fastest growing companies in

21   Orange County, it was on the cover of OC Metro as one of

22   the fastest growing companies and most successful under

23   40 -- at 40.  So as the company was growing, we

24   expanded.  Actually, Mr. Cahill came to our brand new

25   facility on the corner of Main and Jamboree.  We
```

09:44 — line 5
09:44 — line 10
09:45 — line 15
09:45 — line 20
09:45 — line 25

**PLAINTIFFS' EXHIBIT B - 24**

1    expanded another 70,000 feet because we landed some

2    pretty hefty contracts and contract manufacturing.

3         I hired a group of executives from a real CFO

4    to, you know, chief marketing officer, spent a lot of

09:46   5    money on payroll, on a bunch of guys in suits that

6    didn't go to school of hard knocks.  Company had no

7    debt, we were operating fantastic.  And we weren't

8    bankable, so our CFO's idea was we go get a bank loan

9    because we can take on more business.

09:46   10        Q.   I want to interrupt you just to ask you, what

11    do you mean by "we weren't bankable"?

12        A.   We weren't bankable in that the company was

13    always funded by ourselves, the family.  So never had

14    any loans, didn't have any debt.  And probably one of

09:46   15    the biggest learning experiences of my life, I listened

16    to my CFO and we went on and took a hard money loan from

17    a company called Luberski, Inc., and a disaster.  They

18    were supposed to give us a million-dollar loan and they

19    didn't.  They only gave us a half a million.  And the

09:46   20    other half a million they said they had non-performing

21    notes, so they couldn't give us the rest of the money.

22        I worked very hard to get a contract for

23    $38 million for contract manufacturing from one of the

24    brands I grew up in, which is Prolab.  And everything

09:47   25    was great until the cash flow stopped.  And then I

PLAINTIFFS' EXHIBIT B - 25

learned, but I learned probably two things, don't take
money from shady, you know, dirty -- there's a lawsuit
out there, so I'm sure you're aware of it -- people and
don't partner with friends of ten years that claim that

09:47   they'll come in and help you turn things around.

Q.   Okay.  So was there a particular date on
which Sci-Labs Nutraceuticals stopped operating by
reason of this?

A.   I think it was about 2012.  I don't remember

09:47   the exact date.

Q.   Now, is that the same Sci-Labs
Nutraceuticals, Inc. that was involved with the
lawsuit with the FDA?

A.   Yes.

09:48   Q.   That lawsuit was in 2014.

A.   That issue started in 2012.

Q.   Okay.

A.   And another good thing I learned, don't hire an
ex-U.S., you know -- a USA attorney that claims they can

09:48   solve your problems with the FDA because they worked at
the Department of Justice and they know how to handle
the case.

Q.   And they can pick up the phone?

A.   She picked up the phone and caused us more

09:48   problems.  So, you know, it's just been -- it was a

**PLAINTIFFS' EXHIBIT B - 26**

1    streak of bad luck, but so what.

2        Q.    So from 2012, when you say that the company

3    was not in operation any longer --

4        A.    Because we lost our contract with Prolab.

09:48    5        Q.    But was it still operating in 2013 and 2014

6    while the FDA suit was going on?

7        A.    So there was two licenses.  One was Sci-Labs

8    Nutraceuticals, Inc., and there was another license

9    for -- which got issued, by the way, and I think this is

09:49   10    where the FDA case had a little bit of stench for them.

11    Two weeks after they issued us our warning letter, I

12    think it was consent decree -- I'm not sure which one it

13    was, but two weeks after they issued us our

14    pharmaceutical drug license manufacturing under Sci-Labs

09:49   15    Pharmaceuticals or Pharma Pak.

16        Q.    Okay.  When you say "or Pharma Pak," why

17    would it be or Pharma Pak?  Is that a dba?

18        A.    Yeah.  To tell them exactly what we were going

19    to be producing, which at that time, we were working

09:49   20    with a group to bring in pharmaceutical drugs for

21    repackaging.

22        Q.    Just so I'm understanding correctly, is it

23    your testimony that at some point the FDA issued

24    Pharma Pak -- I'm sorry -- it issued a license to

09:50   25    Sci-Lab Nutraceuticals, Inc. and that was the license

PLAINTIFFS' EXHIBIT B - 27

|   | |
|---|---|
| 1 | you contend was at issue in the FDA lawsuit? |
| 2 | A.   I'm not sure exactly which entity it was issued |
| 3 | to, but it was a drug license that we had that was still |
| 4 | active. |
| 09:50  5 | Q.   And did that license remain active after you |
| 6 | entered the consent decree? |
| 7 | A.   Yes. |
| 8 | Q.   Was there a license that was rendered |
| 9 | inactive by the consent decree? |
| 09:50 10 | A.   We're going to get into confidential -- the |
| 11 | confidential settlement that we did with the FDA, but |
| 12 | if -- I think if counsel's okay with it, you can |
| 13 | probably ask for a confidential settlement and you'll |
| 14 | that that was part of the settlement. |
| 09:50 15 | Q.   Is it a settlement agreement? |
| 16 | A.   Yes. |
| 17 | Q.   Is it filed under seal? |
| 18 | MR. DIULIO:  Objection.  Lacks foundation. |
| 19 | THE WITNESS:  I don't know. |
| 09:50 20 | MR. DIULIO:  If you know. |
| 21 | THE WITNESS:  I don't know. |
| 22 | BY MR. MARKHAM: |
| 23 | Q.   You don't know whether it's under seal or |
| 24 | not? |
| 09:50 25 | A.   I have no idea. |

**PLAINTIFFS' EXHIBIT B - 28**

1      Q.    All right.  So you -- Sci-Labs

2    Pharmaceuticals, Inc. was operating under an FDA

3    license; correct?

4      A.    Sci-Labs Pharmaceuticals, Inc.?

09:51  5      Q.    Sci-Labs Nutraceuticals.

6      A.    Yes.

7      Q.    And that license, it's your understanding,

8    was affected by the shutdown that was rendered by the

9    consent decree?

09:51  10      A.    The Nutraceutical, yes.

11      Q.    That license, meaning the Sci-Labs

12    Nutraceuticals.

13      A.    We were not to produce anymore nutraceutical

14    products.

09:51  15      Q.    Okay.  And you're saying that you had a

16    separate license for Sci-Labs Pharmaceuticals?

17      A.    I don't exactly remember which entity the name

18    was under, but I know it was dba Pharma Pak.

19      Q.    But you don't recall the entity that actually

09:51  20    obtained the license?

21      A.    I don't.

22      Q.    But you do believe that it was, in fact,

23    issued in the name of Pharma Pak because whatever

24    entity it was that obtained it, Pharma Pak was its

09:52  25    dba?

**PLAINTIFFS' EXHIBIT B - 29**

```
 1        A.   From what I recall.

 2        Q.   Okay.  Yes, from what you recall?

 3        A.   Yes.

 4        Q.   Now, was there ever a company that you formed

 5   or anybody that you're affiliated with formed that was

 6   Sci-Labs Pharmaceuticals, LLC or Inc. or has that

 7   always been just a dba?

 8        A.   I think it's always been a dba.

 9        Q.   So whatever the entity that the dba

10   Pharma Pak was associated with, it wasn't Sci-Labs

11   Pharmaceuticals, Inc. because that's never been a

12   company; correct?

13        A.   No.

14        Q.   I mean -- I said correct?

15        A.   Yeah.

16        Q.   Yes?

17        A.   I'm pretty sure.

18             MR. DIULIO:  If you know.

19             THE WITNESS:  Yeah.

20   BY MR. MARKHAM:

21        Q.   What is -- but you don't recall the company

22   that Pharma Pak dba was associated with?

23        A.   I don't.

24        Q.   But it was one of your companies, I assume?

25        A.   Yes.  It was on our license, which you have a
```

09:52  5

09:52  10

09:52  15

09:52  20

09:53  25

**PLAINTIFFS' EXHIBIT B - 30**

copy of.

Q.   Do you remember -- well, I'll get back to that later.

All right.  So when did you actually stop working with Sci-Labs Nutraceuticals?

A.   From the day that the consent decree had ordered us to stop.

Q.   All right.  You said earlier that because of the Luberski situation that company halted matters in 2012?

A.   I think --

Q.   It sounds like you kept working on it -- no big deal, I'm just trying to pin down the date.  Sounds like you kept going despite that financial hardship until 2014 when the FDA shut you down?

A.   We kept trying to move forward.  As I said, I hired a former AUSA counsel and she made that even worse.

Q.   What was her name, by the way?

A.   I don't remember.  I don't even want to remember, to be honest with you.

Q.   Do you remember where she was from?

A.   San Diego.

And later we found out she was abusing alcohol and drugs because she was going through a divorce,

PLAINTIFFS' EXHIBIT B - 31

whatever a divorce can do, I guess it breaks anyone.  So

we ended up moving the case to another attorney, Stephen

Cook from Brown Rudnick.  And he ended up settling it

for us because the case had been so mishandled.

09:54   Q.   Do you know anything that she specifically

did wrong once the case was filed?

A.   She didn't respond.

Q.   Didn't respond to the filing of the FDA?

A.   No.  As a matter of fact, the AUSA agent that I

09:54   spoke to that was handling the case was not very happy

with her.

Q.   Which agent was that; do you --

A.   The one that actually -- her name was on the

lawsuit, the agent that was handling the case.  Sorry,

09:54   the Department of Justice, not AUSA, the Department of

Justice.

Q.   So can you think of anything specific that

this woman from San Diego, this former AUSA did in

that case that adversely affected the outcome that you

09:55   can remember?

MR. DIULIO:  You know, objection.  It seems a

little vague to me.  Probably lacks a little bit of

foundation.

BY MR. MARKHAM:

09:55   Q.   I'm just pursuing, you said that she did a

**PLAINTIFFS' EXHIBIT B - 32**

1    bad job.  Why?

2        A.   She wasn't responsive to the filings or

3    anything that the Department of Justice done and she

4    claimed that she can take, like you said -- you're a

09:55  5    former AUSA; right?

6        Q.   Yes, I am.

7        A.   Maybe the same promises you make.  They can

8    take care of things with a phone call and it didn't

9    happen.

09:55  10        Q.   I didn't call you, Mr. Edalat.

11        A.   Sorry?

12        Q.   I didn't call you.

13            How long was she your attorney on that case

14    when she was screwing things up?

09:56  15        A.   About a year.

16        Q.   So after Sci-Labs -- how much of your time is

17    being spent on Sci-Labs Nutraceuticals' operations

18    between 2012 to 2014?

19            MR. DIULIO:  Objection.  Vague.

09:56  20            THE WITNESS:  Look, the ship was sinking.  I

21    was the captain, so I tried my best to keep it afloat.

22    And Mr. Cahill knows very well that's about the time,

23    latter part of 2014 that out of this friendship that

24    we had for so many years and the trust I had in him

09:56  25    and claimed that 80 percent of his time was free

PLAINTIFFS' EXHIBIT B - 33

```
 1    because he was in retirement, he saw the interest in
 2    getting involved and a potential new opportunity.  So,
 3    you know, I was raised as a fighter, we don't quit.
 4    And, you know, as an entrepreneur, you take chances,
 5    that's what you do.  If it wasn't for guys like us,
 6    you guys wouldn't be employed, going out there taking
 7    chances every day.  That's my opinion.
 8            So I tried to save the ship.  I did my best
 9    to keep payroll and try to keep the employees.  I had
10    to -- unfortunately, with the consent decree over 100
11    employees lost their jobs, which the State of
12    California was very against, but the federal
13    government, I guess, didn't care much.  And if you
14    look at the -- if you look at the civil filings they
15    did against Sci-Labs, it's probably one of the
16    biggest -- from the industry, okay -- I've seen a lot
17    of consent decrees, it's probably one of the biggest
18    jokes I've ever seen for not testing protein properly.
19    The same protein you eat in your cheeses and Domino's
20    Pizza, that's the same protein that was being provided
21    to us for the companies we manufactured for.
22            So with that said, I was always raised to
23    fight and win.  I don't like losing, so continued.  I
24    took a trip to Dubai.  I actually brought back a PO,
25    purchase order for, approximately, $3.6 million of
```

09:57 — line 5
09:57 — line 10
09:57 — line 15
09:57 — line 20
09:58 — line 25

**PLAINTIFFS' EXHIBIT B - 34**

```
 1   business.
 2        Q.    When was this?
 3        A.    It was about 2012 -- mid 2012.
 4        Q.    This is after you had the trouble with
 5   Luberski?
 6        A.    Yes.  And Luberski, I didn't want to sue him,
 7   but a lawyer -- another lawyer, great advice, you should
 8   sue first before they sue you, Bobby Samini.  After he
 9   filed the lawsuit, he abandoned the case because he
10   picked up the Clippers' owner as a client and he was
11   going through his trouble.  So picked up a bigger fish
12   and so goes on.
13        But I had that case -- that issue to manage.
14   Obviously, I had the FDA, as you know.  Which, as the
15   CEO of the company, I was not at any of the FDA
16   meetings.  I had hired a very competent 14 years' expert
17   of quality control, quality assurance doctor, Rafi
18   Sharif, very well known.  I hired him to handle our
19   quality control because I couldn't be in 200 places at
20   once.  And unbeknownst to me, while I'm in Dubai, we get
21   a warning letter and it got published.  I've never had
22   one.  I've never made one unethical product, never made
23   a product that hurt anyone.
24        As a matter of fact, I always worked very
25   closely with the government, I was never against them.
```

09:58 (line 5)
09:58 (line 10)
09:59 (line 15)
09:59 (line 20)
09:59 (line 25)

**PLAINTIFFS' EXHIBIT B - 35**

```
 1   And, you know, I think I just got targeted due to the
 2   fact that my quality control assurance person did not
 3   like the fact that the new culture of FDA had changed.
 4   You know, the kids out of every college with their
 5   iPhones and, you know, with a badge.
 6           So he wanted to teach them a lesson, so
 7   basically I became a victim of it because FDA doesn't
 8   write letters to the chief technology or chief science
 9   officers, they go right to the top and put the CEO on
10   the hook to make sure -- CEO and chairman.
11       Q.   Who is the CEO; you?
12       A.   I was.
13           So to make sure that we take attention to it
14   and we -- of course I did.  I did everything I could.  I
15   hired -- I thought I hired a competent lawyer.  She was
16   highly recommended from our FDA consultant, Dennis
17   Moore.  And when you're not in control of some things
18   that are in expert's hands, you have to trust them and
19   move forward with it.  And that's what I did.
20       Q.   And it didn't work out?
21       A.   Obviously.
22       Q.   Okay.  So who was the person getting the
23   warning letters from the FDA?
24       A.   Myself.
25       Q.   You were getting warning letters, so what --
```

09:59   5

10:00   10

10:00   15

10:00   20

10:00   25

PLAINTIFFS' EXHIBIT B - 36

1   that put you on notice that there was something wrong;

2   correct?

3       A.   Of course.

4       Q.   So --

10:00   5       A.   And I took action.  Mr. Sharif was gone, I let

6   him go.  I brought in Dennis Moore's group, FDA

7   consultant.  He was a former investigator for the FDA.

8   I think you talked to him before.  He came in and he

9   brought -- actually, the person that really helped clean

10:01   10   everything up was the former director of FDA, and I

11   forget his name, but Dennis had worked very closely with

12   him.  And his claim was the same thing, that the culture

13   of the FDA has changed.

14          Younger generation coming in, they're out like

10:01   15   cowboys, trying to take down any company they can

16   because they need to make a name for themselves, you

17   know.  The only thing they tend to forget is, those same

18   FDA agents that go out there and try to make a name for

19   themselves by shutting down companies and putting people

10:01   20   out of work for ridiculous reasons, which I think, are

21   the same guys that eventually have to get out in the

22   working world and become consultants.

23       Q.   And you think the reasons that they used for

24   putting you guys out of the business, Sci-Labs

10:01   25   Nutraceuticals, was ridiculous?

PLAINTIFFS' EXHIBIT B - 37

1       A.    Absolutely.

2       Q.    All right.

3       A.    Well, they didn't put us out of business.  It

4   was a continuation of multiple -- this is a learning

10:01   5   experience.  I don't want to use negative words here,

6   mistakes.  I'll take full responsibility for the fact

7   that I'm the one that, you know, was the captain of the

8   ship, but I relied on, you know -- relied on people that

9   worked for me, which were getting paid really good money

10:02  10  to bring me the best advice.

11      Q.    But I'm asking about the reasons that the FDA

12  used to base the lawsuit and, ultimately, the consent

13  decree.  You thought -- it was your view that those

14  reasons were ridiculous?

10:02  15      A.    I think they're ridiculous in the sense that

16  they didn't allow us to work with them closely after a

17  record of, you know, being one of the best manufacturers

18  in the state of California, fastest growing.  And as

19  soon as I took that building on Main and Jamboree, which

10:02  20  half a million cars pass by, I knew some of my

21  competitors were targeting me.  But, you know, I think

22  it was just the fact that -- I'm an emotional guy.  I

23  love what I do.  I go to work, I don't call work work

24  because I love what I do.  I made a lot of products in

10:03  25  the industry.  I had an immaculate record in the

**PLAINTIFFS' EXHIBIT B - 38**

```
 1    products I developed, worked with a lot of professional
 2    athletes.  So I'm entitled to my opinions.
 3            My mentors were guys that built the industry,
 4    Joe Weider, you know, Dick Marconi.  These are guys that
 5    are legends in the industry.  Mark Hughes was my good
 6    friend, passed away, from Herbalife.  When you hang out
 7    with guys like that, you always tend to stay in line and
 8    do things the right way.  FDA, I think, targeted us to
 9    make an example.
10       Q.   Why would they make an example of you; do you
11    know?
12            MR. DIULIO:  Objection.  Lacks foundation.
13    Calls for speculation.
14            THE WITNESS:  My opinion, because of just
15    that, we were the fastest growing, taking a lot of
16    business away from other manufacturers.  It was the
17    culture, it was the timing in the nutraceutical
18    industry.  After 20 years, they wanted to force the
19    industry to consolidation, which they have.  I mean,
20    listen, if you want to continue this, we can go on,
21    but I'll tell you exactly what I think happened and my
22    opinion as a businessman and someone that lived the
23    industry from, you know, ground up.  I think it was
24    just the fact that too much government intervention
25    and -- in the capitalist system.
```

Line timestamps: 10:03 (5), 10:03 (10), 10:03 (15), 10:03 (20), 10:04 (25)

**PLAINTIFFS' EXHIBIT B - 39**

BY MR. MARKHAM:

1

2      Q.    Okay.  When did Sci-Lab Nutraceuticals stop

3  operations?

4      A.    Well, it stopped operation the day Luberski

5  came in and took all the equipment.

6      Q.    But you were still -- you still had employees

7  and you were still doing things to keep it up and

8  running, were you not, until the consent decree, two

9  years later; correct?

10      A.    I was trying, yes.

11      Q.    Were there still employees there?

12      A.    Yes.

13      Q.    Were you still selling any product?

14      A.    Not selling product.  We weren't manufacturing

15  much, but we weren't really -- we lost our biggest

16  account.

17      Q.    How were you making payroll for those two

18  years if you had people working for you?

19      A.    Selling off assets.

20      Q.    Okay.  And when did that all come to a stop;

21  with the consent decree?

22      A.    Yes, officially.

23      Q.    Okay.  And that was in November of 2014?

24      A.    I don't recall the exact date.

25      Q.    Just take a look at -- I've got the exhibits

10:04  5

10:04  10

10:04  15

10:05  20

10:05  25

**PLAINTIFFS' EXHIBIT B - 40**

```
 1    from the last depositions.  Take a look at tab
 2    number 3.  There's a date on the top of it, just so we
 3    get this clearly on the record.
 4            Look to you to be a copy of the consent
 5    decree?
 6      A.   Yes.
 7      Q.   And take a look at the date that was filed.
 8    It's up at the top.
 9      A.   11/12/14.
10      Q.   Does that sound about right in terms of your
11    memory when things stopped at Sci-Labs Nutraceuticals,
12    Inc.?
13      A.   We had already stopped anyways.  The equipment
14    was taken by Luberski, so there was nothing really in
15    the building to produce, so it looks approximately
16    right.
17      Q.   That's when all the employees were let go and
18    it was over, that company?
19      A.   Yeah -- yes.
20      Q.   All right.  So then what did you next do by
21    way of spending your time?  You were no longer working
22    on nutraceuticals at all -- Sci-Labs Nutraceuticals,
23    Inc.?  What did you next focus on?
24            MR. DIULIO:  Objection.  Vague.
25            THE WITNESS:  So I was introduced to a group
```

10:05  5

10:05  10

10:05  15

10:06  20

10:06  25

**PLAINTIFFS' EXHIBIT B - 41**

1    of doctors out of Texas, I think it was Dallas or

2    Austin, Dr. Jim Strader, through a few contacts that I

3    had in the pharmacy world.  And they -- since our

4    building had been -- all the equipment had been taken

10:06    5    out and the building was sitting there and, you know,

6    it was a fully compliant building as far as concerns

7    are with that license we had for drugs --

8    BY MR. MARKHAM:

9        Q.    That's not the nutraceutical license?

10:06    10        A.    No.

11        Q.    It's the other one -- the pharmaceutical

12    license that was issued in the name of Pharma Pak dba

13    for a company that you don't recall exactly which

14    company it was?

10:07    15        A.    No.

16        Q.    That's what we're talking about; right?

17        A.    Yeah.

18        Q.    That's the license?

19        A.    Yeah.

10:07    20            We had a license to be able to go out and do

21    repackaging and this group of doctors were very

22    interested in utilizing the building, the facility for

23    making some of their -- I think it was allergy creams

24    and some patches, medicinal patches.  So that's about

10:07    25    the time when Mr. Cahill got involved.

**PLAINTIFFS' EXHIBIT B - 42**

|        |    |                                                         |
|--------|----|---------------------------------------------------------|
|        | 1  | And they had offered to acquire the remaining           |
|        | 2  | of the lease, which was -- I was a personal guarantor on |
|        | 3  | the lease and they offered to acquire the license,       |
|        | 4  | transfer the license and utilize the building for making |
| 10:07  | 5  | their creams and patches.                               |
|        | 6  | Q.   When you say "transfer the license," you're        |
|        | 7  | talking about the license that -- the pharmaceutical    |
|        | 8  | license that we just talked about?                      |
|        | 9  | A.   Yes.                                               |
| 10:07  | 10 | Q.   I'm going to call that, just so we know what       |
|        | 11 | we're talking about, the Pharma Pak license.            |
|        | 12 | A.   Yes.                                               |
|        | 13 | Q.   And you'll understand that means, not the         |
|        | 14 | nutraceutical license --                                |
| 10:08  | 15 | A.   That was --                                        |
|        | 16 | Q.   -- but the pharmaceutical license?                |
|        | 17 | A.   Right.                                             |
|        | 18 | Q.   You said that was for repackaging.  Was it        |
|        | 19 | just for repackaging or could you do other things with  |
| 10:08  | 20 | that license?                                           |
|        | 21 | A.   It was a drug license, but one of the things we   |
|        | 22 | could do was repackaging of -- from what I understood,  |
|        | 23 | based on what I was told by my FDA consultants, that we |
|        | 24 | could use that license for also repackaging, meaning    |
| 10:08  | 25 | patches come in bulk, medical patches, and we put them  |

**PLAINTIFFS' EXHIBIT B - 43**

```
 1    in boxes, packet of 30s or 10s or however or even
 2    specimen cups.  We would repackage those and send them
 3    out to the medical institutions or pharmacies.
 4        Q.   Did that license allow you to do more than
 5    repackaging?
 6             MR. DIULIO:  Objection.  Lacks foundation.
 7             THE WITNESS:  That's something you have to
 8    consult with the expert, which is Dennis Moore, our
 9    consultant.
10    BY MR. MARKHAM:
11        Q.   Okay.  Did you have any understanding whether
12    that license, that Pharma Pak license allowed you to
13    do more than repackaging?
14             MR. DIULIO:  Objection.  Asked and answered.
15             THE WITNESS:  I think I answered it.
16    BY MR. MARKHAM:
17        Q.   Okay.  So you don't know?
18        A.   I don't know.
19        Q.   Okay.  All right.  Now, I want to get some
20    more about your background before we start down the
21    trail of you and Mr. Cahill.  Excuse me just a second.
22             Have you ever been sued civilly --
23        A.   Yes.
24        Q.   -- other than this case?
25        A.   Yes.
```

10:08  5
10:08  10
10:08  15
10:09  20
10:09  25

**PLAINTIFFS' EXHIBIT B - 44**

|        | 1  | Q. | Approximately, how many times? |
|--------|----|----|----|
|        | 2  | A. | Well, being a defendant? |
|        | 3  | Q. | Yes. |
|        | 4  | A. | I don't know. |
| 10:09  | 5  | Q. | More than once? |
|        | 6  | A. | Yes. |
|        | 7  | Q. | More than twice? |
|        | 8  | A. | I would think so. |
|        | 9  | Q. | More than three times? |
| 10:10  | 10 | A. | In my lifetime? |
|        | 11 | Q. | Uh-huh. |
|        | 12 | A. | Of course. |
|        | 13 | Q. | Okay.  More than four times? |
|        | 14 | A. | I don't know. |
| 10:10  | 15 | Q. | All right. |
|        | 16 | A. | You always have the records, so you can -- |
|        | 17 | Q. | Are there any tax liens filed against you? |
|        | 18 | A. | Tax liens? |
|        | 19 | Q. | Uh-huh. |
| 10:10  | 20 | A. | I don't know. |
|        | 21 | Q. | Do you know whether or not there's a tax lien dated July 24, 2015, federal tax lien, filed in Orange County against you for $66,595? |
|        | 24 |    | MR. DIULIO:  Objection.  Lacks foundation. |
| 10:10  | 25 |    | THE WITNESS:  I don't. |

THE SULLIVAN GROUP OF COURT REPORTERS

45

**PLAINTIFFS' EXHIBIT B - 45**

```
 1   BY MR. MARKHAM:
 2       Q.   You don't know whether there's that tax lien
 3   filed against you?
 4       A.   No.
 5       Q.   Do you know whether there's a tax lien filed
 6   against you in Orange County, dated February 4, 2015
 7   in the amount of $23,489?
 8            MR. DIULIO:  Objection.  Lacks foundation.
 9            THE WITNESS:  Against me personally or the
10   company?
11   BY MR. MARKHAM:
12       Q.   I'm asking you about tax liens filed against
13   you.
14       A.   I don't know.
15       Q.   Do you know if there are any such tax liens
16   filed against any company that you've been involved
17   with?
18            MR. DIULIO:  Objection.  Lacks foundation.
19            THE WITNESS:  I don't know.
20   BY MR. MARKHAM:
21       Q.   How about a tax lien filed February 9, 2016
22   in Orange County for $75,151?
23            MR. DIULIO:  Objection.  Lacks foundation.
24            THE WITNESS:  I don't know.
25   ///
```

10:10 (line 5)
10:11 (line 10)
10:11 (line 15)
10:11 (line 20)

**PLAINTIFFS' EXHIBIT B - 46**

BY MR. MARKHAM:

    Q.   How about a state tax lien in Orange County for the liability amount of $13,541?

        MR. DIULIO:  Objection.  Again, lacks foundation and seems to be asked and answered since he already testified he doesn't know.

BY MR. MARKHAM:

    Q.   I'm going to ask him about all of these. That was filed June 12, 2014.

        MR. DIULIO:  Again, asked and answered.  You asked him and he said, I don't know about any.  So going through each one individually doesn't really -- you're just asking the same question over and over.

        MR. MARKHAM:  I'm going to ask them, so you can have a standing objection, if you want.

        MR. DIULIO:  I will object to each question then.

        MR. MARKHAM:  Whatever you'd like to do. You're defending the deposition as you see fit.

BY MR. MARKHAM:

    Q.   So do you know of a tax lien filed by the State on May 29, 2014 in the amount of $32,096?

        MR. DIULIO:  Objection.  Lacks foundation. Asked and answered.  Duplicative.

        THE WITNESS:  I don't know.

PLAINTIFFS' EXHIBIT B - 47

```
 1   BY MR. MARKHAM:
 2       Q.   How about a state tax lien filed on the same
 3   date, March 17th, 2014, in the amount of U.S. dollars
 4   32,145 --
 5            MR. DIULIO:  Objection.
 6   BY MR. MARKHAM:
 7       Q.   -- $32,145?
 8            MR. DIULIO:  Lacks foundation.  Asked and
 9   answered.  Duplicative.
10            THE WITNESS:  I'm not sure.  I don't know.
11   BY MR. MARKHAM:
12       Q.   How about a tax lien -- state tax lien dated
13   December 12, 2020 -- I'm sorry -- December 20, 2013 in
14   the amount of $32,140?
15            MR. DIULIO:  Objection.  Asked and answered.
16   Lacks foundation.  Duplicative.
17   BY MR. MARKHAM:
18       Q.   How about a tax lien dated December 20, 2013
19   filed in Orange County in the amount of $14,122?
20            MR. DIULIO:  Objection.  Lacks foundation.
21   Asked and answered.  Duplicative.
22            THE WITNESS:  I don't know.
23   BY MR. MARKHAM:
24       Q.   How about a state tax lien filed October 30,
25   2013 in the amount of $32,251?
```

10:12  (line 5)
10:12  (line 10)
10:13  (line 15)
10:13  (line 20)
10:13  (line 25)

PLAINTIFFS' EXHIBIT B - 48

```
 1              MR. DIULIO:  Objection.  Asked and answered.
 2    Lacks foundation.  Duplicative.
 3              THE WITNESS:  I don't know.
 4    BY MR. MARKHAM:
 5       Q.   How about a state tax lien dated
 6    September 27, 2013 in Orange County in the amount of
 7    $9,314?
 8              MR. DIULIO:  Objection.  Asked and answered.
 9    Lacks foundation.  Duplicative.
10              THE WITNESS:  Where are those going to?
11    BY MR. MARKHAM:
12       Q.   Just answer the question.
13              MR. DIULIO:  Yeah, if you don't know, the
14    answer is I don't know.
15              THE WITNESS:  I don't know.
16    BY MR. MARKHAM:
17       Q.   I gather then, Mr. Edalat, when you were
18    speaking to anybody about the sale of any shares of
19    Pharma Pak, you never told any of those people about
20    any of these tax liens?
21              MR. DIULIO:  Objection.  Basically, assumes
22    facts.  He's already testified he didn't know about
23    them.
24              THE WITNESS:  I didn't know about them.
25    ///
```

10:13  (line 5)
10:13  (line 10)
10:14  (line 15)
10:14  (line 20)

**PLAINTIFFS' EXHIBIT B - 49**

BY MR. MARKHAM:

    Q.   So you didn't tell anybody about them?

    A.   How would I tell them if I knew?

    Q.   So is the answer no?

10:14    A.   Did you tell them about your tax liens?

    Q.   Did you --

    A.   Do you know about your tax liens?  Do you know about your tax liens?  I have a whole record here too.

    MR. DIULIO:  That's --

10:14    THE WITNESS:  I'm just asking, do you know about your tax liens?  Did you tell Mr. Cahill that you have tax liens when you took this case?

BY MR. MARKHAM:

    Q.   Mr. Edalat, did you tell any of the people 10:14 who --

    A.   I'm telling you I didn't know.

    Q.   So the answer is, you did not tell any of the people to whom -- let me finish my question.

    I want this on the record, Kris?

10:14    MR. DIULIO:  Mr. Markham, I'm not --

BY MR. MARKHAM:

    Q.   Did you tell anyone --

    MR. DIULIO:  Mr. Markham, you're asking the same question over and over.  Now you're raising your 10:15 voice and leaning across the table.  I ask you don't

**PLAINTIFFS' EXHIBIT B - 50**

```
 1    do that, please.
 2            MR. MARKHAM:  I'm not leaning across the
 3    table and I'm not raising my voice.  We've got a
 4    video here, so --
 5            MR. DIULIO:  We do.
 6    BY MR. MARKHAM:
 7       Q.   I'm asking you, Mr. Edalat, whether or not
 8    you told anybody to whom you sold Pharma Pak stock
 9    that you had any tax liens?  Yes or no.
10            MR. DIULIO:  Objection.  Asked and answered
11    now for the third time.
12    BY MR. MARKHAM:
13       Q.   Yes or no?
14       A.   I didn't know.
15       Q.   Is that your answer?
16       A.   I didn't know.
17            MR. DIULIO:  Objection.  Asked and answered.
18    BY MR. MARKHAM:
19       Q.   Okay.  All right.  Now, do you know whether
20    you have any judgments against you?
21            MR. DIULIO:  Objection.  Vague.  Vague as to
22    time.
23    BY MR. MARKHAM:
24       Q.   Do you have any judgments that have been
25    entered against you in any court of law?
```

Timestamps: 10:15 (lines 5, 10, 15, 20, 25)

PLAINTIFFS' EXHIBIT B - 51

```
 1              MR. DIULIO:  Objection.  Vague.

 2              THE WITNESS:  I don't know.

 3    BY MR. MARKHAM:

 4       Q.   Do you recall ever telling any of the people

 5    to whom you sold Pharma Pak stock that you had any

 6    judgments that are against you?

 7              MR. DIULIO:  Objection.  Vague.  Compound.

 8              THE WITNESS:  What's the relevance?  If I go

 9    sell my stock in Apple, does the CEO of Apple come and

10    ask me if I have any tax judgments?  Everything I

11    sold, my stock, by the way, Mr. Markham, since you're

12    such an expert, you know, in disclosure, Mr. Cahill

13    signed every document for shareholders.  He signed

14    every certificate.  He was the CEO of the company.  I

15    was a founder that -- apparently even in an email that

16    came from Mr. Cahill that was -- I wasn't a director.

17    I wasn't a CEO.  I wasn't a chairman.

18              So what's the relevance if I sell my stock in

19    a company that was approved by the board, approved by

20    the CEO and the chairman, who later stole my company?

21    If it was such a bad company, then why did you go set

22    it up in Oceanside and duplicate the same exact model

23    that I created?  Explain that to me.

24    BY MR. MARKHAM:

25       Q.   I have a question pending and I would like an
```

10:15 (line 5)
10:16 (line 10)
10:16 (line 15)
10:16 (line 20)
10:16 (line 25)

**PLAINTIFFS' EXHIBIT B - 52**

```
 1   answer to it.  Did you --

 2       A.   I've given you an answer.

 3       Q.   Just tell me whether you did or not.  That's

 4   an explanation for perhaps why you did not.

 5           What I'm asking you is, whether or not you

 6   informed anybody to whom you sold Pharma Pak stock

 7   that you had judgments filed against you?  Yes or no.

 8           MR. DIULIO:  Objection.  Asked and answered

 9   again.

10           THE WITNESS:  I did not know.

11   BY MR. MARKHAM:

12       Q.   Have you ever heard of a company called ENGI

13   Corporation, M.D. or M.G.?

14       A.   No.  Refresh my memory.

15       Q.   It's a corporation that was filed in 2012 --

16   it was actually filed in 2000 and it went out of

17   business in 2012.

18       A.   What's the relevance?

19       Q.   Do you -- I'm asking you about all the

20   companies you've been affiliated with and I'm entitled

21   to know.

22       A.   I go eat at Pelican Hills Country Club about

23   five times a week.  Do you want to ask me about that

24   too?

25       Q.   I'm asking you about --
```

10:17
10:17
10:17
10:17
10:18

**PLAINTIFFS' EXHIBIT B - 53**

```
  1        A.    You want to waste my time?

  2              MR. DIULIO:  Look --

  3              THE WITNESS:  We're here to answer questions

  4    on -- direct questions regarding Pharma Pak and its

10:18 5    issues.  And I get what you attorneys -- you think

  6    what you can do is create these distractions out here

  7    so you can focus on stealing my company, moving it to

  8    Oceanside, which Mr. Cahill did.  And my investigators

  9    found it, which they now shut down and they moved it

10:18 10   again.  I understand the games you want to play and

 11    waste time.  Why don't you ask direct questions

 12    regarding what Pharma Pak was about and where Pharma

 13    Pak is now.

 14    BY MR. MARKHAM:

10:18 15       Q.    So I'm asking about your prior companies and

 16    I believe --

 17        A.    I don't think there's any relevance and I'm not

 18    going to answer anything in my past.  I'm here to answer

 19    from the time that I got involved with that gentleman

10:18 20   over there, that guy that came in as my partner, my

 21    friend, who told me, "Don't worry about it, buddy.  Go

 22    take of everything."  14 months I busted my ass working

 23    at that company.  I brought all the contacts to the

 24    table.  I brought all the contracts to the table.

10:19 25         When I went -- took a trip to Dubai in
```

PLAINTIFFS' EXHIBIT B - 54

```
 1    February, company stolen and gone because four partners

 2    colluded together, including you, conspired, and he

 3    hired you as a conspiracy side of it.  He hired you

 4    because he couldn't hire a lawyer out here to take the

 5    case because lawyers out here, you know what they do,

 6    what this gentleman does, asked me for all the documents

 7    before he files anything.  Did you do that?  Did you ask

 8    him for any documents?

 9                MR. MARKHAM:  Kris --

10                MR. DIULIO:  So why don't we do this --

11                THE WITNESS:  If you want to waste my time --

12                MR. MARKHAM:  I'm asking about all his prior

13    companies, so I want on the record he's not going to

14    answer them --

15                THE WITNESS:  There's no relevance.

16                MR. DIULIO:  Wait.

17                THE WITNESS:  Tell me what the relevance is.

18                MR. DIULIO:  Let's not speak over each other.

19                MR. MARKHAM:  Do you want to take a break?

20                MR. DIULIO:  I've had a lot of coffee.  Let's

21    take a couple minute break.

22                MR. MARKHAM:  Good idea.

23                THE VIDEOGRAPHER:  We're going off the

24    record.  The time is 10:19 a.m.

25                (Recess was taken.)
```

10:19 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 55**

```
 1              THE VIDEOGRAPHER:  We're back on the record.
 2    The time is 10:26 a.m.
 3    BY MR. MARKHAM:
 4        Q.   All right.  I want to ask you again what was
 5    the purpose of ENGI Corporation?
 6        A.   I don't know.
 7        Q.   You were listed as its chief executive
 8    officer.
 9              Does that in any way refresh your
10    recollection as to what it did?
11        A.   I don't recall.
12        Q.   Do you know why it stopped doing business?
13        A.   I don't recall.
14        Q.   Another company that was formulated -- that
15    was filed was Formulated Sciences, Inc.  The records
16    show that it was incorporated on July 30, 1997 and you
17    are indicated -- it is indicated you were associated
18    with that.
19              What did that company do; do you know?
20              MR. DIULIO:  Objection.  Vague.
21    BY MR. MARKHAM:
22        Q.   Formulated Sciences, do you have any
23    familiarity with that company?
24        A.   Dietary supplements.
25        Q.   Is that the company you testified about
```

10:26    5

10:27    10

10:27    15

10:27    20

10:27    25

PLAINTIFFS' EXHIBIT B - 56

```
 1   earlier?
 2        A.   Yes.
 3        Q.   Why did that company stop operating?
 4        A.   I don't recall exactly why.  It's been a while.
 5        Q.   The status says that it was suspended.
 6             Do you know why it was suspended?
 7        A.   I don't recall.
 8        Q.   Did you ever tell anybody to whom you sold
 9   Pharma Pak stock that you have been involved with the
10   company called Formulated Sciences, Inc., that it had
11   been suspended?
12        A.   I don't recall.
13        Q.   Ever hear of a company called SF Group, Inc.,
14   filed November 9, 2001?
15        A.   No.
16        Q.   You have no memory of why that company was
17   suspended?
18        A.   No.
19        Q.   Did you ever tell anybody to whom you sold
20   Pharma Pak stock about that company?
21        A.   I don't know who that company is.
22        Q.   How about SF Group, Inc.?
23        A.   Again, I don't know what that company is.
24        Q.   So you never would have told anybody to whom
25   you sold Pharma Pak stock about that company and why
```

10:27  (line 5)
10:28  (line 10)
10:28  (line 15)
10:28  (line 20)
10:28  (line 25)

**PLAINTIFFS' EXHIBIT B - 57**

```
 1   it was suspended?
 2            MR. DIULIO:  Objection.  Assumes facts.
 3            THE WITNESS:  I don't know.
 4   BY MR. MARKHAM:
 5      Q.   Sci-Labs Global Holdings, Inc., do you recall
 6   being involved with that company?
 7      A.   There's so many Sci-Labs.  I mean, these are
 8   all set up by our corporate counsel, so I don't know
 9   which Sci-Labs that is.
10      Q.   Do you know that it was suspended?
11      A.   I don't know.
12      Q.   So you wouldn't know why it was suspended?
13      A.   I don't.
14      Q.   Do you know whether you had anything to do
15   with that company?
16      A.   I don't recall.
17      Q.   Did you ever tell anybody to whom you sold
18   Pharma Pak stock about that company?
19      A.   I don't recall what the company is, so I don't
20   know why I would tell anybody that I knew about it.
21      Q.   Okay.  Sci-Lab Nutraceuticals, Inc., you
22   recall that company?
23      A.   Yes.
24      Q.   And that company ceased operations ultimately
25   just about the time of the consent decree in November
```

10:29 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 58**

1   of 2014; correct?

2        A.   Officially.

3        Q.   Did you ever tell Shane Scott about that

4   company?

10:30   5        A.   I think I did.

6        Q.   What did you tell him?

7        A.   I didn't have to tell anybody anything,

8   Mr. Markham.  You go search my name on Google and it

9   pops up as the first or second search, so -- isn't that

10:30   10  what you usually do when you meet people?

11       Q.   I asked you what you told him, not what he

12  could do.  So I'm asking what you told him?

13       A.   I know that he knew.

14       Q.   How do you know that?

10:30   15       A.   Because once I told him, I think it was his

16  attorney, Mark -- Matt, Matt went and looked everything

17  up.  So they knew about everything.  They knew about the

18  consent decree.  They knew about the cease of operation.

19  They knew the company was in bankruptcy, but didn't have

10:30   20  anything to do with what we were doing going forward.

21  That company made nutraceutical products -- nutritional

22  products.  The new company made patches.

23       Q.   So can you tell me what it was you told him?

24            MR. DIULIO:  Objection.  Lacks foundation.

10:31   25  Calls for speculation.

**PLAINTIFFS' EXHIBIT B - 59**

|       |    |                                                                    |
| ----- | -- | ------------------------------------------------------------------ |
|       | 1  | THE WITNESS:  I don't know the details of                          |
|       | 2  | what I got into with them, but I know that they did                |
|       | 3  | their due diligence.  I mean, he owns a marketing                  |
|       | 4  | company online and has access to lot more information              |
| 10:31 | 5  | than I do.  So they're very well aware of it.  I think             |
|       | 6  | there was email exchanges or text messages.                        |
|       | 7  | BY MR. MARKHAM:                                                     |
|       | 8  | Q.   Do you keep your emails, by the way?                          |
|       | 9  | MR. DIULIO:  Objection.  Vague.                                    |
| 10:31 | 10 | THE WITNESS:  How much of my emails?                               |
|       | 11 | BY MR. MARKHAM:                                                     |
|       | 12 | Q.   Do you keep emails that you have sent and                    |
|       | 13 | received; do you retain them or do you delete them?                |
|       | 14 | A.   I don't normally delete my emails.                           |
| 10:31 | 15 | Q.   I'm sorry?                                                    |
|       | 16 | A.   I don't normally delete my emails.  However --               |
|       | 17 | good point you bring that up.  Mark Erfurt, who was our            |
|       | 18 | IT -- head of IT for Pharma Pak did go in the server and          |
|       | 19 | I think he was convicted before and served time for the           |
| 10:31 | 20 | same issue, which we'll be looking into that too -- went          |
|       | 21 | into our email servers and deleted all my Pharma Pak              |
|       | 22 | emails off the server and blocked me out.  The founder            |
|       | 23 | of the company, I got all my emails deleted, all my               |
|       | 24 | communications with Mr. Cahill and everyone else                  |
| 10:32 | 25 | internally by our head of IT.                                     |

PLAINTIFFS' EXHIBIT B - 60

|    |    |
|----|----|
| 1  | Q.   And when did he do this? |
| 2  | A.   Right after Mr. Cahill pulled the, you know -- |
| 3  | decided to shut down the company as the CEO. |
| 4  | Q.   So this was when you were in Dubai? |
| 10:32   5 | A.   I'm sorry? |
| 6  | Q.   This is when you were in Dubai? |
| 7  | A.   After I got back from -- no.  No.  I got served |
| 8  | with a lawsuit as a present while I was in Dubai. |
| 9  | Q.   Do you know the IP provider that provides |
| 10:32  10 | your email service? |
| 11 | MR. DIULIO:  Objection.  Lacks foundation. |
| 12 | THE WITNESS:  I don't. |
| 13 | BY MR. MARKHAM: |
| 14 | Q.   You don't know who you signed up with because |
| 10:32  15 | they would have a record of every email you have, you |
| 16 | understand? |
| 17 | MR. DIULIO:  Objection.  Assumes facts. |
| 18 | THE WITNESS:  The emails that we had through |
| 19 | Pharma Pak were all controlled with Mr. Mark Erfurt, |
| 10:32  20 | and I think it was through Cox network.  I'm not sure. |
| 21 | BY MR. MARKHAM: |
| 22 | Q.   So would you have any objection if we went to |
| 23 | that IP provider to obtain all of those emails that |
| 24 | you say are missing? |
| 10:33  25 | MR. DIULIO:  No, don't answer that. |

**PLAINTIFFS' EXHIBIT B - 61**

```
  1            MR. MARKHAM:  I want to know if he has an
  2   objection to it.
  3            MR. DIULIO:  No.  Whether he has a legal
  4   objection?
10:33  5       MR. MARKHAM:  No, I didn't ask whether he had
  6   a legal objection.
  7   BY MR. MARKHAM:
  8       Q.  Would you like to see those emails disclosed?
  9            MR. DIULIO:  What kind of objection would you
10:33 10   be asking about?
 11            THE WITNESS:  What I would like to do -- what
 12   I would like to do -- since you're talking about
 13   emails, what I would like to do is find out why a
 14   convicted felon that worked for our company was not
10:33 15   disclosed to me that he did the same exact thing in
 16   Mr. Cahill's past company, went in and deleted files
 17   and emails and Mr. Cahill was very aware of that, and
 18   he worked for Cahill for about 15 years, why he was
 19   hired into Pharma Pak to handle our sensitive property
10:33 20   emails, internal emails, so why he went in and he
 21   deleted those emails -- why he deleted my emails.
 22   BY MR. MARKHAM:
 23       Q.  How do you know he deleted them?
 24       A.  I don't have access to those emails.  My own
10:34 25   company, Pharma Pak that I founded, I don't have access
```

**PLAINTIFFS' EXHIBIT B - 62**

| | |
|---|---|
| 1 | to anything in my bank account, not anything in my |
| 2 | emails. |
| 3 | Q.   What bank account are we talking about here? |
| 4 | A.   The bank account that we set up. |
| 10:34   5 | Q.   The Pharma Pak bank account? |
| 6 | A.   We're here for Pharma Pak; right?  Just clarify |
| 7 | this for me because I don't want to continue you -- |
| 8 | again, like what Cahill does, distractions.  Focus on |
| 9 | Pharma Pak with me today, okay, because the emails that |
| 10:34   10 | you're asking for are all gone. |
| 11 | Q.   Would you like to get them back? |
| 12 | A.   Why would I say -- why would I say -- why |
| 13 | would you ask me if I would like to get them back?  It's |
| 14 | my property.  It was my company.  Why did I get locked |
| 10:34   15 | out of my own company? |
| 16 | Q.   Did you -- |
| 17 | A.   Why did the doors -- in my company, at |
| 18 | Gillette, my buildings, why did the door locks get |
| 19 | changed?  That building was under my name. |
| 10:34   20 | Q.   Do you believe that those emails would have |
| 21 | information that would help you in this lawsuit? |
| 22 | A.   Why wouldn't you disclose them?  We've already |
| 23 | asked you to disclose anything that you're holding.  Are |
| 24 | you withholding evidence? |
| 10:34   25 | MR. MARKHAM:  Kris, this is not -- |

**PLAINTIFFS' EXHIBIT B - 63**

```
 1              THE WITNESS:  Hold on.  Hold on.  Hold on.
 2    Sir --
 3              MR. DIULIO:  Hold on.  Hold on.  Hold on.
 4              Mr. Markham, you're basically just engaging
 5    in verbal combat with him over some site issue.  I
 6    will suggest, ask questions and I will ensure that the
 7    witness responds to the questions.
 8              MR. MARKHAM:  He hasn't been doing that --
 9              MR. DIULIO:  Hold on.  Let me finish.
10              You're not.  And this is a fight over what --
11    some unknown emails may or may not know or who has
12    them.  Just ask questions, please.
13    BY MR. MARKHAM:
14         Q.    Are there emails that you wrote to Shane
15    Scott that would indicate what you informed him about
16    in connection with his purchase of stock?
17         A.    I'm not sure.
18         Q.    And that's because you don't have them;
19    correct?
20         A.    When I say "I'm not sure," does that mean I
21    don't have them?
22         Q.    Would you like to have those emails returned
23    from the people who have them at the IP provider?  Yes
24    or no.
25         A.    Well, I thought we did discovery and you were
```

10:35 on lines 5, 10, 15, 20, 25

**PLAINTIFFS' EXHIBIT B - 64**

```
         1    supposed to provide that.  Are you withholding evidence?

         2         Q.   I'm asking you if --

         3         A.   Sir --

         4              MR. MARKHAM:  Kris --

10:35    5              THE WITNESS:  -- I'm asking you, are you

         6    withholding evidence?

         7              MR. DIULIO:  Mr. Markham, I mean, I don't

         8    know why --

         9              THE WITNESS:  Why would I want to ask for

10:36   10    something back that's mine anyways?

        11              MR. DIULIO:  Right.

        12    BY MR. MARKHAM:

        13         Q.   So the answer is no, you don't want them

        14    back?

10:36   15         A.   Did I say that?

        16         Q.   I'm asking.  You won't answer.

        17         A.   Sir, I know you would love to -- you would love

        18    to, okay, showboat today in front of Mr. Cahill and make

        19    it seem like his money -- maybe you took the case on

10:36   20    contingency, but I guarantee you you're not going to get

        21    a penny.  Okay.  I'll tell you right now -- hold on a

        22    second.  You stole my company.  You conspired with them.

        23         Q.   That's not question I'm asking.

        24         A.   And now you're withholding my emails; is that

10:36   25    what you're saying?
```

**PLAINTIFFS' EXHIBIT B - 65**

```
 1                MR. DIULIO:  Let's not speak over each other.

 2                The question is, as I understand it, these

 3       emails that you don't have access to, would you like

 4       to see them?

 5                THE WITNESS:  My question is, why don't I

 6       have access to my emails that is my company?

 7                MR. MARKHAM:  Kris, do we have to go to the

 8       magistrate?

 9                THE WITNESS:  Let's go.

10                MR. MARKHAM:  You know that --

11                MR. DIULIO:  Stop.

12                THE WITNESS:  This is not my first rodeo with

13       a, you know, talented attorney from Boston that claims

14       that he represents the mob and wants to come over here

15       and rattle my cage.  You don't intimidate me for one

16       minute.  Are you withholding evidence?

17       BY MR. MARKHAM:

18           Q.   I'm asking you a question.

19           A.   Are you withholding evidence?

20                MR. MARKHAM:  Kris --

21                THE WITNESS:  Are you withholding my emails?

22                MR. MARKHAM:  Kris, I'm going to certify

23       this -- unless we can get an answer to this --

24                THE WITNESS:  Yes, I'd like my emails back.

25       How is that?  Today.  Today.  Hold on a second.  We're
```

10:36  (line 5)
10:36  (line 10)
10:36  (line 15)
10:37  (line 20)
10:37  (line 25)

**PLAINTIFFS' EXHIBIT B - 66**

```
 1   going to take a break -- we're going to take a break.
 2   I'm going to ask my attorney to take a break.  You're
 3   going to contact Mark Erfurt, you're going to get all
 4   my emails, everything you locked me out of.
 5   BY MR. MARKHAM:
 6       Q.   I got the --
 7       A.   Mark Erfurt is a convicted felon.  It's very
 8   easy, just go right back to the FBI and say, "Hey, what
 9   he did over here in Mr. Cahill's old company and went to
10   jail for, he's done the same exact thing here."  He
11   stole the server out of our building.
12            MR. MARKHAM:  Kris, this --
13            THE WITNESS:  Where are my emails at?
14            MR. MARKHAM:  -- is not going to end well if
15   he keeps repeating things that are not responsive to
16   the question.
17            MR. DIULIO:  But Mr. Markham --
18            MR. MARKHAM:  You're going to defend this on
19   the record?
20            MR. DIULIO:  I'm going to defend this on the
21   record.
22            MR. MARKHAM:  Good.
23            MR. DIULIO:  You've spent ten minutes asking
24   my client if he wants the emails that are your
25   clients'.  You represent Pharma Pak.  I don't
```

10:37 (line 5)
10:37 (line 10)
10:37 (line 15)
10:37 (line 20)
10:37 (line 25)

**PLAINTIFFS' EXHIBIT B - 67**

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | understand what the point of this is.  I don't            |
|        | 2  | understand you two want to sort of beat up on him a       |
|        | 3  | little bit.                                               |
|        | 4  | THE WITNESS:  I don't -- 15 rounds --                     |
| 10:38  | 5  | MR. MARKHAM:  I don't think he's --                       |
|        | 6  | THE WITNESS:  -- by the time we're done.                  |
|        | 7  | MR. DIULIO:  Let me finish.  Let me finish.               |
|        | 8  | THE WITNESS:  You're not doing a good job.                |
|        | 9  | MR. DIULIO:  Stop.  Stop.  Stop.                          |
| 10:38  | 10 | THE WITNESS:  Withholding evidence?                       |
|        | 11 | MR. DIULIO:  Why don't we focus on questions              |
|        | 12 | that have some semblance of relevance and some            |
|        | 13 | semblance of what he knows or doesn't know.               |
|        | 14 | MR. MARKHAM:  Just for the record, so we'll               |
| 10:38  | 15 | have this -- are you through?  I'm sorry.  I didn't        |
|        | 16 | mean to interrupt you.                                    |
|        | 17 | MR. DIULIO:  Go ahead.                                    |
|        | 18 | MR. MARKHAM:  I asked him if he informed                  |
|        | 19 | Shane Scott about certain matters that were highly        |
| 10:38  | 20 | relevant to a security sale.  He told me that he          |
|        | 21 | believed -- he said it on the record that he believed     |
|        | 22 | that he did so by email.  I asked him where the emails     |
|        | 23 | were.  He says he can't -- he doesn't have them.  He       |
|        | 24 | claims that Mark Erfurt took them from him.  I'm           |
| 10:38  | 25 | asking him whether he would agree to go to the IP         |

PLAINTIFFS' EXHIBIT B - 68

```
 1    server to get them back.  He has now, at long last I
 2    understand, said that he would.  Now, if we can get
 3    them back, that will illuminate for us.  That's all I
 4    was trying to establish and I have, so I can now move
```
10:38    `5    on.`
```
 6              MR. DIULIO:  That's good.  But for the
 7    record, you're asking him about emails that are Pharma
 8    Pak emails.  Presumably, they're within your
 9    possession, custody or control.  So that whole
```
10:39   `10   exercise was just a total waste of time.  In addition,`
```
11    there's -- it absolutely bears no relevance.  I'll be
12    very happy to argue the relevance later, but all of
13    this stuff is a sideshow.  The sale of his own
14    individual Pharma Pak shares has nothing to do with
```
10:39   `15   any of the stuff you talked about this entire morning,`
```
16    which has been a complete waste of time.  Now, you're
17    entitled to waste your time in the deposition, so I
18    will let you continue to do that.
19              MR. MARKHAM:  Excellent.
```
10:39   `20   BY MR. MARKHAM:`
```
21       Q.   Do you have a personal email apart from the
22    one that you're using for Pharma Pak?
23              MR. DIULIO:  Objection.  Vague as to time.
24              THE WITNESS:  Personal like what?
25    ///
```

**PLAINTIFFS' EXHIBIT B - 69**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | BY MR. MARKHAM:                                               |
|       | 2  |     Q.   Did you ever -- during the time period              |
|       | 3  | between January 1, 2014 and April of 2015, did you           |
|       | 4  | have any email that you use, other than the Pharma Pak       |
| 10:39 | 5  | email?                                                        |
|       | 6  |     A.   I think I provided you with all those emails.        |
|       | 7  |     Q.   I asked you a question.  Can you answer it?          |
|       | 8  |     A.   From -- I have emails I use for different            |
|       | 9  | things, but pertaining to Pharma Pak, that's the email       |
| 10:40 | 10 | that I use.                                                   |
|       | 11 |     Q.   I didn't ask you that question.                      |
|       | 12 |        MR. DIULIO:  Hold on.  You did ask him that            |
|       | 13 | question, Mr. Markham.                                        |
|       | 14 |        MR. MARKHAM:  I didn't say pertaining to               |
| 10:40 | 15 | Pharma Pak.  I said any emails he used.                       |
|       | 16 |        MR. DIULIO:  Mr. Markham, you were                     |
|       | 17 | interrupting the witness's answer.  And I know this is        |
|       | 18 | getting a little combative, but I will do my best to         |
|       | 19 | endeavor that --                                             |
| 10:40 | 20 |        MR. MARKHAM:  I'm looking for that, Kris.              |
|       | 21 |        MR. DIULIO:  Will you please stop                      |
|       | 22 | interrupting me.  You're interrupting me.  You're            |
|       | 23 | interrupting the witness's answers.  That's not a way        |
|       | 24 | to conduct a deposition.  Again, I'm trying to lower         |
| 10:40 | 25 | the temperature.  So let's lower the temperature by          |

**PLAINTIFFS' EXHIBIT B - 70**

```
 1    not speaking over each other, that's my ask.
 2    BY MR. MARKHAM:
 3        Q.   All right.  I'll start over.
 4             During that time period, which is from
 5    January 1, 2014 through April of 2015, did you use
 6    emails -- addresses that you had that you used to send
 7    emails by any other email, other than the one provided
 8    by Pharma Pak?
 9        A.   To who?
10        Q.   To anybody.
11        A.   Private emails?
12        Q.   To anybody.
13        A.   Yes.
14        Q.   Okay.  And how many?
15        A.   I don't know.
16        Q.   Are you willing to provide me with a list of
17    all of those addresses?
18        A.   No.
19        Q.   Why not?
20        A.   There's no relevance.  Show me relevance.
21    Actually, not you, the judge shows relevance, I'll be
22    more than happy to.
23             MR. DIULIO:  Why don't we do this, we reserve
24    all legal objections.
25    ///
```

10:40 (line 5)
10:40 (line 10)
10:41 (line 15)
10:41 (line 20)

**PLAINTIFFS' EXHIBIT B - 71**

BY MR. MARKHAM:

Q. Did you ever use an email that was a Sentar email?

A. Of course.

10:41   Q. Do you have access to those emails?

A. I do because Mark Erfurt didn't have access to them, to block them out.

Q. So you do have them?

A. Yeah.

10:41   Q. Have you produced all of them to us?

A. Yes.

Q. Yes?

A. Did you do discovery?

Q. I'm asking if you produced all of them?

10:41   A. Have you done discovery?

MR. DIULIO: Hold on. Hold on. Hold on.

THE WITNESS: I think --

MR. DIULIO: Hold on. There's so many problems with this question. As far as I'm aware,

10:41   there has been no request for production served by plaintiffs in this case.

Is that correct, Mr. Markham?

MR. MARKHAM: Well, we did initial disclosures.

10:42   MR. DIULIO: Well, initial -- I don't know if

PLAINTIFFS' EXHIBIT B - 72

1  you understand civil litigation.  I don't mean to

2  be -- I don't mean to be snide by that.

3          MR. MARKHAM:  Good, because if you aren't --

4          MR. DIULIO:  Let me withdraw that.  I didn't

10:42  5  mean that to come out that way.

6          Let me say it this way:  There is a mechanism

7  under Rule 26 where certain categories of documents

8  must be produced under -- as part of the initial

9  disclosure.  There is no way, no how that would

10:42  10  require my client or anybody to produce all of their

11  emails.  So if your question is, has he produced all

12  of his emails because he has an obligation under

13  Rule 26, the legal answer is, no, he's got no such

14  obligation.

10:42  15          So I think your question is misguided.  It

16  assumes facts and it misstates the standard under the

17  civil rules.  So, again, why don't we focus on

18  relevant things and not a discovery dispute.  If you

19  want to talk later about production of documents,

10:43  20  that's something between the attorneys, not wasting

21  time in a deposition asking a witness about them.

22          MR. MARKHAM:  I asked him whether he produced

23  them.  He can say no or he can say yes.

24          THE WITNESS:  I will refer to my attorney

10:43  25  about --

PLAINTIFFS' EXHIBIT B - 73

```
 1              MR. DIULIO:  So objection.  Lacks foundation.
 2   BY MR. MARKHAM:
 3        Q.   Can you answer?
 4        A.   I will refer to my highly intelligent,
 5   reputable attorney to do that.  If he advises me, I will
 6   do it.
 7        Q.   Okay.  And have you deleted any of your
 8   Sentar emails?
 9        A.   I don't recall.
10        Q.   Would you have any objection to us going to
11   the IP provider that provided that email service to
12   you to get all of them?
13              MR. DIULIO:  Yes.  Yes.  There is a -- I am
14   instituting a legal objection on that, that
15   absolutely --
16              MR. MARKHAM:  Why?
17              MR. DIULIO:  Objection.
18              MR. MARKHAM:  Could you state your reason?
19              MR. DIULIO:  Yes.
20              I don't understand the relevance.  It would
21   be an overbroad request to ask for all emails, as you
22   well know.  It would basically be engaging in a
23   fishing expedition, which is not permitted under the
24   rules.  Certainly there are going to be communications
25   in there that are privileged.  There are going to be
```

10:43  5

10:43  10

10:43  15

10:43  20

10:44  25

PLAINTIFFS' EXHIBIT B - 74

1    communications that deal with things that have nothing

2    to do with the issues in this case.

3         And so the -- in addition to the lack of

4    relevance, in addition to the potential privileges

10:44   5    that exist, in addition to the confidential nature of

6    the communications as far as they relate to things

7    unrelated to this litigation, there's also a burden

8    issue.  And that burden weighted against the lack of

9    probative value or lack of evidentiary weight that

10:44   10   would be given to any of these, I believe at best,

11   irrelevant emails, yes, we would have many, many

12   objections to them.

13   BY MR. MARKHAM:

14        Q.   Okay.  Would you have any objection to a

10:44   15   disclosure by the IP provider of the emails from

16   Sentar that they have that related to your

17   communications about Pharma Pak or about Sentar

18   raising money?

19        MR. DIULIO:  There are several problems with

10:45   20   this line of questioning and with this request.  First

21   is there's an assumption that the IP provider has

22   copies of all of those documents.  As a fundamental

23   premise, I would have an extreme objection to any

24   party seeking from a third party documents that should

10:45   25   probably be sought from the party.  We have a process

PLAINTIFFS' EXHIBIT B - 75

```
     1    under the federal rules in which requests are made.

     2    And there's an opportunity to make objections and

     3    those objections are resolved either through a meet

     4    and confer process or before the magistrate.  That's

10:45    5    the process to follow.

     6           And so trying to short circuit that by going

     7    through a third party, I believe, is not a good faith

     8    use of the federal rules.  So I would have a very big

     9    problem with that, in addition to all of the

10:45   10    objections that I stated previously as to a direct

    11    request.  There are going to be communications that

    12    are privileged.  There are going to be communications

    13    that are irrelevant to the facts and issues in this

    14    litigation.

10:45   15           MR. MARKHAM:  You don't have to repeat the

    16    objection.

    17           MR. DIULIO:  Okay.  For all the same reasons,

    18    as you can see, I would have very strong feelings

    19    about that type of request.  I don't think it's

10:46   20    proper.

    21           MR. MARKHAM:  Okay.  Good.  So we've got our

    22    answer.

    23    BY MR. MARKHAM:

    24      Q.    Let's move on to other companies involved

10:46   25    here.  Telenet Solutions, have you ever heard of that
```

**PLAINTIFFS' EXHIBIT B - 76**

```
 1   company?
 2        A.   I don't recall.
 3        Q.   Do you know why that company was formed?
 4        A.   Don't recall.
10:46  5        Q.   Do you know why that company is no longer in
 6   business?
 7        A.   Don't recall.
 8        Q.   Technological Solutions and Innovation, Inc.,
 9   do you have any knowledge of that company?
10:46 10        A.   No.
11        Q.   Do you know when it was formed?
12        A.   I don't recall.
13        Q.   Do you know whether it's still in existence?
14        A.   I don't recall.
10:46 15        Q.   Do you recall whether you had anything to do
16   with it?
17        A.   No.
18        Q.   I gather you didn't tell Shane Scott or Greg
19   Cullen or Bruce Cahill anything about that company?
10:47 20        A.   If I didn't know?
21        Q.   I have my question.  Is that your answer?
22        A.   How would I -- if I don't know about something,
23   how would I go disclose it to anyone?
24        Q.   So the answer is no?
10:47 25        A.   No.
```

PLAINTIFFS' EXHIBIT B - 77

```
 1        Q.    Telenet Solutions, Inc., have you ever heard
 2   of that company?
 3        A.    You just asked.
 4              MR. DIULIO:  Objection.  Asked and answered.
 5              MR. MARKHAM:  Sorry.  There's a lot of them
 6   here, quite a few of them.
 7   BY MR. MARKHAM:
 8        Q.    EFT Global Holdings, have you heard of that?
 9        A.    Yes.
10        Q.    Do you have any relationship with that
11   company?
12        A.    I do.
13        Q.    And what is your relationship to EFT Global
14   Holdings?
15        A.    What's the relevance?
16        Q.    I don't -- I have a right to ask you about
17   EFT Global Holdings.  I'll explain the relevance
18   once -- EFT Global Holdings now has a dba, am I
19   correct, Sentar Pharmaceuticals; is that a dba of EFT
20   Global Holdings?
21        A.    What's the relevance?
22        Q.    The complaint is literally riddled with
23   allegations that you defrauded people by
24   mischaracterizing the value of Sentar Pharmaceuticals.
25        A.    I defrauded?  Are you making that statement on
```

10:47   5
10:47   10
10:47   15
10:48   20
10:48   25

**PLAINTIFFS' EXHIBIT B - 78**

1  record because I can come after you for making these

2  types of defamatory statements?

3            MR. DIULIO:  Let's --

4            THE WITNESS:  Like Mr. Cahill had done.  I

10:48  5  defrauded?  How did I defraud?  Explain to me how I

6  defrauded.

7  BY MR. MARKHAM:

8       Q.   I'm going to ask you about EFT Global

9  Holdings and Sentar.  It's in the complaint.  I stated

10:48  10  it was in the complaint.

11            MR. DIULIO:  I understand that it's in the

12  complaint --

13            MR. MARKHAM:  Do you want to take another

14  break?

10:48  15            MR. DIULIO:  No, I don't want to take another

16  break.  But rather than -- it's not helpful to throw

17  out defrauded.  Let's ask the question, there's a

18  relationship.  Let's state it again.  We've now had an

19  explanation as to the relevance.  Given that, can you

10:49  20  please ask the question.

21  BY MR. MARKHAM:

22       Q.   What is your relationship to EFT Global

23  Holdings, Inc.?

24       A.   What is the relevance of EFT Global,

10:49  25  Inc. [sic]?  Let me ask you something --

PLAINTIFFS' EXHIBIT B - 79

|   |   |
|---|---|
| 1 | MR. MARKHAM:  Kris, this is ridiculous. |
| 2 | THE WITNESS:  No, this is not ridiculous. |
| 3 | MR. DIULIO:  Stop.  Stop.  Stop.  Stop. |
| 4 | THE WITNESS:  You know Mike O'Brien, Don |
| 10:49  5 | O'Brien?  I eat at Pelican Hills five days a week.  Do |
| 6 | you want to sue him? |
| 7 | MR. DIULIO:  Let's go off the record. |
| 8 | MR. MARKHAM:  I don't actually want to go off |
| 9 | the record. |
| 10:49  10 | MR. DIULIO:  I'm asking to go off the record. |
| 11 | If you're going to refuse that request -- |
| 12 | MR. MARKHAM:  If you want to take a break to |
| 13 | talk to your client, I'm fine with that.  But to be |
| 14 | clear -- |
| 10:49  15 | MR. DIULIO:  That is my request.  So if |
| 16 | you're fine with that, let's do that. |
| 17 | MR. MARKHAM:  Before we go off the record, I |
| 18 | want to say something on the record.  To be clear, |
| 19 | there's no way that I'm going to finish this |
| 10:49  20 | deposition without it being -- without -- absent a |
| 21 | court order without asking him every job until -- |
| 22 | about EFT Global Holdings because of the |
| 23 | representations made by its dba. |
| 24 | I was careful to do an interrogatory request |
| 10:50  25 | to Sentar Pharmaceuticals, Inc. and I was told it has |

**PLAINTIFFS' EXHIBIT B - 80**

1    nothing, it owns nothing, it is nothing.  That is

2    obviously not the Sentar Pharmaceuticals that was the

3    one that was touted by Mr. Edalat as this great thing

4    he could have Shane involved with and Bruce involved

10:50    5    with.  It's in the complaint, I have a right to ask

6    about it, so I'm going to.  So if you want to take a

7    break to discuss that, that's fine, but that's our

8    position.

9         MR. DIULIO:  Well -- and since you made your

10:50   10   position on the record, let me state my position on

11   the record.  This is all totally and completely

12   irrelevant.  This is a lawsuit about investments and

13   the operation and sale of shares of Pharma Pak.  You

14   want to spend time and you did -- I can see you

10:50   15   riddled the complaint discussing Sentar.  As far as

16   I'm aware, there were no sales of Sentar shares,

17   nobody invested in Sentar.  That is not your

18   allegations.  It's not the basis for allegations.

19        So the fact that you riddled the complaint

10:51   20   with an irrelevant statement and interjected an

21   irrelevant entity, I can see you did that, but that

22   doesn't make it relevant.  So, fundamentally, we're

23   going to have some very strong discussions throughout

24   this case as to the relevance and the time that you're

10:51   25   going to spend talking about something that has

**PLAINTIFFS' EXHIBIT B - 81**

1   nothing to do with Pharma Pak.

2         Again, you want to spend your time doing

3   that, it's your deposition, but it doesn't make it

4   relevant.  And the fact that you included in the

10:51   5   complaint doesn't make relevant.  In fact, I strongly

6   believe it's irrelevant.

7         MR. MARKHAM:  Okay.

8         MR. DIULIO:  That being said, you know,

9   again, if you want to spend time on those irrelevant

10:51   10   issues, I think you've got a right to do that.

11   BY MR. MARKHAM:

12     Q.   So what's your involvement with EFT Global

13   Holdings, Inc.?

14     A.   Show me relevance and I'll explain it to you.

10:51   15         MR. DIULIO:  Hold on.  I thought we had an

16   agreement that we were going to take a break.  You

17   said you don't have a problem with that, you wanted to

18   state on the record your statement.  I responded.

19   Let's take a short break, please.

10:52   20         MR. MARKHAM:  Okay.  No problem.

21         THE VIDEOGRAPHER:  We're going off the

22   record.  The time is 10:52 a.m.

23         (Recess was taken.)

24         THE VIDEOGRAPHER:  We're back on the record.

11:00   25   The time is 11:00 a.m.

**PLAINTIFFS' EXHIBIT B - 82**

```
 1              (Deposition Exhibit 69 was marked for

 2              identification and is attached hereto.)

 3   BY MR. MARKHAM:

 4       Q.   Mr. Edalat, I'm showing you what is actually

 5   not next in order because next in order is being

 6   copied.  So I'm showing you what's going to be marked

 7   as Exhibit 69.

 8              MR. DIULIO:  Thank you.

 9              MR. MARKHAM:  Kris, I have a copy for you.

10   I had a copy for Gouya.

11   BY MR. MARKHAM:

12       Q.   I'm asking you to take a look at Exhibit 69,

13   see if you can ever recall seeing it before.

14       A.   No, I don't recall.

15       Q.   Do you know whether -- do you know anything

16   about this Default Judgment?

17       A.   I don't.

18       Q.   Do you know whether or not you were a party

19   to the case in which this Default Judgment was

20   entered?

21              MR. DIULIO:  Objection.  Asked and answered.

22              THE WITNESS:  I don't.

23   BY MR. MARKHAM:

24       Q.   Take a look at the first full paragraph,

25   which starts in capital letters, "IT IS ORDERED AND
```

11:00   5

11:01   10

11:01   15

11:01   20

11:01   25

**PLAINTIFFS' EXHIBIT B - 83**

| | |
|---|---|
| 1 | ADJUDGED." |
| 2 | Do you see where I'm referring to? |
| 3 | A.   Yes. |
| 4 | Q.   "IT IS ORDERED AND ADJUDGED that judgment is |
| 11:01   5 | entered in favor of ThermoLife against defendant, |
| 6 | Sechel Holdings, Inc." gives their address, "and |
| 7 | "Sci-Labs Nutraceuticals, Inc." |
| 8 | Does that refresh your recollection with |
| 9 | anything having to do with this lawsuit or this |
| 11:02   10 | Default Judgment? |
| 11 | A.   No. |
| 12 | Q.   And I gather you don't recall whether you |
| 13 | ever mentioned this Default Judgment to Shane Scott, |
| 14 | Bruce Cahill, Greg Cullen or Ron Franco? |
| 11:02   15 | A.   That it filed for bankruptcy and it was |
| 16 | granted. |
| 17 | Q.   I'm asking you the question that I asked you. |
| 18 | A.   I don't know.  I mean, Sci-Labs had a lot of |
| 19 | litigation. |
| 11:02   20 | Q.   So you don't remember or you don't know or |
| 21 | you do know?  The question was, did you ever inform |
| 22 | them about this? |
| 23 | MR. DIULIO:  So stick with that last |
| 24 | question, right. |
| 11:02   25 | THE WITNESS:  I don't know. |

**PLAINTIFFS' EXHIBIT B - 84**

```
 1              MR. DIULIO:  Asked and answered.

 2              THE WITNESS:  I didn't know about this.

 3    BY MR. MARKHAM:

 4         Q.   Okay.  All right.  Have you ever been charged

 5    with a crime?

 6         A.   Have I ever been charged with a crime?

 7         Q.   Yes.

 8         A.   What kind of a crime?

 9         Q.   Any kind of crime.

10         A.   Speeding ticket.

11         Q.   I don't think that's a crime.

12         A.   It's not?

13         Q.   No, I don't think so.  Well, I hope not.

14              MR. DIULIO:  I don't believe it's a crime

15    either, but I think technically it is.  Why don't we

16    ask a misdemeanor or felony then.

17    BY MR. MARKHAM:

18         Q.   Other than a moving violation -- well, strike

19    that.  I don't want to go that far.

20              Other than a speeding ticket, have you ever

21    been charged with drunk driving?

22         A.   No.

23         Q.   Have you ever been charged with any crime?

24         A.   I don't think so, no.

25         Q.   Okay.  I gather you've never been convicted
```

11:02   5

11:03   10

11:03   15

11:03   20

11:03   25

PLAINTIFFS' EXHIBIT B - 85

```
 1   of a crime that you know of?
 2        A.   No.
 3        Q.   Have you ever spent any time in jail in
 4   relationship to any charge brought against you?
 5        A.   I don't recall.
 6        Q.   Don't recall whether you've ever been in
 7   jail?
 8        A.   No.
 9        Q.   Okay.  Back to EFT Global Holdings.  What is
10   your relationship with the company, EFT Global
11   Holdings, Inc.?
12        A.   I'm a shareholder and chairman.
13        Q.   Chairman of the board?
14        A.   Yes.
15        Q.   Who else is on the board?
16        A.   What is the relevance again?
17        Q.   I'm asking the questions.
18        A.   Does it have anything to do with Pharma Pak?
19        Q.   It has to do with the lawsuit.  I've answered
20   that on the record.
21             So where are we, Kris?
22        A.   You're fishing.
23             MR. DIULIO:  So the question is, who else is
24   on the board, if there's anyone else?  I don't --
25             THE WITNESS:  Which board?
```

**PLAINTIFFS' EXHIBIT B - 86**

BY MR. MARKHAM:

Q.   The board of EFT Global Holdings, the board of which you are the chairman.

A.   Of which board though?

Q.   Does it have two boards?

A.   Has an advisory board and has a board of directors.

Q.   Who is on the board of directors?

A.   Myself and my uncle, Dr. Khaloghli.

Q.   Anybody else?

A.   Sister.

Q.   Farah Barghi?

A.   Yes.

Q.   Anybody else?

A.   Not yet.

Q.   And do you recall when it was formed?

A.   I don't recall.

(Deposition Exhibit 68 was marked for identification and is attached hereto.)

BY MR. MARKHAM:

Q.   Let's mark as Exhibit 68 -- I'm going to ask you to take a look at Exhibit 68.  Take a look at page 2 of Exhibit 68 under the part that says, "Actions/Amendments."

Do you see that?

**PLAINTIFFS' EXHIBIT B - 87**

1    A.    Yes.

2    Q.    And the third block down under that says --

3  well, the first block says, "Action type:  Articles of

4  Incorporation."

11:06    5         Do you see that?

6    A.    Yes.

7    Q.    And the third block down says, "File date:

8  7/2/2013."

9         Do you recall that as being at or near the

11:06  10  time EFT Global Holdings, Inc. was filed?

11         MR. DIULIO:  Objection.  Lacks foundation.

12         THE WITNESS:  According to the document.

13  BY MR. MARKHAM:

14    Q.    Do you know when it was filed?

11:06  15    A.    I don't.

16    Q.    Do you know who filed it?

17    A.    I don't.

18    Q.    Do you know why it was filed?

19    A.    It was a new company.

11:06  20    Q.    And why was the company, EFT Global Holdings,

21  filed, if you know?

22         MR. DIULIO:  Objection.  Lacks foundation.

23         THE WITNESS:  New business.

24  BY MR. MARKHAM:

11:07  25    Q.    And what was the business?

PLAINTIFFS' EXHIBIT B - 88

```
 1        A.    Pharmaceuticals.

 2        Q.    Does it have an office?

 3        A.    Currently?

 4        Q.    Yes.

11:07  5        A.    Yes.

 6        Q.    Where?

 7        A.    At 17809 Gillette, the building that Pharma Pak

 8   abandoned and left me holding the luggage that it didn't

 9   pay -- by the way, they didn't pay the rent.

11:07 10        Q.    And how long has EFT Global Holdings been at

11   that address?

12        A.    I don't know.  Couple of years.

13        Q.    Where was it before that?

14              MR. DIULIO:  Objection.  Assumes facts.

11:07 15              THE WITNESS:  Yeah, I don't know.

16   BY MR. MARKHAM:

17        Q.    Okay.  And what does EFT Global Holdings

18   currently do as a company; what is its business?

19        A.    I just said that, pharmaceuticals.

11:08 20              MR. DIULIO:  Objection.  Asked and answered.

21              MR. MARKHAM:  I asked why it was formed.  I'm

22   now asking what it currently does.

23              THE WITNESS:  You asked what it does.  If you

24   want to have her read it back, she can tell you.

25   ///
```

**PLAINTIFFS' EXHIBIT B - 89**

BY MR. MARKHAM:

1

2      Q.   So still working pharmaceuticals?

3      A.   Yes.

4      Q.   What kind of pharmaceuticals?

11:08  5   A.   Medications.

6      Q.   Does it have employees?

7      A.   Not really.  A lot of consultants.

8      Q.   And who are the consultants?

9      A.   For the FDA side, Dennis Moore.  I actually

11:08  10  consult, bring in -- working on sales accounts, so --

11     it's a very new company.

12     Q.   Does this company currently have a dba?

13     A.   I think so.

14     Q.   Is that dba Sentar Pharmaceuticals?

11:08  15  A.   Yes.

16     Q.   Previously, its dba was Sci-Labs

17     Pharmaceuticals; correct?

18     A.   It still is.

19     Q.   It still has as a dba Sci-Labs

11:09  20  Pharmaceuticals?

21     A.   Yes.

22     Q.   For EFT Global Holdings?

23     A.   Yes.

24     Q.   How come it has two dbas?

11:09  25  A.   You can go to -- and see who filed the

**PLAINTIFFS' EXHIBIT B - 90**

```
 1    corporation.  Actually, that was a plan of the attorneys
 2    to set it up that way.
 3         Q.   Do you ever recall being told to move away
 4    from, in all of your marketing efforts, the name
 5    Sci-Labs?
 6              MR. DIULIO:  Objection.  Assumes facts.
 7              THE WITNESS:  By who?
 8    BY MR. MARKHAM:
 9         Q.   By anybody.
10         A.   See, this is the thing I don't understand about
11    your questioning, you're asking me questions -- again,
12    you're grabbing stuff out of the air.  Who would ask me
13    why would I recall?
14         Q.   I'm asking if you recall if anybody ever
15    suggested to you that EFT Global Holdings, in its
16    marketing efforts or its fund-raising efforts, move
17    away from the name Sci-Labs?
18              MR. DIULIO:  Objection.  Assumes facts.
19              THE WITNESS:  I don't know.
20    BY MR. MARKHAM:
21         Q.   Don't recall?
22         A.   No.
23         Q.   Can you think of any reason why that would
24    have happened?
25              MR. DIULIO:  Objection.  Calls for
```

11:09  (line 5)
11:09  (line 10)
11:09  (line 15)
11:10  (line 20)
11:10  (line 25)

**PLAINTIFFS' EXHIBIT B - 91**

1   speculation and assumes facts.

2         THE WITNESS:  Don't recall.

3   BY MR. MARKHAM:

4      Q.   Do you recall being told once by your sister

11:10   5   that you had sent out some marketing materials under

6   the name Sci-Labs and that they should have been sent

7   out under the name Sentar?

8         MR. DIULIO:  Objection.  Assumes facts.

9         THE WITNESS:  I don't recall.

11:10   10   BY MR. MARKHAM:

11      Q.   Do you recall ever getting any response to

12   that communication?

13         MR. DIULIO:  Objection.  Assumes facts.

14         THE WITNESS:  I don't recall.

11:10   15   BY MR. MARKHAM:

16      Q.   Okay.  All right.  Now, has EFT Global

17   Holdings under any of its dbas ever put out any PPMs,

18   Private Placement Memoranda?

19      A.   Initially, when it was founded -- started, I

11:11   20   think so, yes.

21      Q.   When was the last one it would have put out?

22      A.   I don't recall.

23      Q.   Did you have anything to do with the PPMs?

24         MR. DIULIO:  Objection.  Vague.

11:11   25         THE WITNESS:  Personally?

**PLAINTIFFS' EXHIBIT B - 92**

BY MR. MARKHAM:

Q.   Yeah.

A.   We had a -- you know, I was involved, but there
was a group of people, including Mr. Cahill, that was
giving advice on how to put things together.  I think we
had a company by the name of Red Chip, Dave Gentry that
came to visit us.  And we took meetings that he was
involved as far as, you know, how to put a PPM together
because he claimed he was the, you know -- he had done
it in the past and he knew how to do a PPM and -- with
the attorneys and the financial advisor.  I do recall
that.

Q.   And do you recall -- who is Red Chip?

A.   They were -- I think they were financial,
either advising group or a financial analyst.  Dave has
a TV show on Bloomberg.  So he personally liked the
company so much that he wanted to be hands on.  So I
wanted to rely again on old friends and trusted partners
in Pharma Pak to work on what Sentar should do.

Q.   Did Red Chip in any way try to assist EFT
Global Holdings gain financing by any method?

A.   Yes.

Q.   How did they do that?

A.   Through that -- through the PPM that they were
preparing.

**PLAINTIFFS' EXHIBIT B - 93**

```
 1        Q.    Okay.  And did they -- are they still with
 2   you?
 3        A.    I still talk to Dave.
 4        Q.    Are they still working on that financing?
 5        A.    We decided to go a different route.
 6        Q.    Who is "we"?
 7        A.    As a group, we just -- we weren't ready for
 8   what they wanted to do.
 9        Q.    What did they want to do?
10        A.    They wanted to take the company public.
11        Q.    And did you want to take the company public?
12        A.    It's not what I wanted to do.  It was
13   whether at the time justified to take the company
14   public.
15        Q.    Does EFT Global Holdings presently have any
16   contracts under which it's operating to sell or it
17   manufactured?
18             MR. DIULIO:  Objection.  Lacks foundation.
19             THE WITNESS:  What's the relevance again?
20   What does it have to do with Pharma Pak?
21   BY MR. MARKHAM:
22        Q.    We've been over this.  I'm --
23        A.    I'm going to answer the same way.  What does
24   that have to do with Pharma Pak?
25        Q.    I want an answer to the question.
```

11:13  5

11:13  10

11:13  15

11:13  20

11:13  25

**PLAINTIFFS' EXHIBIT B - 94**

```
 1        A.   I'm giving you the answer.  Tell me what it has
 2   to do with Pharma Pak and I'll answer.
 3        Q.   I've already explained that.  I don't have to
 4   explain it again.
11:14 5   A.   Then we've got a problem, Houston.
 6        Q.   I'm Boston.   Remember?
 7        A.   No, but Houston is a joke.  Yeah, you're
 8   Boston.
 9        Q.   I got it.
11:14 10       MR. DIULIO:  So if you know, if there's
11   anything, I guess --
12             THE WITNESS:  I'll be more than happy to
13   answer anything that has to do with Pharma Pak and any
14   relevance if these companies have to do with Pharma
11:14 15  Pak.
16   BY MR. MARKHAM:
17        Q.   So what's the answer to my question?
18        A.   What does it have to do with Pharma Pak?
19        Q.   That's your answer?
11:14 20  A.   Yes.
21        Q.   Okay.  And does it currently have a bank
22   account?
23        A.   What does that have to do with Pharma Pak?
24        Q.   Does it currently have any relationship to
11:14 25  the 2016 PPM put out by Sentar Pharmaceuticals?
```

**PLAINTIFFS' EXHIBIT B - 95**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  |     A.    What does that have to do with Pharma Pak?          |
|       | 2  |           MR. DIULIO:  Wait.  I'm sorry.  Can you ask         |
|       | 3  | that question again.                                         |
|       | 4  |           MR. MARKHAM:  Can you --                            |
| 11:14 | 5  |           MR. DIULIO:  I think I want to interpose an         |
|       | 6  | objection, but I didn't.  It was very quick.                 |
|       | 7  |           So can we have that last question read back,        |
|       | 8  | please.                                                      |
|       | 9  |           (Record read as follows:                           |
| 11:15 | 10 |             "Q.  Does it currently have any                  |
|       | 11 |             relationship to the 2016 PPM put out by         |
|       | 12 |             Sentar Pharmaceuticals?")                        |
|       | 13 |           MR. DIULIO:  I'm going to object.  Vague           |
|       | 14 | because I don't understand the -- hearing the question       |
| 11:15 | 15 | back, I don't understand the "it," so that's --              |
|       | 16 | BY MR. MARKHAM:                                               |
|       | 17 |     Q.    Okay.  Can you answer the question?                 |
|       | 18 |     A.    What does it have to do with Pharma Pak?           |
|       | 19 |     Q.    Is that the only answer you can give me on         |
| 11:15 | 20 | that question?                                               |
|       | 21 |     A.    We'll go all day.  What does it have to do with    |
|       | 22 | Pharma Pak?                                                   |
|       | 23 |     Q.    Okay.  Can I get you to look at, in this           |
|       | 24 | exhibit folder, Exhibit Number 8.  If you can turn to        |
| 11:15 | 25 | tab 8.                                                        |

**PLAINTIFFS' EXHIBIT B - 96**

1          Do you recognize tab 8, the exhibit?

2     A.    Looks like some kind of form of a PPM by

3     Sci-Lab Pharmaceuticals.

4     Q.    Who was running Sci-Labs Pharmaceuticals back

11:16     5     in 2014 -- '15?

6     A.    Again, it was a group of attorneys, financial

7     advisors, FDA consultants.  Collectively we all worked

8     together and there was patent filed for the delivery

9     system.

11:16    10     Q.    What delivery system?

11     A.    Sublingual delivery system.

12     Q.    Who -- filed under the name Sci-Labs?

13     A.    Sorry?

14     Q.    Was it filed under the name Sci-Labs?

11:17    15     A.    As the inventor?

16     Q.    As the owner.

17     A.    No.  It was filed under my name.

18     Q.    So you own it?

19     A.    Not anymore.  I assigned it.

11:17    20     Q.    To whom?

21     A.    To Sci-Labs -- to Sentar, EFT.

22     Q.    So you assigned it over to a dba, but that

23     really means it's to the company that owns the dba;

24     fair enough?

11:17    25          MR. DIULIO:  Objection.  Lacks foundation.

**PLAINTIFFS' EXHIBIT B - 97**

|     |     |
| --- | --- |
| 1 | THE WITNESS:  I don't know how legally it was |
| 2 | the structure. |
| 3 | BY MR. MARKHAM: |
| 4 | Q.   Okay.  Well, if I were to tell you that at |
| 11:17  5 | the patent office the owner of the patent is Sci-Labs, |
| 6 | would that be Sci-Labs, which was the dba for EFT |
| 7 | Global Holdings or would that be Sci-Labs |
| 8 | Nutraceutical, Inc.? |
| 9 | MR. DIULIO:  Objection.  Lacks foundation. |
| 11:17  10 | BY MR. MARKHAM: |
| 11 | Q.   You don't know? |
| 12 | A.   I don't know what Sci-Labs you're talking |
| 13 | about. |
| 14 | Q.   Which Sci-Labs owns the patent? |
| 11:18  15 | A.   EFT does. |
| 16 | Q.   EFT.  And that's -- it was assigned to |
| 17 | Sci-Labs Pharmaceuticals -- |
| 18 | A.   Yeah. |
| 19 | Q.   Let me finish my question. |
| 11:18  20 | A.   Okay. |
| 21 | Q.   It was assigned to -- the patent that you're |
| 22 | talking about, the sublingual delivery system that -- |
| 23 | you invented; correct? |
| 24 | A.   Correct. |
| 11:18  25 | Q.   And you assigned that to Sci-Labs |

**PLAINTIFFS' EXHIBIT B - 98**

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:18 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:18 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:19 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:19 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:19 | 25 |

1  Pharmaceutical as a dba of EFT Global Holdings;

2  correct?

3       A.    However it was structured, that's a legal

4  question.  You can ask the attorneys that filed it.

5       Q.    Okay.  But you did not assign it to Sci-Labs

6  Pharmaceuticals, Inc.?

7       A.    I don't know who it was assigned to.

8       Q.    In one of your earlier answers, you said that

9  you thought that EFT Global Holdings owned it; is that

10  correct?

11       A.    If Sci-Labs Pharmaceutical is the dba of EFT

12  and according to you I assigned it to Sci-Labs

13  Pharmaceutical, then who owns it?

14       Q.    I'm asking you.  You were the inventor.  You

15  would have had to assign it; correct?

16       A.    Just like --

17            MR. DIULIO:  If you recall.

18            THE WITNESS:  Yeah.  Yeah.  Okay.

19            MR. DIULIO:  If you know.

20            THE WITNESS:  I don't know the legal

21  structure, but I do recall one other thing.  I did

22  file in Pharma Pak -- so maybe you can help me with

23  this -- three patents for transdermal patches.  I was

24  the inventor, I assigned it to Pharma Pak.  So who

25  owns the patents?

PLAINTIFFS' EXHIBIT B - 99

BY MR. MARKHAM:

    Q.   I'm asking you if you can recall to whom you assigned the sublingual delivery system patent that you say you invented?

    A.   I answered.

        MR. DIULIO:  Yeah, I think it's -- objection. Asked and answered at this point.

BY MR. MARKHAM:

    Q.   Okay.  So what's the answer?

        MR. DIULIO:  Objection.  Asked and answered.

        THE WITNESS:  Ask the lawyers that filed the legal work.

BY MR. MARKHAM:

    Q.   But it's your belief, as you sit here as you've testified that EFT Global Holdings is the owner of that patent?

        MR. DIULIO:  Objection.  Asked and answered.

        THE WITNESS:  Ultimately.  Ultimately.

BY MR. MARKHAM:

    Q.   Through the dba, whoever that is?

    A.   Through the dba.

    Q.   When did you invent that patent?

    A.   I think it was filed in -- I'm not sure exactly the date.  It was sometime -- I think it was middle of 2013 or latter part, I think.  I'm not sure.  It might

**PLAINTIFFS' EXHIBIT B - 100**

         1    have been 2014.  I'm not sure of the exact date.

         2         Q.   And how did you go about inventing that

         3    patent; what did you do?

         4         A.   What does this have to do with Pharma Pak?

11:20    5         Q.   I'm asking about EFT Global Holdings.

         6         A.   You want me to give you scientific?  We're

         7    going to go all day.

         8         Q.   Yeah, sure.

         9         A.   Why don't you read the patent.  It's public,

11:20   10    read it.  Then you won't waste my time asking questions

        11    that are irrelevant.  Let's talk about Pharma Pak.

        12    Let's talk about this, let's talk about how that man

        13    over there stole my company.  Okay.  And let's talk

        14    about how he stole money out of the company, embezzled

11:20   15    funds, used it for his own -- got a loan for $5 million

        16    from the bank because he needed to show a salary.  Let's

        17    talk about all the things that I know about that man

        18    sitting over there.  What does my bankruptcy have to do

        19    with anything?  Bankruptcy is not illegal.  What that

11:21   20    man did is illegal.

        21              MR. MARKHAM:  Okay.  Kris, for the record, I

        22    want to say something.

        23              MR. DIULIO:  Let's go back to questions --

        24              THE WITNESS:  Ask me relevant questions,

11:21   25    Counsel.

**PLAINTIFFS' EXHIBIT B - 101**

```
 1              MR. MARKHAM:  Just for the record, I think
 2     it's appropriate to ask counsel to consider informing
 3     the client that he's got to answer my questions and
 4     not use them as a speech to talk about what's in his
 5     cross-complaint, which obviously, I will get to.  But
 6     as you said, it's my deposition.
 7              MR. DIULIO:  Let's focus on that, questions
 8     and answers.
 9              THE WITNESS:  Okay.
10              MR. MARKHAM:  The question part, I think
11     we're making headway on it.
12              THE WITNESS:  Counsel, one other thing.
13              MR. DIULIO:  It's bumpy on both ends.
14     Mr. Edalat, I know you've got a lot to say --
15              THE WITNESS:  I just want to say this --
16              MR. DIULIO:  Let's let him ask questions
17     and --
18              THE WITNESS:  First of all, this isn't a
19     criminal indictment where, Counsel, your AUSA
20     background, you know, hanging on the wall.  You're in
21     California.  I get your bullying tactics of Boston,
22     but you don't have a gun to my head.  I'll answer
23     questions that I feel I need to answer.  And if you
24     think I need to answer them, then go see the judge.
25     Tell me what the relevance is.  If the judge says I
```

11:21  5
11:21  10
11:21  15
11:22  20
11:22  25

**PLAINTIFFS' EXHIBIT B - 102**

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | need to answer those, that's a legal thing that you        |
|       | 2  | guys got to do here.  Right?  And don't think for one      |
|       | 3  | minute I'm losing my focus and the fact that that man      |
|       | 4  | stole my company.                                          |
| 11:22 | 5  |          MR. DIULIO:  All right.  So let's --               |
|       | 6  |          THE WITNESS:  Ask me questions about Pharma        |
|       | 7  | Pak.                                                        |
|       | 8  |          MR. DIULIO:  Let's ask questions and get the       |
|       | 9  | answers.                                                    |
| 11:22 | 10 |          THE WITNESS:  Thief.                               |
|       | 11 | BY MR. MARKHAM:                                             |
|       | 12 |     Q.   So when -- take a look at that same exhibit,       |
|       | 13 | which is tab 8, Exhibit 8.  And if you don't mind, go      |
|       | 14 | to -- in Exhibit 8 there are page numbers, Mr. Edalat,    |
| 11:23 | 15 | down at the bottom right, PL numbers.  Do you see          |
|       | 16 | those?  Could you go to PL3208.  There's a letter          |
|       | 17 | there from a company called Brown Rudnick, LLP to RJ       |
|       | 18 | Demman, president of Sci-Labs Pharmaceuticals.            |
|       | 19 |          Do you see that?                                   |
| 11:23 | 20 |     A.   Yes.                                               |
|       | 21 |     Q.   And what is Brown Rudnick, LLP?                    |
|       | 22 |     A.   A law firm.                                        |
|       | 23 |     Q.   And the letter is signed by Peter Glock.          |
|       | 24 | What is his relationship to that law firm?                 |
| 11:23 | 25 |     A.   He's the IP patent attorney.                      |

**PLAINTIFFS' EXHIBIT B - 103**

```
 1        Q.   And was Brown Rudnick retained by you to

 2   assist with the patent work for the patent that you

 3   say you invented?

 4             MR. DIULIO:  I'll object.  Vague and

 5   compound.  I think there are a number of patents.  So

 6   if there's a -- if we can be specific about which

 7   patent it is.

 8             MR. MARKHAM:  The one that's on file as being

 9   owned by EFT Global Holdings.

10             THE WITNESS:  Me personally?

11   BY MR. MARKHAM:

12        Q.   Yeah.

13        A.   The company retained it.

14        Q.   Who in the company retained it; was it you?

15        A.   Well, I had a relationship with Mr. Glock from

16   the past.  So he went to this firm and I was advised to

17   go with this firm because of our relationship.

18        Q.   Okay.  And do you know what patent is being

19   referred to in this letter?  Is it the one that is the

20   sublingual patent that you have assigned to EFT Global

21   Holdings?

22        A.   Counsel, let the document speak for itself.

23   It's very clear.  On the top portion it saying

24   "Regarding:  Intellectual property snapshot, all

25   natural, non-toxic sublingual drug delivery system."
```

**PLAINTIFFS' EXHIBIT B - 104**

```
 1    This is the part where -- I mean, these documents are
 2    all exhibits.  Why are you asking me about them?
 3         Q.   I'm asking you if the patent of that, which
 4    you've just testified that you assigned --
 5         A.   Right.
 6         Q.   -- is the patent being referred to here.
 7    It's yes or no.
 8         A.   I think it is.
 9              MR. DIULIO:  Objection.  The document speaks
10    for itself.
11    BY MR. MARKHAM:
12         Q.   So you think it is.  All right.
13              Now, do you recall this letter being written
14    at or around August 26, 2014?
15         A.   Do you want to say it or should I?
16              MR. DIULIO:  Objection.  Lacks foundation.
17    BY MR. MARKHAM:
18         Q.   I'm asking if you recall it.  Did you see it
19    at the time?
20         A.   The document is what it is.
21         Q.   Okay.  And can you take a look at Exhibit 7.
22         A.   Okay.
23         Q.   And do you recall Exhibit 7?  Have you ever
24    seen that document before?
25         A.   It looks like Exhibit 8.
```

11:25   5
11:25   10
11:25   15
11:25   20
11:26   25

**PLAINTIFFS' EXHIBIT B - 105**

|      | 1  | Q.    Compare the dates to the titles on the first |
|      | 2  | page.  That may refresh your recollection. |
|      | 3  | A.    Okay. |
|      | 4  | Q.    So Exhibit 8 is a PPM for Sci-Labs -- |
| 11:26 | 5  | Sci-Labs Pharmaceuticals, dated 2014; correct? |
|      | 6  | A.    Okay. |
|      | 7  | Q.    Is that what it says?  I'm just making sure |
|      | 8  | we have the right document in front of you. |
|      | 9  | A.    Sir, you're putting these documents in front of |
| 11:26 | 10 | me.  None of them have been authenticated. |
|      | 11 | Q.    I'm asking you to authenticate them. |
|      | 12 | A.    Have you authenticated any of these documents? |
|      | 13 | Q.    I'm doing it right now, Mr. Edalat.  I have a |
|      | 14 | right to ask you about the documents. |
| 11:26 | 15 | A.    Where did you get the documents? |
|      | 16 | MR. DIULIO:  So let's -- if you know.  Do you |
|      | 17 | know? |
|      | 18 | THE WITNESS:  You're putting these in front |
|      | 19 | of me.  I'm just going off of what you put in front of |
| 11:26 | 20 | me. |
|      | 21 | BY MR. MARKHAM: |
|      | 22 | Q.    You've never given that document to anybody |
|      | 23 | in exchange for raising money, sir? |
|      | 24 | A.    Me personally? |
| 11:27 | 25 | Q.    Yes. |

**PLAINTIFFS' EXHIBIT B - 106**

```
 1        A.    I don't recall.

 2        Q.    Take a look at Exhibit 7.

 3        A.    This is Exhibit 7.

 4        Q.    Then take a look at Exhibit 8.

11:27    5        A.    Okay.

 6        Q.    Is that the one that says on its face that it

 7    is a 2014 Sci-Labs Pharmaceuticals PPM?

 8        A.    What does this have to do with Pharma Pak?

 9    Explain this to me.

11:27   10            MR. DIULIO:   Objection.   Document speaks for

11    itself.

12            Answer if you know anything about it.

13            MR. MARKHAM:   Kris, excuse me, but I did want

14    to put something on the record.   I understand the

11:27   15    document speaks for itself, but when the witness is

16    sitting across the table, just like in a courtroom, to

17    make sure we have the same document is appropriate to

18    read off the title to have him confirm.   So I'm just

19    asking him to do that as a confirmatory matter.

11:27   20            MR. DIULIO:   I understand.

21    BY MR. MARKHAM:

22        Q.    So you don't have to say the document speaks

23    for itself.   I just want to make sure that that's the

24    document that you now have in front of you.

11:27   25            MR. DIULIO:   So the only question is, are you
```

**PLAINTIFFS' EXHIBIT B - 107**

```
 1   looking at the document?
 2           THE WITNESS:  I'm looking --
 3   BY MR. MARKHAM:
 4       Q.   Are you looking at the document and what is
11:27  5   the title of that document starting with "Sentar" at
 6   the bottom?  Could you please read that so the record
 7   will reflect what document you're looking at.
 8       A.   Why would you like me to read it if you're
 9   disclosing this?  It's already on record.  What do you
11:28 10   want me to read?  I mean, you're wasting my time.
11           MR. DIULIO:  The document does speak for
12   itself.
13           THE WITNESS:  I don't understand this.
14           MR. DIULIO:  The goal is to have him sit here
11:28 15   and read documents.
16           THE WITNESS:  That's the best you have?
17           MR. MARKHAM:  This is not what I asked him to
18   do, Kris, and you know it.
19           MR. DIULIO:  I know --
11:28 20   BY MR. MARKHAM:
21       Q.   I'm asking him to identify what document you
22   have in front of you across the table.  Does it say
23   Sentar or does it say Sci-Labs at the bottom?
24       A.   But that's not what you asked.
11:28 25       Q.   I'm trying to make it easier for you.
```

**PLAINTIFFS' EXHIBIT B - 108**

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | MR. DIULIO:  So he's asking that now.                              |
|       | 2  | THE WITNESS:  This says Sentar.                                    |
|       | 3  | BY MR. MARKHAM:                                                    |
|       | 4  | Q.   And what does it say following Sentar, the                   |
| 11:28 | 5  | title on the bottom?                                              |
|       | 6  | A.   "2015 private placement memorandum,                         |
|       | 7  | confidential."                                                    |
|       | 8  | Q.   Okay.  Now, could I ask you to turn in that                 |
|       | 9  | document to PL1626.                                               |
| 11:29 | 10 | A.   Okay.                                                        |
|       | 11 | Q.   Do you recognize the letter, which is                       |
|       | 12 | reflected at PL1626 and PL1627?                                  |
|       | 13 | A.   Yes.                                                         |
|       | 14 | Q.   And is that written by the same law firm and               |
| 11:29 | 15 | the same lawyer as the one that we looked at before?            |
|       | 16 | A.   Looks like it.                                              |
|       | 17 | Q.   Okay.  And take a look at -- let's leave it               |
|       | 18 | there for now.  I got more questions about EFT Global          |
|       | 19 | Holdings that I'm going to ask you in a bit.  I want           |
| 11:29 | 20 | to move to Pharma Pak with your permission.                     |
|       | 21 | A.   Thank God.  Took you six hours.                             |
|       | 22 | Q.   So when did you and Mr. Cahill first discuss              |
|       | 23 | working together in any business relationship?                  |
|       | 24 | A.   I think it was sometime in the middle of 2014,           |
| 11:29 | 25 | my recollection, because that's about the time that the        |

**PLAINTIFFS' EXHIBIT B - 109**

1    doctors from -- Dr. Strader and the group from -- I

2    think it was Austin or Dallas looking at the facility.

3         Q.   Okay.  I gather that before you and

4    Mr. Cahill started talking about doing business

11:30  5    together, you had been social acquaintances?

6         A.   Yes.

7         Q.   Could you describe that relationship and how

8    it started?

9         A.   We were introduced to each other by a mutual

11:30  10   friend, Andy Barath.  He used to be friends with Bruce

11   for over, I think, 20 years.  He was his pilot.  And he

12   had taken me to Bruce's house a couple of times for 4th

13   of July parties.  And we actually, you know -- we used

14   to hang out, we used to go to lunches and he'd come

11:30  15   visit me when -- I think after his company, Centaur

16   Sales with a C --

17        Q.   That's C-e-n-t-a-u-r; right?

18        A.   Yes.

19             -- was winding down.  And, you know, we -- kind

11:30  20   of similar story, I think, we shared -- according to

21   him, he also got swindled by an ex-partner that stole

22   his accounts, moved to San Diego, which he filed a

23   lawsuit against that individual and kind of mirroring

24   what happens to Pharma Pak, but he was the plaintiff in

11:31  25   that deal.

**PLAINTIFFS' EXHIBIT B - 110**

```
 1              But anyways, you know, then his, I think,
 2     controller embezzled money.  So we shared similar -- I
 3     think we bonded that way, the similar thing that
 4     happened to me in Pharma Pak with bad advice and
11:31  5     attorneys and CFO while I'm out there trying to build
 6     the company.
 7         Q.    When you say Pharma Pak and bad advice --
 8         A.    I'm sorry.  Sci-Labs Nutraceuticals.
 9              That we shared similar stories and, you know,
11:31 10     he said, "Buddy, let me go on these trips with you to
11     make sure this doesn't happen to you again because the
12     company you work for so hard, you built" -- okay.  I did
13     work very hard, built companies, built brands and so
14     what --
11:32 15         Q.    This is Sci-Labs Nutraceuticals, Inc.?
16         A.    The dance came to an end and, hey,
17     entrepreneur, that's what happen, you're a target out
18     there.  You do get sued.  One of the most litigious
19     industries is the nutraceutical.  I can sue you for
11:32 20     anything, you can sue me.
21              But regardless, we bonded that way because we
22     shared a similar path of what had happened in the past
23     and Andy Barath actually vouched for me, we were good
24     friends.  Everything was good.  It was a good dance.  It
11:32 25     was sharing wine, going to dinners.  And Bruce said,
```

**PLAINTIFFS' EXHIBIT B - 111**

```
 1    "You know, let me get involved.  I don't want these
 2    doctors to take you" -- "I know you're in a" -- and I
 3    think he meant it.
 4          I really do think he meant well by that because
11:32  5   he saw me as -- going through the similar things he had
 6    gone through in the past and he didn't want me to get
 7    into another deal under duress because I had the
 8    bankruptcy of the company to deal with.  I had to come
 9    up with money.  I was getting, you know -- I was
11:32 10   getting -- I call it extortion, but you can call it
11    whatever you want.
12          I was getting extorted by a lawyer by the name
13    of Steven Katzman, another -- you know what, another
14    former AUSA, told me they can come in my bankruptcy and
11:33 15   clear it all up for 1.5 million.  And that's why I was
16    going to do this deal with these doctors, to be able to
17    take care of that, get my life back on track.  I lost a
18    lot of money.  I lost everything because of what
19    happened in those two incidents.
11:33 20          So Bruce meant well.  I'm going to credit him
21    for that.  He meant well.  He came over kind of like a
22    mentor, you know.  He went on every trip with me.  He
23    went to Dallas.  He went to Austin.  I think he even
24    went to Florida.  We went to multiple trips and things
11:33 25   were good.  And Bruce said, "You know what, buddy, I
```

**PLAINTIFFS' EXHIBIT B - 112**

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | don't want you to sell this company to these guys             |
|        | 2  | because I think there's a big opportunity here."  And I       |
|        | 3  | said, "Bruce, how do you see the opportunity?"  He said,      |
|        | 4  | "Well, we can" --                                             |
| 11:33  | 5  | Q.    Can I just interrupt you for just one second.           |
|        | 6  |       These trips that you just referred to --                |
|        | 7  | A.    Yes.                                                    |
|        | 8  | Q.    -- to Texas and Florida, they were on behalf            |
|        | 9  | of what company?                                             |
| 11:33  | 10 | A.    On behalf of the company that held the license,         |
|        | 11 | Pharma Pak.                                                   |
|        | 12 | Q.    Okay.                                                   |
|        | 13 | A.    There was a deal on the table -- it's in our            |
|        | 14 | lawsuit -- that this group wanted to acquire that             |
| 11:34  | 15 | building and its license operation.  As a matter of          |
|        | 16 | fact, they sent people in for two months to audit the        |
|        | 17 | facility.  And they will tell you, the license was not       |
|        | 18 | the issue.  What happened was, there was three partners      |
|        | 19 | that were looking to invest -- and the number, I think,      |
| 11:34  | 20 | was 2.5 million.  They were looking to invest               |
|        | 21 | 2.5 million in that facility --                              |
|        | 22 | Q.    And the facility is specifically?                       |
|        | 23 | A.    Gillette, the building that --                          |
|        | 24 | Q.    The Gillette address that you have?                     |
| 11:34  | 25 | A.    Yes.  I kept the building.  And I was personal          |

**PLAINTIFFS' EXHIBIT B - 113**

```
         1   guarantor.  Mr. Lenacof, I called a friend and he owned
         2   the buildings.  He's one of the second largest
         3   commercial real estate owners next to Donald Bren,
         4   Irvine Company.  So I went and made a deal with Igor and
11:34    5   I said, "Look, let me get back on my feet.  One thing
         6   about me is got the relationships to bring the business
         7   in."  So he said, "Fine."  I made that deal.  I --
         8   Bruce came in and said, "Let me just shadow you."
         9       Q.   That's fine.
11:34   10       A.   I'm sorry.  I'm giving you a story.  You want
        11   to interrupt me?
        12       Q.   No.  I'm looking for my coffee cup.  Not that
        13   you're not keeping me awake, I just want to grab my
        14   coffee cup.  You can keep going, I was listening.
11:35   15            MR. DIULIO:  Your answer is for the record.
        16            THE WITNESS:  Unbelievable.
        17            MR. DIULIO:  The record will reflect your
        18   answer.  Please continue.
        19            THE WITNESS:  You guys are masters of
11:35   20   distraction, by the way.
        21   BY MR. MARKHAM:
        22       Q.   I wanted to get my coffee, Mr. Edalat.  I'm
        23   sorry.
        24       A.   That's okay.  You didn't have to go on record
11:35   25   and say that, but it's all right.
```

PLAINTIFFS' EXHIBIT B - 114

```
 1              MR. DIULIO:  Please continue.
 2              THE WITNESS:  Apology accepted.
 3          So these doctors wanted to buy the facility,
 4     these rights to the license, which was still active.
11:35  5     And they wanted to come in and do, like I told you,
 6     the allergy drugs and there were pain patch
 7     medications.
 8     BY MR. MARKHAM:
 9          Q.   Who were these doctors specifically?
11:35 10          A.   Dr. Jim Strader, Chad Barrett, Rick Speiss and
11     this Texas oil man by the name of -- who became good
12     friends with Bruce, trust fund kid, Alan Meeker, four
13     partners.  So we took a trip to Dr. Strader's office.
14     They're willing to do the deal, they signed an
11:36 15     agreement, they put a deposit, non-refundable.  That
16     money went to basically build out the building the way
17     they needed it done.  So we entered into an agreement.
18     They had until December -- I think midnight on
19     December 31st to close the deal.
11:36 20          Q.   Which year?
21          A.   I'm sorry?
22          Q.   2014?
23          A.   2014, yes.
24          So, you know, I trusted Bruce as my friend and,
11:36 25     you know, wanted to get involved in this business.  So
```

**PLAINTIFFS' EXHIBIT B - 115**

          1    we went together.  He was there every minute.  He
          2    actually has emails he negotiated.  He was on talks with
          3    them.  And when he realized and we sat down -- and
          4    honestly, Bruce is one of the masters of putting things
11:36     5    on whiteboard because he's such a good engineer, right,
          6    he put it on board and he said, "Paul, you're making a
          7    mistake."  I said, "Well, show me."  And he did.
          8         He said, "Look, if you go partner with these
          9    guys, you're giving away a gold mine.  And that is
11:36    10    that" -- "they can come in here, they will give you
         11    2.5 million, you can still consult with them, buddy, but
         12    you're giving it away cheap."  I said, "Well, explain to
         13    me how that is cheap."  And he did, he showed me.  And
         14    he said, "You know, they need this building more than
11:37    15    you do.  So let me partner with you."
         16         And then I met a gentleman by the name of John
         17    Crowther.  He said, "Buddy, we'll get you out of this
         18    mess," multiple times promised me.  The mess was the
         19    bankruptcy on Sci-Labs Nutraceuticals, Inc.  I only had
11:37    20    $17,000 of debt walking into that bankruptcy.  The
         21    trustee was very aware of that.  I was dragged into
         22    that.
         23         Now, listen, I'm a grown man, I'll handle
         24    whatever mistakes I make.  Okay.  But that was something
11:37    25    I was forced into and I had to deal with it.  Bottom

PLAINTIFFS' EXHIBIT B - 116

1    line, what Bruce put on that whiteboard was amazing

2    because we were going to generate over $100 million in

3    revenues by making the patches for them.  Okay.  So I

4    went to -- I think I went to Dubai -- no, sorry.  I was

11:37    5    in Vegas and Bruce said, "You know, tell those guys that

6    I'm getting involved, you know."  And I said, "Fine,

7    Bruce, you know, I'll let them know."  I let Jim Strader

8    know.

9            Now, Strader wasn't very fond of Bruce, but --

11:38    10    I still talk to him.  He wasn't very fond of Bruce's

11    ways of business.  He just thought he was very shrewd in

12    the way he does things.  I said, "You know what, it's

13    good to have a man like that on my side than against

14    me."  Right?

11:38    15            So with that said, Bruce committed at the

16    2.5 million valuation to buy 20 percent of the company.

17    That was half a million dollars.  And John Crowther

18    committed to buy 11 percent, I think it was at the time.

19    10 percent we sold for 250,000 and 1 percent for the

11:38    20    fact he was going to bring in China -- the patches were

21    coming in from China.  So it was a happy deal.  We're

22    all friends, you know.  I went back to the guys, "Here's

23    the thing" --

24        Q.   By "guys," you mean the people in Texas?

11:38    25        A.   The people in Texas.

**PLAINTIFFS' EXHIBIT B - 117**

1          I said, "Jim, unfortunately, this deal" -- "we

2     may not do the deal."  He said, "But don't worry about

3     it because Chad wants to do it, I want to do this deal,

4     but Alan Meeker is not wanting to do this deal."  I

11:39  5     said, "That's fine."  However, Meeker still wanted to

6     give us the toxicology cups to do business out of our

7     building.

8          Q.   What happened to the 2.5 million that they

9     were going to give you?

11:39 10          A.   We backed out because Bruce and them came in.

11          Q.   So the reason for backing out of that deal

12     with --

13          A.   I had new partners.

14          Q.   -- with Meeker --

11:39 15          A.   Yes.

16          Q.   -- and who; Strader?

17          A.   Meeker and --

18          Q.   Barrett?

19          A.   Chad Barrett and Rick Speiss, Chad's partner,

11:39 20     and Dr. Strader.

21          Q.   And the reason for backing out of that was

22     Bruce said, we can do better?

23          A.   Bruce said, "We can" -- "I can come in.  I will

24     run Pharma Pak and I will get these guys to give a

11:39 25     contract, which will be much more lucrative, Paul.  Your

THE SULLIVAN GROUP OF COURT REPORTERS                    118

**PLAINTIFFS' EXHIBIT B - 118**

1   only problem right now is the fact that you are running

2   on fumes.  We can give you the fuel, which is the money,

3   to go and pay your lawyers and negotiate all this."

4   Because I was down, I was down and out.

11:39   5        So with that said, I accepted to do the

6   partnership with Bruce and with John Crowther.  And,

7   hey, his plan worked.  You know why -- they did come

8   back and they did do a JV agreement with us and it was

9   immaculate.  I was very proud of what he did.  As the

11:40  10   CEO of the company, he did a great job, in that he did

11   create an opportunity, which he put on that whiteboard

12   and it worked out.

13        We did a JV with Chad Barrett and his

14   pharmacies.  Dr. Strader went on and bought his own lab.

11:40  15   He just couldn't wait for these guys.  And he didn't

16   want to be partners with them.  I think at the end he

17   kind of pulled out.  So we did the deal.  We did the JV.

18   As a matter of fact, Bruce and -- that's the notorious

19   day of Bruce and Olivia going to Il Fornaio and sharing

11:40  20   wine and whatever happened that day.  That's between

21   their lawsuit.  I was very happy.  And, you know, I was

22   in Vegas and Bruce called me and said, "The deal's done,

23   buddy."  We were to celebrate.  Things were good.

24        Q.   Did Olivia, after that lunch -- tell you

11:40  25   anything about what happened at that dinner?

**PLAINTIFFS' EXHIBIT B - 119**

```
 1        A.    Yes.

 2        Q.    When was that?

 3        A.    Well, she -- she kept it from me and then later

 4   she told me that they had shared a bottle of wine.  And

11:40 5   I don't know if -- Bruce drank most of the wine.  And

 6   there was some -- she wasn't very comfortable because

 7   she was by herself with him and -- I'm not going to get

 8   into their lawsuit.  That's --

 9        Q.    I just want to know what she told you and

11:41 10  when.  That's all --

11        A.    You know, she didn't feel comfortable with the

12   bottle of wine and I guess, you know -- look, you only

13   have a few minutes left.  Let's leave that for when we

14   get back.

11:41 15       Q.    Just tell me in the minute we have -- they

16   say this on the news all the time, I'm going to ask

17   you in one minute to talk about world peace in the

18   Middle East, something less serious -- less

19   complicated, not less serious.

11:41 20            What did she tell you happened at that

21   dinner -- at that lunch?

22        A.    You're going to need more than a minute.

23        Q.    Start.

24        A.    That Bruce took her to lunch as a

11:41 25  celebratory -- sometime, I think, in the middle of the
```

**PLAINTIFFS' EXHIBIT B - 120**

1    day, noon or 1:00.  And he had ordered a bottle of wine,

2    which she thought that that was not right because she's

3    never gone to lunch on a Friday, you know, with her boss

4    and sharing a bottle of wine.  She didn't drink.  She

11:42  5    acted like she was drinking, but he drank most of it.

6    Bruce likes wine, by the way, and he likes women.  So

7    anyways, he, I guess, made some kind of advancement, you

8    know --

9        Q.    Verbal or physical?

11:42  10       A.    Verbal.  I think it was verbal.

11            Listen, I called Bruce and I told him, "You

12   can't do that stuff."

13       Q.    When did she tell you this?

14       A.    Sorry?

11:42  15       Q.    When did she tell you this?

16       A.    It was probably later that afternoon after she

17   got back.

18            MR. MARKHAM:  We're good.  I think we're just

19   about out, so we'll take a break.  Five minutes?  Ten

11:42  20   minutes?  Whatever.

21            MR. DIULIO:  Five is fine.  Well, let's go

22   off the record.

23            THE VIDEOGRAPHER:  This marks the end of

24   Media Number 1 in the deposition of Paul Edalat.

11:42  25   We're going off the record.  The time is 11:42 a.m.

**PLAINTIFFS' EXHIBIT B - 121**

```
 1              (Recess taken from 11:42 a.m. to 12:41 p.m.)
 2              THE VIDEOGRAPHER:  We're back on the record.
 3    The time is 12:41 p.m.  This is the beginning of
 4    videotape number 2 in the deposition of Paul Edalat.
 5    This is being taken at 695 Town Center Drive,
 6    Suite 700 in Costa Mesa, California.  And the
 7    videographer is Sherri Mulford here on behalf The
 8    Sullivan Group of Court Reporters.
 9              MR. MARKHAM:  So could we read back the last
10    question and answer, please.
11              (Record read as follows:
12                   "Q.  When did she tell you this?
13                   "A.  It was probably later that
14                   afternoon after she got back.")
15    BY MR. MARKHAM:
16         Q.  All right.  So I want to go back to where we
17    were before we got into Ms. Karpinski.  When you were
18    talking about Meeker and Chad Barrett and the others
19    who had had a deal that was going to -- he was
20    promising it was going to net a lot of money.  For
21    2.5 million, was that the amount?
22         A.  Are you talking about the purchase price or
23    the --
24         Q.  The deal that you say was -- that you didn't
25    go through because Mr. Cahill pointed out that it
```

**PLAINTIFFS' EXHIBIT B - 122**

```
 1   wasn't as good as it could be.
 2        A.   Oh, right.   That was not the purchase of the
 3   lab.   That was more about the -- about them doing
 4   business with us in a JV where we create these -- make
 5   these, I think it was lidocaine patches, that we're
 6   supposed to import from China.
 7        Q.   Import the patches or the ingredients?
 8        A.   No, the patches in bulk.   Have them ship to
 9   Pharma Pak and then we were to take them and repackage
10   them into however --
11        Q.   Units?
12        A.   -- units, so 15, 30, whatever.
13             And so then at that time, Mr. Barrett --
14   Rx Pro, that was the name of their pharmacy chain.
15   Mr. Barrett was a chairman and a CEO.   So he made that
16   deal with us specifically to utilize our facility.   It
17   was a true JV, meaning that whatever the cost was, which
18   was a very lucrative deal, had it all worked out the way
19   it should have -- the cost, we would all take the cost
20   out and whatever they sold the patches for -- and that's
21   what enticed us to do the deal with them -- they would
22   share the profits on their side with us.
23             So, you know, Bruce and I and -- I think Tim
24   Balog was our attorney at the time, our corporate
25   counsel.   I'm not sure who was involved in the
```

12:42  5

12:43 10

12:43 15

12:43 20

12:43 25

**PLAINTIFFS' EXHIBIT B - 123**

1    negotiations of that.  But they put the JV, the

2    documents together and Bruce was handling all that as

3    the CEO.  So we struck a deal.  And I got the good news

4    that it was signed and executed and, you know --

12:44  5         Q.    And that's the date that Ms. Karpinski says

6    that after that deal was signed, on that date they

7    went out for a lunch?

8         A.    So I was out of town.  I was in Las Vegas.

9         Q.    But that's what she told you?  I'm just --

12:44  10        A.    That was the celebratory lunch, yes, for

11   signing that deal.

12        Q.    Where he supposedly did something

13   inappropriate, Mr. Cahill?

14        A.    Correct.

12:44  15        Q.    Now, before that, I believe you mentioned

16   that Meeker and some others had proposed a deal.

17   That's a different deal, is it not, than the one that

18   actually got signed with Chad?

19        A.    Yes.

12:44  20        Q.    And that was the deal that you say was not

21   consummated by you folks because Cahill put it up on

22   the board and it didn't look good or --

23        A.    No.  That deal, in particular, was, from what I

24   recall, Meeker had had toxicology labs, that he needed

12:44  25   these urine cups and there was a diuretic drug that

**PLAINTIFFS' EXHIBIT B - 124**

1    needed to be in that kit, which didn't -- it was all

2    about the education business; right?  So what the

3    insurance company was going to adjudicate for these

4    kits --

12:45   5        Q.   Meaning K?

6        A.   I'm sorry?

7        Q.   Meaning that they were K?

8        A.   Correct.

9             That deal, Bruce personally took on that with

12:45  10    Alan Meeker and his lawyers.  And that's the deal that

11    never -- I don't think it ever came to anything because

12    what happened between these four guys that were going to

13    buy the lab, after the deal kind of fell apart, we

14    didn't go forward with it.  And then Bruce and John

12:45  15    Crowther became my partners, Bruce took the role of the

16    CEO to run that company, they all wanted the facility

17    still to utilize it, so they offered us various, you

18    know, profit sharing or JVs.

19             So when we did the deal with Chad's

12:45  20    organization, Mr. Barrett's, Rx Pro, they had some

21    falling out between -- as a matter of fact, they're in

22    litigation.

23        Q.   "They" meaning?

24        A.   "They" meaning Mr. Barrett, Rx Pro, his

12:46  25    partner -- his partner, Rick Speiss and Alan Meeker and

**PLAINTIFFS' EXHIBIT B - 125**

1    I think even Dr. Strader, they're all suing each other.

2        Q.    Okay.

3        A.    So it wasn't over the fact that they didn't get

4    this lab.  I think it was other things.  They had bought

12:46   5    airplanes together.  They had done various businesses

6    together.  They're all at arms too.  It seems like this

7    whole business is -- partners all end up suing each

8    other.

9        Q.    But was there ever a problem with the license

12:46   10   for either the Chad Barrett JV or what Meeker was

11   proposing?

12       A.    No.  The license was for repackaging.  The

13   license was good until February 13, 200- -- as a matter

14   of fact, I think this year.  All we had to do was pay

12:46   15   the renewal fee.  And I'm also aware -- what you have to

16   do is just tell the FDA what you were going to be doing

17   in there.  And I know the FDA had come out and they

18   wanted to see actual production running.  So whatever --

19   if you're making the toxicology kits or you're making

12:47   20   the lidocaine patch kits, they just want to see what

21   you're running, they want to see a process.

22            You know, we hired, again, Dennis Moore, the

23   FDA consultant.  I know we retained him.  Bruce was

24   handling that.  I know that they actually had a

12:47   25   consultant come sit inside the lab and do all the SOPs,

PLAINTIFFS' EXHIBIT B - 126

1    which is the standard of operations [sic].  These things

2    take time and -- but the license was there.  Nobody

3    complained about a license, you know, as far as the

4    experts go.

12:47   5        Q.   And Meeker never did?

6        A.   I don't know if Meeker did or not.  I don't

7    know what Meeker's position was.  I don't think Meeker

8    was an expert, you know.  The expert was Dennis Moore

9    and the license was good until February of 2016, I

12:47   10   think, here, this year.  So you can operate under it.

11       Q.   And that was the license that was in the name

12   of Pharma Pak dba?

13       A.   Yes.  So from what I understood, you know, when

14   the entity set up, which was Pharma Pak, Inc. and the

12:48   15   documents were prepared for Bruce to sign them

16   over -- and they sat on his desk for some time, he never

17   signed them.  From what I understood, that the transfer

18   was never done.  And even when Dr. Ludwig Weimann came

19   on board as a scientist, they needed to know whose name

12:48   20   is going to go on that license as the person in charge.

21   So, again, none of that was done, but the original

22   license was still there.  The building was licensed.

23       Q.   I just want to get something cleared up for

24   the record.

12:48   25       A.   Sure.

**PLAINTIFFS' EXHIBIT B - 127**

1      Q.   When you met Cahill, you already had an

2   operation, a pharmaceutical license as distinct from

3   the -- I'm sorry -- a pharmaceutical license?

4      A.   It was a drug license.

12:48   5      Q.   A drug license, which is different from the

6   pharmaceutical license you had for Sci-Labs

7   Pharmaceutical?

8      A.   Sci-Labs Nutraceuticals.  So making nutritional

9   products, you need a specific license and to do the drug

12:49  10   you needed a separate license.

11      Q.   So the license that we're now talking about

12   that Bruce didn't sign over but was available was not

13   the Sci-Labs Pharmaceutical license?

14      A.   It was a drug license.

12:49  15      Q.   It was a different license; correct?

16      A.   No, it was that license, the drug license.  It

17   said it was a FDA -- it was a license for drug

18   manufacturing and repackaging.

19      Q.   But I'm trying -- you know this better than I

12:49  20   do.  So I'm trying to just get for the record, you had

21   a license in the name of Sci-Labs Pharmaceuticals;

22   correct?  Just say yes or no.

23      A.   I don't know what the name of the company was

24   at the time.  I know it said Pharma Pak -- it had Pharma

12:49  25   Pak dba on it.

**PLAINTIFFS' EXHIBIT B - 128**

1    Q.    But as I understood it from this morning,

2    there were separate licenses.   You had a license for

3    the Sci-Labs Nutraceuticals business and you told me

4    this morning you had a separate one for Sci-Labs

12:49   5    Pharmaceuticals.

6    A.    Not Sci-Labs Pharmaceuticals.   It was Pharma

7    Pak.   Whatever entity that was doing -- dba --

8    Q.    That was different from the pharmaceutical

9    license?

12:50   10    A.    Nutraceutical.

11    Q.    Nutraceutical?

12    A.    Right.

13    Q.    Sorry.   So the one that you had that was

14    different from the Sci-Labs Nutraceutical one was the

12:50   15    one that had -- was in the name of Pharma Pak and that

16    Pharma Pak was dba something else?

17    A.    Dba whatever the original company.

18    Q.    And that was not dba Pharma Pak, Inc., the

19    new company that you formed with Bruce because that

12:50   20    had not been developed yet; correct?

21    A.    Right.

22    Q.    So when you say you had a drug license in the

23    name of Pharma Pak, that was a drug license in the

24    name of a different entity than the Pharma Pak, which

12:50   25    is a plaintiff in this lawsuit?

**PLAINTIFFS' EXHIBIT B - 129**

```
 1        A.    So the Pharma Pak --

 2        Q.    Just yes or no.

 3              MR. DIULIO:  Well, go ahead.  Objection.

 4   Vague.  But go ahead.

12:50  5        MR. MARKHAM:  I thought he said "right," I

 6   just want to make sure that she got that.  I'm just

 7   trying to figure out which license we're talking about

 8   that he said that Mr. Cahill -- he's claimed

 9   Mr. Cahill never signed over.

12:50 10   BY MR. MARKHAM:

11        Q.    That was not one that was issued to Pharma

12   Pak, Inc., a plaintiff in this lawsuit?

13        A.    So --

14              MR. DIULIO:  Please finish your answer

12:51 15   because I think it got cut off.

16              THE WITNESS:  The license that got taken by

17   the FDA was the Sci-Labs Nutraceutical license.  We

18   forfeited that.  Okay.  And then the settlement

19   agreement, like I said, if you guys can agree, you can

12:51 20   look and see what it says in the settlement.

21              The drug license, the actual pharmaceutical

22   license to manufacture pharmaceuticals or repackage

23   drugs was under Pharma Pak.  Okay.  That's why we

24   formed Pharma Pak, Inc. because it was supposed to be,

12:51 25   according to our consultants, that you can transfer
```

PLAINTIFFS' EXHIBIT B - 130

1    that license to the new entity as long as it's got,

2    you know, new operators, which was -- that's where we

3    got Dr. Ludwig Weimann, Bruce as the CEO.  Right?

4         And my name was not it because we're

12:51    5    transferring it.  I'm just the founder of the

6    corporation.  But the people that are operating it --

7    I don't know anything about the patch business, that

8    patch business.  We went and hired probably one of the

9    best patch developers, you know, in the industry,

12:52    10    which was Dr. Weimann.  He came highly recommended.

11    We went and interviewed him and collectively we agreed

12    to bring him in.

13    BY MR. MARKHAM:

14         Q.   So my question -- that's a helpful

12:52    15    explanation for why you did what you did.

16         And the license involved --

17         A.   Yes.

18         Q.   -- was the -- the drug license in the name of

19    Pharma Pak --

12:52    20    A.   Yes.

21         Q.   -- was issued to an entity before Pharma Pak,

22    Inc. got formed?

23         A.   Yeah.  So --

24         Q.   Then the idea was to transfer that to

12:52    25    Pharma Pak, Inc.?

**PLAINTIFFS' EXHIBIT B - 131**

1          A.    That was the idea from our consultant, Dennis

2     Moore.  He said that that license is transferable.  And

3     worst case, if it's not, you can file a new license

4     because the building is compliant.  We had spent

12:52  5     millions in the building as a -- it was doing that type

6     of business, so it's basically like new ownership.

7          Q.    Okay.  I'm going to show you what's marked

8     as -- what are we, 70?

9          A.    Thank you.

12:53  10               THE REPORTER:  You're welcome.

11               (Deposition Exhibit 70 was marked for

12               identification and is attached hereto.)

13     BY MR. MARKHAM:

14          Q.    Can I ask you to read through the email chain

12:53  15     here.

16          A.    Sure.

17               Okay.

18          Q.    First of all, let me ask you, do you see near

19     the top where it says, "From Alan Meeker, Tuesday,

12:53  20     February 3, 2015 to Paul Edalat"?  Do you remember

21     getting an email like this that says, "Everyone:  Full

22     stop"?

23          A.    I think I did, yes.

24          Q.    And it says, I'm quoting, "We need Sci-Labs'

12:54  25     FDA attorney to talk to Zach."

PLAINTIFFS' EXHIBIT B - 132

1           Who is Zach; do you know?

2      A.   Zach, I think it's Allen Meeker's attorney.

3      Q.   Okay.  I'm quoting again, "And show him

4  evidence that the licenses and NDC labeling facility

12:54  5  are valid and still intact and we can do what we have

6  all been contemplating, given the action the FDA has

7  taken against Sci-Labs," unquote.

8           MR. DIULIO:  I believe you said facility in

9  place of ability.

12:54 10  BY MR. MARKHAM:

11      Q.   Let me reread it.  Quote, "We need Sci-Labs'

12  FDA attorney to talk to Zach and show him evidence

13  that the licenses and NDC labeling ability are valid

14  and still intact and we can do what we have been

12:55 15  contemplating, given the action the FDA has taken

16  against Sci-Labs."

17           Did I read that correctly?

18           MR. DIULIO:  I think you missed "all" between

19  have and been, but I don't think we need to read it

12:55 20  again.

21  BY MR. MARKHAM:

22      Q.   Did I read that correctly?  It's in evidence.

23           Do you know what he was talking about there?

24      A.   I don't.

12:55 25      Q.   Now, it looks like in the next page, it

**PLAINTIFFS' EXHIBIT B - 133**

1     indicates that you wrote back, did you not?

2          A.    Yeah.

3          Q.    And is that an email address of yours,

4     Paul@Scilabspharma.com?

12:55 5    A.    I think it was, yeah.

6          Q.    And you went, "Hi, Zach."

7                Do you believe that Zach is the attorney for

8     Meeker?

9          A.    I think so, yes.

12:55 10   Q.    And then you write, "Actually, Tim would not

11    know anything about the license."

12               Did I read that right?

13         A.    Yes.

14         Q.    And "Tim" is Tim Balog; correct?

12:56 15   A.    Tim Balog, correct.

16         Q.    And he wouldn't know anything about the

17    license because he was the corporate attorney, not an

18    FDA attorney?

19         A.    Exactly.

12:56 20   Q.    And did Zach write you back and say, "I will

21    call Tim today"?

22         A.    No, I think Zach --

23         Q.    Wrote the --

24         A.    -- first, then I said, "Hi, Zach.  I don't

12:56 25   think Tim is the right guy."  It's backwards, so --

**PLAINTIFFS' EXHIBIT B - 134**

```
 1          Q.    It is backwards.  And it could be the time
 2     change in the time zones.
 3               MR. DIULIO:  Right.  It looks like we have
 4     two different time zones.
12:56  5               THE WITNESS:  Yeah, I think they were in
 6     Texas.  So I was responding to Zach, saying, "I don't
 7     think Tim is the attorney who they needed to talk to."
 8     Actually, it was -- let's see.  He was at Brown
 9     Rudnick.
12:56 10     BY MR. MARKHAM:
11          Q.    All right.  So --
12          A.    I mentioned his name.  Stephen Cook.
13          Q.    Okay.  Do you know whether they ever got that
14     resolved?
12:57 15          A.    I think so.
16          Q.    And how is it resolved?
17          A.    Well, you see, the license for manufacturing
18     the drugs or making these kits had nothing to do with
19     these guys or talking about the NDC, the National Code
12:57 20     number that goes on the medications.  That, they had to
21     hire an outside consultant to -- basically once these
22     products were made under those SOPs, the standard of
23     operation, under the license.
24               What they're talking about is -- they're mixing
12:57 25     these two things up.  One is a license to actually
```

**PLAINTIFFS' EXHIBIT B - 135**

1    produce.  The other is an actual code that these

2    medications get on them in order to get adjudication

3    from the insurance company.  So when you go to your

4    doctor, doctor writes a prescription, you go to the

12:57    5    pharmacy and every one of the drugs that the doctor

6    prescribes has an NDC number on it.

7         Q.   Is that the number that allows insurance

8    reimbursement?

9         A.   Yes.

12:58    10              So they were mixing these two up.  And I think

11    Mr. Cook sent them that -- this license has nothing to

12    do with the consent decree.  This is the drug license

13    that -- what we forfeited -- again, you know, that

14    document was -- actually, Bruce was managing this.  He

12:58    15    took over and he said, "Let me handle it."  And he did

16    talk to Stephen Cook at Brown Rudnick and we did get a

17    legal opinion, I think, from Mr. Cook to Zach that these

18    are two separate issues.  One is a license in a

19    building, the other -- the NDC is not what we do.  We

12:58    20    just produce it.  NDC is something they have to go

21    through a consulting firm that does that.

22         Q.   "They" meaning the manufacturer of the drug?

23         A.   No.  "They" meaning Alan Meeker's group,

24    whoever they are, that wants to get the NDCs because the

12:58    25    person -- the company that gets the NDCs is going to get

**PLAINTIFFS' EXHIBIT B - 136**

1    reimbursed by the insurance companies.  That's not what

2    we were doing.

3        Q.   To your knowledge, did they ever get a legal

4    opinion that the license that you had, the Pharma Pak

12:58    5    license, was transferable to the new Pharma Pak

6    company?

7        A.   I don't know.  Again, there's experts -- we

8    have Dennis Moore and Mr. Stephen Cook.  Those were the

9    guys that said that they can -- it was based upon their

12:59   10    expertise.

11        Q.   Got it.  Okay.

12             Now, so when was it in relation to trying to

13    work out this deal that you had with Meeker that you

14    switched over to deciding to work with John Crowther

12:59   15    and Bruce Cahill?  I thought you told me before lunch

16    that you were going to go that route, but then Bruce

17    explained to you there was a better way?

18        A.   Yes.

19        Q.   Can you pinpoint that in the time?

12:59   20        A.   So I think it was sometime in the latter part

21    of December before their contract was going to run out

22    on the balance of the moneys that they were to put into

23    to acquire the facilities, license and use.

24        Q.   And this is the Gillette facility?

01:00   25        A.   Yes.

**PLAINTIFFS' EXHIBIT B - 137**

1      Q.    Were they going to buy it or acquire it under

2   a lease?

3      A.    Under the lease.  They wanted me to extend the

4   lease, which was not a problem.  Olen is like family to

01:00   5   us, so they had no problem.

6      Q.    So I just want to interrupt you.  That

7   facility was important, not only because it was in

8   working order, but also because the license was

9   specifically directed to it?  Is the license facility

01:00   10   directed?  Was that an added advantage to the license?

11      A.    I think that's how the drug -- I know

12   nutraceutical license, all you got to do if you get a

13   new building, you just file for a new one.  Drug license

14   you can't transfer.  Yeah, because we did operate the

01:00   15   facility to the standards of being able to package our

16   medications in there.

17      Q.    When you say it was towards the end of the

18   year, you're talking about 2014?

19      A.    2014.

01:00   20      Q.    And so when was it that you and Cahill

21   formally decided that you would form Pharma Pak and

22   start its operations?

23      A.    I think it was -- so we're talking during

24   December and Bruce, you know, persuaded me not to do the

01:01   25   deal because of the presentation on the whiteboard.  So,

**PLAINTIFFS' EXHIBIT B - 138**

```
 1    basically, sometime in January.  I remember it was
 2    before the holiday.
 3         Q.   Before --
 4         A.   The holidays.  Bruce called me and said,
 5    "Buddy, I left you a check in your desk.  We're good to
 6    go.  I want to move with you.  We'll partner up."  So I
 7    think it was sometime maybe -- during the holidays, I
 8    know that, because I wasn't in town.  He called me.  I
 9    was out of town.  And I was happy, you know, that he's
10    going to be my partner and I was very surprised by it.
11         Q.   How much was the check for?
12         A.   I don't recall.  It was supposed to be half a
13    million dollars, 500,000.  But I think he gave me -- I
14    don't know if it was 50,000 or 100,000.  I don't recall
15    exactly the number.  He said he left it on the desk and
16    he was leaving -- I think he was going out with his
17    family -- I don't know if they were going away on a
18    trip.  It was during the holidays, Christmastime or New
19    Year's.  So I don't recall the exact number, but --
20         Q.   Right.
21         A.   I accepted to take payments from him.
22         Q.   And, ultimately, he paid the entire 500,000?
23         A.   Not to me.
24         Q.   Where did he pay it and to whom?
25         A.   I know a portion of it came to me.  And the
```

01:01  (line 5)
01:01  (line 10)
01:01  (line 15)
01:02  (line 20)
01:02  (line 25)

**PLAINTIFFS' EXHIBIT B - 139**

```
 1    other portion was used as capital calls initially to put
 2    into the company for -- basically, used my money to run
 3    the company from its inception.  So I think almost
 4    200,000 of it went into the company or 240,000.  I don't
 5    remember the exact number.
 6         Q.   And the rest of it went to you?
 7         A.   The rest of it came to me in payments.
 8         Q.   But the total was 500,000?
 9         A.   The total was 500,000.
10         Q.   Okay.  Now, had you done any business with
11    Cahill before that December check and moving forward?
12         A.   Like actual --
13         Q.   Yeah.  I mean, was he working for any company
14    that you had or was Pharma Pak the first one?
15         A.   No.  He chose Pharma Pak because he saw that --
16    I filed a patent for Sentar.  It was going to take time.
17    Then we went on some trips.  We went to Florida.  We met
18    with a group.  I was leaning on Bruce's expertise of
19    being senior in business and he's been around.  He sits
20    on the boards of directors.  It's already a given that,
21    you know -- he's got a reputation of sitting on UCI's
22    trustee board, various boards of directors.  He's tied
23    into the medical industry.  He has friends that are CEOs
24    or chairmans.
25         Q.   You were relying on that expertise to help
```

01:02  5
01:02  10
01:03  15
01:03  20
01:03  25

**PLAINTIFFS' EXHIBIT B - 140**

1   you?

2       A.   He was my friend first, of course.  I mean,

3   look, I just came out of a bad situation in my company.

4   He was telling me, "Don't trust these guys just because

01:04  5   they come in and they want to show you some money.  I

6   know you're under duress.  You're not thinking straight.

7   Let me think for you and help you through this."

8           Let me tell you something right now and I'll

9   put this on record, I don't think Bruce's intentions at

01:04  10   that time nor intentions were to end up here.  Okay.  I

11   think we had a very good relationship.  I was at his

12   house numerous times.  His wife was very dear to us, his

13   kids very close to me.  I think my fiancee, Nicole took

14   a very good liking to them.  So we were friends first

01:04  15   before business.  We never did any business prior to

16   this.  And that's kind of something --

17       Q.   "Prior to this" meaning, prior to the Pharma

18   Pak --

19       A.   Pharma Pak, right.

01:04  20           We talked, you know, about it and Bruce, he

21   painted the picture for me.  And Bruce is the ultimate

22   salesman.  He's probably one of the best sales guys I've

23   ever met in my life.  He can draw a picture for you and

24   tell you the sun's not coming out tomorrow and you'll

01:04  25   believe it.  He's good at that.  But to actually execute

PLAINTIFFS' EXHIBIT B - 141

1     and to monetize that, that's another story.

2           So bottom line is that we went through this

3     process.  Right?  I decided to go with Bruce as a

4     partner with John Crowther.  We had numerous talks.

01:05   5     They knew perfectly of my situation at the time.  It was

6     a given, I was in bankruptcy, the company was in

7     bankruptcy.  They knew why I needed the money.  They

8     knew I had to pay my lawyers.  They knew the deal had to

9     be made.  And they knew a lot of the money was needed

01:05  10     for the fact of survival.  So it wasn't anything else.

11           But the thing is that Bruce painted the picture

12     for me that said, look, if you give your company away at

13     2.5, what if you were able to partner with us and you

14     retain it and we work together, buddy.  And you'll still

01:05  15     be -- I was still the largest shareholder at the time,

16     even with the stock that I gave him -- the 20 percent I

17     gave him for running the company.

18           So his relationship was solidified in Pharma

19     Pak because Pharma Pak was the opportunity at the time.

01:05  20     It had contracts.  It had abilities to produce where

21     Sentar didn't really have anything, you know, and

22     patents had been filed and a good story.  What's going

23     to happen if we're successful.  I remember when David

24     Gentry came to our office and we had a meeting, myself

01:06  25     and Bruce, David specifically told him, "Bruce, you

**PLAINTIFFS' EXHIBIT B - 142**

```
 1   cannot have your name on both companies.  Choose which
 2   one.  Because if we take Sentar public, you'll be
 3   scrutinized because you can't be CEO of two companies
 4   that are both in the pharmaceutical industry."  And
 5   Bruce decided, "You know what, I'll go this route.  I'll
 6   take Pharma Pak."
 7          Until today, I'm going to tell you, I never
 8   promised Bruce anything in Sentar, because once he took
 9   his name off the company, there was nothing to promise.
10   I had to bring in others to take over his position.  And
11   at that time, Sentar was not where Pharma Pak was.
12   Pharma Pak just secured a very nice contract and we were
13   good to go to produce.
14      Q.   When you say that Sentar had patents, you're
15   referring to the patents that's filed under the name
16   Sci-Labs because that patent was actually owned by
17   EFT Global Holdings and Sentar that you're talking
18   about is now the dba for that; fair enough?
19      A.   It had provisional patents.  They weren't
20   issued.  They weren't granted.  So, yes, it filed
21   patents.
22      Q.   I wanted to figure out the -- just the names.
23   Whether it was a patent or an application for a
24   patent, when you said in your long answer just before
25   that Sentar had patents but it didn't have anything
```

01:06  5
01:06  10
01:06  15
01:07  20
01:07  25

**PLAINTIFFS' EXHIBIT B - 143**

1    else, but Pharma Pak had a contract, the Sentar that

2    you were talking about that had the patent, that is

3    the patent is assigned to Sci-Labs and that Sci-Labs

4    is a dba of EFT Global Holdings, which now Sentar

01:07    5    Pharmaceuticals is a dba?

6        A.    Yes.

7        Q.    That's the Sentar you're talking about;

8    right?

9        A.    Right.

01:07    10        Q.    Okay.  Thanks.

11            All right.  Now, did Bruce have anything to

12    do with Sentar before the Pharma Pak company was

13    formed?

14        A.    There was two separate operations.  Okay.

01:08    15        Q.    Right.

16        A.    When Bruce came in, he said that -- I think he

17    got to choose which company he wanted to go with at the

18    end of the day.  He chose Pharma Pak because of Dave

19    Gentry's advice.  And you're more than welcome to

01:08    20    contact Gentry and he'll tell you why.  I'm not going to

21    make the Securities Exchange -- I'm not an expert in

22    stocks nor am I an expert in why he chose that route.

23    But at the end of the day, the thing was that Bruce was

24    always concerned about revenues and he always wanted

01:08    25    sales.

**PLAINTIFFS' EXHIBIT B - 144**

```
 1              So Pharma Pak was well positioned with the

 2      contract we signed with Rx Pro or Opus Rx, whatever the

 3      company's name was, I forget.  But it was Chad Barrett

 4      and Rick Speiss' company that we were signing that JV

01:08    5      because they were going to send us business and we were

 6      going to start producing.

 7          Q.    That was the business that it was perceived

 8      Pharma Pak had?

 9          A.    Correct.

01:08   10      Q.    Now, there came a time, did there not, when

11      Bruce Cahill became the CEO of Sentar Pharmaceuticals?

12          A.    I mean, it was on these documents, CEO or

13      president, you know.  This stuff was not really

14      circulated at the end of the day to anyone.  It was all

01:09   15      internal.  It was still being audited by the financial

16      guys on the outside.  And at the time, too, we were

17      using Brown Rudnick as our corporate counsel.

18          Q.    Do you know when he became the nominal CEO

19      just for internal purposes?

01:09   20              MR. DIULIO:  Objection.  Assumes facts.

21              THE WITNESS:  I don't.

22      BY MR. MARKHAM:

23          Q.    It would have been sometime in 2015?

24          A.    I would think.

01:09   25      Q.    Yeah.  Okay.  And --
```

**PLAINTIFFS' EXHIBIT B - 145**

1      A.   If that's what these documents are saying.

2      Q.   Well, if you take a look at the document for

3   2014 -- can I get you to take a look at that.  I think

4   that's Exhibit 8.  It's 2014 Sci-Labs.

01:09   5      A.   Right.

6      Q.   If you'd take a look where it says,

7   "Players" -- let's look at the index here, "Management

8   team," page 43.  They're hard to read because of those

9   red things.  It's in the back.

01:10   10      A.   There's no 43 in 8.

11      Q.   Wait.  That actually is -- it's not those

12   numbers.  It's the numbers in the red here, which

13   are -- I think it is -- take a look at P3224.

14      A.   Go ahead.

01:10   15      Q.   So this specifies that RJ Demman was interim

16   president; correct?

17      A.   Yes.

18      Q.   And Edalat is not listed here in 2014 as

19   being involved?

01:11   20      A.   No.

21      Q.   And if you look at the professional advisors,

22   likewise, which is on the following page, Edalat is

23   not on those either, is he?

24      A.   No.

01:11   25      Q.   Then look, if you would, at Exhibit 7.  And

**PLAINTIFFS' EXHIBIT B - 146**

1    it looks like as of -- if you look at the same place,

2    towards the end, "Management team."

3        A.   Okay.

4        Q.   Do you see that?

01:11  5    A.   Right.

6        Q.   It says, "Mr. Bruce Cahill, president, CEO."

7             That's in the 2015 version; correct?

8        A.   Okay.

9        Q.   So does that confirm that he came on in 2015

01:12 10    to take that position?

11            MR. DIULIO:  Objection.  Assumes facts.

12            THE WITNESS:  According to the document.

13    BY MR. MARKHAM:

14        Q.   I'm asking -- these were --

01:12 15    A.   I mean, these documents were going through

16    modification.  So is this an actual true copy of the

17    document that was in circulation?

18        Q.   You have to tell me.  Did you ever --

19        A.   These are confidential documents anyways, so I

01:12 20    don't know how they got circulated.

21        Q.   Okay.  Did you ever circulate any documents,

22    any PPMs for Sentar?

23        A.   To who?

24        Q.   To anybody.

01:12 25            MR. DIULIO:  Objection.  Vague.

**PLAINTIFFS' EXHIBIT B - 147**

BY MR. MARKHAM:

    Q.   Other than your lawyer internally, did you ever circulate any of these Sentar documents, Exhibit 7, Exhibit 8, for the purposes of attempting to raise money?

    A.   I don't know which one of these sets was circulated at what point.

    Q.   I'm asking you not to identify --

    A.   All right.  So my question, what does this have to do with Pharma Pak?

    Q.   Because I'm trying to pin down when you and Bruce started getting together.  And I gather it was in 2015 or late 2014 when he gave you that check. This indicates that he became involved in Pharma Pak in 2015, but he wasn't involved in Pharma Pak.  You want to tell the story of you and Bruce.  I want to figure out when you and Bruce first got together in business.

    Was it in 2014 with that check and forward or was there anything before?

    A.   Okay.  So are you asking officially when he signed on, when the corporation was filed, Pharma Pak, going forward?

    Q.   Yeah.

    A.   That was 2015.

**PLAINTIFFS' EXHIBIT B - 148**

1      Q.    Okay.

2      A.    But prior to that, back in June of 2014, he was

3   involved shadowing me in all the trips that I was taking

4   to try to understand what business I'm really getting

01:13   5   into and who I'm going to become partners with.

6      Q.    And that was on behalf of, potentially,

7   Pharma Pak or was that on behalf of Sentar

8   Pharmaceuticals?

9      A.    Pharma Pak.

01:13   10     Q.    Now, I'm going to ask you this, give me your

11   best memory of this, when was it that it was

12   determined that Bruce Cahill should be designated as

13   the president, CEO on the -- Exhibit 7, which is the

14   2015 Sentar private placement memorandum; when was

01:14   15   that?

16           MR. DIULIO:   Objection.   Assumes facts.

17           THE WITNESS:   I don't remember.

18   BY MR. MARKHAM:

19     Q.    Was it in 2014 or '15?

01:14   20           MR. DIULIO:   Objection.   Assumes facts.

21           THE WITNESS:   There was a lot going on back

22   then.   We were taking a lot of trips.   I don't really

23   remember exactly what the date was that he came on

24   or -- I don't know if this document was circulated or

01:14   25   this was just a template.   I don't know.   I don't know

**PLAINTIFFS' EXHIBIT B - 149**

```
 1    what was going on at that time.  I was focused more on

 2    my bankruptcy with the, you know -- with the courts

 3    and trying to get one -- get out of one mess.  So I

 4    don't know what all this -- I didn't have like -- I

 5    didn't even write this stuff.

 6    BY MR. MARKHAM:

 7         Q.    Who did?

 8         A.    Various people from marketing companies to

 9    attorneys to consultants to -- I think even Bruce

10    contributed some of the information in there.  I looked

11    it over, but my whole thing was to get that patent done.

12         Q.    I understand.

13               Bruce is listed as the president and CEO?

14         A.    So what?

15         Q.    And he was not listed the year before.

16         A.    Again, so what?

17         Q.    Is it your memory that Bruce's participation

18    in the formulation of this 2015 -- this happened in

19    2015 or did it happen in 2014?

20         A.    Let the document speak for itself, Counsel.

21    You're asking me things -- there's so many documents

22    that I've gone through.  So if you think it was 2015,

23    then -- if this is a true copy --

24               MR. DIULIO:  Yeah, if you don't know --

25               THE WITNESS:  I don't know.  I've said that,
```

01:14  5
01:15  10
01:15  15
01:15  20
01:15  25

**PLAINTIFFS' EXHIBIT B - 150**

```
 1    but he keeps asking, so --
 2    BY MR. MARKHAM:
 3        Q.   No.  What I'm trying to figure out, did a
 4    version of a Sentar Pharmaceuticals PPM get circulated
01:15  5   to people at -- seeking financial support from those
 6    people in 2015?
 7            MR. DIULIO:  Objection.  Lacks foundation
 8    and asked and answered.
 9            THE WITNESS:  I don't know.
01:16 10   BY MR. MARKHAM:
11        Q.   Who would have circulated it, if it wasn't
12    you?
13            MR. DIULIO:  Objection.  Lacks foundation.
14            THE WITNESS:  The actual true PPM that was
01:16 15   numbered and all that?
16    BY MR. MARKHAM:
17        Q.   Yeah.
18        A.   It would have been done through the attorneys.
19        Q.   Brown Rudnick would have circulated the PPMs?
01:16 20       A.   Yeah.  They have to get their NDAs signed -- it
21    was a whole process.  Before anyone could get their
22    hands on these, it had to get a nondisclosure signed,
23    which I think -- whoever gave you this stuff could be in
24    violation of the nondisclosure.
01:16 25       Q.   And do you know which attorney at Brown
```

**PLAINTIFFS' EXHIBIT B - 151**

1    Rudnick would have actually circulated the numbered

2    versions of these?

3         A.   Siddiqi, I think.  Corporate counsel, Nuwman

4    Siddiqi.  And potentially Thomas Poletti, who is right

01:17   5    upstairs.

6         Q.   Did he work on the --

7         A.   I think he contributed, yeah.  We tried to hire

8    some of the best to put the presentation together that

9    speaks the truth.

01:17  10         Q.   So when did you become a shareholder in

11   Pharma Pak?

12        A.   It was January of 2015 when the corporation was

13   filed.

14        Q.   So tell me how the shares were divided up.

01:17  15   Who owned what?  After the company was filed -- I can

16   tell you the company was filed in February because

17   that's what the records say.

18             Does that sound right to you?

19        A.   Okay.

01:17  20        Q.   After that, the shares were issued; correct?

21        A.   Like actual stock certificates?

22        Q.   Yes.

23        A.   I don't think I ever received a stock

24   certificate, but -- I don't have a copy of the stock

01:17  25   certificate, but I mean --

**PLAINTIFFS' EXHIBIT B - 152**

```
 1        Q.   When did you become -- when was it your
 2   understanding that you were unreservedly an owner of
 3   shares of Pharma Pak?
 4        A.   Sometime January, February.
 5        Q.   Of 2015?
 6        A.   Correct.
 7        Q.   And has your share ownership changed since
 8   you first received it in 2015?
 9        A.   As of today?
10        Q.   Yes.
11        A.   Yes.
12        Q.   How much do you own now?
13        A.   Well, there is this argument that it's either
14   37.8 or some number like that or 36 because of the way
15   they -- Bruce and Leslie -- after the last partners came
16   on board, they diluted down myself and the rest of the
17   people in the company.  So if you go based on what the
18   record would speak of the shareholder agreements, the
19   date that they were signed, I think I'm closer to the
20   38 something, but if you go by the way they did it --
21   and I don't know how they did all that with Tim Balog,
22   you know, they increased the share base, then they
23   dropped me down to somewhere around 36. something -- 36.
24   something, so --
25        Q.   Was there ever a time after February of 2015
```

01:18   5
01:18   10
01:18   15
01:18   20
01:19   25

PLAINTIFFS' EXHIBIT B - 153

1    that you owned no interest in Pharma Pak?

2         A.    After 2015?

3         Q.    Yeah.  After February 2015, was there ever a

4    time you had no share ownership; did you give it up?

01:19   5         A.    To who?

6         Q.    I'm just asking, was there ever a time you

7    didn't own Pharma Pak stock after you got your first

8    shares?

9         A.    I think as of today I still own those shares.

01:19   10        Q.    You never gave them away for a period of

11   time?

12        A.    To whom?

13        Q.    I'm just asking if you did.  It doesn't

14   matter to who.

01:19   15        A.    No.

16        Q.    So from 2015, February until today --

17        A.    Right.

18        Q.    -- you have been a continuous owner of a

19   significant share of Pharma Pak stock?

01:19   20        A.    Correct.

21        Q.    Why when the bankruptcy court asked you if

22   you had any ownership in any company you said you

23   didn't?

24        A.    Because prior --

01:20   25             MR. DIULIO:  Objection.  Assumes facts.

THE SULLIVAN GROUP OF COURT REPORTERS                       154

**PLAINTIFFS' EXHIBIT B - 154**

BY MR. MARKHAM:

    Q.   Because, you were saying --

    A.   Because prior to petition I didn't.

    Q.   But he was clear to ask you after petition.
You specifically asked him --

    A.   My bankruptcy attorneys --

    MR. DIULIO:  Hold on.

    THE WITNESS:  That's a legal action.

    MR. DIULIO:  I'm going to caution the witness
not to respond to the extent it reveals any
attorney-client communications, not just with myself,
but any attorneys.

BY MR. MARKHAM:

    Q.   Okay.  So do you recall telling Jeff Golden
when he asked you -- do you recall him asking you if
you had any share ownership and you said, "As of
when?"  And he said, "As of now."  And you said, "No,
I don't believe so," in March of 2016.  Do you recall
that?

    MR. DIULIO:  So the question is just whether
you recall that.

    THE WITNESS:  I don't recall that.

BY MR. MARKHAM:

    Q.   Do you recall giving any answers about share
ownership?

PLAINTIFFS' EXHIBIT B - 155

1        A.    Prior petition or post?

2        Q.    Post petition.

3        A.    From what I was told, that even Steve Katzman

4    said, once you file your petition, you can win the

01:21    5    lottery the next minute and the trustee is not entitled

6    to it.  So what does this have to do -- bankruptcy was

7    filed in 2013.

8        Q.    Here's the relevance of it, Mr. Edalat, for

9    you and your counsel, you are claiming a specific

01:21    10    share ownership in Pharma Pak and that is the basis of

11    some of your claims, which we'll get to later this

12    afternoon.  There was a time when under oath you told

13    the bankruptcy trustee and his lawyer that you didn't

14    own any stock in any company, even post petition.  And

01:21    15    that was in March of 2016.

16        A.    Are you sure about that, Counsel?

17        Q.    We'll get the transcript out, but do you

18    recall that?

19            MR. DIULIO:  Whether you recall it or not.

01:21    20            THE WITNESS:  I don't recall.

21            MR. DIULIO:  That's the answer.

22            THE WITNESS:  But even if what I was told by

23    my attorneys --

24            MR. DIULIO:  Wait.  We're not going to --

01:22    25            THE WITNESS:  All right.

**PLAINTIFFS' EXHIBIT B - 156**

```
 1              MR. DIULIO:  We're not going to reveal
 2    attorney-client communications.
 3    BY MR. MARKHAM:
 4        Q.   Do you recall, Mr. Edalat, having -- I'm
 5    going to get back to it later, but do you recall,
 6    Mr. Edalat, ever having a conversation with Mr. Golden
 7    on the record when you were being questioned about
 8    whether you owned post petition property?
 9        A.   I don't recall.
10              What's the relevance in here?
11              MR. DIULIO:  The answer is, I don't recall.
12              THE VIDEOGRAPHER:  Counsel, your microphone.
13              MR. MARKHAM:  Did I lose it?
14              MR. CAHILL:  There are documents that have
15    already been -- during my deposition, I referred to
16    them.
17              MR. MARKHAM:  Were they marked?  Well, we'll
18    get to it.
19    BY MR. MARKHAM:
20        Q.   Okay.  But you have no memory of that?
21              MR. DIULIO:  Objection.  Asked and answered.
22              THE WITNESS:  I answered it.
23    BY MR. MARKHAM:
24        Q.   Okay.  And as of March of 2016, did you have
25    an ownership interest in Pharma Pak, Inc.?
```

Time stamps in left margin: 01:22 (line 5), 01:22 (line 10), 01:23 (line 15), 01:23 (line 20), 01:23 (line 25)

**PLAINTIFFS' EXHIBIT B - 157**

```
 1              MR. DIULIO:  Objection.  Asked and answered.
 2              THE WITNESS:  I still feel that I have
 3    ownership in Pharma Pak, Inc.
 4    BY MR. MARKHAM:
 5        Q.   And you did in March of 2016?
 6        A.   I'm pretty sure I did.
 7        Q.   Do you have any doubt?  Had you given it
 8    away?
 9        A.   Did you steal it?
10        Q.   I'm asking you --
11        A.   You took the company.  I don't know.
12        Q.   So you don't know whether you had an
13    ownership interest?
14              MR. DIULIO:  Objection.  Asked and answered.
15              MR. MARKHAM:  No.  No, he's not answered it.
16              MR. DIULIO:  Mr. Markham, you've asked him
17    four times.  And he said, I think I did have an
18    ownership.  I think -- if you keep asking it, you just
19    muddy the record.
20              MR. MARKHAM:  Well, I'm sorry, I'm going to
21    ask it one more time.
22    BY MR. MARKHAM:
23        Q.   Do you have any doubt in your mind that in
24    March of 2016 you were a shareholder of Pharma Pak?
25              MR. DIULIO:  Objection.  Asked and answered
```

01:23   5
01:23  10
01:24  15
01:24  20
01:24  25

**PLAINTIFFS' EXHIBIT B - 158**

```
 1   for the third or fourth time now.
 2              THE WITNESS:  I am a shareholder of
 3   Pharma Pak.
 4   BY MR. MARKHAM:
 5        Q.   Do you recall sending out emails to people in
 6   March -- in February and March when you were having a
 7   dispute with Bruce Cahill where you said that you were
 8   still a majority -- you were still a major shareholder
 9   in Pharma Pak and you could call a meeting when you
10   wanted one; do you recall that?
11              MR. DIULIO:  For the record, we're referring
12   to -- the year of this?
13              MR. MARKHAM:  2016.
14              MR. DIULIO:  Okay.
15   BY MR. MARKHAM:
16        Q.   Do you remember those emails?
17        A.   Let the emails speak for themselves.
18        Q.   I asked you if you remember them.
19        A.   If it was an email from my email address, it
20   was what I said.
21        Q.   I'm asking you if you have a memory of
22   writing to the other shareholders in February and
23   March of 2016 and saying that you have a right to call
24   a meeting because you are a major shareholder in
25   Pharma Pak; do you remember that?
```

01:24 5
01:24 10
01:25 15
01:25 20
01:25 25

**PLAINTIFFS' EXHIBIT B - 159**

1    A.   Let me think.  Are you referring to the email I

2    sent that I called a friendly board meeting, in which

3    Bruce responded, I'm not a shareholder -- I'm sorry --

4    I'm not a director.  I'm not a board member.  I'm not an

01:25    5    officer of the company so I can't call a shareholder

6    meeting?  Is that what you're referring to?

7    Q.   I'm asking you if you remember making a

8    statement --

9    A.   I'm trying to remember that.  Is that what

01:25   10    you're referring to?

11    Q.   I don't know what else it says.  I don't have

12    it in front of me.  I'm asking --

13    A.   Let's pull it and let's discuss it because this

14    is your deposition, you should come prepared with your

01:25   15    exhibits.

16        MR. DIULIO:  So if you don't recall without

17    seeing it, the answer is --

18    BY MR. MARKHAM:

19    Q.   Just answer whether you recall or not.  I'm

01:26   20    entitled to have your recall, Mr. Edalat.

21    A.   I don't recall.

22    Q.   Okay.  Good.

23        All right.  Tell me what -- when was it that

24    the events of Pharma Pak started to, in your view,

01:26   25    sour?

**PLAINTIFFS' EXHIBIT B - 160**

1       A.    Thank you.

2       Q.    You're welcome.

3       A.    For once, I can tell my story now on record.

4       Q.    You like this question, do you?

01:26  5       A.    I love it.  Do you know why?

6       Q.    I do not, but I think I'm going to find out.

7       A.    Because when we get done, you're going to see

8  what this whole case is about.

9       Q.    Okay.

01:26  10      A.    All right.  Let's do it.

11      Q.    But I want dates as you go through this, so I

12  don't have to re-cover the ground.

13      A.    All right.  So I think it was sometime in

14  January that we brought a partner by the name Amir

01:26  15  Asvadi.

16      Q.    In January of?

17      A.    January of 200- -- of this year.  Is this the

18  year we filed the lawsuit?

19      Q.    2016.

01:26  20      A.    Right.  You guys sued me.

21            So sometime in January after Amir had come on

22  board -- and we had multiple meetings.  Again, this

23  thing was a very friendly deal.  Everybody was happy.

24  Everybody's partners.  We took on -- multiple lunches,

01:27  25  myself, Bruce, Greg Cullen, Amir Asvadi.  And we

**PLAINTIFFS' EXHIBIT B - 161**

1    qualified to bring them in as partners.  And so until

2    January -- I don't remember the exact date, but it was a

3    Wednesday, and what had happened was, I was supposed to

4    meet Amir at the office and then we were supposed to

01:27  5    meet Bruce.  I was running 15 minutes late.

6         Maybe if I got there 15 minutes earlier, we

7    wouldn't be sitting here.  But what happened, Amir went

8    and approached Leslie Woods and he asked for some

9    financials after he had come on as a partner, an

01:27  10   ownership of 5 percent.  He asked for the payroll.  He

11   just wanted to see what was going on, the health of the

12   company.  He had never done that prior.

13        So Leslie gave him the financials, gave him the

14   payroll and he gave him some -- I think it was -- either

01:28  15   it was a projection for the year that Bruce's son,

16   Brett, had prepared while he was doing his summer work

17   with us.  He was actually an employee of the company.

18   But anyway, Amir asked for these documents to review

19   them.

01:28  20        And I was on my way to the office and I got a

21   phone call from Amir that he wants to go meet with me

22   and have a cup of coffee, there's some concerns he has.

23   And so -- mind you, the night before, I think I was at

24   Bruce's house with my fiancee and his wife and we had a

01:28  25   nice sunset dinner at his beautiful mansion on top of

**PLAINTIFFS' EXHIBIT B - 162**

1    the hill, the $30 million house that he has.

2           We're having a nice dinner, everything is good.

3    That Wednesday, Amir finds all this information.  I

4    drive up to the office.  Amir is downstairs chain

01:28   5    smoking a cigarette.  I pull up, he goes, "Let's go for

6    a drive."  I said, "Sure.  Are you okay?"  He said, "Not

7    really."  So we left the office, we went to the

8    Starbucks at the corner on -- I think it was Main and

9    MacArthur.  And we sat down and Amir went through the

01:29   10   paperwork with me.

11          And he said, "When I invested my money in the

12   company, you told me no executives, no one's taking a

13   salary."  I said, "Yeah, no partner.  Sure, that's the

14   truth, yeah."  He said, "Then why is Bruce taking a

01:29   15   $20,000 a month paycheck?"  I said, "Are you sure he's

16   taking a paycheck because this could be a projection

17   going forward for the 200- -- for the latter part of the

18   year?"  He said, "Yes, he's taking a paycheck."

19          Q.   Can you tell me when this conversation took

01:29   20   place?

21          A.   I think it was in January time.

22          Q.   Of 2016?

23          A.   Yes.

24          Q.   I'm going to interrupt you occasionally.  I

01:29   25   want you to continue with the narrative, but I have a

**PLAINTIFFS' EXHIBIT B - 163**

1    couple of fill-ins so I don't have to go back.

2          Up to that time, did you think there was

3    anything amiss with the way the company was being run?

4          A.    Honestly, I wasn't involved in the day-to-day

01:30    5    operations.  My job was to bring the contacts to the

6    table, which I did.  I brought the Chad Barrett, the

7    Rx Pros or whatever, Opus Rx.  Brought those companies

8    in.  My job was go be the rainmaker, bring these

9    contacts because they knew me, they didn't know Bruce.

01:30   10    So Bruce was running the company with Leslie, everything

11    seemed to be fine.

12          Q.    My specific question was, before that, were

13    you aware of any problems that the company had or did

14    you think it was going along fine until you heard

01:30   15    about the salary business?

16          A.    No.  So the company always had a financial

17    issue.  We always had -- either we were low on -- you

18    know, we were low on funds or went to raise more funds

19    or whatnot.  So what we did, we collectively decided

01:30   20    that I decrease my stock by 10 percent to sell to other

21    partners, but I did it with the approval of both Bruce

22    and the other partners.

23          Q.    I want to focus on when you first knew there

24    were any problems with the company.  For example, did

01:31   25    you know that there were financial problems in 2015?

PLAINTIFFS' EXHIBIT B - 164

01:31

01:31

01:31

01:32

01:32

     1     A.   Yes, there was always a cash flow issue and

     2  there was always capital calls and we all collectively

     3  made it.  Right?  But we were going on the fact that we

     4  had a contract and we knew it was going to take time to

     5  prepare that contract and, you know, start doing

     6  business with this group that we just signed a JV with.

     7  So that kind of problem is manageable.

     8          The problem that was not manageable was that

     9  the partner that came onboard and was assured that

    10  nobody was taking a salary and the funds that were just

    11  raised for the company -- I think $750,000 was raised by

    12  Pharma Pak through Mr. Ron Franco, which I never had any

    13  check writing authorities, I didn't use debit cards.  It

    14  was all under their control.

    15          $750,000 of money was sitting in the bank

    16  account, so Ron, I don't even think should be in this

    17  case, but we'll deal with that later.  I only met him

    18  maybe once or twice.  I think he was friends with Greg

    19  Cullen and I think Bruce had had multiple meetings with

    20  him.  But that money, the $750,000 went into Pharma Pak.

    21  I didn't even see a penny of that.

    22     Q.   What were the financial problems that the

    23  company had back in 2015 and when did they start?

    24     A.   Cash flow.  After my money ran out, the money I

    25  contributed, which Bruce -- that was half my money Bruce

**PLAINTIFFS' EXHIBIT B - 165**

01:32    1    was supposed to give, he put in the company, that money
         2    ran out, then we, you know, capital calls left and
         3    right.  Bruce knew my financial situation.  So forced
         4    me, okay -- forced me to have to go and decrease my
01:32    5    stock, mine, not the company's, sell my shares to bring
         6    other individuals into the company as partners.  But not
         7    just partners, smart money partners, people that had
         8    more experience with not just the money.  Okay.
         9             So that's why we brought your client, your
01:32   10    friend Shane -- Shane Scott into the company because he
        11    had a marketing company out there that he can take these
        12    patches we were producing and sell them on the Internet.
        13    So these were very calculated, we vetted out multiple
        14    potential investors and we decided amongst us that these
01:33   15    guys were the best cut out to be here.
        16             And Bruce was at every one of the meetings.  He
        17    was the CEO.  He was the final decision maker, who wants
        18    to come in the company.  I didn't want to bring someone
        19    in that was going to destroy something we worked so hard
01:33   20    for, to build, so --
        21        Q.   Did you have -- in the spring of 2015, were
        22    there problems making rent payments?
        23        A.   Rent payments to where?
        24        Q.   Rent payments at the Gillette facility?
01:33   25             MR. DIULIO:  Objection.  Lacks foundation.

**PLAINTIFFS' EXHIBIT B - 166**

```
 1              THE WITNESS:  I don't know.
 2    BY MR. MARKHAM:
 3         Q.   Do you remember writing emails of concern to
 4    the effect that you've got to make the rent payment
 5    because I've guaranteed it?
 6         A.   I think there was, yes.  There was -- I think
 7    we fell behind maybe a month and -- but my relationship
 8    with the Olen family, you know -- it was somewhat of an
 9    embarrassment.  And, again, Pharma Pak had taken the
10    liability of, you know, taking on the rent, which I
11    guess rent became secondary next to other expenses,
12    whatever was, you know, handled by the -- Leslie and
13    Bruce.
14         Q.   And you recall Leslie Wood -- what's his --
15    just for the record, what's his relationship to this?
16         A.   He was the acting CFO or controller at the time
17    of the company.
18         Q.   Do you recall him indicating in an email that
19    you didn't have enough money to make the rent payment
20    and, therefore, you expressed the concern, you've got
21    to make the rent payment because I've guaranteed it;
22    does that ring a bell?
23         A.   Counsel, I was just a shareholder.  The CEO's
24    position and his responsibility and what he got to take
25    over Pharma Pak and do, why is that coming to me as a
```

01:33 (line 5)
01:33 (line 10)
01:34 (line 15)
01:34 (line 20)
01:34 (line 25)

**PLAINTIFFS' EXHIBIT B - 167**

1    shareholder?

2         Q.    I'm asking you if you remember that series of

3    events, not whose fault it was that there wasn't the

4    rent payment; do you recall that?

01:34   5         A.    Of course.  He copied Bruce.  He copied John

6    Crowther.  He copied all the partners.

7         Q.    And there were instances like this in April

8    and in October where there was a problem with rent.

9    Forgetting whose fault it was, do you recall that

01:34  10    being a problem, making the rent?

11              MR. DIULIO:  Objection.  Lacks foundation.

12              THE WITNESS:  I think it was a problem.

13    BY MR. MARKHAM:

14         Q.    All right.

01:35  15         A.    Hence why we wanted to bring in other partners

16    and investors into the company.

17         Q.    Okay.  And so -- all right.

18         A.    So --

19         Q.    Now, let's take this a month at a time

01:35  20    chronologically.  What do you recall happening in the

21    first two months of the formation of Pharma Pak,

22    February and March of 2015?  Describe as you

23    understand it.

24         A.    There was a lot of trips to Las Vegas to meet

01:35  25    with the Barretts and the Speisses, you know, the

**PLAINTIFFS' EXHIBIT B - 168**

1    company -- I don't know if they're Rx Pros or Opus Rx at

2    the time -- to try to solidify and close this JV.  As a

3    matter of fact, I know they came down here one time and

4    Bruce and I took them to Darya restaurant right over

01:35    5    here in Costa Mesa and gave them some of the best

6    Persian cuisine and they loved it, so --

7        Q.   Where is that, by the way, for the record?

8        A.   It's just right up the street here.  Across the

9    street.  Maybe Bruce can take you there.

01:36    10        Q.   It's highly relevant to this lawsuit.

11        A.   It's really good food.

12             But, you know -- so we took on -- a lot of

13    meetings.  There was a lot of trips.  One thing about

14    this industry is that it's very belly to belly.

01:36    15    Everybody wants to meet.  Everybody always wants to have

16    a drink.  Everybody wants to get together.  So we took

17    on a lot of that.  I think a lot of that is because they

18    want to trust you and like you and do business with you.

19    So I think we accomplished that.  I mean, you know, we

01:36    20    did invest a lot of time in making good things, not bad

21    things.

22             This was not -- I don't think any of us got

23    into this deal because we wanted to be here.  So it was

24    actually to make a company and make something great out

01:36    25    of it.  So we did, we accomplished it.  But along the

**PLAINTIFFS' EXHIBIT B - 169**

1    way, there was the interim issues, the financial issues,

2    you know.  It was a chicken and egg thing.  Do you want

3    to get the contract then go get the lab or do you want

4    to have the lab and then go get the contract?

01:36    5         So I think that we -- with the time given, we

6    were able to accomplish the contract and we got that.

7    And then the executing of the contract, you know, the JV

8    and making those products for them.  I mean, it was a

9    very lucrative agreement and Bruce, you know --

01:37    10        Q.   Which agreement was this now?

11        A.   The JV between Pharma Pak and Opus Rx, I think

12    it was, the celebratory agreement that Bruce and Olivia

13    went out to that lunch --

14        Q.   And that agreement was signed pretty soon

01:37    15    after Olivia came on board; correct?

16        A.   Yes.

17        Q.   In June of 2015?

18        A.   I think so.

19        Q.   How many sales did that actually end up

01:37    20    creating?

21        A.   Actual revenues?

22        Q.   Yeah.

23        A.   I don't even know if it did anything because

24    there was always the issues of -- well, you know, Opus

01:37    25    Rx did run into some problems as well.  One of the

**PLAINTIFFS' EXHIBIT B - 170**

1    pharmacies got in trouble.  So it was just a lot of time

2    being wasted.  The contract was signed, everything was

3    good, but a lot of time being wasted in order to start

4    producing anything that they wanted to do.  And then

01:38    5    also, I think those patches that they were bringing in

6    from China --

7        Q.    "They," who is bringing in?

8        A.    Opus Rx was bringing those patches in.  I think

9    those patches -- the lidocaine patches got stopped in

01:38    10    the --

11        Q.    Customs?

12        A.    -- customs, yeah, because at the time they were

13    using these compounding pharmacies to bring these

14    patches in, repackaging them in the U.S. and selling

01:38    15    them to their customers.  And I think that became -- got

16    under scrutiny.  That was just one of the things we were

17    going to do for them.  There was the toxicology cups,

18    you know, the toxicology test samples that we were

19    doing.  So there was various products that we were going

01:38    20    to do for them.

21        Q.    Did any of those products generate any

22    revenue for Pharma Pak?

23        MR. DIULIO:  Objection.  Lacks foundation.

24        THE WITNESS:  If it's up to me, I'll tell you

01:38    25    no, I don't think there was anything that came out of

**PLAINTIFFS' EXHIBIT B - 171**

1    that.

2    BY MR. MARKHAM:

3        Q.   And apart from Rx -- I'm sorry, let's get

4    these names down.

01:38   5        Who were the companies involved here with

6    Chad Barrett and Rick?

7        A.   I think it was Opus RX.

8        Q.   Opus Rx?

9        A.   I think, yeah.

01:39  10        Q.   How about Rx Green?

11        A.   Rx Green, I don't recall that one.

12        Q.   Apart from the Opus Rx contract, did you

13    bring in any other contacts that generated contracts?

14        A.   Yes.  I mean, we took on meetings -- when we

01:39  15    brought Dr. Weimann in, he had started to create other

16    patches besides lidocaine.  He actually came on to do

17    the CBD patch because we looked at the cannabis industry

18    as a whole.  Dr. Weimann sold us on the fact that the

19    cannabis industry is going to be the next biggest and

01:39  20    fastest growing industry.

21        Q.   Was that before or after the initiative for

22    the proposition went on the ballot; do you know?

23        A.   I don't know.

24        So he started to develop -- I think he was

01:39  25    going to develop these in the lab, develop a new

**PLAINTIFFS' EXHIBIT B - 172**

```
 1    opportunity for us because he actually -- we took on
 2    multiple trips to Vegas to conventions to kind of
 3    study -- Bruce was kind of hesitant on that whole side
 4    until he finished his diligence.  Bruce was always good
 5    at that.  I credited him for it, but at the same token,
 6    while you're taking all that time, the opportunity goes
 7    right past you.
 8             But in this case, he had the right to do that.
 9    He's the CEO and chairman.  He makes those decisions, so
10    we followed with it and we went to Las Vegas to a couple
11    of conventions.  We took Dr. Weimann there.  Eventually,
12    it was decided that we'd start creating CBD patches.
13        Q.    But I'm asking about contacts that resulted
14    in contracts.  Weimann wasn't a contact to generate
15    money, he became an employee, correct, he was a
16    scientist?
17        A.    Right.
18        Q.    Apart from this Opus Rx, what other deals
19    resulted in contracts that would generate money or
20    were you still basically working on Opus Rx because if
21    it paid off, it was going to be huge?
22        A.    There was a lot of opportunities in the CBD
23    market for the patches.  And then Bruce took a couple
24    meetings -- I think that's what you're talking about,
25    the Rx Green, the guys up in Colorado, I think.  So
```

01:40
01:40
01:40
01:40
01:41

**PLAINTIFFS' EXHIBIT B - 173**

1    Bruce made numerous trips out there.  He went to

2    Arizona.

3           So he kind of took on the role to run the whole

4    cannabis side of the company because, obviously, we're

01:41    5    waiting and things aren't going in a good direction with

6    the Rx Green guys -- I'm sorry -- the Opus Rx guys.  So

7    Bruce and Dr. Weimann, we had a meeting and they said,

8    "This is the new opportunity, that these patches are

9    going to be fine, CBD is not an issue.  THC is an

01:41    10   issue."

11       Q.   So the patches have to do with being a

12   delivery system for cannabis oil and other substances;

13   correct?

14       A.   Correct, transdermal patches.

01:41    15       Q.   And that was a new direction of the company

16   as compared to the older direction, which was the

17   repackaging with Opus Rx?

18       A.   Correct.

19       Q.   So the repackaging with Opus Rx had nothing

01:42    20   to do with CBD patches?

21       A.   No.  The repackaging from Opus Rx was that we

22   were going to get these patches from China, John

23   Crowther was brokering that deal.  They come to our

24   facility, we repackage them into the units that the

01:42    25   pharmacies require, but this side was manufacturing

**PLAINTIFFS' EXHIBIT B - 174**

1    actually, A to Z.

2         Q.   Was part of the reason for going after this

3    new direction was because the Rx -- Opus Rx hadn't

4    panned out; is that fair to say?

01:42   5    A.   No.  I think that we still -- we still gave the

6    Opus Rx guys a lot of credit that they're going to come

7    through, it was something that we would be able to do

8    because we had a full blown JV.  But in the interim

9    while we're waiting for this opportunity because there

01:42   10   was a -- I think Mary's Medicinals, they were making

11   patches.  Dr. Weimann had a lot of relationships in the

12   patch industry.  And so basically by bringing him in and

13   acquiring him from Medi-Patch and bringing him in, he

14   brought a lot of those accounts, so we had to get the

01:43   15   equipment.

16        Q.   Right.  Now, where were you going to get that

17   equipment?

18        A.   Well, you know, I think I went to Dubai, that

19   trip in -- I don't recall if it was the end of the

01:43   20   year -- I'm sorry -- in 2015.  So when I came back,

21   Bruce said that he has this great idea, you know, that

22   the company that actually manufactures that equipment is

23   here in the U.S.  However, Dr. Weimann has a colleague,

24   Erton, you know -- I only met him a few times -- that he

01:43   25   could bring on board.

PLAINTIFFS' EXHIBIT B - 175

01:43

01:44

01:44

01:45

01:45

```
 1              Erton's father has an equipment manufacturing
 2   facility in Turkey that we can get the initial equipment
 3   bought here in the U.S. and Erton's father can produce
 4   these patch machines for us.  And then what we can do is
 5   take those patch machines and sell them to each state as
 6   a -- some manufacturing would use it and then they'll do
 7   a licensing deal and do a royalty deal on the patches
 8   because we filed patents on the transdermal patches.
 9        Q.   Okay.  Did you ever bring in an entity or
10   person that ended up making a contract with Pharma Pak
11   for the purposes of transdermal patches?  I'm talking
12   about you personally.
13        A.   Me personally?
14        Q.   Yeah.
15        A.   I don't know that -- I'm not sure if it was me
16   personally going out and getting those accounts, but I
17   went with them to a few meetings, but I don't think so.
18   I don't think that actually I personally went out there
19   after the fact.
20        Q.   Let's start this way:  Did anybody bring in
21   contacts that made contracts with Pharma Pak for
22   either repackaging or for transdermal patch purchase
23   or manufacturing?
24        A.   Yeah.  Bruce and Dr. Weimann had made
25   agreements with Rx Green.  I think they were
```

**PLAINTIFFS' EXHIBIT B - 176**

01:45

01:45

01:46

01:46

01:46

1    negotiating.  There was multiple contracts that they

2    were either negotiating or they already sold the machine

3    to, which -- the machine that they ended up taking out

4    of our building down to Oceanside and then selling it to

5    the guys up in Oregon.  I think that's the husband and

6    wife that actually were going to buy the equipment from

7    us.

8         Q.   So there's the one in Oregon, but I'm asking

9    if you can identify contracts that Pharma Pak had that

10   could have resulted in revenue generation like the

11   Opus Rx trip?

12        A.   I brought a group in that was willing to take

13   an advance for 40 machines from Florida and Denver.  And

14   I put everybody on the phone.  And at the end of the

15   day, because of the funding that was not available to go

16   out there and, you know, buy all those machines, they

17   rejected the offer.  And that was the -- I think that

18   was Wes, I forget his last name, out of Florida.  So I

19   did get on calls, then I would turn it over to Bruce --

20        Q.   That didn't result in a contract?

21        A.   I don't know if it resulted in an actual

22   written contract.  I don't know.

23        Q.   Are there any other written contracts that

24   you can think of that came into Pharma Pak from the

25   time it started until things went sour in the early

**PLAINTIFFS' EXHIBIT B - 177**

part of 2016, other than the Opus Rx?

    A.   Yes.  I think Bruce did lock down one contract with a group that actually -- we ended up taking a deposit from them on the machine.  And I don't know until this day if the machine was ever delivered to them.

    Q.   Is that the only one you could think of?

    A.   I wasn't day to day on everything, so, again, you know -

    Q.   I'm asking you what you can think of.

    A.   I think that was -- from what I went to the meetings and heard and I think that was the one Bruce was excited about and we were all excited that he did lock that deal down.

    Q.   But nothing else that you could think of that were brought in as contracts to Pharma Pak?

    A.   There was a lot of negotiations going on at the time.

    Q.   I'm talking about actual contracts signed like Opus Rx?

        MR. DIULIO:  Lacks foundation.

        THE WITNESS:  From what I recall, there was one contract solidified, we took a deposit.  And they were going to buy multiple machines from us and do a licensing and royalty.

**PLAINTIFFS' EXHIBIT B - 178**

BY MR. MARKHAM:

1

2      Q.   And that was Bruce's contact?

3      A.   No, that was Dr. Weimann's contact.

4      Q.   Anything else you can think of so we can move

01:47   5   on to another subject?  I don't want to rush you.

6      A.   I thought you wanted me to tell you what went

7   wrong.

8      Q.   I'm going to get back to that, but I want to

9   focus on the contracts.  So we got the Opus Rx

01:47  10   contract and this contract that Dr. Weimann brought in

11   in connection with a machine?

12      A.   I think that company was Rx Green.

13      Q.   Anything else?  Any other contracts?

14      A.   I don't know right now.

01:48  15      Q.   Do you think there were any?

16      A.   I'm sure there were.

17      Q.   Really?  Well, did any of those contracts

18   generate any money?

19           MR. DIULIO:  Objection.  Lacks foundation.

01:48  20           THE WITNESS:  You should look at the bank

21   statements.

22   BY MR. MARKHAM:

23      Q.   Do you know whether it did?

24      A.   I mean, I don't know.  Bruce was handling -- he

01:48  25   was the CEO.  He should be the one that's being asked

PLAINTIFFS' EXHIBIT B - 179

1      those questions.  I was a shareholder.  I don't know

2      what was exactly going on day to day.  All I heard was

3      there was a lot of good things happening.

4          Q.   But as you sit here today, you can't recall

01:48  5      any other signed contracts involving Pharma Pak?

6          A.   Signed contracts I've seen, but --

7          Q.   That you heard about.

8          A.   I heard there was a lot of agreements in place.

9      I heard we signed a contract with -- as a matter of

01:48  10     fact, we wired money to the manufacturer in Turkey,

11     Erton's father's company.  And he was going to produce

12     all these equipment for us.  I don't know if that

13     happened or not, so --

14         Q.   I'm talking about contracts that would

01:49  15     generate income like the Opus Rx that would generate

16     income, not purchasing machines that would allow you

17     people to function, but did you have --

18         A.   Well, those machines --

19         Q.   -- sales contracts?

01:49  20         A.   Those machines were to generate income.

21         Q.   I get that.  We know where that one came

22     from.  I'm trying to find out if any other contracts

23     were executed that would have brought money in either

24     through sales or repackaging or whatever?

01:49  25         A.   I don't know.

**PLAINTIFFS' EXHIBIT B - 180**

1          MR. MARKHAM:  I'm going to take a quick

2     break.

3          THE VIDEOGRAPHER:  We're going off the

4     record.  The time is 1:49 p.m.

01:49  5          (Recess was taken.)

6          THE VIDEOGRAPHER:  We're back on the record.

7     The time is 2:00 p.m.

8          (Deposition Exhibit 71 was marked for

9          identification and is attached hereto.)

02:00  10  BY MR. MARKHAM:

11     Q.   I've marked as Exhibit 71 a document that has

12     pages PL542 through PL578.  And we're going to

13     authenticate a copy, but I'll just represent to you

14     for purposes of seeing if this refreshes your

02:01  15     recollection that this was a transcript that was typed

16     of the questions and answers asked to you, Mr. Edalat,

17     under oath on April 3, 2015 in your bankruptcy

18     proceeding.

19          And you know a fellow by the name of Jeff

02:01  20     Golden; correct?

21     A.   Yes.

22     Q.   And who is he?

23     A.   He was the attorney for the trustee.

24     Q.   Do you know a fellow by the name Leibowitz?

02:02  25     A.   Yes.

**PLAINTIFFS' EXHIBIT B - 181**

1    Q.   Who is he?

2    A.   A scumbag that represented Luberski, Inc.

3    Q.   A lawyer?

4    A.   If you want to call that rat lawyer, sure.

02:02   5    Q.   And a guy by the name of Hays, who is he?

6    A.   My attorney.

7    Q.   And do you recall that you had several

8    sessions where Jeff Golden, as the attorney for the

9    trustee, asked you questions about your ownership of

02:02   10   certain assets?

11   A.   We had a lot of sessions.

12   Q.   Take a look, if you would, about seven lines

13   down, right after Edalat says "Yes."  Do you see that

14   where it says, "Edalat, yes" on page 1, Exhibit 71?

02:02   15   A.   Okay.

16   Q.   See that?  And then Golden says, "Great,"

17   quote, "So let me first of all ask you are you

18   currently involved in any business entities at all

19   right now?"  Do you see your counsel weighs in after

02:03   20   that with a clarification, "Can you be a little more

21   specific about what you mean 'involved'?"  And Golden

22   says, "Thank you for that clarification.  Do you have

23   any ownership interest in any business entities right

24   now?

02:03   25        "Edalat, not right now, no."

**PLAINTIFFS' EXHIBIT B - 182**

1           Do you see that?  Did I read that correctly?

2     A.    Okay.

3     Q.    Were you asked that question and did you give

4  that answer?

02:03  5     A.    What does this have to do with Pharma Pak?  And

6  this case is settled and there's a confidential

7  settlement.  So why even ask me about this stuff?

8     Q.    Is that your answer?

9     A.    That is my answer.  I'm not going to answer

02:03  10  anymore.  The case is settled.  If you have an issue, go

11  back to the trustee, go open the case.  Don't waste my

12  time.  Let's talk about Pharma Pak.

13    Q.    I want to put it back in front of you because

14  I have to ask a couple more questions.

02:04  15    A.    I'm not going to answer anything, that the case

16  has already been settled, there's a confidential

17  settlement agreement and I'm not going to talk about

18  anything.  So you want to bring this stuff out of

19  context, you want to bring it over, let's go look into

02:04  20  Mr. Cahill's past.  And I'm sure there's a lot of things

21  that he's done in his lawsuits that he said.  So what?

22  Maybe that was advice I got from my attorney at the

23  time.

24          MR. DIULIO:  I'm going to caution the witness

02:04  25  not to reveal any attorney-client communications.

**PLAINTIFFS' EXHIBIT B - 183**

1    BY MR. MARKHAM:

2         Q.    So you were asked another question by

3    Mr. Golden right after that, quote, "Have you had any

4    ownership interest in any business entities since the

02:04   5    date of the filing of the petition?"

6         A.    Sir, do you know anything about bankruptcy law?

7         Q.    Let me just finish my question.

8         A.    No, but do you know anything about bankruptcy

9    law?

02:04   10        Q.    I have to ask my question first.

11        A.    You can ask whatever you want.  Until you put a

12   gun to my head and pull the trigger, I'm not answering

13   anything that's already been settled.

14             MR. DIULIO:  Let's not go to that extreme.

02:04   15             THE WITNESS:  He's a, you know, Boston, you

16   know, the whole -- you made that clear in Mr. Cahill's

17   deposition.  But the bottom line is this, the case is

18   settled, it's finished, there's a settlement agreement

19   in place that's confidential.  And if you want to pull

02:05   20   this stuff out of context, then good, I'm not

21   answering it.

22   BY MR. MARKHAM:

23        Q.    Okay.  So just for the record --

24        A.    For the record, let me explain to you -- and

02:05   25   I'll go on record, I will not answer anything that I

**PLAINTIFFS' EXHIBIT B - 184**

```
 1   have a confidentiality agreement signed, especially with
 2   the U.S. Trustee's Office and the matter's been settled
 3   and we're moved on.
 4       Q.   This transcript is filed in the public
 5   record.  It is not confidential.
 6       A.   You know what --
 7            MR. DIULIO:  Objection.  Assumes facts.
 8            THE WITNESS:  Sir, take it home and put it on
 9   your wall and have a dart session at it.
10   BY MR. MARKHAM:
11       Q.   But you're not going to answer any
12   questions -- let me finish my question and put it on
13   the record.
14       A.   What does that have to do with the fact that
15   your client stole my company?
16       Q.   I want to ask you a question.  Give me an
17   answer.
18       A.   No.  It's -- attack my credibility, go ahead.
19   Go ahead.
20       Q.   Are you --
21       A.   Hold on.  Hold on.  Hold on.  I'm a fraud.
22   According to you, I'm a fraud, I'm a thief, I'm a cheat?
23   Am I?
24       Q.   I'm asking you questions about testimony
25   you've previously gave about --
```

02:05 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 185**

1       A.    Listen, there was advice that was given that --

2  post petition that trustee does not have the right to

3  anything.

4       Q.    That's not the answer you gave though.

02:06   5       A.    It doesn't matter.  I can give an answer that I

6  owned oil wells in Iraq.  It doesn't matter, it's post

7  petition.  The trustee got a very nice, handsome pay.

8  One and a half million dollars of assets and cash went

9  to the trustee.  Believe me, if they have a problem,

02:06  10  they could be sitting here asking me questions.  So why

11  are you asking me about this stuff?

12       Q.    So you will not answer questions if I ask you

13  about certain information you gave under oath?

14       A.    If it's public document, then it's public.  Why

02:06  15  are you asking me about it?

16       Q.    You're not going to answer?

17       A.    Why should I?

18       Q.    Okay.  All right.

19             All right.  Can you --

02:06  20       A.    Are you going to ask me the questions about

21  Pharma Pak?  Are you going to let me finish the story?

22       Q.    I'm going to ask you a lot more questions

23  about Pharma Pak.

24       A.    We were talking about how the whole thing

02:07  25  happened, how it went from a dinner event with

**PLAINTIFFS' EXHIBIT B - 186**

Mr. Cahill and his wife, the nice dinner and the next

the whole world turned upside down because Mr. Cahill

got caught taking a paycheck out of a company without

approval, $20,000 a month.

02:07    Q.   Did you ever see an email where the other

shareholders indicated that they had met and talked

about that and they thought it was appropriate for

Mr. Cahill to do that?

        MR. DIULIO:   Objection.   Assumes facts.

02:07        THE WITNESS:   Hold on a second.   Hold on a

second.   Which shareholders?

BY MR. MARKHAM:

        Q.   I'm asking you if you ever saw that.   The

answer is yes or no.

02:07    A.   Do you want to play bluff poker with me?

        Q.   I'm just asking if you ever saw it.

        A.   Is your tie red?

        Q.   Does that mean you have seen it because my

tie happens to be red?

02:07    A.   That doesn't look red to me.   Maybe I'm color

blind, but don't grab stuff out of the air.   I've been

in a lot of depositions and I get what you're trying to

do.   Okay.

        Q.   Did you ever --

02:07    A.   The fact of the matter, sir, is, keep your

**PLAINTIFFS' EXHIBIT B - 187**

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | focus on Pharma Pak, the company that your client and           |
|       | 2  | the other three partners stole.  If the company was so          |
|       | 3  | bad, then why did they take it to Oceanside and do the          |
|       | 4  | same exact thing?  And when my investigators found out          |
| 02:08 | 5  | where it was, they quickly shut it down -- it's still           |
|       | 6  | being watched, by the way, that building and yours --           |
|       | 7  | they shut it down and they moved it to Oregon.  Okay.           |
|       | 8  | You tell me who's the fraud.  You tell me who's the             |
|       | 9  | thief.                                                          |
| 02:08 | 10 | Cahill, you be quiet.  This is my deal.  You're                 |
|       | 11 | just to watch.  You're just here to watch.                      |
|       | 12 | MR. DIULIO:  Hey, it is --                                       |
|       | 13 | THE WITNESS:  So ask me --                                       |
|       | 14 | MR. DIULIO:  -- questions and answers                           |
| 02:08 | 15 | between --                                                       |
|       | 16 | MR. MARKHAM:  You're faulting Mr. Cahill for                     |
|       | 17 | what's going on here now?                                       |
|       | 18 | THE WITNESS:  Are you kidding me?                                |
|       | 19 | MR. DIULIO:  I'm not faulting anybody.  But                      |
| 02:08 | 20 | I'm saying the person observing the deposition                  |
|       | 21 | shouldn't be interjecting.  That's all I'm asking.             |
|       | 22 | That's a reasonable request.                                    |
|       | 23 | MR. MARKHAM:  I have a request of you.  I                        |
|       | 24 | would like you to inform your client to answer the             |
| 02:08 | 25 | questions.  He's not answering the questions.  If I            |

**PLAINTIFFS' EXHIBIT B - 188**

1   were to take this to a magistrate --

2           THE WITNESS:  Put a gun to my head, maybe

3   I'll answer.

4           MR. DIULIO:  Hold on.

02:08   5           MR. MARKHAM:  -- he'd be ordered to answer

6   them.  There have been at last 15 occasions and I'm

7   asking you -- I don't want to go to the magistrate to

8   ask for the rest of the deposition to be taken in

9   front of a magistrate, costs to be borne by

02:09   10   Mr. Edalat, but I'm getting to that.

11           THE WITNESS:  As a matter of fact --

12           MR. DIULIO:  No.  No.  No.

13           THE WITNESS:  As a matter of fact, I

14   appreciate we go in front of the magistrate.  You know

02:09   15   why?  Because I've had depositions --

16           MR. DIULIO:  Let me make that statement.

17           Mr. Markham, you are so far afield from the

18   relevant issues in this case.  You get a lot of leeway

19   in discovery, but it's not unlimited.  Now, I'm going

02:09   20   to disagree as to the extent of questions being

21   answered or not.

22           MR. MARKHAM:  Are you really?

23           MR. DIULIO:  Yes, I am.  I mean, I --

24   absolutely.  So I suggest you ask questions and we

02:09   25   have the witness answer.  That's the way to proceed.

**PLAINTIFFS' EXHIBIT B - 189**

BY MR. MARKHAM:

02:09

1   BY MR. MARKHAM:

2        Q.   Okay.  With that in mind, are you willing to

3   answer more questions about the testimony you gave at

4   the bankruptcy proceeding about your ownership of

5   Pharma Pak stock?  Yes or no.

6             MR. DIULIO:  I'm objecting to that question.

7             Don't respond to that.

8             THE WITNESS:  I'm not.

9             MR. DIULIO:  That's -- ask questions.  That

10  sounds -- I asked you to ask questions.

11            MR. MARKHAM:  I just asked him a question.

12            MR. DIULIO:  You're asking will he answer

13  questions --

14            MR. MARKHAM:  That's a question.

15            MR. DIULIO:  Ask the questions.

16  BY MR. MARKHAM:

17       Q.   Are you going to answer questions?  That's a

18  question I can ask as a summary --

19            MR. DIULIO:  No.  No.

20            MR. MARKHAM:  Don't interrupt.

21            MR. DIULIO:  You're interrupting everybody.

22            MR. MARKHAM:  I am not.

23            What I want to do is, I want to make a record

24  that he's no longer going to answer questions about

25  what he testified to at the bankruptcy proceeding.

**PLAINTIFFS' EXHIBIT B - 190**

```
 1            MR. DIULIO:  There is no such record.  Ask
 2   your questions and he'll either respond, and if you
 3   think he's not responding, then we can deal with it.
 4   There's a process.
```
02:10  5   BY MR. MARKHAM:
```
 6       Q.   I want to know, Mr. Edalat, are you willing
 7   to answer now that we've had the colloquy and your
 8   counsel has said that he will -- I'm supposed to ask
 9   questions, you're supposed to answer them.  I want to
```
02:10 10   know whether you will answer questions about the
```
11   testimony you gave at your bankruptcy proceeding
12   relating to what you owned at the time?
13            MR. DIULIO:  Mr. Markham, you're holding
14   up --
```
02:10 15            MR. MARKHAM:  No.
```
16            THE WITNESS:  There's a reason.  That
17   settlement, that is done, that is settled.  There's a
18   confidentiality agreement.  If you like, go back to
19   Mr. Golden and trustee, Kosmala, if they're willing to
```
02:11 20   open up that settlement again, then let's go for it.
```
21   Let's go ahead and do it.  I'd be more than happy
22   because I'd like to get some of that money back.
23   BY MR. MARKHAM:
24       Q.   Okay.
```
02:11 25       A.   Every attorney I've spoken --

**PLAINTIFFS' EXHIBIT B - 191**

1          Q.    So the answer to the question is no?

2          A.    I'm saying, go talk to -- your two and a half

3    hour lunches he had with Golden, you know, to muddy my

4    bankruptcy because he thought that I did things.  Go sit

02:11  5    down with Golden and if he's willing to open the entire

6    bankruptcy all over again, let's go for it.

7          Q.    Could you turn to Exhibit Number 2 in this

8    exhibit book, please.

9          Have you ever seen Exhibit Number 2 before?

02:11  10         A.    Yes.

11         Q.    When did you first see it?

12         A.    When I was in Dubai.

13         Q.    When?

14         A.    January.

02:11  15         Q.    Of?

16         A.    2013.

17         Q.    And this is a letter you got from the FDA;

18    correct?

19         A.    Yes, sir.

02:12  20         Q.    And it made certain statements about how your

21    company Sci-Labs Nutraceuticals, Inc. was not, in

22    their view, in compliance with certain regulations and

23    laws; correct?

24         A.    Listen, let me explain something to you.  Okay.

02:12  25    All right.  You're not my first rodeo.  I've been in a

**PLAINTIFFS' EXHIBIT B - 192**

```
 1   lot of depositions.  You're the most ill-prepared, you
 2   get off track, you're bringing stuff up, it's all public
 3   document.  Okay.  What does this have to do with the
 4   fact, for the 900th times that your client, you and the
 5   three other partners conspired together, stole my
 6   company, okay, the company that I started, that this
 7   gentleman didn't even know what a patch was besides a
 8   Band-Aid that he puts on his hand when he cuts himself.
 9        I created an opportunity, which at that point
10   was worth $30 million.  They stole my company as soon as
11   they found out that they can't get me out of the company
12   and they moved it down to Oceanside, and they said the
13   company shut down.  Are you kidding me right now?  You
14   want to go pound for pound, let's go.  I told you, I'll
15   take 15 rounds with you.  I have no fear of you, no fear
16   of him.  He's been going around town telling he's going
17   to take me down at whatever expense.
18        Bruce, how much have you spent so far?  And you
19   haven't taken me down.  I didn't do anything wrong.  14
20   months I worked in that company, not one time did I take
21   one fucking penny out of that except what he did every
22   month of $20,000.
23        MR. CAHILL:  I need to take a break.
24        THE WITNESS:  You shut up.  You shut up.
25        MR. DIULIO:  Let's go off the record.
```

02:12   5
02:12  10
02:12  15
02:13  20
02:13  25

**PLAINTIFFS' EXHIBIT B - 193**

```
 1              THE VIDEOGRAPHER:  We're going off the
 2    record.  The time is 2:13 p.m.
 3              (Recess was taken.)
 4              THE VIDEOGRAPHER:  We're back on the record.
 5    The time is 2:14 p.m.
 6              THE WITNESS:  I said --
 7    BY MR. MARKHAM:
 8         Q.   Are you finished with your answer?
 9         A.   No.  Before you interrupted me -- you asked me
10    questions that you want to hear the answers.  I'm going
11    to give you answers to the questions that you haven't
12    asked.  And that is, why are you asking me about these?
13    These are public information.  You want to do this,
14    bring it to trial.  We are going to go to trial.  I
15    already told him, in front of 12 jurors that are going
16    to look at him and see if he embezzled money, if he
17    stole money, if he stole my company.
18              And you know what, there's three partners on
19    this side and four on the other side.  This is a
20    complete fight between partners.  What does an FDA --
21    what does this have to do with anything besides create a
22    distraction and waste everybody's time and, you know,
23    you're getting paid money and so is my counsel and
24    everybody else here except me because Cahill doesn't
25    need money.  He has a $30 million house.  What does this
```

02:13   5
02:14   10
02:14   15
02:14   20
02:14   25

**PLAINTIFFS' EXHIBIT B - 194**

1   have to do with the fact that these guys stole my

2   company?

3        Q.    Okay.  My question was, is this a warning

4   letter from the FDA advising you that Sci-Lab

02:15   5   Nutraceuticals was not, in their view, in compliance

6   with certain laws and regulations; is that what this

7   letter is about to your understanding?

8        A.    Counsel, I'm not an attorney, but let the

9   document speak for itself.

02:15   10          Next question.

11        Q.    Did you ever give a copy of this letter to

12   Shane Scott?

13        A.    Counsel, this document was a public document.

14   Shane Scott probably saw it online.

02:15   15          Next question.

16        Q.    Did you give it to him?

17        A.    Next question.

18        Q.    You're not going to answer that?

19        A.    Mr. Cahill, the CEO of Pharma Pak knew about

02:15   20   this letter.  He actually was part of the negotiations

21   on this.

22        Q.    I asked you whether you ever showed this to

23   Shane Scott?  Are you not going to answer any further?

24        A.    It was a public document.  They knew that

02:15   25   Sci-Labs Nutraceuticals, Inc. was shut down.

**PLAINTIFFS' EXHIBIT B - 195**

```
 1              So what was your question?
 2         Q.    My question was, did you show it to Shane
 3    Scott?  Yes or no.
 4         A.    I showed a lot of things to Shane Scott.
02:15 5    Q.    Yes or no to this letter, Exhibit 2?
 6         A.    It's a public document.  His attorney was very
 7    well aware of it and he saw it, yes.
 8         Q.    How do you know his attorney was very well
 9    aware of it?
02:15 10   A.    Can you do me a favor and go on Google, put my
11    name, Paul Edalat, in there and see what pops up first.
12              You have looked me up, haven't you?
13         Q.    I'm asking you why you know that the lawyer
14    is well aware of it?
02:16 15   A.    Look at the emails that went across, the emails
16    that they deleted out of my Pharma Pak emails because
17    they're protecting him.  They deleted those emails that
18    I was copied on at the time when they were negotiating
19    with Tim Balog for Shane's investment, which he did his
02:16 20   due diligence.  Okay.  And Shane's very well aware of
21    the fact that we're not dealing with Sci-Lab
22    Nutraceuticals, Inc., we're dealing with patches.  This
23    is not for patches.  Do you want me to educate you on
24    this?  We're going to be in here for three days.
02:16 25   Q.    No.  I --
```

**PLAINTIFFS' EXHIBIT B - 196**

```
 1        A.   What I suggest you do, Counsel -- what I
 2   suggest you do, and I mean this, go hire an expert to
 3   explain to you what this is about.  Okay.  Spend a
 4   little bit of Cahill's money and he's going to explain
 5   to you what this is about.  This is a done story.
 6   Bankruptcy is a done story.  So tell me exactly what
 7   we're here for.  Let's focus on Pharma Pak.
 8        Q.   So turn to Exhibit 3.
 9             Did you ever show this -- let me go back to
10   Exhibit 2.
11        A.   Unbelievable.
12        Q.   Did you ever show Exhibit 2 to either Ron
13   Franco or Greg Cullen?  Is your answer the same?
14        A.   What was the date on this?
15        Q.   The date on the letter -- going back to
16   Exhibit 2.
17        A.   Listen, for the sake of just having fun, I'm
18   going to play your game for a little bit.  What is the
19   date on this?
20        Q.   I'm not talking about Exhibit 3 now.  I'm
21   talking about --
22        A.   You just brought me to Exhibit 3.
23        Q.   I asked you to turn back to Exhibit 2.
24        A.   When did you ask that?
25        Q.   I really did.  In any event --
```

02:16   5
02:16   10
02:17   15
02:17   20
02:17   25

**PLAINTIFFS' EXHIBIT B - 197**

```
 1              MR. DIULIO:  Sorry, I missed it too.  Let's
 2     go back to 2.
 3              THE WITNESS:  I'm going to give you, like,
 4     15 minutes, your game, we'll all play it, see how well
 5     you play.
 6     BY MR. MARKHAM:
 7         Q.   Exhibit 2, did you ever disclose or show this
 8     letter to Greg Cullen?
 9         A.   Was I supposed to?
10         Q.   I'm asking if you did.
11         A.   No.  Was I supposed to?
12         Q.   I'm asking if you did.
13         A.   Everything is public.
14         Q.   Did you or did you not?
15         A.   Sir, when you go and invest in a company, okay,
16     who are you going to look and see and -- look up and see
17     who you're investing your money with?
18         Q.   I'm just asking you whether you showed it to
19     them.
20         A.   Whether I did or not I think is irrelevant.
21         Q.   How about Ron Franco?
22         A.   I don't even know where Franco is.  I met him
23     only one time.
24         Q.   Can you turn to Exhibit 3.
25              Do you recognize what Exhibit 3 is?  It's
```

02:17  5
02:17  10
02:17  15
02:18  20
02:18  25

**PLAINTIFFS' EXHIBIT B - 198**

1    your consent decree?

2         A.    Has my name on it.

3         Q.    And did you ever show this to Shane Scott?

4         A.    Did he ask for it?

02:18    5    Q.    I'm asking you whether you showed it to him.

6    I thought you were playing my game, you were going to

7    answer my questions for 15 minutes?  You going back on

8    that promise too?

9         A.    Listen -- listen --

02:18    10        MR. DIULIO:  You're -- take down the

11   temperature a little bit.

12            THE WITNESS:  My temperature's been down.

13            Let me explain something to you, these are

14   public documents, just like you pulled everything else

02:18    15   out.  Okay.  As you have access to it, so did Cahill.

16   Cahill knew everything as the CEO of the company, as

17   the chairman of the company.  And bringing in these

18   new shareholders, it was his responsibility to talk

19   about everybody that was involved in the company.

02:18    20            So what did you want me to do?

21   BY MR. MARKHAM:

22        Q.    I want you to answer my question.

23        A.    What does this have to do with Pharma Pak?

24        Q.    Did you show --

02:19    25        A.    No.  No.  What does this have to do with Pharma

**PLAINTIFFS' EXHIBIT B - 199**

```
1   Pak?

2       Q.   Is that your answer?

3       A.   Yes.

4       Q.   How about to Franco and to Greg Cullen, same

5   answer?

6       A.   What does it have to do with Pharma Pak?

7       Q.   Is that your answer?

8       A.   This was making protein powders that you mix

9   with water or milk or some juice and you drink it up so

10  you could put a little bit of muscle on your body.  The

11  company, Pharma Pak was patches to put on your body to

12  take your care of pain, take care of your epilepsy,

13  seizure, Alzheimer's, I don't know.

14           You know, what do these two companies have to

15  do with it?  This is the part -- connect for me because,

16  you know, maybe I'm not the smartest guy at the table,

17  probably not -- I'm probably not.  I'm not as smart as

18  you, as intelligent as you.  But explain to me, where do

19  you connect these two companies?  Once you do that, I'll

20  be more than happy to answer everything.

21      Q.   I will give you an explanation for why I want

22  to know.

23      A.   Sure.

24      Q.   The allegations that Mr. Scott [sic],

25  Mr. Cullen, Mr. Cahill --
```

**PLAINTIFFS' EXHIBIT B - 200**

1      A.    Right.

2      Q.    -- and Mr. Scott have made is that you failed

3  to disclose to them pertinent information bearing on

4  your reliability.

02:20   5      A.    Excuse me, sir.  I was not the CEO or chairman

6  of Pharma Pak.  Why would I need to disclose anything

7  even if it was an obligation?  Why would I need to

8  disclose everything when Mr. Bruce Cahill, the CEO,

9  chairman, director's responsibility was to disclose

02:20  10  everything to new shareholders that came in?

11      Q.    That may be an augment.  I'm asking whether

12  you did?

13      A.    It's not an argument.

14      Q.    I'm asking whether you did.

02:20  15      A.    According to Mr. Cahill, I was nobody in the

16  company.  I was just a shareholder just like them.

17            Okay.  On that premise --

18      Q.    Did you --

19      A.    Hold on.

02:20  20            -- did Mr. Shane Scott tell me that he filed

21  bankruptcy twice before he got involved with my company?

22      Q.    I'm asking you to answer my question, sir.

23      A.    Did Mr. Shane Scott tell me that you represent

24  his church that he's hiding $50 million in assets and

02:20  25  you represented his partner that went to jail; did he

**PLAINTIFFS' EXHIBIT B - 201**

```
 1   tell me that?  Did Mr. Bruce Cahill tell me that

 2   Mr. Mark Erfurt, the head of our IT, had been in jail

 3   for criminal activities?

 4          What's your point?

 5       Q.   I'm asking you --

 6       A.   What's your point, Counsel?

 7       Q.   You're not going to answer it?

 8       A.   Because you're asking stupid questions.  I hate

 9   to tell you that.

10       Q.   Turn to Exhibit 4, if you would.

11          Do you recognize this as being the docket in

12   your 2004 bankruptcy case?

13          MR. DIULIO:  Objection.  Lacks foundation.

14   BY MR. MARKHAM:

15       Q.   Have you ever seen it before?

16       A.   2004.

17       Q.   2014.

18       A.   Document speaks for itself.

19       Q.   Okay.  How about 5?

20          MR. DIULIO:  Objection.  Lacks foundation.

21   BY MR. MARKHAM:

22       Q.   You filed bankruptcy in 2005; correct?

23       A.   Is it illegal?

24       Q.   I'm asking if you did.

25       A.   Sounds like I did.  Looks like I did.
```

02:20   5
02:21   10
02:21   15
02:21   20
02:21   25

**PLAINTIFFS' EXHIBIT B - 202**

```
 1        Q.   Did you disclose that to anybody to whom you
 2   sold your Pharma Pak shares?
 3        A.   Sir, let me ask you this:  If Mr. Cahill is
 4   banging another girl, mistress, did he tell his wife
 5   that he's banging Dr. Stephanie Klein in Vegas and
 6   having a side affair; did he tell her that?  Did he tell
 7   her that?
 8        Q.   Is that your answer?
 9        A.   Did Shane Scott tell his wife that he's got a
10   mistress coming in from Canada, an Indian woman?  Did he
11   tell her that?  What kind of bullshit questions are you
12   asking?  Focus on what we're here for today, that's
13   Pharma Pak.  Okay.
14        Q.   Take a look at Exhibit 6.
15             You filed bankruptcy in 1997; correct?
16        A.   So what?  Donald Trump, our president, has
17   filed how many bankruptcies?
18             MR. DIULIO:  Quite a few.
19             THE WITNESS:  Hey, I voted for Trump.  What's
20   the big deal?  What are you getting to?
21   BY MR. MARKHAM:
22        Q.   Is that the answer to the question?
23        A.   If the document is public, you're welcome to
24   it.  Enjoy the pizza.
25        Q.   How old were you in 1997?
```

02:21
02:21
02:22
02:22
02:22

**PLAINTIFFS' EXHIBIT B - 203**

|      |     |    |                                                              |
|------|-----|----|--------------------------------------------------------------|
|      | 1   | A. | You do the math.                                             |
|      | 2   | Q. | You can answer the question.                                 |
|      | 3   | A. | What difference does it make?                                |
|      | 4   | Q. | I'm asking you?                                              |
| 02:22 | 5  | A. | I was old enough to file bankruptcy.                         |
|      | 6   | Q. | Tell me how old you were.                                    |
|      | 7   | A. | What difference does it make?                                |
|      | 8   | Q. | You're not going to answer?                                  |

9      A.   Because it has nothing to be relevant about,

02:22  10   the fact that your clients, they stole my company.

11   Okay.  At the date they stole my company, a $30 million

12   valuation, 36 percent is about $12 million.  You know

13   what they offered to buy me out at?  300,000.  Who is

14   the crook?  Who is the scum?

15       Q.   You're not going to answer how old you were

16   in 1997?

17       A.   How old were you in 1925?

18       Q.   I'm actually -- I'm pleased to say I wasn't

19   born in 1925.

02:23  20       A.   There you go.  Let's focus -- what difference

21   does it make?  What did you eat for lunch?  Ask me

22   questions about Pharma Pak and why we're here.

23       Q.   Do you recall telling Shane Scott in a text

24   message --

02:23  25       A.   Okay.

**PLAINTIFFS' EXHIBIT B - 204**

|  |  |
|---|---|
| 1 | Q. -- that you were a millionaire at age 17 and |
| 2 | a billionaire at age 27? |
| 3 | MR. DIULIO: Objection. Assumes facts. |
| 4 | BY MR. MARKHAM: |
| 02:23 5 | Q. Do you recall it? |
| 6 | A. I don't recall it. |
| 7 | Q. Okay. Why don't we, for a moment, go back to |
| 8 | the story you were telling me about Pharma Pak. |
| 9 | A. Thank God. |
| 02:23 10 | (Deposition Exhibit 72 was marked for |
| 11 | identification and is attached hereto.) |
| 12 | BY MR. MARKHAM: |
| 13 | Q. Before we do, I'd like to introduce one more |
| 14 | exhibit, 72. Take a look at Exhibit 72, Mr. Edalat, |
| 02:24 15 | and tell me whether you recognize this as a -- the |
| 16 | Summary of Schedules and the Schedules A through, I |
| 17 | believe it is -- |
| 18 | A. This case is settled. I'm not going to waste |
| 19 | any time on it. If you have an issue, go see the judge. |
| 02:24 20 | Q. All right. |
| 21 | A. Thank you. |
| 22 | Q. But I'm just going to put my question on the |
| 23 | record, if I may, just so the judge will know what I'm |
| 24 | trying to ask you. |
| 02:25 25 | I want to know whether this is a document |

**PLAINTIFFS' EXHIBIT B - 205**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | that you filed a bankruptcy -- by "this" I mean              |
|       | 2  | Exhibit 72 -- which states forth a summary of your           |
|       | 3  | assets and liabilities as you stated them under oath         |
|       | 4  | in the bankruptcy proceeding that you filed in 2014?         |
| 02:25 | 5  | Will you answer that question?                               |
|       | 6  | MR. DIULIO:  Objection.  Lacks foundation.                   |
|       | 7  | BY MR. MARKHAM:                                              |
|       | 8  | Q.   It's signed by you.  Take a look at that                |
|       | 9  | because I want to ask you about your signatures.            |
| 02:25 | 10 | Do you recall this being filed?                              |
|       | 11 | MR. DIULIO:  Objection.  Lacks foundation.                   |
|       | 12 | THE WITNESS:  I don't recall.                                |
|       | 13 | BY MR. MARKHAM:                                              |
|       | 14 | Q.   Okay.  Take a look, if you would, at -- it's           |
| 02:25 | 15 | page 17 of 38 of the document.  Let me put it back in       |
|       | 16 | front of you.  The number's on the top.                      |
|       | 17 | Do you see a signature on that page?                         |
|       | 18 | A.   Yes.                                                     |
|       | 19 | Q.   Is that your signature?                                 |
| 02:26 | 20 | A.   Looks to be.                                             |
|       | 21 | Q.   Okay.  Do you remember signing a declaration           |
|       | 22 | under oath concerning debtor's schedules on or about        |
|       | 23 | 2014?                                                         |
|       | 24 | A.   Let me ask you something --                             |
| 02:26 | 25 | Q.   You need to answer that question.                       |

PLAINTIFFS' EXHIBIT B - 206

1          A.    Hold on.  Hold on.  Hold on.  Hold on.  If you

2     have been looking through my bankruptcy, is this the

3     updated --

4          Q.    I'm asking you whether you recall signing

02:26     5     that on that date?

6          A.    When you update, this one's no good.  Is this

7     the updated one?

8          Q.    I'm asking you if you remember signing it?

9               MR. DIULIO:  Do you recall?

02:26    10               THE WITNESS:  The updated -- I don't recall,

11     but until you bring me the updated one, I will answer

12     your question.

13               MR. DIULIO:  Just answer the question, I

14     don't recall.

02:26    15     BY MR. MARKHAM:

16          Q.    How do you know this isn't the updated one?

17          A.    I'm asking you.  You're doing the homework.

18          Q.    Are you willing to answer the following

19     question:  Did you swear to the truth of the summary

02:26    20     of schedules and other documents that you signed on

21     August 15th, 2014, which now is Exhibit 72?

22               MR. DIULIO:  Objection.  Assumes facts.

23               THE WITNESS:  If I did, I did.

24     BY MR. MARKHAM:

02:27    25          Q.    Okay.  Do you recall?

**PLAINTIFFS' EXHIBIT B - 207**

```
 1        A.   I signed the documents, but I don't think this
 2   is the updated one.  This document is not authenticated
 3   and it's not -- I don't think this is the actual updated
 4   document.
 5        Q.   Okay.  One more exhibit -- I've got one more.
 6        A.   Do you want this back?
 7             (Deposition Exhibit 73 was marked for
 8             identification and is attached hereto.)
 9   BY MR. MARKHAM:
10        Q.   Exhibit 73, and take a look at the second
11   page, it's on the rear side.
12             Do you recognize any of the signatures on the
13   second page of that document?
14             MR. DIULIO:  Sorry, was the question any of
15   these signatures?
16             MR. MARKHAM:  Did he recognize any of the
17   signatures, yes.
18             THE WITNESS:  Well, this is original on it,
19   bit looks like a copy.
20   BY MR. MARKHAM:
21        Q.   I'm asking you whether you recognize the
22   signatures?
23        A.   It doesn't matter.  I'm not going to answer
24   that.  There's no authentication of this document.  If
25   you can bring that for me, I'll be more than happy to
```

02:27  5
02:27  10
02:28  15
02:28  20
02:28  25

**PLAINTIFFS' EXHIBIT B - 208**

1    answer.

2        Q.   So you're not going to answer that?

3        A.   It's not an authentic document.  It says

4    "original," but looks like a copy.

02:28   5        Q.   That's your answer.

6            Take a look at the signature on the back page

7    of that, which is the signature of the debtor in the

8    left-hand column on the second page.

9        A.   Sir, when you bring me the original document --

02:28  10    this is an original, not copy, I'll be more than happy

11    to answer.  Why I tell you this is because, that

12    gentleman over there has forged my signature on a lease

13    that I've already had analyzed, so -- I can't trust any

14    documents you put in front of me with signatures.  Once

02:28  15    you authenticate it --

16        Q.   Your handwriting expert indicated that he did

17    that analysis off the copies.

18        A.   No, I don't think so.  They weren't copies.

19    They were -- but this says original on it, so it's not.

02:29  20    It's a copy.  So bring me the original document and I'll

21    be more than happy to authenticate it for you.

22        Q.   You don't remember signing this?  Do you

23    remember signing a petition in your -- Voluntary

24    Petition for bankruptcy in May of 2005?

02:29  25        A.   My God, there was like 10,000 documents that

**PLAINTIFFS' EXHIBIT B - 209**

| | |
|---|---|
| | 1   went across for those two years.  It was a fun case.  Do |
| | 2   you want to bring it all here and we can go through it |
| | 3   or you can bring Golden here.  We can have a good time |
| | 4   with Golden. |
| 02:29 | 5               MR. DIULIO:  Microphone. |
| | 6               THE WITNESS:  Jesus Christ, such a waste of |
| | 7   time. |
| | 8               (Deposition Exhibit 74 was marked for |
| | 9               identification and is attached hereto.) |
| 02:29 | 10  BY MR. MARKHAM: |
| | 11      Q.   Okay.  Let me show you what we should mark as |
| | 12  Exhibit 74.  Ask you if you deny that that is your |
| | 13  signature on that? |
| | 14      A.   Is this original? |
| 02:30 | 15      Q.   It's the one that you attached to the |
| | 16  complaint. |
| | 17      A.   Oh, okay. |
| | 18      Q.   If you take a look at the front page, |
| | 19  Mr. Edalat, this is your exhibit that was -- |
| 02:30 | 20      A.   Okay.  Okay.  Is this the document in question |
| | 21  about the forgery? |
| | 22      Q.   This appears to be a lease.  If you take a |
| | 23  look at the first page, other than the exhibit page, |
| | 24  it's a lease between Sci-Labs and -- what does it say |
| 02:30 | 25  there? |

**PLAINTIFFS' EXHIBIT B - 210**

1        A.    Sci-Labs Pharma, Inc., Paul -- looks like

2    Edlat, E-d-l-a-t.  That does not look like my signature.

3             Is this the lease you're talking?

4        Q.    Yeah, it's the lease.  You claim there's a

02:31  5    forged lease in this case, do you not?

6        A.    100 percent.

7        Q.    Is that the lease you claim to be forged?

8        A.    If this is part of the exhibits that we --

9        Q.    Take a look at the document.  Take a look at

02:31  10   the first page.

11       A.    Oh, yeah, this is the one, right.

12            I have a question for you:  Mr. Cahill is a

13   landlord that owns a lot of real estate.  The crazy

14   thing about this one, there's no initials.  You usually

02:31  15   initial every page of a lease.

16       Q.    So you recognize that to be the one that you

17   claim to be forged?

18       A.    Of course.  It's not my signature.  If this is

19   the one you're talking --

02:31  20       Q.    Could you circle on this exhibit the

21   signature that you claim to be forged?

22       A.    Right here.

23       Q.    Okay.  Could you just put your initials by it

24   so we know that that's what you're claiming?

02:31  25            MR. DIULIO:  That's fine.

**PLAINTIFFS' EXHIBIT B - 211**

```
 1              THE WITNESS:  Not that I trust these guys
 2   because they can go back and --
 3              MR. DIULIO:  It's going to be handed to the
 4   court reporter.
 5              THE WITNESS:  I just want to make sure
 6   because, you know, not a lot of trust on the other
 7   side of the table.
 8   BY MR. MARKHAM:
 9       Q.   So that is -- you're stating under oath that
10   that is not your signature?
11       A.   That's not even my name.  And why is it even on
12   the Sci-Labs --
13       Q.   I asked you about the signature, Mr. Edalat.
14   You can answer the question.  You're going to have to
15   do that in open court --
16       A.   That's not my signature.
17       Q.   How sure are you that that's not your
18   signature?
19       A.   I went to the extent of hiring an FBI analyst,
20   document expert to say that that's not my signature.
21       Q.   And you don't recognize as that being your
22   signature; correct?
23       A.   Nope.
24       Q.   And that's a copy?
25       A.   Sorry?
```

02:32 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 212**

```
          1       Q.    That's a copy?

          2       A.    It looks like -- but blue ink, I don't know.

          3   Is this a copy?

          4       Q.    It was filed in the case --

02:32     5       A.    This copy says "Original" and the signatures

          6   are in black.  This one is in blue.

          7       Q.    You can copy in color.

          8             I'm asking if this was filed in the case?

          9       A.    I'm telling you --

02:33    10       Q.    That's not your signatures?

         11       A.    That's not my signature.

         12       Q.    Let me mark as the next in order -- what's

         13   the next one?

         14             THE REPORTER:  75.

02:33    15             (Deposition Exhibit 75 was marked for

         16             identification and is attached hereto.)

         17   BY MR. MARKHAM:

         18       Q.    Can you look at those two signatures on the

         19   Exhibit 75 and let me know whether you recognize the

02:33    20   signatures on those?

         21       A.    What signatures?

         22       Q.    The signature on -- the first signature, the

         23   one that's on the actual copy of the check, you see

         24   that?

02:33    25       A.    Yes.
```

**PLAINTIFFS' EXHIBIT B - 213**

1          Q.    This check's made payable to Paul Edalat;

2    correct?

3          A.    Correct.

4          Q.    And that's somebody's signature.  Do you

02:33     5    recognize that?

6                MR. DIULIO:  Objection.  Lacks foundation.

7                THE WITNESS:  There was only -- at the time

8    these checks were cut, it was either Bruce or -- no,

9    actually, sorry.  This is from Dare 2 Dream.  I don't

02:34    10    know whose signature that is.

11    BY MR. MARKHAM:

12          Q.    Take a look at the signature over to the

13    side.

14                Does that look like a signature of yours

02:34    15    where you endorsed that check?

16          A.    Is this the original document?  Where is the

17    check?

18          Q.    I'm just asking if you can recognize the

19    signature?

02:34    20          A.    I won't be able to answer until you

21    authenticate this document with the originals and you

22    put it in front of me with the original signatures, sir.

23          Q.    Do you recognize the number of the account

24    below the signature?

02:34    25          A.    I don't.

**PLAINTIFFS' EXHIBIT B - 214**

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | Q.   You don't think that's an account in which                    |
|        | 2  | you had signing authority?                                         |
|        | 3  | MR. DIULIO:  Objection.  Asked and answered.                       |
|        | 4  | THE WITNESS:  Do you want me to guess?                             |
| 02:34  | 5  | BY MR. MARKHAM:                                                     |
|        | 6  | Q.   I'm asking if you do, if you know.                            |
|        | 7  | A.   I don't know.                                                  |
|        | 8  | Q.   Okay.                                                          |
|        | 9  | MR. DIULIO:  Thank you.                                            |
| 02:35  | 10 | (Deposition Exhibit 76 was marked for                              |
|        | 11 | identification and is attached hereto.)                            |
|        | 12 | BY MR. MARKHAM:                                                     |
|        | 13 | Q.   So do you recognize this document?                            |
|        | 14 | A.   Yes.                                                           |
| 02:36  | 15 | Q.   What is it?                                                    |
|        | 16 | A.   This is a document that I had retained Mr. Phil                |
|        | 17 | Sprague, analyst for -- 25-year document expert working            |
|        | 18 | various federal agencies from the FBI to other law                 |
|        | 19 | enforcement to analyze the signature on the lease that             |
| 02:36  | 20 | was forged and to come up with the analysis of the                 |
|        | 21 | signature on the lease.                                            |
|        | 22 | Q.   Okay.  Now, do you see in this document where               |
|        | 23 | the expert points to or reveals what he calls the                  |
|        | 24 | questioned signature, the signature that he's trying               |
| 02:36  | 25 | to determine whether or not it is yours?                           |

**PLAINTIFFS' EXHIBIT B - 215**

1        A.   Yes.

2        Q.   Where is that?

3        A.   I'm sorry, what was that?

4        Q.   Where is that?

02:36   5        A.   Yep, it says, "The known six signatures of Paul

6    Edalat appear to have been created by the same hand.

7    And all known signatures, there's a small hook like

8    indicator at the bottom of all signatures.  Some of

9    these hooks" -- "some of these hooks are very light and

02:37   10   upon magnification can be seen.  There is no such hook

11   under questioned document's signature for -- Paul

12   Edalat's signature."

13       Q.   Does it indicate to you which is the

14   questioned document signature?  Will you agree with me

02:37   15   that the questioned document --

16       A.   There's six signatures that I gave him and then

17   there's the questioned document.  So, obviously, the

18   questioned document is the counterfeit, forged.  And the

19   six signatures that I have gave him say that they're all

02:38   20   the same, the hooks are the same.  So the one document

21   in question doesn't have that particular hook.  So how

22   much more clear do you want than that?

23       Q.   It looks like to me that the questioned

24   document is the one on the very top, the first

02:38   25   signature appearing on the top of the page 4 out of 5,

**PLAINTIFFS' EXHIBIT B - 216**

1     if you look at the blue numbering up above.

2            A.    Which -- are you looking at page 3?

3            Q.    Actually -- yeah, page 3, but the way we do

4     it is the court version because that will always stay

02:38  5     the same.  Look at the top.

6            A.    All right.

7            Q.    Is that right?

8            A.    All right.

9            Q.    I'm asking you, is that --

02:38  10            A.    Sir, he's an expert, 25 years.  I'm not a

11     handwriting --

12            Q.    I'm asking you --

13            A.    Hold on.  Hold on.  Hold on.  I'm not a

14     handwriting expert.  Okay.  That signature is not mine.

02:38  15     He's saying these other six signatures are mine.  The

16     signature in question doesn't have the hook, so that

17     signature is not my signature.

18            Q.    Now --

19            A.    Now, what is your question?

02:39  20            Q.    My question is, could you circle and put an

21     initial around the signature that you say is not

22     yours?

23            A.    Sure.

24                  MR. DIULIO:  That's fine.  Go ahead.

02:39  25     ///

**PLAINTIFFS' EXHIBIT B - 217**

BY MR. MARKHAM:

1

2      Q.    Will you agree with me that that is what the

3   expert calls the questioned document, the one he's

4   trying to figure out whether that's your signature?

02:39   5   That's what you hired him for, right --

6      A.    Yes.

7      Q.    -- to give you an opinion?

8      A.    Yes.

9      Q.    Now, did he or did he not have the original

02:39   10   lease when he did this analysis?

11      A.    The lease had a chain of custody.  It was sent

12   from Greg Cullen as an email from our office, sent to

13   myself and Amir Asvadi and I think John Crowther.  From

14   there, it was forwarded to -- it's a document, it's a

02:39   15   PDF document, forwarded to Mr. Phil Sprague for

16   evaluation.

17      Q.    And he evaluated the copy that was forwarded

18   to him; right?

19      A.    That was the copy that was forwarded to us, if

02:40   20   you want to look at the chain of custody -- I didn't go

21   make this document.  The document was given to us by

22   Greg Cullen from the office.  He scanned it in.  You

23   need to go ask him where he got the document.

24      Q.    I'm not asking you where Greg Cullen got the

02:40   25   document.  I'm asking you if your document that your

PLAINTIFFS' EXHIBIT B - 218

```
 1   expert examined as the questioned document had been

 2   sent to him as a PDF from somebody and you believe

 3   that to be the genuine copy of the lease?

 4       A.   Well, the email specifically said something

 5   like, the guys -- the lease that's in question is

 6   attached and it was sent to us.

 7       Q.   By email?

 8       A.   From Greg Cullen and I think one other time

 9   from Leslie Woods.

10       Q.   By email -- by email attachment?

11       A.   By email attachment.

12       Q.   Okay.  So your expert did his analysis based

13   upon an email attachment, which is a copy?

14       A.   Okay.  But let me ask you this --

15            MR. DIULIO:  You have answered the question.

16            THE WITNESS:  That's fine.

17   BY MR. MARKHAM:

18       Q.   Now, if I were to put other signatures of

19   things that you have purported to sign that are

20   copies, are you going to tell me that you are not

21   going to identify them because they're copies or are

22   you going to tell me whether it looks like your

23   signature?  I'll do it --

24            MR. DIULIO:  I'll propose objections to that,

25   but if you're going to move on --
```

02:40
02:40
02:40
02:41
02:41

**PLAINTIFFS' EXHIBIT B - 219**

BY MR. MARKHAM:

Q.   No.  I'm going to -- okay.  This is another document that you attached to one of your pleadings. It's in document number 99.  And it is document 3 of document 99.  And it's Exhibit 3, Articles of Incorporation and Bylaws.

Will you mark that as next in order, please?

A.   Thank you.

(Deposition Exhibit 77 was marked for identification and is attached hereto.)

BY MR. MARKHAM:

Q.   I actually want to ask you some substantive questions about this, so do you -- looking through this, do you recall this being the Articles of Incorporation of Pharma Pak and some related documents?  This was attached to your complaint.

A.   Are these documents that we submitted?

Q.   It is a document that is on -- it is submitted as part of document 99 and document 99 is a document that you submitted, yes.

A.   Okay.  Looks like it is.

Q.   Okay.  Now, can I ask you to take a look, using the page references at the top of the page, Mr. Edalat, page 28 of 53.

Do you recognize any signature on that page

**PLAINTIFFS' EXHIBIT B - 220**

```
  1   that you believe is yours?
  2        A.   Yeah, the secretary of meeting, that signature
  3   looks to be like mine.
  4        Q.   Take a look at document number -- page number
02:43  5   33 of 53.  Is there a signature on that page that
  6   looks like your signature?
  7        A.   Looks like it.
  8        Q.   Take a look at page 32 of this exhibit.
  9        A.   Yes.
02:43 10        Q.   Does that have a signature that appears to be
 11   yours?
 12        A.   Yes.
 13        Q.   And that's under secretary of the meeting --
 14   over secretary of the meeting?
02:43 15        A.   Correct.
 16        Q.   Take a look at page 35 and 53.  Have you seen
 17   Bruce Cahill's signature enough so that you believe
 18   you can recognize it?
 19             MR. DIULIO:  Objection.  Lacks foundation.
02:43 20   Calls for expert opinion.
 21             THE WITNESS:  No.
 22   BY MR. MARKHAM:
 23        Q.   You can't recognize his -- okay.
 24             Let's do one more, paragraph 37 of 53.
02:44 25        A.   Paragraph --
```

**PLAINTIFFS' EXHIBIT B - 221**

1      Q.    Sorry.  Page 37.

2      A.    Page 37, okay.

3      Q.    Does that look like a signature of yours on

4  this document that you submitted?

02:45   5      A.    Looks like it.

6      Q.    Can we mark as next in order this piece of

7  paper.

8            THE REPORTER:  It's Number 78.

9  BY MR. MARKHAM:

02:45  10      Q.    Mr. Edalat, I'm going to ask you to write

11  your signature ten times on that piece of paper.

12      A.    Absolutely not.

13            MR. DIULIO:  I'm going to object.  Ten times

14  seems excessive.

02:45  15            THE WITNESS:  Hold on.  Hold on.

16            MR. DIULIO:  Just sign once.

17            MR. MARKHAM:  Can I put on the record why I

18  want him to do it?

19            MR. DIULIO:  You can, yes.

02:45  20            MR. MARKHAM:  He has challenged the

21  genuineness of a signature of his and he has both in

22  testimony and every complaint he's filed made

23  allegations that there is a handwriting expert who has

24  done an analysis and come to a conclusion.  Typically,

02:46  25  handwriting experts would like to see the signature

**PLAINTIFFS' EXHIBIT B - 222**

```
 1   signed more than once.  Frequently, they ask for 30 or
 2   40.  I'm asking him to do it ten times for this
 3   limited purpose of using it to have our handwriting
 4   expert do the comparison.
 5              MR. DIULIO:  So I'm going to object that
 6   that's harassing.  And the reason, because he just
 7   authenticated a number of signatures.  So at this
 8   point, you have a universe of signatures, so -- pardon
 9   me?
10              MR. MARKHAM:  Are you telling him not to do
11   it?
12              MR. DIULIO:  I'm telling him -- I'm
13   objecting.  I think it's harassing.
14              MR. MARKHAM:  But I want him to do it anyway.
15              MR. DIULIO:  I don't think it's proper.
16              MR. MARKHAM:  So you're telling him not to?
17              MR. DIULIO:  I'm telling you that I object.
18   I don't think it's a proper request.
19              THE WITNESS:  Let me tell you, I'm not doing
20   it.
21   BY MR. MARKHAM:
22        Q.   Why not?
23        A.   Based --
24              MR. DIULIO:  No.  No.  You don't explain.  I
25   explain why you don't.
```

02:46 (lines 5, 10, 15, 20, 25)

PLAINTIFFS' EXHIBIT B - 223

```
     1   BY MR. MARKHAM:
     2       Q.   You don't want to explain why you don't want
     3   to do it?
     4            MR. DIULIO:  No, he does not.
02:46 5            THE WITNESS:  He's forged my signature.  I
     6   don't want my live signature -- where are you going to
     7   use this?
     8   BY MR. MARKHAM:
     9       Q.   You're going to give it to the court
02:47 10  reporter.  I won't even keep a copy.
    11            Now will you do it?
    12       A.   No.  Why don't you have the judge subpoena.  Go
    13   get your proper subpoena and have it done properly so it
    14   can be sealed.
02:47 15           MR. DIULIO:  We can confer about this, if you
    16   want to have an analysis.
    17   BY MR. MARKHAM:
    18       Q.   No.  I'm asking you if you will sign your
    19   signature on that piece of paper so that our
02:47 20  handwriting expert can analyze your verified signature
    21   from original since you made such a big point that
    22   they weren't originals that you were authenticating.
    23   Yes or no?
    24       A.   I think you need to go see the judge.  It needs
02:47 25  to be sealed.  I will not give my original signatures to
```

**PLAINTIFFS' EXHIBIT B - 224**

1    anyone.

2        Q.    I'll tell you what, if you sign it, I will

3    agree that -- let me finish.

4        A.    There's a big trust factor between us right

02:47    5    now.  You can't ask me to sign something and hand it to

6    you, knowing what he's already done to my life.

7        Q.    If you had not interrupted me, I was going to

8    allay you of that supposed fear as well.

9        A.    First of all, let me explain something to you,

02:47   10    I have no fear of you, no fear of him.  I only have a

11    fear of something that can take my life tomorrow, which

12    is up there.  So don't call -- don't bring fear into

13    this.  It's not fear.  It's called being smart, being

14    practical.  You think I'm going to sign a document

02:48   15    that's handed over to you?  What do you think?

16            MR. MARKHAM:  Can I now put something on the

17    record?

18            I'm willing, if he does it, to allay him of

19    that concern, you can hold it, you can hold the

02:48   20    original.  And that way, it never serves any

21    illegitimate purpose and we can make arrangements with

22    my handwriting expert to come over here and look at

23    it.  With that proffer, are you willing to do it?

24            MR. DIULIO:  With that proffer, I will

02:48   25    consider that request.

**PLAINTIFFS' EXHIBIT B - 225**

```
 1              MR. MARKHAM:  I want it done.  The case is
 2   going on.  I want it done.
 3              MR. DIULIO:  I will consider that request.
 4              MR. MARKHAM:  I want the signatures done in
 5   front of me, so it's got to be done today.  You can
 6   keep it.
 7              MR. DIULIO:  So I will consider that request.
 8              MR. MARKHAM:  All right.  If it's not done by
 9   the end of the day, I got no choice --
10              MR. DIULIO:  You've verbated yourself.  I
11   said I'd consider it.
12              THE WITNESS:  And I'll do it under seal.
13   BY MR. MARKHAM:
14       Q.   You'll give it to your lawyer.
15       A.   Under seal.
16              MR. DIULIO:  I will take care of that part.
17              MR. MARKHAM:  Okay.  We solved the problem.
18              THE VIDEOGRAPHER:  Counsel, we have --
19              MR. MARKHAM:  Let's take five minutes.
20              THE VIDEOGRAPHER:  This marks the end of
21   videotape number 2 in the deposition of Paul Edalat.
22   We're going off the record.  The time is 2:49 p.m.
23              (Recess was taken.)
24              THE VIDEOGRAPHER:  We're back on the record.
25   The time is 2:55 p.m.  This marks the beginning of
```

02:48  5
02:48  10
02:48  15
02:49  20
02:55  25

**PLAINTIFFS' EXHIBIT B - 226**

```
 1    videotape number 3 in the deposition of Paul Edalat,
 2    which is being taken at 695 Town Center Drive,
 3    Suite 700 in Costa Mesa, California.  The videographer
 4    is Sherri Mulford here on behalf of The Sullivan Group
 5    of Court Reporters.
 6    BY MR. MARKHAM:
 7        Q.   Okay.  Mr. Edalat, did you ever use any space
 8    at Suite 200, Sky Park Circle?
 9        A.   Yes.
10        Q.   You used it for Sentar, did you not?
11        A.   It's a Pharma Pak building.
12        Q.   Did you use it for Sentar?
13        A.   I mean, Bruce gave me an office.
14        Q.   I got a letter from Gouya Ranekouhi.
15             You know who she is, don't you?
16        A.   Yes.
17        Q.   In fact, she is still counsel in this case,
18    but she's seeking to be removed; correct?
19             MR. DIULIO:  It lacks foundation.
20             If you know.
21             THE WITNESS:  I don't know.
22    BY MR. MARKHAM:
23        Q.   Do you know?
24        A.   No.
25        Q.   By the way, she represented Sentar
```

02:56 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 227**

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | Pharmaceuticals, Inc. in this case.                |
|       | 2  | Do you recall that?                                |
|       | 3  | A.   I don't.                                      |
|       | 4  | Q.   Are you familiar with a company called Sentar |
| 02:56 | 5  | Pharmaceuticals, Inc.?                             |
|       | 6  | A.   As to -- it's a party to this case?           |
|       | 7  | Q.   Yes.                                          |
|       | 8  | A.   Yes.                                          |
|       | 9  | Q.   That is a different entity, is it not, from   |
| 02:57 | 10 | the Sentar Pharmaceuticals, which is a dba of      |
|       | 11 | EFT Global Holdings; correct?                      |
|       | 12 | A.   Yes.                                          |
|       | 13 | Q.   Do you have any affiliation at all with       |
|       | 14 | Sentar Pharmaceuticals, Inc.?                      |
| 02:57 | 15 | A.   I think the only reason we filed that         |
|       | 16 | corporation was to protect the trademark of Sentar |
|       | 17 | Pharma based on counsel's advice.                  |
|       | 18 | Q.   So all that company does is to act -- to give |
|       | 19 | you the legal basis for asserting a trademark, which a |
| 02:57 | 20 | dba could not do?                                  |
|       | 21 | A.   What the company did, we had an issue in the  |
|       | 22 | past where various parties would go and register our |
|       | 23 | companies overseas.  So what we did, we filed in Nevada |
|       | 24 | to protect the name, reserve the name if we needed to |
| 02:57 | 25 | use it at some point.                              |

**PLAINTIFFS' EXHIBIT B - 228**

1     Q.    Does it have any assets?

2     A.    No.

3     Q.    And does it have a bank account?

4     A.    No.

02:57   5     Q.    And who manages it?

6     A.    I don't think it's being managed.  It's just a

7   corporation filed.

8     Q.    And it was to protect the trade name --

9     A.    Yeah, it was to protect --

02:58   10    Q.    Let me finish my question.

11          It was to protect the trade name Sentar

12   Pharmaceuticals, which is a dba of EFT Global

13   Holdings?

14    A.    I think that's the reason that the attorney

02:58   15   advised us to do that in the state of Nevada.

16    Q.    Okay.  Attorney Gouya Ranekouhi wrote a

17   letter some time ago claiming that you had a lot of

18   property in -- I'm sorry -- that Sentar

19   Pharmaceuticals had a lot of property in Suite 202,

02:58   20   Sky Park Circle, and she claimed that was property put

21   in there by you, couches, TVs and things; is that

22   correct?

23    A.    Yes.

24    Q.    Who owns that, you or Sentar Pharmaceuticals?

02:59   25    A.    It was my furniture, even Bruce admitted in his

**PLAINTIFFS' EXHIBIT B - 229**

```
 1    deposition.  The TV and the conference room table and my
 2    office furniture, RJ's office, those are all mine, so --
 3        Q.   RJ Demman.
 4        A.   RJ Demman, which Olivia was using.  I think the
 5    majority of the furniture up there, except Bruce's
 6    office and Leslie's office, the furniture were theirs.
 7        Q.   "Theirs" meaning --
 8        A.   Their personal furniture.
 9        Q.   And do you recall when you moved that
10    furniture in?
11        A.   I think it was at some point at the beginning
12    of 2015 because we needed the furniture for the office
13    and we had some furniture in the Gillette building.  And
14    they contributed and I contributed and put that in the
15    office so we didn't have to spend any additional moneys
16    to buy furniture.
17        Q.   Got it.
18             Do you -- you know a fellow by the name of
19    Luis Navarra, don't you?
20        A.   Yes.
21        Q.   Was he ever an employee of any entity you've
22    been associated with?
23        A.   He was an employee of Sci-Labs Nutraceuticals,
24    Inc. and Pharma Pak.
25        Q.   What did he do?
```

02:59    5
02:59    10
02:59    15
03:00    20
03:00    25

**PLAINTIFFS' EXHIBIT B - 230**

1      A.    He was the production manager.  He ran all our

2    production formulations, pretty much ran the entire

3    operations as far as manufacturing under the direction

4    of Dr. Rafi Sharif in the Sci-Lab Nutraceuticals company

03:00    5    and later in Pharma Pak, he pretty much did the same

6    role, you know, the production that was going to happen

7    and setting up the facility.  As a matter of fact, I

8    think they did a lot of TI, tenant improvement in the

9    building.  They tore down walls and they built labs.  So

03:00   10    a very, very handy person on the team.

11      Q.    And how about Luz Navarro?

12      A.    Luz?

13      Q.    I guess.

14      A.    His sister?

03:01   15      Q.    Is that his sister?

16      A.    Yes.

17      Q.    And what did she do?

18      A.    She actually was in charge of -- I love her to

19    death.  She's a wonderful lady.  She -- in Sci-Labs, her

03:01   20    sole position was that she keeps that lab clean, once on

21    the hour, every hour, she goes around and gets the place

22    all cleaned up.  She was trained highly in maintaining

23    the equipment, how the equipment gets cleaned, how the

24    lab gets cleaned, disinfected.  So probably one of our

03:01   25    best employees we've ever had.

**PLAINTIFFS' EXHIBIT B - 231**

1       Q.    Do you recall the names of any other -- they

2    worked out of the Gillette facility; correct?

3       A.    Yes.

4       Q.    Do you recall any of the names of the other

03:01  5    employees that worked over there?

6       A.    There was the other brother of Luis.  His name

7    is Alonzo Navarro.

8       Q.    He's the brother of Luz Navarro?

9       A.    Yes.  And then there was Alex Rosales, I think.

03:02  10   And Jesse -- I hate myself for doing this, but I don't

11   remember his exact last name.  He was in charge of

12   purchasing and somewhat of compliance.  And then there

13   was Olivia Karpinski.  I think that, you know -- I think

14   that Leslie Woods was on payroll and Bruce Cahill.

03:02  15      Q.    I'm asking about the people working at

16   Gillette?

17      A.    Oh, on Gillette?

18      Q.    Yeah.

19      A.    So Olivia was there too.

03:02  20      Q.    So Olivia worked out of Gillette; correct?

21      A.    She had an office in Gillette and she had an

22   office also -- she shared on Sky Park.

23      Q.    And Luis Navarro worked out of Gillette?

24      A.    Correct.

03:02  25      Q.    Luz Navarro worked out of Gillette?

**PLAINTIFFS' EXHIBIT B - 232**

```
 1         A.    Correct.

 2         Q.    Rosales Alejandro worked out of Gillette?

 3         A.    Correct.

 4         Q.    What did she do?

03:02  5         A.    He.

 6         Q.    He?

 7         A.    Yeah.  He was in charge of -- same thing,

 8    production.  They all worked under Luis, so they ran

 9    production, setting up equipment, tearing down

03:03 10   equipment, warehouse mostly.

11         Q.    Alonzo Navarro?

12         A.    Same as --

13         Q.    Worked out of --

14         A.    Gillette.

03:03 15         Q.    And Martin Garcia?

16         A.    Same.

17         Q.    Okay.  Did you believe that Sentar had any

18    obligation to pay any lease payments for the space it

19    was taking in Sky Park Circle?

03:03 20         A.    No.

21         Q.    And you, again, don't recall signing the

22    lease for that space?

23         A.    Absolutely not.

24         Q.    All right.  Let's mark as exhibit next in

03:04 25   order --
```

**PLAINTIFFS' EXHIBIT B - 233**

1                MR. DIULIO:  Do I have a copy?

2                Thank you.

3                And this is 79.

4                THE REPORTER:  Yes.

03:04    5                MR. MARKHAM:  That's the boss over there.

6                (Deposition Exhibit 79 was marked for

7                identification and is attached hereto.)

8    BY MR. MARKHAM:

9        Q.    Take a look at the first page of Exhibit 79.

03:04   10                Do you have that in front of you?

11       A.    Yes.

12       Q.    And looks like an email between Olivia

13   Karpinski and Bruce Cahill with a copy to you and

14   other people, dated February 11, 2016.

03:04   15                Do you recall seeing this email when it came

16   out in February of this year?

17       A.    I think I do, yes.

18       Q.    And the first line of this reads, "Bruce,"

19   quote, "our distributors that we have worked so hard

03:05   20   to develop relationships with have reached out to me

21   to advise that you told them not to talk to me anymore

22   and that I am out of the picture," period, unquote.

23                Did I read that correctly?

24       A.    The document says that.

03:05   25       Q.    Now, do you know what distributors she was

**PLAINTIFFS' EXHIBIT B - 234**

1    referring to?

2        A.   I think she was referring to Rx Green, Mary's

3    Medicinal.  There was also the group that we were

4    talking to about the equipment, Wes, again these guys

03:06   5    out of Miami and I forget the partner's name.  So I

6    think the account that she was working so hard to

7    maintain as far as the business that Bruce had assured

8    we would have with the equipment that we were going to

9    manufacture and lease out to them.

03:06   10       Q.   So those, again, are Rx Green -- the group

11   out of Florida, what's their formal name?

12       A.   I don't remember the name of the company, but

13   it was -- the gentleman's name is Wes.  I saw his name

14   on the witness list.  There was actually another group

03:06   15   down in San Diego that Bruce had taken Olivia to in

16   meetings, a husband and wife team, and I think there was

17   a group out of Oregon.

18       Q.   That's the group that now has the machine?

19       A.   That stole the machine, yeah.  So that group,

03:07   20   yes.

21       Q.   Can you think of any others?

22       A.   This is something you would ask her.  She was

23   vice president of sales, so she was handling all the

24   sales accounts.

03:07   25       Q.   You can't think of any others?

**PLAINTIFFS' EXHIBIT B - 235**

1        A.    There might have been more.

2        Q.    Can you name any of those more?

3        A.    As an individual -- as a shareholder of the

4   company that didn't have a day to day role in the

03:07   5   company and the founder, no.

6        Q.    Do you know whether any of the distributors

7   that I named actually had contracts with Pharma Pak as

8   of the date this was written, February 11, 2016?

9        A.    Bruce was negotiating those contracts with

03:08   10  Olivia.  They're all the sales calls.  So from what I

11  heard and the excitement was when I came back from

12  Dubai, that we had locked down -- sold some machines and

13  a contract had been done.  And I think we did collect

14  some $40,000 into the company as a payment.

03:08   15       So I'm aware of that contract.  I don't know

16  what the name of the company was, but, again, this was

17  Bruce's show.  He's running the company.  We're all, as

18  shareholders and partners, going by what his direction

19  was.

03:08   20       Q.    So apart from that, can you think of any

21  other contracts that have been locked down?

22       A.    Besides what I've already mentioned on record,

23  I don't recall.

24       Q.    Okay.  Take a look at page 2 of this, if you

03:08   25  would.  This is an email that purports to be from you

**PLAINTIFFS' EXHIBIT B - 236**

```
 1    to undisclosed recipients, but then cc Bruce Cahill,
 2    John Crowther, Re:  Payables.
 3             Can I ask you to read that -- the two emails
 4    on that page and then I'm going to ask you some
 5    questions about them.
 6       A.   Okay.
 7       Q.   Okay.  The first line of the email that looks
 8    like you wrote, says, "Rent cannot be late again."
 9             Do you recall writing this?
10       A.   Looks like I did.
11       Q.   And then the next line says, "I personally
12    guaranteed it, guys, and this will create more
13    problems with my BK."
14             Does "BK" in that line refer to bankruptcy?
15       A.   I don't know.
16       Q.   Or bank?
17       A.   I don't know what it refers to.
18       Q.   But had you personally guaranteed lease
19    payments?
20       A.   I personally guaranteed the building.
21       Q.   The lease payments?
22       A.   The lease of the building, yes.
23       Q.   And you were concerned there may not be
24    enough money to pay, in which case that would trigger
25    your guarantee; correct?
```

03:09 (line 5)
03:09 (line 10)
03:09 (line 15)
03:10 (line 20)
03:10 (line 25)

**PLAINTIFFS' EXHIBIT B - 237**

1      A.   Correct, which it did.

2      Q.   Okay.  Now, you next say, "Please work this

3  out.  We will have major issues."  Then you say, "We

4  are close to getting the financing and sales."

03:10   5      Do you see that line?

6      A.   Yes.

7      Q.   What did you mean by that?

8      A.   The contracts that they're working on as far

9  as -- well, financing was actually, I think, the

03:10  10  investment into the company.

11      Q.   By whom?

12      A.   By the group of partners that were being

13  approached, Greg Cullen --

14      Q.   Shane and Ron?

03:10  15      A.   No.  Ron, no, because that was not going --

16  Shane's was not going to the company to buy my shares,

17  but Ron Franco's was going to the company and Bruce was

18  negotiating all that with them, meeting them multiple

19  times.

03:11  20      Q.   You talked to Greg Cullen, correct --

21      A.   Numerous times.

22      Q.   -- before his investment?

23      A.   A lot.

24      Q.   And you talked to Ron Franco before his

03:11  25  investment?

**PLAINTIFFS' EXHIBIT B - 238**

1      A.    No.   Maybe I met him one time in the conference

2    room when he was there, I think when we went to lunch

3    with him.

4      Q.    Did you tell Shane Scott that you were having

03:11  5    these types of troubles with getting lease payments on

6    time from Pharma Pak?

7      A.    What kind of problems?

8      Q.    You were expressing concern here that the

9    lease payment had to be made because, otherwise, it

03:11  10   would trigger your guarantee.  And Leslie had told you

11   that there may not be enough money to do that.

12          Did you pass that on to Shane Scott?

13     A.    My hands were handcuffed.  I wasn't the CEO.  I

14   mean, that was his job.  So did I tell Shane about the

03:12  15   problems in the company?  I think it was very

16   transparent with Shane even when he met with Bruce that

17   there was -- Bruce was very open book about everything

18   as far as disclosure because, obviously, he serves on

19   boards of directors and, you know, he has to, I guess,

03:12  20   operate at a higher standard.  It was Bruce's as the CEO

21   to tell him that.

22     Q.    And they met?

23     A.    I'm sorry?

24     Q.    Did they meet?

03:12  25     A.    Multiple times in Vegas.  And in Vegas, as a

**PLAINTIFFS' EXHIBIT B - 239**

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | matter of fact, I got the suite for both of them.  They                 |
|       | 2  | had a good time.  They met in Orange County.  Shane came                |
|       | 3  | to his house, wine and dined, you know, I think --                      |
|       | 4  | Q.   Sorry.  Go ahead.                                                  |
| 03:12 | 5  | A.   Sorry.  Before his investment.  He was doing                       |
|       | 6  | his due diligence and we met him in Vegas.  He knew --                  |
|       | 7  | Shane's not -- Shane's an intelligent guy and he knew                   |
|       | 8  | that if he could get an investment into Pharma Pak that                 |
|       | 9  | he can then take the patches that Pharma Pak will make                  |
| 03:12 | 10 | and market them online, that's what he wanted.  And                     |
|       | 11 | that's the route we were going.                                         |
|       | 12 | Q.   And do you recall yourself telling Shane                           |
|       | 13 | anything about these cash flow problems?                                |
|       | 14 | A.   I mean, was it my job to tell him that?                            |
| 03:13 | 15 | Q.   I'm just asking you.                                               |
|       | 16 | A.   I'm nobody in the company.  Is it my job?                          |
|       | 17 | Q.   I'm just asking if you did.                                        |
|       | 18 | A.   I don't recall if I showed him emails, I don't                     |
|       | 19 | know.  But if everything was good and there was no                      |
| 03:13 | 20 | opportunity, then an investor wouldn't get involved.  He                |
|       | 21 | would have moved on.  Correct?                                          |
|       | 22 | Q.   I'm asking what you told him.                                      |
|       | 23 | A.   I'm asking you, why do investors get involved                      |
|       | 24 | in companies?  They see an opportunity.  And Shane's                    |
| 03:13 | 25 | very smart and he's a very savvy investor.  He has                      |

THE SULLIVAN GROUP OF COURT REPORTERS                                   240

**PLAINTIFFS' EXHIBIT B - 240**

```
 1    multiple investments and he did his due diligence and
 2    Matt, his attorney, did it.  They were supplied all the
 3    documents.  They were supplied all the presentations,
 4    financials, everything that he asked for, he got.
 5    You're taking one email out of context and you're asking
 6    if I showed him this?  This is an internal document.
 7    Shane wasn't an investor.  Was I supposed to share
 8    confidential, internal documents between partners?
 9         Q.   I didn't ask you whether you showed him the
10    document.  I asked whether you disclosed to him that
11    there were financial problems and the payroll may not
12    be met, according to Leslie?
13         A.   Am I entitled to?
14         Q.   Entitled to?
15         A.   Yes.
16         Q.   I gather you did not?
17         A.   I'm asking you, sir.  This is a confidential
18    email between three partners and their financial -- the
19    financial person that handles all the -- you know, their
20    books.
21              Am I supposed to show this to everybody?
22         Q.   Take a look at the email just down below the
23    one that you -- that I just asked you about, which was
24    Paul Edalat about, quote, "rent cannot be late again,"
25    exclamation mark, end quote.  This is Leslie Woods
```

03:13    5
03:14   10
03:14   15
03:14   20
03:14   25

**PLAINTIFFS' EXHIBIT B - 241**

1    talking about financial circumstances.

2         Do you recall getting that email?  You

3    responded to it.  I'm just asking, do you recall the

4    email?

03:14   5    A.    That's my response to his email.

6    Q.    Yeah.  So you got that email?

7    A.    I mean, unless you went to Photoshop and mocked

8    up stuff, I guess this is the document that you have and

9    the answer is let the document speak for itself.

03:15   10   Q.    But you recall getting it?

11   A.    What did I just say?

12   Q.    Well, you talked about Photoshopping.  I'm

13   asking you whether you have a memory of receiving from

14   Leslie an email that told you that the bank balance

03:15   15   was $5,000 and that there were more things due than

16   that?

17   A.    So am I responsible for the financials of the

18   company when you have a CEO, a CFO and you have other

19   partners in the company?

03:15   20   Q.    Is that your answer?

21   A.    Absolutely.  I'm a concerned shareholder.  I'm

22   entitled to ask questions.

23         Are you telling me I can't ask questions?

24   Q.    I'm just asking you if that's your answer to

03:15   25   my question.  That's all I'm --

**PLAINTIFFS' EXHIBIT B - 242**

1    A.   And I'm asking you if that is the question, if

2    that was the concern and I'm answering it, then let the

3    document speak for itself.  Let's move to the next

4    document.

03:15   5    Q.   Next page, from Bruce Cahill to you and

6    Crowther, "Capital needs for week 9/22/15."

7         Do you see that?

8    A.   Yes.

9    Q.   And do you recall receiving this document,

03:16   10   this email?

11   A.   It says, "Please see attached spreadsheet from

12   Leslie Wood."

13        Where is the spreadsheet?

14   Q.   I'm asking if you've seen this email?

03:16   15        MR. DIULIO:  I'm sorry.  What's the question?

16        MR. MARKHAM:  Does he recall getting this

17   email?

18        MR. DIULIO:  All right.  Do you recall one

19   way or another?

03:16   20        THE WITNESS:  I don't know.

21   BY MR. MARKHAM:

22   Q.   But you do know that there were problems with

23   getting the bills paid.  And it says down here, quote,

24   "It is obvious at this time the company is going to

03:16   25   need an investment of capital of at least $500,000 to

**PLAINTIFFS' EXHIBIT B - 243**

```
 1    carry it to the next 90 days."
 2           Do you see that?
 3       A.   Okay.
 4       Q.   Do you recall having discussions about that
 5    figure being needed because of the amount of expenses?
 6       A.   Sir, prior to the break about an hour ago, I
 7    did tell you there was financial problems in the
 8    company.  So it was about the same timeline.  Now, it's
 9    being reassured and validated within an email that I
10    don't know where this came from and there's no
11    attachment, if you're claiming this is a -- which I
12    would hope under oath -- if I'm under oath, I'm sure you
13    are too as an attorney.  You're giving me this document
14    that is authentic, then let the document speak for
15    itself.
16       Q.   Okay.  You don't recall getting it or you do?
17           MR. DIULIO:  I think asked and answered,
18    yeah.
19           THE WITNESS:  I don't recall.
20    BY MR. MARKHAM:
21       Q.   Did you ever tell Shane Scott when you were
22    talking to him that Bruce had indicated that he had
23    already put in a lot of money into the company, he
24    wasn't putting in any more; do you recall telling him?
25       A.   I don't recall.
```

03:16   5

03:17   10

03:17   15

03:17   20

03:17   25

**PLAINTIFFS' EXHIBIT B - 244**

1      Q.    Take a look at the next page, it's page 5.

2  Do you see the cc to K -- I can't pronounce that last

3  name.  How do you pronounce that last name, Khaloghli?

4      A.    Yes.

03:18      5      Q.    Who is that?

6      A.    A very dear person to me, like my uncle.  I

7  call him my uncle, but he's been a mentor to me since

8  1996.

9      Q.    How is it he became a mentor to you?

03:18      10      A.    Through time.

11      Q.    Did you ever have a falling out with him?

12          MR. DIULIO:  Objection.  Vague.

13          THE WITNESS:  About what?

14  BY MR. MARKHAM:

03:18      15      Q.    Anything.

16      A.    You know, I've learned in life that -- let me

17  tell you something.  When that gentleman filed a lawsuit

18  against me for RICO, I've had a lot of falling out with

19  a lot of friends, but I thank him for it.  You know why?

03:19      20  I don't have to spend hours and hours wasting my time

21  with people that are useless in my life and

22  backstabbers, cheaters, thieves, frauds, embezzlers.

23          So thank you, Bruce, for filing the lawsuit.

24      Q.    And who are these people that you have shed

03:19      25  as a result of this lawsuit?

**PLAINTIFFS' EXHIBIT B - 245**

```
 1        A.   Well, Alex -- Alex Andropov, who was a friend
 2   of mine, so I thought, a brother that Bruce went to
 3   personally and told him a bunch of lies.  Andy Barath,
 4   who was my neighbor, who introduced us.  Again, you
 5   know, I don't know why I got targeted in this thing,
 6   just because I didn't protect him in his cheating and
 7   stealing out of the company in that first board meeting,
 8   but I can see why, because he's a very vindictive person
 9   and he does go after his partners.
10        But I think if he sued me and left everybody
11   else at the curb, I don't know what I did to him
12   personally, you know.  I wasn't going to sue him.  He
13   sued me because he took first action -- first strike on
14   a RICO Act.  And I've been having to explain this RICO
15   for a time now.  But you know what, I thank him,
16   because, you know what, those people, if they don't
17   respect me after 28 years and what I've done in my
18   career, sir, they can kiss my ass.
19        Q.   Okay.
20        A.   Move on.  But Alex Andropov was a good friend
21   of mine.  I introduced him to Bruce.  I took him you his
22   house and Bruce completely turned him against me.  Then
23   there's Andy Barath.  So it's okay, I get it, but we
24   will leave the judgment day, when this case is over,
25   when I publicize the fact that what this man did to me
```

03:19   5

03:20   10

03:20   15

03:20   20

03:20   25

**PLAINTIFFS' EXHIBIT B - 246**

1    and my family because at 71 years old, he should be

2    staying home, enjoying his life with his family, not

3    going after young talented people.

4          Forget me, forget about me -- because you asked

03:20   5    me a question on break, is Qatar a safe country?  And

6    what I said -- what did I say to you?  It's safe.  I can

7    make it not safe for you.  I have a lot of friends all

8    over the world.  I've recouped my life a hundred times

9    over for what this man did.

03:21   10         So bottom line is this, let me just tell you

11   something, I look at it as a favor what he did by filing

12   the lawsuit because he did clean out the trash out of my

13   life that people that I thought were my friends or my

14   partners or people I trusted.  If they just want to read

03:21   15   a document like you do online or somebody does and they

16   judge me by that, go ahead.  Go ahead.  I don't lose.  I

17   don't intend to lose.

18         And on top of that -- on top of that, the

19   people that he turned against me, he doesn't realize one

03:21   20   thing, those people are like -- they go with the wave.

21   They're like a tsunami.  Wherever the ocean takes them,

22   they'll go with.  So once they get the reality of what's

23   going on in this case, then they'll probably come back,

24   which our friendship is probably tarnished by now.

03:21   25         So I'm at a point in my life I don't care.  But

**PLAINTIFFS' EXHIBIT B - 247**

```
 1   to the extent that he sued my sister and to the extent

 2   he sued that poor girl, Olivia Karpinski who ended up

 3   two months in and out of a hospital with a heart

 4   condition she already has existing in her family, that's

 5   when this man should not go to sleep.  He should think

 6   about that.

 7       Q.   Mr. Edalat, we have -- I think it's -- we

 8   have two more hours today.

 9       A.   Let's take ten hours.  I'll keep talking.

10       Q.   Well, I'm asking you, if you could from now

11   on, and I'm asking you, Counsel, I would really like

12   answers to the questions or else we're going to

13   have --

14       A.   You asked me --

15           MR. DIULIO:  Hold on.

16           THE WITNESS:  You asked me who it was and I'm

17   telling you the story.

18           MR. DIULIO:  I know there's been a lot of

19   back and forth, but your open-ended questions are

20   going to get open-ended answers.

21           MR. MARKHAM:  I asked him who those people

22   were.

23           THE WITNESS:  I named them.

24           MR. MARKHAM:  That was an answer for the

25   names, Kris.  It was not entitled -- okay.  I'm asking
```

03:22  (lines 5, 10, 15, 20, 25)

PLAINTIFFS' EXHIBIT B - 248

1    you to assist and I want a record that I've asked you

2    to assist me to inform your client to answer the

3    question, who is -- names.

4         MR. DIULIO:  I --

03:22    5         MR. MARKHAM:  Hold on.  I'm not finished.

6         MR. DIULIO:  Okay.

7         MR. MARKHAM:  Who -- the question was, who

8    are those people?  That does not require a five-minute

9    response about his philosophy on life and who turns on

03:23   10   him.  That's what he does.  He's been doing it all

11   day.  We're trying to get out of here.  So I am going

12   to ask you, for the record, to ask your client to just

13   answer the questions.

14        You'll have a chance to get all of this

03:23   15   brought out.

16        MR. DIULIO:  Mr. Markham, are you finished?

17        MR. MARKHAM:  I have.

18        MR. DIULIO:  All right.  I will ask that you

19   tighten your questions, make them specific and not ask

03:23   20   the same questions three or four times because when

21   you ask the same question three or four times, it

22   opens up the need -- the perception that there's a

23   need for an explanation.  So let's ask questions,

24   let's make them relatively tight and let's not ask the

03:23   25   same questions over and over.

**PLAINTIFFS' EXHIBIT B - 249**

```
 1              MR. MARKHAM:  I asked the same question once.
 2              MR. DIULIO:  And I will do my best to move
 3   this along.  It's a two-way street.  I know both of
 4   you guys have been fighting like cats and dogs.
03:23  5              THE WITNESS:  No.  No.
 6              MR. DIULIO:  No.  No.  No.
 7              THE WITNESS:  It's not fighting.
 8              MR. DIULIO:  "Fight" is the wrong word.
 9   Okay.
03:23 10              THE WITNESS:  Debate.
11              MR. DIULIO:  Let's not make this a debate.
12   Let's ask questions and make them tight --
13              THE WITNESS:  Ask your questions.
14              MR. MARKHAM:  I need to take a break.
03:24 15              MR. DIULIO:  We're going off the record.
16              THE VIDEOGRAPHER:  We're going off the
17   record.  The time is 3:24 p.m.
18              (Recess was taken.)
19              THE VIDEOGRAPHER:  We're back on the record.
03:30 20   The time is 3:31 p.m.
21   BY MR. MARKHAM:
22        Q.   Okay.  So what exhibits do you have in front
23   of you, just for the record?
24        A.   79.
03:31 25        Q.   So take a look at page 5 of 79.  And I'd ask
```

**PLAINTIFFS' EXHIBIT B - 250**

```
 1    you to read through the entire email chain, which is

 2    page 5 and 6, and I'll ask you questions about it.

 3              (Discussion held off the record.)

 4              THE WITNESS:  All right.

 5    BY MR. MARKHAM:

 6         Q.   You read through it?

 7         A.   Yep -- yes.

 8         Q.   All right.  Do you recall getting an email

 9    from John Crowther in or about July 22, 2015 that has

10    the subject matter -- sent to you and sent to your

11    mentor and Bruce; do you recall this email?

12         A.   I don't.

13         Q.   The first line says, quote, "Very happy to

14    learn that Gluck is asserting all is good regarding

15    the patent filings," unquote.

16              Did I read that correctly?

17         A.   Looks like what you read.

18         Q.   Do you know what patents he was talking

19    about?

20         A.   The -- I think he was referring to the

21    sublingual delivery system patents.

22         Q.   You say "patents."  Is there one or more than

23    one?

24         A.   There was quite a few.

25         Q.   And how many of them have been -- are the
```

03:33   5
03:34   10
03:34   15
03:34   20
03:34   25

**PLAINTIFFS' EXHIBIT B - 251**

| | |
|---|---|
| 1 | subject of pending applications? |
| 2 | A.   Which patents? |
| 3 | Q.   Sublingual. |
| 4 | A.   Well, they're going through various countries |
| 03:35  5 | for approval. |
| 6 | Q.   How many have been filed in the |
| 7 | United States? |
| 8 | A.   One. |
| 9 | Q.   That's the one we referred to earlier today? |
| 03:35  10 | A.   I think so. |
| 11 | Q.   Have you filed any other patents in the |
| 12 | United States? |
| 13 | A.   Yes. |
| 14 | Q.   Patent applications? |
| 03:35  15 | A.   Yes. |
| 16 | Q.   Which ones? |
| 17 | A.   The transdermal patch patents in Pharma Pak |
| 18 | that they tried to transfer out. |
| 19 | Q.   Those were invented by you? |
| 03:35  20 | A.   Yes.  It says Paul Edalat, inventor. |
| 21 | Q.   How many of those were there? |
| 22 | A.   Three. |
| 23 | Q.   Can you identify them, describe them in any |
| 24 | way that differentiates one from the other, other than |
| 03:35  25 | that they are transdermal? |

**PLAINTIFFS' EXHIBIT B - 252**

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:36 | 5 |

```
 1      A.   Yeah, it was for the use of CBD and CBTHC and I
 2  think THC.
 3      Q.   Those are separate ones?
 4      A.   Yes.
 5      Q.   And those have been filed, those
 6  applications?
 7      A.   They were filed during the time when Pharma
 8  Pak -- I think last year with Peter Gluck and Bruce's
 9  direction.
10      Q.   All right.
11      A.   And Dr. Weimann's -- Dr. Weimann's contribution
12  to the patent.
13      Q.   Who invented those?
14      A.   The documents say I did, so I did.
15      Q.   Did you?
16      A.   Yes.
17      Q.   And who owns them now?
18      A.   I do.
19      Q.   Any other patents besides those three
20  transdermal patches?
21      A.   They haven't been granted, but they're
22  provisionals.
23      Q.   Provisional patents?
24      A.   Yes.
25      Q.   And is the sublingual patent -- has that been
```

03:36   10
03:36   15
03:36   20
03:36   25

**PLAINTIFFS' EXHIBIT B - 253**

1    granted or is that provisional or what's the status of

2    that in the United States?

3        A.   No, I don't think it's been granted in the

4    United States.

03:36   5        Q.   Not even provisionally?

6        A.   Well, provisionally, from the day you file, you

7    have to agree to operate.

8        Q.   Okay.  And that's the status that this

9    sublingual one is in now, it's application pending?

03:37   10       A.   Yes.

11       Q.   Okay.  This email goes on to say that, quote,

12   "He has more than once told me that he would put

13   together a matrix tracking the current status and

14   future steps needed in the countries of interest."

03:37   15           Did he ever put together that matrix?

16       A.   Yes, he did.

17       Q.   Do you have a copy of it?

18       A.   Is it relevant?

19       Q.   Just asking if you have a copy of it?

03:37   20       A.   I do, but it's irrelevant.

21       Q.   Are you willing to produce it?

22       A.   No, it's not relevant to the case.  You can go

23   through the proper, I guess, subpoena --

24           MR. DIULIO:  Right.  Right.

03:37   25           THE WITNESS:  You guys can discuss that.

**PLAINTIFFS' EXHIBIT B - 254**

|     | 1  |             MR. DIULIO:  We can discuss that. |
|-----|----|-----|
|     | 2  |             THE WITNESS:  I'm not going to give you |
|     | 3  | anything just because you ask for it.  You've got to |
|     | 4  | go through the proper channels to get it. |
| 03:37 | 5  | BY MR. MARKHAM: |
|     | 6  |     Q.   It goes on to say, "No surprise, given the |
|     | 7  | balance owed, but it would certainly be a valuable |
|     | 8  | tool to have." |
|     | 9  |             Do you know what balance he's talking about? |
| 03:38 | 10 |     A.   No. |
|     | 11 |     Q.   Are you aware that when Peter Gluck's firm, |
|     | 12 | Brown Rudnick sent his bills, he sent them to |
|     | 13 | EFT Global Holdings? |
|     | 14 |     A.   I don't have an accounting, I don't know. |
| 03:38 | 15 |     Q.   Well, you were operating for EFT Global |
|     | 16 | Holdings; correct?  They're the patent owner.  They're |
|     | 17 | the patent assignee. |
|     | 18 |     A.   Again, Counsel, what does this have to do with |
|     | 19 | Pharma Pak?  Show me the relevance. |
| 03:38 | 20 |     Q.   I'd like an answer. |
|     | 21 |             MR. DIULIO:  I think the answer was he said |
|     | 22 | he didn't know. |
|     | 23 |             THE WITNESS:  I don't know. |
|     | 24 |             You want to hear an answer you want to hear. |
| 03:38 | 25 | You want me to lie.  You want me to grab answers out |

**PLAINTIFFS' EXHIBIT B - 255**

|     |     |
| --- | --- |
|     | 1   of the air and tell you what you want to hear.  When |
|     | 2   you don't get the answer, you don't like it. |
|     | 3   BY MR. MARKHAM: |
|     | 4       Q.   I'm just asking you, is your answer to the |
| 03:38 | 5   question why they were billing EFT Global Holdings is |
|     | 6   you don't know? |
|     | 7       A.   Sir, EFT Global Holdings is the patent |
|     | 8   assignee.  Would they not bill EFT Global Holdings? |
|     | 9       Q.   Good answer.  Thank you. |
| 03:39 | 10      A.   All right.  Geez. |
|     | 11      Q.   And so were they owed a balance by EFT Global |
|     | 12  Holdings? |
|     | 13          MR. DIULIO:  Objection.  Vague as to time. |
|     | 14  BY MR. MARKHAM: |
| 03:39 | 15      Q.   Ever. |
|     | 16      A.   I don't know. |
|     | 17      Q.   Well, take, for example, July 22, 2015, John |
|     | 18  Crowther says, "No surprise, given the balance owed." |
|     | 19          Does that indicate to you or refresh your |
| 03:39 | 20  recollection that there was a balance owed? |
|     | 21      A.   There's always balances owed to lawyers. |
|     | 22          Are you not owed a balance? |
|     | 23      Q.   Do you have any idea what the size of this |
|     | 24  balance was? |
| 03:39 | 25      A.   I don't know. |

**PLAINTIFFS' EXHIBIT B - 256**

```
 1        Q.   Do you think it could have been as much
 2   as $150,000?
 3        A.    It could have been $100 million.  It's a
 4   running balance.
 5        Q.   Have you made any effort to pay that balance?
 6        A.   Me, personally?
 7        Q.   Yeah.
 8        A.   What's the relevancy here to Pharma Pak?
 9        Q.   Has EFT Global Holdings made any efforts to
10   pay that balance?
11             MR. DIULIO:  Objection.  Lacks foundation.
12             THE WITNESS:  We're going in circles.  What
13   does this have to do with Pharma Pak?
14   BY MR. MARKHAM:
15        Q.   Does EFT Global Holdings have a bank account?
16        A.   What does this have to do with Pharma Pak?
17        Q.   I've explained my reasons --
18        A.   What is your -- hold on.  What is your reason?
19   What do you want from EFT?  What do you want from
20   Sentar?  What are you looking for?  What are you looking
21   for?
22        Q.   I've explained it on the --
23        A.   Sir, I'm asking you.  You filed a lawsuit.  You
24   drag all these companies into, some are not even, you
25   know, operating.  You just threw at the wall -- excuse
```

03:39   5
03:39   10
03:40   15
03:40   20
03:40   25

**PLAINTIFFS' EXHIBIT B - 257**

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:40 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 03:40 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 03:41 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 03:41 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1  me -- shit at the wall.  So what are you exactly looking

2  for?  Pharma Pak is what we're here to discuss so why

3  are you pulling all these other things into it that are

4  irrelevant, have nothing to do with each other?

5          You know, that's not going to go with my

6  attorneys filing a, you know, dismissal or whatever you

7  guys got to do, you do that.  I want to know.  I want to

8  know as a chairman of Sentar, I want to know what does

9  that have to do with the fact that my company, Pharma

10  Pak, that I founded was stolen?  Explain that to me.

11      Q.    You --

12      A.    I'm a rational guy.  When you explain it to me

13  rationally, I'll answer it.

14      Q.    I don't have to do that, but I will.  We have

15  alleged -- my clients have alleged in the complaint

16  that you lied to them about Sentar, that you -- let me

17  finish my explanation.  All right.  I didn't interrupt

18  you.  That you lied to them --

19      A.    I don't lie.

20      Q.    This is not getting anywhere.

21      A.    No, I don't lie.

22          MR. MARKHAM:  Would you tell him to answer

23  the question about --

24          MR. DIULIO:  Hold on.

25          THE REPORTER:  One at a time.  I can't hear

**PLAINTIFFS' EXHIBIT B - 258**

```
 1   you.

 2           THE WITNESS:  I don't lie.

 3   BY MR. MARKHAM:

 4       Q.   Does EFT have a bank account?

 5       A.   What's the relevance?

 6       Q.   Did it have a bank account in 2015?

 7       A.   What's the relevance to Pharma Pak?

 8           MR. DIULIO:  Objection.  Lacks foundation.

 9           You can answer, if you know.

10           THE WITNESS:  I don't know.

11           MR. DIULIO:  It's a yes or no.

12   BY MR. MARKHAM:

13       Q.   You don't know?

14       A.   What is the relevance?

15       Q.   Did you say you didn't know?

16           Did we get that on the record?

17           MR. DIULIO:  He did.  If you want to ask him

18   the same questions several times, you're --

19           MR. MARKHAM:  I'm not.

20           Could I get the answer read back.

21           THE WITNESS:  You're amazing.  You're truly

22   amazing.

23           MR. DIULIO:  Let's wait for a question.

24           THE WITNESS:  Go ahead.

25           I'm entitled to my opinion.  He's amazing.
```

03:41  (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 259**

```
 1              Go ahead.
 2              (Record read as follows:
 3                  "Q.  Did it have a bank account in
 4              2015?
 5                  "A.  What's the relevance to Pharma
 6              Pak?
 7                  "MR. DIULIO:  Objection.  Lacks
 8              foundation.
 9                  "You can answer, if you know.
03:42   10          "THE WITNESS:  I don't know.")
11      BY MR. MARKHAM:
12          Q.   Okay.
13          A.   Next.
14              MR. MARKHAM:  I need to take a break.
03:42   15          MR. DIULIO:  Sure.  Let's go off the record.
16              THE VIDEOGRAPHER:  We're going off the
17      record.  The time is 3:43 p.m.
18              (Recess was taken.)
19              THE VIDEOGRAPHER:  We're back on the record.
03:47   20      The time is 3:47 p.m.
21      BY MR. MARKHAM:
22          Q.   Let me mark as next in order, Number -- I'm
23      sorry.
24              THE REPORTER:  80.
03:48   25          (Deposition Exhibit 80 was marked for
```

**PLAINTIFFS' EXHIBIT B - 260**

```
 1              identification and is attached hereto.)
 2    BY MR. MARKHAM:
 3        Q.   Do you have Exhibit 80 in front of you,
 4    Mr. Edalat?
 5        A.   Yes.
 6        Q.   This looks like it's from an email address
 7    that you use, right, Paul@sentarpharma.com?
 8        A.   Looks like it.
 9        Q.   And it looks like on March 24, 2015 you said
10    to Bruce Cahill and Dave Gentry -- who is Dave again?
11        A.   He's the CEO of Red Ship.
12        Q.   You mentioned Red Ship earlier.
13             What was he doing specifically for you?
14        A.   He was giving us both financial advice and
15    giving us advice on taking the company public.
16        Q.   By "the company," you meant the EFT Global
17    Holdings dba Sci-Labs at this point, dba Sentar?
18        A.   Yes.
19        Q.   And it says, from you to Bruce, "We need an
20    update ASAP."
21             Do you recall writing that?
22        A.   I don't.
23        Q.   And it looks like from Farah, there are some
24    forecasts, which are attached.
25             Do you see that next below from Farah Barghi
```

03:48  5
03:48  10
03:49  15
03:49  20
03:49  25

**PLAINTIFFS' EXHIBIT B - 261**

```
 1    to Paul Edalat, "FW:  Forecasts"?
 2         A.    Okay.
 3         Q.    And then do you see what's attached, there
 4    appear to be five pages of some figures?
 5         A.    Okay.
 6         Q.    Do you know where those figures came from?
 7         A.    I don't.
 8         Q.    Do you know why Farah would have forwarded
 9    those?
10              MR. DIULIO:   Objection.   Lacks foundation.
11    BY MR. MARKHAM:
12         Q.    To anybody.
13         A.    I don't.
14         Q.    Take a look at the first page of these
15    figures, EFT Global, Inc. income statement actual and
16    forecast.
17              Can you tell me what income resulted in the
18    income statement for the calendar year 2014 direct of
19    $3,012,923?
20         A.    I don't know where this document -- who made
21    this document.  I don't know where these numbers came
22    from.  You're asking me to look at something I never had
23    custody of.  I don't know where you got it, so -- I
24    mean, this looks like some type of a projection with
25    numbers in it, which we used to do all the time at
```

03:50   5
03:50   10
03:50   15
03:50   20
03:51   25

**PLAINTIFFS' EXHIBIT B - 262**

1    Pharma Pak.  Bruce used to create them very well too,

2    showing the numbers, hundreds of millions of dollars in

3    Pharma Pak sale.

4        So I don't know if this was a template they

03:51  5    were using to update because it looks like it says, "We

6    need to update."  So it could have been a template sent

7    from Mr. Alex McCuen, who is kind of our active --

8    interim, kind of like CFO, outside accountant.  This was

9    sent to Farah and then Farah had asked -- she sent it to

03:51 10    me, which I then forwarded to Bruce and Dave Gentry that

11    said, "We need an update."  So if this is the document

12    that's attached to this email and it's authenticated,

13    you can go ask Alex where he got these numbers from.

14        Q.   Okay.  And do you know whether or not EFT

03:52 15    Global Holdings had any income during the year 2014?

16        A.   I don't think so.  I don't know.

17        Q.   And it also reflects in one of the columns

18    there that there's a total income of $3,000,769 and

19    623 cents -- sorry -- $3,769,623.

03:52 20        Do you have any idea whether EFT Global

21    Holdings earned that amount or any amount during 2014?

22        A.   I don't know.

23        What's the relevance?

24        MR. DIULIO:  You've answered the question.

25    ///

**PLAINTIFFS' EXHIBIT B - 263**

BY MR. MARKHAM:

Q.   All right.   Take a look at page 2 of that. Those financial projections, which are the assets and liabilities.

03:52  Do you know whether EFT Global Holdings had cash and cash equivalents at the end of the year of $3,382,611?

A.   I don't know.

Q.   Did it have any cash --

03:53  A.   I don't know.

Q.   -- that you're aware of?

Okay.   There's listed here IP patents -- I'm sorry -- IP pharmaceuticals, $50 million.

Do you see that entry?

03:53  A.   Okay.

Q.   Did EFT Global Holdings have any IP pharmaceuticals that were valued at $59?

MR. DIULIO:   Objection.   Lacks foundation.

THE WITNESS:   You know, this email says here,

03:53  as far as the attachments, it says, EFT Global forecast -- Frcst v11 wo APS.xlsx.pdf EFT Global forecast v11 wo APS.xlsx.pdf EFT Global forcast v11 wo APS.xlsx.pdf.

Sir, where does it say anywhere in this

03:54  document that that was the attachment that was

PLAINTIFFS' EXHIBIT B - 264

1    attached to the email and sent out?  Where did you get

2    this?

3    BY MR. MARKHAM:

4        Q.   I'm just asking --

03:54    5        A.   Did you make this up or did he do it?

6        Q.   I'm just asking you --

7        A.   No, I'm asking you, is it authenticated?

8        Q.   I'm not answering any --

9        A.   I'm not answering anymore questions.  Thank

03:54   10   you.  Authenticate this for me with that email

11   attachment and I'll be more than happy to answer your

12   questions.  Thank you.

13       Q.   Can you put it in front of you because I want

14   the record to -- I want to ask you a few more

03:54   15   questions about it.

16       A.   I already told you what my answer is.  Until

17   you authenticate the document with the email attachment

18   because that gentleman's known for creating a lot of

19   documents and forging signatures, I will not answer any

03:54   20   questions until you've gone out formally, authenticate

21   and brought me back original formats.

22       Q.   Do you know whether at the end of 2014,

23   without regard to looking at that document, EFT Global

24   Holdings had any assets valued at anywhere near

03:54   25   $58 million?

**PLAINTIFFS' EXHIBIT B - 265**

1          A.    Your guess is as good as mine.

2          Q.    You don't know?

3          A.    I don't know.

4          Q.    Why don't you know?

03:54   5          A.    Why would I know?

6                MR. DIULIO:  Objection.  Calls for

7     speculation.

8     BY MR. MARKHAM:

9          Q.    And how about loans, did EFT Global Holdings

03:54   10    have any loans?

11         A.    I don't know.

12         Q.    Do you know why John Crowther wrote checks to

13    EFT Global Holdings?

14         A.    He's a shareholder, very happy shareholder.

03:55   15         Q.    And do you know whether or not there's any

16    loan amount outstanding to EFT Global Holdings?

17         A.    Can I help you out?

18               MR. DIULIO:  Object --

19               THE WITNESS:  Can I help you out?

03:55   20    BY MR. MARKHAM:

21         Q.    Absolutely.

22         A.    You're asking about stuff that's like -- you

23    need to go cover the -- dust off of it.  You need to go

24    find out what's going on in the company now before you

03:55   25    continue making an ass out of yourself and him for

PLAINTIFFS' EXHIBIT B - 266

```
 1    bringing all these documents here that are irrelevant.
 2    The company's moved on, the shareholders are very happy,
 3    I've done my job, I delivered.  The company's doing
 4    fantastic and we're potentially -- I don't know if those
 5    numbers are even close to, you know -- whoever created
 6    them, somebody maybe got pretty close to what we're
 7    going to be doing.  So what's your point?
 8         Q.   Why are the shareholders now happy?
 9         A.   Because I did a good job.
10         Q.   What specifically did you do to make --
11         A.   I did everything I said I was going to just
12    like I did in Pharma Pak when I delivered everything to
13    him and he stole my company.
14         Q.   And what was that?
15         A.   I delivered.
16         Q.   Be specific.  What did you do?
17         A.   You don't need to know right now.  I said go
18    find out.  You have obviously been doing an
19    investigation.  But the thing is, you go and find
20    documents from 2013, '14, you go have a lunch with my,
21    you know, trustee's attorney to muddy my -- listen --
22    listen, let me tell you something, if there's anything
23    going on -- if there's anything going on, that I'm under
24    criminal investigation because this gentleman went and
25    met -- it wasn't the other way around, he actually
```

03:55  5
03:55  10
03:55  15
03:56  20
03:56  25

PLAINTIFFS' EXHIBIT B - 267

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | instigated all those investigations, okay, because he's  |
|       | 2  | a sore loser. His company failed. His company that he    |
|       | 3  | stole EF -- what is it called, Life Tech Global, it shut |
|       | 4  | down. So am I a bad guy or is he? My company is going    |
| 03:56 | 5  | like that. So he's just butt hurt because he didn't      |
|       | 6  | have anything in here, he chose the wrong company and he |
|       | 7  | tried to swindle me out of my own shares.                |
|       | 8  | Q.   He's what hurt?                                      |
|       | 9  | A.   I'm sorry?                                           |
| 03:56 | 10 | Q.   You said he's something hurt.                        |
|       | 11 | A.   Hurt?                                                |
|       | 12 | Q.   You said he's something hurt?                        |
|       | 13 | A.   He's butt hurt.                                      |
|       | 14 | Q.   What does that mean?                                 |
| 03:56 | 15 | A.   He's not happy.                                      |
|       | 16 | MR. DIULIO:  It's slang.                                  |
|       | 17 | THE WITNESS:  Welcome to Cali.  Maybe you                 |
|       | 18 | guys call East Coast, he's --                             |
|       | 19 | MR. DIULIO:  Let's not speculate.                         |
| 03:57 | 20 | THE WITNESS:  I want to ask him, what do you              |
|       | 21 | call them in Boston?                                      |
|       | 22 | BY MR. MARKHAM:                                           |
|       | 23 | Q.   My question was, what specifically have you          |
|       | 24 | done for EFT Global Holdings that the shareholders are    |
| 03:57 | 25 | happy?                                                    |

**PLAINTIFFS' EXHIBIT B - 268**

```
1        A.   I've done my job.

2        Q.   What did you do?

3        A.   Delivered everything I said I was going to do.

4        Q.   Like what?

03:57   5        A.   My patents are issued.

6        Q.   Your patents are issued?

7        A.   Absolutely.

8        Q.   How many patents do you have issued for EFT

9   Global Holdings?

03:57  10        A.   Go check it out.  It's online.

11        Q.   You're not going to tell me?

12        A.   I'm not going to waste your time and mine

13   telling you.  Go look it up.

14        Q.   I'm asking --

03:57  15        A.   What again -- what again does that have to do

16   with Pharma Pak?

17        Q.   So you're not --

18        A.   So you want to come after EFT?  Wait.  Hold on.

19   You want to come after me because he failed and his

03:57  20   shareholders are pissed off at him because he stole

21   their money, he mismanaged bank accounts, he blew over

22   $750,000 of investors' moneys, wired moneys overseas,

23   took cash out of the bank account?  We got a picture of

24   him counting cash in the car.  So what he's trying to

03:57  25   do -- he's very good.  Bruce Cahill is --
```

**PLAINTIFFS' EXHIBIT B - 269**

```
 1        Q.    Slow down so that she can get you.
 2        A.    Bruce Cahill is one of the best, always
 3   deflecting the attention on others.  He won't take
 4   responsibility that he failed the company.  When it
03:58  5   failed, when he got caught, he stole the company, moved
 6   it down to Oceanside.  Okay.  So if you think for one
 7   minute you're going to come after Life Tech Global and
 8   my hard work, sir, I will fight you all the way where
 9   the law allows.  Okay.
03:58 10        Q.    You said Life Tech Global.  That's what you
11   meant, is it?
12        A.    No.  Life Tech Global is the company that he
13   currently is now owning.  He is an owner in Life Tech
14   Global.  He can say he's not, we know he is.  I've hired
03:58 15   fantastic investigators.  I've hired fantastic lawyers,
16   much better than what he did because he probably put you
17   on some kind of a hybrid or contingency.  You thought
18   you were going to come after me for 2 million bucks,
19   you're going to get something out of it.  I assure you
03:58 20   one thing, I will not give you one penny.  As a matter
21   of fact, I'll spend every penny to also bring you to
22   court because you filed a malicious prosecution --
23             MR. DIULIO:  Stop.  Stop.
24             THE WITNESS:  No, you're not getting
03:58 25   anything.
```

**PLAINTIFFS' EXHIBIT B - 270**

|       | 1  | MR. MARKHAM:  Counsel, I'm going to ask again |
|-------|----|-----------------------------------------------|

      1      MR. MARKHAM:  Counsel, I'm going to ask again

      2   for you to direct your client to answer the question.

      3   I asked him a very specific question as the record

      4   will reflect.  He has now yet again given an answer

03:58   5   that is completely off message.

      6      For the record, so that we can get through

      7   this without having to go to a magistrate, will you

      8   please tell your client to answer the question.  If he

      9   doesn't want to answer it, which is improper, he can

03:59  10   just say so and we can take that up.

   11      THE WITNESS:  What's your question?

   12   BY MR. MARKHAM:

   13    Q.   My question was, how many patents does EFT

   14   Global Holdings have?

03:59  15    A.   Go look it up.  It's a public document.

   16    Q.   You're not going to answer me?

   17    A.   Next question.

   18    Q.   Can you turn to Exhibit 20 in this book right

   19   here.

03:59  20      Do you have Exhibit 20 in front of you?

   21    A.   Yes.

   22    Q.   Can you identify this document?

   23    A.   Where did you get it?

   24      MR. DIULIO:  Objection.  Lacks foundation.

   25   ///

**PLAINTIFFS' EXHIBIT B - 271**

1    BY MR. MARKHAM:

2         Q.   Can you identify the document?

3         A.   Where did you get it?

4         Q.   I'm asking you if you can identify it.

03:59   5         A.   This is a confidential document that was to not

6    be circulated outside the company.  As the chairman of

7    EFT, I at least will ask you, where did you get it, sir?

8    Because you're in breach of confidentiality for

9    publicizing this.  This is a private company.  Where did

04:00   10   you get this document?

11        Q.   I'm asking --

12        A.   Where did you get the document?

13        Q.   I'm not answering your question.

14        A.   Then you know what, we got a big problem.

04:00   15   We're going to go see the judge about this because this

16   is a confidential shareholders list of people that have

17   invested in this company.  My job as the chairman,

18   unlike him, is to protect my company, not put blame on

19   others.  My job is to protect these investors.

04:00   20        Where did you get this document?

21        Q.   Can you identify --

22        A.   Where did you get the document?

23        Q.   I'm not answering --

24        A.   It's a shareholders list.  Where did you get

04:00   25   it?

**PLAINTIFFS' EXHIBIT B - 272**

```
 1              MR. DIULIO:  So --
 2    BY MR. MARKHAM:
 3         Q.   So it's a shareholders list.  Do you know
 4    when it was prepared?
04:00  5         A.   Where did you get it?
 6              MR. DIULIO:  Objection.  Lacks foundation.
 7              Answer, if you know.
 8    BY MR. MARKHAM:
 9         Q.   You're the chairman.  You know about this
04:00 10    document.  I'm going to lay a foundation.
11         A.   Hold on.  Doesn't matter.  Where did you get
12    it?
13              MR. MARKHAM:  Kris --
14              THE WITNESS:  This is a confidential
04:00 15    document.
16              MR. MARKHAM:  He's made his point about that.
17              THE WITNESS:  Yes.  So you --
18              MR. DIULIO:  He's answered the question as to
19    what it is.
04:00 20              Do you know who prepared it?
21              THE WITNESS:  I want to know where you got
22    it?
23    BY MR. MARKHAM:
24         Q.   Do you know who prepared it?
04:00 25         A.   Where did you get it?
```

**PLAINTIFFS' EXHIBIT B - 273**

```
 1              MR. MARKHAM:  Kris --

 2              MR. DIULIO:  Can we go off the record for a

 3     minute?

 4              MR. MARKHAM:  Yeah.

 5              MR. DIULIO:  Thank you.

 6              THE VIDEOGRAPHER:  We're going off the

 7     record.  The time is 4:01 p.m.

 8              (Recess was taken.)

 9              THE VIDEOGRAPHER:  We're back on the record.

10     The time is 4:08 p.m.

11     BY MR. MARKHAM:

12        Q.   Mr. Edalat, you still have in front of you

13     Exhibit 20?

14        A.   Yes.

15        Q.   Can you tell me why this was prepared as of

16     1/21/2015?

17        A.   I don't know.

18        Q.   Do you know how much Blue Torch Ventures paid

19     for its 60 million shares?

20        A.   I don't know.

21        Q.   You're the chairman of the company, are you

22     not?

23        A.   Currently, yes.

24        Q.   Who was the chairman back in January of 2015?

25        A.   I don't know.
```

04:01   5

04:08   10

04:08   15

04:08   20

04:08   25

**PLAINTIFFS' EXHIBIT B - 274**

```
 1        Q.    And do you know how much Farah Barghi paid
 2   for her shares?
 3        A.    I don't know.
 4        Q.    Do you know how much the total capital was
 5   that Sentar -- that EFT Global Holdings raised?
 6        A.    I don't know.
 7        Q.    What is Blue Torch Adventures, Inc.?
 8        A.    I don't know.
 9        Q.    You don't know what the company is?
10        A.    No.
11        Q.    You had nothing to do with its formation?
12        A.    No.
13        Q.    Do you know who it paid the money to that it
14   paid to get the 60 million shares that you own?
15        A.    I don't know.
16        Q.    And how much money does EFT Global Holdings
17   dba Sentar Pharmaceuticals -- how much money -- how
18   many assets did it have as of January 2015; do you
19   know?
20        A.    I don't know.
21        Q.    Do you know how much -- how many assets it
22   had as of June 30th, 2015?
23        A.    I don't know.
24        Q.    Do you know of any records that you can refer
25   to to find that out?
```

04:09 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 275**

```
 1        A.    I don't know.

 2        Q.    And do you know how much money it had on hand

 3   in -- June 30, 2015?

 4        A.    Do you find this amusing?  If he's going to sit

 5   there and harass me --

 6             MR. CAHILL:  I'm not harassing him.  I'm

 7   sitting here.

 8             THE WITNESS:  Maybe you should go outside.  I

 9   gave you respect when you were taking your deposition.

10   So if you don't want to respect me, then go outside.

11   BY MR. MARKHAM:

12        Q.    Could you answer my question, please?

13        A.    Could you tell him to turn his face --

14        Q.    I want my question answered.

15        A.    You know what, stop your shenanigans.  Okay.

16   Why don't you turn the camera -- why don't I do this,

17   why don't I film him while you're filming me.  How's

18   that?

19        Q.    I want you to answer --

20        A.    Okay?  Is that okay with you?

21             MR. DIULIO:  No, let's not do that.

22             THE WITNESS:  He's sitting there harassing

23   me.  Is that what you guys are doing, dog and pony

24   show here?  You want to harass me?  Look at him, he's

25   still smirking.  Look at him.
```

04:10 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 276**

```
 1                MR. MARKHAM:  Kris --
 2                THE WITNESS:  Why are you asking Kris?  I'm
 3    48 years old, sir --
 4                MR. DIULIO:  Mr. Markham, I do --
04:10   5         THE WITNESS:  Have respect.
 6                MR. DIULIO:  I can hear it and I know you can
 7    hear it too.  So --
 8                THE WITNESS:  If you want --
 9                MR. DIULIO:  We don't want both of the --
04:10  10    Mr. Cahill not make sounds and Mr. Edalat answer the
11    questions.
12    BY MR. MARKHAM:
13         Q.   Please answer the questions.
14              How much cash did EFT Global Holdings, Sentar
04:11  15    Pharmaceuticals have on hand on June 30, 2015?
16         A.   I don't know.
17         Q.   Do you know how many patents they had in
18    their name?
19         A.   Don't know.
04:11  20         Q.   How about at the end of 2015?
21         A.   Don't know.
22         Q.   How about after the first quarter of 2016?
23         A.   I don't know.
24         Q.   How about the first quarter of 2015?
04:11  25         A.   My answers are all going to be I don't know.
```

**PLAINTIFFS' EXHIBIT B - 277**

```
 1          Q.   Yet, you were out raising money for Sentar?

 2          A.   How do you know?

 3          Q.   Were you?

 4          A.   How do you know?

 5          Q.   I'm asking whether you were.

 6          A.   No, you --

 7               MR. DIULIO:  Object.  Assumes facts.

 8   BY MR. MARKHAM:

 9          Q.   Let me withdraw that question and ask another

10   one.

11          A.   I'm doing your job for you, so tell me.

12          Q.   Were you out raising any money from anyone on

13   behalf of Sentar?

14               MR. DIULIO:  Objection.  Vague.  Vague as to

15   time.

16   BY MR. MARKHAM:

17          Q.   In 2015.

18          A.   I don't know.

19          Q.   How about in 2014?

20          A.   Don't recall.

21          Q.   How about in 2016?

22          A.   Don't recall.

23               That was easy; right?  Direct questions, direct

24   answers, without the circus act.

25          Q.   Did you ever mention involving Shane Scott in
```

04:11  5
04:11  10
04:11  15
04:11  20
04:12  25

**PLAINTIFFS' EXHIBIT B - 278**

```
 1   Sentar?

 2       A.   No.  Hold on.  At what level?

 3       Q.   Any level, involving at all.

 4            MR. DIULIO:  Objection as vague.  Vague as to

 5   involvement.

 6            THE WITNESS:  Yeah.  What level?

 7   BY MR. MARKHAM:

 8       Q.   Any level.

 9            MR. DIULIO:  Objection.  Vague.

10            THE WITNESS:  I don't recall.

11   BY MR. MARKHAM:

12       Q.   Okay.  Did you ever tell him that you wanted

13   him to market Sentar products?

14       A.   I don't think Shane could market Sentar

15   products.

16       Q.   So you didn't?

17       A.   It would be illegal for him.  He'd end up in

18   jail.  You can't market drugs, pharmaceuticals the way

19   you do dietary supplements online.

20       Q.   I didn't say online.  I just said market.

21       A.   Market like what, sell at the swap meet?

22       Q.   Market in any way that's legal for him to do

23   it.

24       A.   It was illegal.  I wouldn't get Shane caught up

25   in illegal activities like Mr. Cahill did and
```

04:12 (line 5)
04:12 (line 10)
04:12 (line 15)
04:13 (line 20)
04:13 (line 25)

**PLAINTIFFS' EXHIBIT B - 279**

1    manufacturing THC tablets and patches in my building.

2        Q.   All right.  Can you take a look at Exhibit 20

3    and tell me whether can you confirm that as of

4    January 21, 2015 100 percent of the ownership had been

04:13   5    sold to shareholders?

6        A.   Let the document speak for itself.  Wherever

7    you got this, it's not authenticated.  I don't know

8    where you got this.  Once you authenticate this

9    document -- and tell me, by the way, the chain of

04:13   10   custody because he claimed I handed it to him.  I would

11   never do that.  I was held under strict nondisclosures

12   with the company, so I don't go disclose confidential

13   information.  Cahill had no interest in this company.  I

14   don't even see his name on the shareholder list.  So I

04:14   15   want to know how you got this document.

16       MR. DIULIO:  Apart from the document, do you

17   have any recollection?

18       THE WITNESS:  No.

19   BY MR. MARKHAM:

04:14   20       Q.   You have no recollection about whether or not

21   it was 100 percent --

22       A.   No.

23       Q.   When was the last time, if ever, that you

24   went out and tried to induce anybody to invest in

04:14   25   EFT Global Holdings dba Sentar pharmaceuticals?

**PLAINTIFFS' EXHIBIT B - 280**

```
 1              MR. DIULIO:  Objection.  Assumes facts.
 2     Vague.
 3              THE WITNESS:  I don't know.
 4              Can you hear me when I talk to him?
04:15  5              THE VIDEOGRAPHER:  I heard you that time.
 6              THE WITNESS:  It's okay.  Attorney-client
 7     privilege though.
 8              MR. DIULIO:  It's fine.
 9              Mr. Markham, you're making the camera go
04:16 10    sideways.
11              THE WITNESS:  He wants the camera on himself.
12     Get him on the camera, so he can see his own shot.  He
13     can take some credit for all this.
14              MR. MARKHAM:  Next in order.
04:16 15              MR. DIULIO:  81?
16              MR. MARKHAM:  81.
17              (Deposition Exhibit 81 was marked for
18              identification and is attached hereto.)
19     BY MR. MARKHAM:
04:16 20         Q.   Do you have Exhibit 81 in front of you?
21         A.   Yes.
22         Q.   This is a check made payable to you on Pharma
23     Pak.
24              Do you have any recall about what this check
04:16 25    was for?
```

**PLAINTIFFS' EXHIBIT B - 281**

```
 1        A.    It looks like it says "reduction of loan."
 2        Q.    Do you know what was the occasion of your
 3   getting this check?
 4        A.    When I had to go beg my partners for some money
04:17  5   that I basically loaned to the company.  And he's
 6   sitting in his $30 million house and the other partner
 7   is sitting on his 300 acres in Camarillo, ocean front.
 8   I had to go beg them to give me some of the money that I
 9   invested in Pharma Pak, give it back to me so I could go
04:17 10   and live.
11        Q.    Was this for living expenses?  I thought it
12   was to pay off a gambling debt?
13        A.    Really?
14        Q.    Is that wrong?
04:17 15        A.    Listen, if you keep assuming because you want
16   to put stuff out there, right, if you keep doing that,
17   we're going to have a big problem.  Do you have proof of
18   that?
19        Q.    I'm asking you --
04:17 20        A.    Do you have proof of that?
21        Q.    -- was this to pay off to a gambling debt?
22        A.    No, it was to pay off a room that he stayed
23   with his mistress -- banging his mistress, Dr. Klein,
24   that weekend in Vegas.  No, I'm telling you, a portion
04:17 25   went to that.  No.  No.  Hold on.  I got the room for
```

**PLAINTIFFS' EXHIBIT B - 282**

him.  He brought his mistress in because he didn't want

his wife to find out.  He drove them up to Vegas; right?

And he was having an external affair, not knowing -- the

wifey didn't know, of course.  This is the best friend

04:18  of the wife.  Look, this is the kind of guy I partnered

with, for God sakes.  Some of this money went towards

Vegas.  She came that weekend and paid some of his

expenses -- his personal expenses.

Q.   How much?

04:18  A.   I don't know.

Q.   Where did the rest of it go?

A.   I'll bring you the invoices.

The rest of it went to paying scumbags like you

guys, lawyers that create these problems.  I'm sorry.

04:18  Not you, just scumbags.  I'm entitled to my opinions

about attorneys.  Good lawyers, Boston lawyers, I don't

know, but scumbags.

Q.   So it went to lawyers' fees and to pay off

expenses of Mr. Cahill's; this is where the check

04:18  went?

A.   You know, you asked me if it went to pay

gambling debts; right?  I'm giving you as a rational

answer as to what you answered me.

Q.   Is your answer true, what you told me?

04:18  A.   Is your question true, what you're asking me?

**PLAINTIFFS' EXHIBIT B - 283**

1    You're assuming.  You're assuming.  You assume that I

2    paid gambling debts.  Do you have proof of that?

3         Q.   I'm asking you --

4         A.   I'm one of Las Vegas's --

04:18    5         MR. DIULIO:  Asked and answered.  He answered

6    the question.

7         MR. MARKHAM:  No, but then he backtracked and

8    said I was just giving you a fantasy answer, so --

9         THE WITNESS:  No, I'm not giving you a

04:19   10    fantasy answer.  Hold on.  Hold on.  I picked up

11   expenses for that gentleman over there and I still

12   haven't got reimbursed for Pharma Pak.  It could have

13   gone towards that.  What's the time on this?  Oh,

14   yeah, right about the summertime when wifey didn't

04:19   15   know about the mistress.

16   BY MR. MARKHAM:

17        Q.   And so you're saying that this check was to

18   reimburse you for payments you had made on

19   Mr. Cahill's behalf in Las Vegas and to pay lawyers;

04:19   20   correct?

21        A.   And the cost of living.

22        Q.   All right.  What --

23        A.   It was my money.  I lent it to the company,

24   interest free, zero percent interest.  I asked for some

04:19   25   of that money back.  I, at that time, had the largest

PLAINTIFFS' EXHIBIT B - 284

1    amount of debt -- of loan owed to me.  They didn't want

2    to, you know -- actually, hold on a second.  I'll tell

3    you something.  John Crowther was very, very kind and he

4    said, "I'm willing to" -- I was supposed to get $80,000

04:19    5    back.  Bruce said, "No, that's all we can do, 40,000."

6    And this is what he gave me, a lousy $40,000 check when

7    the company owned me at that time $240,000.

8         When this guy is sitting in a $30 million

9    house, okay, throws these lavish parties, $50,000 he

04:20    10    gets for a wedding per night, okay, this is the kind of

11    guys I partnered with, him.  And then John Crowther, who

12    was willing to do it, but Bruce talked him out of it

13    because he wanted me to suffer.

14         He wanted me to go through pain because what he

04:20    15    was doing was he wanted me to get diluted down from

16    under the company and out because once he figured out

17    the company has the potential of making money, which

18    after he stole Pharma Pak and took it down to Life Tech

19    Global, which is -- why else would he do it?

04:20    20         After that, he made my life very difficult.  He

21    knew I had no source of income.  He knew that I was

22    traveling for 14 months every other weekend to Vegas to

23    go entertain guys that didn't like him because he talked

24    about young 16-year-old girls that walked by --

04:20    25    Q.    This is not answering the question.

**PLAINTIFFS' EXHIBIT B - 285**

```
 1          A.    Hold on.   Hold on.   I'm telling you, this is
 2    why I needed money.
 3                MR. DIULIO:   To be fair, Mr. Markham, you
 4    asked him and so he's explaining.
 5                MR. MARKHAM:   Could you read back my
 6    question, please.
 7                THE WITNESS:   You never said you liked 16 --
 8    you saw a 16-year-old girl walk by?
 9                MR. DIULIO:   Hold on.
10                THE WITNESS:   I will prove that.   Chad and
11    Rick will both come on record and tell me that.
12    Bruce -- Bruce, you have a problem.
13                MR. DIULIO:   Mr. Markham asked for the
14    question to be read back.   Let's --
15                THE WITNESS:   You have a problem, pal.   And
16    it's not my bankruptcies.   You got bigger problem.
17                Go ahead.
18                (Record read as follows:
19                    "Q.   And so you're saying that this
20                check was to reimburse you for payments
21                you had made on Mr. Cahill's behalf in
22                Las Vegas and to pay lawyers; correct?")
23                MR. MARKHAM:   Now, Kris, just for the record,
24    he is not answering the question with that diatribe.
25    If you want to defend it, I'm stunned, but you can.
```

04:20   5
04:21   10
04:21   15
04:21   20
04:21   25

**PLAINTIFFS' EXHIBIT B - 286**

```
 1            MR. DIULIO:  You shouldn't be stunned.  I
 2    mean, geez, Mr. Markham, you asked him a question.
 3    You asked him what he spent it for and he's explaining
 4    what it was spent for.
 5            THE WITNESS:  You just don't want to hear it.
 6            MR. MARKHAM:  This has to do with 16-year-old
 7    girls?
 8            MR. DIULIO:  Well, that --
 9            THE WITNESS:  No.  It has to do with the fact
10    that I had to go to Vegas.  He didn't though because
11    our partners didn't want him there.
12            MR. MARKHAM:  I'm sorry.  I'm really trying
13    to work on this.  We'll have our meet and confer, but
14    this is not the way depositions are going to be
15    conducted.
16            THE WITNESS:  No, Mr. Markham --
17            MR. DIULIO:  Hold on.  Paul -- Paul, no --
18            THE WITNESS:  This is not the way you like to
19    take depositions because I told you, you've never met
20    a guy like me.  I'm not going to lie to you and I will
21    tell you the truth.  But if you want to bend it, if
22    you want to call me a fraud, fuck you.
23            MR. DIULIO:  Stop.
24            THE WITNESS:  Okay.  Don't call me a fraud.
25    I've never defrauded -- I've never defrauded anyone
```

04:22 (lines 5, 10, 15, 20, 25)

**PLAINTIFFS' EXHIBIT B - 287**

```
 1   and don't you ever make claims like that.  Okay.  I'm
 2   not the one that's got problems like him, cheating on
 3   his wife.  If you cheat on your wife, you're going to
 4   cheat on your partners.
 5           MR. MARKHAM:  Kris, I got to tell you --
 6           THE WITNESS:  This is the truth.  The truth
 7   is ugly.  Why did you want me here?
 8           MR. DIULIO:  Can we go off the record,
 9   please.
10           MR. MARKHAM:  No, sorry, this --
11           MR. DIULIO:  I'm requesting to go off the
12   record and I'm going off the record.
13           THE WITNESS:  You can't handle the truth,
14   that's what it is.  When you sue me for RICO, I open
15   up everything about your life, pal.
16           THE REPORTER:  We have to have an agreement
17   between all --
18           THE WITNESS:  Keep it on record.  I'm going
19   to open up everything about your life.  Okay.
20           MR. DIULIO:  A couple times they've gone off
21   the record, so --
22           THE WITNESS:  You sue my little sister for
23   what?  For what?  Because you're a loser.
24           THE REPORTER:  Everyone was in agreement.
25           MR. MARKHAM:  I agree now.
```

04:22  5
04:22 10
04:23 15
04:23 20
04:23 25

**PLAINTIFFS' EXHIBIT B - 288**

```
 1              THE VIDEOGRAPHER:  Going off the record.  The
 2      time is 4:23 p.m.
 3              (Recess was taken.)
 4              THE VIDEOGRAPHER:  We're back on the record.
 5      The time is 4:31 p.m.
 6              MR. MARKHAM:  Let's agree now how long we are
 7      going so we stay within bounds.
 8              MR. DIULIO:  I apologize if this cramps into
 9      things, but I really do have to leave by 5:30.
10              MR. MARKHAM:  We won't finish, but that's all
11      right.
12              MR. DIULIO:  And I -- you know, I understand
13      we're going to a second day anyway, so I did not plan
14      for a late night.
15      BY MR. MARKHAM:
16         Q.   All right.  Did you ever communicate to Shane
17      Scott that you were closing a billion dollar deal?
18              MR. DIULIO:  Objection.  Vague as to time.
19      BY MR. MARKHAM:
20         Q.   Anytime.
21         A.   In what?
22         Q.   Anything.
23         A.   I don't think so.
24         Q.   Did you ever tell Shane Scott that you had
25      signed up John Neubauer as an officer in Sentar?
```

04:30 — line 5
04:31 — line 10
04:31 — line 15
04:31 — line 20
04:31 — line 25

**PLAINTIFFS' EXHIBIT B - 289**

1       A.    I don't recall.

2       Q.    Did you ever tell him you signed up John

3  Neubauer as an officer in Pharma Pak?

4       A.    I think we used John Neubauer as consulting

04:32  5  work with Bruce because John Neubauer was a very

6  reputable -- I knew him from back in the days from

7  Herbalife.  He was ex-CFO of Herbalife when Herbalife

8  went public, which was my friend's company, Mark Hughes.

9  So John was a very respectful individual in the industry

04:32  10 and I brought him in to assist with the financial

11 projections or models that we were trying to build

12 because he was an expert in the nutraceutical industry.

13      Q.    Did you ever have the CEO of Herbalife in

14 your offices?

04:32  15      A.    That would be impossible.

16      Q.    Did you ever meet with the CEO of Herbalife

17 in his office?

18      A.    Mark Hughes?

19      Q.    Any CEO.

04:32  20      A.    Mark Hughes passed away in 2002, I think.

21      Q.    Well, do they have another CEO?

22      A.    I don't know their CEO.

23      Q.    You've never had a CEO of Herbalife in your

24 office?

04:32  25      A.    Ex-CFO.

**PLAINTIFFS' EXHIBIT B - 290**

1      Q.   No.   CEO?

2      A.   I don't know, unless he came with John and I

3  wasn't there.

4      Q.   But you never did?

04:32  5      A.   I've never seen the CEO of Herbalife in our

6  facility.

7      Q.   Did you ever tell Shane that you were closing

8  a series of multimillion dollar deals?

9      A.   With who?

04:33  10     Q.   Anybody.

11     A.   When he was a shareholder in Pharma Pak?

12     Q.   At any time.

13     A.   Well, whatever I would hear from Bruce I would

14  tell Shane that we're closing deals on the patches that

04:33  15  we were supposed to produce.  So those are multimillion

16  dollar deals if you've seen the projections.

17     Q.   I'm asking you if you ever told that to

18  Shane.  I didn't ask you where you got the

19  information.  I'm asking you specifically -- now, let

04:33  20  me finish -- did you ever tell Shane that you were

21  closing multimillion dollar deals?

22          MR. DIULIO:  Objection.  Vague as to "you."

23  BY MR. MARKHAM:

24     Q.   "You" meaning you, Paul Edalat, you.

04:33  25     A.   If I shared information with him, it was passed

**PLAINTIFFS' EXHIBIT B - 291**

```
 1    down and passed through.
 2        Q.   Didn't ask you where you got it.  I asked you
 3    whether you did it?
 4        A.   There were times that I knew we were closing
 5    deals, so it -- we had a JV done in Pharma Pak.  So if
 6    you're referring to Pharma Pak, yes, I shared
 7    information with him.
 8        Q.   What do you think is the biggest deal that
 9    Pharma Pak ever closed dollarwise?
10        A.   I thought it was the JV we did with Opus Rx.
11        Q.   And how much was that --
12        A.   According to Mr. Cahill's projections, I think
13    it was $130 million for the year worth of business.
14        Q.   Did you ever tell Shane Scott that you were
15    closing deals that you had been working on for over a
16    year and that these were multibillion dollar
17    companies?
18             MR. DIULIO:  Objection.  Vague.
19    BY MR. MARKHAM:
20        Q.   Ever.
21        A.   I don't recall.
22        Q.   Have you ever heard of a group called The
23    Tasly Group?
24        A.   Yes.
25        Q.   What do you know about them?
```

04:33  5

04:34  10

04:34  15

04:34  20

04:34  25

**PLAINTIFFS' EXHIBIT B - 292**

```
 1        A.    They're a drug manufacturer.

 2        Q.    And where is their home office?

 3        A.    I think in China.

 4        Q.    Have you ever had a contract with them?

04:34  5        A.    For who?

 6        Q.    For you personally.

 7        A.    Me?

 8        Q.    Yes.

 9        A.    No.

04:35  10        Q.    For Sentar, the dba of EFT Global Holdings?

11        A.    What's the relevance?

12        Q.    I've been over the relevance of Sentar.  I

13   can't improve on what I've told you and your counsel.

14   I want to know --

04:35  15        A.    See, I have a problem with this because you're

16   getting access to confidential information, which this

17   company, Sentar, is not publicly traded and definitely

18   you are not entitled to this information.  This is

19   private information.  So I'd like to know who your

04:35  20   source is because I'm going to drag them into this

21   lawsuit.  There's non-disclosures in place.  There are a

22   lot of protections in place between these contracts.

23        And Tasly is a public company, so if you so

24   choose to make this record, documents and all that,

04:35  25   public, then you will face issues with Tasly, not me.
```

**PLAINTIFFS' EXHIBIT B - 293**

1    We have strict contracts for confidentiality agreements.

2    Again, I don't see the relevance in your questions, but

3    if you're asking me a question about Tasly, I don't

4    know.

04:36    5         Q.   You don't know?

6         A.   No.

7         Q.   Did you ever tell Shane that, quote, "we are

8    locking down a $1 billion contract with the Middle

9    East as we speak, December 2015," i.e., by a text

04:36    10   message?

11        A.   Which company?

12        Q.   I'm asking you if you ever said those words

13   to him in a text?

14        A.   Do you have it?

04:36    15        Q.   I'm just asking you.

16        A.   I don't know.

17             Do you know how many text messages Shane and I

18   exchanged?

19        Q.   How many times have you closed a multibillion

04:36    20   dollar deal in the Middle East?

21        A.   I won't answer.  It's confidential.

22        Q.   You never wrote to him saying, quote, "we are

23   locking down a $1 billion contract with the Middle

24   East as we speak"?

04:36    25             MR. DIULIO:  Objection.  Asked and answered.

**PLAINTIFFS' EXHIBIT B - 294**

```
 1              MR. MARKHAM:  He didn't answer.
 2              MR. DIULIO:  He said I don't know.
 3    BY MR. MARKHAM:
 4        Q.   You said I don't know?
 5              MR. DIULIO:  Yes.
 6    BY MR. MARKHAM:
 7        Q.   Okay.  What did you think about the
 8    organization of the company under the management of
 9    Bruce Cahill?
10              MR. DIULIO:  And by "company," this is Pharma
11    Pak?
12              MR. MARKHAM:  Good clarification.
13    BY MR. MARKHAM:
14        Q.   Pharma Pak.
15        A.   When?
16        Q.   Good question again.
17              Late fall 2015, December 2015.
18        A.   When we were friends?
19        Q.   I don't know when you were friends exactly.
20        A.   Partners?
21        Q.   But when -- during that time frame,
22    regardless of whether that is within or without the
23    time when you and he had a falling out, was it well
24    organized?
25        A.   Was the company well organized?
```

04:36    5
04:37   10
04:37   15
04:37   20
04:37   25

**PLAINTIFFS' EXHIBIT B - 295**

```
 1        Q.    Yeah.   In your complaint you complain it was
 2   mismanaged.   I'm asking you -- let me withdraw that
 3   question.
 4            What is the basis for your complaint that the
 5   company was mismanaged?
 6        A.    The company was well organized with the
 7   individuals that worked in the company.   For each
 8   position in the company, we -- with the money in the
 9   company could hire, we hired the best.   They all had
10   experiences.   They had backgrounds in specific fields
11   that they were to manage.   Obviously, Bruce came with
12   his head of IT, Mark Erfurt, who, once again, never
13   disclosed to us he had a criminal past and got arrested
14   and put in jail for deleting files and emails, which he
15   did here again.   He brought in Leslie Woods and Leslie
16   was handling our books, managing six paychecks and six
17   email addresses by Mark, and got a pretty handsome fee
18   for it.
19            And as far as management, I think the people
20   were in place when the business starts to grow that they
21   could handle it.   Bruce failed at updating the license.
22   Multiple times it was put on his desk and he disregarded
23   it.   He didn't want to put his name on any document and
24   now we know why.   We hired consultants on the outside,
25   the best money can get, Dennis Moore's group, they did a
```

04:37   5
04:38  10
04:38  15
04:38  20
04:39  25

**PLAINTIFFS' EXHIBIT B - 296**

```
 1    fantastic job as far as FDA regulations and all that.

 2              So if you're asking if it was mismanaged by

 3    Bruce Cahill, my answer to you is, at the time, yes.

 4         Q.   Did you ever say that with Bruce this was the

 5    best organized company in the industry?

 6         A.   I said it was probably the best positioned

 7    company in the industry with the partnerships that we

 8    had gotten.  And with the company going forward, I might

 9    have made a statement like that, but I don't what

10    exactly -- it's such a long time, I don't know.  Bruce

11    was a roller coaster, one day he's up and one day he's

12    down.  So don't know which day we caught him on.

13         Q.   Did you ever tell Shane before he paid you

14    any money for shares -- by the way, what did Shane pay

15    you for the shares?

16         A.   I don't think Shane paid me anything.  Shane

17    Scott?

18         Q.   Yeah.

19         A.   Oh, I don't think he paid me anything.

20         Q.   He just got those shares -- he got 5 percent

21    of the company; correct?

22         A.   Shane Scott never paid me.  He paid it through

23    some church or LLC.  And his partner -- there was two

24    guys.  They paid through their companies.  I don't think

25    they directly paid me personally.
```

04:39  5
04:39  10
04:39  15
04:40  20
04:40  25

**PLAINTIFFS' EXHIBIT B - 297**

```
 1        Q.    How much money did you receive in
 2    consideration of the shares of stock that Shane Scott
 3    got?
 4        A.    For the 5 percent?
 5        Q.    Yeah.
 6        A.    He -- so he put $200,000 in my personal
 7    account, but that wasn't really paying for the stock.
 8    What that was was that he wanted to buy my action in
 9    playing blackjack, which I told you the other day when
10    Shane was there that he made about $60,000.  So the
11    200,000 that he put in after the fact that he made
12    $60,000 buying half my action, okay -- and I need a
13    check for that, by the way.
14            So after that, he said, "Now, go ahead and take
15    that money and roll it over into my investment."  He's a
16    smart guy.  Basically paid 140,000 and he swindled his
17    partner into paying the other 300,000 because I thought
18    Shane was buying it.  I didn't know who this other guy
19    is.  So that guy then wired the money in.  So I think
20    all in, there was not individuals that bought my shares,
21    but then they appointed Shane to be the shareholder on
22    behalf of the investment.
23        Q.    So the total amount was the 200- and
24    $300,000?
25        A.    Minus the 60,000 that I gave him, cash.
```

04:40
04:40
04:40
04:41
04:41

**PLAINTIFFS' EXHIBIT B - 298**

```
 1        Q.   And he got 5 percent of the company?

 2        A.   5 percent.

 3        Q.   And the money was wired in -- was that wired

 4   into the Liwa?

 5        A.   Yeah, my consulting company.

 6        Q.   What is Liwa exactly?

 7        A.   It's consulting.  I have a company that when I

 8   do consulting from overseas or put deals together, I

 9   went there.

10        Q.   Does it have an office?

11        A.   It's virtual.  It's right here.

12        Q.   Who do you consult with at the company?

13        A.   I'm sorry?

14        Q.   Who do you consult with at Liwa?

15        A.   Some of the people you're going to go visit in

16   Qatar.

17             MR. DIULIO:  I think the question was within

18   Liwa.  Is there anybody in Liwa you consult with?

19             THE WITNESS:  Oh.  It's just a company that I

20   partnered with -- the Abu Dhabi individuals out there,

21   whatever I can bridge from United States to Middle

22   East.  I think that's the billion dollar deals you

23   were talking about.  Those are all oil deals, crude

24   oil deals.

25             Is that what you're talking about?
```

04:41  5
04:41  10
04:41  15
04:41  20
04:42  25

**PLAINTIFFS' EXHIBIT B - 299**

BY MR. MARKHAM:

1

2      Q.   I'm just asking you whether you ever told

3   Shane about a billion dollar deal?

4      A.   The only billion dollar deal that I know of, my

04:42  5   friend, is the crude oil deals that were offered for

6   various countries.  And, actually, Bruce was involved in

7   some of it.  He introduced me to a group from China.

8      Q.   Back to Liwa.  Does Liwa have a president?

9      A.   No.

04:42  10     Q.   Does it have a CEO?

11     A.   (No verbal response.)

12     Q.   You have to answer audibly.

13     A.   No.

14     Q.   And does it have any officers at all?

04:42  15     A.   I don't know.

16     Q.   You don't know.  Who would know?  Who formed

17  it?

18     A.   It's a consulting company I formed, so I can

19  make a living.

04:42  20          Is that okay with you?

21     Q.   Okay.  So --

22     A.   Does it matter?  Does it matter where the money

23  goes?

24     Q.   So you formed it?  You formed Liwa?

04:43  25     A.   Isn't that what I said?

**PLAINTIFFS' EXHIBIT B - 300**

1       Q.    Has it issued any stock?

2       A.    To who?

3       Q.    To anybody.  Has it issued any stock?

4       A.    For what?  It's just a consulting company.

04:43   5    What stock would it issue?

6       Q.    And does anybody, other than you, have any

7    interest in Liwa?

8       A.    At the time, yes, the government of Abu Dhabi,

9    which is the headquarters -- by the way, you got some

04:43   10   enemies now in Abu Dhabi because you filed a lawsuit

11   against an arm -- a branch of Liwa, which is the Abu

12   Dhabi arm of ADNOC, Abu Dhabi national authority.

13      Q.    That's a public entity?

14      A.    No.  I'm just saying Liwa was -- he's my

04:43   15   partner and we were working on oil deals, which

16   Mr. Cahill was involved in too.

17            Let me explain something to you --

18            MR. DIULIO:  Well, let him ask a question.

19   If he wants you to explain it, then --

04:44   20            THE WITNESS:  I'm going to explain to you

21   what happened.  You want to hear it?

22   BY MR. MARKHAM:

23      Q.    So I want to know is, I gather that Liwa is a

24   company that you use for consulting purposes and that

04:44   25   you formed -- where is it formed?

**PLAINTIFFS' EXHIBIT B - 301**

```
 1        A.    In Wyoming.

 2        Q.    And nobody has an ownership interest in it,

 3   other than you, and you use it from time to time to do

 4   consulting; is that a fair statement?

 5        A.    That's fair.

 6        Q.    Okay.  All right.  Did you ever tell Shane

 7   Scott not to tell any of your Pharma Pak shareholders

 8   or partners that you were making a deal with him for

 9   Pharma Pak stock?

10        A.    Did I tell Shane Scott not to tell Bruce

11   Cahill, John Crowther, Greg Cullen that I'm making a

12   deal with him on the stock?

13        Q.    Yeah.

14        A.    Who signed the shareholders' agreements?

15        Q.    I'm just asking --

16        A.    I'm just saying, even if I said something --

17   see, here we go again.  This whole thing is a cloud you

18   create, him -- even if I said something, what's the

19   relevance?  The relevance is the fact that there's a

20   document with that gentleman's signature, Bruce Cahill,

21   on the shareholders' agreement that he approved Shane

22   Scott to purchase 5 percent of my stock.

23              Even if I told Shane, don't tell your mother,

24   what does that have to do with anything?  He bought

25   shares -- my shares.  Bruce was the one who authorized
```

04:44  5
04:44  10
04:45  15
04:45  20
04:45  25

**PLAINTIFFS' EXHIBIT B - 302**

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:45 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:45 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 04:46 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 04:46 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 04:46 | 25 |

1    it.  Bruce and Tim Balog, our attorney, were the ones
2    that issued the stock and issued the certificates.  So
3    even if I said, don't say anything, he's a partner, it's
4    disclosed.  Let's move on.  What are you asking these
5    questions of -- this is what I'm saying, you're wasting
6    time, precious time.
7        Q.   What I want to know, whether you said it?
8        A.   Okay.  Let's say him and I had a couple of
9    drinks like we used to; right?
10       Q.   Yeah.
11       A.   Right?
12       Q.   Okay.
13       A.   And he used to go into this philosophy of
14   analyzing me, which he did, by the way, send me some
15   nice text messages why he wants to be my partner.
16           Do you have those?  You read those?
17       Q.   Keep going with your answer.
18       A.   Have you read them?
19       Q.   I asked you --
20       A.   No.  Have you read them?  No, because, see,
21   when you -- I told you before we went on record, when
22   you ask irrational questions, I'm going to come back
23   with irrational answers for you.
24       Q.   Did you ever -- let me ask you a --
25       A.   Why would I tell him that?

**PLAINTIFFS' EXHIBIT B - 303**

1      Q.   Then it's a simple answer if you didn't.  I

2  just need to know whether you ever said to Shane Scott

3  that you did not --

4      A.   Sir.

04:46  5      Q.   -- did you ever express to him in a text

6  message that you did not want him to inform your

7  partners that you were giving him a piece of Pharma

8  Pak or words to that effect?

9      A.   I'm not authorized to give a piece of

04:46  10  Pharma Pak.  It has to go through the board, the

11  chairman, the CEO and the directors and the partners.

12  Even if I wanted to -- here we go again, even if he said

13  in his meeting that he took the salary and I knew about

14  it -- even if I knew about it, fine, where is the

04:46  15  employee agreement?

16        You guys are the best at creating documents,

17  right, you attorneys; right?  Okay.  The reason you

18  create documents is because you don't want verbal stuff

19  out there because verbal stuff doesn't stand.  So even

04:47  20  if I told him, "Don't tell anyone," what are you talking

21  about?  He's a partner in Pharma Pak.  All the partners

22  knew about Shane Scott.  Bruce spent time with him.

23        I made sure that whoever comes in the company

24  that I was trying to -- actually, trying to prevent

04:47  25  stuff like this because I wanted him to approve him.  I

**PLAINTIFFS' EXHIBIT B - 304**

```
        1   wanted John Crowther to approve him.  I wanted, you
        2   know, Greg Cullen to -- I wanted everybody to be happy,
        3   we all do business going forward.  So what you are
        4   asking me is completely ridiculous.
04:47   5       Q.   I'm asking if you ever said it to him.  Can
        6   you answer that?
        7           MR. DIULIO:  If you recall.  Do you recall
        8   ever saying it?
        9           THE WITNESS:  No.
04:47  10           Can you ask questions --
       11   BY MR. MARKHAM:
       12       Q.   Now, did you ever say that you had signed up
       13   John Neubauer to be the CFO of Pharma Pak?
       14       A.   I was not authorized to do that even if I said
04:47  15   anything.
       16       Q.   I'm asking you if you said it?
       17       A.   No.
       18       Q.   I'm asking you if you said that you had ever
       19   signed up John Neubauer to be the CFO of Sentar
04:47  20   Pharmaceuticals?
       21       A.   I don't know.
       22       Q.   You don't know?
       23       A.   Ask John Neubauer.
       24       Q.   I'm asking you have you ever told Shane that?
04:48  25       A.   What does that have to do with Pharma Pak?
```

**PLAINTIFFS' EXHIBIT B - 305**

         1              MR. DIULIO:  Asked and answered.

         2              THE WITNESS:  He's not a shareholder.  He's

         3    not an investor.  He's not a director.

         4              Listen -- listen, quit convoluting things.

04:48    5    Okay.  Can you keep your focus on Pharma Pak and quit

         6    jumping around?  I know your game.  Okay.  Look at

         7    this window, ask for Pharma Pak.  All right.

         8    BY MR. MARKHAM:

         9        Q.   I'm asking you --

04:48   10        A.   Don't go and jump around and try to trick me

        11    into -- my attorneys were very respectful with Cahill.

        12    They asked him very straight questions and never bounced

        13    around.  You're doing this typical tactic of AUSA

        14    because you got me under indictment.  You don't, sir.

04:48   15    The game is over.  That party is bye-bye.  You're just a

        16    lawyer now --

        17              MR. MARKHAM:  Again -- again --

        18              MR. DIULIO:  Hold on.

        19              MR. MARKHAM:  This is not an answer.

04:48   20              MR. DIULIO:  I know, Mr. Markham, but we run

        21    into this problem when you ask the question, he gives

        22    an answer and then you ask it again and then he gives

        23    an explanation.  Now, I'd rather he didn't give the

        24    explanation, but you asked the question, you asked it

04:48   25    about Pharma Pak.  He said no.  And you asked about

**PLAINTIFFS' EXHIBIT B - 306**

| | |
|---|---|
| | 1 |

1   Sentar.  He said I don't know.  Then you asked him

2   again, then it opens up an explanation.

3           MR. MARKHAM:  I don't believe that's the

4   case.

04:49   5   BY MR. MARKHAM:

6       Q.   Just to get the record clarified, you don't

7   know whether you ever said to Shane Scott that you

8   had signed John Neubauer as a partner -- as a CFO of

9   Sentar Pharmaceuticals?  Yes or no.

04:49   10      A.   Earlier you asked Pharma Pak --

11      Q.   I thought that's what I had done.

12      A.   That's not my problem.  If you have a memory

13   issue, sir, there's a lot of good supplements out there.

14   Take them and then come here.  Okay.  Because, listen,

04:49   15   you told me you were a poker player.  You're a bad poker

16   player if you don't remember your last hand.  Do not

17   bend.  Do not convolute --

18           MR. DIULIO:  So --

19           THE WITNESS:  Ask me questions about --

04:49   20           MR. DIULIO:  Do you recall ever saying that

21   about Sentar?

22           THE WITNESS:  I answered it.  No.

23           MR. MARKHAM:  All right.  Mark next in order.

24           THE WITNESS:  Thank you.

04:50   25           THE REPORTER:  You're welcome.

**PLAINTIFFS' EXHIBIT B - 307**

```
 1              It's 82.

 2              (Deposition Exhibit 82 was marked for

 3              identification and is attached hereto.)

 4    BY MR. MARKHAM:

 5         Q.   So can I ask you to look through Exhibit 82,

 6    Mr. Edalat.

 7         A.   Sure.

 8         Q.   The first page of that has a check made

 9    payable to you in the amount of 16,192.98.

10              Do you see that?

11         A.   Yes.

12         Q.   Is this a check paid to you for

13    reimbursements that you put in to Pharma Pak for

14    expenses?

15         A.   Yeah, for incidentals.

16              Do you know what those are?

17         Q.   I'm going to ask you to --

18         A.   I'm going to educate you now.  Thank you for

19    bringing this up.  Let's go to -- so the check, if

20    you're okay with the check, let's move on to the next

21    page.

22         Q.   But that's a check that was paid to you after

23    you submitted these --

24         A.   The funny thing is, if I really did the

25    accounting, they owe me $50,000 and I'll explain why.
```

04:50 (line 5)
04:50 (line 10)
04:50 (line 15)
04:51 (line 20)
04:51 (line 25)

**PLAINTIFFS' EXHIBIT B - 308**

1          Q.     No.  I want you to answer my questions.

2                 MR. DIULIO:  He said yes.

3                 THE WITNESS:  Yes.  Yes.  Yes.  Yes.  And you

4     said explain it to me and I'm going to explain it to

04:51  5     you.

6     BY MR. MARKHAM:

7          Q.     I didn't say explain it to me.

8          A.     I said, do you want me to explain it to you?

9     You said, yes.

04:51  10         Q.     No.

11         A.     Make up your mind.  Do you want it or not?

12         Q.     What I want to do is, I want you to turn to

13    page 2 and the rest of the pages in here --

14         A.     Okay.

04:51  15         Q.     -- and tell me what these pages represent.

16         A.     Incidental charges.

17         Q.     And what are incidental charges?

18         A.     I said I was going to explain it to you.  You

19    said, okay, explain it.

04:51  20         Q.     What are incidental charges?

21         A.     Look it, you just wasted, like, three minutes

22    just doing that.  But it's all right, I'll explain it to

23    you because you're a rookie in Vegas.  You don't

24    understand what incidental charges are.  Let me explain

04:51  25    it to you.  This bill for Aria was a penthouse.

**PLAINTIFFS' EXHIBIT B - 309**

```
 1        Q.   Bill for Aria?  Which one are you talking
 2   about?  What page?
 3             MR. DIULIO:  Page 2.
 4             THE WITNESS:  $1,359.78.  Okay.  This was a
 5   penthouse on the -- I think on the top floor, corner
 6   floor -- I'm sorry.  It was the top corner floor that
 7   was given to me complimentary on behalf of the hotel
 8   where Mr. Cahill spent the night in and then his son I
 9   think spent the night in and Ms. Olivia Karpinski.
10   These are three nights.  One, two, three, so 17th,
11   18th and 19th.
12             So anyway, if Aria was to charge you, you put
13   your credit card up, right, and you go to check into
14   your room, they put the credit card up for incidental
15   charges.  Right?  And then there's the room charge.
16   So on this invoice, do you see anything that says room
17   charge?
18   BY MR. MARKHAM:
19        Q.   So you're saying to me the room charge was
20   complimentary?
21        A.   Yes.  $4,500 a night.  Now, hold on a second.
22   Hold on.  Give me a chance to explain and look what I
23   sacrificed and what I did for my company, Pharma Pak.
24   Okay.  At $4,500 a night, sir, times three, taxes and
25   all that, you're looking at about $15,000 in fees for
```

04:52
04:52
04:52
04:52
04:53

**PLAINTIFFS' EXHIBIT B - 310**

1    that penthouse that Mr. Cahill got to enjoy.  Very nice

2    room, by the way, one bedroom, dining room.  I mean,

3    lavish, lavish penthouse.

4        Q.   Did that --

04:53    5        A.   Hold on.  Hold on.

6             MR. DIULIO:  Wait.

7             THE WITNESS:  I'm explaining it to you.

8             MR. MARKHAM:  He's way beyond the answer of

9    the question, Kris.

04:53   10             THE WITNESS:  You asked me to explain.  I'm

11    explaining to you.

12             MR. DIULIO:  You asked him to explain --

13             THE REPORTER:  Hold on.  I can't get all of

14    you --

15    BY MR. MARKHAM:

16        Q.   I asked you what the charges were.  I didn't

17    ask --

18        A.   No.  I said incidental.  I'm explaining what

19    the difference between incidental and room charges are.

04:53   20             MR. DIULIO:  You did ask him to explain

21    incidentals.

22             MR. MARKHAM:  I asked him to explain

23    incidentals, not the room charge.

24             THE WITNESS:  But why not the room charge?

04:53   25    ///

**PLAINTIFFS' EXHIBIT B - 311**

```
 1   BY MR. MARKHAM:

 2        Q.   I don't want to know about that.

 3        A.   Why not?  Why do you want to keep that a

 4   secret?

 5        Q.   I don't want -- look --

 6        A.   That's $15,000 I saved the company that he

 7   didn't have to pay for --

 8             MR. DIULIO:  Okay.  You've answered the

 9   question.

10   BY MR. MARKHAM

11        Q.   Can we go on to the next page?

12        A.   Yeah, let's do the next page, sure.  What's --

13        Q.   There's a check on the next page, Paul

14   Edalat, table and six -- and it totals $2,744.71.

15        A.   Yes.

16        Q.   What's that for?

17        A.   That was because I took Ryan -- Ryan Hilton,

18   who was bringing us deals, and Wes, the other gentleman,

19   on behalf of the company, I took them to -- I think this

20   is, what, Hyde?  But they wined and dined us so many

21   times.  Bruce, as a matter of fact, came to a couple of

22   the events, so it was kind of a repayment.  They paid on

23   any given night $20,000 or more.  I got this room.  I

24   mean, I got this table at a discounted rate because I'm

25   a player.
```

04:53   (line 5)
04:53   (line 10)
04:54   (line 15)
04:54   (line 20)
04:54   (line 25)

**PLAINTIFFS' EXHIBIT B - 312**

1          So they discounted it for me to -- and held

2     the minimum of the bottles to the table to -- what is

3     it, one, two -- three bottles.  The minimum was 10

4     bottles.  So they didn't charge me for the seven

04:54   5     bottles.  So they only charged me for three.  I saved

6     the company money because I'm a player and I've been a

7     player in Vegas and I have friends that own nightclubs

8     and I have friends who do me favors.

9          I took them there because we owed them, at

04:54  10     least, the courtesy of taking them out one night and I

11     did, as a courtesy of all the times they'd taken us out

12     and spent money on us.

13     Q.   Again, I didn't ask you about what they had

14     done.

04:54  15     A.   Sir --

16     Q.   I asked you very specific questions.  We're

17     getting at a late hour.  I just want you to answer my

18     questions.

19     A.   Well, let me educate you on how Vegas works --

04:55  20     Q.   I don't want to be educated on how Vegas

21     works.

22     A.   Then you've got a big problem.  You know why?

23     Because this reimbursement should have been $50,000.

24     Q.   All right.  So on this, it says -- it looks

04:55  25     like the fourth entry down -- or fifth entry, it says,

**PLAINTIFFS' EXHIBIT B - 313**

```
 1    "1 BTL Tito's."

 2         Do you see that?

 3    A.   Yes.

 4    Q.   What is -- do you know what that entry means?

04:55  5    A.   Tito's is a bottle of Tito's vodka.

 6    Q.   So one bottle is $495?

 7    A.   Have you been to a nightclub lately, sir?

 8    You're giving me these.  What does it say?

 9    Q.   I'm just asking you to -- you were there, I

04:55 10    wasn't.  So that's a bottle of Tito's.

11         And then the next is two bottles of

12    Crown Royal for $990?

13    A.   Have you been to a nightclub?

14    Q.   Is the answer to my question -- is that what

04:55 15    that was for?

16    A.   That's what the receipt says.

17    Q.   Okay.

18    A.   And that's very cheap, by the way.

19    Q.   So the next page is Encore Wynn Las Vegas.

04:56 20    And it looks like up in the top right corner you've

21    got room comp, suite comp.  And you've explained that,

22    right, that that was a deal you got --

23    A.   Yes, this suite is a $3,000 night room.  How

24    many nights were we there?  One, two, three, four.

04:56 25    Let's keep the numbers here.  So $12,000 here I saved
```

**PLAINTIFFS' EXHIBIT B - 314**

```
 1   the company.  Let's keep going.  Plus tax -- plus tax
 2   and I think they have -- I don't know.  They got all
 3   these other fees.  I don't know if they added those fees
 4   into your --
 5        Q.   There's something here called XS Nightclub.
 6        A.   Yes.
 7        Q.   $2,730.  What is that?
 8        A.   That's a nightclub at the Encore that I took,
 9   again, our partners.  I think it was Rick, Chad and the
10   guys that were there.  I took them to wine and dine them
11   for one night when they've spent tens and tens of
12   thousands of dollars on us wining and dining us every
13   time we go to Vegas.
14        Q.   And the total of this bill is $5,258.45?
15        A.   That's for the whole weekend on incidental
16   charges, no room charges, which was minus 12,000.  So I
17   saved the company 12,000 there.  All right.
18        Q.   All right.  And I gather the rest of these
19   receipts are other receipts for which you put in for
20   expenses you incurred --
21        A.   Yes.
22        Q.   -- in Las Vegas?
23        A.   Correct.
24        Q.   Okay.
25        A.   Is that illegal?
```

04:56 — 5
04:56 — 10
04:56 — 15
04:57 — 20
04:57 — 25

**PLAINTIFFS' EXHIBIT B - 315**

```
 1         Q.    Okay.

 2         A.    Approved and signed by Leslie Woods.

 3               Can you, by the way --

 4               MR. DIULIO:  We'll talk separately.

 5               THE WITNESS:  I have to get that $37,000

 6    back.

 7               MR. DIULIO:  We can chat about that.  Let's

 8    not do that here on the record.

 9               THE WITNESS:  Add it to our bill.

10               MR. MARKHAM:  Chat away.

11               THE WITNESS:  No, thanks for bringing that

12    up.

13               (Deposition Exhibit 83 was marked for

14               identification and is attached hereto.)

15    BY MR. MARKHAM:

16         Q.    What's the number of the exhibit you have in

17    front of you?

18         A.    83.

19         Q.    And could you state for the record how much

20    of a reimbursement you put in for?

21         A.    $1,333.98 [sic].

22         Q.    And are the justifications for that

23    invoice -- following that invoice on the page after

24    that?

25         A.    Yes.
```

04:57  5
04:57  10
04:58  15
04:58  20
04:58  25

PLAINTIFFS' EXHIBIT B - 316

1       Q.   Let's do this one.

2       A.   Thank you.

3            MR. DIULIO:   Do you have another copy of

4    that?

04:58  5            MR. MARKHAM:   You know, I do.

6            MR. DIULIO:   Thank you.   This one's got your

7    comments.

8            MR. MARKHAM:   Sorry.

9            MR. DIULIO:   It's one page.   I'll look over.

04:59 10            (Deposition Exhibit 84 was marked for

11            identification and is attached hereto.)

12    BY MR. MARKHAM:

13       Q.   Do you recognize that document?

14       A.   Yes.

04:59 15       Q.   Does that document look like the

16    reimbursement that you put in for?

17       A.   I don't know.   There's nothing attached to it.

18    There was reimbursements that I had still to this day I

19    haven't been reimbursed for.   This could be one of them.

04:59 20       Q.   What's the amount on that invoice?

21       A.   It should be 11,085 [sic] because they did comp

22    for a room free and this is just incidentals, but what

23    was billed to my credit card was $1,085.76 and I don't

24    think I got reimbursed for this.

04:59 25       Q.   Mark this.   This is the only copy I had.

**PLAINTIFFS' EXHIBIT B - 317**

1      A.    Do you have any invoices from June?

2            We already looked at this one.  This is

3      already -- Tyler, it's the same one.  Do you want to

4      have that back, a copy?

05:00   5            MR. MARKHAM:  Next --

6            MR. DIULIO:  Next one is 85?

7            THE REPORTER:  Yes.

8            MR. DIULIO:  Thank you.

9            (Deposition Exhibit 85 was marked for

05:00  10            identification and is attached hereto.)

11     BY MR. MARKHAM:

12      Q.    Can you review 85 and tell me whether this

13     reflects a check that you received for reimbursements

14     that you put into Pharma Pak for expenses that you

05:00  15     claimed you incurred over in Las Vegas in furtherance

16     of Pharma Pak business?

17      A.    Yes, for incidental room charges.  Again, no

18     suite charge.  $10,000 saved again for the company, four

19     nights.

05:01  20            (Deposition Exhibit 86 was marked for

21            identification and is attached hereto.)

22     BY MR. MARKHAM:

23      Q.    And let's mark this next in order.

24            Same question.  Do you have the question in

05:01  25     mind?

PLAINTIFFS' EXHIBIT B - 318

```
 1        A.    It looks like, again, incidental charges.
 2   There was no suite charge.   $7,500 saved for the company
 3   and $1,533 billed out to the company for incidentals.
 4        Q.    Did you ever make a recommendation to anyone
 5   at Pharma Pak that Olivia Karpinski should be hired by
 6   Pharma Pak?
 7        A.    I made the initial recommendation to Bruce.   I
 8   said, "You're more than welcome to interview her.
 9   Collectively, we can do it together."
10        Q.    Did you say that you thought that she had
11   experience in the pharmaceutical industry?
12        A.    Looking at her resume, she did.
13        Q.    I'm asking you whether you told Mr. Cahill
14   that.
15        A.    Mr. Cahill got her resume and viewed it and
16   said, Let's call them for an interview, and we did.
17        Q.    I'm asking you whether you ever told
18   Mr. Cahill that Olivia Karpinski had experience in the
19   pharmaceutical industry?
20        A.    I don't remember if I told him that she had
21   experience in pharmaceutical industry.   But based on her
22   resume, I handed it over to him and I said, "You're more
23   than welcome to call her for an interview."
24        Q.    When did you meet her?
25        A.    Couple years ago.
```

05:02   5
05:02  10
05:02  15
05:02  20
05:03  25

**PLAINTIFFS' EXHIBIT B - 319**

1      Q.    How long had you known her when you first
2  mentioned her to Bruce Cahill as a potential
3  salesperson for Pharma Pak?
4      A.    I don't recall.  It was a few months, I think.
05:03  5  Yeah, to my best estimation.
6      Q.    And where did you meet her?
7      A.    Through a mutual friend in Beverly Hills.
8      Q.    Where?
9      A.    In Beverly Hills.
05:03  10      Q.    Where specifically?
11      A.    At the Montage Hotel.
12      Q.    And what were the circumstances under which
13  you met her?
14      A.    My friend had asked her to come meet me because
05:03  15  her and her two partners were putting in a
16  nutritional -- trying to create nutritional product
17  line, something to do with products -- mostly women
18  orientated.  And they asked me -- my friend that knows
19  me very well said that Paul's probably one of the best
05:03  20  in the industry with what he does with nutritional
21  products.  You should go see him, have him consult you
22  and tell you whether you guys are on the right track or
23  not.  So I took a meeting with her and her partners at
24  the Montage Hotel a couple of years ago.  I think
05:04  25  that's -- to the best of my recollection.

**PLAINTIFFS' EXHIBIT B - 320**

```
 1      Q.   And how many times did you see her before you
 2  made the introduction to Mr. Cahill?
 3      A.   I actually met with her a few times still while
 4  she was active in that company.
 5      Q.   What company was that?
 6      A.   It was called Health Angels or Health
 7  something.  I don't know.  Some -- they were all former
 8  WWE or models, you know, they got together with fitness
 9  trainers and had an extensive following on social media.
10  So they were trying to create a brand to promote.
11      Q.   After she became --
12      A.   Health Goddess -- Health Goddess.
13      Q.   After she became employed by Pharma Pak, do
14  you know how many sales contracts she brought into the
15  company that got closed?
16      A.   Individually?
17      Q.   Yeah.
18      A.   I don't, but she was a part of the team.  Her
19  and Bruce would take meetings down to San Diego.  She
20  became Bruce's basically right hand in sales.  I trained
21  her as best as I could and handed her off to Bruce to --
22      Q.   How did you train her?
23      A.   I took her on the sales meetings and, you know,
24  Bruce asked me to -- Bruce asked me to take Olivia to
25  these meetings and kind of, you know, get her used to,
```

05:04  5
05:04  10
05:05  15
05:05  20
05:05  25

**PLAINTIFFS' EXHIBIT B - 321**

1    like, these level meetings.  We would take them to the

2    pharmacists, the Chad Barretts and Rick Speiss, these

3    guys who were willing to JV.

4           She was part of a team.  She didn't say I'm

05:05    5    going to go out there and say I'm going to close the

6    deals.

7       Q.   So can you -- as you sit here today, can you

8    identify any sales contract that she was responsible

9    for bringing into the company?

05:06   10       A.   She was working with Rx Green.  She was working

11   with a firm down in San Diego that Bruce and her went to

12   visit that were friends of John Neubauer's.  I don't

13   remember the names.  I wasn't in those meetings, but she

14   was always at the office.  She always went to every

05:06   15   meeting.  She never said no.  As a matter of fact, I

16   remember one weekend she was sick and when I went to

17   Vegas to meet with these Opus Rx guys -- one of those

18   reimbursements there that you see that I took them out

19   to wine and dine them.

05:06   20           They all wanted to see Olivia.  So I told her

21   to fly out.  She was sick.  And she did, she jumped on a

22   plane and came out.  This industry is all belly to

23   belly.  They do business with people they like.  And,

24   unfortunately, for Bruce, made a couple of comments that

05:06   25   weren't taken too lightly and they didn't want to see

PLAINTIFFS' EXHIBIT B - 322

```
 1    Bruce.  So they wanted to see her.  They wanted to see
 2    me.  As a matter of fact, she would go to some meetings.
 3         Q.   Can you, again -- you can't identify a
 4    contract that she brought in?
 5         A.   She was part of all the contracts that were
 6    brought in.
 7         Q.   What were those?
 8         A.   The JV.
 9         Q.   You've named those?
10         A.   Yeah.  That's not sufficient?
11              (Deposition Exhibit 87 was marked for
12              identification and is attached hereto.)
13    BY MR. MARKHAM:
14         Q.   That is Exhibit 87.
15              Have you ever seen the first page of that
16    document before?
17         A.   Never.
18         Q.   Health Goddess, LLC, you referred to that as
19    the company that they had started; correct?
20         A.   Correct.
21         Q.   Can you look at the rest of these pages and
22    tell me if you've ever seen any of those documents?
23         A.   Snapshots of their modeling pictures.  I know
24    she was Ms. New Hampshire.
25         Q.   So the second page, is that a picture of
```

05:07 — 5
05:07 — 10
05:07 — 15
05:07 — 20
05:07 — 25

**PLAINTIFFS' EXHIBIT B - 323**

1    Olivia Karpinski?

2         A.   Second page --

3         Q.   You just passed it.

4         A.   This one?

05:08    5         Q.   Yeah.

6              MR. DIULIO:  I'm sorry.  Just so I'm clear,

7    second page, first picture?

8    BY MR. MARKHAM:

9         Q.   Second page, first picture, is that Olivia

05:08   10   Karpinski?

11        A.   I would assume.  It says Olivia Karpinski on

12   the document.

13        Q.   But you've seen her many times.  Does that

14   look like her?

05:08   15             MR. DIULIO:  For the record, probably not

16   like this.

17             THE WITNESS:  You're going the wrong way.

18   I've never seen her like that.  I've always seen her

19   clothed very professionally in business suits.

05:08   20   BY MR. MARKHAM:

21        Q.   Take a look at her face.  That's Olivia

22   Karpinski, is it not?

23        A.   I would assume.

24        Q.   How about the next page in, second picture,

05:08   25   is that Olivia?

**PLAINTIFFS' EXHIBIT B - 324**

1        A.    Again, I would assume that's her.  It says her

2   name on the top.

3        Q.    It looks like her, doesn't it?

4        A.    I don't know.  You tell me.

05:08   5        Q.    Are you telling me you can't tell me whether

6   that picture looks like her?  Is that your answer?

7        A.    I don't know.  You tell me.  You're the one

8   that has a secret crush on her, not me.

9              MR. DIULIO:  Leave that aside.  Not to be

05:08  10   sparring, but I represent her and I'm not sure I

11   would --

12              THE WITNESS:  You didn't tell Lee Durst that

13   you were excited about deposing her because she was

14   easy on the eyes?  No?  Sorry.  Sorry.  Take it off

05:08  15   the record.

16   BY MR. MARKHAM:

17        Q.    You don't have to take it off record.  You

18   can say whatever you want.

19        A.    That's what you said; right?

05:09  20        Q.    Take a look at the next picture.

21              MR. DIULIO:  The next one is the third page?

22              MR. MARKHAM:  Yes.

23              MR. DIULIO:  So we're clear.

24              MR. MARKHAM:  Yeah, it is the -- I think the

05:09  25   fourth one in.

**PLAINTIFFS' EXHIBIT B - 325**

1              MR. DIULIO:  You --

2              THE WITNESS:  I'm not an agent.  I'm not a

3    modeling expert, so I don't know -- if you're getting

4    this off a website and you're asking me if this is

05:09    5    Olivia Karpinski -- it says, "Sexy model Olivia

6    Karpinski, super star, sexy model," so I'm assuming

7    that's her.  Why are you asking me to validate these

8    pictures?  I'm not an expert.

9    BY MR. MARKHAM:

05:09   10      Q.    Okay.  So you can't identify that as being

11   Olivia Karpinski?

12      A.    I don't know.  I mean, you know -- I don't know

13   what Olivia looks like -- I've never seen Olivia in a

14   bathing suit or undressed.  I've always seen her very

05:09   15   professionally dressed.

16      Q.    Next picture?

17      A.    Which one?

18      Q.    Ashley Arellano, was this one of the women

19   that she had partnered with in this new venture called

05:10   20   Health Goddess, LLC?

21              MR. DIULIO:  Objection.  Lacks foundation.

22              THE WITNESS:  I don't know.

23   BY MR. MARKHAM:

24      Q.    Did you ever meet the other women involved?

05:10   25      A.    I think I met her partners, but I don't

**PLAINTIFFS' EXHIBIT B - 326**

```
 1    know.  These women, honestly, they can -- modeling
 2    pictures, they can change their looks a hundred
 3    different ways.  But I think Bruce knows her.
 4            Bruce, didn't you know -- wait.  Isn't this the
 5    girl that you told me that, you know -- that through
 6    your circuit of guys, your billionaire buddies that kind
 7    of hang out with these girls?  I think Bruce knows her,
 8    but that's --
 9       Q.   Was there an Ashley Arellano as part of this
10    Health Goddess thing that you were talking about when
11    you met with Olivia and these other women?
12       A.   I don't know.
13       Q.   You don't know her name?
14       A.   I don't know names.
15       Q.   Did you see other women or just Olivia?
16       A.   No, I saw the three of them.  But I assume that
17    was her.  These are all partners in the company.  They
18    were dressed professionally.  They weren't dressed like
19    this, sir.  Show me pictures of them in professional
20    outfits and I can tell you.  They're not dressed like
21    this.
22       Q.   But it looks like her, you can say?
23            MR. DIULIO:  If you know.
24            THE WITNESS:  When you show me a picture of
25    them dressed professionally, like how you are -- I
```

05:10 (line 5)
05:10 (line 10)
05:10 (line 15)
05:11 (line 20)
05:11 (line 25)

**PLAINTIFFS' EXHIBIT B - 327**

```
 1    don't know what you look like under your shirt.  Okay.
 2    So show me pictures of them professionally dressed and
 3    I'd be more than happy to answer that.
 4    BY MR. MARKHAM:
 5        Q.   Okay.
 6        A.   Thank you.
 7            MR. MARKHAM:  We need to take one more quick
 8    break and then go for about another ten minutes.
 9            THE WITNESS:  You got five minutes on the
10    tape.
11            MR. DIULIO:  Let's go off the record.
12            MR. MARKHAM:  You know what, let's not go off
13    the record.
14            THE WITNESS:  Rock and roll.
15    BY MR. MARKHAM:
16        Q.   Do you know what a flux experiment is?
17        A.   A what?
18        Q.   A flux experiment.
19            MR. DIULIO:  Objection.  Lacks foundation.
20    Vague.
21            THE WITNESS:  No.
22    BY MR. MARKHAM:
23        Q.   Okay.  Do you know what part of the human
24    body the skin is taken from to do the flux experiment?
25            MR. DIULIO:  Objection.  Lacks foundation.
```

05:11  5
05:11 10
05:11 15
05:11 20
05:12 25

**PLAINTIFFS' EXHIBIT B - 328**

```
 1              THE WITNESS:  I don't know.
 2    BY MR. MARKHAM:
 3        Q.   Do you know the type of adhesives that are
 4    used to determine the transdermal flux to a human's
05:12  5  skin?
 6              MR. DIULIO:  Objection.  Lacks foundation.
 7    Vague.
 8              THE WITNESS:  I don't know.
 9    BY MR. MARKHAM:
05:12 10       Q.   Do you know the difference in construction
11    between the monolithic patch and reservoir patch?
12              MR. DIULIO:  Objection.  Vague.  Lacks
13    foundation.
14              THE WITNESS:  You're cute.
05:12 15  BY MR. MARKHAM:
16        Q.   Do you know?
17        A.   You're cute.
18        Q.   Can you give me an answer?
19        A.   I'll give you an answer.
05:12 20       Q.   What's that?
21        A.   Dr. Weimann asked me to put my names on those
22    patents because he did not want his partner, Jim --
23    Dr. Jim Williams to find out that he's creating more
24    advanced patches here.  He asked me to put my name on
05:13 25  those patches as one of the shareholders of Pharma Pak
```

**PLAINTIFFS' EXHIBIT B - 329**

```
 1   to protect these ongoing forward patents because I

 2   already had patents in line with Peter Gluck.

 3           Now, let me explain to you something else.  He

 4   did that because he was trying to be -- what word is
05:13
 5   that you like to use, Bruce?

 6   Q.   I thought we weren't --

 7   A.   No.  No.  Hold on.  I'm explaining --

 8           MR. DIULIO:  We're not engaging --

 9           THE WITNESS:  You're asking me for a
05:13
10   scientific expertise.  My scientist was the one that

11   asked me to put my name on the patent.

12   BY MR. MARKHAM:

13   Q.   So you didn't invent them?

14   A.   Sorry?
05:13
15   Q.   You didn't invent them?

16   A.   He asked me to put my name on the patent.

17   Q.   So that's why you said you were the inventor?

18   A.   Because -- sorry?

19   Q.   That's why you said you were the inventor?
05:13
20   A.   And the document speaks for itself.

21   Q.   And that was because Weimann asked you to?

22   A.   Weimann begged me to.

23   Q.   Okay.

24   A.   I still have those patents; right?  You're not
05:14
25   trying to steal them again?  You didn't call Peter Gluck
```

**PLAINTIFFS' EXHIBIT B - 330**

```
 1   and try to transfer them without my notice?
 2            MR. MARKHAM:  Hang on.  I just want consult
 3   with my client.  We don't even have to go off the
 4   record.  I just want to go outside for a real quick
 5   second.
 6            MR. DIULIO:  We should go off the record.
 7            MR. MARKHAM:  Fine.  I just thought it would
 8   be easier.
 9            THE VIDEOGRAPHER:  We're going off the
10   record.  The time is 5:14 p.m.
11            (Recess was taken.)
12            THE VIDEOGRAPHER:  We're back on the record.
13   The time is 5:15 p.m.
14            MR. MARKHAM:  Okay.  Let's mark this as --
15   this is all one and this is the second copy.
16            MR. CAHILL:  And there's a third copy.
17            MR. MARKHAM:  Got it.
18            MR. CAHILL:  No, that's yours.
19            MR. MARKHAM:  No, mine says John Scott.
20            (Deposition Exhibit 88 was marked for
21            identification and is attached hereto.)
22   BY MR. MARKHAM:
23       Q.   What's the number of the exhibit you have in
24   front of you, Mr. Edalat?
25       A.   Looks like 88.
```

05:14
05:14
05:15
05:16
05:16

PLAINTIFFS' EXHIBIT B - 331

```
 1        Q.   Do you recognize this document?

 2        A.   Looks like a patent search.  That's what this

 3   is.  I'm not sure.

 4             MR. DIULIO:  Objection.  Lacks foundation.

 5             But answer whatever you know.

 6   BY MR. MARKHAM:

 7        Q.   Do you recognize any of this document to

 8   reflect the sublingual patent that you invented and

 9   assigned to EFT Global Holdings dba Sci-Labs?

10             MR. DIULIO:  Objection.  Lacks foundation.

11             THE WITNESS:  I don't know where you got this

12   document.

13   BY MR. MARKHAM:

14        Q.   So you don't recognize it?

15        A.   I don't know where you got it.  I've never seen

16   it.

17        Q.   Never seen it before?

18        A.   I have not seen this packet.

19        Q.   Take a look, if you would, starting about ten

20   pages in after an appendix to the page that says,

21   "Novel enhanced sublingual delivery system process."

22        A.   Can I help you out here?  Why are you asking me

23   about -- questions about February 7th, 2014?  Why don't

24   you go do a recent patent search and see what's issued?

25   Why are we even discussing this?  This is irrelevant,
```

05:17  5
05:17  10
05:17  15
05:17  20
05:18  25

**PLAINTIFFS' EXHIBIT B - 332**

```
 1    done, finished.
 2              MR. DIULIO:  I'm sorry.  What page are we
 3    referring to?
 4    BY MR. MARKHAM:
 5        Q.   It's about ten pages in and it is "Novel
 6    enhanced" -- keep going, Mr. Edalat.  It's right here,
 7    this one page.  If you hand me yours, I'll show it to
 8    you.  Yep, wrong one.
 9              Okay.  I'm going to ask you to take a look at
10    this.
11        A.   Okay.
12        Q.   "Novel enhanced sublingual delivery system,"
13    is that the patent that you invented and assigned to
14    Sentar?
15              MR. DIULIO:  Wait.  To be clear, this isn't
16    the same -- this isn't Exhibit 88.  So we're marking
17    Exhibit 89 now?
18              MR. MARKHAM:  No, we're not.  I just want to
19    ask him if looking at that document --
20              THE WITNESS:  This is not a patent.  This is
21    a patent search.  It's not issued.  I don't know what
22    you're -- this is not a patent.
23              MR. MARKHAM:  Okay.
24              THE WITNESS:  Do you know anything about
25    patents?
```

05:18   5
05:18  10
05:18  15
05:19  20
05:19  25

**PLAINTIFFS' EXHIBIT B - 333**

BY MR. MARKHAM:

    Q.   I'm asking you --

    A.   I'm asking you, do you know anything about patents?

05:19         MR. DIULIO:  You answered the question, which is this is not a patent.

        THE WITNESS:  Show me a patent.  A certificate, it says patent issued.  Show me a patent.

BY MR. MARKHAM:

05:19    Q.   This is the one that's marked.  Could you take a look at this page.  Are you telling me that is a patent search?

    A.   Where is the patent number?

    Q.   See the attorney number?

05:19    A.   It says docket number.  Where is the patent number?

    Q.   I'm asking you to tell me whether you recognize that document.

    A.   I don't know what attorneys -- my attorney was

05:19  the one that taught 25 experts in patent.  You need to ask him.  I don't know.  I just invented it.  He documented it.  He did the search.  And there's a certificate.  This is like old, like him.

    Q.   I believe that --

05:20    A.   Don't waste my time on stuff that's already

**PLAINTIFFS' EXHIBIT B - 334**

|   |   |
|---|---|
| | 1 |  passed.  There's a patent issued.  Go get me a patent |
| | 2 |  number and I'll tell you. |
| | 3 |           MR. DIULIO:  So that's the question. |
| | 4 |           MR. MARKHAM:  I want another tape.  I want to |
| 05:20 | 5 |  go for another five minutes.  We've got ten minutes. |
| | 6 |  So can we stop and put in another tape? |
| | 7 |           MR. DIULIO:  That's fine. |
| | 8 |           MR. MARKHAM:   Thanks. |
| | 9 |           THE VIDEOGRAPHER:  We're going off the |
| 05:20 | 10 |  record.  The time is 5:20 p.m.  This is the end of |
| | 11 |  media number 3 in the deposition of Paul Edalat. |
| | 12 |           (Recess was taken.) |
| | 13 |           THE VIDEOGRAPHER:  We're going back on the |
| | 14 |  record.  The time is 5:23 p.m.  This is the beginning |
| 05:23 | 15 |  of media number 4 in the deposition of Paul Edalat. |
| | 16 |  BY MR. MARKHAM: |
| | 17 |      Q.   So I had Exhibit 88 open to a certain page |
| | 18 |  and I'd like to go back there, if I might, because you |
| | 19 |  were saying some things off the record that I would |
| 05:23 | 20 |  like you to put on the record. |
| | 21 |      A.   I'm sorry? |
| | 22 |      Q.   Okay.  I'm going to mark this page with an |
| | 23 |  orange check just to identify it.  It's part of |
| | 24 |  Exhibit 88.  I've marked the top of the page that I'm |
| 05:23 | 25 |  referring to with an orange check. |

**PLAINTIFFS' EXHIBIT B - 335**

```
 1            And could you read the title of that page for
 2   the record?
 3      A.   "Novel enhanced sublingual delivery system,
 4   processes, methodologies and product thereby."
 5      Q.   Okay.  Do you have -- have you ever had any
 6   involvement with a patent that is described like that?
 7            MR. DIULIO:  Objection.  Vague as to
 8   "involvement."
 9            THE WITNESS:  "By Paul Edalat of Irvine,
10   California."
11   BY MR. MARKHAM:
12      Q.   I'm asking you if you did.  I'm not asking
13   what the document says.  I'm asking you to testify
14   under oath --
15            MR. DIULIO:  If you know.
16            THE WITNESS:  The document speaks for itself.
17   BY MR. MARKHAM:
18      Q.   Is the answer yes or no?
19      A.   I mean, I don't know where you got this
20   document, but yes, I was involved in the patent.
21      Q.   Okay.  Is it your testimony that that
22   document does not reflect the patent?
23      A.   I don't know.  I'm not a legal expert.  I don't
24   know what this document is.
25      Q.   Okay.  Here.
```

05:23 — line 5
05:24 — line 10
05:24 — line 15
05:24 — line 20
05:24 — line 25

**PLAINTIFFS' EXHIBIT B - 336**

```
 1        A.    Thank you.
 2        Q.    Now, does it -- has a patent, a sublingual
 3   delivery systems patent been issued by the
 4   United States Patent and Trademark Office in favor of
 5   EFT Global Holdings dba Sci-Labs?
 6        A.    Asked and answered.
 7        Q.    Has it?
 8        A.    A few hours ago.  We went through this already.
 9        Q.    I'm sorry.  I don't --
10        A.    She can read it back.
11        Q.    You're not going to answer.
12        A.    I've already answered it.
13             MR. DIULIO:  It was yes; right?
14             THE WITNESS:  I've already answered it.
15   BY MR. MARKHAM:
16        Q.    I'm sorry.  I don't believe that you answered
17   whether it was issued in the United States.
18        A.    Then if you already know the answer, why are
19   you asking again?
20        Q.    Can I please --
21        A.    Why are you asking again?  You got five
22   minutes.  Ask some relevant questions to Pharma Pak.
23             MR. DIULIO:  Humor him.
24             THE WITNESS:  I don't -- I've already
25   answered it.
```

05:24   5
05:25  10
05:25  15
05:25  20
05:25  25

**PLAINTIFFS' EXHIBIT B - 337**

|   | |
|---|---|
| 1 | MR. MARKHAM:  Kris, I want an answer to this |
| 2 | question.  He has not answered whether -- |
| 3 | THE WITNESS:  I answered it.  She can read it |
| 4 | back. |
| 5 | BY MR. MARKHAM: |

05:25 (line 5)

```
 1          MR. MARKHAM:  Kris, I want an answer to this
 2  question.  He has not answered whether --
 3          THE WITNESS:  I answered it.  She can read it
 4  back.
 5  BY MR. MARKHAM:
 6      Q.  What's the problem with answering it again if
 7  you think --
 8      A.  Because you're wasting my time.  My time is
 9  valuable.
10      Q.  You have not answered that question.
11      A.  I have.  You wanna bet?  You wanna bet?
12      Q.  I want you to answer the question,
13  Mr. Edalat.
14      A.  No.  No.  Do you wanna bet?
15      Q.  Has it been issued?
16      A.  Are you a gambling man?  You told me you're a
17  poker player.  You wanna bet?
18          MR. MARKHAM:  Please tell him to answer the
19  question.
20          THE WITNESS:  I have answered.  Why are you
21  getting frustrated because you don't remember?  I
22  don't have any notes in front of me.  I bet you $1,000
23  I've already answered that question.
24          MR. DIULIO:  Will you answer again now,
25  please.
```

Time stamps in left margin: 05:25 (lines 5, 10, 15, 20), 05:26 (line 25)

PLAINTIFFS' EXHIBIT B - 338

```
 1                THE WITNESS:  No.

 2                MR. MARKHAM:  I think this is a good time to

 3       stop the deposition.

 4                THE WITNESS:  I do too.

05:26  5                MR. MARKHAM:  Do you have to run out or can I

 6       talk to you a little bit?

 7                MR. DIULIO:  I can talk for like a minute.

 8                THE WITNESS:  Am I done?

 9                MR. DIULIO:  Yeah.  We're going off record.

05:26 10                MR. MARKHAM:  For now.

11                THE WITNESS:  For tonight?

12                MR. MARKHAM:  For tonight, yes.

13                MR. DIULIO:  We agreed, let's off the record

14       and we can talk.

05:26 15                THE VIDEOGRAPHER:  This concludes today's

16       deposition of Paul Edalat.  The number of media used

17       was four.  We're going off the record.  The time is

18       5:26 p.m.

19                (The proceedings adjourned at 5:26 p.m.)

20                            ***

21

22

23

24

25
```

PLAINTIFFS' EXHIBIT B - 339

1          I, PAUL BENJAMIN EDALAT, declare under

2    penalty of perjury under the laws of the State of

3    California that the foregoing is true and correct.

4          Executed at _____,

5    California, on _____, 20_____.

6

7

8

9

10                    _____

11                         PAUL BENJAMIN EDALAT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBIT B - 340

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2   Note:  If you are adding to your testimony, print

 3   the exact words you want to add.  If you are deleting

 4   from your testimony, print the exact words you want to

 5   delete.  Specify with "Add" or "Delete" and sign

 6   this form.

 7

 8   DEPOSITION OF:      PAUL BENJAMIN EDALAT

 9   CASE:               CAHILL V. EDALAT

10   DATE OF DEPOSITION: DECEMBER 21, 2016

11   PAGE          LINE      CHANGE/ADD/DELETE

12   _____         _____     _____

13   _____         _____     _____

14   _____         _____     _____

15   _____         _____     _____

16   _____         _____     _____

17   _____         _____     _____

18   _____         _____     _____

19   _____         _____     _____

20   _____         _____     _____

21   _____         _____     _____

22   _____         _____     _____

23   _____         _____     _____

24   _____         _____     _____

25   Deponent's Signature _____ Date_____
```

**PLAINTIFFS' EXHIBIT B - 341**

1   PAGE          LINE          CHANGE/ADD/DELETE

2   _____         _____         _____

3   _____         _____         _____

4   _____         _____         _____

5   _____         _____         _____

6   _____         _____         _____

7   _____         _____         _____

8   _____         _____         _____

9   _____         _____         _____

10  _____         _____         _____

11  _____         _____         _____

12  _____         _____         _____

13  _____         _____         _____

14  _____         _____         _____

15  _____         _____         _____

16  _____         _____         _____

17  _____         _____         _____

18  _____         _____         _____

19  _____         _____         _____

20  _____         _____         _____

21  _____         _____         _____

22  _____         _____         _____

23  _____         _____         _____

24  _____         _____         _____

25  Deponent's Signature _____ Date_____

**PLAINTIFFS' EXHIBIT B - 342**

1  STATE OF CALIFORNIA  ) ss.

2

3      I, CARINA VALLES, CLR, CSR No. 12605, do hereby

4  declare:

5

6      That, prior to being examined, the witness named

7  in the foregoing deposition was by me duly sworn;

8

9      That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter transcribed under my direction;

12

13      I further declare that I have no interest in the

14  event of the action.

15

16      I declare under penalty of perjury under the laws

17  of the State of California, that the foregoing is true

18  and correct.

19

20      WITNESS my hand this 4th day of January, 2017.

21

22

23  _____
   CARINA VALLES, CLR, CSR No. 12605

24

25

**PLAINTIFFS' EXHIBIT B - 343**