1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING

4    BRUCE CAHILL, ET AL.,          )
                                    )
5                                   )
                                    )
6                      Plaintiffs,  )
                                    )
7                                   )
                                    )
8          Vs.                      )   No. SACV16-0686-AG
                                    )
9                                   )
                                    )
10   PAUL PEJMAN EDALAT, ET AL.,     )
                                    )
11                                  )
                                    )
12                     Defendants.  )
                                    )
13   _____  )

14

15

16             REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    *JURY TRIAL, DAY 4*

18                   SANTA ANA, CALIFORNIA

19                  FRIDAY, JULY 28, 2017

20

21

22          MIRIAM V. BAIRD, CSR 11893, CCRA
            OFFICIAL U.S. DISTRICT COURT REPORTER
23          411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 92701
24               MVB11893@aol.com

25

1                          **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFFS,**      JOHN JAMES MARKHAM III
     **BRUCE CAHILL:**                     BRIDGET ZERNER
4                                          MARKHAM & READ
                                           17082 SKY PARK CIRCLE
5                                          SUITE 200
                                           IRVINE, CA 92614
6

7

8

9

10   **IN BEHALF OF THE DEFENDANTS,**      MIR SAIED KASHANI
     **PAUL PEJMAN EDALAT:**               SAIED KASHANI LAW OFFICES
11                                         800 WEST FIRST STREET
                                           SUITE 400
12                                         LOS ANGELES, CA 90012

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2    WITNESS:                                          PAGE:

 3
      Greg Cullen Plaintiffs' Witness, previously         6
 4    sworn
      CROSS-EXAMINATION RESUMED                           6
 5    Amir Asvadi, Defendant's witness, sworn            73
      DIRECT EXAMINATION                                 73
 6    CROSS-EXAMINATION                                  85
      REDIRECT EXAMINATION                              110
 7    RECROSS-EXAMINATION                               116
      Dennis Ardi, Defendant's witness, sworn           119
 8    DIRECT EXAMINATION                                119
      CROSS-EXAMINATION                                 127
 9    Greg Cullen, Plaintiff's witness, previously      129
      sworn
10    CROSS-EXAMINATION RESUMED                         129
      REDIRECT EXAMINATION                              163
11    Phillip Sprague, Defendant's witness, sworn       190
      DIRECT EXAMINATION                                191
12    CROSS-EXAMINATION                                 196
      REDIRECT EXAMINATION                              198
13    RECROSS-EXAMINATION                               199
      Kira Cahill, Plaintiff's witness, sworn           201
14    DIRECT EXAMINATION                                201
      Greg Cullen, Plaintiff's witness, previously      206
15    sworn

16    RECROSS-EXAMINATION                               206
      FURTHER REDIRECT EXAMINATION                      209
17    Karen Cahill, Plaintiff's witness, sworn          210
      DIRECT EXAMINATION                                210
18
                            *****
19

20    EXHIBITS:

21    Exhibit 42 received                                 6
      Exhibit 604 received                               14
22    Exhibit 391 received                               35
      Exhibit 947 received                              114
23    Exhibit 1005 received                             124
      Exhibit 1006 received                             126
24    Exhibit 812 received                              135
      Exhibit 769-57 received                           140
25    Exhibit 74 received                               162
      Exhibits 228-248 received                         169
```

1    Exhibit 575 received                                    195

2                              *****

```
 1        SANTA ANA, CALIFORNIA; FRIDAY, JULY 28, 2017; 8:00 A.M.

 2                              ---

 3        THE COURT:  It's Friday at 8:00 o'clock, and the

 4  jury has shown up.

 5        MR. MARKHAM:  Yes, Your Honor.  Very briefly,

 6  Mr. Kashani and I have agreed that a proper way to lay a

 7  foundation in this case for recordings that a witness has not

 8  heard, any witness, is to play in open court a

 9  noncontroversial part of the tape, maybe a minute or two at

10  the beginning, in front of the jury.

11        Then if the witness says, yes, that's my voice,

12  then it's deemed authenticated.

13        Is that correct?

14        MR. KASHANI:  Yes.

15        THE COURT:  All right.  I appreciate your working

16  that out, counsel.  That's a very creative solution.

17        THE CLERK:  All rise.

18        (Open court - jury present)

19        THE COURT:  Welcome back, ladies and gentlemen.

20  It's 8:00 in the morning.  I appreciate your getting here

21  early.  You have all been so diligent.  I see a few sleepy

22  eyes, but I know you'll get right into it.

23        Counsel and I were just working out a tiny little

24  evidentiary issue that will make things go more quickly

25  today, and we are ready to roll -- which means Mr. Cullen --
```

```
 1              MR. MARKHAM:  Mr. Cullen should retake the stand,
 2    Your Honor?
 3              THE COURT:  Yes, please.
 4              Continue.
 5         Greg Cullen Plaintiffs' Witness, previously sworn
 6                   CROSS-EXAMINATION RESUMED
 7    BY MR. KASHANI:
 8    Q.   Mr. Cullen, good morning.
 9              Do you remember yesterday we were talking about the
10    bill of sale of your purchase of assets of PharmaPak?
11    A.   I do remember that, yes.
12    Q.   Was there also a purchase agreement attached to this
13    bill of sale?
14    A.   I believe there was, yes.
15              MR. KASHANI:  I'd like to offer Exhibit 42.  I
16    think it's stipulated.
17              THE COURT:  Without objection 42 is admitted.
18              (Exhibit 42 received.)
19    BY MR. KASHANI:
20    Q.   Now, sir, this bill of sale or this purchase agreement
21    is dated March 11, 2016; is that correct?
22    A.   It is.
23    Q.   Now, earlier we saw what you say is a corporate
24    authorization for the purchase.  I would like to show that
25    again.  That's Exhibit 54?
```

```
 1    A.    Uh-huh.

 2    Q.    You have to answer audibly, sir.

 3    A.    Yes.  I see that.

 4    Q.    And as you pointed out, the corporate authorization is

 5    dated also March 10th, consistent with the purchase

 6    agreement?

 7    A.    Actually the purchase agreement said March 11th.

 8    Q.    But before the purchase agreement?

 9    A.    Correct.

10    Q.    Isn't it a fact, sir, that you and Mr. Cahill backdated

11    the consent in order to make it appear before the purchase

12    agreement?

13    A.    I will share with you my recollection.  I was sitting in

14    Mr. Cahill's office with these documents.  Mr. Cahill and I

15    signed the resolution.  I then called Mr. Franco.  I believe

16    Bruce called Mr. Scott, and I said we're not doing anything

17    until we get signatures from them.

18    Q.    Well, we went over that, sir.  My question is --

19    A.    Those signatures were on other pages that were not

20    attached to the document with Bruce and my signature.

21    Q.    Pages that we've never seen?

22    A.    I saw them, and that was what was important to me before

23    I did something that in my opinion would have been improper.

24    Q.    Sir, can we just stick to the dates for a moment?

25    A.    Sure.
```

1    Q.   You said you sent around the unanimous consent

2    resolution for the other shareholders to see.  In fact, you

3    just said that when you're signing the purchase and sale

4    agreement, that's when you e-mailed it?

5    A.   I actually didn't send any e-mails.  It wasn't my

6    company.  I was --

7    Q.   Well, someone --

8    A.   -- a shareholder.

9    Q.   But someone did?

10   A.   Somebody did.  I believe it was sent more than once.

11   Q.   Isn't it a fact, sir, that the unanimous consent

12   resolution wasn't sent out until March 14th after you and

13   Mr. Cahill had transferred the assets?

14   A.   Sure.

15   Q.   I'd like to show you Exhibit 53.  Didn't you testify

16   before that Exhibit 53 is your sending around or Bruce

17   sending around -- Mr. Cahill sending around the unanimous

18   consent resolution?

19   A.   I see that.

20   Q.   And don't you see, sir, that the unanimous consent

21   resolution was not sent until March 14, which is after you

22   had already sold the assets to yourself?

23   A.   I do see that.

24   Q.   So what happened here, sir, is that you got together

25   with Mr. Cahill in his office, transferred the assets to

```
 1    yourselves, and then papered the transaction a few days
 2    later.  Isn't that what you did?
 3    A.   No, that's not what happened, sir.
 4    Q.   Did you send -- and then in that case did you send the
 5    unanimous consent resolution on March 14 and then backdate
 6    the bill of sale so it would appear to be before you got the
 7    consent?
 8    A.   I'll explain if you allow me.
 9    Q.   Please.
10    A.   Sure.  In a setting like this it is not uncommon that
11    more than one e-mail may go out.  Okay?  Some people didn't
12    respond to this.  Your client didn't respond to it.
13    Mr. Asvadi to my knowledge did not respond to it.  So it
14    wouldn't surprise me that there's more than one e-mail like
15    this that did go out.
16    Q.   Okay.  Where are those other e-mails, sir?  We'd be
17    happy to see them.
18    A.   I don't know where they are.
19    Q.   Like the signatures that you don't know where they are?
20    A.   As I explained yesterday, I sat in Mr. Cahill's office
21    and did nothing until I personally saw a consent to this from
22    a majority of the shareholders -- Mr. Scott and Mr. Franco --
23    and they can -- you can ask them under oath if they signed
24    that.
25    Q.   Sir, is that what you testified to in your deposition?
```

1  A.   I don't recall.  Maybe I could -- you could point out my

2  deposition and refresh my memory.

3  Q.   Well, I'll just read from your deposition.

4  A.   Sure.

5           MR. MARKHAM:  Can you give us a page?

6           MR. KASHANI:  One second, please.

7           MR. MARKHAM:  And which deposition?  There's two.

8           MR. KASHANI:  That's correct.  This is

9  Mr. Cullen's -- I call it the first deposition.  It's a

10  deposition where he was testifying personally.

11           MR. MARKHAM:  Okay.

12           MR. KASHANI:  And it's page 76, lines 17 through

13  22:

14           "Question:  So are you saying that you believe

15  there's another document that has not been produced?

16           "Answer:  I would imagine there is a document like

17  this that has Shane and Ron's signature, yes.  I would

18  believe that to be the case because I did speak to them at

19  this time."

20  BY MR. KASHANI:

21  Q.   Now, sir, you're telling this jury today that you saw

22  the document with Ron and Shane's signatures.  That's what

23  you're telling this jury under oath today; correct?

24  A.   That's what I'm telling them.

25  Q.   But in your deposition you were also testifying under

1    oath?

2    A.    Yes.  And in my deposition, as you might imagine --

3    Q.    You've answered my question, sir.  You were testifying

4    under oath?

5    A.    Yes.

6    Q.    In your deposition you testified that you would imagine

7    that there was a document out there with the signatures, but

8    you did not say in your deposition that you saw such a

9    document?

10   A.    I didn't give it much thought in my deposition.  I have

11   thought this through many times since that and I remember

12   specifically, and I confirmed it with Mr. Franco that he and

13   I had a phone conversation.

14          MR. KASHANI:  Objection.  Move to strike as

15   hearsay.

16          THE COURT:  Sustained.

17          THE WITNESS:  Okay.

18   BY MR. KASHANI:

19   Q.    Now, I want to go back to this trust of yours.

20   A.    Okay.

21   Q.    Sir, the entity that bought the shares in this case is

22   your trust; is that correct?

23   A.    I believe they are held in my trust.

24   Q.    Not held, sir.  Hasn't it been factually stipulated that

25   the trust purchased the shares?

```
 1   A.   I believe so.

 2   Q.   Now, that --

 3   A.   I didn't read all the stipulations, just for the record.

 4   Q.   That trust, that's an entity I assume you set up for tax

 5   reasons or asset reasons?  Some reason you had; correct?

 6   A.   Yes.

 7   Q.   Now, that trust is a legitimate trust; isn't it?

 8   A.   As far as I know.  I paid an attorney to set it up, so I

 9   would assume so.

10   Q.   And that trust is a separate legal entity from you

11   individually; is it not, sir?

12   A.   You know, you would have to speak to my lawyer who set

13   it up.  I don't necessarily consider them separately, but

14   maybe under the definition of the law they would be.

15   Q.   Well, sir, if some creditor came up, you're not going to

16   say that that trust and you are one and the same; are you?

17   A.   My bank considers it when they ask for my guarantee, so

18   I've never viewed them as different.

19   Q.   But when the trust borrows money, the bank asks for a

20   separate guarantee from you; right?

21   A.   The trust has never borrowed money.

22   Q.   When the trust engages in transactions, the bank treats

23   you separately; do they not, sir?

24   A.   Actually the trust is never engaged in those type of

25   transactions to my knowledge.
```

```
 1    Q.   In any event, sir, you set up this trust and it's a
 2    legitimate entity; correct?
 3    A.   That's my understanding, yes.
 4    Q.   And you are here as a plaintiff as an individual; is
 5    that correct, sir?
 6              THE WITNESS:  John, could you clarify that?
 7              MR. MARKHAM:  I can't.
 8              THE WITNESS:  Okay.
 9    BY MR. KASHANI:
10    Q.   Sir, why don't I show you your complaint in this case.
11              MR. MARKHAM:  Your Honor, I can shortcut this.  The
12    complaint names Greg Cullen, not Greg Cullen as trustee.
13              MR. KASHANI:  All right.  Thank you.
14              THE COURT:  Thank you for that.  Appreciate it.
15    BY MR. KASHANI:
16    Q.   Now, sir, you've testified that you relied on some
17    information regarding Sentar Pharmaceutical in making your
18    investment in PharmaPak; is that correct?
19    A.   I relied on it to be truthful, yes.
20    Q.   Isn't it a fact, sir, that you understood that Sentar
21    was separate from PharmaPak and that your decision as to
22    Sentar was independent?
23    A.   It was clear to me that Sentar was a separate company.
24    Q.   A separate company in which you did not invest?
25    A.   In which I was promised an interest.
```

14

```
 1    Q.   Sir, can you just answer my question?

 2    A.   Yes, but I did not write a check to Sentar.  That's

 3    correct.

 4              MR. KASHANI:  I'd like to show Exhibit 604.  I

 5    think it's in evidence.

 6              Mr. Markham, Exhibit 604?

 7              THE COURT:  It's not in evidence, but it was

 8    stipulated.  It's admitted without objection.

 9              (Exhibit 604 received.)

10    BY MR. KASHANI:

11    Q.   Is Exhibit 604, sir, an e-mail from you to Paul Edalat

12    and Bruce Cahill dated September 18, 2015?

13    A.   Yes, it is.

14    Q.   And in this e-mail are you describing the investment

15    that you're going to make in PharmaPak?

16    A.   Yes, it does.

17    Q.   And do you state clearly in your e-mail that the

18    investment would be in PharmaPak for a ten percent interest

19    in the company?

20    A.   These were some of the initial discussions that I was

21    having with Mr. Edalat, yes.

22    Q.   Well --

23    A.   Well, not the conclusive, but certainly one of the

24    initial discussions, yes.

25    Q.   Well, in the end isn't that what happened is that you
```

1   invested?  Well, you didn't invest 500,000, but you invested

2   250,000 in shares in PharmaPak; is that correct?

3   A.   Actually it says from me, but it was the trust that did

4   it, to clarify.

5   Q.   Yes, it is.  Thank you.

6        Now, sir, one of the things that you cover here is

7   that you're buying shares from Mr. Edalat; is that correct?

8   A.   Yes.

9   Q.   Did you have the option to ask to buy shares directly

10  from the company?

11  A.   I don't recall that being part of the discussion.

12  Q.   But you understand the difference between buying shares

13  directly from the corporation and buying shares from another

14  shareholders; don't you?

15  A.   I do.

16  Q.   And if you chose to do so and insisted and bought shares

17  directly from the company, then 100 percent of your money

18  would go to the company and not to Mr. Edalat; is that

19  correct?

20  A.   That would be the normal course, yes.

21  Q.   As it happened, you said you bought $250,000.  Of that,

22  how much money went to Mr. Edalat and how much did you

23  deposit directly into the company?

24  A.   All of it went to Mr. Edalat or to pay down debts of

25  Mr. Edalat's.

1    Q.   Were they debts or capital costs?

2    A.   My understanding is they were obligations of his to the

3    company.

4    Q.   Well, sir, in any event you gave -- you've been

5    talking -- you've said -- I want to clarify this point.

6    You've said that Mr. Edalat took $2 million.  That's what

7    you've been saying here; is that correct?

8    A.   Collectively he took, I'll say, approximately two

9    million.  We can do an accounting.  It might be slightly

10   less.

11   Q.   Well, isn't it a considerably less, sir?  Your $250,000,

12   of that you gave $100,000 to Mr. Edalat to purchase shares;

13   is that correct?

14   A.   Yes, absolutely.  That's correct.

15   Q.   And then you deposited directly $100,000 into the bank

16   account of PharmaPak; is that correct?

17   A.   At Paul's request, yes.

18   Q.   And then you gave $50,000 to Bruce Cahill?

19   A.   At Paul's request, to pay down his debt to Mr. Cahill.

20   Q.   Well, that's what you're saying.  I haven't -- is there

21   a --

22            MR. MARKHAM:  Objection, Your Honor, to that's what

23   he's saying.

24            THE COURT:  Sustained.

25

```
 1   BY MR. KASHANI:

 2   Q.   Is there --

 3            THE COURT:   Hold on.   Stop.   The objection is

 4   sustained.   Start a new question.

 5   BY MR. KASHANI:

 6   Q.   Is there a note or other document that indicates that

 7   Mr. Edalat owed money to PharmaPak?

 8   A.   That's a great question.   I was not -- I was just coming

 9   in as an investor, and Paul asked me to do that --

10   Q.   I --

11   A.   -- to take care of his obligation.   Did I see a note

12   between him and the company?   I did not, but it didn't

13   matter.   The money was going to him, and he could have put it

14   all in his pocket and then turned around and redeposited it

15   into the bank account.   To save that step, he asked me to

16   deposit it directly into the bank account.

17   Q.   Well, you say it's a debt.   But regardless of how you

18   characterize the transaction, isn't it a fact that of the

19   250,000 that you invested, 100,000 went to Mr. Edalat,

20   100,000 went directly to PharmaPak, and 50,000 went to Bruce

21   Cahill?

22   A.   That is exactly how Paul directed me to make those

23   checks, yes.

24   Q.   Now, in the two million, are you including 750,000

25   invested by Mr. Ron Franco's trust?
```

```
 1    A.    When I say $2 million, no, I'm not, actually.  Well,

 2    hold on.  If you give me a moment, I'll do the math in my

 3    head.

 4    Q.    Sure.

 5    A.    No, I'm not.

 6    Q.    Well, where is the two million coming from?  How do you

 7    get that number?

 8    A.    Okay -- from recollection.  My understanding is that

 9    Mr. Cahill gave half a million to Mr. Edalat.  Mr. Crowther

10    gave 250,000 to Mr. Edalat.

11    Q.    Wait a minute, sir.  Oh, okay.  I understand now.

12    A.    I gave 250,000 to Mr. Edalat.  That's a million.

13    Mr. Asvadi and Mr. Scott gave 500,000 each to Mr. Edalat.

14    That's two million.

15    Q.    Okay.  I understand where you're coming from, sir.

16    A.    So if Mr. Edalat put a hundred thousand back in to the

17    company to repay a loan, then maybe it's 1.9.  But --

18    Q.    I --

19    A.    -- I didn't --

20    Q.    I understand what you're saying.  Mr. Crowther, is he

21    here suing for his money back?

22    A.    He is not to my knowledge.

23    Q.    Is Mr. Crowther asking for anything from Mr. Edalat?

24    A.    My understanding is they have ongoing business dealings,

25    and he has other interests with Mr. Edalat.
```

```
 1    Q.   Sir, I asked you for your personal knowledge.  Is

 2    Mr. Crowther suing Mr. Edalat for any of that $500,000 back?

 3    A.   I don't have knowledge of that.

 4    Q.   And Mr. Asvadi whose trust invested, is the Asvadi trust

 5    asking for that $500,000 back?

 6    A.   That would be a great question for him.

 7    Q.   Well, he'll be here later today.

 8    A.   My understanding is he's got a deal worked out with Paul

 9    to get his money back.

10    Q.   Sir, I'm asking for your personal knowledge, not your

11    understanding.  Is Mr. Asvadi suing Mr. Edalat for any of

12    that money back?

13    A.   Not to my knowledge.

14    Q.   So of the defendants in this room -- the plaintiffs in

15    this room who are actually suing Mr. Edalat, how much money

16    did you folks give to Mr. Edalat as opposed to went into the

17    company?

18    A.   1.25 million.

19    Q.   And of that 1.25 million, wasn't a lot also deposited

20    one way or another into the company?

21    A.   My understanding is that 100,000 of it was.

22    Q.   Of your money?

23    A.   Of my money.

24    Q.   Are you aware that over half of Mr. Cahill's investment

25    was in fact deposited into the company?
```

1    A.   I'm not aware of that.

2    Q.   Are you -- and Mr. Franco, of course, his entire

3    investment of 750,000 went into the company?

4    A.   Yes.

5    Q.   So when you say Mr. Edalat got $2 million, you're

6    counting a million dollars from investors who are not suing

7    him and are not in this courtroom?

8    A.   Perhaps if Paul made deals with me, I wouldn't be suing

9    him either.

10   Q.   Sir, you're speculating as to deals; right?  That's your

11   speculation.  That's not evidence.

12   A.   I've seen documentation that Mr. Asvadi --

13   Q.   Where is this documentation?  More signatures that you

14   imagined?

15           MR. MARKHAM:  Objection, Your Honor.  That's two

16   questions.

17           THE COURT:  Sustained.

18           THE WITNESS:  I --

19           THE COURT:  Hold on.

20           THE WITNESS:  Okay.

21           THE COURT:  Frame another question.

22   BY MR. KASHANI:

23   Q.   Where is this documentation that you say of some deals

24   between Mr. Edalat and Mr. Asvadi's trust or John Crowther?

25   A.   I've seen documentation to the effect that show

1    Mr. Asvadi and Ms. Karpinski have stock in the new company

2    which Paul is involved in now making patches, a publicly

3    traded company.  This is public information.

4    They're making --

5    Q.   Where is this document, sir?

6    A.   I'm sure we could dig it up.  I think it's on the

7    Internet.

8    Q.   Isn't what really is going on here is that when you cut

9    out Mr. Edalat as a shareholder, you also cut out Asvadi

10   trust and John Crowther?

11   A.   When I formed a new company -- when I formed a new

12   company, I had conversations with people who I thought would

13   be beneficial and productive in the new venture.  A key

14   element in forming any venture is whether or not you can

15   trust the people you're working with.  That's a key element.

16          Business is one element.  Who you're working with,

17   the character of who you're working with, is another huge and

18   perhaps the most important --

19   Q.   Excuse me, sir.  Are you now challenging the character

20   of John Crowther as well?

21   A.   No.  I did talk to John and asked him if he would be

22   interested in being part of the new company.

23   Q.   Sir, is that a -- wasn't Mr. Crowther already a

24   shareholder in PharmaPak?

25   A.   Yes, he was.

1    Q.   And are you saying that as a director of -- now, as a

2    director of PharmaPak, Bruce Cahill had fiduciary duties to

3    all the shareholders, not just his buddies; right?

4    A.   Of course he did.

5    Q.   And didn't that fiduciary duty include the duty not to

6    do self dealing?

7    A.   Of course it did.

8    Q.   So Mr. Cahill had no right to take the assets of the

9    corporation, PharmaPak, out from under the other shareholders

10   and transfer it to a company that he owned?

11              MR. MARKHAM:  Objection, Your Honor.

12              THE WITNESS:  Of course he didn't.

13              THE COURT:  Hold on.  When you hear an objection --

14              THE WITNESS:  Sorry.

15              THE COURT:  The objection is?

16              MR. MARKHAM:  Legal conclusion -- no right.

17              THE WITNESS:  Yes.  That's why I --

18              THE COURT:  Boy --

19              THE WITNESS:  Sorry.

20              THE COURT:  I'm tempted to make a comment about

21   Harvard men.  This public-school guy is wearing the black

22   robe, so -- just see if you can rephrase.

23   BY MR. KASHANI:

24   Q.   Sir, is it -- in your understanding was it consistent

25   with Mr. Cahill's fiduciary duty to all the shareholders of

1    PharmaPak to take the assets of PharmaPak into a company that

2    he owned?

3    A.    That would be improper, and I did not permit it.

4    Q.    Fair enough.

5          Let's go back to your e-mail, Exhibit 604.  Now, in

6    your e-mail did you not state that you understood that Sentar

7    was independent?

8    A.    I did state that.

9    Q.    Sir, before you invested in PharmaPak, you had prior

10   dealings with Mr. Cahill; is that correct?

11   A.    I've known him for probably 15 years.  Yes.

12   Q.    And you were involved in different business with

13   Mr. Cahill?

14   A.    One different business, yes.

15   Q.    How did that business go?

16   A.    It failed.

17   Q.    So you had previously been involved in a failed business

18   with Mr. Cahill, and Mr. Cahill asked you to invest in

19   PharmaPak?

20   A.    He mentioned the company to me.  We talked over the

21   years about all sorts of things we were involved in.

22   Q.    Sir, who originally approached you to invest in

23   PharmaPak?

24   A.    Bruce told me what he was working on.  He and I had a

25   meeting.  I don't recall him saying:  Come down here.  We

1    would like you to invest.

2    Q.    But Bruce Cahill introduced you to PharmaPak?

3    A.    Yes.  Fair statement.

4    Q.    And that's understandable because you had the prior

5    relationship with Bruce Cahill?

6    A.    Correct.

7    Q.    You had no prior relationship with Mr. Edalat?

8    A.    I did not.

9    Q.    And you certainly had no relationship with

10   Ms. Karpinski?

11   A.    I did not.

12   Q.    Bruce Cahill was CEO of PharmaPak; correct?

13   A.    That is correct.

14   Q.    Bruce Cahill signed your trust's shares; did he not?

15   A.    I believe he did.

16   Q.    Bruce Cahill signed the purchase agreement for shares

17   with your trust?

18   A.    Yes.  I think that's correct.

19   Q.    And you had conversations with Bruce Cahill before

20   investing here today?

21   A.    I did have some conversations, yes.

22   Q.    One of your complaints is you're claiming that you did

23   not know that Mr. Edalat had previously been subject of an

24   FDA action; is that correct?

25   A.    That's correct.

1   Q.   Now, you invested when?   October 2015?

2   A.   Correct.

3   Q.   Have you -- you've been sitting in this courtroom;

4   right?

5   A.   Yes.

6   Q.   Did you see the e-mail dated January 2015 in which

7   Mr. Edalat sent Mr. Cahill a copy of the FDA Injunction and

8   Consent Decree?

9   A.   I saw it in the courtroom for the first time, yes.

10   Q.   So isn't it clear based on that e-mail that Mr. Cahill

11   had some knowledge in January 2015 of Mr. Edalat's FDA

12   problems?

13   A.   It would certainly appear if everything that e-mail was

14   true and he read it.   I would say even with my education, the

15   word consent decree doesn't really mean much to me

16   personally.   I mean, that's a very uncommon term.   So a

17   consent decree kind of sounds like two people getting married

18   or something.

19   Q.   Well, wait a minute.   You've never heard of, for

20   example, the Securities & Exchange Commission Consent Decree?

21   A.   I've never heard that term before, no.

22   Q.   But in any event, Mr. Cahill had knowledge of these

23   issues before you invested?

24   A.   It would appear so from the e-mail you showed.

25   Q.   And Bruce Cahill introduced you to PharmaPak as the

```
 1    investment?
 2    A.    Yes.
 3    Q.    And Bruce Cahill was the CEO of PharmaPak?
 4    A.    Yes, he was.
 5    Q.    Now, don't you think if this was a problem, it was
 6    Mr. Cahill's duty to tell you that:  My partner here, Paul
 7    Edalat, has had some FDA problems?
 8    A.    I think if Bruce was fully aware of it, he should have
 9    informed me of that.
10    Q.    Well, sir, this litigation has been going on for a
11    while.  There's been a lot of documents exchanged.
12    A.    Sure.
13    Q.    Hasn't it become clear to you and your attorney by now
14    that Mr. Cahill had some knowledge of these FDA issues?
15    A.    The interesting thing is I never saw the Consent Decree
16    before you put it up on the screen.
17    Q.    Because Bruce Cahill never showed it to you?
18    A.    If he had it, he didn't show it to me.
19    Q.    And Bruce Cahill never told you that Mr. Edalat was
20    involved in a bankruptcy?
21    A.    I don't -- I recall him telling me that after the
22    company imploded.
23    Q.    Sir, as between the CEO of the company who has this
24    knowledge, and Mr. Edalat, who is responsible to tell you as
25    a friend and the investor about these issues?
```

```
 1    A.   I would answer it this way:  It would depend on what he

 2    knew and understood about those issues.  I would also expect

 3    Paul to be forthcoming about the issues in his past --

 4    Q.   Isn't it a fact --

 5    A.   -- if I'm buying stock from him.

 6    Q.   Isn't it a fact --

 7    A.   Sorry.

 8            THE COURT:  Hold on.

 9            THE WITNESS:  I said I would expect Mr. Edalat, if

10    I am buying stock from him, to disclose issues that might

11    affect the future of the company.

12    BY MR. KASHANI:

13    Q.   But, sir, Mr. Cahill was fully aware of your stock

14    purchase from Mr. Edalat; was he not?

15    A.   He was fully aware of the stock purchase from

16    Mr. Edalat, yes.

17    Q.   In fact, let's look again at your e-mail of

18    September 18.  You see that on your e-mail describing your

19    stock purchase, Bruce Cahill is copied?

20    A.   Yes.  He was aware of it.

21    Q.   Well, you're not suing Bruce Cahill; are you?

22    A.   I'm not suing Bruce Cahill.

23    Q.   Now, Mr. Edalat was not an officer or a director of

24    PharmaPak; was he?

25    A.   He claimed to be.  He claimed to be a director.
```

1    Q.   Sir, you've seen the corporate records?

2    A.   I have.

3    Q.   And you testified before that Mr. Cahill was the sole

4    director?

5    A.   Yes.

6    Q.   And Ms. Karpinski, was she an officer or director of

7    PharmaPak?

8    A.   She was not an official officer or director.

9    Q.   She was an employee; right?

10   A.   Correct.

11   Q.   And you sued her for fraud over your stock purchase;

12   isn't that correct, sir?

13   A.   I believe when you make false misleading statements,

14   that's fraud.

15   Q.   Just yes or no, sir.

16   A.   Yes.

17   Q.   You have sued Ms. Karpinski.  So instead of suing the

18   CEO of the company who is your friend that you knew for

19   15 years and who introduced you to PharmaPak, you're suing an

20   employee?

21   A.   She's part of the suit, yes.  There were other

22   fraudulent --

23   Q.   Is that what they taught you at the Harvard Business

24   School, to blame the employees and --

25            MR. MARKHAM:  He had not finished his answer.

```
 1          THE COURT:  Actually the answer -- it was adding
 2    on, but the question had been answered.  And I'm not sure if
 3    the court reporter got what he added on, but it was an
 4    add-on.  The question had been answered.
 5          And now we have a question about what Harvard is
 6    doing?
 7          THE WITNESS:  Harvard Business School --
 8          THE COURT:  Hold on.  Is that really relevant?
 9          MR. KASHANI:  No, sir.  No, Your Honor.
10          THE COURT:  Okay.  So we need another question.
11    BY MR. KASHANI:
12    Q.   Who told you to sue Olivia Karpinski?
13    A.   We came to that conclusion after looking at what she and
14    Paul did to, in my view, defraud PharmaPak and lead to its
15    demise.
16    Q.   Sir, who is we?  You and Bruce Cahill?
17    A.   I had a conversation with John Markham --
18    Q.   I'm just asking you:  Who is we?
19    A.   We included Bruce.  It included Shane, who was part of
20    team Paul in the beginning.  And there were lines he would
21    not cross, and he said:  They're crossing lines.  I can't
22    live with myself.  I'm not going to cross those lines.
23    Q.   Sir, isn't it a fact that all four of you who took the
24    corporate assets of PharmaPak over to Life Tech, you're the
25    four who are now suing Mr. Edalat and Ms. Karpinski?
```

1    A.    Let me restate.

2    Q.    I'm just asking.  Those four who are listed in the

3    PharmaPak -- in the Life Tech Global private offering

4    memorandum as founders of Life Tech Global, these are the

5    four who are suing Mr. Edalat and Mr. Karpinski [sic]?

6    A.    I took the assets via a purchase agreement.  The four

7    did not take the assets, to be clear, because you made that

8    statement, that's not clear.  My company --

9    Q.    I said the four who are listed as founders in your

10   private offering memorandum, they're the ones who are suing

11   Mr. Edalat and Ms. Karpinski?

12   A.    The four individuals who I referred in a nonlegal manner

13   in the PPM that I wrote as founders, yes, are the individuals

14   suing Mr. Edalat and Ms. Karpinski.

15   Q.    Isn't what happened here, sir, is that you four took the

16   assets and then sued Mr. Edalat and Ms. Karpinski to shut

17   them up?

18   A.    PharmaPak was put out of business through their reckless

19   actions, sir.  There was no company left.  In my business

20   judgment Mr. Cahill did the most prudent thing he could to

21   try to pay off the creditors.  In the e-mail you showed the

22   other day I sent out on February 19th, I said:  Everybody,

23   Mr. Edalat, we have maybe a week left in this company if we

24   don't put more money.  He chose not to invest $31,000 to help

25   it go.

1    Q.   Sir, this company that you said had no money made your

2    company, Life Tech, a loan of $95,000; did it not?

3    A.   That document, sir, the top heading of the document, if

4    you want to put it up again, says promissory note.  PharmaPak

5    did not give me $95,000 and a machine.  I would welcome you

6    to put that exhibit back up for the jury to see, because it

7    says promissory note.

8         The promissory note is a promise of Life Tech

9    Global to pay to PharmaPak $95,000.  PharmaPak was a company

10   that had no money and had no ability to pay its creditors

11   without going back to the shareholders and asking for more

12   money.

13   Q.   Sir, I refer you back to the promissory note,

14   Exhibit 265.

15   A.   I see it.

16   Q.   Doesn't it say here that Life Tech Global is the

17   borrower?

18   A.   You want to pull it down so they can see the heading?

19   Q.   Yes.  Doesn't it say here Life Tech Global is the

20   borrower?

21   A.   Yes.  What does the top of the document say?

22   Q.   Promissory note.

23   A.   Promissory note means I promise through Life Tech Global

24   to pay to PharmaPak $95,000.

25   Q.   No, sir.  Isn't what's going on in this document that

1    Life Tech is borrowing $95,000 from PharmaPak to finance Life

2    Tech's purchase of the assets?

3    A.    When you buy a car, oftentimes the dealership will loan

4    you the money, quote, unquote.  You have to pay, make car

5    payments.  Same concept here.

6    Q.    Okay.  So the seller, PharmaPak, is lending, loaning

7    money to the buyer, Life Tech Global, to purchase the assets?

8    A.    As opposed to getting a check for $100,000 up front?  Is

9    that the question?

10   Q.    No.  I'm just -- as it says right here, -- you made the

11   car analogy.

12   A.    Yes.

13   Q.    In the car analogy the seller of the car is giving a

14   loan to the buyer of the car to purchase the car.

15   A.    It could be characterized as that, as a carryback loan.

16   Yes.  So PharmaPak had a seller carryback loan, if you will.

17   Q.    Is that what you Harvard guys call a leverage buyout?

18   A.    Yes.  It was very popular in the '80s.

19   Q.    In fact, it's called a management buyout; right?

20   A.    I've never been involved in one.  But, yes, that is

21   probably something that companies do.

22   Q.    Okay.  Sir, when did you actually make your investment

23   in PharmaPak, Inc.?

24   A.    It came in multiple parts.  Mid October is my best

25   recollection when I handed Mr. Edalat the first two checks

1    for $50,000 each.

2    Q.   And you testified yesterday that after you made your

3    investment, Ms. Karpinski told you the company doesn't have a

4    license?

5    A.   I saw the license.

6    Q.   No.  I'm --

7    A.   I was referring to an e-mail in which she made a claim

8    after my investment was in.

9    Q.   Okay -- just the sequence of events.  So October you

10   invested?

11   A.   Yes.

12   Q.   And you said within a week of your investment,

13   Ms. Karpinski told you the company has no license?

14   A.   No.  I said it was within a week of the final portion of

15   my investment.

16   Q.   Sir, what was PharmaPak's business in your

17   understanding?

18   A.   Well, again, as a shareholder I wasn't managing all of

19   it, but as it was explained to me, that it was going to be

20   involved in packaging various components and trying to sell

21   those to compounding pharmacies.

22          In addition, there was going to be a transdermal

23   line of patches with various vitamins and medicinal products

24   derived from the CBD or hemp plant -- or the marijuana or the

25   hemp plant.  It was an internal discussion that we were going

1    to use hemp, some hemp which was non-psychoactive.

2    Q.   Well, sir, you didn't invest in this company because of

3    vitamins; did you?

4    A.   That absolutely was a contributing factor.  We discussed

5    it.

6    Q.   Sir, wasn't your investment based on the company plan to

7    sell patches with cannabidiol either from hemp or marijuana,

8    wherever it came from?  Isn't that what you were excited

9    about?

10   A.   That was certainly one of them, sure.

11   Q.   Now, you said you made your first investment in October?

12   A.   Yes.  I did.

13   Q.   Now, isn't it -- and then you made a further investment

14   in January -- in January, you say, or you put more money in

15   in January?

16   A.   The final portion -- the final checks I believe were

17   written in January, mid-January.

18   Q.   Now, isn't it true, sir, that soon after your first

19   investment in October, Olivia Karpinski sent an e-mail

20   saying:  We need FDA approval for these patches and we don't

21   have it?

22   A.   She may have sent an e-mail to that effect.

23   Q.   The sequence of events is in October you invested.  Soon

24   after, Ms. Karpinski sends an e-mail saying:  Hey, guys, we

25   need FDA approval.  And then in January you made a further

```
 1    investment of $50,000?

 2    A.   She was also the same person who told me we're going to

 3    have no problem selling these patches.  My understanding, if

 4    you'll allow me to finish, is that the FDA approval would be

 5    required if we wanted to submit these through doctors'

 6    offices so we could get insurance reimbursements.

 7    Q.   Why don't we look at her e-mail and see what she exactly

 8    said.

 9    A.   Okay.

10            MR. KASHANI:  I'd like to offer 391.

11            MR. MARKHAM:  Okay.  Is that stipulated?

12            MR. KASHANI:  I'm not sure.

13            THE COURT:  I'll tell you in a moment.  Okay.  391

14    does not have a checkmark.  Is there any objection to it?

15    Please take a look.

16            MR. KASHANI:  No objection, Your Honor.

17            THE COURT:  Thank you.  It's admitted, 391.

18            (Exhibit 391 received.)

19            THE COURT:  I do appreciate all the work counsel

20    has done to pre-approve these exhibits and the efficiency

21    that they're being presented.

22    BY MR. KASHANI:

23    Q.   Sir, is Exhibit 391 an e-mail -- I'm looking at the

24    center portion -- an e-mail that Olivia Karpinski originally

25    sent to Paul Edalat on October 21, 2015?
```

UNITED STATES DISTRICT COURT

```
 1   A.    It appears to be.

 2   Q.    And did Mr. Edalat immediately forward that e-mail to a

 3   number of people, including you?

 4   A.    That would've been copied to me.  It looks like it.

 5   Here we go:  Dinner was a success.

 6   Q.    Great job, Olivia?

 7   A.    Yep.

 8   Q.    That's Olivia Karpinski?

 9   A.    That would be my guess, yes.

10   Q.    Do you see that Ms. Karpinski says, among other things:

11   After our discussion regarding CBD -- that's the cannabidiol?

12   A.    Yes.

13   Q.    And do you see that she says that:  I can work with

14   people to take the product through FDA approval?

15   A.    Yes.  That's consistent with what we had discussed.

16   Q.    Okay.  So you knew immediately after investing that FDA

17   approval was something that you were going to try to get for

18   these patches?

19   A.    Yes.  We wanted to get FDA approval, go through clinical

20   trials, which takes again FDA approval, as in the Sentar PPM,

21   takes years, lots of money, none of which we had at that

22   time.

23        And if we wanted to apply for reimbursement -- the

24   intent was to sell these through doctor offices, and we would

25   need FDA approval to do that, in which case we could bill the
```

1    doctors and collect insurance, which would make PharmaPak

2    very profitable.  Part of the projections, yes.

3              So I was aware of that, but that wasn't the only

4    thing PharmaPak was intending to do, nor was there any

5    indication that orders were not forthcoming, and we needed to

6    go through those.  My understanding is we had other channels

7    we could sell through immediately.

8    Q.   Sir, where is the e-mail where someone is telling you we

9    have other channels we can sell through immediately before

10   you invested?

11   A.   As I'm sure you're aware, not everything is done through

12   e-mail and text messages.  There were a lot of personal

13   conversations.

14   Q.   So why is it that everything that's coming from this

15   side of the room is documented by an e-mail, and everything

16   coming from you guys is someone told me and someone told me?

17   A.   I think the answer is you guys never gave us your

18   e-mails during the discovery process.

19   Q.   Sir, isn't it a fact that my clients produced over 3,000

20   pages of e-mails two months ago?

21   A.   I did not look through those e-mails.

22   Q.   So many thousands of pages of e-mails were produced by

23   my side.  But let's talk about that.

24   A.   Sure.

25              THE COURT:  Hold on.  That was a statement of

```
1    counsel.  Statement of counsel are not evidence.
2            Continue.
3    BY MR. KASHANI:
4    Q.   Let's talk about that.  You thought my clients didn't
5    have their e-mails; isn't that correct, sir?
6    A.   I don't know if they did or didn't.
7    Q.   And that's why you came in here saying he said, she
8    said, because you didn't think my clients had the e-mails to
9    disprove your contentions?
10   A.   Sir, I'm happy to defend everything I did with PharmaPak
11   and everything I did with Life Tech Global.  I don't need to
12   lie about anything.
13   Q.   Well, let's talk about that.  Why in the world -- what
14   incentive did Ms. Karpinski possibly have to lie to you about
15   FDA licensing?
16   A.   I don't think she was lying here.
17   Q.   No, sir.  You said in your testimony that Ms. Karpinski
18   told you that the facility has a license -- had a license and
19   that you relied on that in making your investment.
20   A.   Yes.  That's true.
21   Q.   Now, first of all, just as an aside, isn't it
22   Mr. Cahill's duty as the CEO to tell you whether the facility
23   has a license or not?
24   A.   If he knew it to be false and he -- if he knew it not to
25   be a valid license and he disclosed -- and he failed to tell
```

```
 1    me that, then, yes, that would be a problem.
 2    Q.   You're saying -- yes or no -- you're saying that
 3    Ms. Karpinski lied to you about the license or status of the
 4    facility?
 5    A.   I don't think I said Ms. Karpinski lied about the
 6    license.  I was told there was a license and we could
 7    produce.
 8    Q.   Sir, didn't you --
 9    A.   We're not talking about an FDA license.
10    Q.   Are you now saying that Ms. Karpinski did not tell you
11    about the license one way or another?
12    A.   I heard it from Ms. Karpinski.  I heard it from
13    Mr. Edalat.
14    Q.   Okay.  Ms. Karpinski, was she going to get any kind of
15    commission from your sale purchase?
16    A.   Not that I was aware of.
17    Q.   Was she going to get a bump in salary because of your
18    sale purchase?
19    A.   I heard discussions of her getting an increase of
20    salary.  I don't know what that was in relation to.
21    Q.   Did it have anything to do with your sale purchase to
22    your knowledge?
23    A.   Not to my knowledge.
24    Q.   She was just an employee, right?
25    A.   Yes.  At the time I believed she was an employee for
```

 1   PharmaPak.

 2   Q.   Now, let's lock something down here.  You've talked

 3   about a relationship between Mr. Edalat and Mr. Karpinski

 4   [sic].  Are you suggesting something, sir?

 5   A.   I would suggest that the two them worked very closely

 6   together and in my view orchestrated what happened to the

 7   downfall of PharmaPak.  That's my view.

 8   Q.   Perhaps you didn't understand my question.  Are you

 9   suggesting, sir, that there was some kind of romantic

10   relationship between Mr. Edalat and Ms. Karpinski?

11   A.   I have no knowledge of whether there is or isn't.  My

12   understanding is Paul's got a girlfriend.

13   Q.   Someone else?

14   A.   That's my understanding, so I would find it improper if

15   there was.

16   Q.   I'd like to show you Mr. Weimann's resignation letter

17   that we saw before, Exhibit 89.

18   A.   Sure.

19   Q.   Sir, did you write this resignation letter for

20   Mr. Weimann?

21   A.   Mr. Weimann is Polish.  I was born in this country.  My

22   writing style is quite a bit better than this -- not to put

23   him down.

24   Q.   Sir, I'm not saying that you selected the grammar.  I'm

25   saying:  Did you actually tap this out for Mr. Weimann to

```
 1   sign?

 2   A.   Absolutely not.

 3   Q.   Sir, I'd like to show you the letter that you sent to

 4   shareholders, Exhibit 49.

 5            (Pause in the proceedings)

 6            MR. KASHANI:  I'm sorry, Your Honor.  I --

 7            THE WITNESS:  I can see it.

 8   BY MR. KASHANI:

 9   Q.   Okay.  Do you see, sir, that the font and typeface of

10   your letter to shareholders is exactly the same as the font

11   and typeface of Mr. Weimann's letter?

12   A.   I don't know that -- that doesn't look like the same

13   font to me, but -- you know, there's probably a hundred fonts

14   in every computer.  Most computers default to Times Roman.

15   Q.   This is not Times Roman, sir.

16   A.   I don't know what it is.

17   Q.   It's your font.

18   A.   I did not write Dr. Weimann's letter.  When he comes on,

19   you can ask him under penalty of perjury whether he wrote his

20   letter.  I saw his letter.  I might add that I was aware long

21   before March 3rd that he was going to resign.  Okay?

22            So at some point -- I have no idea where -- he

23   wrote that resignation letter, and he turned it in to Bruce.

24   He didn't turn it in to me.

25   Q.   Sir, let's talk about that.  In the resignation letter
```

```
 1    didn't Mr. Weimann say:  About three months ago, Mr. Edalat
 2    became gradually hostile, and his hostility turned towards
 3    me?  Do you see that?
 4    A.   Yes.
 5    Q.   Isn't it a fact that a month before this letter, Mr. --
 6    Dr. Weimann was communicating with Mr. Edalat and calling him
 7    "my best friend and brother?"
 8    A.   They may have had those conversations.  Mr. --
 9    Dr. Weimann told me he was having heart palpitations because
10    of his interactions with Mr. Edalat.  He's 75 years old and
11    not in great health.
12    Q.   And that's why you had to write this letter for him?
13    A.   He's actually -- he's got a Ph.D.  he's quite capable of
14    writing his own resignation letter.
15    Q.   Sir, we've gone through the sequence of events.  March
16    2, 3:00 in the morning, Mr. Cahill decided to fire all the
17    employees; isn't that correct?  And -- withdrawn.  March 3,
18    3:00 in the morning, Mr. Cahill sent out an e-mail that he's
19    going to fire all the employees; right?
20    A.   That's when I saw the date on that e-mail, yes.
21    Q.   Okay.  So the plan was to fire all the employees.  That
22    plan was in process before Mr. Weimann resigned?
23               MR. MARKHAM:  Objection.  That's two questions.
24               MR. KASHANI:  I'll try to rephrase.
25               THE WITNESS:  Sorry.  What was the first question?
```

1    BY MR. KASHANI:

2    Q.   Sir, isn't it a fact that the plan was set in motion to

3    fire the employees and then rehire them at Life Tech?

4    A.   On February 19th I sent out an e-mail and said we have a

5    week to go before we're out of business.  The plan was to

6    collect money from the shareholders and try to keep the

7    company going.  I was fully committed to PharmaPak.

8         Every shareholder knew that I was committed to

9    PharmaPak, and I was trying to work out the disagreements and

10   the problems between Mr. Edalat and Mr. Cahill for the

11   benefit of the company.

12        Three people chose not to the respond and

13   contribute more money.  We had a week left.  We had a week

14   left.  Nobody wanted to put money in.  The company was dead.

15   Under California law it was my responsibility, and I wasn't

16   the director of the company and I wasn't the CEO.

17        But I certainly informed Mr. Cahill under my

18   knowledge of California law, he had no choice but to lay off

19   the employees, to terminate them.  He had no choice.

20   Q.   Sir, I understand --

21   A.   So there was no plan.

22   Q.   You stated that several times.

23   A.   Yes.

24   Q.   The fact is that the key employees were rehired at Life

25   Tech within a few days of being fired at PharmaPak; isn't

1    that true, sir?

2    A.   As I told you yesterday, after PharmaPak closed, I had

3    decided to write off the investment.

4    Q.   Sir, I'm just asking you a question.  Yes or no, isn't

5    it true that within a few days of you guys shutting down

6    PharmaPak, Inc., you rehired the key employees -- Dr. Weimann

7    and Mr. Aydinol -- at Life Tech, LLC?

8    A.   Within a few days?

9    Q.   Within a few days, six days, seven days.

10   A.   Within a few days I started having conversations after

11   Dr. Weimann approached me and said:  Would you be interested

12   in starting a new company?

13   Q.   Sir, didn't you actually rehire Dr. Weimann and

14   Mr. Aydinol at Life Tech Global within a few days of their

15   being fired from PharmaPak?

16   A.   Those two individuals were not fired.  They chose to

17   resign.

18   Q.   So you say, but I'm just talking about timing.

19          MR. MARKHAM:  Objection, Your Honor.

20          THE COURT:  Hold on.

21   BY MR. KASHANI:

22   Q.   I'm just talking about timing, sir.

23          THE COURT:  I'm sorry.  When I say hold on, it

24   means hold on.  Understand?

25          MR. KASHANI:  Yes, Your Honor.

1          THE COURT:  The court reporter has to take things

2     down.  Why would you continue asking questions after I say:

3     Hold on?

4          MR. KASHANI:  It was my mistake, Your Honor, and I

5     apologize.

6          THE COURT:  Well, you've done it a few times.  When

7     there's an objection, we need to stop.  The witness has

8     talked over me.  You've talked over me.  It gets things into

9     the record.  It makes it impossible for the reporter.

10          I don't say "hold on" softly.  I say:  Hold on.

11     And you go on with questions.  I don't understand that.  You

12     know, there's rules of evidence.

13          What is your objection?

14          MR. MARKHAM:  His gratuitous comment, quote, so you

15     say, to an answer, which is an attempt to disparage.  He's

16     done it three or four times.  I object to it.

17          THE COURT:  I have no problem with general attempts

18     to disparage a witness on cross-examination, but it is not

19     helpful for the "so you say."  Okay?

20          Cross-examination is full and vigorous, and

21     Mr. Kashani has been doing that.  But "so you say" is extra

22     words in the middle of a conversation and it -- in the middle

23     of an examination, and it slows the examination down.

24          So the objection is sustained.  Thank you.

25          Next question.

```
 1    BY MR. KASHANI:

 2    Q.   Mr. Cullen, why don't we go on to something else.  Can

 3    you look at the PharmaPak bylaws, please, sir.

 4    A.   If you can put them up.

 5    Q.   Yes.  Exhibit 77.

 6    A.   Are you going to put it on the screen?

 7    Q.   Yes.  Yes.

 8    A.   Okay.

 9    Q.   If you look at the page 2.

10    A.   Yes.  I see that.

11    Q.   Now, do you see, sir, it says that:  Notice of meetings

12    of shareholders shall be sent not less than ten days before

13    the meeting date?

14    A.   Yes.  We looked at this yesterday, I recall.

15    Q.   And do you see also that it says that special notice has

16    to be given for -- to approve certain types of actions?  Do

17    you see that, sir?

18    A.   I do see that.

19    Q.   And one of the transactions in which there has to be

20    special notice is, quote, a transaction in which a director

21    has a financial interest within the meaning of Section 310 of

22    the California Corporations Code.  Do you see that, sir?

23    A.   I do see that.

24    Q.   Now, would you characterize Mr. Cahill's profit-sharing

25    interest in Life Tech Global as a financial interest in Life
```

1    Tech Global?

2    A.   I have to say you're very good.  Would I characterize

3    it?  When the transaction was made, he had no interest

4    whatsoever in Life Tech Global, and it was many months later

5    that he and I had discussion about his potential profit

6    interest.  So --

7    Q.   I'm trying to take this a step at a time.

8            MR. MARKHAM:  Your Honor, objection.  "So" was not

9    an end to the question -- to an answer.  May he complete his

10   answer?

11           THE WITNESS:  So if --

12           THE COURT:  Hold on.  No.  I didn't say you may

13   complete your answer; did I?

14           THE WITNESS:  Sorry.

15           THE COURT:  All right?

16           THE WITNESS:  Yeah.

17           THE COURT:  Okay.

18           THE WITNESS:  Correct.

19           THE COURT:  Just a moment.  I'm not a potted plant

20   here, folks.

21           You may complete that answer.

22           THE WITNESS:  So --

23           THE COURT:  Let me help by saying what you

24   previously said.  Would I characterize it?  When the

25   transaction was made, he had no interest whatsoever in Life

1    Tech Global.  It was many months later that he and I had a

2    discussion about his potential profit interest.  So --

3              THE WITNESS:  So had he been a shareholder of Life

4    Tech Global at the time of the transfer, it absolutely

5    would've been improper.  However, as I explained yesterday,

6    everything I was doing, I was doing on the advice of our

7    corporate counsel to avoid this eventuality.

8              THE COURT:  All right.  Now the question has been

9    answered.  Next question.

10   BY MR. KASHANI:

11   Q.   Mr. Cullen, my question was simpler than that.

12   A.   Okay.

13   Q.   Regardless of what you say is the timing, my question is

14   simply:  Is Mr. Cahill's profit-sharing interest in Life Tech

15   Global a financial interest in the corporation?

16   A.   It may be characterized as that.

17   Q.   And your position is that Mr. Cahill had no interest in

18   Life Tech Global at the time the assets were transferred

19   over?

20   A.   He didn't then and he didn't for quite a while

21   afterwards.

22   Q.   And it had to be that way because if Mr. Cahill did have

23   an interest in Life Tech Global at the time you transferred

24   the assets, that would be a serious violation?

25   A.   If he did, it would.  So I intentionally did not do

1    that.

2    Q.    Isn't it a fact, sir, that Mr. Cahill was founder of

3    Life Tech Global and he was there from the beginning?

4    A.    As I explained yesterday, I used that word.  I'm not a

5    lawyer.  I used the word as a general sense.  Mr. Cahill,

6    Mr. Franco, and Mr. Scott subsequently, many months after I

7    formed it, agreed to help and contribute money to the company

8    in the form of loans.  So I chose to refer to them as

9    founders.

10           Is that a technically legal correct word?  Perhaps

11    if you were advising me, I would have chosen a different

12    word.  But to me it was a word that made sense.

13    Q.    Do you recall telling Mr. Brian Quinn that Mr. Cahill

14    was a founder.  He was there from the beginning.  He's the

15    CEO.  He's everything at Life Tech Global?

16    A.    I recall a general conversation with a man by the name

17    of Brian Quinn over the telephone, somebody who I'd never met

18    before.  And I spoke in very vague generalities, which is my

19    custom.  This is what I teach people how to approach

20    investors, which I do on a regular basis.

21           When you're speaking with investors, you have a

22    very limited window and you speak in generalities.  So, yes,

23    I probably did use a phrase such as that in a very vague,

24    general sense.

25           MR. KASHANI:  At this point I'd like to start

```
1    playing a recording of your conversation with Mr. Quinn.

2    Now, we can do this several ways.  The first part of the

3    conversation is introductions.

4              With my colleague's permission, I'd like to play it

5    just so you can authenticate that that's your voice.

6              THE WITNESS:  Okay.

7              MR. KASHANI:  I hope this works.

8              (Audio recording played in open court)

9    BY MR. KASHANI:

10   Q.   Is that your voice, sir?

11   A.   That's my voice.

12             MR. KASHANI:  With counsel's permission, may I

13   continue?

14             MR. MARKHAM:  I think he has authenticated it the

15   way we agreed we would authenticate it.  So, no objection.

16             THE COURT:  Thank you for that, counsel.

17             You may continue.

18             (Audio recording played in open court)

19   BY MR. KASHANI:

20   Q.   Sir, you --

21             THE COURT:  Let me also -- let me just say, I

22   previously said I'm leaving it up to counsel to create

23   whatever record they want.

24             And just to remind you -- Ms. Baird, it would not

25   be your practice to attempt to record that; correct?  Okay.
```

1    She's acknowledging that that's correct.  It's up to you to

2    make your record however you wish.

3         Go ahead.

4    BY MR. KASHANI:

5    Q.   Mr. Cullen, you told Mr. Quinn that the company had been

6    in existence for three years.  That's referring to Life Tech?

7    A.   I spoke in vague generalities, and I thought that was

8    the best way to describe it, yes.

9    Q.   Now, this conversation took place in 2017; did it not?

10   A.   I believe it took place a couple months ago.

11   Q.   You showed us yesterday a formation document of Life

12   Tech Global that Life Tech Global was created in 2016?

13   A.   Correct.

14   Q.   So Life Tech Global was only in existence as a

15   corporation for one year?

16   A.   Correct.

17   Q.   But you told Mr. Quinn that Life Tech has been in

18   existence for three years; is that right?  That's what you

19   told him?

20   A.   I did not say specifically, nor did I know this was

21   being recorded to be played back in a courtroom.  It is my

22   practice whenever anybody invests in a company is that we go

23   through in fine detail the whole history of it.

24         In this tape, I do, if you'll play it for the

25   jury -- I don't know if you will or not -- I do explain that

1    there was a predecessor company and that it was -- that there

2    was a falling out with the partners.  It was restarted as

3    Life Tech Global.  I do make those statements.  That's part

4    of the history of what happened.

5    Q.   In fact, sir, isn't the reason that you used the three

6    years is that you're counting the two years of PharmaPak as

7    part of the three years of Life Tech Global?

8    A.   In a general sense.  This -- what we're doing now does

9    date back to three years ago.  And, in fact, yes, PharmaPak

10   failed, not because I wanted it to.  I invested in it with

11   high hopes.

12          It failed because of actions of your clients.  And

13   to try to recover my money, I formed a new company and I'm

14   looking for investments.  And I don't think there's anything

15   inconsistent in that tape.

16   Q.   Sir, you say -- I asked you this yesterday.  I'll ask

17   you again.

18   A.   Sure.

19   Q.   Is Mr. Cahill relieved of his fiduciary duties to the

20   shareholders of PharmaPak because PharmaPak has stopped

21   operations?

22   A.   (No response).

23   Q.   I mean -- let me rephrase.

24   A.   I don't know if I'm qualified to answer that.

25   Q.   Can the director of a company say:  Well, the company

UNITED STATES DISTRICT COURT

1   has stopped operations.  The company has failed, so I can do

2   whatever I want now?

3   A.   I believe he may still have some level of fiduciary

4   duty.  I don't know what that would be actually at this

5   point.

6   Q.   I mean, PharmaPak was still a corporation with

7   shareholders as of March 2016; wasn't it?

8   A.   I'm -- to my knowledge I'm still a shareholder of

9   PharmaPak.

10   Q.   Yet you never sold your shares of PharmaPak?

11   A.   I would if there was a buyer.

12   Q.   Didn't you tell Mr. Quinn that Life Tech Global is just

13   a reformulation of PharmaPak?

14   A.   In a general sense I may have expressed it that way.

15   That's possible.

16          MR. KASHANI:  I'd like to play more from the

17   recording.

18          (Audio recording played in open court)

19          MR. KASHANI:  I'd like to play a further portion of

20   the tape.

21          (Audio recording played in open court)

22   BY MR. KASHANI:

23   Q.   When Mr. Quinn asked were they original founders of the

24   company, did you answer:  Correct?

25   A.   He had read the PPM, and I do refer to them in the PPM

1    as founders.

2    Q.    I'm just asking about the tape, sir, because it got a

3    little unclear at that point.  I can play it again, but maybe

4    I can just ask you.  When Mr. Quinn asked were those four

5    gentlemen the original founders of Life Tech, did you answer:

6    Correct?

7    A.    That may have been what I said.  That would have been

8    something I would have said to a potential investor.

9    Q.    All right.

10    A.    It's consistent with what's in the PPM.

11    Q.    Let's turn to the PPM.

12    A.    Sure.

13    Q.    This is what you call the private placement or private

14    offering memorandum?

15    A.    Correct.

16    Q.    Now, you said yesterday that this document is

17    confidential but it's not secret?

18    A.    It is a confidential document, yes.  It's not typical

19    for it to be spread around to people that you're not aware

20    of.

21    Q.    Now, in this case Life Tech Global is actually a

22    defendant?

23    A.    Yes.  I believe Paul is -- Mr. Edalat has sued Life Tech

24    Global, yes.

25    Q.    And as part of the litigation process before trial, both

1    sides exchanged documents?

2    A.   I believe they do.

3    Q.   Did Life Tech Global provide the private offering

4    memorandum to my office or Mr. Edalat before this trial?

5              MR. MARKHAM:  Objection, Your Honor.  There was no

6    document request for it.  And when the initial documents were

7    exchanged, it wasn't in existence.  So that's misleading.

8              THE COURT:  All right.

9              Mr. Kashani, it's always a challenge to explore

10   discovery responses in a trial.  I think you know what I

11   mean.  Who knows what?  Who did what?  I think at this point

12   I have to sustain the objection.

13   BY MR. KASHANI:

14   Q.   Let me rephrase, Mr. Cullen.

15             You did not give Mr. Edalat a copy of the private

16   offering memorandum; did you?

17   A.   I only gave it out to about seven individuals.

18   Mr. Edalat was not one of them.

19   Q.   Now, the purpose of the Life Tech Global private

20   offering memorandum that I have up on the screen, that's to

21   raise some more money for Life Tech Global?

22   A.   That's the intent, yes.

23   Q.   Is this a legal document?

24   A.   I'm not sure what you mean by the word legal document.

25   I authored the document and I stand by what's written in it.

```
 1   Q.   In fact, let's go to the third page.  Doesn't it have
 2   about 20 pages of legal statements about what this document
 3   is and this is kind of a legal document?
 4   A.   In that respect, yes.
 5   Q.   And you understand, sir, that in a private offering
 6   memorandum, it's very important to be truthful?
 7   A.   I do understand that, yes.
 8   Q.   How much money were you seeking to raise for Life Tech
 9   Global through the private offering memorandum?
10   A.   We were hoping to raise $2 million.
11   Q.   And what was an investor going to get in return for that
12   $2 million?
13   A.   They would be making a loan and they would receive
14   interest.  Along with that, they would have an option for two
15   years to convert it into equity in the company.
16   Q.   Now, are you familiar with -- in connection with stock
17   offerings, are you familiar with the concept of valuation?
18   A.   Very.
19   Q.   Okay.  In the context of a stock offering, what does
20   valuation mean?
21   A.   What the company -- what the value of the company is.
22   Q.   What the company is worth?
23   A.   Yes.
24   Q.   The assets?  Withdrawn.  What the company's worth.
25             Now, sir, is it possible to calculate the value of
```

```
 1    the company based on the terms of the stock offer?
 2    A.    In some cases, yes.
 3    Q.    So, for example, if you are selling ten percent of the
 4    company for $2 million, that means that the company is
 5    worth -- that means ten percent of the company is worth
 6    $2 million, correct, in your estimation?
 7    A.    Yes.  That would be an appropriate way to do it, yes.
 8    Q.    And that means the company as a whole is worth
 9    $20 million?
10    A.    That would be correct.
11    Q.    And that's what you were doing in the Life Tech private
12    offering; correct?
13    A.    I think you're mischaracterizing -- you are grossly
14    mischaracterizing this offering.
15    Q.    Well, let's look at it.  Do you see -- this is from page
16    18 of the offering.  Do you see that, sir?
17    A.    I do see that.
18    Q.    It says:  Upon closing, the company will have three
19    classes of authorized equity interest, provided however that
20    class A will be a reserved interest.  Do you see that?
21    A.    I do see that.
22    Q.    Class A is the people buying $2 million?
23    A.    Yes.
24    Q.    Do you see that there's a reference to the class A, and
25    it says:  Class A consists of a total of 2,000 class A units
```

 1    based on a capital raise of two million?

 2    A.   Yes, it does say that.

 3    Q.   So the two million purchase is class A?

 4    A.   You're leaving out the words ultimately convert their

 5    interest in the note into an ownership.

 6    Q.   I understand, sir.  I just want to know.  The $2 million

 7    is class A?

 8    A.   Yes.

 9    Q.   Okay.  And class A starts as a loan to the company;

10    correct?

11    A.   Right.

12    Q.   And the class A investors have the right to -- under

13    certain terms, to convert their two million to ownership of

14    the company; is that correct?

15    A.   That's what's being offered, yes.

16    Q.   And the conversion terms are they can convert $2 million

17    investment into ten percent of the company?

18    A.   That is correct.

19    Q.   And doesn't that support a valuation of Life Tech Global

20    of $20 million?

21    A.   The way this offer is structured is that an investor has

22    an option.  They're making a loan to the company.  They're

23    going to get interest on their loan.  And they can watch the

24    company for a period of two years and make the decision to

25    either convert the loan into equity in the company based on a

1    $20 million valuation, or they can keep it as a loan and

2    retain their interest, and they would get a smaller share of

3    the profits ongoing.

4            The loan also is secured, so it's very different

5    from buying equity in a company.  Yes, if they were buying

6    equity in the company, which they are not and this offering

7    is not.  The Sentar PPM by the way was an equity offering

8    which placed the valuation at 400 million.  That was the one

9    I was looking at when I was making my investment.

10           This is giving somebody a two-year look ahead to

11   convert their loan into an equity interest in the company.

12   It's not what the value is today.

13   Q.   Sir, who is -- who is Chip Hackley?

14   A.   He's a friend of Greg McPherson.  Greg McPherson was on

15   the phone call.  I've never met Chip Hackley.  Greg McPherson

16   and I went to the Harvard Business School together.  He has

17   been a friend of mine for many years.  Chip Hackley, Hackney

18   or Hackley, is a friend of his.  I have never met him.

19           My understanding is he is involved in raising money

20   and was trying to find somebody to invest in Life Tech

21   Global, and that's how Brian Quinn showed up on the radar.

22   My understanding is he's a friend of Chip's or they know --

23   somehow they know each other.  I've never met either of those

24   individuals.

25   Q.   Sir, on the phone call didn't Mr. Hackley say that the

1   valuation of Life Tech Global is 20 mil, meaning million?

2   A.   If he said that, then he was incorrectly stating what is

3   clearly written in the document being offered to potential

4   investors.

5   Q.   Well, sir, you heard him on the phone call say the

6   valuation is 20 mil; correct?

7   A.   There's another part of the phone call discussing

8   valuations where I said it is subject to negotiation.

9   Q.   I understand.  We'll play it all, sir.  I'm just asking

10  you:  Did you hear Mr. Chip Hackley say the valuation is

11  20 mil?

12  A.   I may have.

13  Q.   And when Mr. Hackley said the valuation is 20 mil on the

14  phone call, did you correct him?

15  A.   I don't recall him specifically saying that.  There were

16  several people on the call and there was conversation going

17  back and forth.  However, Life Tech Global would not take any

18  money from anybody without going through this -- without

19  reviewing this private placement memorandum.

20          So if Chip made that statement, it was not an

21  accurate reflection of the offering.  People make mistakes on

22  phone calls typically.

23  Q.   Okay.  People make mistakes, but you were on this

24  particular call; weren't you?

25  A.   Sure.

```
 1    Q.   And did you correct Mr. Hackley and give all this

 2    legalese you've been giving us, saying that that's not the

 3    actual valuation; we're not worth 20 million?

 4    A.   I have a lot of calls with a lot of investors.  If there

 5    was a lack of clarity after Mr. Quinn reviewed the PPM, I

 6    would have most certainly cleared that up and clarified it.

 7              MR. KASHANI:  I'm going to play from the recording,

 8    and I'm going to have to do this in two parts, just the way

 9    the equipment is set up.  But I'm going to play from the

10    recording.

11              (Audio recording played in open court)

12              THE WITNESS:  I did say that it was subject to

13    negotiation.

14              MR. KASHANI:  We heard the tape.

15              THE WITNESS:  Yeah.

16    BY MR. KASHANI:

17    Q.   Now, sir, I'd like to go into this --

18              MR. KASHANI:  This is another topic here,

19    Your Honor.  I'm not familiar with the break schedule.

20              THE COURT:  I think we need to go to at least 9:30

21    today.

22              MR. KASHANI:  No problem.

23              THE COURT:  It's two breaks, and I don't like any

24    break going further than 1 hour 45 minutes.  If we break

25    early -- we need to go to 9:30 at least.
```

```
 1              MR. KASHANI:  That's no problem, Your Honor.

 2              THE COURT:  Sure.

 3  BY MR. KASHANI:

 4  Q.   Could you turn to page 31.  I'm sorry.  Could you turn

 5  to page 33 of the Life Tech offering.  Can you do that?

 6  A.   Yes, sir.  Uh-huh.

 7  Q.   Do you see it says:  The company's primary product line

 8  consists of various transdermal patches.  The company has

 9  developed numerous SKUs for the medical marijuana product.

10  These include patches that contain CBD, et cetera.  These

11  will be marketed under the brand name Pharma Patch.  These

12  patches include CBD.

13              Do you see that, sir?

14  A.   Yes, I do.

15  Q.   So you were -- you invested in PharmaPak, and now you're

16  selling patches called Pharma Patch?

17  A.   Would you like me to explain?

18  Q.   No, sir.  I'm just asking you:  Is that what it is?

19  Your patches are called Pharma Patch; is that correct?

20  A.   PharmaPak was a corporation.  Pharma Patch is an

21  intended brand name.

22  Q.   I understand, sir.

23              Now, isn't this CBD patch plan what PharmaPak, the

24  corporation, was doing?

25  A.   PharmaPak did intend to do -- to produce transdermal
```

1    patches, yes.

2    Q.   More than intend, sir.  Isn't it a fact that

3    PharmaPak was prepared to start production of the CBD patches

4    in or about March of 2016?

5    A.   I believe that was the intent before, before your

6    clients did what they did.  Yes, that was the intent.

7    Q.   Isn't it also before you transferred all the assets to

8    Life Tech?

9    A.   Life Tech did buy the assets, yes.  There was no

10   PharmaPak in existence -- well, technically it was.  I don't

11   think it formally filed bankruptcy or closed its doors.

12   Q.   There's a picture here of your patch.  Do you see that,

13   sir?

14   A.   I do see that picture.

15   Q.   Isn't that identical to the patches that were going to

16   be produced as PharmaPak?

17   A.   I believe that's a stock photo off the Internet, but

18   they do look like that, yes.

19   Q.   My question is:  Do the patches at PharmaPak look like

20   that?

21   A.   They look exactly like that.

22   Q.   Okay.

23   A.   Actually I think the corners are a little more -- aren't

24   as rounded off.

25   Q.   Now, Life Tech Global also has some patent rights; is

1    that correct, sir?

2    A.    My understanding is we have one patent moving forward.

3    Q.    And that patent incorporates the four provisional

4    patents from PharmaPak; does it not?

5    A.    I would say the explanation Peter gave yesterday is

6    probably much better than I could do.

7    Q.    Well, why don't we just go to your private placement

8    memorandum.

9    A.    Sure.

10   Q.    This is page 37 of your private placement memorandum.

11   Do you see, sir, that in your PPM you say the company

12   currently holds pending U.S. letters patent application

13   15/265?

14   A.    I see that, yes.

15   Q.    Now, do you remember Mr. Gluck's explanation that when

16   you filed the patent application, it incorporates the prior

17   provisional patents?

18   A.    Again, it was a very technical explanation, but my

19   understanding is that it can do that, yes.

20   Q.    Well, in the next paragraph of your PPM, you discuss the

21   patent.  Don't you say that this patent incorporates

22   expressly by reference all required intellectual property

23   owned by the company that was contained in its four previous

24   provisional patents?  Then it gives some numbers?

25   A.    I see that, yes.

1    Q.   Now, these are the four patents on which Mr. Edalat is

2    listed as inventor or co-inventor; are they not?

3    A.   Are you referring to the chart yesterday?

4    Q.   Yes, sir.

5    A.   Yeah.

6    Q.   They are not the patents in which Mr. Ludwig Weimann was

7    listed as inventor and Mr. Edalat was not listed as inventor?

8    A.   Correct.

9    Q.   Do you remember Mr. Gluck's discussion that provisional

10   patents have to be incorporated into a patent application in

11   order to survive?

12   A.   I remember him saying and I remember having a discussion

13   with him that we were going to allow these patents to lapse

14   because they required more money.  I asked him if they had

15   any value, and he said no.

16   Q.   Sir, that wasn't my question.  Do you recall Mr. Gluck's

17   discussion that the provisional patents are incorporated into

18   a patent application?  Do you recall that process?

19   A.   I recall him discussing it, yes.

20   Q.   Do you recall this discussion that when that happens,

21   that means your patent application is using some or all of

22   the inventions of the provisional patent?  Do you recall that

23   discussion?

24   A.   In general terms, yes.

25   Q.   And according to your PPM, isn't that exactly what it

```
 1    says, that your patent application incorporates the four

 2    provisional applications that belong to PharmaPak?

 3    A.   That Life Tech Global purchased from PharmaPak?

 4    Q.   Yes.

 5    A.   Yes.

 6    Q.   Okay.  So these provisional patents that you say have no

 7    value and expired according to your PPM were incorporated

 8    into Life Tech's patent application; isn't that correct, sir?

 9    Isn't that what the PPM says?

10    A.   That's what the PPM says, yes.

11    Q.   Now, in addition to patent rights, does Life Tech Global

12    have either a design or on order certain machines to make

13    these patches?

14    A.   Yes, it does.

15    Q.   These are the machines that were on order from Turkey?

16    A.   These -- rephrase that question, please.

17    Q.   Yesterday we had -- we heard a discussion of different

18    machines?

19    A.   Yes.

20    Q.   And you mentioned a machine from New Hampshire that you

21    said didn't work?

22    A.   I did, yes.

23    Q.   But you also mentioned there were some machines on order

24    from Turkey.  Do you recall that, that Mr. Aydinol's family

25    is making?
```

```
1    A.   Yes, I do recall that.

2    Q.   And those Turkish machines do work?

3    A.   We've not put them to full production task, but it's

4    certainly our hope and expectation that they will work.

5    We've had limited tests, yes.

6    Q.   Well, Mr. Aydinol wouldn't send you a machine that

7    doesn't work; would he?

8    A.   I'm confident that if it doesn't work, he'll be able to

9    fix it.

10   Q.   My point is, sir, that you have confidence in

11   Mr. Aydinol and his family?

12   A.   I do.

13   Q.   They do a good job?

14   A.   They do.

15   Q.   Isn't it a fact, sir, that those Turkish machines were

16   ordered by PharmaPak?

17   A.   The ones we have now were not ordered by PharmaPak.

18   Q.   Isn't it a fact, sir, that PharmaPak ordered machines

19   from Mr. Aydinol's family that were designed by Mr. Aydinol?

20   A.   That's perhaps a better question for Mr. Cahill because

21   I was not running that company.  So what I can tell you is

22   Life Tech Global borrowed money from a number of investors

23   and has purchased several machines independently of

24   PharmaPak.

25   Q.   I'm going to read from your deposition, page 75, line
```

 1    15, through 76, line 1.

 2    A.    Okay.

 3           MR. KASHANI:  Actually, I'll start reading at -- in

 4    fact, I'll put it on the screen.

 5           THE COURT:  Since you're working on that, it is

 6    9:30.  So why don't we take our break and come back at 9:45.

 7           Thank you.

 8           You may step down.

 9           (Open court - jury not present)

10           THE COURT:  Yes, sir?

11           MR. MARKHAM:  I have one evidentiary question.  We

12    have 17 exhibits which are not stipulated to.  They are

13    certified copies of tax lien notices, state and federal, and

14    certain judgments filed against SciLabs Pharmaceutical during

15    the period of 2013 and 2014, just as Mr. Edalat was saying he

16    was wealthy and all the rest of it.  We believe that those

17    are relevant as omissions --

18           THE COURT:  I'm sorry.  Relevant as?

19           MR. MARKHAM:  Omissions.  That he should have

20    disclosed to the people he was asking for money to sell his

21    shares of stock, claiming that he was a high roller, very

22    successful.  He had very successful companies.  He had a

23    30-year successful business in the nutraceutical industry.

24           THE COURT:  I understand.  Let's see where we are.

25           MR. KASHANI:  Your Honor, we don't object to the

1    authentication, but we have a relevance and 403 objection to

2    these.  It just seems to me to be far afield to talking

3    about -- now we're talking about a third company.  We had

4    Sentar.  Now we're on SciLabs.  We're talking about a third

5    company with publicly recorded tax liens and judgments.

6           It's just we can't -- we don't have time for a mini

7    trial over these judgments and how they came about.  I think

8    that there's a 403 and relevance problem.  Authentication, as

9    I told my colleague, that's not the issue.  In fact, I was

10   happy to stipulate to the uncertified in terms of

11   authentication.

12          It's just relevance.  I mean, we've been hearing a

13   lot about Sentar that nobody here invested in.  Now we're

14   going to hear about SciLabs that nobody invested in.

15          MR. MARKHAM:  May I be heard?

16          THE COURT:  No.  You used the magic words, mini

17   trial.  You know, I told you 403's have limited power, but

18   here it has power because his introduction requires you to

19   waste your time -- not waste your time.  Expend your time in

20   potential mini trials, explaining each of these.

21          So that's a good argument.  Mini trial is a

22   powerful argument.  Still, I think the relevance is such that

23   it overcomes a 403, although I'm listening carefully to the

24   403 in the context of it imposing a time burden on you.

25          So the reason I didn't allow you to continue is I'm

1    going to overrule the objection.  Okay?

2            MR. MARKHAM:  I will say nothing more.

3            MR. KASHANI:  Your Honor, one -- we have a witness

4    waiting.  Per agreement, he will take the stand because he's

5    been waiting.  He's going to leave --

6            THE COURT:  Before the redirect?

7            MR. KASHANI:  Yes.  Well, I'm not finished with my

8    cross, but he's been waiting.

9            THE COURT:  All right -- before the conclusion of

10   the present witness?

11           MR. MARKHAM:  That's okay.

12           THE COURT:  Thank you.  Thank you for all your

13   accommodations.  Now we're going to come back at 10 minutes

14   to 10:00.

15           MR. KASHANI:  Thank you.

16               (Recess from 9:34 a.m. to 9:52 a.m.)

17           MR. MARKHAM:  Your Honor, very quickly before the

18   jury comes.  You asked us to do a comparison chart on the

19   jury instructions dispute.

20           THE COURT:  Yes.

21           MR. MARKHAM:  We haven't done that because we

22   anticipate we're not sure if it makes a difference.  We'll

23   tell you today a significant number of the jury instructions

24   may be falling away.

25           THE COURT:  All right.

```
1            MR. MARKHAM:  For that reason I just wanted to tell
2    you --
3            THE COURT:  I appreciate that.  That's actually
4    very helpful.  When will that decision be made?
5            MR. MARKHAM:  First thing Monday morning, or
6    perhaps over the weekend.  If you want it made sooner, we
7    will.  I just wanted to find out what your timing --
8            THE COURT:  No.  See, it's just -- besides this
9    case I have other things, so I need to make sure I have
10   sufficient time set aside to resolve what you folks can't
11   resolve on jury instructions.
12            A good time to do that is over the weekend, and I
13   was hoping you would get me the material so over the weekend
14   I could roll up my sleeves and get everything done.  By the
15   way, it's very hot in this courthouse, and the government
16   doesn't pay for air-conditioning.  So if you get it resolved,
17   that would be good.
18            MR. MARKHAM:  Meaning not just a bunch of the
19   disputes, but a significant --
20            THE COURT:  I understand.  Right now I'm just
21   focusing on making sure I have time to resolve the dispute,
22   because what I don't like happening is you finish the
23   evidence and the jury has to come back two days later while
24   we work out the instructions.
25            The moment the evidence is finished, I want to have
```

UNITED STATES DISTRICT COURT

```
 1   the instructions in hand and I don't want to have you -- I've

 2   done this a few times.  I don't want to have you working at

 3   midnight before you give the closing argument while you slap

 4   together everything we've decided about the instructions.

 5   I'm just trying to think ahead.  So --

 6            MR. KASHANI:  If I may --

 7            THE COURT:  -- I think what we're going to have to

 8   do is have -- and it's just a simple document I need from

 9   you.  So what I'm going to need you to do is please e-mail me

10   as soon as you can over the weekend what's going on so I'll

11   know when to allot time.  Okay?

12            MR. MARKHAM:  I think you'll have to allot less,

13   but that's why --

14            THE COURT:  So I'm going to give you both my card.

15   E-mail me over the weekend what the position is on jury

16   instructions.  Then keep in mind, you know, Monday I'm

17   going -- I'm not -- I love my job, but Monday I'm going to

18   be -- it's usually 8:00 to 5:00 o'clock on law and motion

19   matters.  Then Tuesday I have you.  I just need to set aside

20   time.

21            All right.  So I'll give you my card.  You e-mail

22   me when you have it.

23            Let's bring in the jury.

24            THE CLERK:  All rise.

25            (Open court - jury present)
```

```
1              THE COURT:  Welcome back.  When this trial comes to
2    an end, I'm going to have to give you jury instructions.  We
3    were just talking about how we can put those jury
4    instructions together.
5              And with that, Mr. Kashani.
6              MR. KASHANI:  The defense with the permission of my
7    colleague calls witness Amir Asvadi out of order.
8              THE COURT:  All right.
9              So this is another one of those out-of-order
10   situations.  We're not done with Mr. Cullen.  But to
11   accommodate someone -- I'm not even sure who -- we're going
12   to call the witness right now.
13              Amir Asvadi, Defendant's witness, sworn
14             THE CLERK:  Please state and spell your first and
15   last name for the record.
16             THE WITNESS:  Okay.  My first name is Amir,
17   A-m-i-r.  My last name is Asvadi, A-s-v-a-d-i.
18             THE CLERK:  Thank you.
19             THE COURT:  Proceed.
20                      DIRECT EXAMINATION
21   BY MR. KASHANI:
22   Q.   Mr. Asvadi, thank you for coming.
23   A.   Sure.
24   Q.   First, I apologize.  Do you mind if I sit while
25   examining?  Sometimes there are documents, and I need to use
```

1    the computer.

2    A.    No problem.

3    Q.    Thank you, sir.

4          Could you just tell us briefly what your college

5    education is.

6    A.    Yes.  I'm an engineer.  I graduated in electrical

7    engineering degree from San Diego State back in 1982.

8    Q.    Have you had experience with startup companies?

9    A.    Yes.  I had two startup company myself, both in

10   electrical engineering field.

11   Q.    How did your startups go for you?

12   A.    Good.  I sold the first one or got acquired by a public

13   company called International Rectifier back in the year 2000,

14   and then I started another startup in about, I think, four or

15   five years after that.  Also that one was acquired by another

16   company in 2009 called Microsemi, M-i-c-r-o-s-e-m-i.

17   Q.    Did you do well financially out of your two startups?

18   A.    Yes.  I mean, if I make more than what I used to make as

19   a salary, I call it success.  Let's put it this way.

20   Q.    Sir, do you understand that when you invest in a startup

21   company, there's a degree of risk?

22   A.    Definitely.  Yes.

23   Q.    Is it your understanding that people who make those

24   investments need to accept those risks?

25   A.    Yes, I do.

1    Q.   And when you invest -- in addition to starting two

2    companies and selling them successfully, have you invested in

3    startup companies?

4    A.   Before -- I mean, I do have investment these days on a

5    startup company.  But prior to that, I mean, I was -- I

6    invested in a Denny's chain, if you call that, but that was

7    like any I also did with my partner where we had started the

8    first company.  We invested on buying Denny's Restaurant as

9    well as some real estate.  I don't know if you call that

10   startup or not.

11   Q.   And is it your understanding when people make these

12   investments, they have to be prepared to accept the risk of

13   loss?

14   A.   Yes, I do.

15   Q.   Do you know Mr. Paul Edalat?

16   A.   I met Mr. Paul Edalat back in, I want to say, August or

17   July 2015.

18   Q.   Do you know Mr. Bruce Cahill?

19   A.   Yes.  I met Mr. Bruce Cahill maybe a week or two weeks

20   after I met Mr. Paul Edalat.

21   Q.   So you have known Mr. Edalat and Mr. Cahill for about

22   the same amount of time?

23   A.   Minus one or two weeks.  I'm an engineer.  I've got to

24   be exact.  Minus one or two weeks apart, yes.

25   Q.   Let's say before this current dispute, did you consider

```
 1   Mr. Cahill to be a friend?
 2   A.   You know, I don't call anybody friend, per se.  I call
 3   it business associates.  I mean, I -- that's why I look at
 4   Mr. Paul Edalat the way I look at Mr. Bruce and other
 5   investors as business associates.
 6   Q.   Let's put it this way:  In your mind did you consider
 7   Mr. Edalat and Mr. Bruce Cahill in the same category?
 8   A.   Yes, I do.
 9   Q.   Now, is anyone in this room suing you for anything?
10   A.   No.
11   Q.   Are you suing anyone in this room for anything?
12   A.   No.  In the past 35 years of my professional life, I've
13   not sued one person in my life, no.  Nothing against lawyer
14   or the Court, but I -- I'm a peaceful man.
15   Q.   Mr. Asvadi, do you have any financial interest of any
16   kind in the outcome of this litigation?
17   A.   Zero.
18   Q.   Are you going to get anything if Mr. Edalat wins?
19   A.   Zero.  I mean, I hope he -- I would be -- I'm
20   (indiscernible).
21            THE COURT:  Stop.  Stop.  No offense, sir.  I don't
22   think we understood what that last comment was.
23            THE WITNESS:  No.  No, I don't.  I don't get
24   involved.
25            THE COURT:  Hold on.  The question was:  Are you
```

```
 1    going to get anything if Mr. Edalat wins?  And the answer we
 2    have is:  I mean, I hope he -- I would be -- I'm.  Then I
 3    wasn't able to --
 4              THE WITNESS:  The answer is no.
 5              THE COURT:  Hold on.  We have to talk one at a
 6    time.  Then I didn't hear what you said after that.  There
 7    was some laughter and you said stuff and I didn't hear it, so
 8    it's not in the record.
 9              I guess the answer is no.  Let's go to the next
10    question.
11    BY MR. KASHANI:
12    Q.  Let me ask again for the record, Mr. Asvadi -- and I
13    apologize if I contributed to making the record unclear.
14              Mr. Asvadi, are you going to get anything if
15    Mr. Edalat wins this lawsuit?
16    A.  No.
17    Q.  Are you going to get anything if Mr. Cahill and his
18    associates win?
19    A.  No.
20    Q.  So you're neutral here?
21    A.  Yes.
22    Q.  Are you familiar with a company called Sentar
23    Pharmaceutical?
24    A.  Yes, I am.
25    Q.  Are you familiar with a company called PharmaPak, Inc.?
```

```
 1    A.   Yes, I am.

 2    Q.   Did you or your trust invest in Sentar Pharmaceutical?

 3    A.   Yes.

 4    Q.   How much money?

 5    A.   $500,000.

 6    Q.   Did you or your trust invest in PharmaPak, Inc.?

 7    A.   Yes.

 8    Q.   How much?

 9    A.   $500,000.

10    Q.   Did you understand those two companies to be separate?

11    A.   Yes, I do.

12    Q.   Did you understand your investment in Sentar to be

13    separate from your investment in PharmaPak, Inc.?

14    A.   Yes, I do.

15    Q.   Did anyone suggest to you that by investing in Sentar,

16    you were going to get something out of PharmaPak, Inc.?

17    A.   No.

18    Q.   Did anyone suggest to you that by investing in

19    PharmaPak, Inc., you were going to get something out of

20    Sentar?

21    A.   No.

22    Q.   As you sit here today, are you satisfied with your

23    investment in Sentar Pharmaceutical?

24    A.   Yes, based on the progress they're doing.  Yes, I am.

25    Q.   After you invested in PharmaPak, Inc., did you from time
```

UNITED STATES DISTRICT COURT

1    to time look in on the activities of the company?

2    A.   Yes, I did.

3    Q.   How did you do that and how often?

4    A.   I -- since at that time I was retired, per se, I offered

5    my help both to Paul and Bruce that I can spend over

6    80 percent of my time with PharmaPak if needed and give any

7    advice if necessary, which I did.

8         I mean, for the beginning -- after my investment I

9    spent at least two, three days at the office in Irvine.  Sky

10   Park I think was the address.

11   Q.   This is the office of PharmaPak?

12   A.   Yes.

13   Q.   Did you used to take something for the employees?

14   A.   Every Friday with no exception I used to take doughnuts.

15   Go to the Gillette factory, not the one in Sky Park.  That's

16   always my habit as manager.  Go and have communication with

17   the people, understand what they do, if we can be any help.

18   So I offer my help as an acting investor, per se.

19   Q.   And did you used to take doughnuts for the workers?

20   A.   Every Friday at 8:00.

21   Q.   Did you have occasion to observe the employees and what

22   they were doing?

23   A.   Yes.  I spent time with Mr. Ludwig quite a lot since I'm

24   an engineer and he's a scientist.  I spent time with him

25   trying to understand what he's doing, talk about his

1    progress, the product he's making, as well as I spent time

2    with Olivia to understand the market side, because that's a

3    brand-new area for me.

4           As an engineer I try to understand, so I spent time

5    with Olivia to see how the market is doing.  The state is

6    legalizing, per se, the CBD.  That was one area I was

7    interested as well.  So, yes, I did.  I spent time with both

8    of them, as well as I spent time with Bruce and Paul when I

9    was in Irvine office.

10   Q.   Did you have occasion to observe Ms. Olivia Karpinski

11   working?

12   A.   Yes.

13   Q.   What was your impression of her work ethic and work?

14   A.   I mean, she -- every time I meet her, she was either on

15   the phone or was on a conference call talking to either

16   customer or supplier.  She come across as a very impressive

17   employee.

18   Q.   When you invested in PharmaPak, did you have any

19   understanding as to whether the officers or management would

20   be taking a salary?

21   A.   No.  I specifically asked Paul is anybody besides the

22   employees, the management, and the answer was no.

23   Q.   Did there come a time when you found some information

24   that suggested otherwise?

25   A.   Yes.  If I recall, we did have a meeting with Bruce and

 1    Greg, Paul, and myself back maybe in December 2015 talking

 2    about the PharmaPak.  And later on he send me an Excel sheet.

 3    Either I got it through him directly or Paul or Bruce.  And

 4    when I reviewed the forecast, I noticed there's a section

 5    saying the expenses, and one of them was salary and there was

 6    a line.  It says management, 240K.

 7              So after that I talked, I believe, either Greg or

 8    Bruce again -- or sorry, Greg or Paul again, and I make sure

 9    that if this is the present expenses or it's going to be for

10    future.  Both of them told me nobody would draw any salary

11    from PharmaPak.

12    Q.   Did you later discover that Mr. Cahill had been taking a

13    salary?

14    A.   Yes, and I told Paul.  Paul says you can go and ask the

15    accountant, Leslie Wood, and I did.  I did go and ask him:

16    Does anybody withdraw salary?  Not the employee.  He says

17    this is the list of the payroll, and the first line was Bruce

18    Cahill.  I think about 240K a year.

19    Q.   Why were you concerned about management taking salaries?

20    A.   I -- because when I invested the money like in my own

21    startup, I didn't withdraw any salary until the company start

22    making money.  So -- and when I started at PharmaPak, I was

23    given the -- this from Paul, Bruce, that, yes, indeed -- I

24    guess maybe Paul.  I don't recall Bruce told me, that, yes,

25    indeed nobody is going to withdraw any salary until the

1    company start generating revenue.

2    Q.   Do you recall that there were discussions in

3    shareholders meetings about PharmaPak in the early part of

4    2016

5    A.   Yeah.

6    Q.   Or spring 2016?

7    A.   Yes.

8    Q.   Do you recall a meeting between you and Mr. Edalat and

9    Shane Scott, and there might have been someone named Freeman

10   there?

11   A.   You know, I was asked that during my deposition, and I

12   do not recall that meeting specifically among four of us.

13   Q.   Have you ever observed Mr. Edalat to do anything that

14   you considered erratic or irresponsible?

15   A.   No.

16   Q.   I'll ask the same question about Mr. Cahill.  Have you

17   ever observed Mr. Cahill to do anything you consider erratic

18   or irresponsible?

19   A.   I mean, this is a very tough question because I remember

20   during one of our meeting, I specifically asked him about the

21   salary as well as renewing the license for PharmaPak.  He was

22   not, how do I say, very forthcoming to answer that question.

23   So I don't know if you call that behavior, whatever you want

24   to call.

25   Q.   That was Mr. Cahill?

1   A.   Yes.  Yes.  Along with all the other investors, I

2   specifically asked him that question.

3   Q.   Did you at some point become aware that the operations,

4   let's say, of PharmaPak had been transferred to another

5   company in Oceanside, Life Tech Global?

6   A.   Later on I took -- I mean, when I understood that the

7   company shut down, I understood the company has been

8   transferred to another company in Oceanside called whatever

9   you call, Life Tech Global.  Yes.

10  Q.   Were you offered a share in Life Tech Global?

11  A.   No.  Nobody contact me.

12  Q.   Was it ever disclosed to you that Mr. Cahill might have

13  an interest in Life Tech Global at the time the company was

14  transferred over?

15  A.   No.

16  Q.   Would you -- in light of your experience, would you

17  consider that to be a conflict of interest?

18  A.   I mean, definitely the answer is yes, I think, because

19  later on my understanding was this new company is pretty much

20  duplicating the business model of PharmaPak, as well I

21  understood Mr. Ludwig, who is the chief scientist, also is

22  working for that.  So to me definitely, besides ethical, I

23  don't think it's legal you do that.

24  Q.   Mr. Asvadi, in your experience, normally when a company

25  fails and there's a loss --

1    A.    Yes.

2    Q.    -- the investors get a tax document they can use to

3    declare that loss in their taxes?

4    A.    Yes.

5    Q.    So the normal case if it's a real failure of the

6    company, you get this tax document in your experience?

7    A.    Yes, I do.

8    Q.    Were you ever given a tax -- withdrawn.

9              Who in your understanding handled the taxes for

10   PharmaPak?

11   A.    Let me just answer this question by saying I asked Bruce

12   several, several times that for my 2015 taxes, I would like

13   to get something called K-1.  I don't know if that's the term

14   the IRS uses, which can claim my losses.  He responded to me

15   that he -- there are several criminal investigation going and

16   he cannot talk to me.

17             So I went to Greg and asked him for that as well,

18   and he said he's going to talk to Leslie Wood to get that for

19   me.  And I never ever got it even though I sent several text

20   messages to Greg and Bruce as well as calling Bruce.  I never

21   managed to get any form of paperwork showing my losses.

22   Q.    Now, sir, in your understanding and experience, if there

23   has been a loss to the investors in PharmaPak, Inc., they

24   should get a tax document showing the loss; is that correct?

25   A.    Yes, that is correct.

1    Q.   On the other hand, if the company is still in operation

2    under a different name, maybe there is no tax document?

3    A.   I don't -- I mean, I'm not a tax person, per se, but my

4    understanding is PharmaPak is shut down and my investment is

5    hundred percent gone.  So I want to claim that.

6    Q.   But they never gave you a tax document to show that

7    loss?

8    A.   No.  No.  No, they did not.

9              MR. KASHANI:  Okay.  Thank you, sir.  Appreciate

10   your coming.

11             THE WITNESS:  Thank you.

12                        **CROSS-EXAMINATION**

13   BY MS. ZERNER:

14   Q.   Good morning, Mr. Asvadi.

15   A.   Good morning.

16   Q.   Mr. Asvadi, you were just talking about how you were

17   looking for a K-1 because you understand you had completely

18   lost your investment as of the time that PharmaPak shut down

19   in early March of 2016; correct?

20   A.   Yes, that is correct -- K-1 or any form of document to

21   show my losses so I can claim on my tax return.

22   Q.   Because you had a 100 percent loss of that investment at

23   that time?

24   A.   Yes.

25   Q.   You mentioned earlier that generally when one is making

```
 1    an investment, that you -- you accept a risk of loss;

 2    correct?

 3    A.   That is correct.

 4    Q.   But do you have to accept it when someone lies to you

 5    about the investment before you make it?

 6    A.   I mean, that's a general question.  I mean, lies in what

 7    manner?  I mean, the lies about the investment?

 8    Q.   Yes.  If someone lies to you to induce you to make that

 9    investment, do you just have to accept that kind of loss?

10    A.   I mean, be specific, please.  I mean, I just don't know.

11    Your question is too general.  I mean, who lied to me?

12    Q.   I wasn't -- you were asking.  I was just following up on

13    a general question to you by Mr. Kashani about one generally

14    accepts a risk of loss; correct?

15    A.   Yes.

16    Q.   And I was following up to see if -- generally if one

17    just has to accept a loss when the investment is

18    misrepresented to them before they invest?

19    A.   Yeah.  I mean, that's the obvious question.  I mean,

20    something is misrepresented to me.

21    Q.   Then you wouldn't accept that as just a risk of

22    investing?

23    A.   Depends on what information was misrepresented to me.  I

24    mean, if I was their age, I take my losses.

25    Q.   Right.  So there are misrepresentations that you
```

```
 1   wouldn't just accept as a general risk of investing?

 2   A.   Yes.  That's why I asked you please be specific what it

 3   is so I can answer you correctly.

 4   Q.   Okay.  You also said that you made an investment in

 5   PharmaPak; correct?

 6   A.   Yes.

 7   Q.   And when you made that investment, you actually -- your

 8   investment didn't go directly into PharmaPak, but rather you

 9   paid Mr. Edalat the money to buy his shares; correct?

10   A.   That is correct.

11   Q.   And you made the wire directly to one of Mr. Edalat's

12   accounts?

13   A.   That is correct.

14   Q.   And thereafter you made an investment in EFT Global

15   Holdings doing business as Sentar Pharmaceuticals?

16   A.   That is correct, yes.

17   Q.   And that's another of Mr. Edalat's companies?

18   A.   Yes.

19   Q.   And Mr. Cahill wasn't -- didn't discuss that investment

20   with you; correct?

21   A.   Not at all.

22   Q.   And you thereafter also promoted Sentar products in

23   Iran?

24   A.   That is correct.

25   Q.   And it was your understanding -- I know you mentioned at
```

UNITED STATES DISTRICT COURT

1    PharmaPak you observed Ms. Karpinski on the phone.  You

2    believe she was making calls to make sales; correct?

3    A.   Yes, because I mention in my deposition I didn't want to

4    be nosy, but I stand by her door to get a hold of her and I

5    did hear.  She talk about patches at that time.  She was

6    talking about the product with the supplier and so forth.

7            So my assumption is, yes, she was working at

8    PharmaPak regarding the PharmaPak product line.

9    Q.   So she was -- to your understanding she was working on

10   sales for PharmaPak?

11   A.   Yes, I do.

12   Q.   She was not working on sales for Sentar?

13   A.   No, she was not.

14   Q.   It was your understanding she had no involvement in

15   Sentar?

16   A.   Yes.

17   Q.   And as to -- after Sentar, Mr. Edalat has given you

18   shares in another company as well; correct?

19   A.   That is correct.

20   Q.   What's the name of that company?

21   A.   Alternate Health.

22   Q.   And how many shares did he give you in that company?

23   A.   300,000 shares.

24   Q.   And that's another company, HC, that has nothing to do

25   with Mr. Cahill or PharmaPak; correct?

1    A.    No.

2    Q.    Did he just give you the shares, or did you pay him

3    money for those shares?

4    A.    No.  As part of the agreement was I sit down and review

5    his licensing and consulting agreement with Alternate Health.

6    And based on my negotiation with the management of Alternate

7    Health, I basically be able to compensate the amount of the

8    share that I got regarding his benefit, outside benefit on

9    that contract.

10   Q.    Okay.  And when did this happen?

11   A.    I want to say probably late 2016 or early 2017.

12   Q.    So certainly after PharmaPak had shut down?

13   A.    Yes.  My understanding is PharmaPak shut down

14   March 2016 -- at least six, seven months after that, if not

15   longer.

16   Q.    And back to PharmaPak, you mentioned with regard to

17   salaries that it was Mr. Edalat who told you no one was

18   supposed to be taking salaries?

19   A.    After I received the Excel sheet from Greg, if I recall,

20   I'm -- I'm not sure if hundred percent, but either Paul or

21   Greg told me nobody is withdrawing salary, or both.  Both

22   Paul and Greg told me that.

23   Q.    Okay.  Mr. Edalat had told you that, is what I

24   understood from your previous testimony.

25   A.    Yes, yes, as well as Greg.

```
 1    Q.    So you had conversations with Mr. Cullen?

 2    A.    Yes.

 3    Q.    And during this period of time; right?

 4    A.    What period?

 5    Q.    During the PharmaPak period of time.

 6    A.    Yes.  Yes.

 7    Q.    Into March of 2016?

 8    A.    Yes.

 9    Q.    And did you have conversations with Mr. Cullen face to

10    face?

11    A.    After March?

12    Q.    In the period of time you were involved with PharmaPak?

13    A.    Yes.  Yes.  Several meetings.

14    Q.    And did you have conversations ever with Mr. Cullen over

15    the phone?

16    A.    Several phone calls.

17    Q.    And what about Mr. Ron Franco?  Did you ever talk with

18    him?

19    A.    Yes, I did.

20    Q.    And Mr. Shane Scott, did you --

21    A.    Yes.

22    Q.    You spoke with him over the phone?

23    A.    Over the phone and face to face.

24    Q.    You developed a good relationship with Mr. Scott; right?

25    A.    I assume I develop good relationship with every single
```

```
 1    investor.

 2    Q.    You had a friendly relationship with all of them?

 3    A.    All of them.   That was my assumption, my perception.

 4    Q.    Okay.

 5          And do you recall then in early March of 2016

 6    receiving an e-mail from Mr. Cahill regarding a consent

 7    agreement to sell the assets of the company?

 8    A.    I was shown that during my deposition, and I clearly

 9    said I did not recall seeing the e-mail and I explained to

10    you why.   And you can ask every single investor sitting

11    there.   I spent days and hours on the phone with every single

12    of those gentlemen except Bruce to try to fix the problem at

13    PharmaPak, which I call a management problem.   So my focus

14    was hundred percent on fixing the PharmaPak management

15    problem.

16    Q.    And you have no memory as you sit here today, then, of

17    receiving that unanimous consent agreement --

18    A.    No, I do not.

19    Q.    Sir, if you could let me finish my question before you

20    answer.

21    A.    Please.

22    Q.    Thank you.   The unanimous consent agreement that was

23    e-mailed by Mr. Cahill, are you saying that you did not

24    receive it in March of 2016 when it was sent?

25    A.    I did not say I did not receive it.   I said if I had
```

```
 1    received it, I did not recall seeing the document.
 2    Q.   And --
 3    A.   I for sure may have received it.  I'm not claiming I did
 4    not.
 5    Q.   And do you recall, then, if you received it, so do you
 6    have a memory of reading through that document?
 7    A.   No.
 8    Q.   And you didn't discuss that document with anyone?
 9    A.   No.  All -- can I explain?  All my discussion for almost
10    a month, day and night, hours and hours -- which, my wife was
11    criticizing me -- was with every single investors how to fix
12    the PharmaPak management problem.
13         The last thing on my mind was to let my investment
14    go, and I was spending tons of hours on the phone, meetings
15    face to face with every single investor -- Mr. Cullen, Shane,
16    John, and everybody else.
17    Q.   Well, there came a point where you had to let your
18    investment go or you came to the conclusion that there was
19    nothing to save; correct?
20    A.   Yes.
21    Q.   Do you recall when that was?
22    A.   Yes.  When I keep calling Bruce and say, Bruce, what's
23    going on?  He said:  Sorry.  There are three criminal
24    investigation going and the company is shut down.  And good
25    luck on your other investment.
```

 1            That was my last conversation with Bruce on the

 2    phone.

 3    Q.   And you just mentioned da criminal investigation.

 4    You're referring to when Mr. Edalat called the police to come

 5    and --

 6    A.   No.  No.  He never explained to me what it is.  He sent

 7    me a text and he said:  There are criminal investigation

 8    going.  Good luck with your other investment.

 9    Q.   In early March around the time that this consent

10    agreement was sent around, you knew that there had been a

11    police investigation into drugs at the facility because

12    Mr. Edalat called the police; correct?

13    A.   Yes, I do.

14    Q.   Okay.  And at that time you had also received another

15    e-mail from Mr. Cahill indicating that all the employees

16    needed to be terminated from PharmaPak; did you not?

17    A.   No.  As I mentioned earlier, they show it to me, the

18    deposition.  I do not recall seeing that e-mail, but I don't

19    say I did not receive it.

20    Q.   So again, did you review either of those e-mails by

21    Mr. Cahill, either the one for terminating employees or the

22    one for selling the assets?

23    A.   No.

24    Q.   Okay.  And did you -- at that same time that those

25    e-mails were going around, did you understand that the rent

1    couldn't be paid by PharmaPak for its facilities?

2    A.   No.  I -- no.

3    Q.   You didn't have an understanding of that?

4    A.   No.

5    Q.   And did you have an understanding that certain employees

6    weren't getting their insurance paid?

7    A.   I understood during one of our investors' meeting that

8    we had with everybody at Pelican Hills Restaurant that

9    insurance was not being paid.

10   Q.   So you're aware of that one?

11   A.   That was brought up by somebody during that

12   conversation, that meeting we had at Pelican Crest -- Pelican

13   Hills.  I'm sorry.  Pelican Hills.

14   Q.   But as of early March, you weren't aware that the rent

15   wasn't being paid?

16   A.   No, I was not aware.

17   Q.   As of early March when these e-mails were going around

18   about terminating employees and transferring or selling the

19   assets of PharmaPak, did you understand that the company had

20   no money?

21   A.   I understood the company was in the process of raising

22   money, and I talked to Greg specifically that I will

23   participate if we fix the management, because management was

24   a big issue inside the company.  It was a firework going on,

25   and I specifically told him.

1          I remember I was at lunch.  He called me and he

2    said:  Amir, we would like to raise money.  I said:  By all

3    means I participate if the management gets fixed.

4    Q.   Okay.  I'm going to ask you again to answer my

5    questions.

6    A.   Please.

7    Q.   Did you have an understanding at that time in early

8    March of 2016 that the company did not have money?

9    A.   I do not know if it was early March.  That date I do not

10   recall.

11   Q.   So as of early March did you believe the company was

12   dead?

13   A.   I knew the management is bad, not the company is dead.

14   Q.   So you -- you didn't say or believe that you thought the

15   company was dead as of that time?

16   A.   Not at all.  Can I explain to you why?

17   Q.   Sure.

18   A.   Because there was a $750,000 invested by another

19   investor called on toward the end of the year or early 2016.

20   So I had no idea in my mind small company like PharmaPak has

21   a problem with the money after he invested $750,000.

22   Q.   So you never said the company was dead?

23   A.   I never ever said the company was dead.  In early March?

24   No.  No.

25   Q.   As of that time in early March when again Mr. Cahill was

```
 1    sending these e-mails around about terminating the employees

 2    and transferring or selling the assets, you recall that;

 3    right?  This e-mail, you've seen it at your deposition?

 4    A.   I mentioned to you they show me the e-mail with the

 5    attachment.  It was no content.  There was nothing that

 6    Mr. John showed to me.  The e-mail didn't have anything in

 7    there.  It just show attachment.

 8            He told me:  Have you seen this e-mail?  It has my

 9    e-mail address.  But did I open the attachment?  I told him I

10    do not recall because my focus for almost four weeks, day and

11    night, with every single investment including Paul, except

12    Bruce, spending time to fix the management of the company.

13    Q.   So as of the time that the e-mails went around about

14    terminating employees and selling off the assets, in your

15    mind was the company shut down?

16    A.   No, not at all.

17    Q.   As of that time that those e-mails were going around,

18    had you concluded that your investment was gone; the company

19    is worth zero?

20    A.   I work -- I keep saying -- six, seven, eight hours on

21    the phone.  The answer --

22    Q.   Yes or no?

23    A.   Let me explain to you.

24            THE COURT:  Just a moment.

25            THE WITNESS:  It's not a simple yes or no.
```

```
 1              THE COURT:  No.  One at the time.

 2              THE WITNESS:  Yes.

 3              THE COURT:  Would you repeat the question?

 4    BY MS. ZERNER:

 5    Q.   As of the time that the e-mails were going around to

 6    terminate the employees and sell off the assets, did you

 7    believe that your investment was gone and worth zero?

 8              THE COURT:  You may answer that yes or no.

 9              THE WITNESS:  You know, can you repeat the

10    question, because it's so vague for me, if you don't mind.  I

11    mean, can you repeat?  The e-mails going around?  I have no

12    idea there was e-mails about termination, selling the assets.

13    And you're telling me as the e-mail is going around telling

14    you we're selling the assets, terminating the employees.  Are

15    you saying your investment is zero?  I said I don't recall

16    seeing those e-mails.  I was spending hours on the phone to

17    fix the company.

18              THE COURT:  All right.  Let's have the -- the ball

19    is now in your court.

20              MS. ZERNER:  Thank you, Your Honor.  I'll be more

21    specific.

22    BY MS. ZERNER:

23    Q.   In March 2016 when an e-mail is sent by Mr. Bruce Cahill

24    with a consent agreement proposed to sell off the assets, did

25    you have an understanding that your investment was now gone,
```

1    worth zero?

2    A.   If I had seen the e-mail, the answer is yes, my

3    investment was zero.  I mentioned to you earlier I did not

4    see the e-mail.  I did not open the e-mail.

5    Q.   Okay.

6         And did you come to the conclusion then that -- in

7    early March 2016 had you come to the conclusion that you all,

8    the investors, had all lost your money except for Mr. Edalat?

9    He's the only one that made out with something?

10   A.   I came to conclusion I lost the money.

11   Q.   And not that everyone else, Mr. Scott and the others,

12   had lost theirs as well and --

13   A.   I just worry about --

14   Q.   -- that Mr. Edalat was the only one that made money off

15   of this investment?

16   A.   I mentioned I lost the money.

17   Q.   So your answer is, no, you had not come to that

18   conclusion?

19   A.   I came to the conclusion I lost the money.

20   Q.   And not that Mr. Scott had lost his money?

21   A.   I do not know.

22   Q.   And was it your belief, then, at the time that

23   Mr. Cahill is sending -- sent around the e-mail saying we

24   need to sell off the assets, that they were going -- the

25   equipment needs to be sold off anyway, whether you signed off

1    on the document or not?

2    A.    Yes.

3    Q.    Is that true?

4    A.    Yes.

5    Q.    And you knew there was -- there was -- the company was

6    significantly in debt at that time?  Did you know that?

7    A.    I did not know that.  All I know, I explained to you.

8    Greg called me and said:  We are about to raise money for the

9    company, and my simple answer was:  Let's fix the management

10   problem.  Then I participate on investing money.  That was my

11   answer to Greg.  He is here and he can tell you that.

12   Q.    Did you ever talk to Mr. Scott about this e-mail from

13   Mr. Cahill with the resolution to sell off the PharmaPak

14   assets?

15   A.    No.

16   Q.    So you didn't talk to Mr. Scott about how the company

17   was dead as of that time the e-mail went around?

18   A.    No.

19   Q.    And you didn't talk to Mr. Scott about how the e-mail

20   proposing to terminate the employees didn't matter because

21   they were going to be terminated anyway?

22   A.    No.

23   Q.    And you didn't say to Mr. Scott that PharmaPak doesn't

24   have the money to go on at that time?

25   A.    No.

```
1    Q.   And you didn't say to Mr. Scott that the company really

2    needed an injection of money at that point?

3    A.   I spoke to --

4    Q.   Sir?

5    A.   No, no, no.  I don't --

6              THE COURT:  Hold on.  Hold on.  We can't talk at

7    the same time.  I'm going to place the ball in your court,

8    counsel.

9    BY MS. ZERNER:

10   Q.   Did you say to Mr. Scott that we need an injection of

11   money into this company when you -- as of the time the e-mail

12   of Mr. Cahill regarding selling off the assets was sent

13   around?  Did you say that to Mr. Scott?

14   A.   Can I say without saying yes or no?  Can I explain to

15   you?  I spoke to every --

16   Q.   No, sir.  Can you answer my question?

17   A.   I mean, Scott, Greg, Ron -- Ron, maybe not.  And John.

18   The answer is, yes, I told them that we have to go and fix

19   the management to raise the money.

20   Q.   So you didn't say that the company was dead?

21   A.   No.

22   Q.   Sir, I'm going to now play a recording for you.

23   A.   Yes.

24   Q.   And I'm just going to play a part of it to start off so

25   you can listen to the voices --
```

```
 1   A.   Sure.

 2   Q.   -- and identify them.  Okay?

 3   A.   Sure.

 4             MR. KASHANI:  I object.  I haven't been

 5   provided with this recording.

 6             MS. ZERNER:  Your Honor, this is offered for

 7   impeachment.  We had an agreement as to authenticating the

 8   audio recording.  This objection has nothing to do with

 9   foundation.  Again, it's offered for impeachment based on the

10   direct testimony offered here today.

11             MR. KASHANI:  We had no agreement concerning this

12   recording.  Last night --

13             THE COURT:  Just a moment.  Is this recording

14   related at all to the previous recording?

15             MS. ZERNER:  No.

16             THE COURT:  Hold on.  It's a different meeting?

17             MS. ZERNER:  It's a different meeting.

18             THE COURT:  And how do we have -- why don't we have

19   a foundation issue?

20             MS. ZERNER:  The stipulation that was made earlier

21   today for both of us is that if there was an audio recording

22   offered today, that it could be -- the foundation would be

23   established by playing a portion of it for the witness on the

24   stand a part that's not controversial.

25             THE COURT:  All right.  Just a moment.  In the
```

1    stipulation you have described, was that clearly intended to

2    apply to all other voice communications that might be

3    presented?

4             MS. ZERNER:  Yes.

5             THE COURT:  What do you say to that, Mr. Kashani?

6             MR. KASHANI:  I disagree very strongly with that.

7    I made a lot of technical effort to get them the recordings

8    that I used in advance.  This is a recording they have not

9    provided to me.

10            THE COURT:  Okay.  Let me stop you there.  It would

11   seem to me unlikely that a counsel would say:  Anytime you

12   have a recording, we'll just listen to the beginning and see

13   if that establishes a foundation.  That -- it seems to me

14   unlikely that there would be an agreement as to all future

15   recordings along that basis.

16            Perhaps you misinterpreted.  But unless it was

17   clear that -- the gracious concession.  Perhaps it was clear

18   that the gracious concession you made -- let me back up.

19            You made a gracious concession.  In order for that

20   handling of foundation to apply across the board to all other

21   recordings, it would have to be much more clear than the

22   literal she said, he said, that we have here in court right

23   now, because it seems unlikely there would be a concession

24   like that for all future recordings.

25            So what do you now propose?

1           MS. ZERNER:  I have Mr. Scott here who can

2   authenticate the recording I was about to play for

3   Mr. Asvadi, -- if I can do that through Mr. Scott in light of

4   what we now understand, that our stipulation does not apply

5   as the way we thought it did.

6           THE COURT:  Let me ask this:  How long will you be

7   inquiring of this witness?

8           MS. ZERNER:  Of Mr. Asvadi?

9           THE COURT:  Yes.

10          MS. ZERNER:  Do you mean --

11          THE COURT:  Right now, how much more time?  When I

12   ask that, I'm usually looking for a break where all this can

13   be ironed out without wasting the jury's time.  That's why I

14   ask that kind of question.

15          How much longer with this witness?  Probably not

16   that much longer?

17          MS. ZERNER:  I don't have anything more with that

18   other than the recording.

19          THE COURT:  Okay.  So this is the last thing on

20   this witness.

21          MS. ZERNER:  And Mr. Scott will just take a moment

22   to -- a minute or two to authenticate, Your Honor.

23          THE COURT:  What do you think of that proposal?

24          MR. KASHANI:  Foundation is not the only problem.

25   I provided the complete recordings.  There were about

1    45 minutes of recording.  I provided both of them to the

2    opposing counsel and --

3           THE COURT:  That is true.

4           MR. KASHANI:  -- they have not provided me with

5    this recording.  I cannot review it and know if they've taken

6    a misleading excerpt out of context.

7           THE COURT:  Nor can you know that if the foundation

8    element was satisfied, whether what's in the recording might

9    also have objectionable material -- attorney-client

10   privilege, hearsay, et cetera.

11          So unless Mr. Kashani has the opportunity to hear

12   it -- and I realize you're presenting it now because you

13   claim it's impeachment.  But we are presented with challenges

14   as to how we may proceed.

15          MS. ZERNER:  In light of this, Your Honor, then we

16   ask that Mr. Asvadi be ordered to return after the audio

17   recording is heard.

18          THE COURT:  By who?  I'm not understanding the

19   procedure.

20          MS. ZERNER:  If Your Honor could order Mr. Asvadi

21   to return for further questioning --

22          THE COURT:  I heard that.  And then you said after

23   the audio is heard.  My question was:  Heard by who?

24          MS. ZERNER:  After the audio recording is heard and

25   it's admitted to play before the jury, if we could then

```
 1     have Mr. Asvadi --

 2             THE COURT:  For the third time.  I'm sorry.  For

 3     the third time, heard by who?

 4             MS. ZERNER:  By the jury.

 5             THE COURT:  I'm not understanding that at all.

 6     We've presented numerous problems for playing the audio in

 7     front of the jury.

 8             MS. ZERNER:  If that's resolved and we are allowed

 9     to proceed and present the evidence to the jury, then we

10     would like Mr. Asvadi to be available for questioning

11     thereafter.

12             THE COURT:  All right.  I'm sorry.  And by what

13     mechanism are we going to resolve that?

14             MS. ZERNER:  By Your Honor ordering that Mr. Asvadi

15     remain available to appear again before --

16             THE COURT:  No.  We're having -- we're not making a

17     connection here.  There are numerous problems with playing

18     this right now.  There may be foundation issues.  The audio

19     may have additional injections embedded in it.  I'm just

20     asking how you want to resolve all those issues before it can

21     be played in front of the jury in any context.

22             MS. ZERNER:  As I understood, Your Honor, we were

23     going to take a break to resolve those issues.  And assuming

24     those do get resolved --

25             THE COURT:  How?
```

1          MS. ZERNER:  -- such that we can then thereafter

2     play the recording, we would like Mr. Asvadi to be available

3     thereafter subject to that approval to offer it in evidence.

4          THE COURT:  Okay.  Before I do that, I need to have

5     a clear program on how you intend to resolve these issues.

6     And you said play it, and I said:  To whom?

7          MS. ZERNER:  I understood, Your Honor, we would

8     take a break and resolve whether it needs to be --

9          THE COURT:  How?  How?  How?  What are you -- if we

10    were to take a break right now, I just want to know what

11    you're proposing to do.

12         MS. ZERNER:  Your Honor, we would discuss whether

13    this can be stipulated to with Mr. Kashani or, as I

14    understood your order --

15         THE COURT:  I don't see a clear path.  If you can

16    give me a clear path, I can consider it, but a number of

17    things have to happen before we could resolve the

18    admissibility of this.

19         Mr. Markham, do you have a proposal?

20         MR. MARKHAM:  I do, Your Honor.

21         THE COURT:  And it is?

22         MR. MARKHAM:  We suspend our examination of this

23    witness.  We give Mr. Kashani the tape.  We come back

24    Tuesday.  If he does not have a legitimate objection to the

25    tape, Mr. Asvadi retakes the stand.  Mr. Scott, if he can

1    satisfy the Court that he authenticates the tape, then we

2    play the tape and ask him the questions about the tape and

3    the contents of the tape.

4            THE COURT:  Okay.  You've just added something key.

5    You said Tuesday.

6            MR. MARKHAM:  Yes.

7            THE COURT:  Okay.  So now we can turn to

8    Mr. Kashani and say:  What is your view on that?

9            MR. KASHANI:  Your Honor, I specifically raised the

10   issue of recording --

11           THE COURT:  Hold on.  Let's get directly to the

12   point.  The issue of Tuesday has been raised.  Don't give me

13   a lot of other arguments.  I think I already know what they

14   are.  I'm on top of this.  What about the proposal of you

15   reviewing over the weekend and potentially having this

16   witness come back Tuesday?

17           MR. KASHANI:  I think that's an unfair imposition

18   on the witness and on me.  There's issue of audio recordings

19   I raised outside the earshot of the jury conservatively.  I

20   said I had a recording yesterday when the jury was absent,

21   and we discussed the issue.  I provided copies to counsel

22   before I made any attempt to play it --

23           THE COURT:  Okay.  I'm going to cut you off because

24   you're winning.  I think that makes sense.  I'm not going to

25   order this witness to come back Tuesday on this matter.

1          MR. MARKHAM:  May Mr. Scott retake the stand to

2     authenticate the tape?

3          THE COURT:  When and how?

4          MR. MARKHAM:  Well, as the next witness.  Well,

5     after Mr. Kashani sees it over the weekend, may he come back?

6     I represent to the Court that this is a statement by this man

7     that is relevant --

8          THE COURT:  Hold on.  Hold on.  Hold on.  We don't

9     want a statement in front of the jury about the statement

10    from this man.

11         MR. MARKHAM:  In fairness to us, because we did not

12    get the benefit of the stipulation that we thought and is

13    worded as beyond --

14         THE COURT:  You know what?  The Court is always

15    concerned about stipulations being addressed in front of the

16    jury.

17         MR. MARKHAM:  All right.

18         THE COURT:  We've had plenty of time to resolve

19    this matter.

20         You know, for the record, I was here at 7:30 and I

21    was in this courtroom at 7:30.  We could have sat down and

22    resolved it all at that time.

23         MR. MARKHAM:  Until recently --

24         THE COURT:  Let me ask this:  How long is this

25    audio?

```
1              MR. MARKHAM:  We will play about 20 minutes of it.
2    And Mr. Kashani --
3              THE COURT:  Okay.  Now, you see, that presents a
4    further difficulty.  You're requiring Mr. Kashani to listen
5    to 20 minutes of an audio, making it --
6              MR. MARKHAM:  Between now and Tuesday, yes.
7              THE COURT:  We're talking over each other again,
8    which isn't helpful.
9              MR. MARKHAM:  I apologize.
10             THE COURT:  All right.
11             State your objections, Mr. Kashani.  Let's return
12   to where we were.  The plaintiff requires -- the plaintiff
13   requests that the tape be played at this time.  Do you
14   object?
15             MR. KASHANI:  Yes, foundation, and foundation is
16   the main objection.  Hearsay.  And I don't know what's on the
17   tape, so I don't know what else to object to.
18             THE COURT:  Potential hearsay.
19             MR. KASHANI:  Potential hearsay.  Potential
20   attorney/client privilege.  Many potential objections.
21             THE COURT:  The objection is sustained.
22             That's the best I can do.  Sorry.  If you wish at a
23   later time to make an offer of proof, you may, but there's
24   just too much obstacles to get from there to here.
25             MR. MARKHAM:  No further questions, Your Honor.
```

1          THE COURT:  Okay.  Thank you.

2          Redirect.

3                      **REDIRECT EXAMINATION**

4    BY MR. KASHANI:

5    Q.   Mr. Asvadi, you mentioned a company called Alternate

6    Health?

7    A.   Yes.

8    Q.   Is that a public company in Canada?

9    A.   Yes, it is.

10   Q.   Are you aware that Sentar Pharmaceutical has a U.S.

11   patent application?

12   A.   Yes, I -- yes, international.  Not just U.S.

13   Q.   And this is a patent that Mr. Edalat is the inventor?

14   A.   Yes.

15   Q.   And Mr. Edalat is listed as the inventor on the final

16   application, not just the provisional?

17   A.   That's my understanding, yes.

18   Q.   And this invention is separate from anything in

19   PharmaPak?

20   A.   That is correct.

21          MR. KASHANI:  I would like to offer at this time

22   Exhibit 947, which is the U.S. patent application.

23          THE COURT:  Which is that?

24          MR. KASHANI:  947 is the patent application.

25          THE COURT:  Any objection?

```
1              MS. ZERNER:  Objection, Your Honor.  Hearsay.
2    Authentication.
3              THE COURT:  Sustained.
4    BY MR. KASHANI:
5    Q.   Sir, has that patent application resulted in value for
6    Sentar Pharmaceutical?
7              MS. ZERNER:  Objection, Your Honor.  Referring to
8    something that's not admitted.
9              THE COURT:  That objection is overruled.
10             Do you have another one?  Does this witness know of
11   the patent we're speaking of?
12             MS. ZERNER:  Foundation, Your Honor.
13             THE COURT:  Not foundation.  Actually I'll call it
14   foundation.  We don't know if this witness has any idea what
15   that patent application is.
16   BY MR. KASHANI:
17   Q.   Mr. Asvadi, are you familiar with Mr. Edalat's and
18   Sentar's patent application?
19   A.   Yes, I am familiar.
20             THE COURT:  Is that a sufficient description of
21   this particular patent application?  There seemed to be more
22   than one.
23             MR. KASHANI:  Yes.
24   BY MR. KASHANI:
25   Q.   I don't expect you to know it by number, sir, but are
```

```
 1   you familiar with a U.S. patent application that lists
 2   Mr. Edalat as inventor, Sentar Pharmaceutical as the
 3   assignee, and relates to sublingual or under-the-tongue
 4   pills?
 5   A.   Yes, I am familiar.
 6   Q.   And is that because you participated in the discussions
 7   with Alternate Health concerning this patent application?
 8   A.   Yes.
 9              MS. ZERNER:  Objection.  Leading.  Hearsay.
10              THE COURT:  Sustained.  The answer if it came in
11   will be stricken.
12   BY MR. KASHANI:
13   Q.   How is it that you are familiar with the patent
14   application that I will refer to as the Edalat invention,
15   Sentar assignment?
16   A.   Because --
17              MS. ZERNER:  Objection, Your Honor.  Again, this
18   document or title is not in evidence.
19              THE COURT:  Overruled.
20              THE WITNESS:  I'm familiar because when I invested
21   at Sentar, Paul Edalat specifically mentioned about that
22   patent.  And I liked what the patent does and what it can do
23   for the revenue of Sentar at that time.
24   BY MR. KASHANI:
25   Q.   I'd like to blank the screen and show you, sir, the
```

```
 1    first page of Exhibit 947 for identification.

 2              THE COURT:  All right.  We'll blank the screen.

 3    BY MR. KASHANI:

 4    Q.   Sir, could you look at the screen in front of you?

 5    A.   Yes.

 6    Q.   Do you recognize this document, what has been marked as

 7    Exhibit 947?  Do you recognize this document?

 8    A.   Yes.  Yes.

 9    Q.   What is Exhibit 947?

10    A.   It's a United States patent application.

11              MS. ZERNER:  Objection, Your Honor.  He's reading

12    from the document rather than identifying it himself.

13              THE WITNESS:  I thought you said you --

14    BY MR. KASHANI:

15    Q.   Without looking --

16              THE COURT:  Hold on.

17              MR. KASHANI:  I'm sorry.

18              THE COURT:  Finish the sentence you started.  It's

19    a United States patent application.  Go ahead.

20              THE WITNESS:  United States patent application

21    publication.

22              THE COURT:  Next question.

23    BY MR. KASHANI:

24    Q.   Without looking at the document, having looked at it.

25    Please turn away and I'll blank the screen.  Do you recognize
```

```
 1    Exhibit 947?

 2    A.   Yes, I do.

 3    Q.   What is Exhibit 947?

 4    A.   It was about the patent for sublingual.

 5    Q.   Is this a patent of which Mr. Edalat is inventor?

 6    A.   Yes.

 7    Q.   Assigned to Sentar?

 8    A.   Yes.

 9              MR. KASHANI:  I offer Exhibit 947.

10              MS. ZERNER:  Objection, Your Honor.  Hearsay.

11              THE COURT:  Response?

12              MR. KASHANI:  Patent application is an official

13    document filed with the patent office.

14              THE COURT:  The objection is overruled.  947?

15              MR. KASHANI:  Yes, Your Honor.

16              THE COURT:  All right.

17              (Exhibit 947 received)

18    BY MR. KASHANI:

19    Q.   Now, sir, Exhibit 947 --

20              THE COURT:  Hold on.  I'm going to at this point,

21    because I don't know where we're going, going to accept its

22    admission for a limited purpose.  It is possible that in the

23    application column 17, line 14, there's a factual statement,

24    and that would be hearsay.

25              So we're letting this patent application in.  It's
```

1    an official filing of the United States.  It's in to let you

2    know that there's an application, but you can't look at it

3    for facts that might appear on page 17 because the plaintiffs

4    wouldn't have had the opportunity to cross-examine on those

5    facts or to determine if those facts are true.

6              So for this document, it's coming in as an official

7    document of the United States, but it's not coming in to

8    prove particular facts that may or may not appear in it.  I

9    haven't looked it over.

10             Okay.  With that, continue.

11   BY MR. KASHANI:

12   Q.   Mr. Asvadi, do you understand that this is the patent

13   application, the actual patent application, not the

14   provisional application?

15   A.   Yes.  I understand.

16             THE COURT:  By the way, at any time if you would

17   like to voir dire the witness concerning his knowledge,

18   you're free to do so.

19             MS. ZERNER:  Thank you, Your Honor.

20             THE COURT:  Okay.

21   BY MR. KASHANI:

22   Q.   To your knowledge was Mr. Edalat the inventor on this

23   patent?

24   A.   Yes, I do.

25   Q.   And just to be clear, this patent is separate from the

1    provisional patents that belong to PharmaPak?

2    A.   The PharmaPak was patch delivery.  This is sublingual

3    for pills.  I'm not a medical doctor, but this is my

4    understanding.

5    Q.   I'm going to ask you, sir:  Do you have any knowledge as

6    to whether Sentar Pharmaceutical has derived value from this

7    patent application, Exhibit 947?

8    A.   I mean, this patent is the reason I invested at Sentar,

9    whatever valuation you want to put on that.

10   Q.   And are you satisfied with your investment?

11   A.   Yes.  I mentioned earlier based on the progress that the

12   Sentar is going through, I'm happy.

13   Q.   All right.  Thank you, sir.

14          MR. KASHANI:  No further questions.

15                     **RECROSS-EXAMINATION**

16   BY MS. ZERNER:

17   Q.   Mr. Asvadi --

18   A.   Yes.

19   Q.   -- you were just talking about this particular patent

20   that you identify as Mr. Edalat's for his sublingual process;

21   correct?

22   A.   Yes.

23   Q.   And that's not for a patch process; correct?

24   A.   Yes.  It says clearly sublingual, which, my

25   understanding is for pills.

```
 1    Q.   At PharmaPak your understanding was the patents were for

 2    patches?

 3    A.   Yes.

 4    Q.   If you'll just give me a moment, I'm going to show you a

 5    document.

 6    A.   Sure.

 7              THE COURT:  Sure.

 8              (Pause in the proceedings)

 9    BY MS. ZERNER:

10    Q.   If you could take a look at Exhibit 216 which has

11    already been admitted in evidence, Mr. Asvadi, this is, I'll

12    represent to you, a list of the PharmaPak patents.  If you

13    could take a look through and read the titles there in the

14    column marked title.

15    A.   It says client matter number, title, filing date,

16    application serial number, status, next action, assignment,

17    inventor.

18    Q.   Right.  And if you go back to the title column --

19    A.   Yes.

20    Q.   -- can you read those titles to yourself?

21    A.   You cover it with the circle.

22    Q.   Sorry.

23              MR. MARKHAM:  I thought that was helping you.

24    Sorry.

25
```

```
 1    BY MS. ZERNER:

 2    Q.   Actually, sir, if you could read them aloud for us while

 3    you're going through them.

 4    A.   It says novel enhanced pure CBD only comprising device

 5    and method for the transdermal delivery of cannabidiol.

 6    Q.   Is that transdermal delivery?

 7    A.   Yes, transmittal [sic] delivery, cannabidiol.

 8    Q.   So that's not sublingual; correct?  It identifies

 9    transdermal there; correct?

10    A.   Transdermal means, yes, delivery of, methodology of

11    delivery, yes.

12    Q.   Can you read the next one for us?

13    A.   Device and method for the transdermal delivery of

14    cannabis without other cannabidiol.

15    Q.   So again that's no mention of the sublingual process;

16    correct?

17    A.   I do not see sublingual, no.

18    Q.   And can you read the third one, sir?

19    A.   Improved device and method for the transdermal delivery

20    of cannabis and cannabidiol, yeah.

21    Q.   Thank you, sir.

22    A.   Sure.

23    Q.   Just a moment, sir.

24         MS. ZERNER:  No further questions.  Thank you.

25         THE COURT:  All right.
```

```
 1              MR. KASHANI:  No questions.  Thank you, Mr. Asvadi.

 2              THE COURT:  Sir, you may step down.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  And I believe we are back to

 5    Mr. Cullen.

 6              MR. KASHANI:  Actually, Your Honor, I apologize

 7    again.  We have a very briefly witness, a rebuttal witness,

 8    per agreement with my colleague.  He can come on and off now.

 9    His name is Dennis Ardi.

10              MR. MARKHAM:  No objection.

11              THE COURT:  That's very kind of you, Mr. Markham.

12              MR. MARKHAM:  Thank you, Your Honor.

13              Dennis Ardi, Defendant's witness, sworn

14              THE CLERK:  If you will please state and spell your

15    first and last name.

16              THE WITNESS:  My name is Dennis Ardi.  First name

17    is D-e-n-n-i-s.  My surname is A-r-d-i.

18              THE CLERK:  Thank you.

19                         DIRECT EXAMINATION

20    BY MR. KASHANI:

21    Q.   Thank you for coming, Mr. Ardi.  Where do you reside?

22    A.   I reside in Pacific Palisades, California.

23    Q.   Could you tell us briefly about your educational

24    background.

25    A.   Yes.  I'm an attorney.  I went to college at Cornell
```

1    University where I received a bachelor of arts degree in

2    government.  Then I went to Harvard Law School and received a

3    JD degree.  I graduated in 1971.

4    Q.   Since then have you worked at various law firms?

5    A.   I've been in continuous law practice since I graduated

6    from law school.  I'm a member of the bar in California, in

7    New York, in Massachusetts, and in the District of Columbia.

8    Q.   Could you list some of the firms that you -- law firms

9    that you've worked with?

10   A.   Yes.  My longest stint working for a law firm was with

11   the Wall Street law firm of Sherman and Sterling.  I worked

12   with Sherman and Sterling in international finance in the

13   1970s and then again when Sherman and Sterling opened in

14   Los Angeles for the entire time they were open in Los Angeles

15   in the 1990s.

16   Q.   And for the record, as a matter of disclosure you and I

17   met at Sherman and Sterling, the Wall Street firm?

18   A.   That is correct.

19   Q.   And since then off and on we have had certain

20   collaborations; is that correct, sir?

21   A.   Yes, it is.

22   Q.   Do you and I have any collaboration of any kind relating

23   to this case?

24        Let me rephrase.  Other than referring me to the

25   client, Mr. Edalat, do you and I have any collaboration or

 1    connection in regard to this case?

 2    A.    No.

 3    Q.    Do you have any financial interest in the outcome of

 4    this case?

 5    A.    No, I do not.

 6    Q.    How did you meet Mr. Paul Edalat?

 7    A.    I met Mr. Edalat through my partners in an investment

 8    fund that we were organizing.  I met Mr. Edalat at the time

 9    we were organizing the investment fund about 10, 11 months

10    ago.

11    Q.    What is the purpose of this investment fund?

12    A.    Our investment fund is to invest money on behalf of

13    foreign nationals who want to invest in United States real

14    estate.

15    Q.    Has Mr. Edalat assisted your efforts in setting up this

16    investment fund?

17    A.    Yes, Mr. Edalat has.

18    Q.    How has Mr. Edalat assisted your efforts in setting up

19    this fund?

20    A.    Well, first he introduced us to Farooq Arjomand.

21    Mr. Arjomand is a citizen of the United Arab Emirates.  He

22    went to school in the United States.  He's a successful

23    businessman in the United Arab Emirates.

24          He was one of the founders of Emaar Properties,

25    which is one of the largest construction companies and

1   property holding companies in Dubai.

2   Q.   Sir, for -- by Dubai, you mean Dubai in the United Arab

3   Emirates?

4   A.   That's correct.  Dubai is one of the Emirates, and Emaar

5   Construction built the Burj Khalifa, which is the tallest

6   building in the world.

7   Q.   So Mr. Edalat introduced your fund to the chairman of

8   the company that constructed the tallest building in the

9   entire world?

10  A.   To one of the founders of that company, yes.  And

11  subsequently Mr. Arjomand, we took him in as a partner in our

12  fund.  And he's a senior manager, as am I, as is Mr. Edalat.

13  Q.   Did Mr. Edalat introduce you to other persons who were

14  useful to your fund?

15  A.   Yes, he did.  We all made a trip to Dubai in March.

16  While we were there, Mr. Edalat arranged us to meet His

17  Excellency Salah Al Shamsi, who owns a company called -- and

18  is the CEO of a company called Liwa Petroleum Supplies,

19  something like that.

20          His company supplies equipment and pipelines to the

21  petroleum industry -- offshore oil rigs, rigs to drill for

22  wells on land.  It's quite a big company.

23  Q.   Did Mr. Edalat introduce you to other, let's say, big

24  players in Dubai?

25  A.   Yes, he did.  Well, we met Mr. -- His Excellency's son,

1     Salem Al Shamsi.  Farooq Arjomand was with us.  We had many

2     meetings at our hotel, and we were actually invited to Mr. --

3     His Excellency's house in Abu Dhabi, which is 70 miles away.

4     Q.   You said house.  Is it more like a palace?

5     A.   It is a palace.

6     Q.   In fact, it's the largest -- it's the largest private

7     palace in the Emirates; isn't it?

8     A.   I was told that, and I have no reason to doubt it.

9     Q.   If I may, sir, I'd like to show you a photograph for

10    identification.

11             THE COURT:  All right.  This isn't admitted?

12             MR. KASHANI:  No, it's not.  I'm simply showing it

13    to him for identification.

14             THE COURT:  Are you asking me to black the screen?

15             MR. KASHANI:  Yes, Your Honor.  I wasn't moving it

16    over until I made that request.

17    BY MR. KASHANI:

18    Q.   Sir, do you see a photograph in front of you?

19    A.   Yes, I do.

20    Q.   Is this photograph a fair and an accurate depiction of

21    the persons and events in the photograph?

22    A.   Yes, it is.

23             MR. KASHANI:  I offer the photograph as

24    Exhibit 1006.

25             MR. MARKHAM:  No objection.

```
 1              THE COURT:  Admitted.

 2              MR. KASHANI:  I'm sorry, Your Honor.  I need to

 3     move the screen on.

 4              THE COURT:  Now, you've admitted it as 1006.  For

 5     the record, I don't have 1005.  I don't know if Ms. Bredahl

 6     does.

 7              Do you, Ms. Bredahl.

 8              THE CLERK:  I do not, Judge.

 9              THE COURT:  Okay.  Do you want to make this five

10     instead of six.

11              MR. KASHANI:  Yes, Your Honor.  My mistake.  I

12     apologize.

13              THE COURT:  So this is 1005, a photo of a meal.

14              (Exhibit 1005 received.)

15     BY MR. KASHANI:

16     Q.   Sir, I just want to point out a few people in the photo.

17     Who is the gentleman in the black?

18     A.   If you're pointing to the person who is third from the

19     left -- I can't see where you're pointing -- that's Paul

20     Edalat.

21     Q.   Let me see if I can get a better pointer.  I'm not sure

22     I can.  And are you -- you have the right way of doing it.

23     Are you fifth from the left?

24     A.   Yes, I am.

25     Q.   Who is first on the left?
```

1    A.    That's His Excellency Al Shamsi's son.    His name is

2    Salem Al Shamsi.

3    Q.    Who is the gentleman at the head of the table?    I think

4    he has his hand out.

5    A.    That's His Excellency Salah Al Shamsi.

6    Q.    What's going on in this photograph?

7    A.    This is at the beginning of a -- I have to call it a

8    banquet that His Excellency had for us at his house.    He

9    hosted us at his house on a Sunday afternoon.

10   Q.    And who got your group invited to this banquet?

11   A.    Mr. Edalat.

12   Q.    Was the banquet in connection with your business

13   discussions?

14   A.    Well, yes.    His Excellency traveled from Abu Dhabi down

15   to Dubai and met with us there for an entire day, and we

16   talked about business.    He gave us information about doing

17   business in Dubai and in Abu Dhabi.    He wanted to find out

18   more about our business plans.

19          Then after that, he invited us to his house in Abu

20   Dhabi and we made the trip, and this is the banquet he held

21   for us that day.

22   Q.    I'd like to show you for identification --

23          MR. KASHANI:    I'm sorry, Your Honor.    I have to ask

24   to blank the screen again.

25   BY MR. KASHANI:

```
 1    Q.   I'd like to show you for identification another

 2    photograph we'll mark as Exhibit 1006.  Do you recognize this

 3    photograph?

 4    A.   Yes.  This is a photograph --

 5    Q.   Just answer yes at this time.

 6    A.   Yes.

 7              MR. MARKHAM:  I have no objection to its admission.

 8              THE COURT:  Admitted, 1006.

 9              (Exhibit 1006 received.)

10    BY MR. KASHANI:

11    Q.   Could you go across the room and tell us the people in

12    this photograph?

13    A.   Yes.  On the left is George Peterson, who is a partner

14    and a senior manager of our fund.  Next from the left is Sean

15    Chen, who is also a partner and a senior manager of our fund.

16              Next underneath the television screen is Morton

17    Irvine Smith, who is a partner and a senior manager of our

18    fund.  And then sitting, the next one from the left, fourth

19    from the left, is Farooq Arjomand, who as I said before is a

20    partner and a senior manager in our fund.

21              Then fifth from the left, that is me sitting there.

22    Then sixth from the left in the couch in the middle on the

23    left is His Excellency.  Then is -- there is Paul Edalat.

24    Then there is Chris Condon, who is a partner and senior

25    partner in our fund.  On the last couch with the pink shirt,
```

```
 1    that's Brian Quinn, who is a partner and senior manager of
 2    our fund.  And finally His Excellency's son.
 3    Q.   And of the people in this room, who introduced you to
 4    His Excellency?
 5    A.   Paul Edalat did.
 6    Q.   Who arranged the meetings?
 7    A.   Paul Edalat did.
 8    Q.   Is this one of the, I'm sure, many rooms in His
 9    Excellency's palace?
10    A.   Yes, it is.
11    Q.   How is the business going in general?
12    A.   The business is going very well.  We are talking to many
13    investors in the Middle East, not only in Dubai and Abu Dhabi
14    but also in Qatar through someone introduced by Mr. Edalat,
15    and also to someone from Saudi, a person who is a physician
16    and owns seven or eight hospitals in the Middle East and is
17    very well connected there.
18    Q.   And these are all people introduced by Mr. Edalat?
19    A.   Yes, they are.
20    Q.   Thank you very much, sir.
21         MR. KASHANI:  No further questions.
22                        **CROSS-EXAMINATION**
23    BY MR. MARKHAM:
24    Q.   Good morning.
25    A.   Good morning.
```

1    Q.   So, 53 Wall Street or 399 Park Avenue?

2    A.   53 Wall Street.

3    Q.   I was at 399.

4    A.   I've been to 399 many times.

5    Q.   Mr. Harfield, did you know him -- Henry Harfield?

6    A.   Yes.

7    Q.   John Hoffman?

8    A.   I don't recall John Hoffman.

9    Q.   Dan Boone?

10   A.   I don't recall.

11   Q.   He went to Cornell and went to Sherman and Sterling as

12   well.

13   A.   I don't recall them.

14   Q.   I went to Sherman and Sterling and worked with

15   Mr. Harfield.

16   A.   Oh, I see.

17   Q.   Lucky break for me, huh?

18   A.   Yes.

19   Q.   Okay.  Now, did Paul ever invest in your fund --

20   Mr. Edalat?

21   A.   No.  Paul Edalat has not invested in our fund.

22   Q.   Did Mr. Edalat get a finder's fee or fee for making

23   these introductions for you?

24   A.   No, he did not.

25   Q.   Do you know whether or not Mr. Edalat has ever been in

1    bankruptcy?

2    A.    I do not know.

3    Q.    Do you know whether or not he's ever been enjoined by

4    the Food and Drug Administration from operating certain

5    businesses?

6    A.    I do not know.

7    Q.    It sounds like your fund is doing well?

8    A.    The business is progressing very nicely.

9             MR. MARKHAM:   Thank you.

10            MR. KASHANI:   No questions.   Thank you, Mr. Ardi.

11            THE COURT:   You may step down.

12            Are we now finally back to Mr. Cullen?

13            MR. KASHANI:   Yes, Your Honor.

14            THE COURT:   Mr. Cullen, please come forward.   You

15   remain under oath.   Do you understand?

16            THE WITNESS:   I do indeed.

17            THE COURT:   All right.

18        **Greg Cullen, Plaintiff's witness, previously sworn**

19                 **CROSS-EXAMINATION RESUMED**

20   BY MR. KASHANI:

21   Q.    Sir, returning to the Life Tech Global private placement

22   memorandum, we left off on description of the patents.   Do

23   you recall that, sir?

24   A.    I do, yes.

25   Q.    I would like to discuss more the business model of Life

1    Tech Global.  Are you familiar with the business model of

2    Life Tech Global?

3    A.    Yes.

4    Q.    Can you turn to page 34 of the private placement

5    memorandum.  Could you read the paragraph I've highlighted?

6    A.    The company is presently negotiating joint venture

7    relationships and distribution agreements for the

8    manufacture, distribution, and sale of patches.  The company

9    has signed a definitive agreement with a large reputable

10   company in Colorado.  It is in active discussions with

11   similar groups in California, Washington, Nevada, Florida,

12   and Maine.  It is anticipated that all of the agreements that

13   the company enters into for its products will be similar in

14   nature.

15   Q.    Now, sir, CBD's derived from marijuana are not legal in

16   every state, are they, to your knowledge?

17   A.    To my knowledge there's some question over whether it's

18   legal or not in some states.

19   Q.    But some states have legalized marijuana and marijuana

20   products?

21   A.    That is correct.

22   Q.    In those states are there restrictions on the

23   importation of marijuana products from outside of the state?

24   A.    I'm certainly not an expert in this, and I will state

25   that up front, but I believe there is a restriction.  But

1    somehow it gets there, and I don't know how that's handled.

2    Q.    Is Life Tech Global licensed to sell marijuana products

3    in Colorado?

4    A.    It is not.

5    Q.    You have -- Life Tech Global has set up an agreement to

6    joint venture with a company in Colorado?

7    A.    That is correct.

8    Q.    And that company in Colorado is licensed to sell

9    marijuana products in Colorado?

10   A.    It is represented to us that it is.

11   Q.    So the business model of Life Tech Global is to joint

12   venture with the license companies in the various states, and

13   then you, Life Tech Global, derive some profit from the

14   operation.  Is that essentially what it is?

15   A.    I would say that's a general explanation, yes.

16   Q.    Sir, isn't this the idea that was developed at

17   PharmaPak?

18   A.    There were a number of ideas.  This was one of the ones

19   that was discussed amongst the investors at PharmaPak, yes.

20   Q.    I'd like to take you back to -- I'd like to look at

21   Exhibit 769-50.  I'm not sure if that's admitted.

22             MR. MARKHAM:  What's the number again?

23             MR. KASHANI:  I guess I have to -- unless there's a

24   stipulation.

25             MR. MARKHAM:  What's the number?

```
 1                    MR. KASHANI:  769-50.

 2                    THE COURT:  Any objection?

 3                    MR. MARKHAM:  Your Honor, yes.  Hearsay.

 4       Objection.  Hearsay.

 5                    THE COURT:  Response to the hearsay objection?

 6                    MR. KASHANI:  Well, it's not offered for the

 7       truth of the matter implied.

 8                    THE COURT:  Do you have it?  Can you put it on the

 9       screen easily, or shall I get it from the --

10                    MR. KASHANI:  No.  I can put it on the screen,

11       Your Honor.

12                    THE COURT:  Please do.

13                    MR. MARKHAM:  That part is not hearsay, Your Honor.

14                    MR. KASHANI:  I'll highlight the part we're most

15       interested in.

16                    THE COURT:  Do you have any objection to that part

17       being admitted?

18                    MR. MARKHAM:  Yes, Your Honor.  Hearsay.

19       Ms. Karpinski.

20                    THE COURT:  The objection is sustained.

21       BY MR. KASHANI:

22       Q.   Sir, do you recall it being specifically discussed at

23       PharmaPak while it was PharmaPak that PharmaPak would enter

24       into joint ventures with dispensaries that were licensed to

25       sell marijuana products so that PharmaPak could derive a
```

1   profit from those sales?

2   A.   I remember general discussions, again as a shareholder

3   just to be clear.  I was just a shareholder.  I remember

4   general discussions that one of the intended ways of

5   generating revenue was to find local partners in various

6   states where marijuana and CBD had been legalized and try to

7   come to some sort of business arrangement with them.  I

8   wasn't involved in those business arrangements.

9   Q.   What I want to understand, sir, is that this is the

10  model that was devised in order to accommodate the fact that

11  PharmaPak did not have a license to sell marijuana in these

12  states.  Is that part of the purpose of the model?

13          MR. MARKHAM:  Objection, Your Honor.  He says he

14  wasn't involved in that.

15          THE COURT:  Sustained.

16  BY MR. KASHANI:

17  Q.   Sir, do you know why this model was developed?

18  A.   Well, setting up joint ventures of this nature in

19  various states is a very normal, common business practice.

20  There's nothing proprietary about it.  This makes perfect

21  business sense to try to do something like that.

22  Q.   Well, let's talk about Life Tech.  You are familiar with

23  Life Tech?

24  A.   Yes.

25  Q.   Life Tech is not licensed to sell marijuana products in

```
 1    Colorado, for example?
 2    A.    Correct.
 3    Q.    But there's a company in Colorado that is licensed?
 4    A.    I'm sure there are numerous companies in Colorado that
 5    are licensed.
 6    Q.    And Life Tech entered into an agreement with a company
 7    in Colorado to supply machines, blank patches, something like
 8    that?
 9    A.    That's a general characterization, yes.
10    Q.    And then the company in Colorado inserts the marijuana
11    product onto the patch and sells the patch?
12    A.    Again without going into proprietary details, that's the
13    concept, yes.
14    Q.    Does Life Tech need a license of any kind to engage in
15    that joint venture?
16    A.    Well, interesting question.  I did answer yesterday that
17    we are not yet up and running in Colorado, so that's one of
18    the things that we are legally exploring to make sure that
19    we're in compliance with the law in Colorado.
20    Q.    Sir, I'm not suggesting that you're not in compliance.
21    A.    Okay.
22    Q.    I'm just suggesting that through this joint venture
23    mechanism, this is a mechanism whereby Life Tech can utilize
24    the license of another company in order to make a profit
25    through products involving marijuana.  Is that the idea?
```

```
 1    A.    That's the idea, yes.

 2    Q.    And didn't PharmaPak have the same idea?

 3    A.    My understanding is there's many companies that have

 4    this idea.

 5    Q.    Sir, didn't --

 6    A.    PharmaPak, yes.   PharmaPak did have this idea.

 7    Q.    Didn't Dr. Ludwig Weimann while he was PharmaPak suggest

 8    this company in Colorado as a joint venture partner for

 9    PharmaPak?

10    A.    He did not.

11    Q.    Didn't Mr. Ludwig Weimann suggest that Colorado was the

12    first place to go for this joint venture idea?

13    A.    I don't know if he suggested it.   It was an obvious

14    choice since it was the first state that legalized marijuana

15    to my understanding.

16    Q.    One moment, sir.

17    A.    Sure.

18          MR. KASHANI:   I'd like to offer Exhibit 812.   It's

19    stipulated, I believe.

20          THE COURT:   812 is admitted without objection.

21          (Exhibit 812 received.)

22    BY MR. KASHANI:

23    Q.    Sir, do you recognize Exhibit 812 as an e-mail from

24    Dr. Ludwig Weimann at PharmaPak to, among other people, Greg

25    Cullen at PharmaPak?
```

1   A.   Greg Cullen at Harvard Investment Group?  Is that what

2   you're referring to?

3   Q.   Greg Cullen.

4   A.   Greg Cullen.  Okay.

5   Q.   So you received this e-mail on or about February 21,

6   2016?

7   A.   I imagine I did.

8   Q.   And this e-mail was PharmaPak; right?  This is the

9   PharmaPak time, not the Life Tech time; correct?

10  A.   Correct.

11  Q.   And in this e-mail doesn't Dr. Ludwig Weimann propose

12  the sales model for cannabis patches for PharmaPak?

13  A.   Can I read it?

14  Q.   Yes, sir.

15  A.   Thanks.

16  Q.   In fact, if you want it in the binder, you can read the

17  whole thing.

18  A.   What exhibit is it?

19  Q.   Exhibit 812, sir.

20  A.   I don't have 812 here.  This only goes to --

21  Q.   We will approach and hand you a copy.

22  A.   Sure.

23          (Counsel handing the witness a document)

24          THE WITNESS:  You said it was --

25          MR. KASHANI:  812.

```
 1              THE WITNESS:  812, okay.  I've read it.
 2    BY MR. KASHANI:
 3    Q.    Could you read the part that says:  Hi, Olivia.  This is
 4    the sales model.
 5    A.    Hi, Olivia.  This is the sales model.  Read below
 6    article.  What Bruce also envisioned for our cannabis patches
 7    THC, THC, A, CBD, CBM, et cetera, in other states than
 8    California.  Full manufacturing, sales, and distribution of
 9    cannabis patches of our formulation will happen in three
10    states -- Oregon, Colorado, and Long Beach, California, by
11    the end of March.  I have contacted regulatory company to
12    help us obtain license to manufacture CBD from Department of
13    Health and Human Services of California.
14    Q.    And Dr. Weimann attached an article there pertaining to
15    Colorado?
16    A.    Yes, about edibles, some sort of edibles in Colorado,
17    yes.
18    Q.    Or edibles with marijuana; correct?  Do you want to see
19    the rest of it?
20    A.    I'm reading it:  I don't know that it states marijuana.
21    At least I'm not seeing that in the article.  Does it say
22    marijuana?
23    Q.    Let me see if I can enlarge it.  DB3, which produces a
24    line of edibles called Zoots -- I'll read another section.
25              Do you see the fourth paragraph that says Zoots,
```

1    Z-o-o-t-s, products will be available at two medical and

2    recreational cannabis retailers in Denver?

3    A.   I was looking for the word marijuana.  I do see

4    cannabis, yeah.

5    Q.   So this is the idea you were talking about?  You

6    associate with a dispensary that has a license?

7    A.   Not that we associate with a dispensary.  We associate

8    with an entity in the state that has a license.  I don't know

9    that dispensaries necessarily have licenses, but find

10   somebody who does have a license.  Is that something -- are

11   you asking is that something PharmaPak was discussing at the

12   time?

13   Q.   Yes, sir.

14   A.   Yes, it was.

15   Q.   Could you also look at Exhibit 769-57 for

16   identification.  You can look in the book or I can put it on

17   the screen.

18   A.   769?

19   Q.   Yeah, 769-57.  And I'm sorry for the numbering, sir.

20   It's not the best.

21   A.   Your book goes from 81 to 770.  I don't have 769.

22   Q.   Perhaps we can assist you.

23   A.   Sure.  Oh, tab 57?  Okay.  So...

24   Q.   Sir, do you recognize Exhibit 769-57?

25   A.   If you give me a moment to read it.

```
 1    Q.    Sure.  And I'm interested primarily in the center

 2    section.

 3    A.    The center section.  Okay.

 4              MR. MARKHAM:  Your Honor, I have the same objection

 5    to this document.  Hearsay.

 6              THE COURT:  Response?

 7              MR. KASHANI:  Well, this is an e-mail that was sent

 8    to the witness.  It's not offered for the truth.  It's just

 9    offered for the fact that there was a discussion about this

10    issue.

11              THE COURT:  All right.  Are you offering this

12    exhibit?

13              MR. KASHANI:  I don't have the right one on the

14    screen.  Let me put the right one there.  I'm sorry, Your

15    Honor.

16              This is what's being offered, and we're only

17    interested in the part that I've expanded here.

18              MR. MARKHAM:  Your Honor, if it's not being offered

19    for the hearsay purpose, offered for the truth, I have no

20    objection.

21              THE COURT:  Is that for the full article or what's

22    displayed on the screen?

23              MR. MARKHAM:  What's displayed on the screen.

24              THE COURT:  Response?

25              MR. KASHANI:  That's fine.  That's all I want is
```

```
 1    what's on the screen.
 2              THE COURT:  All right.  Counsel will take it
 3    amongst themselves to assure that only the redacted portion
 4    is provided to the jury; correct?
 5              MR. KASHANI:  Yes, Your Honor.
 6              THE COURT:  Correct?
 7              MR. MARKHAM:  Yes, Your Honor.
 8              THE COURT:  All right.  Exhibit 769-57 is admitted
 9    in redacted form.
10              MR. MARKHAM:  And for a limited purpose and not for
11    the truth, Your Honor.
12              THE COURT:  All right.
13    BY MR. KASHANI:
14    Q.  Now, sir --
15              THE COURT:  Just a moment.
16              Ladies and gentlemen, a portion of this document is
17    being admitted.  It is not being admitted to establish the
18    truth of any statements that might be in it.
19              (Exhibit 769-57 received as redacted)
20              THE COURT:  Go ahead.
21    BY MR. KASHANI:
22    Q.  Sir, was it -- do you recognize this portion we've shown
23    as an e-mail from Olivia Karpinski to, among other people,
24    you, Greg Cullen, at PharmaPak on February 9, 2016?
25    A.  I do recognize it, although I would point out that I
```

```
 1    never used the PharmaPak e-mail address.  So anything that
 2    was ever sent to that, I can assure you I never saw or read.
 3    Q.   I'm not offering it for that purpose, sir.
 4    A.   Okay.  So I did not see this before today.  That's not
 5    the e-mail that I use.
 6    Q.   Do you see that Ms. Karpinski is talking about going --
 7    saying, quote, we need to finish our products and go
 8    dispensary direct or through a distributor one state at a
 9    time?  Do you see that?
10    A.   I do.
11    Q.   And that's what Life Tech is doing; correct?
12    A.   Not exactly, no.
13    Q.   What's different about what you're doing?
14    A.   We are finding local people who are already in business
15    in these various states, and we're making patches completely
16    independent of that.  They're taking the step to bring them
17    to the dispensaries in their supply chain -- not supply chain
18    but their distribution chain.
19    Q.   Okay.
20    A.   I think that's different than us as a company going
21    directly.  I don't think we have the legal right to do that.
22    Q.   Doesn't the e-mail also suggest going through a
23    distributor?
24    A.   Can you put it up again?  (Witness reading.)  Or through
25    a distributor.  I see that.
```

 1    Q.   Do you see that, sir?

 2    A.   Yes, I do.

 3    Q.   Okay.  Now, back to the private placement memorandum,

 4    we've talked about patents; is that correct, sir?

 5    A.   Yes.  We've had a discussion.

 6    Q.   We talked about business model?

 7    A.   Uh-huh.

 8    Q.   And the other thing Life Tech has is a machine or a

 9    machine design, the patch machine?

10    A.   I'm not sure I understand the question.  Life Tech

11    Global has bought machines from Mr. Aydinol's Turkish

12    company, if that's what you're asking.

13    Q.   These machines are called coders; is that correct?

14    A.   That is correct.

15    Q.   And weren't these the machines that were originally

16    designed by PharmaPak with Mr. Aydinol's help while he was at

17    PharmaPak?

18    A.   I believe, if my recollection serves, that Mr. Aydinol

19    came in to PharmaPak at the very end of 2015, perhaps 45 days

20    before the company fell apart.  And I believe there were

21    discussions.  I can't tell you from my knowledge how far

22    along any of that had taken or how far any of that had

23    progressed in that 45-day period or so.

24    Q.   Sir, I'd like to read from your deposition, page 75,

25    line 3, through page 76, line 1.

1    A.    Okay.

2    Q.    I'll just read it:

3          "Question:  Is there one machine that can make

4    patches, or are there two separate --

5          "Answer:  One.

6          "Question:  -- machines that make patches?

7          "Answer: One.

8          "Question:  One machine?

9          "Answer:  Correct.

10         "Question:  All right.  And this is a machine that

11   was acquired by Life Tech from Imoxin?

12         "Answer:  Correct."

13         An aside, sir, Imoxin is a Turkish company?

14   A.    Yes.

15   Q.         "Question:  Who designed the machine?

16         "Answer:  I assume the folks in Turkey.

17         "Question:  But you don't know?

18         "Answer:  I don't.

19         "Question:  When was the machine ordered?

20         "Answer:  I don't know the answer to that.

21         "Question:  Who ordered it?

22         "Answer:  My belief is it was ordered during the

23   PharmaPak time, but I'm not sure of that.

24         "Question:  In other words, it was a machine that

25   was ordered prior to the formation of Life Tech?

1              "Answer:  I believe so."

2              So these machines originally ordered by PharmaPak

3    is what Life Tech is utilizing now?

4    A.   As I stated before, Mr. Aydinol joined the company --

5    and I don't have these records in my memory fresh at this

6    point, but he joined the company in the latter part of

7    December, and Mr. Cahill and Mr. Aydinol had discussions.

8    Where those discussions were in the process when PharmaPak

9    imploded, I can't tell you.  I was not involved in any of

10   those discussions.

11             Again, I wasn't an officer of PharmaPak.  I was a

12   shareholder.

13   Q.   I'd like to show you page 41 of the private placement

14   memorandum.  Now, do you see that your PPM says the

15   company -- that's Life Tech Global?

16   A.   Yes.

17   Q.   -- is organized as an LLC.  The relationship between the

18   founders is regulated by the operating agreement of the

19   company and various other agreements related to the funding

20   and services provided by the founders or entities controlled

21   by the founders.

22             Now, sir, do you recall showing us the operating

23   agreement of Life Tech Global?

24   A.   I recall you putting it on the screen, yes.

25   Q.   And the operating agreement is a document you showed us

1    that only has you listed as the owner; correct?

2    A.    That was correct then and it still remains correct

3    today.

4    Q.    But your PPM refers to various other agreements --

5    A.    Yes.

6    Q.    -- relating to funding and services with the founders.

7    Have you shown us those various other agreements?

8    A.    Many of those agreements, sir, are oral, as I stated

9    yesterday.  Life Tech Global is a work in process, and this

10   is subject to change.  As I stated specifically, Mr. Scott

11   came to me and said:  If you can repay my loans, I'm not

12   interested in having any part of Life Tech Global, which

13   would mean his 16.7 division of profits as stated here which

14   was originally discussed in the beginning would be zero,

15   which would make all three of these change.

16   Q.    Sir, I'm going to read -- can you read the last sentence

17   there of your PPM where it says -- well, actually, I'll read

18   it.

19            Based on the initial agreements between the

20   founders, the initial division of profits between the

21   founders or entities controlled by them was as follows:

22   Bruce Cahill, 50 percent; Ron Franco, 18 percent; Shane

23   Scott, 16.6 percent; Greg Cullen, 15 percent.

24            Do you see that?

25   A.    I do see that, yes.

```
 1    Q.    And this is referring to the initial division when the

 2    company was first set up?

 3    A.    Not when it was first set up but early on.

 4    Q.    It says initial and founders.  Doesn't that mean when

 5    the company was first set up?

 6    A.    That could be one meaning, but in this case that is not

 7    precisely the meaning.

 8    Q.    Do you say elsewhere in the PPM that when we say

 9    founders, we actually don't mean founders?  We have some

10    special definition of founders we're using?

11    A.    I've made that clear to everybody who has expressed a

12    genuine interest in the company and has gone beyond

13    initial -- an initial tape-recorded conversation for which I

14    wasn't aware.  But before anybody invests, none of this will

15    be -- none of this will be generalities.  It will be very

16    specific and they'll see everything related to this.

17    Q.    Sir, your private placement memorandum --

18               MR. KASHANI:  May I approach the witness?

19               THE WITNESS:  Sure.  Well, sorry.

20               MR. MARKHAM:  That's not for you.

21               THE COURT:  Yes, you may.  And you may walk in the

22    well if you wish.

23               (Counsel handing the witness a document)

24               THE WITNESS:  Thank you.

25
```

1    BY MR. KASHANI:

2    Q.   Now, sir, this private placement memorandum seems to be

3    about 50 pages; is that right?

4    A.   Yes.

5    Q.   And of those, it looks like 10 or 15 pages are legal

6    statements.  Do you see that at the beginning?

7    A.   I do.

8    Q.   You've got legal statements for every state in the

9    country?

10   A.   Yes.

11   Q.   So, sir, this is a legal document.  It's not just

12   introduction, vague statements; is it, sir?

13   A.   Correct.

14   Q.   Now, in this legal document, the private placement

15   memorandum, do you not say that the company, Life Tech

16   Global, has been in operation for three years?

17   A.   I don't recall if it specifically says that.  Do you

18   want to show me the reference?

19   Q.   I'll try.

20   A.   Again, I want to state that I authored this without the

21   overview of my very capable attorney, so there may be some

22   factual errors to some degree or another.  But let's look at

23   them.

24        By the way, I don't think this is a factual error.

25   This is a clear statement of what the initial division of

```
 1    profits was.
 2           MR. KASHANI:  Your Honor, I don't know where we are
 3    on the status of the break.  This is actually my last
 4    question for this witness, but I just had a problem with the
 5    equipment and pulling up the page.
 6           THE COURT:  We can't break earlier than six minutes
 7    from now.
 8           MR. KASHANI:  That's fine, Your Honor.  I'll get it
 9    up.
10    BY MR. KASHANI:
11    Q.   Sir, I'll just ask the question.  Do you recall a
12    statement in the private placement memorandum that the
13    company has been in business for three years?
14    A.   Again, I'd like to see the reference.  I don't believe
15    that I made that statement.  I believe I made a statement
16    something to the effect that there was a predecessor company.
17    I do recall that.
18    Q.   And the predecessor company was PharmaPak?
19    A.   Yes.  I don't believe that I would have put in there
20    that this company has been in business for three years
21    because it has not.
22    Q.   Well, the combination -- actually I think I'll just ask
23    the question.  The combination of PharmaPak and Life Tech,
24    that's where you get the three years?
25           MR. MARKHAM:  Objection to where he gets the three
```

```
 1   years.  He said he didn't get the three years.
 2              THE COURT:  Sustained.
 3   BY MR. KASHANI:
 4   Q.   Is it the combination of the time period of PharmaPak
 5   and Life Tech that adds up to three years?
 6   A.   I'm not sure of the question you're asking.  Are you
 7   saying if I take the start date of PharmaPak and run it
 8   through today, does that equal three years?  Is that your
 9   question?
10   Q.   I'm just wondering how you came up with the three years.
11              MR. MARKHAM:  Objection, Your Honor.  Same
12   objection.  He said he didn't come up with --
13              THE COURT:  Sustained.
14              MR. KASHANI:  If I may, Your Honor, and I apologize
15   for this delay.  I've had a computer problem here.
16              (Pause in the proceedings)
17              THE COURT:  All right.
18              MR. KASHANI:  I understand --
19              THE COURT:  Now we're close.  You see, on these
20   Friday sessions I just don't like any of them going too long.
21   I think we can break now and come back at noon.  Then we'll
22   go for another hour and a half and we'll be done.
23              So we'll break now.  Remember, keep an open mind.
24   Don't discuss the case.  Don't do any research on the case.
25   We'll see you at noon.
```

```
 1                Thank you.

 2                THE CLERK:  All rise.

 3                (Open court - jury not present)

 4                THE COURT:  Okay.  Are we ready?

 5                MR. MARKHAM:  Yes, Your Honor.

 6                THE COURT:  Ready to leave?  What are we --

 7                MR. MARKHAM:  I would like to make a very brief

 8     offer of proof on that tape if this is a good time.

 9                THE COURT:  Okay.  Yes.  Make an offer of proof on

10     the tape.

11                MR. MARKHAM:  So the tape recording is a tape

12     recording between Mr. Scott and Mr. Asvadi.  It directly

13     refutes his major points.  It renders them a lie.

14                We did not know Mr. Asvadi was coming as a witness

15     because they told us, the defense did, that he was overseas.

16     They said:  We're going to use his deposition.  They told us

17     several days before trial or even during trial he was coming.

18                THE COURT:  When did you find out he was going to

19     be a witness?

20                MR. MARKHAM:  The day before yesterday or

21     yesterday?

22                MR. KASHANI:  When did I find out?

23                MR. MARKHAM:  No.  When did I find out?

24                MR. KASHANI:  I think it was yesterday.  That's

25     when I knew he was coming in -- because I thought he wouldn't
```

```
 1   come in.
 2            THE COURT:  Now, so there is a wrinkle here now.
 3   He is your witness; correct?
 4            MR. KASHANI:  Yes.
 5            THE COURT:  Out of courtesy you allowed him to be
 6   called out of order; yes?
 7            MR. MARKHAM:  I did.
 8            THE COURT:  All right.  So I have a little
 9   difficulty with you saying they didn't provide you with the
10   document in enough time, et cetera.  If they were expecting
11   this witness next week, I think based on your own trial
12   strategy, which I have found acceptable because you had some
13   pretty true and powerful impeachment, they might not want to
14   have given it to you over the weekend.
15            So now that they've put him on early as an
16   accommodation to you, it seems a little troublesome that
17   you're complaining they did not review the impeachment
18   evidence with you quick enough.  What about that?
19            MR. KASHANI:  Let's go over -- if I can go over the
20   sequence to the best of my recollection.  I informed when I
21   knew my colleague that Mr. Asvadi would testify live as
22   opposed to deposition either yesterday or the day before.
23            MR. MARKHAM:  Yesterday, now that you tell me.
24            MR. KASHANI:  Okay.  And that was the same time we
25   were having discussion of audio, and that's the same time I
```

```
 1    sent my complete audio over to my colleague for his review.

 2              THE COURT:  The day before the witness was on the

 3    stand?

 4              MR. KASHANI:  Correct.

 5              THE COURT:  Partly because it was impeachment

 6    evidence?

 7              MR. KASHANI:  Yes, Your Honor.

 8              MR. MARKHAM:  No, Your Honor.  He sent it -- we

 9    received this last night at 8:45 at night.  There's very

10    little time to review it, certainly no time to do what

11    Mr. Kashani proposes to do with our tape, which is get it to

12    an expert to see if it's been doctored.

13              MR. KASHANI:  No.  No.  That's not --

14              MR. MARKHAM:  We got it at 8:15 last night.  That's

15    the first time we looked at the tape.

16              MR. KASHANI:  As I told my colleague, the --

17    there's a technical issue of getting the tape.  We had a long

18    discussion of it being sent over by e-mail and the size of

19    the file and so forth.  I attempted before.  But it is true

20    that after a phone conversation and being referred to a

21    different account that could handle the size of the file, he

22    did get it at that time, at 8:00.

23              MR. MARKHAM:  Your Honor, he --

24              MR. KASHANI:  But it's not from lack of --

25              THE COURT:  No.  Hold on.  You can't talk over each
```

UNITED STATES DISTRICT COURT

1    other.

2              MR. MARKHAM:  He only tried --

3              MR. KASHANI:  Be that as it may, it is correct what

4    my colleague says, that he received the tape after 8:00 last

5    night.  That is true.  It is also true that Mr. Asvadi was

6    disclosed as a live witness as opposed to by deposition

7    yesterday.  I don't remember if that was during the day or

8    during the evening.  So these are true facts.

9              So my only point is the issue of audio was being

10   discussed last night.  Audio was going back and forth.  If

11   they had another audio that they wanted to use against a

12   witness they knew was coming, it seems to me that the proper

13   method was to tell me that you've got an audio and we've got

14   an audio, too.  How can we arrange to some arrangement, some

15   mutual stipulation or something to let this audio in?  That's

16   the procedure.

17             What I don't like is the procedure of they know

18   I'm bringing audio and they know I'm bringing a witness.

19   Audio is being discussed, and they don't tell me until after

20   the witness testifies and they bring it up first in front of

21   the jury that they've got an audio to impeach this witness.

22   I don't think that's the right procedure.

23             I was very careful yesterday not to mention

24   impeachment audio until the jury was out.  That's my biggest

25   concern of just the method, how they handled this.

```
 1                THE COURT:  What is the present status of the
 2     witness?
 3                MR. KASHANI:  I think he's on his way to Palm
 4     Springs.  That's what he said.
 5                MR. MARKHAM:  If I could be heard, I can --
 6                THE COURT:  You can be heard when I finish
 7     speaking, counsel.
 8                MR. MARKHAM:  Of course.
 9                THE COURT:  How long will he be in Palm Springs?
10                MR. KASHANI:  That I don't know.  Just going off
11     memory of what he said his schedule was, he said:  I'm going
12     to Palm Springs.  I just do not remember.  I do not know.  I
13     don't know.
14                THE COURT:  All right.  Is he under subpoena?
15                MR. MARKHAM:  No, because we didn't think he was
16     going to be here until yesterday.  I do have a proposal,
17     however, that might obviate his travel.
18                THE COURT:  All right.
19                MR. MARKHAM:  If Mr. Scott, who we might recall in
20     rebuttal and offer that tape as impeachment as we would be
21     allowed to do because this is their case, if Mr. Scott could
22     retake the stand, authenticate the tape -- he listened to it
23     last night.  He has listened to it two times before at my
24     instruction -- he will say that he's listened to it and it is
25     a fair and accurate depiction of the conversation with
```

Mr. Asvadi --

THE COURT:  Hold on.  Now I'm interrupting you.
Forgive me.  Was he present in the conversation?

MR. MARKHAM:  Oh, yes.

THE COURT:  Oh.

MR. MARKHAM:  Yes.

THE COURT:  I think your solution is wonderful.  So
we can do that at the beginning of next week.

MR. MARKHAM:  All right.

THE COURT:  Any response -- assuming you have no
objection.  And again, I'm concerned not only about
foundation, but I don't know what's said in the middle of it.
You know, he might say Donald Trump is the world's greatest
president and someone may or may not like that.  Or he may
say the worst president and someone may or may not like that.
Or he may make a hearsay statement which might or might not
be acceptable.

So it's not just the foundational issue.  So what
you need to do is simply give Mr. Kashani the tape and
Mr. Kashani will tell us what he thinks.  Do you have it
transcribed at all?

MR. MARKHAM:  We do not, but we have sent it to
him.  Ms. Zerner is outside sending it now.  He will have it,
and he will have three days to review it all.  If there's any
part that he objects to, he can bring it to the Court's

1    attention and we can hash it out.

2         THE COURT:  Okay.  That's what you need to do over

3    the weekend.

4         MR. KASHANI:  If I may just state my further

5    objection.  The problem is this is being used for

6    impeachment, not as affirmative evidence.  The witness is off

7    the stand.  You know, if my colleague had brought up these

8    other facts that he considers important while the witness was

9    still here, then we'd have a better situation because then

10   the witness can respond to what's on the tape and explain.

11        THE COURT:  I think it was fair for Mr. Markham to

12   consider that the witness would be coming next week as part

13   of your case.

14        MR. KASHANI:  That is true.

15        THE COURT:  And so if you want your witness to

16   answer it, he is your witness and you can bring him in next

17   week.

18        MR. KASHANI:  Let --

19        THE COURT:  We need to assume -- we need to decide

20   first what's coming in.

21        So, get it to him right away.

22        MR. MARKHAM:  Yes, Your Honor.

23        THE COURT:  Please be courteous to me to give me as

24   much lead time if I need to make rulings on it.  If I have to

25   sit down and listen to 20 minutes, it's going to be charged

```
1    to someone.  So you want to be as efficient as possible in

2    that.

3              So to be clear, you have provided the transcript

4    to --

5              MR. MARKHAM:  The tape.

6              THE COURT:  The tape, yes.  You provided the tape

7    to Mr. Kashani.  Mr. Kashani will read it and let you know

8    what objections he may have.

9              It is anticipated that you will call who to

10   authenticate it?

11             MR. MARKHAM:  Mr. Scott, who was the other

12   participant throughout the phone call.

13             THE COURT:  All right.  Then Mr. Kashani can make

14   whatever objections he wishes to whatever portion he wishes.

15             Do you want the full 20 minutes?

16             MR. MARKHAM:  I'm not sure.  What we're going to do

17   now is we're going to go and find somewhere to get it

18   transcribed so Your Honor can have that and Mr. Kashani --

19             THE COURT:  All right.  So that's how we'll proceed

20   on that.  Thank you.

21             Anything else?

22             MR. MARKHAM:  No, Your Honor.

23             MR. KASHANI:  Can I just inquire:  Is the full tape

24   20 minutes or just what you want to play is 20 minutes?

25             MR. MARKHAM:  I can't time it.  We'll get it to
```

```
 1    you.

 2              THE COURT:  It's a fair question.  You said

 3    20 minutes.  Were you anticipating that to be the relevant

 4    part you wanted to play or the entire tape?

 5              MR. MARKHAM:  Yes.  I think the whole thing is

 6    slightly over 30 minutes.  We'll have a transcription of all

 7    of it and we'll play the parts that we think are pertinent.

 8              Obviously he can play whatever he wants if he does.

 9    I doubt he will, but...

10              THE COURT:  There you have it.

11              Anything else, Mr. Kashani?

12              MR. KASHANI:  I'll wait for the tape.

13              THE COURT:  Okay.  And then we'll see you -- now

14    we'll see you at 12:05.  Okay?

15              MR. KASHANI:  Thank you.

16              THE COURT:  And we're off the record now.

17               (Recess from 11:52 a.m. to 12:10 p.m.)

18              THE CLERK:  All rise.

19              (Open court - jury present)

20              THE COURT:  Welcome back, everyone.  I'm sorry we

21    were a little delayed.  We had some witness and evidence

22    issues to deal with.

23    BY MR. KASHANI:

24    Q.   Mr. Cullen, do you recall that two specific issues were

25    raised regarding Mr. Cahill in the, let's say, spring of
```

1   2016, and one issue was that Mr. Cahill was taking a salary

2   from PharmaPak?

3   A.   That issue was raised for the first time in my presence

4   at a meeting on January 19th at the Pelican Hills Country

5   Club, which would put it in the -- I don't think it's the

6   spring.  I think it's the winter technically.

7   Q.   Sir, was another issue raised that an allegation was

8   made that Mr. Cahill was paying rental payments to a company

9   controlled by himself?

10  A.   There was a question about -- I don't recall there being

11  a question raised at that meeting about the rent, but there

12  could have been.  In fact, maybe there was.

13  Q.   And to set the stage, the allegation or the question was

14  raised from the financials that money was going to an entity

15  called Kira Investments?  That's K-i-r-a.

16  A.   Yes.

17  Q.   And Kira Investments is a company controlled by

18  Mr. Bruce Cahill?

19  A.   I would suggest you ask him.  I can't definitively

20  answer that.

21  Q.   I didn't want to ask this, but Kira is the name of

22  Mr. Cahill's daughter?

23  A.   It is, and I have assumed there's some sort of

24  connection.  I imagine there is, but I don't know what it is.

25  Q.   Now, in response to these questions, did you provide to

1    Mr. Asvadi a copy of the lease between PharmaPak, Inc., and

2    Kira Investments?

3    A.   Yes.  He asked -- somebody asked me for a copy of the

4    lease, and I believe I gave it to Mr. Asvadi.

5    Q.   Could you look in maybe the first book at Exhibit 74 for

6    identification.

7    A.   Okay.

8    Q.   Is Exhibit 74 the copy of the lease between PharmaPak,

9    Inc., and Kira Investments that you provided in response to

10   an inquiry from a shareholder?

11   A.   This exhibit is from Olivia to Bruce.  It says:  Hi,

12   Bruce.  Great working today.

13   Q.   Is that 74?  Are we on the same page, Exhibit 74?

14   A.   It says 74.

15   Q.   That may be 769-74.  Sorry, sir.  We have a peculiar

16   numbering system for which I take the blame and apologize.

17   A.   What am I looking for?

18   Q.   Exhibit 74.  It would be an entirely different book.

19   Can we come and hand it up to you?

20   A.   That would be helpful.

21              MR. KASHANI:  With the Court's permission.

22              THE COURT:  Yes.

23              (Counsel handing the witness a document)

24              THE WITNESS:  Exhibit 74?

25   BY MR. KASHANI:

1    Q.    Yes.  You can disregard the cover page.

2    A.    Okay.  Yes.  Okay.  Yes, I see the lease.

3    Q.    Now, is Exhibit 74 a copy of the lease between PharmaPak

4    and Kira Investments that you provided to an investor in

5    response to an inquiry?

6    A.    I hate to say this, but I almost need reading glasses to

7    read this.  It's so small.  Sorry.

8    Q.    Let me rephrase it more generally.  Is Exhibit 74 the

9    copy of the lease that you provided to an investor in

10   PharmaPak in response to a question as to why is money going

11   to Kira Investments?

12   A.    Yes.  I believe I gave this to Amir and perhaps other

13   people as well -- Mr. Asvadi.

14   Q.    So Mr. Asvadi asked:  Why is money going to Kira

15   Investments?  And you responded:  There's a lease with Kira

16   Investments.  Here is the lease, Exhibit 74?

17   A.    He asked for a copy of the lease.  I don't remember the

18   specific discussion, but he did want to see a copy of the

19   lease.

20   Q.    And was there money going from PharmaPak, Inc., to Kira

21   Investments as reflected in the financials that you reviewed

22   so carefully?

23   A.    My recollection is, yes, PharmaPak, which was occupying

24   that space, was making rental payments, which I deemed to be

25   appropriate and proper.

162

```
 1    Q.    Okay.  But the rental payments were to a company

 2    controlled by Mr. Cahill; correct?

 3    A.    Again, I'm not sure Kira Investments -- his daughter's

 4    name is Kira.  That I do know.  I don't know if she owns it

 5    completely.  I don't know that.

 6              MR. KASHANI:  I'd like to offer Exhibit 74.

 7              MR. MARKHAM:  No objection.

 8              THE COURT:  74 is admitted without objection.

 9              (Exhibit 74 received.)

10    BY MR. KASHANI:

11    Q.    Do you see on your screen the first page of the lease?

12    A.    I do see it.

13    Q.    And I'd like to show you the seventh page of the lease

14    with the signatures.  Do you see that, sir?

15    A.    I do see that.

16    Q.    And when you provided the copy of the lease to

17    Mr. Asvadi, it had these signatures on it as we see right in

18    front of us?

19    A.    I didn't spend a lot of time looking at the signatures.

20    I recall it being signed by two parties.

21    Q.    I mean, this document hasn't been altered by anyone

22    since you gave it to Mr. Asvadi?

23    A.    I assume not.  It -- I -- you're asking me do I remember

24    a year and a half ago if this is the exact signatures that I

25    saw.  I remember there being -- I remember -- let me say
```

```
 1    this.  I remember being asked about the lease.  I remember

 2    seeing and supplying a signed lease.  I didn't try to

 3    authenticate any signatures.  I didn't pay much attention.

 4    Q.   But this document, Exhibit 74, is what you provided to

 5    Amir?

 6    A.   I believe it is.

 7    Q.   All right.  Thank you, sir.

 8           MR. KASHANI:  No further questions.

 9           MR. MARKHAM:  May I confer with counsel just one

10    moment, Your Honor?

11           (Pause in the proceedings)

12                      REDIRECT EXAMINATION

13    BY MR. MARKHAM:

14    Q.   Mr. Cullen, you looked at the financial records of the

15    company in some detail; correct?

16    A.   I did, yes.

17    Q.   And can I ask you to turn to Exhibit 13, which we'll put

18    up on the board.  You can look at it in your book if you have

19    it.  Exhibit 13, and it would be page PL387 of Exhibit 13.

20    A.   I don't have 13 here.

21    Q.   Do you have 13?

22    A.   I do not.

23           MR. MARKHAM:  May I approach to give it to him in

24    hard copy?

25           THE COURT:  Yes, you may.
```

1                    (Counsel handing a document to the witness)

2     BY MR. MARKHAM:

3     Q.   It will be up on the screen, but take a look at that and

4     the page to which I referred you.

5     A.   Got it.

6     Q.   We went over this entire exhibit which has many pages;

7     correct?

8     A.   Yes.

9     Q.   And this is the exhibit which shows all the money that

10    PharmaPak received, all that it spent, what it spent it on,

11    and the backup checks to prove that it had been spent;

12    correct?

13    A.   Correct.

14    Q.   And you looked at all of that; right?

15    A.   I did in pretty good detail a year and a half ago.

16    Q.   Okay.  And can you -- did you get the page that I told

17    you to refer to?

18    A.   I'm on the first page.  Is that the one you want me to

19    look at?

20    Q.   Take a look at PL388.

21    A.   388?

22    Q.   Yes.

23    A.   Okay.  388, yes.

24              MR. MARKHAM:  Can you put that up on the board?

25    Put the whole thing up if I can -- if you can.

1    BY MR. MARKHAM:

2    Q.    Do you have that in front of you?

3    A.    I do.

4    Q.    And does that reflect what this statement shows the

5    available cash of PharmaPak to be as of the very beginning of

6    April 2016 -- or the end of March?  Sorry.

7    A.    Period ending, this says -- excuse me.  Give me a

8    second.  Yes.  After -- as of March 15th, 2016, there was

9    $3,000 left in the bank account.

10   Q.    Okay.  Now, that was about the time that Life Tech

11   Global purchased the machine from PharmaPak; correct?

12   A.    That is correct.

13   Q.    And was there enough money in that account to loan Life

14   Tech Global the $95,000 that Mr. Kashani was insisting was

15   loaned?

16   A.    Life Tech -- I stated before that in February I alerted

17   the shareholders that I thought we had a week to go.

18   Q.    What do you mean, a week to go?

19   A.    We had enough money to last another week, and we

20   desperately needed cash.

21   Q.    Right.  Now, you said that to --

22   A.    I actually put it in writing and circulated a document

23   and tried to solicit funds.

24   Q.    And you told that to Mr. Kashani?

25   A.    Yes.

1    Q.   But he kept coming back and asking you:  Wasn't there

2    really a loan?  Didn't it loan money?  Right?

3    A.   Yes.

4    Q.   And:  Did PharmaPak loan money to Life Tech?

5    A.   Yes, he did.

6    Q.   Take a look at this asset sheet and tell the jury

7    whether it could've loaned you money even if it loved you to

8    death and wanted to loan you money.

9    A.   There's only $3,000 in the bank account.

10   Q.   Take a look up that and tell me -- tell the jury when

11   the last time there was $95,000 in that bank account.

12   A.   Well, my guess without -- $95,000 in this bank account?

13   I don't think you can tell from this chart.  But if I went

14   through the transactions and details, I can tell you there

15   was not $95,000 in the account in February when I sent out

16   the document requesting money.

17   Q.   So if you had said that you had been transferred money

18   by PharmaPak at that period of time, if Life Tech Global had

19   been transferred money, that money didn't exist; correct?

20   A.   There was no money.  That was a promissory note.

21   PharmaPak did not give me $95,000.  It was a seller carryback

22   or, you know, like a loan you might get on your car.

23   Q.   All right.  So if you had said it had, that would have

24   been a lie because it couldn't have happened; correct?

25   A.   It did not have money.

1   Q.   Now, how much of the loan has Life Tech Global paid to

2   PharmaPak?  And by loan, I mean purchase price; correct?

3   A.   Correct.

4   Q.   You purchased the -- Life Tech purchased the machinery

5   for $100,000; right?

6   A.   Correct.

7   Q.   What did it pay as a down payment?

8   A.   Initially there was a thousand-dollar down payment, and

9   there was another $4,000 payment due once the machine was

10  delivered.  So that was $5,000.

11  Q.   Okay.  And how much has Life Tech paid since either to

12  PharmaPak or to pay off PharmaPak debts which are required to

13  be paid because it's money owed to creditors?

14  A.   My last recollection is that there may be six or seven

15  thousand dollars owed still to PharmaPak or to expenses

16  related to the loan agreement related to PharmaPak.

17  Q.   Did you think it was important to pay off the creditors'

18  debts?

19  A.   Well, there's a lot of legal problems if you don't pay

20  off creditors.  Yes, I thought it was very important.

21  Q.   All right.

22  A.   I was requested to find a way to try to do that as a

23  shareholder, and that's what I was attempting to do.

24  Q.   All right.  Do you have book 234 in front of you?

25  A.   Book 234?

```
 1    Q.   I'm sorry.  Exhibit 234.  Exhibit 234.

 2              THE COURT:  That should be in book one of six.

 3              MR. MARKHAM:  Yes.  It's through --

 4              THE WITNESS:  I don't see 234 here.

 5              THE COURT:  What book is that?

 6              THE WITNESS:  This one says --

 7              THE COURT:  Can you come forward and help.

 8              THE WITNESS:  This one says binder one.  What

 9    exhibit, please?

10              MR. MARKHAM:  May I approach the witness?

11              THE COURT:  If you're saying something, I'm not

12    hearing it.

13              MR. MARKHAM:  May I approach the witness to give --

14              THE COURT:  Yes, you may.

15              MR. MARKHAM:  All right.  Thank you, Your Honor.

16              Your Honor, at this time I'm offering into evidence

17    Exhibits 234 through 245.

18              THE COURT:  All right.  Now, you say 234.  Are you

19    saying 234 and not 231?

20              MR. MARKHAM:  Hold on.

21              THE COURT:  Or for that matter 228?

22              MR. MARKHAM:  Yes.  228, 230, 231 --

23              THE COURT:  Okay.  Just a moment, then.  The way we

24    keep track of our exhibits, it's good if you can give a

25    range.  If they're individual, you have to do individual.
```

1    It's helpful to give a range because we record them all down.

2    So it sounds like 228 but not 229.  So we've got 228, and

3    then we're going to?

4            MR. MARKHAM:  229.

5            THE COURT:  We are going to 229?

6            MR. MARKHAM:  We are going to 229.

7            THE COURT:  And then what after that?

8            MR. MARKHAM:  230.

9            THE COURT:  Well, then, give me the range.

10           MR. MARKHAM:  Okay -- 228 through 248.

11           THE COURT:  Good.  See, ranges are very helpful.

12   Now, we discussed that this morning I think before the jury

13   arrived; right?

14           MR. MARKHAM:  Yes, Your Honor.  We did.

15           THE COURT:  All right.  And you submitted

16   objection, and the objection I think is overruled.  So that's

17   where we're at.

18           **(Exhibits 228-248 received.)**

19           MR. KASHANI:  I just don't remember.

20           THE COURT:  On the liens?

21           MR. KASHANI:  The question of mini trial.

22           THE COURT:  Hold on.  I thought we took care of

23   this.

24           MR. MARKHAM:  We did.

25           THE COURT:  Perhaps I'm wrong.

1          MR. KASHANI:  And then --

2          THE COURT:  All right.  Perhaps I'm wrong.  Just a

3    moment.  One at a time.  You're moving these liens which you

4    say are certified.

5          You said, Mr. Kashani, you have no objection on

6    foundation, but.  And --

7          MR. KASHANI:  I remember --

8          THE COURT:  -- perhaps the fault is mine because I

9    led you one way and then did a U-turn on you, sort of.  Are

10   you with me?

11         MR. KASHANI:  I am now.

12         THE COURT:  I apologize for the U-turn.  They're

13   admitted.

14         MR. MARKHAM:  Very well.

15         MR. KASHANI:  I know what he's talking about.

16         THE COURT:  Yeah.  So that for the record is

17   through 240.

18         MR. MARKHAM:  All right.

19         THE COURT:  Go ahead.

20   BY MR. MARKHAM:

21   Q.   The first one of these is a lien, a notice of federal

22   tax lien filed against SciLab Pharmaceuticals in the amount

23   of $66,595.61.

24         MR. KASHANI:  Sir, you read it wrong.  That's not

25   the same company.  Wrong company.  And I have an objection in

UNITED STATES DISTRICT COURT

1    that I don't have all these exhibits in my book provided by

2    defendants.

3              MR. MARKHAM:  Your Honor, those were provided to

4    him.

5              THE COURT:  Hold on.  That doesn't respond to the

6    question.  Are they in his book under tabs for each of these

7    numbers?

8              MR. MARKHAM:  Yes.  They should be.

9              MR. KASHANI:  If I may approach my colleague?

10             THE COURT:  Yes.

11             (Counsel conferring)

12             THE COURT:  Just a moment.  Now, are they lacking

13    in his book?

14             MR. MARKHAM:  He says they're lacking in his book.

15    I haven't looked at his book.

16             MR. KASHANI:  But not all of them.  Some of them.

17             THE COURT:  Here's my point.  Maybe my book is

18    complete and I could lend it to him.

19             MR. MARKHAM:  You can borrow his book.

20             MR. KASHANI:  Sure.  Or you can give them to me if

21    they're in your book.

22             (Counsel conferring)

23             THE COURT:  Hold on.  Hold on.  This talking among

24    yourselves I'm not sure is getting reported.

25             Mr. Kashani, can you tell me a tab that is missing

```
1    in your book?
2              MR. KASHANI:  For example, I don't have --
3              THE COURT:  Just a moment.  For example, he does
4    not have 229.  I don't either, so I can't help.  All right.
5              MR. MARKHAM:  We'll skip 229 and we'll withdraw it.
6    We'll go to -- if we may, we'll go to -- we'll start with
7    231.  Do you have that?
8              MR. KASHANI:  Yes.
9              MR. MARKHAM:  Okay.  That is a certified copy of a
10   notice of state tax lien filed against SciLabs
11   Nutraceuticals, Inc., in the amount of $13,541.68.
12             We'll next go to 232.  Do you have that?
13             MR. KASHANI:  Yes.
14             MR. MARKHAM:  That is a notice of state tax lien
15   filed against SciLabs Global Holdings, Inc., $32,096.18.
16             The next one is Exhibit 233, which is a notice of
17   state tax lien against SciLabs Nutraceuticals, Inc., in the
18   amount of $14,444.21.
19             MR. KASHANI:  Your Honor, I'm starting also to have
20   a relevance objection.  I don't recognize any of these
21   companies.
22             THE COURT:  I believe this morning that was your
23   objection.  Well, actually it was 403.  You're having a
24   relevance objection.  All right.
25             MR. KASHANI:  My objection is a little different
```

```
 1    now, looking at these, because I don't recognize these

 2    companies.

 3              THE COURT:  Explain your relevance objection.

 4              MR. KASHANI:  I don't recognize any of these

 5    companies as having been mentioned in this case.  I don't

 6    know what SciLabs Global Holdings is.  I don't know what

 7    SciLabs Nutraceuticals is.

 8              I just don't know if these are attached to have any

 9    attachments to any of the companies that have come up in this

10    case.

11              MR. MARKHAM:  SciLabs Nutraceuticals, Inc., is a

12    derivation of SciLabs Nutraceuticals, which is the company

13    that was shut down by the FDA that Mr. Edalat operated just

14    up until the time that he got involved with PharmaPak and

15    Mr. Cahill.

16              THE COURT:  All right.  That objection then will be

17    overruled.

18              MR. MARKHAM:  All right.

19              THE COURT:  If you have others, let us know.

20              Continue.

21              MR. MARKHAM:  So 238 is another notice of tax

22    lien -- 238.  And it's against SciLabs Nutraceuticals, Inc.

23    It's a tax lien in the amount of $9,314.

24              There is an another tax lien against SciLabs

25    Pharmaceuticals which is Exhibit 239, which is a notice of
```

 1    tax lien in the amount of $6,451.

 2            There is another -- it's Exhibit 240.  It is a

 3    notice of state tax lien against SciLabs Nutraceuticals,

 4    Inc., in the amount of $4,047.55.

 5    BY MR. MARKHAM:

 6    Q.   Now, Mr. Cullen, were those the very types of debts that

 7    you were determined to pay off with the money that PharmaPak

 8    had left to its -- the tax liens?  Did PharmaPak have any tax

 9    liens?

10    A.   Not that I saw.

11    Q.   Okay.  But you were trying to pay off all of PharmaPak's

12    debts; right?

13    A.   That was the intent.

14    Q.   When you were talking --

15    A.   Well, let me say that was the intent of the purchase and

16    sale agreement so Bruce would be able to do that, if that's

17    what you're getting at.

18    Q.   Okay.  And that money went -- money that Life Tech paid

19    went to pay off the debts of PharmaPak that had to be paid

20    off?

21    A.   It did pay bills, yes.  That was part of it.

22    Q.   Okay.  And when Paul was riding around with you in a

23    Rolls Royce and talking about all of his connections in the

24    Middle East, did he ever mention --

25            THE COURT:  Excuse me.

1          MR. MARKHAM:  Mr. Edalat.

2          THE COURT:  Start the question again and please use

3    last names.

4    BY MR. MARKHAM:

5    Q.   Did Mr. Edalat in any of the times when he was riding

6    around in a Rolls with you or showing up in a Rolls or a

7    Ferrari or a Lamborghini with you, talking about his

8    successes with his companies, did he ever tell you that he

9    owed the state taxing authorities money and that they had

10   filed -- that his company owed these taxes and had gotten

11   liens filed against it and that they were sitting there?

12   A.   I was never told that.

13   Q.   Would that have made a difference to you?

14   A.   Maybe one or -- maybe one would have been explainable,

15   but this is a very big number of tax liens.  That's a huge

16   red flag.

17   Q.   Do people in business ever use property that a company

18   of theirs -- that they own and lease it to their own company?

19   A.   Yes.  That's a common business practice.

20   Q.   And is it proper for them to do that depending on the

21   amount of the lease payment made?

22   A.   Yes.

23   Q.   Did you look to see how much of a lease payment was

24   being made by PharmaPak to the space that Mr. Cahill was

25   letting them use and determine whether or not you thought it

1    was a reasonable payment?

2    A.   I don't recall the exact number, but it seemed

3    reasonable for space in Orange County and that type of office

4    building, yes.

5    Q.   Why don't you describe the office building involved that

6    Mr. Cahill allowed PharmaPak, and Sentar for that reason, to

7    enter and use.

8    A.   It's a two-story, walkup building.  It's in good shape.

9    It was fully furnished with TVs, desks, chairs -- everything

10   you need to set up an office.  The carpet was nice, new.  It

11   had a big balcony.

12          So again, I think the rent might have been 5,000 a

13   month, which is perfectly acceptable in Orange County in that

14   type of office space.

15   Q.   And your investment was paid into that company in the

16   late fall and the early winter of 2015, '16?

17   A.   Yes.

18   Q.   And therefore some of your money was going to pay that

19   rental; correct?

20   A.   My money technically went to Paul, so --

21   Q.   Right.

22          THE COURT:  Excuse me?

23          THE WITNESS:  Mr. Edalat.

24   BY MR. MARKHAM:

25   Q.   Let's talk about that.  How much money did you pay for

```
 1    PharmaPak stock?
 2            MR. KASHANI:  I'm going to object to the pronoun
 3    you.
 4            THE COURT:  Sustained.  Objection, vague.
 5    Sustained.
 6    BY MR. MARKHAM:
 7    Q.   How much money did you as the trustee of your living
 8    trust of which you are the beneficiary pay for your PharmaPak
 9    stock?
10    A.   $250,100.
11    Q.   The 100, why that?
12    A.   That was in payment for -- that was in essence to give
13    me a larger share of PharmaPak for, let's just call it,
14    having me being involved in the company, my services.
15    Q.   $100?
16    A.   That's not an uncommon practice if you want to have
17    somebody that has a good stellar reputation be part of your
18    company.  It's often that you give them stock or options.
19    Q.   Okay, Harvard.  You're worth a hundred dollars?
20    A.   No.  I had to pay a hundred dollars for additional
21    percentage of the company.
22    Q.   Got it.  All right.  And how much money did you as
23    trustee for the trust of which you're the beneficiary lose?
24    A.   $250,100.
25    Q.   And that was because there were no contracts that came
```

1    in?

2    A.    There were no contracts.

3    Q.    And that was because you didn't have the licenses you

4    thought you would have?

5    A.    That is correct.

6    Q.    And you couldn't get any income?

7    A.    That is correct.

8    Q.    When you went around asking people, the other investors,

9    if they would all invest each of them $238,000, each of the

10   seven; correct -- sorry.  Each of the seven were asked to

11   invest how much more?

12   A.    We were trying to collect $100,000 at the point in time

13   February 19th when I sent out the letter.  That wasn't

14   designed to solve all the problems.  I believe my e-mail said

15   this is the first step.

16   Q.    All right.  Did Mr. Edalat ever express to you that he

17   had to put in his percentage of that so that he could

18   preserve the model that was so valuable to PharmaPak?

19   A.    I was told he was not going to make any additional

20   contributions.

21             MR. KASHANI:  Hearsay.

22             MR. MARKHAM:  It's Mr. Edalat.

23             MR. KASHANI:  He said I was told.

24   BY MR. MARKHAM:

25   Q.    Did Mr. Edalat tell you?

```
 1              THE COURT:  Hold on.  The hearsay objection has
 2    been made.  Clarify, please.
 3    BY MR. MARKHAM:
 4    Q.   Did Mr. Edalat -- first of all, I'll withdraw the
 5    question.
 6              Did Mr. Edalat ever send to you his amount of that
 7    money that had been requested?
 8    A.   No.
 9    Q.   Okay.
10              THE COURT:  All right.  Then the objection is
11    sustained and that answer is stricken.
12    BY MR. MARKHAM:
13    Q.   Did he ever --
14              THE COURT:  Hold on -- the previous answer.  Your
15    question was -- the answer was he was told.  We don't know
16    who told him.
17    BY MR. MARKHAM:
18    Q.   Did you ever learn from Mr. Edalat himself that he was
19    not going to invest any further?
20    A.   I can't be certain of that.
21    Q.   Did he ever tell you --
22              THE COURT:  Again, I want to emphasize.  We've lost
23    it.  I thought you were going to clarify.  The hearsay
24    objection is sustained and that statement about he was told
25    must be stricken.
```

1    BY MR. MARKHAM:

2    Q.    Did Mr. Edalat ever tell you anything about his interest

3    in PharmaPak and what he wanted to do with it?

4    A.    Yes.  At the meeting at the Islands Hotel that we talked

5    about yesterday, he indicated to all of us present and

6    Mr. Franco over the phone that he was done with the company,

7    that he didn't want to be involved with partners like us and

8    he was walking away and we could take his stock and divide it

9    up.  He actually said that to Mr. Franco.

10   Q.    Now, when thereafter -- was it thereafter that you

11   invited all of the shareholders to pay a little bit more

12   money in to keep it going for a while?

13   A.    It was before that time.

14   Q.    Okay.  And did you ever get any payment from Mr. Edalat

15   in response?

16   A.    No payment came in.

17   Q.    Now, Mr. Kashani asked you a great deal of -- many

18   questions about the model.  Do you recall that?

19   A.    Yes.

20   Q.    And the model he was talking about was taking a product

21   and going state by state to gain a franchise or a joint

22   venture in a state and then moving on; correct?

23   A.    Yes.

24   Q.    How new a model is that in the United States of America?

25   A.    I studied it extensively at Harvard Business School.

```
1    Q.   And that was long before PharmaPak; correct?

2    A.   Yes, that was long before PharmaPak.

3    Q.   Was there any trade secret at PharmaPak involving the

4    model that it was using going state to state?

5    A.   None.

6    Q.   Was there any proprietary information filed about the

7    model they were using?

8    A.   None.

9    Q.   Was that model put up on the Internet in their website

10   that that's what they were doing?  Do you recall?

11   A.   That I don't recall.

12   Q.   Okay.  Was any attempt made to protect the model of

13   going state to state from anybody else?

14   A.   There's nothing proprietary about a model like that.

15   Q.   Isn't that what Mr. Edalat is doing with the company

16   AHC --

17   A.   I believe --

18   Q.   -- in the country of Canada?

19   A.   I believe that's what he's doing.

20             MR. KASHANI:  Foundation.

21             THE COURT:  Hold on.  You need to speak up.

22             MR. KASHANI:  The foundational objection to what

23   this gentleman knows about a company in Canada and what

24   they're doing.

25             THE COURT:  It's always helpful if you can speak up
```

UNITED STATES DISTRICT COURT

1    before the answer comes in.

2            The objection is sustained.  The answer therefore

3    is stricken.

4    BY MR. MARKHAM:

5    Q.   And do you know what Mr. Edalat's model is that he is

6    using with his Canadian company?

7    A.   I have seen public videos on the Internet and other

8    documents that describe it, yes.

9    Q.   All right.  Well, then, we'll wait and ask Mr. Edalat

10   about those videos.  We won't ask you.

11   A.   Okay.

12   Q.   Now, does the Life Tech private placement memorandum

13   state that you have any contracts that you don't have?

14   A.   It does not.

15   Q.   Does it state that you have any patent pendings that you

16   don't have?

17   A.   It does not.

18   Q.   Does it state that you have any FDA approvals that you

19   don't have?

20   A.   It does not.

21   Q.   Does it mention any litigation that you are in?

22   A.   It does.

23   Q.   What litigation does it mention that you, Greg Cullen,

24   as CEO and sole shareholder are in?

25   A.   This one.

1    Q.   Okay.  Did you try to hide that?

2    A.   We did not.

3    Q.   Do you wish that Mr. Edalat had not hidden from you the

4    litigation he had with the FDA when he was trying to get you

5    to invest in PharmaPak?

6    A.   I wish I had known about it, yes.

7    Q.   All right.  Now, Mr. Kashani asked you if you were -- if

8    Sentar was a separate company; correct?

9    A.   Yes.

10   Q.   It is; correct?

11   A.   It is.

12   Q.   Was the fact that it was separate and had its own

13   corporate or structural identity, did that mean it didn't

14   matter in terms of whether or not you invested in PharmaPak?

15   A.   No.

16   Q.   And what was it that Mr. Edalat told you about Sentar

17   that made you more inclined to pay money to him for his

18   PharmaPak stock?

19   A.   Well, as I described, I received additional stock for

20   my -- I guess my name, services, whatever you want to call

21   it, by joining PharmaPak.  And I had a similar discussion

22   with Mr. Edalat which was contained in an e-mail about

23   getting stock and warrants in SciLabs, so that was certainly

24   an inducing factor.  I expected that to happen.

25            But the two companies shared the same offices, and

184

1    there were a lot of synergies between the two companies.  It

2    was my expectation that given the executives of both

3    companies were a few feet apart, sharing the same offices, we

4    would use the same distribution channels.  We would use the

5    same sales force.  We would be able to take the new products

6    from PharmaPak and hopefully enjoy the $400 million valuation

7    that SciLabs was claiming, or Sentar.

8    Q.   Mr. Edalat told that you that Sentar had existing

9    contracts in the Middle East, China, Asia, and Eastern

10   Europe; correct?

11   A.   Yes.  It was -- yes.

12   Q.   And what was the -- what was -- what did he say about

13   those contracts and their value to PharmaPak if you invested,

14   by paying him?

15   A.   We were discussing selling our products in the same

16   channels.

17   Q.   Did you ever see any such contracts?

18   A.   I did not.

19   Q.   Did any such -- did people under contract ever ask

20   PharmaPak to place any orders for them?

21   A.   That I don't know.  I didn't see any.

22   Q.   All right.  Did you ever see any money that came from

23   any such orders?

24   A.   I did not.

25   Q.   No balance sheets; correct?

1    A.    Correct.

2    Q.    Not in the -- not in your stock dividends?

3    A.    I did not.

4    Q.    Were there any stock dividends?

5    A.    There were not.

6    Q.    Mr. Kashani asked you if you thought that PharmaPak

7    stock had a value?

8    A.    Yeah, I think he asked me that question.

9    Q.    When -- as of the time that you opened Life Tech Global,

10   did PharmaPak stock have a value?

11   A.    It had absolutely no value in my opinion.

12   Q.    Did you ever backdate any documents in connection with

13   your work at PharmaPak when you were helping Mr. Cullen

14   [sic]?

15   A.    When I was helping --

16   Q.    Sorry.  It's been a long week -- when you were helping

17   Mr. Cahill?

18   A.    It's not my practice to backdate documents.

19   Q.    All right.  Did you -- do you remember doing it?

20   A.    I do not.

21   Q.    Now, many times Mr. Kashani in his questioning of you

22   referred to the time that you took assets from PharmaPak.

23   Remember?

24   A.    I do.

25   Q.    Did you ever literally take assets from PharmaPak?

1    A.    I purchased assets from PharmaPak through Life Tech

2    Global.

3    Q.    And you paid -- what was the ultimate purchase price

4    received by PharmaPak?

5    A.    100,000.

6    Q.    And where could you have gotten a machine?

7    A.    I could've bought another one in New Hampshire from Ken

8    Booth.

9    Q.    Why didn't you?

10   A.    As a shareholder of PharmaPak, it seemed prudent to try

11   to help PharmaPak solve its obligations of paying its

12   creditors as opposed to going back to the shareholders and

13   asking for money when the company had no future ability to

14   survive.

15   Q.    Okay.  Now, did you at any time, do you believe, take

16   unfair advantage of PharmaPak by offering to sell it or

17   offering to buy its assets?

18          MR. KASHANI:  That calls for speculation and

19   foundation.

20          MR. MARKHAM:  On cross, Your Honor, he asked many

21   questions about the fairness of this.

22          THE WITNESS:  Am I supposed to wait?

23          MR. MARKHAM:  Yes.

24          THE COURT:  Ask him in his view.

25

1    BY MR. MARKHAM:

2    Q.   In your view, based upon your experience?

3    A.   No.  I made every intent to overpay for the assets, not

4    by much but a little bit.

5    Q.   Okay.  And did you -- were you aware of any other place

6    that PharmaPak could have gone to sell those assets to take

7    the money to pay off its creditors?

8    A.   I was not.

9    Q.   Now, Mr. Kashani asked you a lot of questions about the

10   way the decision was made to sell the assets of PharmaPak,

11   about its legality and about the shares, the share ownership

12   and the number of votes that were cast in favor of taking --

13   in favor of selling the property of PharmaPak.

14        Was there a consent among a majority of the

15   shareholders to sell its assets to Life Tech Global?

16        MR. KASHANI:  I'm going to object as calling for a

17   legal conclusion, and best evidence.  We've seen the

18   document.  There's a factual stipulation as to the corporate

19   authorization.  He's trying to introduce other material

20   that's outside the stipulation.

21        THE COURT:  Speaking objections are to be avoided.

22        Ask his understanding.

23        MR. MARKHAM:  I'll withdraw the question and ask it

24   this way if I may.

25

1    BY MR. MARKHAM:

2    Q.   Was there a consent, an agreement between a majority of

3    the shareholders to sell the assets of PharmaPak --

4    A.   Yes.

5    Q.   -- at the price you stated to Life Tech Global?

6            MR. KASHANI:  Well, I need to get my objection in.

7    I mean, that's contrary to the factual stipulation.  And

8    foundation.

9            MR. MARKHAM:  Excuse me.  If he can point out where

10   in the stipulation that's contrary to --

11           THE COURT:  All right.  The objection is sustained.

12   The answer is stricken.  I suggested the language you might

13   use.

14           Next question.

15   BY MR. MARKHAM:

16   Q.   Well, did you believe there was consent, an agreement

17   among the majority of the shareholders to sell the items?

18   A.   The majority of shareholders did agree to do that.

19           MR. KASHANI:  Your Honor, I ask that the answer be

20   stricken as nonresponsive.

21           THE COURT:  Overruled.

22   BY MR. MARKHAM:

23   Q.   Now --

24           THE COURT:  Hold it.  Wait a minute.  You're right.

25   You're right.  He rephrased the question.  The answer is

1    stricken.

2    BY MR. MARKHAM:

3    Q.    Do you believe that a majority of the shareholders voted

4    to sell the assets?

5    A.    More than 50 percent voted.  Is that --

6    Q.    We're asking for your belief.

7              THE COURT:  Just a moment.

8              MR. KASHANI:  Same objection.  Move to strike.

9              THE COURT:  Same objection.  The answer is

10   stricken.  Listen to the question.  Don't reframe your

11   answer.

12   BY MR. MARKHAM:

13   Q.    In your view did a majority of the shareholders of

14   PharmaPak agree to sell its assets to Life Tech Global?

15   A.    Yes.

16   Q.    In your view did you know of any other place where those

17   assets could have been sold for as much?

18   A.    No.

19   Q.    Now, you understand, do you not, that at the end of the

20   case His Honor is going to explain to the jury the law that

21   is applicable to this?

22   A.    Yes.

23   Q.    And --

24             MR. KASHANI:  Your Honor, I object to this line of

25   questioning.

```
 1              THE COURT:  Next question.
 2    BY MR. MARKHAM:
 3    Q.   And Mr. Kashani asked you a lot of questions about the
 4    proprietary -- about the proper -- the propriety of what you
 5    had done; correct?
 6    A.   He did.
 7    Q.   All right.  And did you believe that what you did was
 8    proper?
 9              MR. KASHANI:  Objection.  Asked and answered.
10              THE WITNESS:  Yes.
11              THE COURT:  Overruled.
12              MR. KASHANI:  Your Honor, with the agreement of my
13    colleague, we have a witness, a handwriting expert who will
14    testify now out of order that Mr. Markham has agreed that he
15    could testify at this time.
16              THE COURT:  Thank you for your accommodation,
17    Mr. Markham.
18              You have 35 minutes.
19              MR. KASHANI:  Call Phillip Sprague.
20              THE COURT:  I think that means you may step down,
21    sir.
22              Please come forward.
23          **Phillip Sprague, Defendant's witness, sworn**
24              THE CLERK:  Thank you.  Please be seated.
25              THE COURT:  All right.  Let me ask -- we do only
```

```
 1   have 35 minutes.  How long will your examination be?

 2            MR. KASHANI:  Ten minutes.  Shorter if we could

 3   stipulate to --

 4            THE COURT:  Will you have sufficient time to cross?

 5            MR. MARKHAM:  I will.  Thank you, Your Honor, for

 6   asking.  I will.  And we've also agreed there's another very

 7   quick witness who's going to be on today.  So --

 8            MR. KASHANI:  Will you stipulate to --

 9            THE COURT:  We'll see about that.

10            Let's proceed.

11            MR. KASHANI:  I'm sorry.  Will you stipulate to

12   qualification?  I didn't understand.

13            MR. MARKHAM:  Just ask the witness.

14            MR. KASHANI:  Okay.

15            THE CLERK:  Please state and spell your first and

16   last name.

17            THE WITNESS:  Phillip, P-h-i-l-l-i-p, Sprague,

18   S-p-r-a-g-u-e.

19            THE CLERK:  Thank you.
```

**DIRECT EXAMINATION**

```
21   BY MR. KASHANI:

22   Q.   Mr. Sprague, how long were you engaged in the work of

23   handwriting analysis?

24   A.   When I was with the Dallas Police Department, I went to

25   a school for investigators and a day was allotted for
```

```
 1   question document examination.  I did question document
 2   examination while I was with the police department and then
 3   while I was a special investigator for the Dallas County
 4   district attorney's office.
 5   Q.   For how many years?
 6           THE COURT:  May I say, I don't see his name on your
 7   witness list.
 8           Were you aware of this witness?
 9           MR. MARKHAM:  I'm not objecting to it.  I don't
10   think it's on the list.
11           THE COURT:  Does anyone on the jury recognize this
12   gentleman?
13           Okay.  None.  Go ahead.
14   BY MR. KASHANI:
15   Q.   Mr. Sprague, how many years did you serve in that
16   capacity with the Dallas police and the Dallas County sheriff
17   and the Dallas DA?
18   A.   I was with the Dallas Police Department from 1966 until
19   1973.  I was with the Dallas County district attorney's
20   office as a special investigator from 1973 to 1977.
21           MR. KASHANI:  I'd like to offer Mr. Sprague as an
22   expert on handwriting analysis.
23           THE COURT:  Any objection?
24           MR. MARKHAM:  Your Honor, I've got no objection.
25           THE COURT:  All right.  The ruling of the Court
```

```
 1    will be that this man may offer opinion testimony.
 2           Go ahead.
 3           MR. MARKHAM:  Could the counsel give me the report
 4    number, Your Honor, the exhibit number for his report?
 5           MR. KASHANI:  His report is Exhibit 575.  It's a
 6    stipulated exhibit.
 7           MR. MARKHAM:  Thank you.
 8    BY MR. KASHANI:
 9    Q.   Sir, were you asked to analyze the signatures on a
10    document that we have referred to here as Exhibit 74, which
11    is a property lease with Kira Investments?
12           Do you recall that document?
13    A.   Yes.
14    Q.   Could you look on your screen.  Is that the lease you
15    were given?
16    A.   Yes.
17    Q.   I show you the last page with the signatures.  Are these
18    the signatures that you were asked to analyze?
19    A.   Yes.
20    Q.   The top signature says Paul Edalat.  Do you see that?
21    A.   Yes.
22    Q.   And was it your understanding that the lower signature
23    is Bruce Cahill?
24    A.   Yes.
25    Q.   Were you given authentic exemplars, samples of the
```

1    signatures of Mr. Cahill and Mr. Edalat?

2    A.   This document was e-mailed to me, and I was given

3    some --

4           THE COURT:  All right.  Just to cut the time, the

5    question was about exemplars.  The witness said this

6    document.  I believe he's referring to what's on the screen,

7    but in response to the question it will sound like exemplars.

8    Let's be clear.

9           MR. KASHANI:  Let me move this along.

10   BY MR. KASHANI:

11   Q.   Mr. Sprague, did you come to any conclusion regarding

12   the authenticity of the signature of Paul Edalat on the

13   lease?

14   A.   Yes.

15   Q.   What conclusion did you come to?

16   A.   That it was not his authentic signature.

17   Q.   Did you come to any conclusion regarding whether or not

18   the same hand signed the signature of Bruce Cahill and the

19   signature of Paul Edalat on the lease?

20   A.   No, I did not.

21   Q.   What was the basis of your conclusion that the

22   questioned signature of Paul Edalat was not his true

23   signature?

24   A.   I was given a number of known signatures of Mr. Edalat

25   to compare to the questioned signature on this document.  And

1    from looking at his known signatures and comparing it to this

2    questioned document signature, I determined that it was not

3    his authentic signature.

4    Q.   There's another signature of Bruce Cahill.  Did you come

5    to any conclusion as to whether the signature of Bruce Cahill

6    is authentic or not?

7    A.   This -- the signature I was given, the known signature

8    of Mr. Cahill, and this signature appear to be by the same

9    hand.

10   Q.   So it's your conclusion that the signature of Bruce

11   Cahill on this lease is genuine, but the signature of Paul

12   Edalat is not genuine?

13   A.   That is correct.

14   Q.   I'm going to show on the screen Exhibit 575, which is

15   admitted.

16           MR. MARKHAM:  What is this one that you're taking

17   down now?

18           MR. KASHANI:  Sorry.  Sorry.  Sorry.  I didn't mean

19   to do that.  I'm offering -- the lease is Exhibit 74.  I'm

20   offering 575, which I think is an admitted exhibit.

21           THE COURT:  All right.  74 is what was just on the

22   screen?

23           MR. KASHANI:  Yes, Your Honor.

24           THE COURT:  575 will be admitted without objection.

25           **(Exhibit 575 received.)**

1    BY MR. KASHANI:

2    Q.   Sir, is Exhibit 575 your report on the signatures?

3    Would you like a hard copy?  We can get you a hard copy.

4    A.   I can read this.  Yes.

5    Q.   I'd like to show you the third page.  Is this the page

6    where you made the comparison of the known signature with the

7    questioned signatures?

8    A.   Yes.  And there were other known signatures.

9    Q.   And based on the comparison as shown here and other

10   known signatures, you were able to conclude that in your

11   opinion the signature of Paul Edalat on this lease is not

12   genuine?

13   A.   That is correct.

14   Q.   All right.  Thank you, sir.

15        MR. KASHANI:  No further questions.

16                    **CROSS-EXAMINATION**

17   BY MR. MARKHAM:

18   Q.   I want to start by clarifying something if it needs

19   clarification.  You didn't make any finding that the

20   signature that is purported to be Paul Edalat's was signed by

21   Mr. Cahill's handwriting; did you?

22   A.   Can you rephrase that?

23   Q.   Did Mr. Cahill make the Paul Edalat signature?  Are you

24   suggesting --

25   A.   I cannot determine that, no.

1   Q.   You're not suggesting that; are you?

2   A.   No.

3   Q.   Okay.  And when you say you got the known signature of

4   Paul Edalat, what do you mean?

5   A.   I was offered this document here that I cut and pasted

6   the known signatures of Bruce Cahill and the known signatures

7   of Paul Edalat.

8   Q.   You used -- the question said what did you mean by

9   known, and you used known in the answer.  How did you know

10  you were getting a genuine signature of Paul Edalat with

11  which to compare to the signature on the lease?

12  A.   The signatures I received was from a number of

13  signatures by Paul Edalat tendered to me by Paul Edalat.

14  Q.   You never saw him sign?

15  A.   No.

16  Q.   Have you ever done a handwriting analysis where the

17  person whose signature is questioned comes before you and

18  signs their name over and over again and then you use

19  known -- those as the known signatures?

20  A.   Yes.

21  Q.   You've done that before; haven't you?

22  A.   Yes.

23  Q.   That's a frequent way to do it; isn't it?

24  A.   I've done it both ways.

25  Q.   Isn't the better approach for you to sit here under oath

```
1    and say you know that is the signature of Paul Edalat is to

2    have seen him in person sign it in original in front of you?

3    A.   Yes.

4    Q.   And you didn't use that; did you?

5    A.   No.

6    Q.   You based your assumption that it was the known

7    signature of Mr. Edalat on something he said to you and sent

8    to you; correct?

9    A.   Correct.

10        MR. MARKHAM:  Nothing further.

11                 REDIRECT EXAMINATION

12   BY MR. KASHANI:

13   Q.   Mr. Sprague, the documents you were provided with

14   Mr. Edalat's signature, were you provided the complete

15   document?

16   A.   Yes.

17   Q.   One document here I noticed it's signed Paul Edalat,

18   secretary of the meeting?

19   A.   Correct.

20   Q.   Is that from a corporate document?

21   A.   Yes.

22        MR. KASHANI:  I'd like to offer -- I'd like to

23   show -- it's in evidence -- Exhibit --

24   BY MR. KASHANI:

25   Q.   I'd like to show you what has been marked previously as
```

 1   Exhibit 77 where it's Paul Edalat, secretary of the meeting.

 2   Is that one of the known signatures you were provided to your

 3   recollection?

 4   A.   I don't recall.

 5   Q.   Well, in any event, you were provided complete documents

 6   with the signatures on them?

 7   A.   Correct.

 8   Q.   All right.  Thank you, sir.

 9         MR. KASHANI:  No further questions.

10         MR. MARKHAM:  One more.

11                    **RECROSS-EXAMINATION**

12   BY MR. MARKHAM:

13   Q.   Were any of those signatures originals?

14   A.   I don't believe so.

15         MR. MARKHAM:  Nothing further.

16         MR. KASHANI:  No further questions.

17         Thank you, sir.

18         THE COURT:  You may step down.

19         THE WITNESS:  May I be excused?

20         THE COURT:  Yes, you may.

21         MR. MARKHAM:  We have one very short witness if we

22   may by stipulation.

23         THE COURT:  All right.

24         MR. MARKHAM:  Ms. Kira Cahill.

25         THE COURT:  I'm sorry.  What is by stipulation

1    here?

2            MR. MARKHAM:  That we're calling her out of order

3    now as opposed to --

4            THE COURT:  That's Mr. Kashani is calling her?

5            MR. MARKHAM:  No.

6            MR. KASHANI:  I'm not calling her.

7            THE COURT:  Then why would you be out of order?

8    What am I missing here?

9            MR. MARKHAM:  You're not.  It's before we finish up

10   with Mr. Cullen because of her schedule.

11           THE COURT:  I'm sorry.  I thought we were finished

12   with Mr. Cullen.

13           MR. MARKHAM:  No.

14           MR. KASHANI:  No, we were not.  I'm sorry,

15   Your Honor.

16           THE COURT:  Well, when you stepped down, there was

17   confusion.

18           All right.  So we're not finished with Mr. Cullen.

19   All right.

20           MR. MARKHAM:  Almost.

21           THE COURT:  Back to your special calling.

22           You see, I thought you were allowing Mr. Kashani to

23   call his witness out of order and that you were done with

24   Mr. Cullen.  It sure seemed you were done.

25           Did you have further recross on Mr. Cullen?

1          MR. KASHANI:  Briefly, yes, I did.

2          THE COURT:  All right.  That was not clear.  Now

3     it's clear.

4          MR. MARKHAM:  And I have a little bit more redirect

5     on Mr. Cullen as well.

6          THE COURT:  Time is flying, counsel.  It's your

7     time.

8          MR. MARKHAM:  I know.

9          THE COURT:  Please come forward.

10         **Kira Cahill, Plaintiff's witness, sworn**

11         THE CLERK:  For the record, please state and spell

12    your first and last name.

13         THE WITNESS:  Kira Cahill, K-i-r-a, C-a-h-i-l-l.

14         THE COURT:  All right.  May I ask.  She does not

15    appear to be on the witness list either.  Is she listed here

16    perhaps as Karen?

17         MR. MARKHAM:  No.  I believe she's on Mr. Kashani's

18    witness list.

19         MR. KASHANI:  She's not on my witness list, but I

20    have no objection to defendants calling this witness [sic].

21         THE COURT:  Proceed.

22         Well, let me ask.  I'm sure members of the jury

23    have not met Ms. Cahill or know of her?

24         Okay.  Go ahead.

25                     **DIRECT EXAMINATION**

BY MR. MARKHAM:

Q.   Well, you're an actress, so they may have seen you; correct?

A.   That is true, yes.

        THE COURT:  Well, then, let me ask.  She's an actress.  Has anyone seen her?

        Still nothing.  Okay.

        MR. MARKHAM:  She wishes it were otherwise.

BY MR. MARKHAM:

Q.   Ms. Cahill, what is your relationship to Bruce Cahill?

A.   He's my dad.

Q.   Okay.  And what is your occupation?

A.   I am an actress.

Q.   Where did you go to high school?

A.   I went to St. Margaret's Episcopal School.

Q.   And did you go to college?

A.   I did.

Q.   Where?

A.   University of San Diego.

Q.   And when did you graduate?

A.   2013.

Q.   And after you graduated, what did you do?  That's four years ago.  What have you been doing?  Tell the jury briefly.

A.   What have I been doing?  I moved up to L.A. very soon after graduating, and I have been working there consistently

1    for the last four years.  So, yeah.  Oh, I guess as an

2    actress and as a personal assistant.

3    Q.   Do you have an ongoing narcotics habit?

4    A.   No.

5    Q.   Have you ever had a narcotics addiction?

6    A.   No.

7    Q.   Do you take drugs?

8    A.   No.

9    Q.   I want to read you something from --

10        MR. KASHANI:  Your Honor, I feel this is --

11        THE COURT:  What's your objection?

12        MR. KASHANI:  Relevance and 403.

13        THE COURT:  All right.  There's no pending

14   question.  Let's let him finish.

15        What are you about to read from?

16        MR. MARKHAM:  I'm about to read from a defendant

17   Edalat statement published publicly in a complaint, docket

18   number 44, filed 6/21/2016, page 33, making reference to her.

19        THE COURT:  Any objection?

20        MR. KASHANI:  Well, yes.  I don't know how it's

21   innate of any claim of this case.  If it's published in a

22   pleading, it doesn't go to their defamation claims.  So what

23   is the relevance?  I think it's very inflammatory, as I

24   understand it.

25        THE COURT:  I don't know that inflammatory is an

UNITED STATES DISTRICT COURT

1    objection.  In fact, it's not.

2             Your response?

3             MR. MARKHAM:  My response is that one of the

4    allegations is that after the complaint was filed, Mr. Edalat

5    said certain things that we'll bring out through him about

6    threats of what he was going to do to the family, and this is

7    one of the first incantations.

8             It is not offered as a libel.  It is offered as a

9    fulfilling his promise which was made in very colorful

10   language to what he was going to do to Mr. Cahill and his

11   family.  His statement offered -- it is an 801(d)(2)(C) or

12   (D) statement of a party representative.  It's a statement in

13   his pleading.

14            THE COURT:  You said it's a statement, is his

15   pleading?

16            MR. MARKHAM:  The statement -- I'm sorry, Your

17   Honor.  The statement I'm about to read is in his pleading.

18            THE COURT:  In what particular pleading?

19            MR. MARKHAM:  In his complaint.

20            THE COURT:  Okay.  So he put this in his complaint?

21            MR. MARKHAM:  Yes, Your Honor, docket 44 for the

22   record, page 33.

23            THE COURT:  Is this listed on the list of exhibits?

24            MR. MARKHAM:  No.  It's a statement of the party

25   opponent.  And certainly they've had it since they filed it.

1          MR. KASHANI:  Well, wait a minute.  Wait a minute.

2     I object to that.  I did not file this document.  I

3     personally had nothing to do with this document.

4          MR. MARKHAM:  That's true, but that's not relevant.

5          THE COURT:  So you're representing to me that this

6     is a complaint that was filed by Mr. Edalat apparently from

7     an attorney other than his present attorney; correct?

8          MR. MARKHAM:  When that attorney was currently the

9     officer of the Court and the counsel of record and he was

10    speaking on behalf of Mr. Edalat, and it makes reference to

11    something that Edalat says he's informed about.  And I

12    believe it comes in under the citations that I stated.

13         THE COURT:  The objection is overruled.  It's

14    certainly not offered to prove the truth by the plaintiff.

15    BY MR. MARKHAM:

16    Q.   Now, I want to read something to you.  Edalat is

17    informed based upon belief that Kira Investments is the

18    vehicle through which plaintiff Cahill funnels money to his

19    daughter, Kira Cahill.  Plaintiff Cahill had previously made

20    statements in late 2015 to Edalat and others that his

21    daughter had blown through over $100,000 in less than three

22    months due to her Hollywood lifestyle.  Furthermore,

23    plaintiff Cahill had alluded to Cahill's ongoing narcotics

24    habit.

25         Now, again, did you ever have an ongoing narcotics

```
 1    habit?

 2    A.    Absolutely not.

 3    Q.    Have you ever done anything to Mr. Edalat?

 4    A.    No.

 5              MR. MARKHAM:  Nothing further, Your Honor.

 6              MR. KASHANI:  No questions for this witness.

 7              THE COURT:  Thank you.  You may step down.

 8              Next, where are we now?

 9              MR. MARKHAM:  We're back to Mr. Cullen.  I've got

10    nothing further for you, now that I think of it.

11         Greg Cullen, Plaintiffs' witness, previously sworn

12                        RECROSS-EXAMINATION

13    BY MR. KASHANI:

14    Q.    Mr. Cullen, you stated that you -- at the time of the

15    transfer of assets, did you advertise the assets to see if

16    you could find other buyers?

17    A.    Again, I was a buyer.  I was not a seller.  That might

18    be a good question for PharmaPak, whether they advertised

19    them.

20    Q.    Well, to your knowledge, sir, was any advertising done

21    to find other potential buyers of these assets?

22    A.    Not to my knowledge.

23    Q.    To your knowledge, sir, was, for example, a broker

24    engaged, a business broker, to try to sell the assets on the

25    open market?
```

```
 1    A.   Not to my knowledge.

 2    Q.   To your knowledge were competitors of PharmaPak

 3    contacted to see if they would buy out the assets?

 4    A.   I don't know the answer to that.

 5    Q.   So there was only ever one buyer and one seller, and the

 6    buyer was Life Tech; right?

 7    A.   The buyer was indeed Life Tech.

 8    Q.   Mr. Markham showed you some liens.  Were any of those

 9    liens on PharmaPak?

10    A.   I did not see any against PharmaPak.

11    Q.   Were any of those liens on Sentar Pharmaceuticals?

12    A.   Sentar was not named on those liens.

13    Q.   You have stated that at one point Mr. Edalat offered to

14    turn over his shares.  Do you recall that?

15    A.   In Sentar?

16    Q.   No.  In PharmaPak.

17    A.   Yes, I do recall that.

18    Q.   Now, there's a mechanism to turn over shares.  You turn

19    over the certificate and sign it; right?

20    A.   Yes.  That would happen in the ordinary course of events

21    eventually, yes.

22    Q.   Did that ever happen?

23    A.   It did not happen.

24    Q.   When Mr. Edalat, as you say -- well, withdrawn.

25         When you claimed that Mr. Edalat made the offer to
```

```
 1   just turn over his shares, did someone put a piece of paper
 2   in front of him and say:  Fine, let's resolve this right now.
 3   Let's get it told.  Just sign this.  You'll turn over the
 4   shares and we'll move on?
 5   A.   Nobody came -- actually nobody was prepared for that
 6   response, to be honest.
 7   Q.   Well, everyone has an iPhone, right, or some kind of
 8   phone?
 9   A.   Yes.
10   Q.   Did anyone ask him, okay, just send us a text message.
11   You're going to give us your shares and then you leave the
12   room.  We'll divide them up and we'll tell you what the deal
13   is?
14   A.   Well, nobody showed up with share certificates to that
15   meeting, sir.
16   Q.   They showed up with phones?
17   A.   Yes.
18   Q.   Okay.  Did anyone ask Mr. Edalat at this meeting:  Okay.
19   We want a record.  You made a generous offer.  Send us a text
20   that you're going to give us the shares, and then we'll
21   divide them up and we'll be done?
22   A.   No.  His response was:  Ron, you're a fair guy.  Figure
23   out how to divide it up.  And then my recollection is he
24   threw up his arms and left.
25             MR. KASHANI:  Move to strike as nonresponsive.
```

 1    BY MR. KASHANI:

 2    Q.   Did anyone ask Mr. Edalat to just send a text saying:

 3    Give us the shares.  We'll divide them up and we'll be done,

 4    and then you have a record?

 5              THE COURT:  Apparently you didn't want a ruling on

 6    your motion.  There's a question pending.

 7    BY MR. KASHANI:

 8    Q.   Let me rephrase.  Do you have any written record of any

 9    kind of this supposed offer by Mr. Edalat to just turn over

10    his shares and walk away?

11    A.   I do not.

12    Q.   All right.  Thank you, sir.

13              MR. KASHANI:  No further questions.

14              MR. MARKHAM:  One question.

15                  **FURTHER REDIRECT EXAMINATION**

16    BY MR. MARKHAM:

17    Q.   Did he ever to your knowledge pay in any money when you

18    asked people to pay in money to keep the company going?

19              MR. KASHANI:  That's asked and answered and outside

20    the scope of my examination.

21              THE COURT:  Overruled.

22              THE WITNESS:  He did not.

23              MR. MARKHAM:  Nothing further, Your Honor.

24              MR. KASHANI:  I'm done.

25              THE COURT:  All right.

1          You may step down.

2          Plaintiff will call its next witness.

3          MR. MARKHAM:  Yes.  Mrs. Karen Cahill.

4          **Karen Cahill, Plaintiff's witness, sworn**

5          THE CLERK:  If you wil please state and spell your

6    first and last name.

7          THE WITNESS:  Karen, K-a-r-e-n.  Last name, Cahill,

8    C-a-h-i-l-l.

9          THE COURT:  How long do you anticipate with this

10   witness?

11         MR. MARKHAM:  I'll be about maybe five minutes, six

12   minutes.

13         THE COURT:  Go ahead.

14                    **DIRECT EXAMINATION**

15   BY MR. MARKHAM:

16   Q.   Good afternoon, Mrs. Cahill.

17   A.   Good afternoon, Mr. Markham.

18   Q.   Where do you live?

19   A.   I live in Laguna Beach, 1330 Moorea Way.

20   Q.   Are you married?

21   A.   Yes.

22   Q.   Who are you married -- to whom are you married?

23   A.   Bruce Cahill.

24   Q.   How long have you been married?

25   A.   29 years.

```
 1   Q.    Okay.  Do you have any children?

 2   A.    Yes.  Two.

 3   Q.    Who?

 4   A.    Kira Cahill, who is 26, and our son Brent Cahill, who is

 5   20.

 6   Q.    What is your occupation?

 7   A.    I choreograph musical theater at a small school in San

 8   Juan Capistrano called St. Margaret's Episcopal School.

 9   Q.    And before that -- how long have you been doing that?

10   A.    Whoa.  16 years.

11   Q.    And before that what did you do?

12   A.    I was both a performer in a show called Holiday on Ice

13   Europe --

14   Q.    Is that a skating --

15   A.    It is.  Then for ten years I choreographed a skating

16   show called Ice Capades.

17   Q.    You were a skater?

18   A.    Yes.

19   Q.    Ever get close to the Olympics?

20   A.    Close.  Almost.  In 1971, if I get my years right, I was

21   in the top three in Canada.  And then in 1972, which would

22   have been the Olympic year, I was plagued with horrible

23   injuries, which is why I tell my students to stay in school.

24   Q.    All right.  Now, do you and Mr. Cahill live in a large

25   house?
```

1    A.    Yes, we do.

2    Q.    Just generally describe the house to the jury, please.

3    A.    There's about seven bathrooms -- I'm sorry.  I mean

4    seven bedrooms and probably ten bathrooms or so.  It's up on

5    a hill.  It's a gorgeous place.

6    Q.    And does it have a lot of places -- living rooms dining

7    rooms, patios, and lawns for the purposes of --

8    A.    It has a living room.  Oh, go ahead.  I'm sorry.

9    Q.    -- for the purposes of holding meetings and having

10   gatherings?

11   A.    The story actually is that we gave a wish list to our

12   architect.  When he came back with the plans which he took

13   forever to do, it was too large, but we decided that we

14   didn't want to wait another eight months to get drawings.  So

15   we decided if we were going to build it, we were going to use

16   it for charity.

17   Q.    And have you used that building for charity?

18   A.    Multiple times a year.

19   Q.    For how many years?

20   A.    The entire time we've been there, really.

21   Q.    And that's how many years?

22   A.    I think we moved in in 1996.

23   Q.    All right.

24   A.    I'm not remembering that exactly, but it's somewhere in

25   there.

1    Q.   And what -- tell the jury what charities you help and

2    how you help those charities using that big space.

3    A.   Okay.  So we host --

4             MR. KASHANI:  Your Honor, excuse me.  I have a 403

5    objection and relevance objection to this.  I mean, we've

6    heard about --

7             THE COURT:  Just a moment.

8             Yes.  How is this relevant and worthy of the time?

9             MR. MARKHAM:  Five minutes.  And it's worthy of the

10   time I believe because there is a defamation claim here.  The

11   work that Mr. Cahill does as she's going to describe it in

12   the next three minutes, interacting with the people to raise

13   money for charities, is impacted by the denigration that has

14   occurred.

15            THE COURT:  The objection is overruled.

16            THE WITNESS:  All right.  So our largest is called

17   Sea Change, and it's for a group called Oceana, which is --

18            MR. MARKHAM:  Excuse me.  I don't mean to

19   interrupt.

20            I should have said threatened, not denigrated, Your

21   Honor.  I apologize.

22   BY MR. MARKHAM:

23   Q.   Go ahead.

24   A.   -- which is the world's largest oceans conservancy

25   group.  They understand that 75 percent of the world lives

1     off the ocean.  If those oceans are damaged, those people

2     can't survive.  So that's our largest, and it's substantial.

3     It's about 380 to 400 people.  We just did it two weeks ago.

4     Q.   And how is it that you do it, and how does it make

5     money?

6     A.   Okay.  So it makes money through two ways -- ticket

7     sales, and we are blessed to have donations from South Coast

8     Plaza primarily giving us auction items.  So I think over the

9     past maybe ten years, we've raised $13 million for the ocean.

10    Q.   And there are other charities.  I won't detail them, but

11    are there other charities where you do similar work?

12    A.   Yes.

13    Q.   What is Mr. Cahill's visible role --

14    A.   Oh, he's the supreme --

15    Q.   -- in connection with these charities and the charity

16    events?

17    A.   He's the supreme host.  I mean, he's just incredible

18    with the guests and totally supports the causes.  And it's --

19    it's great team work actually.

20    Q.   And how is it that his name and reputation impact on how

21    these people are treated and whether they come to the charity

22    event?

23    A.   I think that if it was -- if his reputation is damaged,

24    these people probably are not going to want to come and

25    donate to causes that we support and come to our home.

```
 1              MR. KASHANI:  Object and move to strike as
 2    nonresponsive, and speculation.
 3              THE COURT:  Overruled.
 4    BY MR. MARKHAM:
 5    Q.   Have you seen the posts of Ms. Karpinski?
 6    A.   Of course.
 7    Q.   Have you seen the post where she says that Mr. Cahill
 8    sexually assaulted her?
 9    A.   Of course.
10    Q.   Have you seen the post of Mr. Edalat where he puts up a
11    picture of Bernie Madoff and a picture of Mr. Cahill right
12    next to him and calls Mr. Cahill the Bernie Madoff of the
13    West Coast?
14    A.   I have.
15    Q.   Have you seen the post where it indicates with him in
16    his UC Irvine cap and gown on with allegations of sexual
17    harassment and misconduct?
18    A.   I have.
19    Q.   In your experience as somebody doing charity for a long
20    time, are those public pronouncements impactful on somebody's
21    ability to induce rich folks to come over and give to a
22    charity like Oceana?
23    A.   Of course.
24              MR. KASHANI:  Foundation.
25              MR. MARKHAM:  What?
```

```
 1              MR. KASHANI:  Foundation objection.

 2              THE COURT:  Just a moment.

 3              MR. KASHANI:  And speculation.

 4              THE COURT:  Well, the better objection might be

 5      calls for opinion testimony, but it is based on her

 6      experience and therefore I think suitable as a percipient

 7      witness with this witness's experience.

 8              Overruled.

 9      BY MR. MARKHAM:

10      Q.  What's your answer?

11      A.  Yes.

12      Q.  Have you observed your husband's reaction to these posts

13      as they started coming in last year?  Yes or no?

14      A.  I think he was appalled.

15      Q.  All right.  Did he have any --

16              MR. KASHANI:  Your Honor, could I ask about the

17      timing?  I don't want to be the one to keep this jury past

18      1:30.

19              MR. MARKHAM:  You know what?  I'll stop it right

20      now.  We can come back next week.

21              THE COURT:  Well, let me ask.

22              How much do you anticipate?

23              MR. KASHANI:  Very brief.

24              THE COURT:  I need a number.

25              MR. KASHANI:  Less than five minutes if Mr. Markham
```

```
 1    finishes now.
 2              THE COURT:  Are you concluded?
 3              MR. MARKHAM:  I'm not, and I do not believe this
 4    witness who is in our regular order has any problem coming
 5    back next Tuesday so that the jury can leave at their regular
 6    time.
 7              THE COURT:  It's your call.  What would you like to
 8    do?
 9              MR. MARKHAM:  I'd like to keep going.  And then
10    if --
11              THE COURT:  You have one more minute, then.
12              MR. MARKHAM:  Beg your pardon?
13              THE COURT:  You have one more minute.
14              MR. MARKHAM:  Okay.
15    BY MR. MARKHAM:
16    Q.   Have you seen any reaction from him other than being
17    appalled at being posted as someone who sexually assaulted,
18    sexually harassed?
19    A.   You know, I think that he was, like I said, appalled.
20    But I think also when your integrity is threatened by
21    someone, it's -- you have to be very secure within yourself
22    as who you are as a human being to not let that totally
23    destroy you.
24              He knows that he has 100 percent of his family, his
25    children, his business associates, everyone on the UCI board,
```

```
 1   the Rose-Hulman Institute of Technology board.  I think he
 2   knows he has many, many good, upstanding people behind him.
 3   And I think that's helpful.
 4   Q.   Are you very -- are you close to your daughter?
 5   A.   Very.
 6   Q.   Do you know whether or not she has ever had a narcotics
 7   habit?
 8   A.   Never.
 9           THE COURT:  Hold on.  That means she doesn't know.
10           MR. MARKHAM:  You're right.
11   BY MR. MARKHAM:
12   Q.   Are you aware -- well, do you know whether or not she
13   has a drug habit, yes or no, narcotics habit?  Do you know?
14   A.   I know she does not.
15           MR. MARKHAM:  All right.  I have nothing further.
16           THE COURT:  All right.  Tell me how much time
17   you'll need.
18           MR. KASHANI:  With those extra questions, it's 10
19   or 15 minutes now.
20           THE COURT:  Okay.  It's 10 or 15 minutes?
21           MR. KASHANI:  Yes.  Again, I don't want to be
22   responsible for keeping this jury past 1:30.
23           MR. MARKHAM:  She can come back on Tuesday.
24           THE COURT:  All right.  There we have it.
25           Thank you, and we'll need to see you, then, on
```

1    Tuesday at 9:00.

2              And we'll be ending this case next week.  Remember,

3    don't research the case.  Don't discuss the case.  Keep an

4    open mind.  We'll see you Tuesday, not Monday.  You can come

5    in on Monday and watch us do law and motion, but you probably

6    don't want to.  I wouldn't recommend it.

7              So we'll see you Tuesday at 9:00.  Thank you.

8              THE CLERK:  All rise.

9              (Open court - jury not present)

10             THE COURT:  Okay.  So you may step down, ma'am.

11             THE WITNESS:  Thank you.

12             THE COURT:  I don't have a two-minute warning.  I

13   have a two-day warning.  We told this jury this would be

14   completed on Wednesday.  Frankly, our timing might spill over

15   into Thursday, particularly given some of the issues that

16   remain unresolved on things like jury instructions.

17             You all may be seated if you wish.  I would ask for

18   you to e-mail me as soon as you know where you're standing on

19   jury instructions.  I'm looking for a card and I'm not

20   finding one.

21             Here's what I'm going to do, then.  I'm going to

22   send plaintiff's counsel my address with the order that had

23   you send it to everyone, even -- send to everyone just so

24   everyone has got the same thing.

25             What is your address?

220

```
 1                    MR. MARKHAM:  Both counsel.  It's
 2       jmarkham@markhamread.com.  Markhamread is one word.
 3                    THE COURT:  Okay.  Jmarkham@markhamread.com.
 4                    MR. MARKHAM:  R-e-a-d.
 5                    THE COURT:  All right.  So by receiving this,
 6       you'll have my address.  And regardless of what you do,
 7       before the end of today just send that to them so it's not a
 8       one-sided ex-parte communication.  Okay?
 9                    MR. MARKHAM:  Of course.
10                    THE COURT:  Then you'll both have my address.  The
11       purpose for giving this to you is for both of you to let me
12       know where we stand on the jury instructions.
13                    Now, I've given the two-day warning.  I have after
14       suitable adjustments the plaintiff at 10:45, 10 hours 45
15       minutes; the defense at 9 hours 35 minutes.
16                    Boy, I must say, Mr. Cullen was an interesting
17       witness, but you've got some others on there and you've got
18       some others on there.  I would have allocated it differently
19       than all the time we spent back and forth and back and forth
20       on Cullen when we don't have yet Mr. Edalat or Mr. Cahill or
21       Ms. Karpinski.  But it's your call.
22                    MR. MARKHAM:  Yes, Your Honor.
23                    THE COURT:  I think you might have allocated that
24       time differently.
25                    Any further questions?
```

```
 1              MR. KASHANI:  Your Honor, this is something that
 2   we -- first of all, our count doesn't quite match, but that's
 3   not my main question.
 4              THE COURT:  Let me explain.
 5              MR. KASHANI:  That's not my main question.
 6              THE COURT:  Have you included the time for jury
 7   selection?
 8              MR. KASHANI:  I don't think so.  Your Honor, that
 9   wasn't my main question.  I'm not concerned about the count.
10              THE COURT:  I'm telling you as I've told you before
11   when I last gave you the time and as my notice says, we've
12   told the jury Wednesday.  I need Wednesday for the jury to
13   begin its deliberations.
14              I could give you all the reasons why that's the
15   case.  I give you an extra day.  I did not -- we need to end
16   by Wednesday, and these times are not going to get us to
17   Wednesday.  The allocation includes things like video,
18   objections, cases that we then have to review at length.  It
19   includes the jury selection.  So that may be why we don't
20   line up.
21              What's your point?
22              MR. KASHANI:  My question was not -- I'm not
23   challenging -- I've discussed this with my colleague, which
24   is hours versus days.  The question very briefly put is if
25   there are hours left but not days, which controls?
```

```
 1              THE COURT:  I'm not sure what that means.
 2              By the way, the time still leaves you both with an
 3    hour for closing argument, just so you're aware of that.
 4    It's all in the orders.  I've sent it out over and over.
 5              MR. MARKHAM:  When you say those numbers, they're
 6    daunting.  I had forgotten momentarily.
 7              THE COURT:  Okay.  I suggest you read orders sent
 8    out by the Court.  If we need to spill over into Thursday, as
 9    is looking likely, we'll spill over into Thursday.
10              MR. KASHANI:  That answers my question.  That was
11    only my question.  Again, it's something we discussed.
12              MR. MARKHAM:  Can we send you our view on whether
13    or not there are any shortening of the jury instructions?
14    Would you like, if we have it -- of course, assuming I send
15    it to opposing counsel -- a copy of the transcript of the
16    tape recording that we're going to be playing on Tuesday of
17    Amir Asvadi?  We will have a transcript.  I don't know
18    whether you'd get to it over the weekend if we could make it
19    available.  Or do you want to wait until you hear -- I guess
20    maybe until you get objections?
21              THE COURT:  I really don't want to be reading that
22    until you tell me that I need to make rulings.  I certainly
23    wouldn't want to read it without knowing what rulings I need
24    to make.
25              MR. MARKHAM:  Very well.
```

1          THE COURT:  I suggest you send me the transcript as

2    soon as you can with instructions on what rulings I need to

3    make on that.  Okay?

4          MR. MARKHAM:  Mr. Kashani will be the one to do

5    that, because I'm going to send it to him this afternoon.  He

6    can let you know what, if anything --

7          THE COURT:  I would appreciate it if you could send

8    it to me with that information so I can keep the trial moving

9    along.

10          Anything else.

11          MR. MARKHAM:  Not from plaintiffs.

12          THE COURT:  All right, then.  Have a nice weekend.

13          MR. KASHANI:  We resume at 9:00 on Tuesday, Your

14    Honor?

15          THE COURT:  Yes.

16          MR. KASHANI:  That's always the last question I

17    have at the end of the day.

18          THE COURT:  There we go.

19          MR. KASHANI:  Thank you.

20              (Proceedings adjourned at 1:38 p.m.)

21

22

23

24

25

```
1                          CERTIFICATE

2    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

4    THE ABOVE MATTER.

5    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

6    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

8

9    /s/ Miriam V. Baird            08/01/2017

10   MIRIAM V. BAIRD                       DATE
     OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```